1 Steve Wilson Briggs
2 4322 Chico Ave.,
 Santa Rosa, CA 95407
3 510 200 3763
 snc.steve@gmail.com
4 PLAINTIFF, In Propria Persona
5
6
7
8 **UNITED STATES DISTRICT COURT,**
9 **NORTHERN DISTRICT OF CALIFORNIA,**
10 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 11 STEVE WILSON BRIGGS, | Civ No: 20-CV-1596-WHO |
| 12 Plaintiff, | PLAINTIFF'S OPPOSITION TO |
| 13 vs | DEFENDANT INTERNET ARCHIVE'S MOTION TO DISMISS COMPLAINT |
| 14 JAMES CAMERON et al, | |
| 15 Defendants. | |

16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

June 26, 2020, Defendant **Internet Archive** submitted a Rule 12(b)(6) Motion To Dismiss (**MTD**) Complaint. Like the other MTDs recently submitted by the other Defendants (**Defs**), Internet Archive (**IA**) failed to cite the Ninth Circuit's prevailing new copyright order, enterterd on March 9, 2020, by an 11 judge panel: ***Skidmore v Led Zeppelin,*** 16-56057. Failing to contemplate *Skidmore v Led Zeppelin* dooms the Internet Archive's *Infringement* argument (argument #1), because *Skidmore* resets the Ninth's definition of "access" and "substantial similarity," and proclaims the Ninth's intent to treat all litigants equally, and end any preference for "better-funded rights holders."

The MTD's central arguments and "above-the-law" tenor, capture the essence of the Defendant's corrupt mentality, and capture the heart of an ethical decay that threatens to destroy America's station in the world, frighteningly soon, if US corporations are allowed to engage in unthinkable deceit (even international criminal internet fraud, as in this case), then receive US court protection and the mere utterance of *Twombly* and *Iqbal*. The idea that a defendant (like Internet Archive) might appeal for a dismissal **because a plaintiff revealed too many facts about the corporation's corrupt actions**, is as un-American as it is nauseating, and threatens to push the US into the ranks of the world's reviled kleptocracies.

America earned its station as a beacon to innovation because of three things:

1. because the Constitution promised reasonable liberties and protections;
2. because our Government creatively monetize dormant assets;
3. because of an international belief that US courts and policy held US business to a higher standard.

In the years since *Twonbly* and *Iqbal*, America's station in the world has declined. Given that the Def's actions are such betrayals of trust and decency, Plaintiff believes that if the Court allows the Defendant (**Def**) to be dismissed, or allows *any* of the corporate Defendants to be dismissed, the consequences will resound.

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **LEGAL STANDARD:** |
| 2 | DISMISSAL |
| 3 | ● FRCP 12(b)(6) instructs the court must "accept factual allegations in the |
| 4 | complaint as true and construe the pleadings in the light most favorable to the |
| 5 | nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d |
| 6 | 1025, 1031 (9th Cir. 2008). |
| 7 | ● The court must: "read the complaint generously and draw all reasonable |
| 8 | inferences in favor of the plaintiff." *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th |
| 9 | Cir. 2005). |
| 10 | ● If motion to dismiss is granted, a court should grant leave to amend unless it |
| 11 | determines the pleading could not possibly be cured by allegations of other |
| 12 | facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th |
| 13 | Cir. 1990). |
| 14 | STATING THE CLAIMS |
| 15 | ● Understanding that some cases are more complicated, and involve many |
| 16 | parties, many charges, and many moving parts, there is no maximum or |
| 17 | minimum length limit for a Complaint. But the <u>Fed. R. Civ. P. 8(a)(2)</u> does, at a |
| 18 | minimum require: "a short and plain statement of the claim[s] showing that the |
| 19 | pleader is entitled to relief". |
| 20 | ● In 1957, <u>*Conley v. Gibson*, 355 U.S. 41 (1957)</u> established the current standard |
| 21 | stating: "a complaint should not be dismissed for failure to state a claim unless |
| 22 | it appears beyond doubt that the plaintiff can prove no set of facts in support of |
| 23 | his claim which would entitle him to relief" |
| 24 | ● <u>Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)</u> modified Conley v. |
| 25 | Gibson, as Twombly specified that a complaint need not contain detailed |
| 26 | factual allegations, but only allege "enough facts to state a claim to relief that is |
| 27 | plausible on its face." |
| 28 | |

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

# I.  PLAINTIFF'S OPPOSITION TO INTERNET ARCHIVE'S
## MOTION TO DISMISS ARGUMENTS

1. <u>PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET ARCHIVE'S FIRST ARGUMENT</u> that **"Plaintiff Fails to State a Claim for Contributory Infringement Against IA"**

   The Defendant's argument is mistaken on at least two bases:

   1. The Defendant's argument misinforms the Court that there are three (3) elements of "Contributory Copyright Infringement" claim, when, in fact, <u>there are only two (2) elements Contributory Infringement</u>.

   2. The Def Internet Archive (**IA**)  supports their false argument by citing an untested California <u>district court</u> citation (Napster, Inc. Copyright Litig., 377 F. Supp. 2d 796, 801 (N.D. Cal. 2005). (See MTD, page 10, line 7.)

   - There is no requirement to show "direct infringement" by a third party.

   Since IP defense attorneys have convoluted this issue over the years, rather than citing a case (which the Defense will counter with a conflicting citation), the Plaintiff turned to the highest authority on the matter: The US Copyright Office.

   The US Copyright Office explains Contributory Copyright Infringement in the "**Statement of Marybeth Peters**, The Register of Copyrights, before the Committee on the Judiciary, United States Senate, 108th Congress, 2d Session, July 22, 2004, in the ***Intentional Inducement of Copyright Infringements Act* of 2004**. Located online at: https://www.copyright.gov/docs/regstat072204.html,   and   attached   as   **EXHIBIT   A**. The statement explains *Contributory Copyright Infringement* as follows:

   > "There is another form of secondary liability in copyright law, "contributory infringement," which stretches back to 1911. As the Second Circuit Court of Appeals has explained, contributory infringement occurs where "[o]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another."[4] In general, the two elements of contributory infringement are **(1) knowledge of the infringing activity**; and **(2) material contribution to the activity."**

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

1    The Defendant's argument dies here because, both,  the Defendant's citation, and

2  conclusion (that there are **3** elements of  Contributory Infringement) are wrong.

3    The Defendant's false argument had two misleading goals:

4  1.  to suggest that the Plaintiff must show "direct infringement" (verbatim copying);

5  2.  to suggest that the Plaintiff failed to show that IA knew about the other Defendants'

6      Infringement (a mistaken argument, that laterally expects the Court to ignore that IA

7      also committed criminal internet fraud in furtherance of the Defendants' plan).

8    Toward the first mistaken premise (above): the Plaintiff **did** show "infringement,"

9  via substantial similarity. Showing "direct infringement" is not a requirement. It is only

10  necessary to show "knowledge of the infringing activity."

11    Toward the second mistaken premise (above): IA's argument falsely implies that the

12  Plaintiff did not show that IA **knew** about the other Defs' Infringement. This is false.

13  The Complaint explains that with **knowledge** of the other Defendants's actions, the IA

14  materially  contributed  to  the  infringement  by (1) producing  fraudulent  web  crawls,

15  (2) producing  a  web  page  redirection  system, (3) producing  secret  website  subfolders,

16  (4) coordinating with Google LLC about where the subfolders are located. The Plaintiff then

17  realleges  these  facts  and  acts  into  his  Claims  For  Relief, where, under *Contributory*

18  *Copyright Infringement*, on paragraphs 620, 621, and 622, the Plaintiff wrote:

19    620.  Defs Google LLC and Internet Archives **materially contributed** to the
       infringing acts of the other Defendants, by helping the infringers gain access
20     to Plaintiff's work, and preventing the Plaintiff from learning the truth about
       the infringement by sending Plaintiff fraudulent URL readings, and likely by
21     preventing Plaintiff from seeing and reading other or prior fraudulent articles
       that the Defendants produced for their infringing film, Avatar.
22

23    621.  Although Defs Google LLC and Internet Archives did not directly
       engage in the actual infringement of the Plaintiff's work, Google LLC and
24     Internet  Archive  had **clear knowledge** of  the  infringing  Defendants'
       infringement of Plaintiff's work.
25
26    622.  The acts and conduct of Defs Google LLC and Internet Archive
       constitute contributory copyright infringement.

27

28    As the Court can see, the required elements are present in the allegation.

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

1        Given that IA's argument cited a 15 year old district order (*Napster, Inc.*), the Def

2    may have hoped to mislead the Court that somehow the Plaintiff's claims were not properly

3    pled under **California** law. But Contributory Infringement arises under <u>federal</u> *Infringemen*t

4    law; thus, California does not have a pleading requirement for Contributory Infringement.

5    The federal government just requires that both elements are present in the claim.

6        The Def's argument is also false because it tacitly suggests that if the Plaintiff

7    alleges Contributory Infringement, he must  produce audio or video footage of Brewster

8    Kahle (Internet Archive's founder and Chairman) at a meeting with the other Defendants,

9    evilly wringing his hands as he asks how he can assist the other Defs in their effort to

10   infringe the Plaintiff's property. The Defendant's argument states:

11       "Plaintiff's contributory infringement claim fails because <u>he has alleged no</u>
         <u>facts **showing** that IA had knowledge of any infringing activity</u> involving
12       Plaintiff's Butterfly Driver script."

13

14       The Defendant's implied audio or video confession standard does not exist. The

15   standard of "knowledge," where a confession does not exist, is *constructive knowledge*:

16   1.  ***Constructive Knowledge***: knowledge that a person is deemed to have of facts that he

17       would have discovered had he made the usual and proper **inquiries**.

18       With this understanding of "constructive knowledge," the Complaint alleged facts

19   showing that IA assisted the Defs' Infringement, by committing the following acts:

20   1.  IA produced thousands of fraudulent crawls of web pages that did not exist;

21   2.  IA created an elaborate "redirecting" technology that sent users to falsified web

22       pages if they tried to access certain inexistent and/or fraudulent web page crawls;

23   3.  IA created countless subfolder web-address locations, and placed fake crawls of the

24       Defendants' fake websites and fake articles in these subfolders.

25   4.  IA coordinated with Def Google LLC to create a system by which browsers would

26       display an incorrect URL reading in the address bar when IA site visitors attempted

27       to visit the fraudulent page crawls. To make this work, IA had to inform Google LLC

28       where the fraudulent web pages were located.

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

1       Given that IA is a trusted source for verifying web documents (the US Patent Office

2 began accepting IA date stamps to establish prior art in 2002), US courts, or any reasonable

3 person—including the Plaintiff—would reasonably assume that the Internet Archive would

4 never produce falsified web crawls, for anyone. Thus, once the Plaintiff discovered that the

5 Internet Archive was producing fake crawls for the Defendants, it follows, logically, that:

6    1. either, IA was <u>knowingly</u> engaged with the other Defendants' in the Infringement; or

7    2. IA did not make reasonable or proper inquiries as to why the other Defs (News

8       Corporation, Twentieth Century Fox) would ask IA to: (1) produce fraudulent web

9       crawls, (2) produce a web page redirection system, (3) produce secret website

10       subfolders, (4) coordinate with Google LLC about where the subfolders are located.

11       (Away from these facts, the IA's production of thousands of fraudulent web pages is,

12       in itself, a criminal act, plainly executed to assist the Defendants unlawful activities.)

13       **Thus, the Defendant's argument is further proven false and defeated.**

14    ● Also, this false argument (which suggests the Complaint should have also included

15       1. a definition of "constructive knowledge", 2. a definition of "Contributory

16       Copyright Infringement", and 3. a thesis on how the IA could have known about the

17       other Defs' Infringement) is in direct conflict with the Def's third argument—that

18       the Complaint is too long and confusing and alleges too many unnecessary facts.

19

20   **2.**  <u>PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET ARCHIVE'S</u>

21      <u>SECOND ARGUMENT</u> that **"Plaintiff Fails to State a Claim of Intentional**

22      **Misrepresentation Against IA"**

23       This argument <u>is valid</u> to some extent. Although, in the body of his Complaint, the

24 Plaintiff alleged all of the pleading requirements for an *Intentional Misrepresentations* claim

25 against Internet Archive, and although the Plaintiff realleges these facts in his claim for

26 *Intentional Misrepresentations*, under his *Claims For Relief*, the Plaintiff did not, however,

27 specifically and briefly review the major unlawful actions that Internet Archive took. All the

28 Plaintiff specifically stated in his *Intentional Misrepresentations Claim for Relief* against

1  Internet Archive is (Comp ¶ 641):

2   "It is impossible to know when the article was actually published because it
3   is falsified and the Defs used the **Internet Archive** to produce fraudulent
    crawls of the article."

4

5  However, given that Internet Archive is named in the heading of the Plaintiff's

6  Intentional Misrepresentations claim, and given that all the facts and allegations made in the

7  Complaint against Internet Archive were also realleged under the heading of the Plaintiff's

8  Claim For Relief of *Intentional Misrepresentations*, it is therefore reasonable for the

9  Plaintiff to hope the Court might liberally construe Plaintiff's intent and claim.

10  However, if the Court cannot see or infer a valid claim, as the claim is currently

11  presented, the Plaintiff respectfully requests leave to amend his Complaint, to properly

12  allege *Intentional Misrepresentations*, against Internet Archive. This will only require

13  modifying and/or adding a few paragraphs under the *Claims For Relief*.

14

15  **3.**  PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET ARCHIVE'S THIRD

16  ARGUMENT that **"The Complaint Violates Federal Rules of Civil Procedure**

17  **8(a) and 12(b)(6)"**

18  This argument is baseless for at least two reasons.

19  First, logically, the Defendant's third argument (which claims the Complaint is too

20  long and confusing and alleges too many unnecessary facts) is in direct conflict with the

21  Defendant's first argument—which claims that the *Contributory Infringement* claims should

22  have included more facts, including: (1) a definition of "constructive knowledge",

23  (2) a definition of "Contributory Copyright Infringement", and (3) a theory on how the IA

24  could have known about the other Defendants' unlawful Infringement (as if publishing

25  thousands of fraudulent web documents for the Defendants' plan was insufficient evidence).

26  Both arguments should not exist in the same MTD.

27  Secondly, the Defendant's argument seems intent to mislead the Court that two

28  requirements of law are in conflict, when no actual conflict exists.

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

1    Bothe Federal Rule 8(a) and California CCP § 438 require that a complaint **state facts**

2    **sufficient to constitute a cause of action."** This requirement has been part of California

3    law for almost **150 years**, and part of federal law for untold generations. Plaintiff

4    meticulously endeavored to meet this demand.

5    However, in ***Bell Atlantic Corp. v. Twombly***, 550 U.S. 544 (**2007**), in an effort to

6    reduce frivolous lawsuits, the Supreme Court ruled that a complaint must make "a short and

7    plain statement of the claim showing that the pleader is entitled to relief." But,

8    understanding that this new requirement was subordinate to the long established

9    requirement to "state facts sufficient to constitute a cause of action," the Supreme Court

10   ordered that complaints must still include "sufficient factual matter, accepted as true, to

11   "state a claim to relief that is plausible on its face." LexisNexis addresses this as follows:

12   "Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short
     and plain statement of the claim showing that the pleader is entitled to relief."
13   "[D]etailed factual allegations" are not required, Twombly, 550 U.S., at 555, 127 S.
14   Ct. 1955, 167 L. Ed. 2d 929, **but the Rule does call for sufficient factual matter,**
     **accepted as true, to "state a claim to relief that is plausible on its face**."
15

16   Beyond the need to "state facts sufficient to constitute a cause of action," each of

17   Plaintiff's Causes has **specific** elemental pleading requirements (for example, *Copyright*

18   *Infringement* requires some comparative analysis to show substantial similarity, and the

19   elements of Fraud must be demonstrated with "particularity").

20   Further, in a complex case, such as this, with many defendants who have hatched an

21   array of schemes (e.g., falsifying web pages, producing fraudulent web articles and fake

22   stories, hacking, backdating documents, using Chrome browser to make falsified web

23   documents appear valid…) it is impossible to submit a brief Complaint.

24   Plaintiff's Complaint meets the pleading requirements of each Cause of Action, and

25   meets the Federal and State requirement to **"state facts sufficient to constitute a cause of**

26   **action,"** and it meets both Rule 8(a)(2) requirements of (1) **"a short and plain statement of**

27   **the claim showing that the pleader is entitled to relief",** and (2) to **"state a claim to**

28   **relief that is plausible on its face."**

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

**4.**   PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET ARCHIVE'S

FOURTH ARGUMENT that **"Plaintiff's Claims Involve Conduct Protected by**

**the Communications Decency Act (CDA) Section 230."**

47 USC § 230 is often referred to as the Communications Decency Act (**CDA**).

The Defendant's citation of the CDA is audacious, false and improper for two reasons:

1. The Communications Decency Act applies only to actions that are executed in **good**

   **faith**. (Internet Archive did not produce thousands of fraudulent web pages, etc,

   **in good faith**); AND

2. the CDA does not apply to criminal, **intellectual property**, state, or privacy law.

   (Perhaps the Defense Counsel was not aware that *Copyright Infringement* is

   intellectual property action.)

   To assure the Court that the CDA does not apply to providers, like IA, who do not

act in good faith, the text of the CDA (47 USC § 230**(c)(2)(A) & (B)**) is provided below:

**(2)    Civil liability:** No provider or user of an interactive computer service shall
be held liable on account of—

**(A)**  any action voluntarily taken in **good faith** to restrict access to or
availability of material that the provider or user considers to be obscene,
lewd, lascivious, filthy, excessively violent, harassing, or otherwise
objectionable, whether or not such material is constitutionally protected; or

**(B)**  any action taken to enable or make available to information content
providers or others the technical means to restrict access to material
described in paragraph (1).

   To assure the Court that the CDA does not apply  to intellectual property cases, the text

of the CDA (47 U.S. Code § 230 **(e)(2)**) is provided below:

**(2) No effect on intellectual property law:**

Nothing in this section shall be construed to limit or expand any law
pertaining to intellectual property.

   As the Court can see, nothing about the CDA applies to this matter, as the CDA is not

intended to supersede intellectual property law, and is only applicable when providers act in

good faith.

| | |
|---|---|
| 1 | SUMMATION |
| 2 | The Intent & Spirit Of *Skidmore v Led Zeppelin* |
| 3 | In *Skidmore v Led Zeppelin* the Ninth seemed to announce a more egalitarian view of |
| 4 | copyright law, consistent with our Founding Fathers' vision of US copyright law. |
| 5 | Specifically, the Ninth said, **"[N]othing in copyright law suggests that a work deserves** |
| 6 | **stronger legal protection simply because it is more popular or owned by better-funded** |
| 7 | **rights holders."** |
| 8 | Although the Plaintiff is glad that this sentiment is now codified in Ninth Circuit |
| 9 | copyright law, he believes the statement was intended **with teeth**. The IA submitted an |
| 10 | MTD with one reasonable argument (#2), and three wholly invalid arguments; seemingly |
| 11 | only added to create *busy work* for the Plaintiff. Mindful that the IA's Counsel is a |
| 12 | professional attorney who understands the importance of the Court's time, the Plaintiff |
| 13 | hopes the Court shows the Defense Counsel no more patience than it would show the |
| 14 | Plaintiff, had he submitted a motion with so many baseless claims. |
| 15 | **CONCLUSION** |
| 16 | For the foregoing reasons, and because there is *good cause* to hold the Defendant to |
| 17 | account for the production and publication of thousands of fraudulent web pages, the |
| 18 | Plaintiff respectfully requests that the Court deny Defendant Internet Archive's *Motion To* |
| 19 | *Dismiss Complaint*. (Further, regarding Internet Archive 's argument #2, if the Court cannot |
| 20 | liberally construe the Plaintiff's *Intentional Misrepresentation* claim against IA, the Plaintiff |
| 21 | respectfully requests leave of the Court to amend the Complaint and correct the allegation |
| 22 | for the claim of *Intentional Misrepresentations*, as this is an easily curable problem.) |
| 23 | |
| 24 | Dated: July 10, 2020.                              Respectfully Submitted, |
| 25 |                                                      /s/ Steve Wilson Briggs_____ |
| 26 |                                                      Plaintiff, In Propria Persona |
| 27 | |
| 28 | |

PLAINTIFF'S OPPOSITION TO DEF INTERNET ARCHIVE'S MOTION TO DISMISS

Exhibit A

**Statement of Marybeth Peters**
**The Register of Copyrights**
**before the**
**Committee on the Judiciary**

United States Senate
108th Congress, 2d Session

July 22, 2004

## Intentional Inducement of Copyright Infringements Act of 2004

Mr. Chairman, Senator Leahy, Members of the Committee, good afternoon. Thank you for giving me the opportunity to testify about S. 2560, the Intentional Inducement of Copyright Infringements Act. I believe this bill addresses the most important issue facing our copyright system today: new services that employ peer-to-peer technology to create vast, global networks of copyright infringement. There should be no question that such services should be liable for the copyright infringement they encourage and from which they profit.

The Copyright Office supports S. 2560 because it improves the existing law of secondary liability for copyright infringement. This area of the law is essential for effective copyright protection, but it has become confused as courts have struggled to apply the existing common-law doctrines to the new peer-to-peer services, with conflicting results. This bill recognizes liability for the "intentional inducement" of copyright, which will allow courts to examine fully the circumstances behind infringing activity to find those truly responsible, such as the operators of the current peer-to-peer networks who depend upon infringement for their commercial viability.

## I. Background

### A. Contributory Infringement and Vicarious Liability

S. 2560 and the controversy surrounding peer-to-peer services revolve around the central legal issue of secondary liability for copyright infringement. For decades, courts have recognized that those who assist and facilitate copyright infringement are liable just as those who actually commit the acts of infringement. For example, in 1929 the Seventh Circuit Court of Appeals in *Dreamland Ballroom, Inc. v. Shapiro, Bernstein & Co.*,[1] held that a dance hall that hired an orchestra to provide music to its patrons was liable for the unauthorized public performance of musical works committed by that orchestra. That case is an example of "vicarious liability," which the landmark case of *Shapiro, Bernstein & Co. v. H.L. Green Co.*[2] explained this way:

> When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials . the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation.

Thus, vicarious liability requires two elements: (1) the right and ability to supervise or control the infringing activity; and (2) a direct financial benefit from that activity. It is closely related to the doctrines of enterprise liability and respondeat superior in tort law.

There is another form of secondary liability in copyright law, "contributory infringement," which stretches back to 1911.[3] As the Second Circuit Court of Appeals has explained, contributory infringement occurs where "[o]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another."[4] In general, the two elements of contributory infringement are (1) knowledge of the infringing activity; and (2) material contribution to the activity.

Note that the common formulation of contributory infringement includes a reference to those who "induce" another to commit infringement, which is similar to the language of the proposed bill. In theory, the existing contributory infringement doctrine may be flexible enough to cover situations where a defendant induces another to commit infringement. When actually applying this standard, however, courts have not focused on the inducement aspect of contributory infringement, and thus, as

I will explain, legislation is needed to address these circumstances directly to remove any doubt about liability for inducement.

These doctrines were developed by case law under the 1909 Copyright Act, which did not contain any express provision on secondary liability. In the 1976 Act, Congress recognized secondary liability in the grant of rights under copyright, providing authors and copyright owners with the "exclusive right to do *and to authorize*" the enumerated rights.[5] As the legislative history to the Act explains, "[u]se of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers."[6] The statute, however, left the details of the secondary liability doctrines to the courts to apply in specific cases.

From a policy perspective, the secondary liability doctrines are critical to the effective functioning of our copyright system, and even more so in the new digital environment. They allow copyright owners to focus their enforcement (and licensing) efforts on those entities that foster infringing activity and have the resources and wherewithal to either pay licensing fees or satisfy an infringement judgment, without bringing costly, time-consuming and usually futile actions against multiple, mostly judgment-proof individual defendants. As one court has explained,

> Recognizing the impracticability or futility of a copyright owner's suing a multitude of individual infringers . the law allows a copyright holder to sue a contributor to the infringement instead, in effect as an aider and abettor.[7]

Thus, enforcement against the "middlemen" who encourage, facilitate and benefit from infringement has long served an important role in providing meaningful and efficient copyright protection. As another court explained, in finding a supplier of "time-loaded" cassettes liable for infringement facilitated by those cassettes:

> Regrettably, in copyright litigation, enforcement efforts seem ineffective. Misappropriation may often needlessly succeed. Thus, liability for contributory infringement is particularly appropriate here. Given the apparent division of labor in the counterfeit recording industry, the actions of contributory infringers make possible the wide dissemination of the infringing works.[8]

As I will explain, a similar phenomenon is occurring in the digital environment, as proprietors of services that use peer-to-peer technology rely on a "division of labor" strategy that enlists millions of consumer to become distributors of infringing copies, thereby attracting more users and advertisers who generate revenue for these companies, but which is designed to leave the proprietor without legal liability. Secondary liability is appropriate in these situations, but there is confusion in the courts as to whether current law reaches that result. I will next describe the state of the law and how it has been applied to these new services.

## B. The *Sony* Betamax Case

Perhaps the most significant development in secondary liability was the Supreme Court's first attempt to interpret the 1976 Copyright Act, *Sony Corp. of Am. v. Universal City Studios, Inc.*[9] Often referred to as the Betamax case, Sony involved the question of whether a manufacturer of a VCR could be held liable under the doctrines of secondary liability for the infringing actions of the customers who buy the VCR. The Court recognized that secondary liability was established in copyright law:

> [V]icarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another.[10]

But the Court concluded that these doctrines had not been applied to a situation presented by the VCR, where the manufacturer did not have actual knowledge of the infringing activity for which customers used the device, only "constructive knowledge of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material."[11]

To resolve this situation, the Court looked to patent law, specifically the "staple article of commerce" doctrine embodied in Section 271(c) of the Patent Act, which provides that sale of a "staple article or commodity of commerce suitable for substantial noninfringing use" is not contributory infringement, on the grounds that patent rights should not extend the patentee's control to allow it to

control the sale of staple articles or commodities. Applying this concept to the copyright context, the Court explained that:

> [t]he staple article of commerce doctrine must strike a balance between a copyright holder's legitimate demand for effective — not merely symbolic — protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce.[12]

Based on this reasoning, the Court adopted the following approach to address the question of whether Sony could be held liable for copyright infringement:

> The sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses. The question is thus whether the Betamax is capable of commercially significant noninfringing uses.[13]

It found that the Betamax met this test, based largely on its separate conclusion that the customers' "time-shifting" of broadcast television programs was a fair use. The Court noted, however, that judgments in this area were primarily the responsibility of Congress rather than the Courts, and that it might be appropriate for Congress to take a "fresh look" at these issues in new copyright legislation.

### C. Secondary Liability and Peer-to-Peer Services

The *Sony* decision has played a substantial role in the legal dispute over "peer-to-peer" services like Napster and its progeny, such as Aimster, Grokster, Morpheus and Kazaa. As I explained in my testimony before this committee last Fall, the courts have struggled to apply *Sony* to resolve the question of whether companies who operate peer-to-peer networks are liable for the massive amounts of infringement that take place on them. In the case of Napster and Aimster, the courts have held the operators of those services liable under theories of secondary liability. In the case of Grokster and Morpheus, a district court found that secondary liability did not apply to those peer-to-peer services, in large part because of the Sony decision. To understand how secondary liability and *Sony* have operated in this context, I will go into these cases in some more detail.

#### 1. *A&M Records v. Napster*

The first peer-to-peer service to prompt copyright infringement litigation was Napster.[14] A user would download Napster's "Music Share" software and install it on his computer. When he started the software, it would send information to the Napster servers about the MP3 files the user had stored in the "shared folder" of his hard drive. The file names that were sent to the Napster servers were included in an index of all of the files being made available by users of the Napster network. When the user searched for an artist or title of a song, the Music Share software used the index on the Napster server to locate another user with that MP3 file. If he chose to download the file, the software then connected the two users together and a transmission proceeded directly between them, rather than go through any Napster server.[15]

Because the user's equipment, and not Napster's, actually reproduced and distributed the MP3 file copies of the copyrighted works, Napster could only be liable for secondary liability, rather than direct copyright infringement. The major record companies and musical work copyright owners brought suit against Napster in 2000 for contributory infringement and vicarious liability. The district court issued a preliminary injunction against Napster in July 2000, and the Ninth Circuit affirmed that decision in part in February 2001, finding that the plaintiff copyright owners had shown a likelihood of success on the merits to support a preliminary injunction.

The panel found that Napster met the requirements for both contributory infringement and vicarious liability. As to contributory infringement, the Ninth Circuit found that Napster had actual knowledge of infringing activity being made possible by its software, and that the software and services Napster provided were its "material contribution" to the infringement.[16] On the issue of vicarious liability, the panel found that Napster enjoyed a financial benefit from the infringement, and has the right and ability to supervise the infringing conduct by blocking users' access to the Napster service.[17]

The Ninth Circuit discussed the *Sony* case and its effect on the issue of contributory infringement, as it interpreted *Sony* as providing a defense only to that form of secondary liability. It held that *Sony* was "of limited assistance to Napster" because Napster had "actual, specific knowledge of direct infringement" occurring on its network.[18] It viewed the *Sony* test of whether the technology is "capable of substantial noninfringing uses" as a means for imputing knowledge of infringement to the technology provider. Where such knowledge was actually present, the Ninth Circuit held the *Sony* test does not apply. In this way, the court felt "compelled to make a clear distinction between the architecture of the Napster system and Napster's conduct in relation to the operational capacity of the system."

The *Sony* case also played a role in the panel's review of the district court's preliminary injunction, where it narrowed the scope of the injunction to apply only where Napster had reasonable knowledge of infringing files on its service and failed to take action to prevent the distribution of those files. It noted that the mere existence of the network on which files could be distributed was not enough to render Napster liable, citing *Sony*. This reflects the Supreme Court's concern over inhibiting non-infringing uses of technology through an overly-broad application of secondary liability under copyright.

As a result of the Ninth Circuit's opinion, Napster was forced to filter out infringing files from its network. Unable to find a way to continue operating in light of the injunction, it shut down in 2002.

### 2. *In re Aimster*

The Seventh Circuit was the next appellate court to consider the liability of a peer-to-peer service in the case of *In re Aimster*.[19] Aimster operated in conjunction with an instant-messaging ("IM") service, such as AOL's Instant Messenger, hence the AIM in Aimster. When users were online using an IM program to chat, they could also trade music files through the Aimster P2P software. The transmissions between users were encrypted such that the proprietor of the Aimster service argued that he could not know whether the files being transmitted were copyrighted or not. The district court issued a preliminary injunction against Aimster, and the Seventh Circuit affirmed that decision in an opinion written by Judge Richard Posner.

Judge Posner's opinion addresses Aimster's liability only in terms of contributory infringement, not vicarious liability.[20] It concludes that Aimster did have sufficient knowledge of infringing activity, based on evidence from the software's tutorial that showed examples of how it is to be used that only included copyrighted music files.[21] Also, the service offered a "Club Aimster" option for a monthly fee that lists the 40 most popular songs being made available on the service, which the court found were "invariably under copyright."[22] The panel rejected Aimster's argument that the encrypted nature of the transmissions prevented it from having knowledge of the infringing activity, concluding that this feature was an attempt by Aimster to avoid liability by remaining purposefully ignorant of the infringement, and noting that "willful blindness is knowledge, in copyright law ... as it is in the law generally."[23]

Judge Posner also extensively analyzed the *Sony* defense raised by Aimster, ultimately rejecting it on the grounds that Aimster had offered no evidence that its software could be used for noninfringing purposes.[24] He noted that it is not enough for a defendant to show that a "product or service be physically capable ... of a noninfringing use."[25] Even if Aimster could show such substantial noninfringing uses, the panel held that the defendant would have to "show that it would have been disproportionately costly for [it] to eliminate or at least reduce substantially the noninfringing uses,"[26] which Aimster also failed to do.

### 3. *MGM Studios v. Grokster*

In contrast to the *Napster* and *Aimster* decisions, in the case of *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, the District Court for the Central District of California ruled that the peer-to-peer services Morpheus (operated by Streamcast) and Grokster were not liable for the copyright infringement of their users.[27] The court focused on the central technological difference between these new services and Napster — rather than maintain a centralized index of files being distributed on their servers like Napster, the defendants' software either creates *ad hoc* indices on the computers of users on the network, known as supernodes, or it uses no centralized index at all. In essence, the court accepted defendants' characterization that all they did was sell a piece of software to users, and had no further interaction after that, just as Sony merely sold a VCR to consumers. Based on this fact, the court concluded that Grokster and Streamcast could not limit the infringement occurring on their networks,

because there was no centralized index through which they could control infringing uses of their software.[28]

Thus, when applying the tests for contributory infringement and vicarious liability, the court's characterization of defendants as mere providers of software became essential to its analysis. Although it recognized that the defendants had actual knowledge of infringement thanks to plaintiffs' numerous notices sent to defendants, it held that contributory infringement requires knowledge of specific infringement at the precise moment when defendants could limit such infringement.[29] In this case, the court, relying heavily on the *Sony* decision, found that once the software had been downloaded, then the defendants could not longer control the use of the software, and thus their knowledge of infringement occurring after the download was irrelevant.

With respect to the material contribution element of contributory infringement, the court relied again on *Sony* to find that defendants did not materially contribute to the infringement, comparing their software to the VCR or a photocopying machine — devices that enable both infringing and non-infringing uses. On these grounds the court denied contributory infringement.

On vicarious liability, the court found that defendants gained a direct financial benefit from the infringement that takes place on their service. As the court explained:

> Here, it is clear that Defendants derive a financial benefit from the infringing conduct. The ability to trade copyrighted songs and other copyrighted works certainly is a "draw" for many users of Defendants' software. As a result, Defendants have a user base in the tens of millions.
>
> * * *
>
> [I]ndividuals are attracted to Defendants' software because of the ability to acquire copyrighted material free of charge. While those who use Defendants' software do not pay for the product, Defendants derive substantial revenue from advertising. For example, StreamCast had $ 1.8 million in revenue in 2001 from advertising. ... And as of July of 2002, StreamCast had $ 2 million in revenue and projects $ 5.7 million by the end of the year. ... Grokster also derives substantial revenue from advertising. ... The more individuals who download the software, the more advertising revenue Defendants collect. And because a substantial number of users download the software to acquire copyrighted material, a significant proportion of Defendants' advertising revenue depends upon the infringement. Defendants thus derive a financial benefit from the infringement.[30]

Yet, on whether they had the right and ability to control the infringement, the court again relied on the lack of a centralized index to find that defendants could not control the infringement taking place on the network created by their software.

In the end, the court acknowledged that its result might not be the right one from a policy standpoint. It noted the "possibility that Defendants may have intentionally structured their businesses to avoid secondary liability for copyright infringement, while benefiting financially from the illicit draw of their wares."[31] It also noted that "additional legislative guidance may be well-counseled" in this circumstance. The case is currently on appeal to the Ninth Circuit, where oral argument was held this past February, but no decision has been issued to date.

In my view, the *Grokster* decision was wrongly decided, and I hope the Ninth Circuit corrects the errors in the district court's decision. The court employed an unnecessarily cramped view of existing secondary liability doctrines, creating a much narrower test of "knowledge", "material contribution" and "right and ability control" than any case before it, including the Ninth Circuit's decision in *Napster*. It also misapplied the *Sony* decision to an inaccurate characterization of the defendants as mere providers of software, comparing them to maker of a VCR, when their services were functionally the equivalent of Napster and Aimster. Most importantly, the *Grokster* decision fails to see the forest for the trees; it essentially ignores defendants' intent to establish and create a network of massive infringement — by enlisting ordinary consumers to engage in piracy — upon which they have built their business.

* * *

As can be seen from the discussion of these cases, application of the secondary liability doctrines in the peer-to-peer context has produced conflicting results. On the one hand, the Napster and Aimster

services were found to be liable by the Ninth Circuit and Seventh Circuit, while, on the other hand, Grokster and Streamcast were not found liable by the Central District of California. Each of the cases involved different interpretations of the Supreme Court's decision in *Sony* and its effect on the secondary liability doctrines.

But there is one constant in all of these cases. All of the services at issue facilitate massive copyright infringement involving literally billions of copies of copyrighted works. There is also no dispute that the use of these services constitutes copyright infringement — unlike the Sony case which held that the principal use of the VCR was a fair use. It is also undisputed that the defendants who operate these services rely on the copyright infringement as a draw to attract users, thereby attracting advertisers. These facts make the comparison to *Sony* remarkably inapt. In my view, if the VCR had been designed in such a way that when a consumer merely turned it on, copies of all of the programs he recorded with it were immediately made available to every other VCR in the world, there is no doubt the *Sony* decision would have gone the opposite way.

It would seem, in these circumstances, that sensible application of secondary liability doctrines would result in liability against these companies, even accounting for the concerns expressed by the Supreme Court in the *Sony* decision. As I noted above, the doctrine of contributory infringement, which includes notions of inducement, is likely broad enough to find liability in these circumstances. Yet, as the *Grokster* case shows, it appears that defendants are able to evade copyright liability successfully while still profiting from massive copyright infringement which they enable and encourage.

As I testified last year, I believe that legislative action in this area is warranted if courts interpret current law to exonerate proprietors of P2P services like Grokster, Morpheus and Kazaa. In my view, S. 2560 would help correct the problems created by the Grokster court's misapplication of *Sony* and secondary liability doctrines in the peer-to-peer context. I will now turn to the provisions of the bill.

## II. The Inducing Infringements Act

The Inducing Infringements Act would add a new subsection (g) to Section 501 of the Copyright Act. The existing Section 501 defines copyright infringement — in subsection (a) — and provides a civil cause of action for the legal or beneficial owner of copyright to bring against infringement.[32] The new subsection would create a new species of copyright liability by making clear that anyone who "intentionally induces any violation of subsection (a) shall be liable as an infringer." In other words, a person who "intentionally induces" infringement would be liable as if he or she committed the infringement. The bill defines "intentionally induces" as meaning:

[i]ntentionally aids, abets, induces, or procures, and intent may be shown by acts from which a reasonable person would find intent to induce infringement based upon all relevant information about such acts then reasonably available to the actor, including whether the activity relies on infringement for its commercial viability.

Paragraph (3) of the new subsection makes clear that the new form of inducement liability is in addition to existing common-law secondary liability doctrines, and does not modify them in any way. It also provides that nothing in the bill "require[s] any court to unjustly withhold or impose any secondary liability for copyright infringement."

As you explained in your floor statement, Mr. Chairman, this provision draws from patent law and federal criminal law. Section 271(b) of the Patent Act provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."[33] Similarly, the Section 2 of the Federal Criminal Code provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."[34] You have noted that the concept of liability for "inducement" was not at issue in *Sony*, as the Court made clear that no evidence existed that the defendant in that case "intentionally induce[d] its customers to make infringing uses of respondents' copyrights, nor does it supply its products toidentified individuals known by it to be engaging in continuing infringement of respondent's copyrights."[35]

In my view this change would be a positive addition to the copyright law. As I described above, secondary liability for copyright infringement is an important feature of copyright — it helps ensure real, effective enforcement of copyright against those who are truly responsible in both legal and financial terms. This is especially true in the context of peer-to-peer services, which have created vast networks of copyright infringement by relying on clever technology and inducing others to join the network and infringe copyright. As I testified last year, we are seeing the natural consequences of what

happens when secondary liability doctrines are not applied in this context: enforcement against infringement is left to suits against individual users, rather than the businesses that are profiting from the infringement. As you pointed out in your floor statement, Mr. Chairman, this result makes no sense, and is a departure from traditions of copyright, which has regulated the relationship between copyright owners and intermediaries (like dance halls and swap meets) for the ultimate benefit of consumers. Decisions like *Grokster* scramble this venerable structure, forcing copyright law to administer the relationship between copyright owners and consumers, to the undeserved benefit of intermediaries like Kazaa and Grokster.

The bill is appropriately tailored to the defendant's intentions and behavior, rather than the technology it chooses to employ, making the bill technology neutral. It would allow courts to examine all of the circumstances of a particular case to determine whether the defendant had intentionally constructed its business to profit from infringement of others that it induced. Recognizing that an actor's state of mind can often only be shown by indirect evidence, the definition of "intentionally induce" allows a court to apply an objective, reasonable person standard to the conduct of defendant to determine whether that evidences the requisite intent. The central definition, however, requires that the defendant "intentionally aids, abets, induces or procures" infringement, which is a high level of *mens rea* that should limit application of this bill only to the most egregious actors.

For example, the provisions of this bill would appropriately place liability on the operators of the current peer-to-peer services such as Grokster, Kazaa and Morpheus/Streamcast. There is a wide array of evidence that the proprietors of those services induce users to infringe copyright:

1. Their business is based on advertising revenue, which is based on the number of users participating on the network, which, as the *Grokster* court recognized is based on the free availability of copyrighted works on that network.

2. The availability of copyrighted material on the network is assured by the software, which automatically and invisibly to the user immediately begins making their copies of works available to the millions of others on the network. As the Harvard Law School's Berkman Center for Internet and Society explains: "With Kazaa, it is easy to begin file sharing, but much more difficult to turn it off."[36] The Berkman Center explains the several different steps Kazaa has programmed into is software to make sure the user is "sharing" as many files as possible:

   • "[B]y default, Kazaa starts itself immediately when the user turns on his computer. The program runs in the background, pre-set with the file-sharing feature set 'on' and configured to allow an unlimited number of uploads at a time. Many users may not be aware that the program is running continuously in this fashion."

   • "When a user downloads a file from another Kazaa user, by default that copy is stored in the publicly shared folder, which means that it becomes immediately available for copying by others on the Kazaa network. Kazaa defaults to creating a shortcut to open this folder on the user's desktop; however the user may not be aware where exactly the folder itself is located on his computer."

   • "Unlike most computer applications, clicking on the 'x' button on the top right-hand corner of the Kazaa program does not shut down Kazaa. This action merely hides the Kazaa program from the screen while the program continues to run the program in the background. To actually shut down the program, the user must then right-click the Kazaa icon located in Windows taskbar and choose the 'close' option."

   • "Disabling the default file-sharing features in Kazaa is a complicated process due to an intricate series of steps within the software itself. In addition, the available resources that detail how to disable file sharing are often inconsistent or provide incomplete instructions."

   As the Berkman Center concludes, "it can be extremely difficult for a non-expert computer user to shut down their file-sharing capability." That difficulty is not an accident — it is the intentional design of the proprietors of these services.

3. The defendants also affirmatively encourage people to distribute as many files as possible, knowing that most people will share infringing files. Kazaa implements what it calls "Participation Levels", which increase a user's download performance based on the amount uploaded from that user.[37] In other words, the more attractive the files you are sharing with other, the easier it will be for you to download copies from others. Indeed, Kazaa suggests that the user "share large and interesting files." This

feature encourages users to make available popular copyrighted works, which will likely be the most frequently downloaded by others.

4. The proprietors of these services employ strategies of "plausible deniability" and "disaggregat[ing] functions" to avoid legal liability but allow copyright infringement on their networks to continue. As one attorney for these services explained:

> Can you plausibly deny what your users are up to? ...
>
> Have you built a level of 'plausible deniability' into your product architecture? If you promote, endorse, or facilitate the use of your product for infringing activity, you're asking for trouble. ... Software that sends back user reports may lead to more knowledge than you want. Customer support channels can also create bad "knowledge" evidence. Instead, talk up your great legitimate capabilities, sell it (or give it away), and then leave the users alone.
>
> Disaggregate functions ... In order to be successful, peer-to-peer networks will require products to address numerous functional needs—search, namespace management, security, dynamic file redistribution, to take a few examples. There's no reason why one entity should try to do all of these things. ...
>
> This approach may also have legal advantages. If Sony had not only manufactured VCRs, but also sold all the blank video tape, distributed all the TV Guides, and sponsored clubs and swap meets for VCR users, the Betamax case might have turned out differently. ... A disaggregated model, moreover, may limit what a court can order you to do to stop infringing activity by your users.[38] As I noted above, secondary liability, like the form proposed in this bill, can and should be used to impose liability where the defendant organizes its business structure to permit illegal activity to continue unabated but keep itself insulated from liability.

In short, the way Kazaa and other peer-to-peer technologies have structured their businesses and designed their software, they make a user's infringement almost inevitable. Indeed, many users probably don't know they are engaged in the distribution of works, and continue to do so even after they think they've turned the program off. When all of these circumstances are considered, they meet the test of "intentionally induce," and courts should be able to find liability based on them under the new provision.

These circumstances also help to show why the concerns about the breadth of the bill are misplaced. As Senator Leahy's floor statement makes clear, those who merely provide copying technology should not be liable under this bill, because they would lack indicators of "intentional inducement" like those found in the peer-to-peer context. For example, the seller of a portable MP3 player does not make it nearly inevitable that the user will commit copyright infringement just by turning the device on. Rather, several additional steps must be taken by the user before any potential infringement takes place. Also, the seller of the portable device is very likely not reliant on building a network like the peer-to-peer service that is trying to sell advertising, and therefore it typically has no need to and does not encourage users to become distributors of copyrighted works.

While I believe the bill as drafted does not present the concerns raised by some, to the extent you wish to confirm this interpretation of the scope of the bill with additional clarifying language, the Copyright Office would be pleased to assist you with suggestions that would help achieve this result.

In addition, concerns that this bill would affect liability of Internet Service Providers ("ISPs") are unfounded. Normal activity of an ISP like that defined in the Section 512 safe harbors could not reasonably be considered intentional inducement. Even if such actions could be considered within this new species of liability, nothing in this bill affects operation of Section 512, so that the same limitations of liability would apply to qualifying ISPs for this new form of liability.

While I think this bill would provide courts with a useful and effective means of assessing the liability of the current generation of infringing services, I am concerned that the next generation of technology-based pirates will be able to devise a way around this new species of liability. They may be able to limit evidence of their "inducement," yet still be able to reap substantial financial benefit from enabling and encouraging massive copyright infringement, just as Grokster, Kazaa and Morpheus appear to have devised a way around the *Napster* decision. To achieve a more comprehensive solution, this Committee may want to consider other legislative approaches in addition to this bill that would

provide guidance to courts so that liability can be found in appropriate circumstances. While you have carefully crafted this bill to preserve the 20-year-old decision in the *Sony* case, it may become necessary to consider whether that decision is overly protective of manufacturers and marketers of infringement tools, especially in today's digital environment. If the *Sony* precedent continues to be an impediment to obtaining effective relief against those who profit by providing the means to engage in mass infringement, it should be replaced by a more flexible rule that is more meaningful in the technological age, but that still vindicates the Court's goal to balance effective "and not merely symbolic" protection of copyright with the rights of others to engage in substantially unrelated areas of commerce.[39] The Copyright Office offers whatever assistance this Committee would need with respect to such efforts.

Let me be clear, however, that our concern about its future application should not hold up this bill. It is an important improvement over existing law that will help avoid results like the district court opinion in *Grokster*. It also has a sufficiently high standard of intent that will not subject legitimate businesses to any new liability. I support enactment of the Inducing Infringement Acts of 2004.

1. 36 F.2d 354 (7th Cir. 1929)

2. 316 F.2d 304, 307 (2d Cir. 1963)

3. *See Kalem v. Harper Brothers*, 222 U.S. 55 (1911).

4. *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

5. 17 U.S.C. § 106 (emphasis added).

6. H.R. Rep. 94-1476, at 61.

7. In re Aimster, 334 F.3d 643, 646 (7th Cir. 2003) (Posner, J.).

8. *A&M Records, Inc. v. General Audio Video Cassettes, Inc.*, 948 F. Supp. 1449, 1455 n.4 (C.D. Cal. 1996).

9. 464 U.S. 417 (1984).

10. 464 U.S. at 435.

11. *Id.* at 439.

12. 35 U.S.C. � 271(c).

13. 464 U.S. at 442.

14. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

15. *Id.* at 1012-13.

16. *Napster*, 239 F.3d at 1019-22.

17. *Id.* at 1022-23.

18. *Id.* at 1020.

19. 334 F.3d 643 (7th Cir. 2003).

20. *Id.* at 654-55 (noting that existence of vicarious liability was "academic" in light of contributory infringement finding).

21. *Id.* at 649. In so doing, the Seventh Circuit departed from the Ninth Circuit's holding that where a provider of technology has actual knowledge of specific infringing uses the Sony defense becomes inapplicable.

22. *Id.* at 651-52.