Steve Wilson Briggs
4322 Chico Ave.,
Santa Rosa, CA 95407
510 200 3763
snc.steve@gmail.com
PLAINTIFF In Propria Persona

**UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA,**

**SAN FRANCISCO DIVISION**

| STEVE WILSON BRIGGS, | Civ No: 20-CV-1596-VC |
|---|---|
| Plaintiff, | Amended Second Declaration Of Steve Wilson Briggs (Plaintiff) In Support Of Complaint |
| vs | |
| JAMES CAMERON et al, | |
| Defendants. | |

(This 62 page declaration is supported by 44 attachments, all totaling 328 pages.)

**<u>Declaration Of Steve Wilson Briggs</u>**

I, Steve Wilson Briggs, declare the following:

1.      I am the Plaintiff in this action, and I make this declaration of my own personal knowledge, or on information and belief, and if called to testify in Court on these matters, I could do so competently.

2.      This declaration was written (1) to support the facts and evidence presented in the Complaint, (2) to inform the Court and the public of facts and evidence concerning the infringement of other of my original works, and (3) to present imperative facts and evidence that **the Defendants and their associates have been using the US Copyright Office to falsify documents**, which threatens the security of all American creators and threatens America's standing in the World. Worse, the evidence shows that at least one foreign nation

1   is aware and complicit in the corruption of the US Copyright Office.

2       3.      This declaration was also written because on June 11, 2020,  I informed the

3   Court of a credible threat against my life, which, I believe, was sent by the Defendants or

4   their associates, which stated that I would not live to see my next birthday (see page 11 of

5   amended first motion in limine). My birthday is September 24. I have never made any sort

6   of hyperbolic accusation in my 7 year legal effort to defend my intellectual property. The

7   Court did not acknowledge this concern. Rather, 12 days later, the presiding Hon Judge

8   William Orrick recused himself from this action, and the Hon Judge Vince Chhabria was

9   assigned. Having had an unsettling prior experience with Judge Chhabria, I moved to

10  disqualify him (submitted June 29, 2020). Three days later, July 1, 2020, the Court filed a

11  "Notice of New Hearing Date," which moved the Initial Case Management hearing date

12  from where it had been, in July or early August (if memory serves), to September 30, 2020.

13  Because I take this threat very seriously (although I will not withdraw this suit, and I will

14  file future suits in the Ninth Circuit, or the Second Circuit, or abroad) I have composed and

15  executed this declaration, in case someone acts on the aforementioned threat. This

16  declaration reveals the extent of the Defendants' and their associates' corruption. I also

17  composed and executed this declaration to prevent corporations from stealing the

18  intellectual wares of private Americans ever again.

19      4.      Shortly after filing the Complaint, I began investigating other films that may

20  infringe my work. From that investigation, I've collected facts and evidence that show that

21  for 17 to 20 years the Defendants and their associates (referred to herein as the ***Infringers***)

22  unlawfully accessed my computers and phone to steal my screenplays, shorts, book(s) and

23  novel notes, to make **64** infringing works (see next page), infringing **ten (10)** of my works.

24  At least 40 of the infringing works infringe *Butterfly Driver*—because *it* contains 9 to 12

25  original ideas (original ideas are extremely rare). The Infringers infringed far more than just

26  the films named on the next page. They routinely stole clips of my dialogue for many other

27  infringing works. However, the films named on the following page are the works that rise to

28  an actionable level of infringement, although I will likely only act on two-thirds of them.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

| | **TITLE OF MY WORK** | TITLE OF THE INFRINGING WORKS |
|---|---|---|
| 1 | | |
| 2 | **Hot Orange & Honey (1999,** | Freak and Geeks |
| 3 | **short story)** | |
| 4 | **Sunflowers** | 1. Undeclared, 2. The Maiden Heist, |
| | **(screenplay, 1999)** | 3. Mona Lisa Smile, 4. Tower Heist |
| 5 | **The 13 Gates of Rayne** | 1. Stranger Things (Netflix), 4. Gravity Falls (Disney), |
| 6 | **(novel series notes, 2001-02)** | 2. The Owl House (Disney), 3. The Last Witch Hunter |
| 7 | **Stutter** | The Transporter |
| | **(draft 2000; revised 2005/06)** | (Judd Apatow's unreleased *Life on Parole* also infringes *Stutter* |
| 8 | | 1. Avatar, 2. Taken, 3. WALL-E, 4. Prometheus, |
| 9 | | **5. The Last of Us, 6. The Last of Us 2, 7. Portal, 8. Portal** |
| | | **Two, 9. Fallout 3, 10. Fallout 4, 11. Star Citizen,** |
| 10 | | **12. Half-Life: Alyx, 13. Borderlands 14. Death Stranding,** |
| 11 | | 15. The Purge, 16. District 9, 17. Elysium,18. Sleepless, |
| 12 | | 19. The Hunger Games, 20. The Hunger Games: Catching |
| | | Fire, 21.The Hunger Games: Mocking Jay (Part One), |
| 13 | **Butterfly Driver** | 22. The Hunger Games: Mocking Jay (Part 2), 23. Source |
| 14 | **(screenplay 2004-2007)** | Code, 24. Divergent, 25. Insurgent, 26. Allegiant, 27. Tenet, |
| | | 28. The Dark Knight, 29. Snowpiercer, 30. I Am Legend |
| 15 | | (setting),  31. Rick & Morty, 32. Gran Torino, 33. The Mule, |
| 16 | | 34. Oblivion, 35. Repo Men, 36. Upload (Amazon), |
| 17 | | 37. Interstellar, 38. South Park (Lice Capades), 39. War of |
| | | the Worlds (2005), 40. Edge Of Tomorrow, *41. Gurren* |
| 18 | | *Lagann, 42. Top Secret ~The Revelation, 43. BNA: Brand New* |
| | | *Animal, 44. Ultraviolet: Code 044.* |
| 19 | | **Bold = video games;** *Bold & Italics = anime series* |
| 20 | **The Amazing Mr. Excellent** | 1. Super, 2. Kick-Ass, |
| | **(script 2007, film 2010)** | 3. Johnny English: Reborn, 4. ***Boku no Hiro Academia*** |
| 21 | **Alfrey & Darry (2008-09)** | Beats (Netflix) |
| 22 | **Sweeter Nectar Cherries** | The Neighbors |
| 23 | **(2011-12)** | |
| 24 | **Nakota's Great Adventure** | Amphibia (Disney) |
| | **(children's book 2016)** | |
| 25 | **Cyclones (1991)** | 1. The Lookout, 2. Baby Driver |
| 26 | **Butterfly Driver / Stutter** | Breaking Bad |
| | | (infringes aspects of two of my works) |
| 27 | **Butterfly Driver /** | Avengers: Infinity Wars (Disney, Marvel) |
| 28 | **The 13 Gates of Rayne** | (infringes aspects of two of my works) |

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  **5.    All of the documents attached hereto, and referred to herein, are**

2  **incorporated herein, and made part hereof by reference, as if fully set forth herein.**

3  6.    This declaration and attachments will show that, beyond the Infringement

4  detailed in the Complaint, the Defendants and their associates (the Infringers) infringed my

5  work and ideas to produce over 60 derivatives, and used Microsoft, Amazon.com, Google

6  (Alphabet), and Internet Archive to foil my personal efforts to market my own works.

7  <div align="center">**The Truth In The Copyright Registrations**</div>

8  7.    In the vast majority of cases, after a creator completes a book, script, etc,

9  **before** she/he **sells** the rights to their work to another party, creators almost always register

10  their works with the US Copyright Office. And when these creators register their work, they

11  name themselves as the copyright *claimant*, to control all marketing of their characters, etc.

12  **[NOTE:** The only exception to this rule is if the creator sells all or some portion of the

13  rights to his/her work to another entity. This is done with a transfer agreement, which is

14  usually registered with the Copyright Office. When a writer/creator sells the rights to his/her

15  work, he/she will almost always be named somewhere on the copyright registration (often in

16  the title line), and credited as the writer; while the rights' *buyer* will be named as the

17  *claimant*, with the designation "Employer For Hire."**]** Thus, for many years, George Lucas

18  owned the merchandising rights to his *Star Wars* related properties, although he sold the

19  film distribution rights to Twentieth Century Fox (since then, Disney has purchased the

20  rights to *Star War*s; thus, it is probable that Disney now owns the merchandising rights).

21  8.    To show that most true creators will properly name themselves as the claimant

22  on their copyright registrations, I have attached the 28 screenplay copyright registrations of

23  nine (9) well-known screenwriters/creators, as **EXHIBIT A**. Sequentially, the notable

24  writers who are named in these 28 copyrights registrations are **Gene Roddenbury** (creator

25  of Star Trek), **Francis Ford Coppola** (director of The Godfather series), **George Lucas**

26  (creator of Star Wars), **Trey Parker** (creator of South Park), **Woody Allen** (director/writer),

27  **Christopher Nolan** (director/writer), **James Cameron** (director/writer), **Steven Spielberg**

28  (director/writer), and **Ridley Scott** (director/writer). By examining these copyright

<div align="center">Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint</div>

1  registrations, one notices that although most of them are "Employer for Hire" (meaning the
2  studio purchased the film rights). Somewhere on each registration someone carefully
3  specified who wrote each work—EXCEPT on #25 (see page 25 of Exhibit A, a registration
4  for Spielberg's film "*Poltergeist*"), and *that* failure is possibly an oversight of the Copyright
5  Office, who may have neglected to enter that information on the webpage.

6       9.      However, astonishingly, unlike the aforementioned 28 copyright registrations,
7  when we examine the 64 infringing works on page 2 (subtracting the 5 Japanese titles and
8  the two American titles that are not on file with the US Copyright office), we see that 35 of
9  the remaining 57 infringing works (over 60%) do not name or identify the writer on the
10 copyright! (See **EXHIBIT B**, 35 infringing copyrights.) This defies logic and probability.

11      10.     Several of the 9 acclaimed directors mentioned in paragraph 6 also directed
12 and/or wrote one or more of the infringing films named on page 3. Thus, we can see that
13 several of these writers/directors registered their non-infringing films very differently from
14 their infringing films. Compare Ridley Scott's infringing *Prometheus* to his noninfringing
15 *Alien*; compare James Cameron's infringing *Avatar* to his noninfringing films *Terminator,*
16 *Judgment Day, Titanic* and *True Lies*. On the non-infringing prior copyright registrations,
17 the writers are carefully credited, but on the infringing registrations omit the writer's name.

18      11.     Perhaps more astonishingly, the 64 infringing titles on page 3 are many of the
19 biggest and most respected titles in entertainment history (*Breaking Bad, Avatar, Hunger*
20 *Games, Gravity Falls, Avengers:Infinity Wars, Stranger Things*, *WALL-E*….). Yet all of
21 these titles —which any writer/creator would ordinarily demand copyright credit for— are
22 missing the name of the writer/creator. This, because all of these works' core ideas are
23 derived from my work/ideas, and the film Studios and producers (who registered the films'
24 copyrights) did not want their hired writers to register a copyright, which would allow the
25 hired writers to claim the rights to my ideas. The Studios and producers intended to make
26 MANY movies using my ideas. This is why the *Hunger Games* series does not sue the
27 *Divergent* series; it is why *Interstellar, Oblivion* and *Prometheus* do not sue each other; why
28 *Gravity Falls* does not sue *Stranger Things*; it is why *Kick-Ass* does not sue *Super*; it is why

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  *Maiden Heist* does not sue *Tower Heist*; it is why *Baby Driver* does not sue *The Lookout*

2  (both centered on a getaway driver who is brain damaged/disabled due to a head injury).

3      12.    To reinforce their theft of my work, for many of their infringing derivatives,

4  the Infringers published (in Wikipedia) false tales of how the writers conceived these works

5  many years earlier.  In some cases the Infringers tried to backdate their work by indicating

6  on the copyright registrations that the works were based on a pre-existing work (which

7  resembled their new work in some non-copyrightable way). To debunk these strategies, it is

8  widely known that the film "Apocalypse Now" is based on Conrad's "Heart of Darkness",

9  and the 2005 film "War of the Worlds" is based on H.G. Wells' 1898 novel of the same

10  name. However, if one looks at the copyright registrations for the films *Apocalypse Now* and

11  *War of the Worlds* (**EXHIBIT C**) one sees one of the registrations identify the screenwriters,

12  but not the prior works they are based on. Similarly, most Wikipedia film entries do not

13  explain how the writer *conceived* the story (this is more appropriate for a writer's bio entry).

14  These unusual "backdating" efforts that the Studios employ are unique to the infringement

15  of my work. But all of these stories unravel upon examination. Consider the following:

16      a.  Ross and Matt Duffer (the Duffer Brothers), who Netflix allege created *Stranger*

17          *Things*, are not on any of the *Stranger Things* copyright registrations. In fact, Ross

18          and Matt Duffer are only on two copyright registrations. Both are named on two

19          different registrations of the same obscure work, "Hidden," in 2011 and 2012. [See

20          **EXHIBIT D**, copyright searches for *Ross Duffer* and *Matt Duffer*.].

21      b.  Alex Hirsch, who Disney claims created "*Gravity Falls*," is not named on ANY

22          *Gravity Falls* copyright, and does seem to have ever registered, or appeared on, a

23          copyright. (See **EXHIBIT E,** a copyright search of *Alex Hirsch*.)

24      c.  Justin Roiland and Dan Harmon, whom Cartoon Network allege created *Rick and*

25          *Morty* (2014), are NOT on any of the *Rick and Morty* copyright registrations. Dan

26          Harmon has not registered a copyright since 2004. (See **EXHIBIT F,** a copyright

27          search of *Dan Harmon*.) Justin Roiland, registered 2 copyrights, but none since

28          1998. (See **EXHIBIT G**, a copyright search for *Justin Roiland*.)

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

d. Matt Braly, who Disney claims created "Amphibia," is not on any Amphibia registration, and has never registered any copyrights. (See **EXHIBIT H.**)

e. Dana Terrace, who Disney claims created *The Owl House*, is not on any Owl House registration and has only registered 1 copyright, in 2014. (See **EXHIBIT I.**) It is possible that "Dana Terrace" on the 2014 registration is a different person.

f. Prior to "Freaks and Geeks," in 1996, Judd Apatow re-wrote "The Cable Guy," considered one of the worst films ever. Because *The Cable Guy* was so horrible, Apatow had no writing, production or acting credits for the next 3 years. Because Apatow was in a bad situation, in late 1999, Dreamworks asked Apatow to take credit for executive producing the infringing series "*Freaks and Geeks*." Paul Feig is credited for "creating" (conceiving) *Freaks and Geek*s, and credited for writing episodes 1, 3, 7, 8, 11 and 18. But Feig is only on one copyright registration for *Freaks and Geeks* ("Discos and Dragons," ep 18). (See **EXHIBIT J.**) Prior to *Freaks and Geeks*, Feig (who was 37 in 1999) registered only 1 copyright, in 1986, <u>for a piece of music</u>. Since the infringement of my work (1999) Feig has registered 37 copyrights. In 2002, Feig registered a book titled "Kick Me: Adventure In Adolescence," derived from my short "Hot Orange & Honey" —which inspired "Freaks and Geeks" and two decades of infringement.

g. Cartoon Network (ViacomCBS) credited Aaron McGruder with creating "Black Jesus," which infringes aspects of my script and film *The Amazing Mr. Excellent*. (McGruder is the creator of the cartoon series *The Boondocks*.) The problem with this story is Aaron Mcgruder is not on ANY of the *Black Jesus* copyright registrations, BUT he IS on many of the copyrights for *The Boondocks*, including the first *Boondocks* copyright —as a creator should be. (See **EXHIBIT K.**)

h. Sony Pictures Television is named as the "claimant" on all "**Breaking Bad**" copyrights, and Vince Gilligan only appears on the first Breaking Bad copyright registration, <u>but</u> Gilligan is <u>not credited</u> on the registration, and he is not named on any transfer or assignment agreement. This means Vince Gilligan has no business

1    on the only *Breaking Bad* copyright that he appears on. (See **EXHIBIT L.**)

2    Breaking Bad steals its entire premise of Butterfly Driver: To meet the urgent

3    healthcare needs of his son, a father resorts to impossible lengths (first act to final

4    act). The crystal meth aspect was stolen from my rough script *Stutter*.

5    i.  Suzanne Collins is NOT named anywhere on the <u>first</u> "Hunger Games" copyright.

6    (See **EXHIBIT M.**) Scholastic is identified as the "*Employer For Hire*".

7    ●  Suzanne Collins is named on the <u>first</u> copyrights of all of her previous 12 books.

8    And none of Collins' previous 12 books were registered as "Employer For Hire."

9    j.  Warner Bros created the fraudulent story that "Edge Of Tomorrow" was based on a

10    Japanese manga titled "All You Need Is Kill" (Japanese: "Ōru Yū Nīdo Izu Kiru")

11    released in 2004.  But by going to the Manga Encyclopedia, one sees that neither

12    of those titles appear in the Manga Encyclopedia. (See **EXHIBIT N**.) By doing a

13    back dated Google Chrome search, from 2000 to 2005, one sees that the title "Ōru

14    Yū Nīdo Izu Kiru" was never in print before 2005. (See **EXHIBIT O**.) I found 2

15    web pages that indicate the manga may have been released much later, in **<u>2009</u>**, but

16    these 2 web pages are unreliable and appear fraudulent. But a tell-tale sign that this

17    story is fraudulent is that on all web search results there is no book publisher

18    associated with the title. The first book publisher associated with the title is

19    Amazon, in January 2014. (More fraud related to this title on pages 12-14.)

20    **Larger Signs Of Fraud And Infringement**

21    k.  Hunger Games began filming <u>before</u> the book it's allegedly based on was published.

22    l.  *Kick-Ass* began filming <u>before</u> the comic it is allegedly based on was published.

23    m.  Oblivion is based on a graphic novel that doesn't exist. (See **EXHIBIT P**, a

24    BleedingCool.com article "*Oblivion, Based On The Non-Existing Graphic Novel*.")

25    n.  On March 18, 2011, Summit Entertainment bought the film rights for *Divergent*

26    —BUT the novel was not released until almost 6 weeks later, April 26, 2011.

27    ●  Unconscionably corrupt, because *Divergent* was Veronica Roth's first book, thus,

28    Summit cannot allege they purchased the rights early, based on Roth's prior sales.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**The Infringers Have Infected The US Copyright Office**

**And Threaten To Destroy US Credibility and Global Standing**

13.     As explained in the "Access" section of this declaration, the Infringers began infringing my work in early 1999. The first person/entity to _access_ my work was Rupert Murdoch's and his media companies News Corp, Twentieth Century Fox (**20CFOX**), and Fox TV, who accessed my work via their subsidiary _HarperCollins_. However, Murdoch and HarperCollins were not the first to _infringe_ my work. Rather, after accessing my work, Murdoch gave my work to Steven Spielberg and Dreamworks, who infringed my short story _Hot Orange & Honey_, to make the 1999 TV series _Freaks and Geeks_. The evidence supporting this is presented in the "Access" section (pages 23-38, specifically pp 25, 26).

14.     But Murdoch (and Fox) _would_ join Spielberg and DreamWorks on the second infringing series, _Undeclared_, which infringes my screenplay _Sunflowers_. And in late 2000, Murdoch and 20CFOX  hacked into my computer to access a rough script named _Stutter_, about a good-hearted ex-con who cannot find a job because of his criminal record, thus he agrees to take a job driving cars full of contraband, under the condition he is never told what is in the cars. 20CFOX infringed this script to make "The Transporter" (late 2002).

15.     By late 2003, Steven Spielberg was obsessed with my ideas. Thus, with the help of Bill Gates and Paul Allen (who owned 55% of DreamWorks), Spielberg was regularly hacking into my computer(s) in the early 2000s.

16.     Around 2007, although the Infringers were robbing me regularly, some of them became so enamoured with my underlying interests that they began to mimic my interests, with no understanding of their meaning. For example, the Infringers began to adopt my preference for the number "4"; hence the character "Four" in the _Divergen_t series, hence the number "044" in the title of one infringing work, hence several of the infringing works have four books in their series (Hunger Games, Divergent), and hence several of the infringing works are set in a year ending with "4". But the Infringer's preoccupation with my interest in the number 4 would become much more bizarre, and would eventually lead to the Defendants unwittingly exposing their corrupt power over the US Copyright Office.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

17.     The clearest, most corrupt example of the Infringers adopting (mocking) my interest in the number "4" is seen by examining the copyright registration for the infringing film "Baby Driver" (2017). (See **EXHIBIT Q,** five sequential copyright registrations; two before Baby Driver, two after. Baby Driver's registration is the third, in the middle.)

18.     Baby Driver infringes my first screenplay, *Cyclones* (1992). The Baby Driver Infringers were two of the *Briggs v Blomkamp* (2013) defendants: Sony and MRC. **These Infringers accessed this script by asking someone at the Copyright Office for a copy.**

19.     By examining the five sequential copyright registrations (**Exhibit Q**) one notices that the *Baby Driver* registration is sandwiched between FOUR registrations for the Showtime TV series "Billions". The first two registrations end with 44442 and 44443, and the last two registrations end with 44445 and 44446. And in the middle of the four "Billions" registrations, is *Baby Driver*, ending in 44444 (#PA0002044444).

20.      The Infringers chose to sandwich the *Baby Driver* registration between the registrations for "Billions" to gloat and taunt me about the countless billions that Hollywood and the tech industry has made from my ideas. They chose to name their lousy film "Baby Driver" because it sounded similar to (but not half as good as) "Butterfly Driver."

21.     On March 1, 2017, the Ninth Circuit improperly denied my appeal of the *Briggs v Blomkamp* district court decision. A few months later, June 28, 2017, the *Briggs v Blomkamp* defendants released *Baby Driver*. Two days later, June 30, 2017, they copyrighted *Baby Driver*. The Infringers (Sony and MRC) selected the number 44444, because I would notice the aggregation of fours (as I did). Thus, if I ever discovered that *Baby Driver* was an infringement of my screenplay "Stutter" and I looked at *Baby Driver*'s copyright registration (as I did), the Infringers wanted me to know that they were watching me—as they would only know my interest in the number four from hacking into my computer and observing such things as: **(1)** the presence of multiple fours in all of my passwords, **(2)** I made a couple of the songs in my film *The Amazing Mr Excellent* exactly 4 minutes and 44 seconds long, **(3)** various hints the Infringers observed in my literary works.

22.     The "44444" at the end of Baby Driver's registration was meant as a threat.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

23. *Showtime,* owner of the show "Billions," is owned by ViacomCBS (the infringers of my first work, *Hot Orange & Honey* (1999). But *Baby Driver* was owned and produced by **Sony Pictures** (a foreign owned company) and **MRC** (owned by two foreign born men, who may not be US citizens). Sony and MRC could NOT have placed the *Baby Driver* copyright registration between those four registrations for "Billions" without the assistance of ViacomCBS and someone very corrupt and powerful at the Copyright Office. This is proven by examining the copyright registration <u>dates</u> for the four *Billions* registrations, then examining the *Baby Driver*'s copyright registration (see Exhibit Q).

24. The four *Billions* copyright registrations were all registered on May 8, 2017, but the *Baby Driver* copyright registration (center) was registered seven weeks later, June 30, 2017. This is impossible. **The US Copyright office registers copyrights sequentially**, in the order that they are received. If this were true it would mean that Baby Driver, #PA0002044444, was registered on June 30, 2017, then somehow the next two registrations (Billions #PA0002044445 and #PA0002044446) reversed time and registered themselves seven weeks earlier. The other problem with this is it suggests that after *Billions* registered its first two copyrights (#PA0002044442 and #PA0002044443) no registrations came into the copyright office for seven weeks, until *Baby Driver* was filed on June 30 2018. This is impossible. The US Copyright Office registers hundreds or thousands of copyrights daily.

25. This is Hollywood's vast corrupt influence; stealing my work to make countless billions, then bribing people in the Copyright Office (Washington DC) to issue invalid copyright registration numbers. Worse, if someone examines a few hundred registrations on either side of #PA0002044444, they will notice some troubling irregularities, and a disconcerting concentration of major entertainment registrations.

26. In summation, Sony Pictures (the Japanese corporation behind *Baby Driver*) stole my work by asking a corrupt agent at the US Copyright Office to give them a copy of my script, *Cyclones* (filed at the US Copyright Office); then they used another agent at the US Copyright Office to falsify registration numbers, to send me an intimidating message.

27. But the Fraud at the US Copyright Office will get even worse.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**The Us Copyright Office Suddenly Blocks**

**My Access To Its Online System**

28.     Preparing this declaration took several weeks. I wrote the preceding information (about the falsified *Baby Driver* copyright registrations) between July 29 and August 4, 2020. The following day Aug 5, 2020, I began to be blocked from accessing the US Copyright office's website. These blocks lasted for hours, and occurred for about a week, from Wednesday, August 5, 2020, to Tuesday, August 11, 2020. When these blocks occurred I encountered a message reading: "All available connections to the Online Catalog are currently in use." (See **EXHIBIT R**, two of these blocking messages.) As the Court can see, by rotating the exhibit and examining the lower right hand corner, some of these blocks occurred late on Friday night and weekend nights, when one would expect very few people would care to search copyright registrations.

**The Defendants Employ An Insider At The Copyright Office**

**To Backdate Documents, To Infringe My Work**

29.     But should anyone think this fraud and false numbering scheme that the Infringers induced the U.S. Copyright Office into (or induced a few corrupt and unAmerican agents working for the US Copyright Office into) is limited to the "harmless" re-numbering of a few documents necessary for the Infringers to send me "secret" intimidating messages, they are mistaken. The evidence that these Infringers relied on the US Copyright Office to further their infringement of my work, falsify documents, and commit fraud is far more corrupt than the previous examples. The Infringers used the US Copyright Office to help falsify and fraudulently backdate documents and make these fraudulent registrations appear valid and credible—while using this same system to improperly make **MY** valid documents appear as if they were created later. More disturbingly, the US Copyright Office falsified documents for an infringing foreign entity, and gave this foreign entity preferential filing to an American creator, as I will demonstrate.

30.     To see some of the evidence of document filing falsification at the US Copyright Office, simply go to the Copyright Office's website (https://www.copyright.gov),

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

12

*click* on  *Search Copyright Records*, on the next screen types "All You Need Is Kill" in the search bar below the words "Basic Search", choose "Title" in the "Search by:" menu, click "Begin Search".  On the next screen, to organize the results, select "Date (ascending)" from the "Resort results by" menu bar. The results of this search are attached as **EXHIBIT S**.)

31.    By examining this search one sees that the first result in this search fraudulently indicates that in 2004 a <u>Japanese</u> work titled "All You Need Is Kill" was registered in the **US Copyright Office**. This is fraud on its face. But the problems go on.

32.    The next problem is when one clicks the link to the 2004 *All You Need Is Kill* registration (see **EXHIBIT T**) it clearly shows the document <u>WAS NOT registered in 2004</u>; rather, it was registered on **Nov 5, <u>2015</u>**, 11 years after it alleges to have been created on the search screen. This was a clear attempt to fraudulently backdate this document.

33.    Disturbingly, if one looks at the "Copyright Claimant" and "Authorship on Application" lines (Exhibit T), one sees that the claimant is located in Japan. This is very unusual, but not unlawful. However, this infringing Japanese author is transparently using the US Copyright Office as a tool to falsify and backdate this document. This is proven by the fact that, from my truncated research, none of the other known Japanese works that infringe my work (listed on page 3, under Sony) are registered in the US; rather, they are registered in Japan, if at all.

34.    One may wonder, "Maybe the US Copyright Offices backdates all registrations to when the owner alleges the works were first created?" Not so. This is  an effort by corrupt agents at the US Copyright Office to assist the Defendants and the Infringers, domestic and foreign, to steal my work. Proof of this follows.

35.    If one searches my name in the US Copyright Office (enter "Wilson Briggs, Steve" in the search bar; select "*Name*" in the "*Search by*" menu; click "Begin Search"), one sees that the US Copyright Office does not backdate *my Butterfly Driver* registration to 2005 (or 2004); rather, the Copyright Office indicates that the registration was filed in 2013. (See **EXHIBIT U**.) But by looking at the actual Copyright Certification for Butterfly Driver (see **EXHIBIT V**), or by looking at the copyright registration for Butterfly Driver in the

1  Copyright Office's web database (see **EXHIBIT W**), one clearly sees that on the

2  "Completion/Publication" or "Date of Creation" lines, respectively, show that I informed the

3  Copyright Office that Butterfly Driver (AKA: Uberopolis: City of Light) was first completed

4  in 2005. **But the US Copyright Office was careful NOT to backdate MY work to 2005**

5  **(or earlier), as they generously backdated All You Need Is Kill to 2004.**

6  [NOTE: I have proof, filed with the Court, that I emailed finished versions of my script to

7  friends and family in May of 2005, and emailed other parties in Dec 2005, and more parties

8  still in Jan 2006, but I did not register the script with the Copyright Office until I sued Neill

9  Blomkamp et al, in 2013 (*Briggs v Blomkamp*), because registration is only *required* to file

10 an Infringement action, but registration is NOT required to establish copyright ownership

11 and/or rights. Hence, in the early 1990s I stopped registering my works. Further, I can also

12 prove that I completed a full script outline and a rough draft of the script in early 2004.]

13    36.    This clearly shows the US Copyright Office acted to falsify and backdate the

14 registrations of a foreign infringers' falsified copyright applications, but did not use this

15 same procedure to register and backdate my copyright registrations/applications.

16    37.    Since the falsification occurring at the Copyright Office, described in this

17 section (and in the section titled "The Infringers Have Infected The US Copyright Office

18 And Threaten To Destroy US Credibility and Global Standing", p 9) was done to assist

19 different big film companies, domestic and foreign (Sony, Warner Bros, Rat Pac-Dune Ent,

20 Viz Media, Media Rights Capital….), it can only be reasoned that agents inside the US

21 Copyright Office are willing to falsify any documents for any large film studio.

22               **Blocked From Accessing The Copyright Office, Again**

23    38.    August 11, 2020, the night after writing the preceding passage, I was again

24 blocked from accessing the Copyright Office for over 4 consecutive hours. (See **EXHIBIT**

25 **X.**) We can assume that some corrupt Hollywood insider at the Copyright Office is working

26 hard to solve the problems I created by discovering this fraud; much as, after I filed the

27 Complaint, Defendants Internet Archive and Google LLC futilely worked to make new fake

28 crawls and URLs to address the fraud described in the Complaint.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**The Copyright Registration for South Park's Lice Capades**

**Reveal ViacomCBS' And Trey Parker's Corrupt Plan To Infringe My Work**

39.     The Complaint explains that the Defendants in *THIS* action accessed my work in 2006. However, page 51 of the Complaint explains that the Defendants and many other Infringers accessed my script again, between December 2006 and May 2007, while my script was posted on TriggerStreet.com. The Complaint explains:

> "...the Defs accessed his script again, between Dec 2006 and May 2007, while it was posted on Kevin Spacey's social network TriggerStreet.com (TS), because the film Avatar features aspects that were in versions of Plaintiff's screenplay that were posted on TS, during that period, and not prior. Specifically, Avatar features:
> 1.   the mind/soul scanner/replicator/transferer.
> 2.   An amplified and more pronounced environmental theme, message and story.
> 3.   Amplified God, religion, spirituality, and dreams story structures."

40.     As mentioned in the passage above, one of the significant differences in my screenplay, during this period on TriggerStreet.com, is that it featured a spiritual discussion about the Earth being alive, and our (mankind's) responsibility to try to protect it.

41.     Trey Parker and Viacom accessed my screenplay on TriggerStreet.com in March of 2007. The *South Park* episode "Lice Capades", season 11 episode 3 (2007) infringes most of the major elements of *Butterfly Driver*:

> A father lice (Travis) goes to impossible lengths to save his daughter (Hope) from being killed by pollution (lice shampoo), as a powerful mayor with presidential ambitions tries to stop Travis.

42.     *Lice Capades* even steals my story's spiritual thread, and my hero's near death spiritual dream vision that saves his life in the closing moments.

43.     To be clear, I had been a huge fan of Trey Parker's work, until discovering this flagrant infringement. I even dedicated a page of my book *Morons Don't Ride Harleys* to praise Parker and his creative partner, Matt Stone.

44.     Trey Parker is named on over 100 copyright registrations. The *Lice Capades*

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  episode aired on Mar 21, 2007, making it the second film or TV show to infringe my script.

2  The last *South Park* copyright registration that Parker is named on was the episode

3  immediately before *Lice Capades*, season 11, episode 2. **[**See **EXHIBIT Y**, all of Parker's

4  copyrights, sequentially. "Comedy Partners" (an alternate entity name for ViacomCBS'

5  *Comedy Central Network*) is named on all South Park copyright registrations for episodes

6  produced after March 14, 2007.**]** This suggests that ViacomCBS made Parker an extremely

7  generous offer (a bribe) to write *Lice Capades.* ViacomCBS would do this to promulgate my

8  ideas in as many infringing works as possible. This would have many advantages.

9  ViacomCBS would have asked *Trey Parker* to do this because Parker and Matt Stone and

10  their cartooning crew work so fast that they can (and usually do) produce a half-hour

11  cartoon in a single week. The surest evidence of this bribe is that a few days after *Lice*

12  *Capades* aired, Comedy Central allowed Parker to put all South Park episodes on

13  SouthParkStudios.com. (**SEE EXHIBIT Z**, an April 6, 2007, Internet Archive screenshot of

14  SouthParkStudios.com attached to a March 24, 2008 TechCrunch.com article discussing the

15  fact that all episodes of South Park are available on South ParkStudios.com.)

16      45.    All South Park episodes appeared on SouthParkStudios.com **with**

17  **commercials**. Thus, Parker and ViacomCBS' arrangement allowed them to profit <u>again</u>

18  from the theft of my work. Proving Parker, who has made a career out of deriding celebrities

19  for their corruption and hypocrisy, is far more corrupt and hypocritical than any celebrity.

20  <div align="center">**Trey Parker Further Infringed My Work To Make**</div>

21  <div align="center">**"The Book Of Moron" Broadway Musical**</div>

22      46.    The unabashed spiritual voice of *Butterfly Driver* also transparently inspired

23  Parker's Broadway play *The Book of Mormon,* 2011, which is unlike any of his prior works.

24      47.    Prior to accessing my work (March 2007), Trey Parker and Matt Stone dealt

25  with God, religion and faith 15 times on South Park. All of these South Park episodes

26  treated God, religion and faith irreverently and with zero appreciation for the hope that faith

27  brings to our lives. The South Park episodes that dealt with God, religion and faith, prior to

28  Lice Capades (March 2007) are: 1. "**Damien**", February 4, 1998; 2. "**Spontaneous**

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  **Combustion**," April 14, 1999; 3. "**Jewbilee**," July 28, 1999; 4. "**Do the Handicapped Go**
2  **to Hell?**" July 19, 2000; 5. "**Probably**," July 26, 2000; 6. "**Super Best Friends**," July 4,
3  2001; 7."**Red Hot Catholic Love**," July 3, 2002; 8."**All About Mormons**," November 19,
4  2003; 9. "**The Passion of the Jew**," March 31, 2004; 10."**Trapped in the Closet**,"
5  November 16, 2005; 11."**Bloody Mary**," December 7, 2005; 12. "**Cartoon Wars Part I**,"
6  April 5, 2006; 13. "**Cartoon Wars Part II**," April 12, 2006; 14. "**Go God Go**," November
7  1, 2006; 15. "**Go God Go XII**," November 8, 2006.

8      48.    The only <u>remotely</u> hopeful messages in all of these episodes are:

9      a.    "Red Hot Catholic Love," culminates with Father Maxi reminding the
10      church that Catholicism is not about *molestation and queen spiders*.

11      b.    "All About Mormons," culminates with Gary explaining that his
12      religion (Mormonism) may not be factually true, but it supports good
13      family values and helping the poor.

14      c.    "The Passion of the Jew" culminates with Stan saying that Christians
15      should follow Jesus' teachings and not focus on how he died.

16      49.    Hence, during an eight year span and 15 episodes, this is all the insight and
17  hope Parker and Stone could muster.  Effectively nothing. Nothing beautiful or hopeful.
18  Believers and their beliefs were to be mocked.

19      50.    But after accessing my work, suddenly Parker and Stone, professed atheists,
20  who had habitually mocked all aspects of faith, changed their tune. And in *The Book of*
21  *Mormon*, Parker suddenly parrots my message that belief and faith give us <u>hope</u>, and "hope
22  is unreasonable," but it gives our lives value,  meaning, and makes our suffering bearable.

23      51.    NOTE: South Park episodes "**Go God Go**" and "**Go God Go XII**" (Nov
24  2006) indicate that Parker and Stone accessed my script (Butterfly Driver) in 2006.
25  However, this storyline in not infringing, but, as there is unlawful access, it may constitutes
26  a basis for a separate action

27      52.    Many of the infringing works, based on my work(s), use Wikipedia to claim
28  that these infringing works were conceived long before they were actually published.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

Like the Defendant's in this *Avatar* action's insane creation of many fraudulent and backdated articles/webpages, then using the Internet Archive to create fraudulent crawls of the articles/web-pages, Trey Parker used Wikipedia to try to backdate *The Book of Mormon*, by claiming the co-creators began developing Book of Mormon in 2003. Wikipedia tells an elaborate story about how The Book of Mormon was conceived in 2003 through 2006:

> "During the summer of 2003, Parker and Stone flew to New York City to discuss the script of their new film, Team America: World Police, with friend and producer Scott Rudin (who also produced South Park: Bigger, Longer & Uncut).[5][8] Rudin advised the duo to see the musical Avenue Q on Broadway, finding the cast of marionettes in Team America similar to the puppets of Avenue Q. [8] Parker and Stone went to see the production during that summer and the writer-composers of Avenue Q, Lopez and Jeff Marx, noticed them in the audience and introduced themselves. Lopez revealed that South Park: Bigger, Longer & Uncut was highly influential in the creation of Avenue Q. [8] The quartet went for drinks afterwards, and soon found that each camp wanted to write something involving Joseph Smith.[5] The four began working out details nearly immediately, with the idea to create a modern story formulated early on.[5] For research purposes, the quartet took a road trip to Salt Lake City where they "interviewed a bunch of missionaries—or exmissionaries."[9] They had to work around Parker and Stone's South Park schedule.[6][10]

> "In 2006, Parker and Stone flew to London where they spent three weeks with Lopez, who was working on the West End production of Avenue Q. There, the three wrote "four or five songs" and came up with the basic idea of the story. After an argument between Parker and Marx, who felt he was not getting enough creative control, Marx was separated from the project.[11] For the next few years, the remaining trio met frequently to develop what they initially called The Book of Mormon: The Musical of the Church of Jesus Christ of Latter-day Saints. "There was a lot of hopping back and forth between L.A. and New York," Parker recalled.[5]"

53.   The Wikipedia entry claims that Parker, Stone and Robert Lopez had a major falling out with Jeff Marx, in 2006. So I went to the US Copyright office to see if Parker, Stone, Lopez or Marx registered any copyrights in 2006—as one would expect, given that Marx and Lopez are Tony Award winning composers. Nope. The earliest registration for any *Book of Mormon* song or literary work is October 17, 2011. Another problem with the Wikipedia story is that the first line of the passage above claims: "During the summer of 2003, Parker and Stone flew to New York City to discuss the script of their new film, *Team*

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  *America: World Police*, with friend and producer Scott Rudin";  but this story disagrees with

2  the Wikipedia entry for *Team America: World Police*, which states: **"The first draft of the**

3  **script [*Team America: World Police*] was turned in well before the Iraq War."** Since the

4  Iraq War started in March 2003, and the first draft of *Team America* was turned in "well

5  before" then. Parker and Stone would NOT need to fly to New York to discuss their script

6  with Rudin. This story is a lie, created to try to put them in New York with Marx and Lopez,

7  and backdate *The Book of Mormon* to before my work.  Nobody grabs their best friend and

8  flies across a continent to discuss a script. They get on the phone and call, or send an email

9  or text. Fortunately, lies are not a copyright alternative. For a work to be copyrightable it

10  must be in fixed form. Parker will never be able to prove he had a script for *The Book of*

11  *Mormon* before 2008.

12      54.    It should also be noted that Scott Rudin, who produced the film *South Park:*

13  *Bigger, Longer, Uncut* in 1999, also co-produced the infringing film, in this action, *Avatar.*

14             **Disney Would Become The Most Ravenous Infringer Of My Work;**

15             **Disney's Use Of My Work Goes Against 60 years Disney History**

16      55.    As explained in the Complaint, among other things, my screenplay was the

17  first literary work that told the simple, universally relatable story of a father (or family

18  member) who would go to impossible lengths and defy all odds to save his daughter (or

19  family member), first act to the final act. It may feel as if this incomparably powerful

20  storyline must have been executed thousands of years ago, but no.

21      56.    Since 2007, Disney has <u>repeatedly</u> taken <u>many</u> copyrightable aspects of my

22  work for their TV shows and films. The aspect that Disney infringes most often is the

23  storyline about a family member who goes to impossible lengths for another family member.

24      57.    Currently, Disney XD (TV) appears to have ten cartoon series that it is

25  producing new episodes for. Of these ten series, four infringe several of my works **severely**

26  (Gravity Falls, DuckTales, Amphibia, The Owl House), and two infringe my work(s)

27  negligibly (Big City Greens, Big Hero 6). DuckTales' infringement is curious because

28  DuckTales existed long before my work, but it was cancelled many years ago. But after

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

infringing *Butterfly Driver*, Disney created a new *DuckTales* series that abandons every aspect of the original series, and infringes virtually every aspect of Butterfly Driver (and added a biological mother character). Now, in virtually every episode, a family member risks their lives for another family member (then boasts about how heroic they are, and how much family matters). None of this was part of the original series.

58.     Perhaps more disturbing than Disney repeatedly stealing and infringing my screenplays, is the fact that where I used my ideas to create diverse and progressive works that might bring people together, Disney repeatedly infringed my story thread about a person going to impossible lengths and risking life and limb for a family member for films and TV shows that were entirely cast with White actors, set in Europe, centuries ago; *Brave* and *Frozen* are prime examples (although I presently don't intend to sue to Brave or Frozen). In doing this, Disney endeavored to steal my ideas, to promulgate the myth that this story structure was borne of European values and European minds. It was not. It was conceived by a bi-racial, Black American, who ardently believes in the virtue and equality of all races.

59.     My original storyline (about a father who goes to impossible lengths and risks life and limb for his daughter) was borne of my values, experiences, and my personal choices. Where other writers wrote about disillusionment, finding love in the modern world, and countless other rehashed ideas, I reflected on what is meaningful to all people the world over. Butterfly Driver required countless hours of analyzing what stories have, and have not, done before. Then threading a dozen issues that matter profoundly to me (and most of the world) into a seamless garment. The vast and deep appeal of Butterfly Driver's many storylines/structures does not reduce their copyrightability; rather, it makes them more copyrightable, as highly creative works are entitled to "broad" and "thick" protection.

60.     Someone might argue that surely this story structure must have been done by Disney in one or more films, long ago; after all, Disney is synonymous with "family films." But Disney never used a storyline close to my storyline, prior to 2011.

61.     From Disney's first cartoon in 1937, to the first film that Disney created that infringed my work (The Lookout, 2007), exactly 70 years elapsed. And in 70 years there is

nothing like my storyline to be found in Disney's filmography. In fact, before my work, Disney films often promoted very warped and disturbed family values and concepts. Consider 20 of the most popular Disney films over the past 70 years:

| | |
|---|---|
| Dumbo (1941) | A mother elephant is separated from her baby after she tries to defend him from bullies. |
| Cinderella (1950) | After her parents die, Cinderella (**orphaned**) is forced to work as a maid for her evil stepmother. (How an orphan has a stepmother is not explained) |
| Peter Pan (1953) | A traditional family is visited by Peter Pan. ...In the end, the lost boys (**orphans**) return to Never Land, rather be put up for adoption |
| Kidnapped (1960) | After his father dies, **orphaned**, David must live with his uncle, who tries to kill him, then sells him into servitude. |
| The Parent Trap (1961) | 2 divorced parents opt to raise their twin girls separately, with no plans to see the other daughter ever again. |
| Sword In The Stone (1963) | Authur, a 12-year-old **orphan** is raised by Merlin... |
| Mary Poppins (1964) | Two incompetent parents hire a new nanny —after their kids drive off the original nanny. |
| The Jungle Book (1967) | A black panther finds a young human **orphan** boy in a basket, in a jungle in India . |
| Bedknobs and Broomsticks (1971) | 3 British **orphan** siblings are forced to live with Miss Price, who is using magic to fight the Nazis. |
| Superdad (1973) | A father tries to save his 17-year old daughter from her lazy friends. Failing, his defiant daughter becomes a hippy |
| Escape To Witch Mountain (1975) | 2 **orphan** siblings escape an orphanage to learn the truth about their parent's deaths. |
| Apple Dumpling Gang (1975) | A cowboys is tricked into taking care of 3 **orphans**. |
| Freaky Friday (1976) | A disagreeable mother and daughter switch bodies. |
| Pete's Dragon (1977) | A dragon helps Pete (a young **orphan**) escape from the abusive family that purchased Pete. |
| The Black Cauldron (1985) | A teen with no known family, helps a warlock fight evil. |
| Honey I Shrunk The Kids (1989) | An inventor's shrink ray shrinks his kids. |
| The Little Mermaid (1990) | After twice defying her father, a young mermaid makes a deal with a sea which. |
| Finding Nemo (2003) | A young fish gets lost. A father searches, desperately. |
| The Incredibles (2004) | Superhero parents allow their kids to fight a supervillain. |

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

62.     I found only three Disney films where self-sacrifice for a family member factored into the storyline. All three of these films were released in the nineties:

| 1. Beauty And The Beast (1991) | A farm girl agrees to take her father's place in a beast's dungeon. |
|---|---|
| 2. The Lion King (1994) | A father lion gives his life to save his son. |
| 3. Mulan (1998) | A young woman joins the army to fight in place of her father. |

63.     All of these 1990s films were very successful, but none of them caused a rush to make copycat films. But my script's storyline was very different from these Disney films:

a.  In *Beauty And The Beast*, Belle offers to trade places with her father, but there is no imminent harm that threatens her father, he is fed, clothed and housed. Thus, the heroism of facing death is gone. This allows Belle to eventually feel for the beast, and it allows the story to evolve into a romance.

b.  In *The Lion King* the father lion is killed at the end of the first act. Although he fights heroically to save his son, because the father dies in the first act, he is not the story's hero. More importantly, the father did not do anything extraordinary. Most parents would risk their lives for their kids. It is respected, but not extraordinary. (In Butterfly Driver, what Arlo does —literally going across the Earth and up to Uberopolis— is extraordinary.)

c.  In *Mulan*, Mulan chooses to fight in the Army in place of her father, but the father's life is never at risk; thus, the heroism is lost. More importantly, the father has other options (1. He can flee; 2. He can pay someone to fight for him; 3. He can fight and perhaps survive…). Further, just because Mulan chooses to fight in her father's place, does not mean she must fight heroically. She fights heroically, but not to save her father, but because she loves China.

64.     Disney believes they are entitled to steal ideas from poor, undiscovered writers, revise history, and promulgate the idea that Whites are uniquely devoted to family. In future suits I look forward to exposing how Disney used *Gravity Falls* (a cartoon, stolen from me) to regularly attack Blacks, and seemingly plant seeds of racial hatred in children.

**ACCESS**

65.     Because of the Ninth Circuit's recent Skidmore v Led Zeppelin order, which returns to the original and intended principles of copyright law, in this action and in all future actions, I need only present a plausible access theory. A very reasonable standard, which I easily exceeded in this action. [The Complaint details how I responded to the advertisement of a company named Zero Gravity Management LLC, stating the company was looking for screenplays. I sent Zero Gravity Management a query email. They responded by asking me to send them my screenplay, "City of Light" (Uberopolis: City of Light). I emailed them a PDF of the screenplay. immediately.]

66.     However, because the infringers hacked into my computer and email (documented in the Complaint), I feel a duty to others, whom the Infringers may have also robbed, to provide a complete telling of how the infringers hacked into my computers and email to steal screenplays and stories, to made themselves billions.

67.     This access section is also intended to address logical and ethical questions, such as, if there is clear evidence (as there is) that the Defendants/Infringers hacked into my computer, and clear evidence that the Defendants produced countless falsified articles, and clear evidence that the Defendants enlisted the Internet Archive to produce fraudulent web crawls of the Defendants/Infringers' fraudulent web-documents **beginning in 2006**, and if there is already established evidence that News Corp engaged in hacking into phones of thousands of private citizens between 2005 and 2006, then is it reasonable to assume that these corrupt Defendants and their associate (Dreamworks, Microsoft, Viacom, Disney, Time-Warner) engaged in that same unlawful conduct (hacking) several years earlier, around 2000? These access facts and questions are essential because the Court's past preferential treatment of the Defendants/Infringers (the Hollywood film industry) contributed to the growth of a corrupt Hollywood culture whose bad actions now threaten America's standing in the world, as the Infringers' successful corruption of agents at the US Copyright Office and Internet Archive, with the support of a Court system that turns a blind eye, declares to the world that America is transforming, from a world leader to an irrelevant kleptocracy.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

### HOW THE DEFENDANTS/INFRINGERS CAME TOGETHER

#### 1994 Microsoft & Dreamworks Enter Into Direct Partnership

68.     The infringement of my work started with Microsoft, Steven Spielberg and NBCU.

69.     In 1994, Steven Spielberg, Jeffrey Katzenberg and David Geffen set out to form a new film production company, which would be called (originally) Dreamworks SKG (Spielberg, Katzenberg, Geffen). Spielburg would be in control of live action film production, Katzenberg would be in control of animated film production, and Geffen would be in control of music production. But Spielberg, Katzenberg and Geffen lacked the money required to start a major studio. The new company would need roughly $900-million dollars to start. They would get most of that money from Microsoft's co-founder, the late Paul Allen.

70.     **In 1994, Paul Allen invested $500-million in Dreamworks**; Stielberg, Katzenberg and Geffen each contributed $33-million (roughly $100-million), and Cheil Jedang Group heiress Miky Lee would invest $300-million.

71.     **Paul Allen's investment gave him and Microsoft 55% controlling interest in Dreamworks**, and he would use his influence at Microsoft to protect his investment. (In December 1999, Paul Allen would invest $35-million in Lionsgate Entertainment, a company that Paul Allen would also help infringe my work, years later, in 2006.)

#### 1996 Microsoft & NBC Enter Into Partnership;

72.     Two years later, in 1996, Microsoft would invest $221-million in a new joint TV partnership with NBCUniversal, forming the new television station MSNBC.

#### 2002 DreamWorks & NBC Enter Into Direct Partnership

73.     Although prior to 2002, Dreamworks and NBC did not have a direct partnership, they were indirect business partners because they were both partnered with Microsoft. Thus, in 1999, after Spielberg and Dreamworks accessed my screenplay, Dreamworks' infringing TV series, *Freaks and Geeks*, would air on NBC.

74.     In 2002 Dreamworks entered into a  development agreement with NBC.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

75.     With partnerships in place, these three parties could have infringed my work without help, but the catalyst to the infringement was News Corp, a Defendant in this action, and owner of HarperCollins Publisher, whom I sent my short story in early 1999. Thus, although the first *infringers* of my work were Microsoft, Spielberg, Dreamworks and NBCU, the first *accessor* was News Corporation and Rupert Murdoch.

<div align="center">

**How The Defendants Accessed My FIRST Work,**

**"Hot Orange and Honey" (1999)**

</div>

76.     *Hot Orange & Honey* is a short story about my experience as a 13 year old kid, trying to survive puberty and heartbreak in Northern California's Bay Area in 1978, written between November 1998 and January 1999. The 1999-2000 Dreamworks TV series Freaks and Geeks was inspired by and infringes my short, *Hot Orange & Honey*.

77.     Between February and April 1999, I sent my short (Hot Orange & Honey) to 6 to 12 publishers, including HarperCollins, Simon & Schuster, and Zoetrope: All Story. HarperCollins Publishers is owned by Defendant News Corporation (owned by Rupert Murdoch, owner of Twentieth Century Fox, and Fox TV), Simon and Schuster is owned by ViacomCBS (which, at the time, owned numerous DreamWorks business entities), and Zoetrope is owned by Francis Ford Coppola.

78.     The Infringers (DreamWorks) most likely obtained my short through one of two sources: News Corporation (owner of HarperCollins Publishers), or Francis Ford Coppola's publishing company, "Zoetrope: All Story." However, I believe it is, by far, most likely that my screenplay arrived with Spielberg via Rupert Murdoch and News Corporation (HarperCollins), for two reasons:

a. First, Steven Spielberg is considered one of the greatest directors ever, but in 1999 (when my short was infringed), in Spielberg's 25 years of directing films, he had never agreed to direct a film for Murdoch or Twentieth Century Fox Film Corporation. However, immediately after my short story was infringed, Spielberg began directing his first film for Murdoch (Minority Report, released in 2002). Spielberg would not make another film for Murdoch for ten years (2012).

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

25

1  This appears to be a quid pro quo.

2  b.  Second, shortly after Dreamworks infringed my short, they began production of a

3     new TV show, "Undeclared" (inspired by my short "Sunflowers"). **Undeclared**

4     **would air on Fox TV** (owned by Murdoch and News Corp). Prior to this,

5     Dreamworks had television business relationships with ABC and NBC, but not Fox

6     or CBS. This appears to be another quid pro quo.

7  79.  In 1999, to find publishers to send my first short, *Hot Orange & Honey,*

8  I purchased 2 or 3 independent writer's marketing books, containing the names, addresses

9  and submission guidelines of hundreds of publishers; one of these books was the 1999

10 edition of "Writer's Market." I decided to send my short to large publishers that allowed

11 unsolicited manuscripts from unagented writers. In looking through "Writer's Market"

12 (1999) I found two listings for two News Corporation/*HarperCollins Publishers*:

13 (1) *Harpers Magazine* (page 492), and (2) *William Morrow & Co* (page 255). William

14 Morrow & Co and Harper Magazine are subsidiaries of *HarperCollins Publishers,* and

15 *HarperCollins Publishers* is a subsidiary of News Corporation. *Zoetrope: All Story* also

16 accepted unsolicited and unagented material (page 596)

17 80.  Rupert Murdoch and News Corporation  engaged in an infamous hacking

18 scandal in 2005 to 2007. The Complaint also shows that News Corp and other Defendants

19 hacked into my computer and phone from 2007 to the present. I believe, and the evidence

20 shows, that after Murdoch (News Corp) accessed my work, he contacted Spielberg, and the

21 two entered into a partnership to infringe my work. Soon, Murdoch and Spielberg persuaded

22 Paul Allen (55% owner of Dreamworks) to use Paul Allen's *Microsoft Corporation* to hack

23 into my computer. This is certainly how DreamWorks, Twentieth Century Fox and

24 Microsoft unlawfully accessed two of my screenplays between 1999 and 2006 (and a third

25 script, *Sunflowers*, may have been accessed by hacking, or, as I will explain later, when a

26 film producer requested a copy). (After late 2007, all of the Infringers accessed my work via

27 hacking.) In 1999, Paul Allen (co-founder of Microsoft) became a 7.6% owner/investor of

28 Lionsgate Entertainment.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**How The Infringers Likely Hacked Into My Computer To Access**

**The Second Stolen Work, "Sunflowers" (Late 1999-2000)**

81.     I suspect that hacking into my computer in late 1999 to 2001 would have been fairly easy, because I was then using *Juno* dial up phone internet service (I have retained one or two of my old Juno billing statements). Juno was a poorly run company, developed by a man named Charles Ardai, who aspired to be a writer.

82.     Sometime around 2001 I moved from dial-up internet to high-speed internet with Time-Warner cable ("RoadRunner") service in New York. There are indications that Time-Warner joined the Infringers by 2004, and helped them hack into my computer. Such indications as the fact that 3 of the first 4 films to infringe my screenplay *Uberopolis/Butterfly Driver* were all released by Warner Bros (a Time-Warner subsidiary); these 3 infringing Warner Bros films are *I Am Legend*, *The Dark Knight*, *Edge of Tomorrow*.

83.     The second of my works that the Infringers would unlawfully access and infringe was my screenplay *Sunflowers* (1999 to 2000) . The first draft of "*Sunflowers*" was completed in late 1999. I continued to revise it, from time to time, until early 2001.

84.     *Sunflowers*, loosely based on myself and several of my Bay Area friends, is a comedy about 4 friends from Northern California, who, on the day they graduate from art college in San Francisco, are contacted by a suave art entrepreneur who asks the young artists to move to London where they can produce flawless replicas of celebrated masterworks for the entrepreneur's extremely wealthy and demanding clientele. Unbeknownst to the naive artists, the entrepreneur is an underworld mob boss, who plans to use the artists' reproductions to help him steal the originals from The National Gallery.

85.     It is most likely that the Infringers accessed "Sunflowers" in early 2000, after I sent a query letter about the script to the Paradigm Talent Agency. In response, a man named Mark Kamen (I am certain that the first name was Mark, and 90% that the last name was Kamen) responded to my query, with a voice message on my answering machine, and asked me to send a copy of *Sunflowers* to him in Chicago, care of Paradigm. I sent the script in a large, padded manilla envelope, addressed in blue felt-tip marker. I remember this so

clearly because it was <u>the first time</u> a film industry professional asked me to send a copy of my work. Mark (Kamen) did  NOT contact me again.

### Access: "Stutter" (2000 to Early 2001)

86.     The first rough draft of Stutter was completed in early 2000. Stutter was accessed by hacking, as I never gave the script (a rough draft, 40-80 pages) to anyone, period. Although I described the script to two or three friends and/or family members.

87.     Stutter is about a very good-hearted young man from the inner-city, whose fiance is pregnant, and who cannot find a job because of his record: Manslaughter, for accidentally killing someone (who was holding a gun on his best friend) with a blow from his bare hand. The hero (nicknamed "Stutter," because he stutters—usually only when he's excited or lying) has weekly check-ins with his probation officer. Because Stutter cannot find work, he inevitably agrees to take a job driving cars, point A to point B, for a gang lord. Stutter knows the cars carry contraband, but he agrees to drive the cars on the condition that no one ever tells him what is inside the cars' trunks. Stutter reasons that this gives him *plausible deniability*. Plus, by not knowing what is in the cars, he will be able to tell his probation officer that he is employed driving cars, without worrying about getting caught lying (by stuttering) about what he is transporting. The story culminates with Stutter trapped in a trunk full of **crystal meth**, as a group of ganglords meet in the garage outside.

88.     "The Transporter" film series infringes my screenplay Stutter. Dreamworks' "Life on Parole" TV series (which, apparently was never aired) infringes Stutter. To write Stutter, by that point in 2000, I had worked with *at-risk* inner-city youth for 14 years, and several of my girlfriends (including my son's mother) had been practicing social workers or healthcare workers, and a couple friends were probation officers. I'm eager to see and hear Judd Apatow share what experiences he drew on to write *Life on Parole*.

### What Spielberg Infringed From Butterfly Driver

### For *War Of The Worlds*

89.     In 2004, by the time Spielberg and the other Infringers accessed my screenplay *Uberopolis: City of Light/Butterfly Driver*,  H.G. Wells' *War of the worlds* had

1  been an American classic for over 100 years. In all of those hundred years *War of the Worlds*

2  had not changed. *War of the Worlds* tells the story of a space alien invasion and attack on

3  Earth and all of mankind, told through the narrative voice and eyes of a man who becomes

4  separated from his wife. The man and his wife do not have children. At the end of the story

5  the man is reunited with his wife.

6      90.    Around mid 2004, Spielberg, Microsoft and NBCU accessed my screenplay

7  *Butterfly Driver*, in the early stages, while I was writing it, by hacking into my computer. By

8  late January 2004, my "Butterfly Driver" *MovieMagic Screenwriter 2000* program file had a

9  complete plot layout. By March 2004, the file contained a rough draft of half of the script

10  and the overarching plot layout. The file contained a complete rough draft by April 2004.

11      91.    Steven Spielberg remained 90% faithful to the original War of the Worlds

12  script, BUT he dramatically deviated from H.G. Wells book to infringe 2  aspects:

13   a.  the never-before-executed story structure of a family man hero (with children), in the

14       sci-fi and/or action adventure genre, who must go impossible lengths and risk life

15       and limb, for the life (lives) of his children/family.

16   b.  a central sci-fi hero who is a father AND who is divorced or separated from his wife.

17      92.    Infringing these 2 aspects was a DRAMATIC departure from the H.G. Wells'

18  story, because Wells specifically made his book's hero MARRIED with NO children.

19      93.    By Infringing my work, Spielberg saved Dreamworks from Bankruptcy, as the

20  Wikipedia article for "Dreamworks Pictures" explains:

21      David Geffen admitted that DreamWorks came close to bankruptcy twice.
22      Under Katzenberg's watch, the studio suffered a $125 million loss on
        Sinbad: Legend of the Seven Seas, [20] and also overestimated the DVD
23      demand for Shrek 2. [21] In 2005, out of their two large budget pictures,
        War of the Worlds was produced as a joint effort with Paramount Pictures
24      which was the first to reap a significant amount of profits, while The
25      Island bombed at the domestic box office but turned a profit
        internationally through Warner Bros.
26

27      94.    The primary evidence of unlawful access is the unprecedented infringement:

28  my concept of a sci-fi action hero who has children that he must save. The fact that H.G.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  Wells' *War of Worlds*' hero, and the hero of all previous versions of War of the Worlds, did

2  not have children is the giveaway. Ignoring the fact that Spielberg infringed two of my

3  works (*Freaks And Geeks*, and *Undeclared*) prior to stealing my concept for War of Worlds,

4  the conclusive evidence that Spielberg hacked into my computer is found in the next section,

5  in the story of  how Spielberg "acquired" the concepts for *Interstellar* in 2005, then gave

6  those ideas to Christopher Nolan, who quickly claimed credit for the ideas.

**How Christopher Nolan Acquired Interstellar From Spielberg**

8  95.      The film *Interstellar* is a gross infringement of my work (Butterfly Driver).

9  **Wikipedia**'s entry on "Steven Spielberg" explains how Spielberg announced his intent to

10  produced *Interstellar* in June 2006 (five months after Zero Gravity Management LLC and

11  Murdoch unlawfully accessed my screenplay, in January 2006; see Complaint):

> In June 2006, Steven Spielberg announced he would direct **a scientifically
> accurate film** about "a group of explorers who travel through a worm hole and
> into another dimension", from a treatment by Kip Thorne and producer Lynda
> Obst. In January 2007, screenwriter Jonathan Nolan met with them to discuss
> adapting Obst and Thorne's treatment into a narrative screenplay. The
> screenwriter suggested the addition of a "time element" to the treatment's basic
> idea, which was welcomed by Obst and Thorne. In March of that year,
>      Paramount hired Nolan, as well as scientists from Caltech, forming a
> workshop to adapt the treatment under the title Interstellar. The following July,
> Kip Thorne said there was a push by people for him to portray himself in the
> film. Spielberg later abandoned Interstellar, which was eventually directed by
> Christopher Nolan.

21  96.      As the Complaint explains, immediately after Zero Gravity Management and

22  James Cameron accessed my script in January 2006, James Cameron repeatedly announced

23  (in 2006 and 2007) that he was making a scientifically accurate film called *Project 880*

24  (later renamed *Avatar*).

25  97.      Spielberg and Cameron's eagerness to tell the world about their scientifically

26  accurate work reflects the fact that both scripts were derived from my scientifically accurate

27  work. And, as explained in the Complaint, in a version of my script that I posted on

28  TriggerStreet.com from approximately December 2006 to May 2007, I actually explained

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  and showed how a virtual time machine is possible. Spielberg and Cameron's eagerness to

2  tell the world about "their" scientifically accurate projects (just months apart), YEARS

3  BEFORE either film was released, speaks to how unprecedented my ideas were (and how

4  unimaginitive Cameron and Spielberg are).

5      98.    As a copyright plaintiff, all I need to show is (1) a reasonable access theory,

6  and (2) substantial similarity of the aspects that I allege were infringed (which I will do in

7  these respective future suits). However, Spielberg and Nolan's story is plagued by three

8  clear signs of fraud and infringement:

9    a.  The Wikipedia article (above) explains that Kip Thorne and Lynda Obst wrote the

10       Interstellar treatment, and explains that Christopher Noloan did not get involved

11       until seven months later (Jan 2007). Yet, the film's credits state that Chistopher and

12       Jonathan Nolan wrote the film by themselves. Obst is named as a producer. Thorne

13       is not credited.

14   b.  As explained earlier, typically, a valid film copyright will identify the writer. But

15       Interstellar's copyright registrations do not identify a writer. (See **EXHIBIT AA**).

16   c.  Although no writer is named on the copyrights, both Paramount and Warner Bros

17       Pictures are named on the copyright. Paramount is Spielberg's home studio. Warner

18       Bros is Nolan's home studio.

19          **Nolan Goes From *Interstellar* To *The Dark Knight***

20              **(Infringing My Work In Both Films)**

21      99.    As the previously cited Wikipedia article about Steven Spielberg explained, in

22  January 2007, Jonathan Nolan asked the writers of Interstellar to include a "time element" to

23  the film. As I explained previously, herein, and in the Complaint, in a version of my script

24  that I posted on TriggerStreet.com from approximately December 2006 until May 2007, I

25  showed how a massive virtual time machine is possible, and that vision towered.

26      100.   It appears that about a month after I introduced that new "time element" to my

27  screenplay, in January 2007 Christopher Nolan accessed my script on TriggerStreet.com,

28  then asked Obst and Thorne to add an infringing "time-element" to the Interstellar story.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

101.    Also curious, is the fact that Jonathan Nolan chose to approach Obst about the "time element" in January 2007. Why is this curious? Because pre-production of *The Dark Knight*, the Nolan brothers' most celebrated film, began in late 2006 (8 months after Zero Gravity Management accessed my screenplay), filming began in mid 2007. Thus, while one would expect Nolan's complete attention would be on The Dark Knight (which also which actionably infringes Butterfly Driver), Nolan was breaking away to ask the infringing "writers" of Interstellar to add a new "time-element" to the Interstellar script. This indicates how consumed the Nolan brothers were with my ideas.

**Access: "Cyclones" (1991)**

102.    I am a bit embarrassed that the infringers accessed and infringed "Cyclones," because it was my first semi-serious attempt at screenwriting (written in 1991-92 when I was 27), and it is extremely flawed and full of amateurish mistakes. I am not embarrassed about this work, as it was necessary to my growth as a writer. But I am embarrassed that I may need to submit a copy to the Court in future lawsuits, which will make this script a permanent public document; whereas, I would prefer to keep it a private.

103.    Cyclones is about two young men in their mid to late twenties, living in Los Angeles, who realize that they probably are not going to succeed in this world, because they have both made significant mistakes, augmenting other disadvantages. Thus, the two young men decide to rob a wealthy music mogul. Just in case their plan goes wrong, they enlist the help of a childhood friend who grew up to be a free-lance getaway driver. However, several years earlier the getaway driver friend sustained brain damage, when he was severely beaten in a gang attack. But Nate (one of the two primary friends) chooses to use the brain-damaged friend as their getaway driver anyway, because he is still a great driver.

104.    The getaway driver friend who sustained brain damage via a life-altering head injury, is the most interesting aspect of "Cyclones." This character would foreshadow my later works' preoccupation with characters that have clear, often profound, character anomalies (this preoccupation would reach its peak in 2007 with *The Amazing Mr Excellent*; in 2009 with *Alfrey and Darry*; and in 2012 *Sweeter Nectar Cherries*).

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

105.    The Infringers first accessed Cyclones by asking someone at the US Copyright Office to send them a copy. I only gave perhaps a dozen copies of the script to a few friends and family in late 1991 and early 2002, then moved on to other pursuits. I suspect the Infringers contacted the Copyright Office around 2005, because the first film to Infringe Cyclones (The Lookout) was released by Disney (Buena Vista Pictures) in 2007. Not surprisingly, by 2007 the Infringers were layering elements from other of my works into the primary infringing work. For instance, The Lookout's primary anti hero, in addition to being a getaway driver who suffered brain damage in a prior car accident (taken from *Cyclones*), also has a case worker (taker from Stutter).

106.    Before I discovered the facts and exhibits, contained herein, showing that the Defendants/Infringers had insiders at the US Copyright Office falsifying their documents (however poorly) and manipulating the Copyright Office's filing system (see pages 9 to 14), I emailed the Copyright Office to request a *records search and report* of everyone who has requested access to my Cyclones screenplay over the years. The Copyright emailed back to explain that I would need to pay $400 for this search. But, by the time the copyright office responded, I had discovered evidence that the US Copyright Office falsified documents for various infringing film studios (said evidence is detailed herein). Thus, I resolved to abandon my request for a records search and report; given that insiders at the Copyright Office are working with/for the Defendants/Infringers, any such Copyright Office search would be futile.

107.    The Infringers infringed *Cyclones* to make their films The Lookout (2007) and Baby Driver (2017).

### Access: "The Amazing Mr. Excellent" (2007)

108.    The Complaint documents many of the facts and much of the evidence concerning how the Defendants unlawfully hacked into my computer by sending various emails, which opened "backdoor" access to my computer; allowing the infringers access to *The Amazing Mr Excellent*, in 2007, 2008, 2009 and in 2019. (The Complaint also provides at least two attachments that establish that the Defendants used the Internet Archive and

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1   Wikipedia to fraudulently backdate the creation of their infringing film Kick-Ass.) Each of

2   these viral emails would have given the infringers indefinite access to my computer,

3   potentially for many years. It is reasonable to assume that all such hacks and viral email

4   attacks, prior to 2007, would also have given the infringers indefinite access.

5   <center>**Access: "Alfrey And Darry" (2009)**</center>

6   109.    The Infringers accessed Alfrey and Darry either by hacking into my computer

7   between 2009 and 2020, or downloading a trailer of the movie (4-10 minutes long) which

8   was filmed in 2012 , and available to download from 2012 to around 2015.

9   <center>**Access: "Nakota's Great Adventures" (2016)**</center>

10  110.    The Infringers accessed my children's book *Nakota's Great Adventures* (2016,

11  three versions available) from Amazon.com or Kindle, or any of several online sources.

12  <center>**Access:  "Thirteen Gates Of Rayne" (2001-2002)**</center>

13  111.    Originally titled Joey Raymond and the Thirteen Gates of Rayne, later

14  renamed Danny Zander and the Thirteen Gates of Rayne, and finally titled simply The

15  Thirteen Gates of Rayne. This story evolved from **(1)** 37 to 40 pages of very detailed written

16  story and character notes (for a 4 volume preteen novel series), typed in Microsoft Word in

17  2002, possibly early 2003; **(2)** a collection of 100-150 handwritten notes, floor-plans and

18  maps created between 2002 and 2009 (which the Infringer had no access to, ever); **(3)** a few

19  samples chapters written in Google Docs between 2011 and 2013. The 37-40 pages of story

20  and character notes were kept on a Word file on my computer for many years. I also printed

21  up at least 2 hard copies of these notes, and imported them into Google Docs around 2011.

22  112.    *The Thirteen Gates of Rayne* evolved from a story that I told my son, over the

23  course of three nights (bedtimes) in 2002. Shortly after telling him the story, I began writing

24  an enlarged version of the story.

25  113.    The Defendant/Infringers (namely News Corp, Disney and Twentieth Century

26  Fox) appear to have accessed my *13 Gates of Rayne* story and character notes when they

27  began hacking into my computer, again, in 2007 (see Complaint, page 56 and 57). The

28  evidence that they had access to my story and character notes in 2007 is that in Avatar

<center>Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint</center>

<center>34</center>

1   (2009) one of the characters refers to the hero (Jake Sully) as a "Dream Walker," this was a

2   central, recurring term in *The 13 Gates of Rayne.* Prior to 2014, when the infringing film

3   *The Last Witch Hunter* was released, the term "dream walker" was very uncommon, but I do

4   not believe that I coined the term. But the term does not appear in any prior *Twentieth*

5   *Century Fox* or *Disney* films. Using the term "Dream Walker" infringes my selection and

6   arrangement of unprotectable elements, and indicates that when the Defendants accessed

7   and infringed "Butterfly Driver," they also accessed *13 Gates of Rayne*.

8       114.   The Infringers (and other Infringers, Summit Entertainment and Netflix) chose

9   not to infringe my notes until 2012, to make *Gravity Falls* (June 2012), The Last Witcher

10  (2014), and Stranger Things (2016).

11      115.   I believe the Infringers waited until 2012 to infringe *13 Gates of Rayne*

12  because I resumed work on *13 Gates of Rayne*, intermittently, from 2011 to 2013 (in Google

13  Docs). I also imported a PDF scan copy of my *13 Gates of Rayne* notes into Google Drive

14  sometime around 2011. I stopped working on 13 Gates of Rayne in 2013 because I

15  discovered the Infringers' infringing film, "Elysium," and filed legal action, *Briggs v*

16  *Blomkamp*, October 2013, and I have remained engaged in legal action since. The

17  Defendant was able to unlawfully access my computer and my Google Docs files in 2013

18  (as they are now), and were able to observe my writing, and download my work. I suspect

19  that by watching me write—or by stealing—the first 2 or 3 chapters, the Infringers were

20  able to completely understand my original story notes. However, when the Court sees how

21  detailed the 37-40 pages of story notes are, the Court may be surprised that the Defendants'

22  team of unimaginative writer/thieves lacked the creativity to complete less than a 4 part

23  movie series a decade earlier.

24      116.   I will wait until I take legal action against Disney, Netflix and Summit

25  Entertainment before I submit the 37 pages of story notes and PDFs of other documents, etc.

26  However, I have attached a screenshot of my Google Docs folder showing The 13 Gates of

27  Rayne, untouched since July 1, 2013. (See **EXHIBIT BB**.) (NOTE: for a short while in

28  2013, I thought about changing the title to 13 Gates of "Raym"; thus, the word "Raym" in

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

the title in the screenshot.)

117.    *The 13 Gates of Rayne* features many story structures that were infringed by both Disney and Netflix. These story structures are very rare, some are wholly original. Some are copyrightable in their unique structure, while the others are copyrightable in any significant selection or/and or arrangement of these elements. Among the interesting story elements that readers of this declaration may recognize from *Gravity Falls* and *Stranger Things*, and many current Disney TV cartoons (including *The Owl House*):

   a.  The story takes place on the edge of **a small town** near a forest in Colorado.

   b.  The story centers on 4 friends of various races and genders (white male, a black male, an Asian male who <u>has multiple sclerosis and cannot walk</u>, a hispanic female). They are about 11 years old.

   c.  Each of the four friends has unique aptitudes and limitations.

   d.   One of the characters' (Danny Zander) father went missing 8 years earlier.

   e.  Danny's father left <u>notes</u> (journal) that leave some clues as to what the father was doing before he went missing.

   f.  An extremely strange event (a giant cloud bull, ridden by a demon, races across the night sky) causes Danny to explore the forest, alone, the following day.

   g.  Danny finds a cave blocked by a giant rock, hidden by trees, at the base of a mountain, with a <u>hand shape imprinted</u> on the side of the big rock.

   h.  <u>Danny places his hand over the hand shape</u> in the rock and the rock slides to the side, to reveal a huge cave entrance behind the rock.

   i.  In the cave, the kids discover a portal "gate". Entering the gate, they find a large chamber (hall) with thirteen giant portals, "gates". The guardian of the gates, Verdan explains that <u>each gate leads to a different distant galaxy (dimension)</u>.

   j.  In the chamber with the 13 gates, above each gate is <u>a different symbol.</u>

   k.  Evil entities begin to come through the gate that leads to Earth and their community.

   l.  The kids learn that <u>the most powerful and evil entity in the universe inevitably will come through their town's gate</u>.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

m.  <u>It will be up to the kids to stop the enormous and powerful entity</u>.

n.  <u>Many powerful and dangerous entities begin to come through the portal located outside of the kids' town</u>.

o.  The kids must secure a different powerful totem (or piece of clothing) in each of the 14 realms, to prepare for the advancing evil and his many minions and servants.

p.  The totems give the holder a specific super/magic powers, such as the ability to lift enormous weight, speak to animals, or dream walk.

q.  <u>A man (Miguel Sierra) who used to work with Danny Zander's father</u>, helps the kids solve various mysteries, and warns them of the dangers they will encounter.

r.  Danny <u>finally meets his long lost father (family member)</u> through the portal.

s.  **<u>Dreaming</u>** <u>is a heavy element in the story</u>, as the only alternative to going to each dimension through a portal, is by going via dreams (but only very advanced dreamers can travel to a different dimension/world via this method (dreams), and <u>if one dies in their dream while travelling this method, they will die in actuality</u>, or they will be permanently separated from their bodies.

t.  <u>The story pointedly disparages the idea of a "chosen" hero</u>, or predestined hero, or being special or unique, and stresses that heroes are not chosen, but are people choose to overcome their fear, and choose to be great—via hard work.

u.  People from Earth can only practice the lowest magic form: illusion.

v.  The story explains that dark magic is most powerful in the night or in the dark.

w.   The kids' heroic action saves the world and Danny Zander's father.

118.    No prior work ever contained more than a couple of these story aspects. No Disney or Netflix work ever contained more than a couple of these structures, if any.

119.    Disney's *Gravity Falls* infringes many of the elements above, but it also regularly steals Butterfly Drivers' "heroic fight for family," and various elements and scenes, such as where just before dying (in *Butterfly Driver*) Roddy looks at a picture of his young son on his phone (see Complaint, Exhibit X6, p 9**)**. Gravity Falls replicates this in *The Golf Wars*, as a character looks at a picture of his daughter as he dies.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**The Infringers Made Hundreds of Billions From My Work**

120.    The Infringers stole my work to make countless billions, by entertainment, and selling my vision of space tourism, and **by fraudulently representing my ideas as their own**, then selling my ideas of aggregated surveillance, etc., to the US Department of Defense (**DoD**) and NASA. I am certain the DoD was not aware that the ideas were stolen from me. Evidence that the DoD and NASA used my ideas is found on pages 122-124 of the Complaint, and in various subsequent filings, particularly the filing titled: "Amended Second Motion In Limine To Include New Evidence, In Support Of Complaint, And In Contemplation of Google LLC's Motion To Dismiss," which explains that in 2008, after Zero Gravity Management accessed my script, owner Michael Pierce, opened 212 Degrees Fahrenheit Corporatiom (**212DFC**); 212DFC's website claims the <u>US Marines</u> as clients.

**The Infringement Writing Lair**

121.    I suspect the true infringing writers worked for one of 2 companies: (1) **MRC** (formerly *Media Rights Capital,* a defendant in Briggs v Blomkamp), (2) Nielsen Holdings.

122.    MRC owns *Valence Media* and *Eldridge Industries*, owners of *The Hollywood Reporter* (**THR**) and *Billboard Magazine*. I believe MRC used Billboard and THR writers to write new scripts, infringing my ideas, and sold these derivatives to various studios.

123.    Earlier this year (2020) Billboard's website was hacked to announce company layoffs (due to the Covid-19 pandemic). (See New York Post, Variety, etc.) This only could have been done by a hacker/writer insider. I suspect that Billboard and The Hollywood Reporter had a small but significant hacking operation, but primarily the writers' role was to write works that were based on my ideas. <u>I believe the primary American hackers were fulltime dedicated hackers, working for a fake business facade called **MovieLabs**</u>. [**NOTE: Nielsen Holdings** (*AKA Nielsen, Nielsen Media Research* and/or *Nielsen Company*) is the prior owner of *THR* and *Billboard*. In 2008, two years after Murdoch and Zero Gravity Management accessed and infringed my work, Nielsen bought controlling interest of the company **NeuroFocus**, then created **Nielsen Consumer Neuroscience**, to achieve my vision (from *Butterfly Driver*) of scanning and digitizing human brains/souls.]

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

### The Infringers Primary Hacking Operation: MovieLabs

124.    July 2006, six months after ZGM unlawfully accessed my work, 20CFOX, Disney, Sony Pictures, Universal (NBCU), Paramount (ViacomCBS), and Warner Bros (WarnerMedia) create a new joint business called ***Motion Picture Laboratories, Inc.***, commonly known as **MovieLabs** (MovieLabs.com). The formation of MovieLabs connects all of the "big six" Studios (Disney, Warner Bros, Universal, Paramount, 20CFOX, Sony Pictures) to ZGM and their January 2006 access of my work.

125.    MovieLabs was created ONLY to hack into my computer and online files. MovieLabs then gave/sold the stolen works to the big 6 studios "writers". All of the known executives/employees at MovieLabs are/were elite hackers, and/or former 20CFOX and Sony Pictures chief technology officers (Steve Weinstein, Hanno Basse, Richard Berger). The clearest evidence that MovieLabs was created only to hack into my work is:

1.  Steve Weinstein, the first CEO of MovieLabs is an elite professional hacker who teaches hacking at Stanford University, in a program called "Hacking For Defense," for students who are interested in hacking for US intelligence or military. (See: https://medium.com/@sgblank/hacking-for-defense-stanford-2020-lessons-learned-presentations-b8ea81ace517 ) Or see the website screenshot below, which specifically states which class Weinstein teaches in the Stanford "Hacking for Defense" program.



Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

2. The skillsets of the *other* people involved with MovieLabs also confirms hacking:

    a.  Hanno Basse (computer scientist/engineer; fluent in English, Russian, French German; Chief Technology Officer for 20CFOX);

    b.  Richard Berger (Chief Technology Officer for Sony Pictures).

3. MovieLabs claims it was created "to drive innovation that creates business opportunities and develop tangible solutions to challenges faced by Hollywood in transitioning to digital distribution systems." Thus, one would expect to find dozens of patents in the company's name. However, MovieLabs has only applied for one (1) patent in 14 years (and the patent appears specious). Meanwhile, two of its executives, combined, have more than 50 patents (Hanno Basse has 27 patent grants, and Richard Berger has 24 granted/applied for patents), all for previous employers.

4. MovieLabs did not release one technology announcement for over 13 years. For the first 13 years they only cut and pasted the same company blurbs on various inadmissible sources (blogs, etc). True tech companies apply for patents and publish research, to attract talent that might help their effort. August 20, 2019 (a week after I started writing/researching the Complaint) MovieLabs released a "white paper," not an announcement, but a hope. MovieLabs summarized its white paper as follows:

LOS ANGELES, Aug. 20, 2019 /PRNewswire/ -- MovieLabs, together with member studios, has published a white paper presenting an industry vision for the future of media creation technology by 2030. The paper paints a bold picture of future technology and discusses the need for the industry to work together now on innovative new software, hardware and production workows to support and enable new ways to create content over the next ten years. The white paper is available for free download on the MovieLabs website.

No credible publications published the story. The only known publisher that ran the story was *The Hollywood Reporter* (owned by the first infringer of my work, MRC).

126. Supporting my assertion that Microsoft helped hack and infringe my work, after Hanno Basse was laid off from 20CFOX in 2019 (after Disney purchased 20CFOX), Microsoft hired Hanno Basse for its Azure team, in 2019. Curiously, page 49 of this declaration explains that in 2019 Microsoft also tripled its annual <u>hacking</u> budget. Hmm...

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**Conceived My Ideas To Promote National Unity, But The Defendants**
**Used Them To Promote White Supremacy, Sow Racial Division**
**And Promote Terrible  Racial Stereotypes**

127.    My stories reflect my devotion to family and God, my concern for the well-being of mankind and our Earth, my uncompromising morality, my passion for hard-work, my desire to uplift, create beauty and encourage others to never give-up or make excuses, and my commitment to what I believe is true. My stories are intended to promote empathy, cooperation, understanding, and provide opportunities for actors of all races and genders to be cast in meaningful and powerful roles. My stories reflect American and human values, and seek to bring people together, and make a diverse nation, like America, stronger, by reflecting the best in all races, religions and genders, so we can all feel proud about being uniquely American, but uniquely different from each other.

128.    But where my stories seek to unite, the Infringers would steal my ideas to promote a divisive, White nationalist and supremacist views, that insists on dividing us, by perpetuating the belief that American film heroes must be White, and other races should be cast in secondary or subordinate roles. This is why of the 44 films and games that infringe *Butterfly Driver*, only four (9%) feature non-white heroes.

129.    I am a person of mixed race—half Black, half White.

130.    I started writing Butterfly driver between November 2003 and January 2004; then titled *Uberopolis: City of Light*. Originally, I made Arlo Black. But a few months later, I began to believe that Hollywood would reject such an unprecedented hero, as Black. Thus, soon, I decided to omit Arlo's race and skin color. This allowed me to imagine Arlo as Black hero, without feeling defeated by a Hollywood culture that reserves the most heroic roles for White actors.

131.    Three years later, in 2007, I decided to make my first movie. As I thought about what to write, I continued to reflect on race and casting, and wondered how I could meaningfully change Hollywood's attitude and help create a world where kids of all colors can expect to see tremendous heroes of all colors. Amid these questions, I remembered a

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1   quote attributed to Gandhi: "Be the change that you wish to see in the world." (Gandhi

2   actually said, "If we could change ourselves, the tendencies in the world would also change.

3   As a man changes his own nature, so does the attitude of the world change towards him.")

4       132.    Thus, I resolved to be the difference, and I decided to write a film with a white

5   hero. I resolved that if I have a chance to make other films, of course, I'll cast Blacks and

6   other races in the leading roles. My thinking was, casting a White person in the leading role

7   of my first film would give me strategic positioning. If I ever had a chance to ask a major

8   financier to finance one of my future films, I could argue that we create a colorblind world

9   by investing in that vision. And I could then show my own investment in that vision, as a

10  Black American who cast a white leading man in his first film.

11      133.    In 2007 (circa November) I finished the screenplay *The Amazing Mr*

12  *Excellen*t. I assembled an amazing crew of 4 or 5 brilliant people, and we selected a cast of

13  70 to 100 people, and began filming around May of 2008. By the end of 2008 we began to

14  experience severe technical problems (described in the Complaint and herein). Much later,

15  in 2019, I discovered that these technical problems were, in fact, acts of sabotage:

16  destructive infections sent by the Defendants, intended to keep *The Amazing Mr Excellent*

17  from arriving at market before the two infringing films that the Defendants' associates based

18  on The Amazing Mr Excellent.  Thus, in 2008, the Infringers and their associates began

19  infringing my work in real time, and working to beat me to market.

20      134.    The Defendants' associates' sabotage delayed The *Amazing Mr Excellent* by

21  at least 18 months. Thus, *The Amazing Mr Excellent* would not be completed until Fall

22  2010. Mr Excellent was only entered into two film festivals. *The Amazing Mr Excellent* won

23  *Best of Fest* in the comedy division in Temecula. The Oakland festival did not select

24  winners, but *The Amazing Mr Excellent*, alone, was singled out for creative excellence and

25  capturing the spirit of social responsibility that the festival organizers hoped to foster.

26      135.    *The Amazing Mr Excellent* captures why I write: to confront problems, to

27  bring people together, and to reveal our shared humanity and potential.

28      136.    Meanwhile, the Infringers had much more toxic goals….

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**The Infringers' Use My Publishing Venue Idea**

**To Create The Amazon.com Racist Book Market Frenzy**

137.    The Defendants' and their associates' (Sony, Amazon and Microsoft) preoccupation with me was far more sinister than just taunting or mimicking my interest in the number 4 (see p 9-11).  In February 2017, I did something unusual, and the Infringers would replicate that action thousands of times, to do something very evil.

138.    After Donald Trump was elected President, I was so concerned and disturbed that I wrote a book titled "**Morons Don't Ride Harleys**." I self-published the book on **Amazon.com** and Kindle in February 2017. The book was **concise and used indisputable facts**, packed with quotes, facts, sources and public domain images, supporting my scathing (but humorous) musings on Trump and where America went wrong, and how to get back on the right path. The book culminated with an extremely hopeful message, that if we all support each other's causes we can all progress together—and survive Donald Trump. (See **EXHIBIT CC**, front cover, followed by the final few pages of *Morons Don't Ride Harleys*.)

139.    About five months after I published *Morons Don't Ride Harleys*, in the Summer 2017, people, who I believe are the Defendants and their associates, followed my lead, but with a sick and hateful twist: they encouraged racists to self-publish racist books on Amazon.com. And they would ignite a racist hate-book craze.

140.    On April 7, **2020**, Ava Kofman, Francis Tseng and Moira Weigel wrote an article in ProPublica that traced the history of racist books on Amazon, titled, "**The Hate Store: Amazon's Self-Publishing Arm Is a Haven for White Supremacists**." (See **EXHIBIT DD**.) The article traced the beginnings of Amazon.com's now enormous racist-book-market back to the Summer of 2017 (five months after my anti-racism book appeared). The article explains:

> "Give me, a white man, a reason to live," a user posted to the anonymous message board 4chan in the summer of 2017. "Should I get a hobby. What interests can I pursue to save myself from total despair. How do you go on living."
>
> A fellow user had a suggestion: "Please write a concise book of only factual indisputable information exposing the Jews," focusing on "their selling of our

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

high tech secrets to China/Russia" and "their long track record of pedophilia and perversion etc."

The man seeking advice was intrigued. "And who would publish it and who would put it in their bookstores that would make it worth the trouble," he asked.

The answer came a few minutes later. "**Self-publish to Amazon**," his interlocutor replied.

"**Kindl**e will publish anything," a third user chimed in.

141.    And so the vast Amazon-racist-book-market was born from Jeff Bezos' and Bill Gates' preoccupation with my ideas —then twisting these ideas to promote a White nationalist agenda.

142.    Certainly the Infringers' operatives wrote <u>every</u> *anonymous* 4chan message cited in the ProPublica article, leading to the Amazon self-published racist book craze.

143.    It is also likely that the more popular racist books published on Amazon.com were financed by Murdoch, Bezos, Gates and the other Infringers.

144.    The Infringers encouraged unknown, average-Joes to self-publish racist books on Amazon.com because the Infringers' (Murdoch, Bezos and Gates, etc) did not want to diminish their celebrity status by personally publishing these toxic views. Nor did they want their brands and products to suffer in association with these small-minded and horrible ideas.

**My Screenplay Inspires Bezos To Commit Fraud**

145.    My screenplay (Butterfly Driver, AKA Uberopolis: City of Light, 2004-2007) provides a fantastic new vision of space tourism. The Defendants in this action first accessed my screenplay in January 2006. In September 2006, eight months after the Defendants accessed my work, Jeff Bezos (CEO of Amazon.com) formed his space tourism company, Blue Origin, LLC; registered in California in Feb 2007. Also in 2007, Jeff Bezos suddenly made his first foray into the film business, partnering with Defendant Twentieth Century Fox Film Corporation.

146.    Bezos was so excited about starting a space tourism company (as envisioned in my screenplay) that he was willing to commit fraud. Thus, Bezos fraudulently backdated

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1   the formation of his space tourism company, Blue Origin, LLC, to 2000, by claiming on his
2   September 26, 2006 Washington State Certificate Of Existence (**COE**; see **EXHIBIT EE**),
3   and on his California Business Entity Statement (**BES**; see **EXHIBIT FF**) that Blue Origin,
4   LLC was formed in 2000, when, in fact, it was formed in September 2006 (however, since
5   Blue Origin, LLC's COE is fraudulent, and the company has no valid Certification of
6   Formation, the entire company is invalid).

7       147.   There are TWO clear signs of fraud on Blue Origin, LLC's Washington state
8   and California business filings:

9   a.   First, below the date on the Washington state Blue Origin, LLC COE clearly
10       indicates that Blue Origin LLC's UBI number is "602-064-321." But by going to the
11       Washington Secretary of State records I discovered the UBI number "602-064-321"
12       was issued to a company named "Blue **Operations**, LLC" (see **EXHIBIT GG**), Sept
13       8, 2000, not to "Blue Origins. LLC."   Bezos clearly hoped that no one would
14       investigate this story. Or, if someone did investigate, Bezos hoped "Blue Operations
15       LLC" looked enough like Blue Origins, LLC that no one would notice. Bezos clearly
16       purchased this UBI number from the original owner of Blue Operations, LLC.

17  b.   Jeff Bezos' second act of fraud appears on the third row ("Date And Place Of
18       Organization ") on Blue Origin, LLC's 2007 California BES (Exhibit FF), where it
19       states that Blue Origin, LLC was formed in Washington State in 2000. As shown in
20       paragraphs 151-153, Blue Origin, LLC did not exist in 2000.

21      148.   It also appears as if Bezos may have fraudulently superimposed the file
22  number from the upper right corner of the California BES, onto the lower right corner of the
23  Washington COE. I could be mistaken, but this appears irregular. It appears impossible
24  because the Washington state document was created on September 29, 2006 (see Exhibit
25  EE, lower, center, right). But the California State BES did not exist until February 5, 2007
26  (see Exhibit FF, upper right corner). Thus, logically, it seems this could not have happened.
27  If I am correct, superimposing a California BES file number onto a Washington COE would
28  be a federal crime.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**Amazon's Ideological (White Nationalist)**

**Connections To The Defendants**

149.    In 2007, shortly after Defendant Twentieth Century Fox Film Corporation (**20CFOX**) first accessed my screenplay, **Twentieth Century Fox went into the film business with Amazon.com and Jeff Bezos**, to make the film "Stolen Child."

150.    20CFOX was then owned by Rupert Murdoch (owner of News Corp and FOX News). Rupert Murdoch and News Corp are consistently associated with White nationalist and even White supremacists. Similarly, Jeff Bezos and Amazon.com are consistently accused of abetting and supporting White nationalists and supremacists, by not prohibiting the sale of various racist products on Amazon.com. Thus, the fact that Jeff Bezos' and Amazon's first film partnership was with a Murdoch owned company is not surprising.

151.    Four facts:

a.    January 2006, Murdoch's Twentieth Century Fox accessed and began the infringement of my screenplay, Butterfly Driver, which featured a stunning vision of space tourism to a fantastic super-satellite city, Uberopolis.

b.    Eight months later, September 2006, Jeff Bezos attempted to fraudulently backdate the formation of Blue Origin, LLC (a space tourism company), just as Defendants News Corp and 20th Century Fox fraudulently backdated many news articles concerning when they conceived Avatar.

c.    Jeff Bezos's Amazon.com and Rupert Murdoch's News Corporation have provided forums to propagate White nationalist views.

d.    I am a Black American.

152.    From the four preceding facts ("a" through "d" above) one might reason that Bezos and Murdoch unlawfully accessed my work and falsified documents simply because they are evil, greedy, lying thieves. However, one might also reason Bezos and Murdoch did this because they are evil, greedy, lying thieves, who do not want to admit that the conception of their many infringing films, and their space tourism company, came from a Black American.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**How Microsoft, NBCUniversal (Comcast), Used Distraction**

**To Propagate Their White Nationalist Vantage**

153.    On page 75 of Butterfly Driver (Complaint, Exhibit X6), when a powerful subordinate statesman emplores the villain (world President, Peter Drexler) to shut down Riordan Network (the only left-wing news outlet in The State), Drexler explains he allows the Riordan Network to exist because it gives the populace hope that the media is free:

                         BUSINESS WOMAN
           "I'm concerned that the Riordan Network is pushing
            free speech limits. Maybe it's time…"
     Drexler shakes his head.
                         DREXLER
           "Riordan's 10 percent market share assures voters
            the media is free."

154.    It is fair to wonder if Gates and NBCU created MSNBC to distract attention, and falsely assure liberals that the press is free. Consider the following.

155.    In 1989 NBCU created CNBC, a business centered (conservative) news outlet.

156.    Seven years later, in 1996, NBCU and Bill Gates (CEO of Microsoft) created MSNBC (**M**icro**S**oft**NBC**), a liberal news outlet.

157.    Today,  after 31 years, NBCU has created 13 different branches of CNBC\*, and has pushed CNBC's conservative view into countless countries **around the world**, and onto 5 continents. These foreign international CNBC stations are: 1. CNBC World, 2. CNBC Latin America, 3. CNBC Africa, 4. CNBC Asia, 5. CNBC Europe, 6. CNBC Arabiya, 7. CNBC TV18, 8. CNBC Awaaz, 9. Nikkei CNBC, 10. SBS CNBC, 11. CNBC Indonesia, 12. Class CNBC, 13. JKN-CNBC. (See **EXHIBIT HH**, NBCU's list of assets.)

158.     Meanwhile, after 24 years, MSNBC is still only available in the US. [See **EXHIBIT II,** MSNBC's Wikipedia page.] Although MSNBC is primarily owned by NBCU (a Comcast subsidiary), it may be the only Bill Gates founded business that is not international. If Microsoft and NBCU wanted MSNBC's liberal views internationalized,

---

\*August 2018, Trump's economic advisor, Larry Kudlow, who worked at CNBC for years, invited Peter Brimelow, a White Nationalist web-publisher, to his birthday party.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  they would have done so long ago, as MSNBC is much more profitable than CNBC. Sadly,

2  MSNBC's (including Rachel Maddow) comply with this. Thus, MSNBC abets the

3  conservative international news expansion, by providing no countervailing liberal voice.

4      159.   More, MSNBC does not report stories that are critical of Bill Gates or

5  Microsoft, particularly MSNBC avoids reporting about Gates and MSNBC's record on

6  racial employment equity. News reports of how Microsoft employs very few black and

7  women have circulated for years. (See **EXHIBIT JJ**, Nov 2018, Geekwire article)

8  Currently only 4% of Microsoft's workforce is Black, although Blacks comprise about 13%

9  of the US population. Since MSNBC's core audience is largely minorities and women, one

10  would assume this would interest MSNBC's audience. Yet, MSNBC has never reported this

11  story. Nor have they (or any network related to the infringement) reported about *this* case.

12      160.   MSNBC and FOX News assure their viewers that they are presenting news

13  and perspective—and that the opposing network is run by extremists. Ironically, Gates and

14  Murdoch, aided by an army of hack *journalists* who wouldn't know investigative journalism

15  from a freelance movie review, have created a system in which no information appears on

16  their network that Gates, or Murdoch, respectively, does not approve.

17                    Stealing Isn't Just For Right-Wing Networks

18      161.   Microsoft helped the Infringers hack into my computer to access my work.

19  News Corp, Microsoft and NBCU also tapped my phone, periodically, for 16 years, and

20  stole plot germs and remedial social ideologies, such as *community policing* (see *Butterfly*

21  *Driver,* as Arlo works as a community police *volunteer*), and stole lines like "silence is

22  complicity," (taken from a poem within a story, 2008) which they disseminated on MSNBC.

23              As they complacently mistook my silence for complicity,
                I sat and contemplated the kindest way to kill them.

24

25      162.   NOTE: I am aware that this point (MSNBC stealing social theory) is minutia,

26  small potatoes, sounds unlikely, and does not help my case; but NBCU and Microsoft are

27  committed to stealing anything I produce, and seem to believe they are invulnerable. Thus, I

28  will address everything, and expose their vulnerability.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**August 11, 2020, FOX News Goes Global**

163.    Throughout this action the Defendants have continued to hack into my computer and devices. And as stated earlier, the Defendants are preoccupied with my ideas, stealing and applying even the worst of my ideas, as fast as I can write them down. This hacking and stealing of an idea occurred, again, as I composed this declaration.

164.    I began composing this declaration on or around July 22, 2020. Composing it took 3 or 4 weeks (I completed it Tuesday, August 18, 2020). On or around August 9, 2020, I composed the preceding section, regarding the fact that MSNBC is still only available in the USA, while CNBC is global. Two days later, August 11, 2020, Fox news announced its new international new streaming service, "**Fox News International**," which will bring Fox News and Fox Business Network to 20 countries by the end of 2020. (See **EXHIBIT KK**.)

**Microsoft Triples Hacking Budget, 2019 to 2020**

165.    My Complaint explains that in mid August 2019 I began composing the Complaint, and saw evidence that I was being hacked by the end of August. This was the first time that I realized that the Defendants were able to hack into my devices. All other facts related to hacking were discovered after that. The Complaint explains that the hackings intensified, until Jan 14, 2020. The hacking continued to this day, but at a lower level than in January, 2020, because my computer is now usually offline. When I am online, I cannot tell when I am being hacked. I surmise that I have been or am being hacked when **(1)** I find my phone or computer settings changed; **(2)** visiting a website, like the Copyright Office, which I usually visit unobstructed, suddenly I am blocked from accessing; **(3)** very rarely, I might find my computer desktop folders greatly rearranged, or a document missing or altered.

166.    In August 2019, the same month that the Defendants began hacking into my devices, Microsoft tripled its annual hacking budget. August 5, 2020, Forbes.com reported: "Microsoft has confirmed that during the past 12 months it paid hackers a total of $13.7 million (£10.4 million) which is three times as much as it did the year before." (See **EXHIBIT LL**.) I believe Microsoft tripled this budget because they began aggressively hacking into my computer.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

### How The Defendants Sabotaged My Independent Efforts

167.    The Defendants sabotaged my marketing efforts as follows.

168.    Pages 56 and 57 of the Complaint documents how the Defendants (and Microsoft) sent a virus to my computer, June 6, 2007, via a fictitious business *South East Film Association/Club* (sefilmclub.com). This virus eventually erased 2 years of my personal outgoing emails, from May 2005 until September 2007.

169.    In late 2008, as my crew edited *The Amazing Mr. Excellent*, we experienced an incomprehensibly destruct virus that destroyed my computer, 8 of my harddrives, some of my writing, 8 years of my personal music compositions, and destroyed the computers of Matt Johnson (co-producer), David Jones, and an associate whose name escapes me. The virus delayed completion by at least 18 months and caused in-fighting amongst our team.

170.    Microsoft and Google saw to it that my projects did not appear in Chrome or Explorer search results. Meanwhile, Amazon made sure that my books (*Morons Don't Ride Harleys*, and *Nakota's Great Adventure*) did not appear in Amazon search results.

171.    Attached to the Complaint is evidence that Google sent infected ads to my email inbox in 2019, bypassing my spam folder, against California law and Google's policy.

172.    In 2012, I launched TWO separate marketing campaigns for TWO films, using KickStarter.com (and another online fundraising resource). Both campaigns raised $0, despite having hundreds of interested, active, young contacts and connections.

173.    In 2010 and 2011, Bill Gates abused his known and established connection with the Sundance Film Festival to block "The Amazing Mr Excellent."

174.    Jeff Bezos and Amazon caused huge delays (6 weeks) in the publication of two of my books, and caused *Morons Don't Ride Harleys* to have obvious typos, although I pentuple-checked, using 3 software editors, and two professional proofreaders. One such malicious typo can be seen on the final page of Exhibit DD, seventh line from the bottom.

175.    NOTE: I am aware that the previous point, about the typo, like several other points made herein, is small potatoes. But the Infringers have stopped at nothing to steal my work and antagonize me, as if daring me to to stop them. Thus, I will address everything.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**NOTICE**

176.     It is reasonable to wonder if I have overestimated the extent of Hollywood's infringement. To dispel any doubt, this section is included to provide evidence that **there are MANY more major films derived from my work, not named on page 3, that I am choosing not to act on**. I am including this section to send notice to Hollywood that I may act on these other titles, as well those on page 3, if they do not end their ongoing unlawful access and infringement of my work and devices.

177.     The reason Hollywood was attracted to my work was it was both gritty and refined. My characters were purposefully flawed people; unnecessarily moral or crude; brilliant but compulsive; blue-collar scholars, not afraid to talk about God, who took unpredictable actions that sometimes repelled viewers—only to pull them closer. But more than anything, my stories felt honest, indifferent to opinion or convention; aware of every rule, broken or obeyed. But, where I used a brash approach to make beautiful, broad-minded, culturally inclusive and constructive works, the Infringers emulated this to make exclusive, even hateful works. Consider *Tropic Thunder*….

178.     Personally, I love Tropic Thunder. But I love offensive stuff. I particularly loved Robert  Downey Jr's portrayal of a White, Australian actor playing a Black American. I am certain Downey did not have malicious intent. But the intent of the studio (DreamWorks) was to create a pro-caucasian comedy that derided Blacks and Asians.

179.     *Tropic Thunder* was released in August 2008, 2.6 years after Zero Gravity Management accessed Butterfly Driver. Butterfly Driver broke seemingly every rule in the book, by being unapologetically and aggressively political, with an unprecedented and unflinching villain that twisted our emotions by phrasing the most unfeeling and hateful ideas into lyrically beautiful and sensible ideas. Likewise, Tropic Thunder is an aggressively political comedy, that unapologetically jokes about Blacks, Asians and the learning impaired (and anyone but White men), with an unflinching villain (Tom Cruise), who twists our emotions by phrasing unfeeling and cynical ideas in a seemingly sensible way.

180.     In 2007 I completed my script "The Amazing Mr. Excellent," a superhero

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

51

1  comedy that ended with the cast disco dancing to the song "*If God Loves Disco Dancing*"

2  (a first in superhero film history). Thus, 10 months later, Dreamworks couldn't help but end

3  *Tropic Thunder* with Tom Cruise disco dancing (perhaps a first in comedy history).

4  181.   Like Avatar, the studio needed to credit someone with writing Tropic Thunder.

5  DreamWorks chose Ben Stiller, 'cause everyone knows Stiller isn't really a racist. Right?

6  182.   Once again, the studio wanted a backstory to backdate the theft of my ideas.

7  Thus, they asked Stiller to say he wrote Tropic Thunder back in 1987 (20 years earlier),

8  while he worked on *Empire of the Sun*. Sound familiar? Yes, this will get worse.

9  183.   But before I address the registration evidence… Ben Stiller willfully

10  participated in a plan to infringe the screenplay of an unknown, hardworking and deserving

11  Black screenwriter. And he did so to make a hateful, racist film seem less offensive. I think

12  this makes Stiller an order worse than your *average* racist—who harbors hateful views, but

13  does not personally act to harm those he/she despises, as Stiller did.

14  184.   A copyright registration search (at https://www.copyright.gov) for *title*

15  "Tropic Thunder" yields 30 results. (See **EXHIBIT MM**). If you sort them in ascending

16  order (Exhibit MM) you see that Tropic Thunder copyright was <u>first</u> registered on April 12,

17  2007. This first registration is for a <u>screenplay</u>. The only name on the registration is

18  <u>DreamWorks</u> Films LLC. (See **EXHIBIT NN**.) Ben Stiller's name would not appear on a

19  Tropic Thunder copyright for **16 more months**, Aug 13, 2008, when the film was released.

20  185.   If one searches Ben Stiller's copyright registrations and organizes them in

21  ascending order (see **EXHIBIT OO**), one sees that Stiller registered *Zoolander* (the only

22  other film he's written) <u>2.5 years before Zoolanger was released</u>. Hmm…

23  186.   DreamWorks would have us believe that Stiller prudently registered

24  Zoolander 2.5 years before Zoolander was released, BUT did not register Tropic Thunder

25  (allegedly written in 1987) until the day the film was released. Absurd.

26  187.   Hopefully, Hollywood will relent, and spare me the unkindness of humialing

27  their "*writers*" (Seth Rogen, Evan Goldberg, Alexander Payne...), and films (*Sideways*, *The*

28  *Watch*...).

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

| | |
|---|---|
| 1 | **Ninth Circuit And District Court** |
| 2 | **Failures And Bias** |

3    188.    For about 40 years the Ninths rulings in film industry infringement case have
4  been so troubling that in 2014 the **UCLA Entertainment Law Review** published
5  **"Substantial Similarity in Literary Infringement Cases: A Chart for Turbid Waters"**
6  (see **EXHIBIT PP**). The article provides a thorough analysis of the Ninth's application and
7  misapplication of copyright law, as it pertains to major film industry infringement. Page 16
8  to 25 are particularly troubling, as, in case after case, the Court stretches reason and ignores
9  precedent to help the film industry prevail. Almost as disturbing as this happening is
10  American is that the majority of the cases that created the Ninth's untenable system were
11  cases involving the creative works of minorities. Notable, in these infringement actions, is
12  *Funky Films v Time Warner*, in which a brilliant Black American writer's plot, centered in a
13  black owned mortuary, is clearly stolen by Time Warner, to create the almost all white
14  production, "Six Feet Under." The article's writer, Robert F. Helfing, explains:

15
16     The plaintiff in Funky Films v. Time Warner Entertainment Co.' was another
    industry outsider who asserted that acclaimed television series Six Feet Under
17    infringed the copyright in her screenplay, The Funk Parlor. The similarities cited
    by the court were extensive. Both works centered upon a small funeral home
18    and the lives of the family members who operated it. Both were set in motion by
    the sudden death of the father, who had run the funeral home for decades. In
19    both works, the older son, decidedly heterosexual, has long ago moved out of
    town and maintained no involvement in the family business, while the younger
20    son, homosexual, has remained behind to assist his father in running it. After the
    father's death, the two sons inherit the business, which is deeply in debt and
21    operating from a deteriorating facility with obsolete equipment, including a
    malfunctioning hearse. Initially, the older brother wants no part of the business
22    and announces his intention to sell it. He changes his mind, however, after the
    overbearing female head of a rival funeral home attempts to force the brothers
23    to accept a low-ball offer to purchase given at the father's funeral. The brothers
    manage to fend off the competitor and keep the business afloat, in part by the
24    unconventional methods of the older brother.'
25
26        Describing these similarities as merely "apparent," the Court stated that
    there were few "real" similarities."
27

28    189.    And it only goes downhill from there.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

190.    Thus, because of its "unique" application of law, the Ninth helped Time Warner effectively "steal" a beautiful work of art that was intellectually, spiritually and creatively transformative; depicting Blacks as diverse in spirit, mind and sexuality. But sadly, as Time-Warner stole the Funk Parlor, they simultaneously gave America "Oz" created by White producers, which depicted Blacks as low-minded, violent and dangerous.

191.    Most attorneys believe bringing race into the argument weakens the case. This reflects an intellectual weakness in our judicial system. As an *enlightened* nation, with an ongoing history of racial abuse, the question of race should be safe, even required, to explore. In my legal effort to defend my work, for 7 years (*Briggs v Blomkamp*, 2013, to the present) I have avoided discussing race, to be rewarded with the most untenable rulings, always **un**published —one released on a Saturday, 3 days before Christmas.

192.    On page one of the previously cited UCLA Entertainment Law Review article, Helfing addresses the Ninth's recent (1980 to 2014) history of poor copyright rulings.

> As home to that fictional piece of real estate known as Hollywood, the Ninth Circuit has dealt with the copyright law issue of substantial similarity more than any other jurisdiction, yet it has not developed useful principles for analyzing it. This article examines the history of the Ninth Circuit's two-step test for substantial similarity in literary infringement cases, <u>showing how a quirk in the evolution of the test has created a confusing and ineffectual body of law on the subject</u>. The article argues that the courts have underestimated the complexity of the issue and have given too much credit to their own judgment, unaided by expert input. The absence of a genuine understanding of the issue has led courts to look for substantial similarity where it cannot be found: in the individual elements of literary works. The article presents a proposed rule to re-direct the court's inquiry from the individual elements of the work, where copyright protection cannot be found, to the artistic structure of the work, where it must be found if it exists at all.

193.    Helfing's article goes through the most pivotal and egregious rulings in recent Ninth Circuit history. But midway through the paper, page 16, Helfing addresses the one case where the Ninth Circuit did everything right, *Twentieth Century-Fox Film Corp. v. MCA*. This case involved George Lucas's Star Wars. And in this ruling, the Ninth properly rejects dissection analysis, and returns to the *Total Concept and Feel* test, established in

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

Krofft. Helfing explains:

> In Krofft, the Ninth Circuit rejected the use of analytic dissection in determining the existence of protected similarity. The Court explained:
>> Lest we fall prey to defendants' invitation to dissect the works, however, we should remember that it is the combination of many different elements which may command copyright protection because of its particular subjective quality. "While any one similarity taken by itself seems trivial, I cannot say at this time that it would be improper for a jury to find that the overall impact and effect indicate substantial appropriation."
>
> This critical principle was promptly disregarded, the extrinsic test was transformed and, applying the Jason v. Fonda analysis, Ninth Circuit courts proceeded to dissect literary works, looking for protected similarity in their elemental units. For more than 12 years following Krofft, the Ninth Circuit applied that divergent analysis in every case but one, Twentieth Century-Fox Film Corp. v. MCA, Inc., the Star Wars case. **It is no coincidence that the Star Wars case was also the only case during that period in which the court reversed the summary judgment of a literary infringement claim.**

194.   Perhaps the Ninth suspended dissection for *Twentieth Century-Fox Film Corp. v. MCA* because the case involved two major film companies. Whatever the reason, the Court used the Total Concept and Feel test, and got it right, and reversed the district ruling.

195.   *Twentieth Century-Fox Film Corp. v. MCA* is often called "The Star Wars case" because it involved George Lucas' Star Wars film and the TV show BattleStar Galactica. What is relevant to this matter about the Twentieth Century-Fox Film Corp. v. MCA ruling is the Court cited **13** of the 34 aspects that Twentieth Century Fox (**20CFOX**) and Lucas thought were copyrightable aspects of Star Wars. The Court cited these 13 copyrightable expressions (for illustrative purposes only) as a basis for **its decision to reverse and remand**. The 13 aspects that the court cited were (taken from the case text):

> Appellant Fox argued in its brief that a comparison of the two works discloses at least 34 similarities. For illustrative purposes only, we list 13 of the alleged similarities:
> (1) The central conflict of each story is a war between the galaxy's democratic and totalitarian forces.
> (2) In Star Wars the young hero's father had been a leader of the democratic forces, and the present leader of the democratic forces is a father figure to the

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

young hero. In Battlestar the young hero's father is a leader of the democratic forces.

(3) The leader of the democratic forces is an older man, displaying great wisdom, and symbolizing goodness and leadership, with a mysterious mystical ability to dominate a leader of the totalitarian forces.

(4) An entire planet, central to the existence of the democratic forces, is destroyed.

(5) The heroine is imprisoned by the totalitarian forces.

(6) A leading character returns to the family home to find it destroyed.

(7) The search by the totalitarians and the liberation attempt by the democratic forces are depicted in alternating sequences between the totalitarian and democratic camps.

(8) There is a romance between the hero's friend (the cynical fighter pilot) and the daughter of one of the leaders of the democratic forces.

(9) A friendly robot, who aids the democratic forces is severely injured (Star Wars) or destroyed (Battlestar) by the totalitarian forces.

(10) There is a scene in a cantina (Star Wars) or casino (Battlestar), in which musical entertainment is offered by bizarre, non-human creatures.

(11) Space vehicles, although futuristic, are made to look used and old, contrary to the stereo-typical sleek, new appearance of space age equipment.

(12) The climax consists of an attack by the democratic fighter pilots on the totalitarian headquarters.

(13) Each work ends with an awards ceremony in honor of the democratic heros.

196.    What's remarkable about these 13 aspects, which the Ninth thought were sufficient to support their reversal and remand, is that they are so succinct. Not one element or expression that I have claimed in my Complaint is so brief as the longest of the aforementioned 13 expressions/aspects. In fact, many of my claimed expressions/aspects are lengthier and more complicated than all 13 of the "Star Wars" aspects underlined(combined). (And the copyright claims I cited in Briggs v Blomkamp were even more detailed). [NOTE: The fact that Twentieth Century Fox Film Corp (a Defendant in this matter) successfully offered up these 13 childishly brief aspects as copyrightable expressions in *Twentieth Century-Fox Film Corp. v. MCA* (1983), **WHICH THE NINTH UPHELD**, but in this matter 20CFOX argues that the detailed, lengthy and original expressions that I have claimed are not copyrightable, is hypocritical beyond measure.]

197.    The preceding establishes the copyrightability of every expression I have

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

1  claimed.

2  198.    As Helfing explained on the first page of his UCLA Entertainment Law

3  Review paper, his goal was to propose a new rule for the Ninth Circuit assess infringement.

4  Toward this end, on page 28 of the article (see Exhibit PP) Helfing proposes his new rule:

5  Taking into account what the courts have said, or have failed to say, or have
   failed to say clearly, the following rule is proposed for evaluating substantial
6  similarity of non-verbatim copying under the extrinsic test:

7  The extrinsic test is satisfied where a combination of unprotected
     elements shared by the works constitutes a cohesive artistic
8  structure sufficiently delineated and distinct from those of other
     works of its type to warrant protection.

9

10  199.    Should there be any doubt, Helfing and the UCLA Entertainment Law Review

11  are far from alone in their concerns and doubts about the Ninth Circuit's infringement

12  rulings over the past forty years. In 2010 Steven T Lowe wrote "Death of Copyright,"

13  published in the *Los Angeles Lawyer*. (See **EXHIBIT QQ**.) In his tremendously

14  well-research article Lowe exposed the Ninth's peculiar rulings and showed how no plaintiff

15  has prevailed against the film industry in over 20 years. Lowe's article concludes that

16  copyright law is effectively dead in the Ninth because judges were inexplicably stepping

17  outside of their judicial duty. In the final paragraphs of the article, Lowe explains:

18  In copyright infringement cases, judges are supposed to play the role of
    gatekeeper to the jury. Their task in analyzing substantial similarity is
19  supposed to be extrinsic—that is, objective. If a plaintiff can show objective
    similarity, a jury is brought in to determine whether the **total concept and
20  feel**—the intrinsic test—of the plaintiff's and defendant's works are
    substantially similar. In practice, however, the extrinsic test has been
21  devoured by an intrinsic test performed by the judge. Simply put, with
    judges able to substitute their opinions for those of experts and juries on
22  issues of material fact, all other witnesses to the case become effectively
    redundant.
23
    Case law has provided defendants with an impenetrable shield of
24  confusing and often contradictory principles that thwart plaintiffs in nearly
    every instance, with only tiny cracks in that shield providing a mere glimpse
25  of hope. Unless the Ninth Circuit seriously reexamines where courts have
    taken the law of copyright infringement, the cards will remain completely
26  stacked in favor of the studios and networks.

27

28

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**Concerns**

200.    The Complaint documents crimes that are so unconscionable that the Defendants and their associates have misused and abused their various news outlets, and web browsers (Google' Chrome, and Microsoft's Explorer), to prevent people from learning about this case. On one level, I don't care. But, as a concerned citizen, I will use this public document to sound a warning that our adversaries are aware of the Defendants' suppression of this story. This <u>greatly</u> weakens America's world standing, perhaps permanently; because our adversaries will report this deceit to their citizens, and tell them that America's press is not free. The American dollar is the global standard because America is regarded as the world's most trusted nation, largely because of our free press. This leads to other concerns.

201.    Our founding fathers added the copyright clause to the constitution, because they believed the right to own one's ideas, fueled by American's ingenuity and sense of fair competition, would make America the most prosperous nation ever. And they were right. However, on March 4, 2020, I submitted an unprecedented Complaint that documented TWO incidents of major motion picture copyright infringement. More significantly, the Complaint showed serious national security issues are at hand, and showed unlawful activity related to the infringement. Further, the Complaint showed that Google LLC and Internet Archive aided the infringement with modified browsers, fraudulent URLs, and fake crawls.

202.    My concern is this: Given the very serious and expansive issues at hand, any reasonable American would expect that some branch of the US intelligence would want to interview me, to hear me describe the hackings, ask questions, and certainly, to see my computer and see if they can trace the hacking sources, etc. <u>But this never happened</u>. This causes me to wonder if the US Department of Justice is helping the Defendants and the Infringers. I suspect this is the case, of course, because under Donald Trump, William Barr has not properly defended the Constitution, and <u>Stephen Mnuchin was one of the first infringers of my work; in fact Mnuchin's companies (Dune Entertainment LLC, and Dune Entertainment III LLC) are on the *Avatar* copyrights</u>. I chose not to name Mnuchin as a Defendant because I found no circumstantial evidence that he knew of the infringement.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

203.    Although the failure of any branch of US Intelligence to interview me is concerning, it is dwarfed by a more significant event that occurred in October 2019, as I worked to complete my Complaint…   The Complaint explains that shortly after I began writing it, in August 2019, I soon began to observe indications that I was being monitored, via hacking, such as:

    a.  In late August 2019, Internet Archive crawls suddenly began changing;

    b.  September 27, 2019, Future Service Inc (a company owned by Zero Gravity Management LLC, which became a 20CFOX subsidiary in late 2006), suddenly closed its Delaware business—the day after I researched the company;

    c.  In December 2019, Larry Page and Sergey Brin resigned from Google;

    d.  In January 2020, Emma Watts resigned from Twentieth Century Fox.

204.    The strange resignation of CEOs, just days after I discovered their connection to the infringement of my work, would continue until a few days after I filed the Complaint. Notably, March 13, 2020, 9 days after I filed the Complaint, Bill Gates resigned from the board of directors of Microsoft and Berkshire Hathaway. Immediately after stepping down, Gates began a media blitz (which continues to this day) warning American about the risks of Covid-19 (although he has no standing as any sort of medical or pathogen expert). This media campaign is plainly designed to promulgate an image of Gates as a crusader for world health and information transparency, to circumvent any reputational damage he might suffer if news of his involvement in the theft of my ideas breaks through the Infringers' firewall. But although this is troubling, my primary concern is larger still…

205.    October 11, 2019, as I composed the Complaint, amid the strange business closures and CEO resignations, US Attorney General William Barr, had a meeting with Rupert Murdoch, as reported in Vanity Fair, and widely. (See **EXHIBIT RR.**)

206.    I am concerned that this secret meeting indicates that the Department of Justice is negotiating a deal (or worse) for the very person who first stole my ideas: Rupert Murdoch—who was not born in the United States, and does not have US interests at heart. Any deal to help billionaires avoid prosecution is fundamentally unAmerican.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

**A Word of Caution**

207.    This page/section contains information that I regard as axiomatic fact, that others may regard as my heart-felt opinions. Bill Gates is an evil moron. Bill Gates has never conceived an original idea, much less an interesting idea. Period. Microsoft's operating system was conceived and developed by Tim Paterson. Paul Allen and Bill Gates simply bought Paterson's work, and "Windows" was purchased from developers at Xerox. Gates' only skill set is recognizing great ideas that are far beyond his cognitive or creative range, then purchasing (or stealing) these ideas to aggregate into the Microsoft product line-up. Bill gates owes his wealth and fame to three factors: (1) he was born very rich, (2) he was born with no moral compass, (3) dumb people conflate wealth with intellect. Bill Gates' listless manner, marginal intelligence and labored acts of kindness, belie a very dangerous man, whose unique capacity to manipulate, compelled by a profound lack of wisdom and character, now threatens America. Microsoft is a dangerous international monopoly that should be divided, immediately.

208.    Jeff Bezos is an evil moron. Like Bill Gates, Jeff Bezos has never conceived an original or interesting idea. Jeff Bezos owes his fortune to being an ambitious retail distributor. Amazon represents an existential threat to the American way of life, as it functions not just to compete with large, medium and small businesses, but it functions to destroy and replace large, medium and small businesses; retail, wholesale and distributors.

209.    Rupert Murdoch is an unAmerican, evil moron, who has repaid his debt to America, for accepting his immigration request, by producing decades of hate-fueled lies, to foment fear and stoke national division.

**Battle For The Soul Of America**

210.    My ideas have inspired generations of infringers and imitators. Perhaps more importantly, my ideas have motivated international space exploration programs, science and industry, and, rightly or wrongly, the US military and  police surveillance programs. America's courts have, to this point, repaid me by failing to execute their Constitutional duty to defend my copyright interests.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

211.    The Defendants and Infringers sought out and stole my work because my ideas are uncommonly creative, and my approach is uncommonly honest and candid. This declaration is composed with that same candor and honesty.

212.    The Defendants and their associates owe me an unparalleled debt. I expect every penny paid, with interests and damages.

213.    The Defendants in this Action, like the Infringers in prior actions, in my opinion, have behaved in very unbecoming, cowardly and unAmerican ways; such as hiding from process servers, for months —over a year in Kevin Spacey's case.

214.    I will not cower and hide. I will fight this war, untiring; a patriot in the open field. No weapon more ferocious than the truth, loaded in my pen. And I will say their names, unflinching, as they try to stay the tide: Rupert Murdoch, Steven Spielberg, Bill Gates, Paul Allen, Judd Apatow, Christopher Nolan, Jonathan Nolan, James Cameron, Sergey Brin, Larry Page, Mark Williams, Michael Pierce, Jon Feltheimer, George Lucas, Vince Gilligan, Neill Blomkamp, Suzanne Collins, Veronica Roth, Ari Emanuel, Alex Hirsch, Shawn Levy, Trey Parker, Scott Rudin, Robert Mark Kamen, James Gunn, Mark Millar, Seth Rogen, Evan Goldberg, Alexander Payne, Asif Satchu, Mordecai Wiczyk, Kevin Spacey, Matt Damon, Ben Affleck….

215.    I view this suit, and all future suits, as a battle for the soul of America.

216.    The Infringers believe that America belongs to the privileged, who cannot compete fairly. They believe it is American to **compromise** national security by publishing false stories, and paying Internet Archive to produce fraudulent crawls. They believe it is American to install corrupt agents at the Copyright Office. They believe it is American if their clandestine actions betray their public words. They believe it is American to help other nations steal from American creators. They believe it is American to pay hackers to steal a hard-working American's life's work, then gleefully watch him grow old and die poor.

217.    I believe true Americans are honest people who obey the law and play by the rules. I believe true Americans can compete, and would never dream of cheating or stealing. I believe true Americans would never use their resources to hide the truth, or publish lies.

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

218.    But my vision of America and the Defendants' vision cannot both stand.

219.    Is America a nation of lying, hateful, thieves, on its way to ruin?

220.    Or, is America, although imperfect, in its heart, a relentlessly brave, virtuous and honest nation of uncompromising heroes, who do in the dark what they say in the light?

221.    American Courts have a duty. The world is watching. There are foreign nations who proudly, aggressively and properly defend the intellectual property of their citizens. Does America still sit with the family of civilized nations that properly and vigilantly defend the copyright claims of their citizens? Or does America dine with thieves?

222.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 18th day of August, 2020, in Santa Rosa, California.

Dated:____08/25/2020_____          Signed:_/s/ Steve Wilson Briggs_____

Plaintiff, In Propria Persona

Amended Second Declaration Of Steve Wilson Briggs In Support Of Complaint

Exhibit A



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = star trek
Search Results: Displaying 190 of 5699 entries

◀ previous    next ▶

Labeled View



***Star Trek II : In thy image : work draft, Nov. 21, 1977 / screenplay by...***

| | |
|---:|:---|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu000099467 / 1979-04-19 |
| **Title:** | Star Trek II : In thy image : work draft, Nov. 21, 1977 / screenplay by Gene Roddenberry, Harold Livingston, Robert Collins ; story by Alan Dean Foster and Gene Roddenberry. |
| **Description:** | 137 p. |
| **Copyright Claimant:** | Paramount Pictures Corporation |
| **Date of Creation:** | 1977 |
| **Authorship on Application:** | script: Paramount Pictures Corporation, employer for hire. |
| **Previous Registration:** | Appl. identifies one first draft & one rev. script as preexisting material. |
| **Basis of Claim:** | New Matter: revisions. |
| **Other Title:** | In thy image |
| **Names:** | Roddenberry, Gene |
| | Livingston, Harold |
| | Collins, Robert |
| | Foster, Alan Dean |
| | Paramount Pictures Corporation |

◀ previous    next ▶

| **Save, Print and Email (Help Page)** |
| Select Download Format   Full Record ⌄   Format for Print/Save |
| Enter your email address:           Email |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = star trek
Search Results: Displaying 186 of 5699 entries

◄ previous     next ►

Labeled View

*Star Trek : the motion picture : rev. draft, May 17, 1978 / screenplay by...*

**Type of Work:** Dramatic Work and Music; or Choreography
**Registration Number / Date:** PAu000099469 / 1979-04-19
**Application Title:** Star Trek, the motion picture; Star Trek II--In thy image.
**Title:** Star Trek : the motion picture : rev. draft, May 17, 1978 / screenplay by Gene Roddenberry, Harold Livingston ; story by Alan Dean Foster and Gene Roddenberry.
**Description:** 141 p.
**Copyright Claimant:** Paramount Pictures Corporation
**Date of Creation:** 1978
**Authorship on Application:** script: Paramount Pictures Corporation, employer for hire.
**Previous Registration:** Appl. identifies one first draft & three rev. drafts as preexisting material.
**Basis of Claim:** New Matter: revisions.
**Other Title:** Star Trek, the motion picture
Star Trek II--In thy image
In thy image
**Names:** Roddenberry, Gene
Livingston, Harold
Foster, Alan Dean
Paramount Pictures Corporation

◄ previous     next ►

| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ▾   Format for Print/Save |
| Enter your email address:          Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = Coppola, Francis
Search Results: Displaying 1 of 58 entries



Labeled View

***Apocalypse now / directed and produced by Francis Coppola ; co-produced by...***

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000054814 / 1980-01-18 |
| **Title:** | Apocalypse now / directed and produced by Francis Coppola ; co-produced by Fred Ross, Gray Frederickson, and Tom Sternberg. |
| **Imprint:** | [s.l. : A United Artists release], c1979. |
| **Description:** | 9 film reels (146 min.) : Technovision, sd., col. ; 35 mm. |
| **Notes:** | Narration by Michael Herr. |
|  | Deposit includes pressbook (1 v.) |
| **Cast:** | Marlon Brando, Robert Duvall, Martin Sheen et al. |
| **Performer:** | Presented by Francis Ford Coppola. |
| **Credits:** | Written by John Milius & Francis Coppola; photography by Vittorio Storaro; music by Carmine Coppola & Francis Coppola. |
| **Copyright Claimant:** | Omni Zoetrope |
| **Date of Creation:** | 1979 |
| **Date of Publication:** | 1979-08-07 |
| **Authorship on Application:** | Omni Zoetrope, employer for hire. |
| **Names:** | Ross, Fred |
|  | Frederickson, Gray |
|  | Sternberg, Tom |
|  | Coppola, Francis Ford |
|  | Omni Zoetrope |



| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record  ▾  Format for Print/Save |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Coppola, Francis
Search Results: Displaying 9 of 58 entries

◀ previous　　next ▶

---

Labeled View

---



***The Outsiders : screenplay : shooting script, Mar. 1, 1982 / by Francis...***

| | |
|---:|:---|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu000416304 / 1982-04-09 |
| **Title:** | The Outsiders : screenplay : shooting script, Mar. 1, 1982 / by Francis Ford Coppola. |
| **Description:** | 118 p. |
| **Notes:** | From the novel by Susan E. Hinton. |
| **Copyright Claimant:** | Pony Boy, Inc. |
| **Date of Creation:** | 1982 |
| **Authorship on Application:** | Pony Boy, Inc., employer for hire of Francis Coppola. |
| **Basis of Claim:** | New Matter: "a screenplay." |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Hinton, Susan E. |
| | Coppola, Francis Ford |
| | Pony Boy, Inc. |

◀ previous　　next ▶

| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format [Full Record ▾] | [Format for Print/Save] |
| Enter your email address: | [Email] |

---

Help　Search　History　Titles　Start Over

---

Contact Us　|　Request Copies　|　Get a Search Estimate　|　Frequently Asked Questions (FAQs) about Copyright　|
Copyright Office Home Page　|　Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Coppola, Francis
Search Results: Displaying 11 of 58 entries



Labeled View

*Rumble fish / produced by Fred Roos and Doug Claybourne ; directed by...*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000193533 / 1984-01-05 |
| **Title:** | Rumble fish / produced by Fred Roos and Doug Claybourne ; directed by Francis Coppola. |
| **Imprint:** | Tulsa : Hot Weather Films, c1983. |
| **Description:** | 5 film reels : sd., b&w ; 35 mm. |
| **Notes:** | From Zoetrope Studios. |
| | Based on the novel by S. E. Hinton. |
| | Deposit includes synopsis (4 p.) & advertising material (6 p.) |
| **Cast:** | Matt Dillon, Vincent Spano, Mickey Rourke et al. |
| **Performer:** | Presented by Francis Ford Coppola & Universal. |
| **Credits:** | Screenplay by S. E. Hinton & Francis Coppola; music by Stewart Copeland; edited by Barry Malkin; director of photography: Stephen H. Burum. |
| **Copyright Claimant:** | Hot Weather Films |
| **Date of Creation:** | 1982 |
| **Date of Publication:** | 1983-09-02 |
| **Authorship on Application:** | Hot Weather Films, employer for hire. |
| **Names:** | Roos, Fred |
| | Claybourne, Doug |
| | Coppola, Francis Ford |
| | Hinton, S. E. |
| | Universal |
| | Zoetrope Studios |
| | Hot Weather Films |





Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Coppola, Francis
Search Results: Displaying 20 of 58 entries



---

Labeled View

---

### *The rainmaker : screenplay / by Francis Ford Coppola.*

|  |  |
|--|--|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu001878455 / 1996-07-25 |
| **Title:** | The rainmaker : screenplay / by Francis Ford Coppola. |
| **Description:** | 131 p. |
| **Notes:** | Adapted from the novel by John Grisham. |
| **Copyright Claimant:** | Mont Blanc Entertainment, GmbH & Bernina Film, AG (employers for hire) |
| **Date of Creation:** | 1996 |
| **Previous Registration:** | Novel prev. reg. 1995, TX 4-069-842. |
| **Names:** | Coppola, Francis Ford |
| | Grisham, John |
| | Mont Blanc Entertainment, GmbH |
| | Bernina Film, AG |



---

| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format   Full Record ⌄ | Format for Print/Save |
| Enter your email address: | Email |

---

Help    Search    History    Titles    Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Lucas, George
Search Results: Displaying 165 of 172 entries



Labeled View

*Revenge of the Sith.*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0006242348 / 2005-09-06 |
| **Title:** | Revenge of the Sith. |
| **Series:** | Star Wars ; 3 |
| **Copyright Claimant:** | Lucasfilm, Ltd. |
| **Date of Creation:** | 2004 |
| **Date of Publication:** | 2005-04-02 |
| **Previous Registration:** | Based on story and screenplay by George Lucas. |
| **Basis of Claim:** | New Matter: adaptation. |
| **Copyright Note:** | Cataloged from appl. only. |
| **Names:** | Lucas, George |
|  | Lucasfilm, Ltd. |



| **Save, Print and Email (Help Page)** |
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address:              Email |

---

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Lucas, George
Search Results: Displaying 23 of 172 entries



Labeled View

---

*The Empire strikes back story treatment / by George Lucas.*

**Type of Work:** Text
**Registration Number / Date:** TXu000046584 / 1980-05-27
**Title:** The Empire strikes back story treatment / by George Lucas.
**Description:** 9 p.
**Copyright Claimant:** Lucasfilm, Ltd.
**Date of Creation:** 1977
**Authorship on Application:** Chapter II Company, employer for hire of George Lucas.
**Previous Registration:** Appl. identifies the Adventures of Luke Skywalker screenplay, 4th revision, taken from Journal of the Whillis, reg. no. PAu 137-062 as preexisting material.
**Basis of Claim:** New Matter: "new, original adventures of characters from the Adventures of Luke Skywalker & introd. of new characters."
**Names:** Lucas, George
Lucasfilm, Ltd.
Chapter II Company





| **Save, Print and Email (Help Page)** |
| Select Download Format   Full Record ⌄   Format for Print/Save |
| Enter your email address:         Email |

---

Help    Search    History    Titles    Start Over



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |

## Public Catalog

 Copyright Catalog (1978 to present)

Search Request: Simple Search = Lucas, George

Search Results: Displaying 34 of 172 entries



Labeled View

*Raiders of the Lost Ark : novel / by Campbell Black.*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0001330377 / 1984-05-09 |
| **Title:** | Raiders of the Lost Ark : novel / by Campbell Black. |
| **Edition:** | 1st ed. |
| **Imprint:** | New York : Ballantine Books, 1981. |
| **Description:** | 181 p. |
| **Notes:** | Adapted from a screenplay by Lawrence Kasdan, based on a story by George Lucas & Philip Kaufman. |
| **Copyright Claimant:** | Lucasfilm, Ltd. (LFL) |
| **Date of Creation:** | 1981 |
| **Date of Publication:** | 1981-06-04 |
| **Authorship on Application:** | Lucasfilm, Ltd. (LFL), employer for hire. |
| **Basis of Claim:** | New Matter: "novelization." |
| **Names:** | Black, Campbell |
| | Kasdan, Lawrence |
| | Lucas, George |
| | Kaufman, Philip |
| | Lucasfilm, Ltd. |
| | LFL. |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record ▼   Format for Print/Save |
| Enter your email address:               Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Lucas, George
Search Results: Displaying 166 of 172 entries



Labeled View

*Revenge of the Sith / written and directed by George Lucas.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001271265 / 2005-05-04 |
| **Title:** | Revenge of the Sith / written and directed by George Lucas. |
| **Description:** | 7 film reels ; 35 mm. |
| **Series:** | Star Wars. episode III |
| **Copyright Claimant:** | Lucasfilm, Ltd. (employer for hire) |
| **Date of Creation:** | 2005 |
| **Date of Publication:** | 2005-05-02 |
| **Previous Registration:** | Screenplay prev. reg. 2004, PAu 2-809-087. |
| **Basis of Claim:** | New Matter: all other cinematographic material, incl. music. |
| **Other Title:** | Star Wars: episode III |
| **Names:** | Lucas, George |
| | Lucasfilm, Ltd. |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format [Full Record ▾]  [Format for Print/Save] |
| Enter your email address: [          ] [Email] |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Lucas, George
Search Results: Displaying 44 of 172 entries



Labeled View

***Return of the Jedi / by James Kahn ; screenplay by Lawrence Kasdan and...***

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0001200499 / 1983-09-06 |
| **Title:** | Return of the Jedi / by James Kahn ; screenplay by Lawrence Kasdan and George Lucas ; story by George Lucas. |
| **Edition:** | 1st ed. |
| **Imprint:** | New York : Ballantine Books, 1983. |
| **Description:** | 181 p. |
| **Notes:** | At head of ti.: Star wars. |
| **Copyright Claimant:** | Lucasfilm, Ltd. (LFL) |
| **Date of Creation:** | 1982 |
| **Date of Publication:** | 1983-05-02 |
| **Authorship on Application:** | Lucasfilm, Ltd., employer for hire. |
| **Other Title:** | Star wars |
| **Names:** | Kahn, James |
|  | Kasdan, Lawrence |
|  | Lucas, George |
|  | Lucasfilm, Ltd. |
|  | LFL. |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record ⌄    Format for Print/Save |
| Enter your email address:                Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
| --- | --- | --- | --- | --- |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Lucas, George
Search Results: Displaying 20 of 172 entries



Labeled View

### *The Empire strikes back / by Leigh Brackett ; second draft (2Apr78) by...*

| | |
| --- | --- |
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu000205078 / 1980-05-27 |
| **Title:** | The Empire strikes back / by Leigh Brackett ; second draft (2Apr78) by George Lucas. |
| **Description:** | 167 p. |
| **Series:** | Star wars ; episode 5 |
| **Notes:** | Screenplay. |
| | From The Adventures of Luke Skywalker by George Lucas. |
| **Copyright Claimant:** | Lucasfilm, Ltd. |
| **Date of Creation:** | 1978 |
| **Authorship on Application:** | revision of screenplay dialogue & direction: Chapter II Company, employer for hire of George Lucas. |
| **Basis of Claim:** | New Matter: revisions. |
| **Other Title:** | Star wars; episode 5 |
| | The Adventures of Luke Skywalker |
| **Names:** | Lucas, George |
| | Brackett, Leigh |
| | Lucasfilm, Ltd. |
| | Chapter II Company |





| Save, Print and Email (**Help Page**) | |
| --- | --- |
| Select Download Format  Full Record  ⌄ | Format for Print/Save |
| Enter your email address: | Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Simple Search = Lucas, George

Search Results: Displaying 68 of 172 entries



Labeled View

*Willow / story by George Lucas ; screenplay by Bob Dolman ; adaptation by...*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0002562266 / 1989-04-11 |
| **Title:** | Willow / story by George Lucas ; screenplay by Bob Dolman ; adaptation by Joan D. Vinge. |
| **Imprint:** | New York : Random House, c1988. |
| **Description:** | 125 p. |
| **Notes:** | Based on the motion picture. |
| **Copyright Claimant:** | Lucasfilm, Ltd. (L F L) |
| **Date of Creation:** | 1987 |
| **Date of Publication:** | 1988-07-07 |
| **Authorship on Application:** | entire text & cover ill.: Lucasfilm, Ltd. (L F L), employer for hire. |
| **Basis of Claim:** | New Matter: "entire text and cover illustration." |
| **Names:** | Lucas, George |
|  | Dolman, Bob |
|  | Vinge, Joan D. |
|  | Lucasfilm, Ltd. |
|  | LFL. |





| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format   Full Record ▾ | Format for Print/Save |
| Enter your email address: | Email |



WebVoyager Record View

Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Parker, Trey
Search Results: Displaying 4 of 110 entries



Labeled View

### *THE BOOK OF MORMON.*

| | |
|---|---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0001836498 / 2013-12-20 |
| **Application Title:** | THE BOOK OF MORMON. |
| **Title:** | THE BOOK OF MORMON. |
| **Description:** | Print Material. |
| **Copyright Claimant:** | Robert Lopez. Address: c/o Peikoff Mahan Law Office, P.C., 173 East Broadway Suite C1 NY, NY 10002. |
| | Trey Parker. Address: c/o Morris, Yorn, Barnes, Levine, Krintzman, Rubenstein & Kohner 2000 Avenue of the Stars, 3rd Floor, North Tower, Los Angeles, CA, 90067. |
| | Matt Stone. Address: c/o Morris, Yorn, Barnes, Levine, Krintzman, Rubenstein & Kohner 2000 Avenue of the Stars, 3rd Floor, North Tower, Los Angeles, CA, 90067. |
| **Date of Creation:** | 2011 |
| **Date of Publication:** | 2011-06-07 |
| **Authorship on Application:** | Matt Stone; Citizenship: United States. Authorship: Co - author of book of musical stage play. |
| | Trey Parker; Citizenship: United States. Authorship: Co-author of book of musical play. |
| | Robert Lopez. Authorship: Co-author of book of musical stage play. |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Stone, Matt |
| | Parker, Trey |
| | Lopez, Robert |
| | Parker, Trey |
| | Stone, Matt |
| | Lopez, Robert |





Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |
| --- | --- | --- | --- | --- |

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Left Anchored Name = allen, woody

Search Results: Displaying 16 of 146 entries



**Labeled View**

***Manhattan / a Jack Rollins--Charles H. Joffe production ; produced by...***

|  |  |
| --- | --- |
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000031598 / 1979-05-15 |
| **Title:** | Manhattan / a Jack Rollins--Charles H. Joffe production ; produced by Charles H. Joffe ; directed by Woody Allen. |
| **Imprint:** | [s.l. : Released by United Artists], c1979. |
| **Description:** | 5 film reels (96 min.) : Panavision, sd., b&w ; 35 mm. |
| **Notes:** | On film: United Artists, a Transamerica company. |
| | Deposit includes pressbook (15 p.) |
| **Cast:** | Woody Allen, Diane Keaton, Michael Murphy et al. |
| **Credits:** | Music by George Gershwin; written by Woody Allen & Marshall Brickman; director of photography: Gordon Willis; orchestral music by the New York Philharmonic, conducted by Zubin Mehta; music by Buffalo Philharmonic & Michael Tilson Thomas; music orchestrated & adapted by Tom Pierson. |
| **Copyright Claimant:** | United Artists Corporation |
| **Date of Creation:** | 1979 |
| **Date of Publication:** | 1979-04-20 |
| **Authorship on Application:** | Jack Rollins & Charles H. Joffe Productions, employer for hire. |
| **Names:** | Rollins, Jack |
| | Joffe, Charles H. |
| | Allen, Woody |
| | Joffee, Charles H. |
| | United Artists Corporation |
| | Jack Rollins & Charles H. Joffe Productions |
| | Charles H. Joffe Productions. |
| | Charles H. Joffee Productions. |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = allen, woody
Search Results: Displaying 26 of 146 entries



Labeled View

*Stardust memories / a Jack Rollins--Charles H. Joffe production ; produced...*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000084950 / 1980-10-20 |
| **Title:** | Stardust memories / a Jack Rollins--Charles H. Joffe production ; produced by Robert Greenhut ; written and directed by Woody Allen. |
| **Imprint:** | [s.l. : Released by United Artists], c1980. |
| **Description:** | 5 film reels (89 min.) : sd., b&w ; 35 mm. |
| **Notes:** | On film: United Artists. |
|  | Deposit includes pressbook (15 p.) |
| **Cast:** | Woody Allen, Charlotte Rampling, Jessica Harper et al. |
| **Credits:** | Editor: Susan E. Morse; director of photography: Gordon Willis. |
| **Copyright Claimant:** | United Artists Corporation |
| **Date of Creation:** | 1980 |
| **Date of Publication:** | 1980-09-18 |
| **Authorship on Application:** | Woody Allen, employer for hire. |
| **Names:** | Rollins, Jack |
|  | Greenhut, Robert |
|  | Allen, Woody |
|  | Joffe, Charles H. |
|  | United Artists Corporation |





| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record ▾ | Format for Print/Save |
| Enter your email address: | Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Nolan, Christopher
Search Results: Displaying 4 of 23 entries



| Labeled View |

### *Memento; By Christopher Nolan.*

**Type of Work:** Recorded Document
**Document Number:** V3426D655
**Date of Recordation:** 1998-12-18
**Entire Copyright Document:** V3426 D655 P1-2
**Date of Execution:** as of 7May98; 12Oct98
**Title:** Memento; unpublished screenplay / By Christopher Nolan.
**Notes:** Short-form option agreement.
**Party 1:** Christopher Nolan.
**Party 2:** Newmarket Capital Group, LP.
**Names:** Nolan, Christopher
        Newmarket Capital Group, LP.



| **Save, Print and Email (Help Page)** |
| Select Download Format [Full Record ▼] [Format for Print/Save] |
| Enter your email address: [ ] [Email] |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Simple Search = Nolan, Christopher

Search Results: Displaying 12 of 23 entries



---

Labeled View

***The Junior novel / adapted by Peter Lerangis ; screenplay by Christopher...***

**Type of Work:** Text

**Registration Number / Date:** TX0006193673 / 2005-07-12

**Title:** The Junior novel / adapted by Peter Lerangis ; screenplay by Christopher Nolan and David S. Goyer ; story by David S. Goyer.

**Imprint:** New York : Scholastic, c2005.

**Description:** 157 p.

**Series:** Batman begins

**Copyright Claimant:** DC Comics (employer for hire)

**Date of Creation:** 2005

**Date of Publication:** 2005-06-01

**Basis of Claim:** New Matter: adaptation of preexisting movie.

**Names:** Lerangis, Peter
Nolan, Christopher
Goyer, David S.
DC Comics



| Save, Print and Email (**Help Page**) |
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address: [          ]   Email |



---

Help    Search    History    Titles    Start Over



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Cameron, James
Search Results: Displaying 40 of 81 entries



Labeled View

*Judgment day / screenplay by James Cameron & William Wisher ; adapted by...*

| | |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0005126293 / 1999-11-15 |
| **Title:** | Judgment day / screenplay by James Cameron & William Wisher ; adapted by Jeff Campbell ; illustrated by Work in Progress Studios. |
| **Imprint:** | San Francisco : Chronicle Books, c1998. |
| **Description:** | 310 p. |
| **Series:** | Terminator 2 |
| **Copyright Claimant:** | Canal+DA |
| **Date of Creation:** | 1998 |
| **Date of Publication:** | 1998-10-01 |
| **Previous Registration:** | Preexisting material: Terminator 2, movie. |
| **Basis of Claim:** | New Matter: new text. |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | [Cameron, James](#) |
| | [Wisher, William](#) |
| | [Campbell, Jeff](#) |
| | [Work in Progress Studios](#) |
| | [Canal+DA](#) |



| | |
|---|---|
| **Save, Print and Email (<u>Help Page</u>)** | |
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: |   Email |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Cameron, James
Search Results: Displaying 10 of 81 entries



Labeled View

### *Terminator / by James Cameron and Gale Anne Hurd.*

|  |  |
|---|---|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu000584564 / 1984-02-03 |
| **Title:** | Terminator / by James Cameron and Gale Anne Hurd. |
| **Description:** | 129 p. |
| **Notes:** | Screenplay. |
| **Copyright Claimant:** | Hemdale Film Corporation |
| **Date of Creation:** | 1983 |
| **Authorship on Application:** | Gale Anne Hurd, as employee for hire of Pacific Western Productions. |
| **Names:** | Cameron, James |
| | Hurd, Gale Anne |
| | Hemdale Film Corporation |
| | Pacific Western Productions |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ▾    Format for Print/Save |
| Enter your email address:    Email |

---

Help | Search | History | Titles | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Simple Search = Cameron, James
Search Results: Displaying 36 of 81 entries



Labeled View

---

*Titanic / a Lightstorm Entertainment production ; produced and released by...*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000780847 / 1997-12-16 |
| **Title:** | Titanic / a Lightstorm Entertainment production ; produced and released by Twentieth Century Fox and Paramount Pictures ; written and directed by James Cameron. |
| **Description:** | 10 film reels ; 35 mm. |
| **Copyright Claimant:** | Paramount Pictures Corporation & Twentieth Century Fox Film Corporation (employers for hire) |
| **Date of Creation:** | 1997 |
| **Date of Publication:** | 1997-11-19 |
| **Previous Registration:** | Screenplay prev. reg. 1996, PAu 2-120-134; music preexisting. |
| **Basis of Claim:** | New Matter: all other cinematographic material. |
| **Names:** | Cameron, James |
|  | Lightstorm Entertainment |
|  | Twentieth Century Fox |
|  | Paramount Pictures |
|  | Paramount Pictures Corporation |
|  | Twentieth Century Fox Film Corporation |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ▾   Format for Print/Save |
| Enter your email address: _____   Email |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Cameron, James
Search Results: Displaying 27 of 81 entries



Labeled View

*True lies : a screenplay / by James Cameron.*

**Type of Work:** Dramatic Work and Music; or Choreography
**Registration Number / Date:** PAu001763516 / 1993-07-16
**Title:** True lies : a screenplay / by James Cameron.
**Description:** 147 p.
**Copyright Claimant:** American Gothic Productions, Inc. (employer for hire)
**Date of Creation:** 1993
**Names:** Cameron, James
American Gothic Productions, Inc.



| **Save, Print and Email (Help Page)** |
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address:   Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  | 
Copyright Office Home Page  |  Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Spielberg, Steven
Search Results: Displaying 4 of 130 entries



Labeled View

***Close encounters of the third kind / a Julia Phillips and Michael Phillips...***

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000085537 / 1980-09-26 |
| **Title:** | Close encounters of the third kind / a Julia Phillips and Michael Phillips production ; written and directed by Steven Spielberg. |
| **Edition:** | Expanded version. |
| **Imprint:** | [s.l. : s.n., 1980] |
| **Description:** | 8 film reels (132 min.) : Panavision, sd., col. ; 35 mm. |
| **Notes:** | A Columbia presentation, in association with E M I.<br>Deposit includes description (1 p.) |
| **Cast:** | Richard Dreyfuss, Francois Truffaut, Teri Garr et al. |
| **Credits:** | Music by John Williams; director of photography: Vilmos Zsigmond; director of photography of additional material: Alan Davian; film editor: Michael Kahn. |
| **Copyright Claimant:** | Columbia Pictures Industries, Inc. |
| **Date of Creation:** | 1980 |
| **Date of Publication:** | 1980-08-01 |
| **Authorship on Application:** | additional special ending, new scenes, re-editing, added special effects & other new cinematographic material: Columbia Pictures Industries, Inc., employer for hire. |
| **Previous Registration:** | Motion picture prev. reg. 16Nov77, LP50006; some additional music also prev. reg. |
| **Basis of Claim:** | New Matter: additional special ending, new scenes, re-editing, added special effects & other new cinematographic material. |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Phillips, Julia<br>Phillips, Michael<br>Spielberg, Steven<br>EMI.<br>Columbia Pictures Industries, Inc. |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Simple Search = Spielberg, Steven
Search Results: Displaying 2 of 130 entries



Labeled View

*Close encounters of the third kind : a Mandala Productions Fotonovel.*

**Type of Work:** Text
**Registration Number / Date:** TX0000151626 / 1978-11-22
**Title:** Close encounters of the third kind : a Mandala Productions Fotonovel.
**Imprint:** New York : Dell Pub. Co., c1978.
**Description:** 1 v.
**Notes:** Based on the screenplay by Steven Spielberg.
**Copyright Claimant:** Dell Publishing Company, Inc.
**Date of Creation:** 1978
**Date of Publication:** 1978-04-11
**Previous Registration:** Adapted from the film and book, prev. reg. 1977, A930121.
**Basis of Claim:** New Matter: photo-novelization, compilation, editing & additions.
**ISBN:** 0440109795
**Names:** Spielberg, Steven
Mandala Productions
Dell Publishing Company, Inc.





| **Save, Print and Email (Help Page)** |
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address:                              Email |

| Help | Search | History | Titles | Start Over |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Spielberg, Steven
Search Results: Displaying 15 of 130 entries



Labeled View

***Poltergeist / produced by Steven Spielberg & Frank Marshall ; directed by...***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000142980 / 1982-07-08 |
| **Title:** | Poltergeist / produced by Steven Spielberg & Frank Marshall ; directed by Tobe Hooper. |
| **Description:** | 6 film reels (114 min.) : sd., col. ; 35 mm. |
| **Cast:** | Jobeth Williams, Craig T. Nelson, Beatrice Straight et al. |
| **Copyright Claimant:** | Metro-Goldwyn-Mayer Film Company & S L M Entertainment, Ltd. |
| **Date of Creation:** | 1982 |
| **Date of Publication:** | 1982-06-04 |
| **Authorship on Application:** | Metro-Goldwyn-Mayer Film Company, employer for hire. |
| **Names:** | Spielberg, Steven |
| | Marshall, Frank |
| | Hooper, Tobe |
| | Metro-Goldwyn-Mayer Film Company |
| | SLM Entertainment, Ltd. |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address: [              ]   Email |

| Help | Search | History | Titles | Start Over |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

 Copyright Catalog (1978 to present)

Search Request: Left Anchored Title = close encounters of the third kind

Search Results: Displaying 13 of 105 entries



---

Labeled View

---

### *Close encounters of the third kind; Based on an original screenplay written...*

      **Type of Work:** Recorded Document

      **Document Number:** V1651P212

      **Date of Recordation:** 1978-01-18

      **Entire Copyright Document:** V1651P212-217

      **Date of Execution:** 19Jul77

      **Title:** Close encounters of the third kind; motion picture / Based on an original screenplay written by Steven Spielberg.

      **Notes:** Assignment.

      **Party 1:** Cinerenta Gesellschaft fur Internationale Filmproduktion, G.M.B.H. & Co. & Hercules, K.G.

      **Party 2:** Columbia Pictures Industries, Inc.

      **Names:** [Cinerenta Gesellschaft fur Internationale Filmproduktion, G.M.B.H. & Co.](#)
              [Hercules, K.G.](#)
              [Columbia Pictures Industries, Inc.](#)



| **Save, Print and Email ([Help Page](#))** | |
|---|---|
| Select Download Format   Full Record ▾ | Format for Print/Save |
| Enter your email address: | Email |

---

[Help](#)    [Search](#)    [History](#)    [Titles](#)    [Start Over](#)



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Spielberg, Steven
Search Results: Displaying 14 of 130 entries



Labeled View

*Poltergeist / by James Kahn ; with a screenplay by Steven Spielberg,...*

|  |  |
|--|--|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0000984382 / 1982-06-18 |
| **Title:** | Poltergeist / by James Kahn ; with a screenplay by Steven Spielberg, Michael Grais & Mark Victor. |
| **Imprint:** | New York : Warner Books, c1982. |
| **Description:** | 301 p. |
| **Notes:** | Based on a story by Steven Spielberg. |
| **Copyright Claimant:** | Amblin' Enterprises, Inc. |
| **Date of Creation:** | 1981 |
| **Date of Publication:** | 1982-05-14 |
| **Authorship on Application:** | novelization: Amblin' Enterprises, Inc., employer for hire. |
| **Names:** | Kahn, James |
| | Spielberg, Steven |
| | Grais, Michael |
| | Victor, Mark |
| | Amblin' Enterprises, Inc. |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record ⌄   Format for Print/Save |
| Enter your email address:           Email |



**Copyright**
United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = Ridley Scott alien
Search Results: Displaying 6 of 10000 entries

[◄ previous] [next ►]



Labeled View

*Alien / a Brandywine-Ronald Shusett production ; produced by Gordon...*

**Relevance:** ▮▮▮▮
**Type of Work:** Motion Picture
**Registration Number / Date:** PA0000038135 / 1979-06-11
**Title:** Alien / a Brandywine-Ronald Shusett production ; produced by Gordon Carroll, David Giler, and Walter Hill ; directed by Ridley Scott.
**Imprint:** [s.l.] : Released by Twentieth Century-Fox Film Corporation, c1979.
**Description:** 7 film reels (ca. 117 min.) : Panavision, sd., col. ; 35 mm.
**Notes:** A Ridley Scott film.
Deposit includes descriptive material (4 v.)
**Cast:** Tom Skerritt, Sigourney Weaver, Veronica Cartwright et al.
**Credits:** Story by Dan O'Bannon and Ronald Shusett; screenplay by Dan O'Bannon; music by Jerry Goldsmith; conducted by Lionel Newman; film editor: Terry Rawlings; director of photography: Derek Vanlint.
**Copyright Claimant:** Twentieth Century-Fox Film Corporation on all portions of motion picture except original music on soundtrack;
**Date of Creation:** 1979
**Date of Publication:** 1979-05-11
**Authorship on Application:** Twentieth Century-Fox Film Corporation, employer for hire.
**Names:** Carroll, Gordon
Giler, David
Hill, Walter
Scott, Ridley
Shusett, Ronald
Brandywine
Twentieth Century-Fox Film Corporation

Exhibit B



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**



| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = avatar
Search Results: Displaying 23 of 713 entries

◀ previous    next ▶

Labeled View

***AVATAR.***

**Type of Work:** Motion Picture
**Registration Number / Date:** PA0001653536 / 2009-12-10
Supplemented by: PA0001395488 / 2010-04-28
**Application Title:** AVATAR (Feature Motion Picture)
**Title:** AVATAR.
**Description:** 10 Film reels ; 35mm.
**Copyright Claimant:** Twentieth Century Fox Film Corporation, Transfer: By written agreement. Address: PO Box 900, Beverly Hills, CA 90213 United States.
Dune Entertainment III LLC, Transfer: By written agreement. Address: 5851 W. Charleston Blvd., Las Vegas, NV 89146 United States.
**Date of Creation:** 2009
**Date of Publication:** 2009-12-09
**Nation of First Publication:** United States
**Alternative Title on Application:** PROJECT 880
**Authorship on Application:** Ingenious Film Partners LLP, employer for hire; Domicile: United Kingdom. Authorship: entire motion picture.
Ingenious Film Partners 2 LLP, employer for hire; Domicile: United Kingdom. Authorship: entire motion picture.
Future Service, Inc., employer for hire; Domicile: United States. Authorship: entire motion picture.
**Preregistered as:** PRE000001349
**Previous Registration:** 2007, PAu 3-066-090.
2007, PAu 3-144-657.
**Pre-existing Material:** script/screenplay, preexisting music.
**Basis of Claim:** all other cinematographic material.
**Copyright Note:** See also Avatar; Reg. 28Apr10; PA0001395488
**Names:** Cameron, James



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

 Copyright Catalog (1978 to present)

Search Request: Left Anchored Title = Breaking Bad

Search Results: Displaying 11 of 221 entries



---

Labeled View

*Breaking Bad :*

**Type of Work:** Motion Picture

**Registration Number / Date:** PA0001603377 / 2008-04-15

**Application Title:** Breaking Bad: Pilot Premiere - Episode #100.

**Title:** Breaking Bad : 100, Pilot Premiere.

**Description:** Videocassette (Betacam SP) ; 1/2 in.

**Series:** Breaking Bad

**Copyright Claimant:** Sony Pictures Television Inc.. Address: 10202 West Washington Boulevard, Culver City, CA 90232-3195 United States

**Date of Creation:** 2007

**Date of Publication:** 2008-01-20

**Nation of First Publication:** United States

**Alternative Title on Application:** Breaking Bad: Premiere - Episode #100

**Authorship on Application:** Sony Pictures Television Inc., employer for hire; Domicile: United States. Authorship: entire motion picture.

**Names:** Gilligan, Vince

Sony Pictures Television Inc.

Sony Pictures Television Inc.





| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format [Full Record ▾] | [Format for Print/Save] |
| Enter your email address: [＿＿＿＿＿] | [Email] |

---



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Stranger Things
Search Results: Displaying 85 of 274 entries



---

Labeled View

---

### *Stranger Things :*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002009946 / 2016-09-26 |
| **Application Title:** | "Stranger Things" - Season I - Episode 8 - "Chapter Eight: The Upside Down". |
| **Title:** | Stranger Things : 8, Chapter Eight: The Upside Down. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | Netflix Studios, LLC, Transfer: By written agreement. |
| **Date of Creation:** | 2016 |
| **Date of Publication:** | 2016-07-15 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Bride Lake Productions, LLC, employer for hire; Domicile: United States. Authorship: Produced the entire motion picture. |
| **Names:** | <u>Bride Lake Productions, LLC</u><br><u>Netflix Studios, LLC</u> |



| **Save, Print and Email (<u>Help Page</u>)** |
|---|
| Select Download Format  Full Record ⌄   Format for Print/Save |
| Enter your email address: [_____]  Email |

---

<u>Help</u>   <u>Search</u>   <u>History</u>   <u>Titles</u>   <u>Start Over</u>

---



**United States Copyright Office**

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = Avengers: Infinity Wars
Search Results: Displaying 20 of 10000 entries



Labeled View

*AVENGERS: INFINITY WAR.*

|  |  |
|---|---|
| **Relevance:** | ■ ■ ■ ■ |
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002097619 / 2018-05-07 |
| **Application Title:** | AVENGERS: INFINITY WAR. |
| **Title:** | AVENGERS: INFINITY WAR. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | MVL FILM FINANCE, LLC. Address: 500 S. Buena Vista Street, Burbank, CA, 91521, United States. |
| **Date of Creation:** | 2018 |
| **Date of Publication:** | 2018-04-25 |
| **Nation of First Publication:** | Australia |
| **Authorship on Application:** | MVL FILM FINANCE, LLC, employer for hire; Citizenship: United States. Authorship: entire motion picture, Screenplay as spoken text. |
| **Preregistered as:** | PRE000010024 |
| **Pre-existing Material:** | Based on Marvel Characters published by Mavel Comics and Marvel Theatrical series of works. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture, Screenplay as spoken text. |
| **Rights and Permissions:** | Carol G Pinkus, Marvel Entertainment, LLC, c/o Marvel Entertainment, LLC, 135 West 50th Street, 7th Floor, New York, NY, 10020, United States, (212) 576-4033, cpinkus@marvel.com |
| **Copyright Note:** | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |
| **Names:** | [MVL FILM FINANCE, LLC](#) |



| **Save, Print and Email (Help Page)** |
|---|



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = "Gravity falls"
Search Results: Displaying 1 of 72 entries



Labeled View

*DISNEY GRAVITY FALLS :*

**Relevance:** ████

**Type of Work:** Motion Picture

**Registration Number / Date:** PA0001807305 / 2012-09-11

**Application Title:** DISNEY GRAVITY FALLS "THE HAND THAT ROCKS THE MABEL" (1-04)

**Title:** DISNEY GRAVITY FALLS : 1-04, THE HAND THAT ROCKS THE MABEL.

**Description:** Videocassette (Betacam SP) ; 1/2 in.

**Copyright Claimant:** DISNEY ENTERPRISES, INC., Transfer: by assignment. Address: 500 S. Buena Vista St., Burbank, CA, 91521, United States.

**Date of Creation:** 2012

**Date of Publication:** 2012-07-06

**Nation of First Publication:** United States

**Authorship on Application:** Disney Channel, employer for hire; Domicile: United States. Authorship: All other cinematographic material.

**Pre-existing Material:** Based on and incorporates preexisting Disney character artwork.

**Basis of Claim:** all other cinematographic material.

**Names:** Disney Channel
DISNEY ENTERPRISES, INC.



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format   Full Record ▾ | Format for Print/Save |
| Enter your email address: | Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = wall-e
Search Results: Displaying 49 of 88 entries



Labeled View

### *WALL-E.*

| | |
|---:|:---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001606305 / 2008-08-21 |
| **Application Title:** | WALL-E. |
| **Title:** | WALL-E. |
| **Description:** | 6 Film reels ; 35mm. |
| **Copyright Claimant:** | DISNEY ENTERPRISES, INC., Transfer: Assignment. Address: 500 S. Buena Vista Street, Burbank, CA 91521 |
| | PIXAR. Address: 1200 Park Avenue, Emeryville, CA 94608 |
| **Date of Creation:** | 2008 |
| **Date of Publication:** | 2008-06-27 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Pixar, employer for hire; Citizenship: United States. Authorship: Motion picture. |
| **Pre-existing Material:** | Based on and incorporates preexisting Disney/Pixar artwork. |
| **Basis of Claim:** | Motion Picture. |
| **Names:** | Stanton, Andrew |
| | Walt Disney Pictures |
| | Pixar Animation Studios Film |
| | DISNEY ENTERPRISES, INC. |
| | PIXAR |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record ▾ | Format for Print/Save |
| Enter your email address: | Email |





**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**



# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Keyword = "the last of us"
Search Results: Displaying 9 of 18 entries



Labeled View

*The Last of Us.*

| | |
|---:|:---|
| **Relevance:** | ■ ■ ■ ■ |
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | PA0001861054 / 2013-08-14 |
| **Application Title:** | The Last of Us (PS3 system) |
| **Title:** | The Last of Us. |
| **Description:** | Blu-Ray Disc. |
| **Notes:** | Videogame. |
| **Copyright Claimant:** | Sony Computer Entertainment America LLC. Address: 2207 Bridgepointe Pkwy., San Mateo, CA, 94404, United States. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-06-14 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Sony Computer Entertainment America LLC, employer for hire; Domicile: United States. Authorship: Audio Visual Elements. |
| **Rights and Permissions:** | Kiphanie Radford, 2207 Bridgepointe Pkwy., San Mateo, CA, 94404, United States, (650) 655-8004, (650) 655-8004, kiphanie_radford@playstation.sony.com |
| **Names:** | [Sony Computer Entertainment America LLC](#) |



| Save, Print and Email (**<u>Help Page</u>**) | |
|:---|:---|
| Select Download Format [Full Record ▾] | [ Format for Print/Save ] |
| Enter your email address: [                    ] | [ Email ] |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Freaks and Geeks
Search Results: Displaying 6 of 54 entries



Labeled View

*Freaks and geeks : no. 23-99-100 / directed by Jake Kasdan.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000983136 / 2000-06-08 |
| **Title:** | Freaks and geeks : no. 23-99-100 / directed by Jake Kasdan. |
| **Description:** | Videocassette ; 3/4 in. |
| **Notes:** | Pilot. |
| **Copyright Claimant:** | DreamWorks, LLC |
| **Date of Creation:** | 1999 |
| **Date of Publication:** | 1999-09-07 |
| **Authorship on Application:** | DreamWorks SKG TV, LLC (employer for hire) |
| **Previous Registration:** | Musical compositions and some footage prev. pub. |
| **Basis of Claim:** | New Matter: all other cinematographic material. |
| **Variant title:** | Freaks and geeks : no. 23-99-100 |
| **Names:** | Kasdan, Jake |
|  | DreamWorks, LLC |
|  | DreamWorks SKG TV, LLC |



| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record ▾   Format for Print/Save |
| Enter your email address:  _____  Email |

| Help | Search | History | Titles | Start Over |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. [More](#).**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = death stranding
Search Results: Displaying 1 of 2 entries



Labeled View

---

### *DEATH STRANDING*

| | |
|---:|:---|
| **Type of Work:** | Preregistration |
| **Type of Work Preregistered:** | Computer Program (may include a videogame) |
| **Preregistration Number / Date:** | PRE000011063 / 2019-09-30 |
| **Application Title:** | DEATH STRANDING |
| **Title:** | DEATH STRANDING |
| **Copyright Claimant:** | Sony Interactive Entertainment Inc. Address: 1-6-27 Konan, Minato-ku, Tokyo, Japan. |
| **Creation of Work Began:** | 2016-01 (Approximate) |
| **Date of Anticipated Completion:** | 2019-09 (Approximate) |
| **Projected Date of Publication:** | 2019-11 (Approximate) |
| **Authorship on Application:** | Sony Interactive Entertainment Inc. |
| **Description of Work:** | The computer program titled "Death Stranding" is a video game that will be published as a disc-based and as an online downloadable product.The game takes place in a dystopian environment after the collapse of civilization. The main character, Sam Bridges, must journey across a ravaged landscape crawling with otherworldly threats to save mankind from the brink of extinction.The game will be available for the PlayStation�4 system. |
| **Names:** | [Sony Interactive Entertainment Inc.](#) |



| **Save, Print and Email ([Help Page](#))** |
|:---:|
| Select Download Format   Full Record ▾   Format for Print/Save |
| Enter your email address:   [_____]   Email |



**Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. [More](#).**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = elysium
Search Results: Displaying 19 of 190 entries



---

Labeled View

---

### *ELYSIUM.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001853308 / 2013-08-07 |
| **Application Title:** | ELYSIUM. |
| **Title:** | ELYSIUM. |
| **Description:** | 6 film reels ; 35mm. |
| **Copyright Claimant:** | MRC II Distribution Company L.P. Address: 1800 Century Park East, 10th Floor, Los Angeles, CA, 90067, United States. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-08-07 |
| **Nation of First Publication:** | Trinidad and Tobago |
| **Authorship on Application:** | MRC II Distribution Company L.P., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Previous Registration:** | 2011, PAU 3-551-777. |
| **Pre-existing Material:** | script/screenplay, preexisting music. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture. |
| **Names:** | [Blomkamp, Neill](#) |
|  | [MRC II Distribution Company L.P.](#) |



| Save, Print and Email ([Help Page](#)) |
|---|
| Select Download Format  Full Record ▾   Format for Print/Save |
| Enter your email address: _____  Email |





Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = district 9
Search Results: Displaying 13 of 47 entries



Labeled View

### *DISTRICT 9.*

|  |  |
|--|--|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001639379 / 2009-08-13 |
| **Application Title:** | DISTRICT 9. |
| **Title:** | DISTRICT 9. |
| **Description:** | 6 Film reels ; 35mm. |
| **Copyright Claimant:** | District 9 Ltd. Address: 6 Portsmouth Road, PO Box 15-303, Miramar, Wellington, 6243, New Zealand. |
| **Date of Creation:** | 2009 |
| **Date of Publication:** | 2009-08-13 |
| **Nation of First Publication:** | Australia |
| **Authorship on Application:** | District 9 Ltd., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Previous Registration:** | Screenplay pending. |
| **Pre-existing Material:** | script/screenplay, preexisting footage, preexisting music, Based on the 2005 short "Alive In Jo'Berg". |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Blomkamp, Neill |
|  | District 9 Ltd. |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format [Full Record ▼]  [Format for Print/Save] |
| Enter your email address: [                    ]  [Email] |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = rick & morty
Search Results: Displaying 1 of 21 entries



---

Labeled View

### *RICK & MORTY :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001897334 / 2014-04-21 |
| **Application Title:** | RICK & MORTY - Episode #2: "Lawnmower Dog". |
| **Title:** | RICK & MORTY : 2, Lawnmower Dog. |
| **Description:** | Videocassette (Betacam SP) ; 1/2 in. |
| **Copyright Claimant:** | The Cartoon Network, Inc. Address: 1050 Techwood Drive, NW - #EXE304H, Atlanta, GA, 30318, United States. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-12-09 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | The Cartoon Network, Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Names:** | Cartoon Network, Inc. |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record   ⌄    Format for Print/Save |
| Enter your email address:                               Email |

---

Help    Search    History    Titles    Start Over

---

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Amphibia
Search Results: Displaying 276 of 318 entries



Labeled View

### *AMPHIBIA - CHARACTER GUIDE.*

|  |  |
|---|---|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VAu001382142 / 2019-06-27 |
| **Application Title:** | AMPHIBIA - CHARACTER GUIDE. |
| **Title:** | AMPHIBIA - CHARACTER GUIDE. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Disney Enterprises, Inc., Transfer: by assignment. Address: 500 S. Buena Vista St., Burbank, CA, 91521, United States. |
| **Date of Creation:** | 2018 |
| **Authorship on Application:** | Walt Disney Television Animation a.a.d.o. Walt Disney Pictures, employer for hire; Domicile: United States. Authorship: 2-D artwork. |
| **Pre-existing Material:** | Preexisting artwork of Anne, Sprig, Polly, and Hop Pop. |
| **Basis of Claim:** | 2-D artwork. |
| **Copyright Note:** | Basis for Registration: Registration based on deposited pictorial authorship describing, depicting, or embodying character(s). Compendium 313.4(H). |
| **Names:** | Walt Disney Television Animation a.a.d.o. Walt Disney Pictures |
|  | Disney Enterprises, Inc. |





| Save, Print and Email (**Help Page**) |  |  |
|---|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |

| Help | Search | History | Titles | Start Over |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Keyword = The Owl House luz disney

Search Results: Displaying 11 of 10000 entries



---

Labeled View

---

### *THE OWL HOUSE :*

| | |
|---|---|
| **Relevance:** | ■ ■ ■ |
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002231356 / 2020-01-14 |
| **Application Title:** | THE OWL HOUSE "A LYING WITCH AND A WARDEN" (1-01) |
| **Title:** | THE OWL HOUSE : 1-01, A LYING WITCH AND A WARDEN. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Disney Enterprises, Inc., Transfer: by assignment. Address: 500 S. Buena Vista Street, Burbank, CA, 91521, United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2020-01-10 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Disney Channel a.a.d.o. ABC Cable Networks Group, employer for hire; Domicile: United States. Authorship: entire motion picture, screenplay as spoken text. |
| **Pre-existing Material:** | Based on and incorporates preexisting elements, including artwork, from Disney The Owl House. |
| **Basis of Claim:** | all other cinematographic material, Screenplay as spoken text. |
| **Names:** | Disney Channel<br>ABC Cable Networks Group<br>Disney Enterprises, Inc. |



---



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: | _____   Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
| --- | --- | --- | --- | --- |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = borderlands
Search Results: Displaying 94 of 164 entries



Labeled View

*Borderlands.*

| | |
| --- | --- |
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | PA0001817977 / 2012-12-17 |
| **Application Title:** | Borderlands. |
| **Title:** | Borderlands. |
| **Description:** | Electronic file (eService) |
| **Notes:** | Videogame. |
| **Copyright Claimant:** | Gearbox Software, LLC. Address: 101 East Park Blvd., Suite 1200, Plano, TX, 75074, United States. |
| **Date of Creation:** | 2009 |
| **Date of Publication:** | 2009-10-06 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Gearbox Software, LLC, employer for hire; Domicile: United States. Authorship: audiovisual material, music and summary for videogame, videogame box cover and instruction manual. |
| **Rights and Permissions:** | Gearbox Software, LLC, 101 East Park Blvd., Suite 1200, Plano, TX, 75074, United States |
| **Names:** | [Gearbox Software, LLC](#) |



| Save, Print and Email (**Help Page**) |
| --- |
| Select Download Format [Full Record ▼] [Format for Print/Save] |
| Enter your email address: [ ] [Email] |



**Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = fallout 3
Search Results: Displaying 5 of 6 entries



Labeled View

*Fallout 3 : XBox 360.*

**Type of Work:** Computer File
**Registration Number / Date:** PA0001617156 / 2008-12-15
**Application Title:** Fallout 3 for XBox.
**Title:** Fallout 3 : XBox 360.
**Edition:** Collector's Edition.
**Description:** 2 DVD-ROMs.
**Notes:** Videogame.
Computer printout (50 p.) also deposited.
**Copyright Claimant:** Bethesda Softworks LLC. Address: 1370 PICCARD DRIVE, Suite 120, Rockville, MD 20850 United States.
**Date of Creation:** 2008
**Date of Publication:** 2008-10-28
**Nation of First Publication:** United States
**Authorship on Application:** Bethesda Softworks LLC, employer for hire; Domicile: United States. Authorship: text, computer program, artwork, audiovisual material.
**Copyright Note:** C.O. correspondence.
**Names:** Bethesda Softworks LLC



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record | Format for Print/Save |
| Enter your email address: | | Email |





**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = fallout 4
Search Results: Displaying 1 of 4 entries



---

Labeled View

---

### *Fallout 4.*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0008157714 / 2016-02-03 |
| **Application Title:** | Fallout 4. |
| **Title:** | Fallout 4. |
| **Description:** | XBOX disc + Print material. |
| **Copyright Claimant:** | Bethesda Softworks LLC. Address: 1370 PICCARD DRIVE, Rockville, MD, 20850, United States. |
| **Date of Creation:** | 2015 |
| **Date of Publication:** | 2015-11-10 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Bethesda Softworks LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: text, computer program, artwork. |
| **Names:** | Bethesda Softworks LLC |



| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record ▾   Format for Print/Save |
| Enter your email address:  [          ]  Email |

---

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Half-Life Alyx
Search Results: Displaying 1 of 1 entries



Labeled View

*Half-Life:Alyx.*

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | TX0008861120 / 2020-04-09 |
| **Application Title:** | Half-Life:Alyx. |
| **Title:** | Half-Life:Alyx. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Valve Corporation. Address: 10400 NE 4th Street, Suite 1400, Bellevue, WA, 98004, United States. |
| **Date of Creation:** | 2020 |
| **Date of Publication:** | 2020-03-23 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Valve Corporation, employer for hire; Domicile: United States. Authorship: computer program, Revised and Additional computer program. |
| **Previous Registration:** | 2004, TX0006147922. |
| **Pre-existing Material:** | computer program. |
| **Basis of Claim:** | computer program, Revised and additional computer program. |
| **Rights and Permissions:** | Valve Corporation, 10400 NE 4th Street, Suite 1400, Bellevue, WA, 98004, United States |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Valve Corporation |





| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format [Full Record ▾] [Format for Print/Save] |
| Enter your email address: [                    ] [Email] |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Baby driver
Search Results: Displaying 1 of 44 entries



Labeled View

*BABY DRIVER.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002044444 / 2017-06-30 |
| **Application Title:** | BABY DRIVER. |
| **Title:** | BABY DRIVER. |
| **Description:** | Videocassette (HDCAM SR) |
| **Copyright Claimant:** | TriStar Pictures, Inc. Address: 10202 W. Washington Blvd., Culver City, CA, 90232-3195, United States. |
| | MRC II Distribution Company L.P. Address: 9665 Wilshire Blvd., 2nd Floor, Beverly Hills, CA, 90212, United States. |
| **Date of Creation:** | 2017 |
| **Date of Publication:** | 2017-06-07 |
| **Nation of First Publication:** | France |
| **Authorship on Application:** | TriStar Pictures, Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| | MRC II Distribution Company L.P., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000008830 |
| **Previous Registration:** | 2016, PAu003845444. |
| | 2016, PAU003839366. |
| **Pre-existing Material:** | script/screenplay, preexisting music, French language (dubbed) soundtrack as released in the country of first publication. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture, Entire English language soundtrack as originally released in the United States. |
| **Copyright Note:** | C.O. correspondence. |
| | Regarding special handling request: Claim upgraded for special handling per request received on 07/14/2017 due to pending or prospective litigation. Registration decision and certificate issued on 7/25/2017. |



**Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = interstellar
Search Results: Displaying 223 of 342 entries



---

Labeled View

### *INTERSTELLAR.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001920916 / 2014-11-05 |
| **Application Title:** | INTERSTELLAR. |
| **Title:** | INTERSTELLAR. |
| **Description:** | 8 film reels ; 35mm. |
| **Copyright Claimant:** | Paramount Pictures Corporation. Address: 5555 Melrose Avenue, Hollywood, CA, 90038, United States. |
| | Warner Bros. Entertainment Inc., Transfer: By written agreement. Address: 4000 Warner Blvd., Burbank, CA, 91522, United States. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-11-05 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Paramount Pictures Corporation, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| | Warner Bros. Pictures, a division of WB Studio Enterprises Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000007487 |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Nolan, Christopher |
| | Paramount Pictures Corporation |
| | Warner Bros. Pictures. |
| | WB Studio Enterprises Inc. |
| | Warner Bros. Entertainment Inc. |





**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Johnny English
Search Results: Displaying 40 of 53 entries



---

Labeled View

***Johnny English Reborn.***

|  |  |
|--|--|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001752398 / 2011-10-03 |
| **Application Title:** | Johnny English Reborn. |
| **Title:** | Johnny English Reborn. |
| **Description:** | 6 Film reels ; 35mm. |
| **Copyright Claimant:** | Universal City Studios Productions LLLP, Transfer: By written agreement. Address: 100 Universal City Plaza, Universal City, CA, 91608. |
| **Date of Creation:** | 2011 |
| **Date of Publication:** | 2011-09-15 |
| **Nation of First Publication:** | Australia |
| **Authorship on Application:** | Intelligence Films Limited, employer for hire; Domicile: United Kingdom; Citizenship: United Kingdom. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000004776 |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Parker, Oliver |
|  | Intelligence Films Limited |
|  | Universal City Studios Productions LLLP |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: |      Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = undeclared
Search Results: Displaying 18 of 84 entries





### Labeled View

*Undeclared : no. 101 / directed by Jake Kasdan.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001091373 / 2002-07-03 |
| **Application Title:** | Undeclared : no. 33-00-101. |
| **Title:** | Undeclared : no. 101 / directed by Jake Kasdan. |
| **Description:** | Videocassette (Betacam-SP) ; 1/2 in. |
| **Notes:** | Pilot. |
| **Copyright Claimant:** | DreamWorks, LLC |
| **Date of Creation:** | 2000 |
| **Date of Publication:** | 2001-09-26 |
| **Authorship on Application:** | DreamWorks SKG TV, LLC, employer for hire. |
| **Previous Registration:** | Some material, incl. music & some footage, prev. pub. |
| **Basis of Claim:** | New Matter: all other cinematographic material. |
| **Variant title:** | Undeclared : no. 101 |
| **Other Title:** | Undeclared : no. 33-00-101 |
| **Names:** | Kasdan, Jake |
|  | DreamWorks, LLC |
|  | DreamWorks SKG TV, LLC |



| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format [Full Record ▾] [Format for Print/Save] |
| Enter your email address: [                    ] [Email] |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = oblivion
Search Results: Displaying 478 of 644 entries



Labeled View

## *Oblivion.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001840631 / 2013-04-11 |
| **Application Title:** | Oblivion. |
| **Title:** | Oblivion. |
| **Description:** | 7 film reels ; 35mm. |
| **Copyright Claimant:** | Universal City Studios Productions LLLP, Transfer: By written agreement. Address: 100 Universal City Plaza, Universal City, CA, 91608. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-04-10 |
| **Nation of First Publication:** | Belgium |
| **Authorship on Application:** | Universal City Studios LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture. |
| **Previous Registration:** | 2012, PAu 3-651-698. |
| | 2013, PAu 3-658-042. |
| **Pre-existing Material:** | script/screenplay, preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Kosinski, Joseph |
| | Universal City Studios LLC |
| | Universal City Studios Productions LLLP |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ∨   Format for Print/Save |
| Enter your email address:  _____  Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = prometheus
Search Results: Displaying 368 of 474 entries



Labeled View

### *PROMETHEUS.*

|  |  |
|--|--|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001788296 / 2012-06-01 |
| **Application Title:** | PROMETHEUS (Feature Motion Picture) |
| **Title:** | PROMETHEUS. |
| **Description:** | 7 film reels ; 35mm. |
| **Copyright Claimant:** | Twentieth Century Fox Film Corporation, Transfer: By written agreement. Address: PO Box 900, Beverly Hills, CA, 90213, United States. |
|  | Dune Entertainment III LLC, Transfer: By written agreement. Address: 5851 W. Charleston Blvd., Las Vegas, NV, 89146. |
| **Date of Creation:** | 2012 |
| **Date of Publication:** | 2012-05-30 |
| **Nation of First Publication:** | France |
| **Authorship on Application:** | Twentieth Century Fox Film Corporation, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000004463 |
| **Previous Registration:** | 2011, PAu 3-536-833. |
| **Pre-existing Material:** | script/screenplay, preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Scott, Ridley |
|  | Twentieth Century Fox Film Corporation |
|  | Dune Entertainment III LLC |



| **Save, Print and Email (Help Page)** | | |
|---|---|---|
| Select Download Format | Full Record | Format for Print/Save |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = DeMonaco, James
Search Results: Displaying 10 of 24 entries



Labeled View

*The Purge.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001874812 / 2013-05-31 |
| **Application Title:** | The Purge. |
| **Title:** | The Purge. |
| **Description:** | 5 film reels ; 35mm. |
| **Copyright Claimant:** | Universal City Studios Productions LLLP, Transfer: By written agreement. Address: 100 Universal City Plaza, Universal City, CA, 91608. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-05-31 |
| **Nation of First Publication:** | United Kingdom |
| **Authorship on Application:** | Overlord Productions, LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000006396 |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Demonaco, James |
| | Overlord Productions, LLC |
| | Universal City Studios Productions LLLP |





| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: |          Email |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = transporter
Search Results: Displaying 43 of 252 entries

◀ previous    next ▶

---

Labeled View

---

*The transporter / Twentieth Century Fox presents a Europa Corp. production...*

**Type of Work:** Motion Picture
**Registration Number / Date:** PA0000847070 / 2002-10-02
**Title:** The transporter / Twentieth Century Fox presents a Europa Corp. production in co-production with TFI Films Production in association with Current Entertainment and Canal+ ; director, Cory Yuen.
**Description:** 7 film reels ; 35 mm.
**Copyright Claimant:** Europa Corporation & TFI Films Production
**Date of Creation:** 2002
**Date of Publication:** 2002-09-03
**Authorship on Application:** Europa Corporation and TFI Films Production, employers for hire.
**Previous Registration:** Screenplay of same title prev. reg. 2002, PAu 2-650-970; music preexisting.
**Basis of Claim:** New Matter: all other cinematographic material.
**Names:** Yuen, Cory
    Twentieth Century Fox
    Current Entertainment
    Canal+
    Europa Corporation
    TFI Films Production

◀ previous    next ▶





| Save, Print and Email (**Help Page**) |
| Select Download Format [Full Record ▾] [Format for Print/Save] |
| Enter your email address: [      ] [Email] |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Source code
Search Results: Displaying 615 of 1009 entries



Labeled View

### *Source Code.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001725600 / 2011-03-09 |
| **Application Title:** | Source Code. |
| **Title:** | Source Code. |
| **Description:** | 5 film reels ; 35mm. |
| **Copyright Claimant:** | Vendome International, LLC. Address: 9320 Wilshire Blvd, Suite 204, Beverly Hills, CA, 90212, United States. |
| **Date of Creation:** | 2010 |
| **Date of Publication:** | 2011-02-28 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Vendome International, LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture. |
| **Previous Registration:** | 2010, PAu 3-444-454. |
| **Pre-existing Material:** | script/screenplay. |
| **Basis of Claim:** | production as a motion picture, revisions/additions to script. |
| **Names:** | Jones, Duncan |
|  | Vendome International, LLC |





| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record  ⌄   Format for Print/Save |
| Enter your email address:                        Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = "The Last Witch Hunter"
Search Results: Displaying 9 of 36 entries



Labeled View

*The Last Witch Hunter.*

| | |
|---|---|
| **Relevance:** | ▮▮▮▮ |
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001964116 / 2015-11-30 |
| **Application Title:** | The Last Witch Hunter. |
| **Title:** | The Last Witch Hunter. |
| **Description:** | HDCam. |
| **Copyright Claimant:** | Summit Entertainment, LLC, Transfer: By written agreement. Address: 2700 Colorado Avenue, Suite 200 N.E., Santa Monica, CA, 90404-5502, United States. |
| **Date of Creation:** | 2015 |
| **Date of Publication:** | 2015-10-22 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Summit Entertainment, LLC, employer for hire; Citizenship: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000007452 |
| **Previous Registration:** | 2014, PAu-3-737-502. |
| **Pre-existing Material:** | script/screenplay. |
| **Basis of Claim:** | production as a motion picture. |
| **Rights and Permissions:** | Barbara Butler, Summit Entertainment, LLC, 2700 Colorado Avenue, Suite 200 N.E., Santa Monica, CA, 90404-5502, United States, (310) 255-3248, (310) 449-9200, bbutler@lionsgate.com |
| **Names:** | Eisner, Breck |
| | Summit Entertainment, LLC |



| Save, Print and Email (Help Page) |
|---|



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Sleepless
Search Results: Displaying 123 of 1271 entries



Labeled View

### *Sleepless.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PAu003850152 / 2016-06-15 |
| **Application Title:** | Sleepless (f/k/a Sleepless Night) |
| **Title:** | Sleepless. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | OR Productions LLC. Address: 12301 Wilshire Blvd, Suite 600, Los Angeles, CA, 90025, United States. |
| **Date of Creation:** | 2016 |
| **Authorship on Application:** | OR Productions LLC, employer for hire; Citizenship: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | script/screenplay, preexisting footage, preexisting music. |
| **Basis of Claim:** | production as a motion picture. |
| **Rights and Permissions:** | Elliott Kleinberg, 12301 Wilshire Blvd., Suite 600, Los Angeles, CA, 90025, United States, (310) 571-2220, ekleinberg@openroadfilms.com |
| **Names:** | OR Productions LLC |



| | |
|---|---|
| **Save, Print and Email (Help Page)** | |
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: |      Email |



| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Star Citizen
Search Results: Displaying 6 of 26 entries



Labeled View

*Star Citizen - ARENA COMMANDER v0.9.1.3.*

| | |
|---|---|
| **Type of Work:** | Computer File |
| **Registration Number / Date:** | PA0002218019 / 2019-10-11 |
| **Application Title:** | Star Citizen - ARENA COMMANDER v0.9.1.3. |
| **Title:** | Star Citizen - ARENA COMMANDER v0.9.1.3. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Cloud Imperium Rights LLC, Transfer: By written agreement. Address: 12322 Exposition Blvd, Los Angeles, CA, 90064, United States. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-10-17 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Cloud Imperium Games, LLC, employer for hire; Domicile: United States; Citizenship: United States. Authorship: Computer Program (Videogame) |
| **Pre-existing Material:** | Audiovisual material in previous published version of videogame. |
| **Basis of Claim:** | All new expression embodied in program and audiovisual material introduced in this version of computer program (videogame). |
| **Rights and Permissions:** | Steven Kam, Cloud Imperium Rights LLC, 12322 Exposition Blvd, Los Angeles, CA, 90064, United States, (310) 275-1300, legal_notices@cloudimperiumgames.com |
| **Names:** | Cloud Imperium Games, LLC |
| | Cloud Imperium Rights LLC |



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |



**Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. More.**

Help | Search | History | Titles | Start Over

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = tower heist
Search Results: Displaying 1 of 17 entries



Labeled View

*Tower Heist.*

| | |
|---|---|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu003551348 / 2011-04-14 |
| **Application Title:** | Tower Heist - Final Shooting Script dated 01/11/11. |
| **Title:** | Tower Heist. |
| **Description:** | Print material, 129 p. |
| **Copyright Claimant:** | Universal City Studios LLLP. Address: 100 Universal City Plaza, Universal City, CA, 91608. |
| **Date of Creation:** | 2011 |
| **Authorship on Application:** | Universal City Studios LLLP, employer for hire; Domicile: United States; Citizenship: United States. Authorship: text. |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Universal City Studios LLLP |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format [Full Record ⌄]  [Format for Print/Save] |
| Enter your email address: [_____]  [Email] |

Help | Search | History | Titles | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = upload
Search Results: Displaying 2 of 137 entries



Labeled View

---

### *Upload :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002248450 / 2020-05-12 |
| **Application Title:** | Upload: 101, Welcome to Upload. |
| **Title:** | Upload : 101, Welcome to Upload. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Amazon Content Services LLC. Address: 410 Terry Avenue N, Seattle, WA, 98109, United States. |
| **Date of Creation:** | 2020 |
| **Date of Publication:** | 2020-05-01 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Amazon Content Services LLC, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Rights and Permissions:** | Amazon Content Services LLC, 410 Terry Avenue N, Seattle, WA, 98109, United States |
| **Names:** | Amazon Content Services LLC |





| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record ⌄ | Format for Print/Save |
| Enter your email address: | Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Repo MEn
Search Results: Displaying 11 of 13 entries



Labeled View

*Repo Men.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001724059 / 2010-03-19 |
| **Application Title:** | Repo Men. |
| **Title:** | Repo Men. |
| **Description:** | 6 film reels ; 35mm. |
| **Copyright Claimant:** | Universal City Studios Productions LLLP, Transfer: By written agreement. Address: 100 Universal City Plaza, Universal City, CA, 91608. |
| **Date of Creation:** | 2009 |
| **Date of Publication:** | 2010-03-19 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Universal City Studios LLLP, employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000003260 |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Sapochnik, Miguel |
|  | Universal City Studios LLLP |
|  | Universal City Studios Productions LLLP |



| **Save, Print and Email (Help Page)** |  |
|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |





**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

 Copyright Catalog (1978 to present)

Search Request: Left Anchored Title = Black Jesus

Search Results: Displaying 91 of 144 entries



Labeled View

### *BLACK JESUS :*

|  |  |
|--|--|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001929765 / 2014-10-17 |
| **Application Title:** | BLACK JESUS - Episode #1: "Smokin', Drinkin' and Chillin'". |
| **Title:** | BLACK JESUS : 1, Smokin', Drinkin' and Chillin. |
| **Description:** | Videocassette (Betacam SP) ; 1/2 in. |
| **Copyright Claimant:** | The Cartoon Network, Inc. Address: 1050 Techwood Drive, NW - #EXE304H, Atlanta, GA, 30318, United States. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-08-07 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | The Cartoon Network, Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | Certain preexisting music. |
| **Basis of Claim:** | all other cinematographic material, Including the story and theme music. |
| **Names:** | Cartoon Network, Inc. |



| Save, Print and Email (**Help Page**) |
|--|
| Select Download Format   Full Record ⌄   Format for Print/Save |
| Enter your email address:  _____   Email |



Help    Search    History    Titles    Start Over



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Left Anchored Title = Maiden Heist

Search Results: Displaying 3 of 3 entries



Labeled View

### *The Maiden Heist.*

**Type of Work:** Motion Picture

**Registration Number / Date:** PAu003391301 / 2008-10-07

**Application Title:** The Maiden Heist.

**Title:** The Maiden Heist.

**Description:** Videodisc (DVD)

**Copyright Claimant:** Lonely Maiden Productions, LLC. Address: 10850 Wilshire Blvd., Sixth Floor, Los Angeles, CA 90024.

**Date of Creation:** 2008

**Alternative Title on Application:** The Lonely Maiden

**Authorship on Application:** Lonely Maiden Productions, LLC, employer for hire; Domicile: United States. Authorship: Entire Motion Picture.

**Pre-existing Material:** Screenplay, "The Lonely Maiden," by Michael LeSieur (PAu 3-335-959)

**Basis of Claim:** Motion Picture dramatization including audio, visual and other cinematographic materials.

**Names:** Lonely Maiden Productions, LLC



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |



Help    Search    History    Titles    Start Over

Exhibit C



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = Coppola, Francis
Search Results: Displaying 1 of 58 entries



Labeled View

***Apocalypse now / directed and produced by Francis Coppola ; co-produced by...***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0000054814 / 1980-01-18 |
| **Title:** | Apocalypse now / directed and produced by Francis Coppola ; co-produced by Fred Ross, Gray Frederickson, and Tom Sternberg. |
| **Imprint:** | [s.l. : A United Artists release], c1979. |
| **Description:** | 9 film reels (146 min.) : Technovision, sd., col. ; 35 mm. |
| **Notes:** | Narration by Michael Herr. |
| | Deposit includes pressbook (1 v.) |
| **Cast:** | Marlon Brando, Robert Duvall, Martin Sheen et al. |
| **Performer:** | Presented by Francis Ford Coppola. |
| **Credits:** | Written by John Milius & Francis Coppola; photography by Vittorio Storaro; music by Carmine Coppola & Francis Coppola. |
| **Copyright Claimant:** | Omni Zoetrope |
| **Date of Creation:** | 1979 |
| **Date of Publication:** | 1979-08-07 |
| **Authorship on Application:** | Omni Zoetrope, employer for hire. |
| **Names:** | Ross, Fred |
| | Frederickson, Gray |
| | Sternberg, Tom |
| | Coppola, Francis Ford |
| | Omni Zoetrope |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record ▾   Format for Print/Save |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = "War of the Worlds" josh fiedman
Search Results: Displaying 1 of 10000 entries

◄ previous | next ►

Labeled View

*War of the worlds / screenplay by Josh Friedman and David Koepp ; introd....*

**Relevance:** 
**Type of Work:** Text
**Registration Number / Date:** TX0006261962 / 2005-12-05
**Title:** War of the worlds / screenplay by Josh Friedman and David Koepp ; introd. by and Q&A with David Koepp.
**Edition:** 1st ed.
**Imprint:** New York : Newmarket Press, c2005.
**Description:** 163 p.
**Series:** The Shooting Script
**Copyright Claimant:** David Koepp
**Date of Creation:** 2005
**Date of Publication:** 2005-11-22
**Previous Registration:** Text & photos preexisting by Paramont Pictures and DreamWorks.
**Basis of Claim:** New Matter: introd. & Q&A.
**Other Title:** Paramont Pictures and DreamWorks
**Names:** Friedman, Josh
Koepp, David
Koepp, David

◄ previous | next ►

| Save, Print and Email (**Help Page**) |
| Select Download Format  Full Record  ∨   Format for Print/Save |
| Enter your email address:                          Email |

Exhibit D



WebVoyage Titles

# Copyright
United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More...**

| Help | Search | History | **Titles** | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Duffer, Matt
Search Results: Displaying 1 through 2 of 2 entries.

◀ previous    next ▶

Resort results by: [        ▾]

Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| ☐ [ 1 ] | Duffer, Matt | Hidden (2011) & 1 other title. | V3614D560 | 2012 |
| ☐ [ 2 ] | Duffer, Matt | HIDDEN (Draft: November 28, 2011) | PAu003685881 | 2013 |

Resort results by: [        ▾]

Set Search Limits

Clear Selected   Retain Selected

◀ previous    next ▶

| **Save, Print and Email (Help Page)** | |
|---|---|
| **Records** | Select Format: [Full Record ▾]   Format for Print/Save |
| ○ All on Page<br>● Selected On Page<br>○ Selected all Pages | Enter your email address: [                    ] Email |

Search for: [Duffer, Matt          ] Search by: [Name (Crichton Michael; Walt Disney Company) ▾] Item type: [None          ▾]

[25 records per page ▾]    Submit   Reset

Help | Search | History | **Titles** | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = Duffer, Ross
Search Results: Displaying 1 through 2 of 2 entries.



| # | Name Heading | Author | Full Title | Date |
|---|---|---|---|---|
| ☐ [ 1 ] | Duffer, Ross | | Hidden (2011) & 1 other title. | 2012 |
| ☐ [ 2 ] | Duffer, Ross | | HIDDEN (Draft: November 28, 2011) | 2013 |

Resort results by: [            ⌄ ]      Set Search Limits

Clear Selected    Retain Selected



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| **Records** | Select Format: Full Record ⌄ | Format for Print/Save |
| ○ All on Page ● Selected On Page ○ Selected all Pages | Enter your email address: [                    ] | Email |

Search for: [ Duffer, Ross ]   Search by: [ Title (omit initial article A, An, The, El, La, Das etc.) ⌄ ]   Item type: [ None ⌄ ]

[ 25 records per page ⌄ ]    Submit   Reset

Help | Search | History | Titles | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit E



Copyright United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Hirsch, Alex
Search Results: Displaying 1 through 6 of 6 entries.

previous next

Resort results by: | Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| [ 1 ] | Hirsch, Alex, 1986- | Simplified pictorial method for mastering the math of diagnostic probability : animating the 2x2 table. | TXu001042890 | 2001 |
| [ 2 ] | Hirsch, Alex, Jr., 1968- | Middle Earth music. | SRu000296239 | 1995 |
| [ 3 ] | Hirsch, Alexander Keller | Democratic Arts of Mourning : Political Theory and Loss. | TX0008731555 | 2019 |
| [ 4 ] | Hirsch, Alexander Keller | Theorizing Post-Conflict Reconciliation. | TX0007677939 | 2011 |
| [ 5 ] | Hirsch, Alexander Max Jaglom | FEG : ridiculous poems for intelligent children / by Robin Hirsch with the assistance of Benjamin Joshua Jaglom Hirsch ; and a critical introd. by Alexander Max Jaglom Hirsch ; illustrated by Ha. | TX0005496303 | 2002 |
| [ 6 ] | Hirsch, Alexander Max Jaglom | FEG : ridiculous poems for intelligent children / by Robin Hirsch with the assistance of Benjamin Joshua Jaglom Hirsch ; and a critical introd. by Alexander Max Jaglom Hirsch ; illustrated by Ha. | VA0001124231 | 2002 |

Resort results by: | Set Search Limits

Clear Selected | Retain Selected
previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Records | Select Format: Full Record — Format for Print/Save |
| All on Page / Selected On Page / Selected all Pages | Enter your email address: Email |

Search for: Hirsch, Alex | Search by: Name (Crichton Michael; Walt Disney Company) | Item type: None
25 records per page | Submit | Reset

Help Search History **Titles** Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit F



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Harmon, Dan
Search Results: Displaying 1 through 15 of 15 entries.



Resort results by:  Date (ascending) ⌄

Set Search Limits

| # | Name Heading | Author | Full Title | Date |
|---|---|---|---|---|
| [ 1 ] | Harmon, Dan | | Charles Spurgeon : the great orator / J. C. Carlile ; abridged and edited by Dan Harmon. | 1995 |
| [ 2 ] | Harmon, Dan | | Scud, the disposable assassin. | 1995 |
| [ 3 ] | Harmon, Dan | | Martin Luther, the great reformer / Edwin P. Booth ; edited and abridged by Dan Harmon. | 1995 |
| [ 4 ] | Harmon, Dan | | Life after death / S. D. Gordon ; abridged by Dan Harmon. | 1997 |
| [ 5 ] | Harmon, Dan | | Great clean jokes for kids / compiled by Dan Harmon. | 1998 |
| [ 6 ] | Harmon, Dan | | Life after death / S. D. Gordon ; updated in today's language by Dan Harmon. | 1998 |
| [ 7 ] | Harmon, Dan | | Monster house / By Dan Harmon. | 1998 |
| [ 8 ] | Harmon, Dan | | More clean jokes for kids / compiled by Dan Harmon with Tamela Hancock Murray. | 1999 |
| [ 9 ] | Harmon, Dan | | Heat vision and Jack : pilot / written by Rob Schrab and Dan Harmon. | 1999 |
| [ 10 ] | Harmon, Dan | | Heat vision & Jack ; teleplay / By Dan Harmon & Rob Schrab. PAu 2-394-305. | 2000 |
| [ 11 ] | Harmon, Dan | | Juan Ponce DeLeon and the search for the Fountain of Youth / by Dan Harmon. | 2001 |
| [ 12 ] | Harmon, Dan | | Ultimate joke book / by Dan Harmon. | 2002 |
| [ 13 ] | Harmon, Dan | | Ultimate joke book : guaranteed laughs for every day / by Dan Harmon. | 2002 |
| [ 14 ] | Harmon, Dan | | Monster house / Dan Harmon & Rob Schrab ; revisions by Gil Kenan. | 2004 |
| [ 15 ] | Harmon, Dan | | Book of clean jokes / Dan Harmon. | 2004 |

Resort results by:  Date (ascending)  ⌄

Set Search Limits



Clear Selected   Retain Selected

previous   next

| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| **Records** | Select Format:  Full Record  ⌄ | Format for Print/Save |
| ○ All on Page<br>● Selected On Page<br>○ Selected all Pages | Enter your email address: | Email |

Search for:  Harmon, Dan     Search by:  Title (omit initial article A, An, The, El, La, Das etc.)  ⌄     Item type:  None  ⌄

25 records per page  ⌄       Submit   Reset

Help  Search  History  Titles  Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit G



# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = Roiland, Justin
Search Results: Displaying 1 through 2 of 2 entries.

◀ previous    next ▶

Resort results by: [ ▼ ]

Set Search Limits

| # | Name Heading | Author | Full Title | Date |
|---|--------------|--------|-----------|------|
| ☐ [ 1 ] | Roiland, Mark Justin, 1980- | | Laceration gang! / by Justin Roiland. | 1998 |
| ☐ [ 2 ] | Roiland, Mark Justin, 1980- | | Monkey Bob. | 1993 |

Resort results by: [ ▼ ]

Set Search Limits

Clear Selected   Retain Selected

◀ previous    next ▶

| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| **Records** | Select Format: Full Record ▼ | Format for Print/Save |
| ○ All on Page<br>● Selected On Page<br>○ Selected all Pages | Enter your email address: [ ] | Email |

Search for: Roiland, Justin   Search by: Title (omit initial article A, An, The, El, La, Das etc.) ▼   Item type: None ▼

25 records per page ▼    Submit   Reset

Help   Search   History   **Titles**   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit H



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)

**Your search found no results. Refer to search examples, check spelling or try another search type.**

**Basic Search**    **Other Search Options**

**Search for:**   Braly, Matt

**Search by:**

Title (omit initial article A, An, The, El, La, Das etc.)
Name (Crichton Michael; Walt Disney Company)
Keyword
Registration Number (for VAu 598-675 type vau000598675)
Document Number (for V2606 P87 type v2606p087)
Command Keyword

*Scroll down for Search Hints*

25 records per page     Begin Search    Clear Search     Set Search Limits

## Search Hints

- Works registered prior to 1978 may be found only in the Copyright Public Records Reading Room.
- Can't find what you're looking for? Try our "Other Search Options".
- Search terms are not case sensitive.
- Search limits can be used with all "Search by:" options.

| Search Type | Hint |
|-------------|------|
| **Title** | - Omit initial articles (A, An, The, El, La, Das): **King and I** <br> - Type the entire title, or the first few words of the title, starting with the first word |
| **Name** | - For personal names, type last name first name: **Hillerman Tony** <br> - For corporate names, type in order: **Sony Music Entertainment**; **Walt Disney Company** <br><br> For Claimant names, go to **Other Search Options** and select "Name: Claimant (KLCN)" from the *Search by* box. For personal names, type first name last name: James Michener. For corporate names, type in order: Metro Goldwyn Mayer <br><br> For Document names, go to **Other Search Options** and select either "Docs: Party1 Statement (K291)" or "Docs: Party2 (K292)", or "Docs Party1/2 (KPTY)" from the *Search by* box. For personal names, type first name last name: Stephen King. For corporate names, type in order: Warner Brother Pictures |
| **Keyword** | - Searches word(s) anywhere in the record <br> - Retrieves records with at least one of your search words <br> - Use + before words that **must** appear in every record retrieved <br> - Use ! before words that **must not** appear in any record retrieved <br> - Use ? for truncation: **photo?** finds **photograph, photographic, photographer** <br> - Use "" to surround exact phrases: **"war of the worlds"** |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Amphibia
Search Results: Displaying 268 of 318 entries



Labeled View

*AMPHIBIA :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002208096 / 2019-07-16 |
| **Application Title:** | AMPHIBIA "CURSED!" (1-17A) |
| **Title:** | AMPHIBIA : 1-17A, CURSED! |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Disney Enterprises, Inc., Transfer: by assignment. Address: 500 S. Buena Vista Street, Burbank, CA 91521 United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2019-07-08 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Walt Disney Television Animation a.a.d.o. Walt Disney Pictures, employer for hire; Domicile: United States. Authorship: entire motion picture, screenplay as spoken text. |
| **Pre-existing Material:** | Based on and incorporates preexisting elements, including artwork, from Disney's Amphibia. |
| **Basis of Claim:** | all other cinematographic material, Screenplay as spoken text. |
| **Names:** | Walt Disney Television Animation |
| | Walt Disney Pictures |
| | Disney Enterprises, Inc. |





| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |

# Exhibit I



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Keyword = The Owl House luz disney
Search Results: Displaying 11 of 10000 entries



Labeled View

### *THE OWL HOUSE :*

| | |
|---|---|
| **Relevance:** | ▮▮▮ |
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002231356 / 2020-01-14 |
| **Application Title:** | THE OWL HOUSE "A LYING WITCH AND A WARDEN" (1-01) |
| **Title:** | THE OWL HOUSE : 1-01, A LYING WITCH AND A WARDEN. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Disney Enterprises, Inc., Transfer: by assignment. Address: 500 S. Buena Vista Street, Burbank, CA, 91521, United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2020-01-10 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Disney Channel a.a.d.o. ABC Cable Networks Group, employer for hire; Domicile: United States. Authorship: entire motion picture, screenplay as spoken text. |
| **Pre-existing Material:** | Based on and incorporates preexisting elements, including artwork, from Disney The Owl House. |
| **Basis of Claim:** | all other cinematographic material, Screenplay as spoken text. |
| **Names:** | Disney Channel |
| | ABC Cable Networks Group |
| | Disney Enterprises, Inc. |





**Save, Print and Email (Help Page)**
Select Download Format | Full Record ⌄ | Format for Print/Save
Enter your email address: | | Email



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = Terrace, Dana
Search Results: Displaying 1 of 1 entries



Labeled View

*Mirage.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001882947 / 2014-01-30 |
| **Application Title:** | Mirage. |
| **Title:** | Mirage. |
| **Description:** | Videodisc (DVD) |
| **Notes:** | Animated |
| **Copyright Claimant:** | Iker Perez. Address: Basetxeta 15, Zaramillo, 48820, Spain. |
| | Dana Terrace. Address: 34 Fallon Dr, North Haven, CT, 06473, United States. |
| **Date of Creation:** | 2013 |
| **Date of Publication:** | 2013-06-11 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Iker Maidagan, pseud. of Iker Perez (author of pseudonymous work); Domicile: United States; Citizenship: Spain. Authorship: production/producer, direction/director, script/screenplay, editing/editor. |
| | Dana Terrace; Citizenship: United States. Authorship: production/producer, direction/director. |
| **Copyright Note:** | Regarding author information: deposit contains no dialogue. |
| **Names:** | Perez, Iker |
| | Maidagan, Iker, pseud. |
| | Terrace, Dana |



| | |
|---|---|
| **Save, Print and Email (Help Page)** | |
| Select Download Format | Full Record ⌄   Format for Print/Save |
| Enter your email address: | Email |



# Exhibit J



**Copyright**
United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog
is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Feig, Paul
Search Results: Displaying 1 through 25 of 37 entries.


◀ previous    next ▶

Resort results by: Date (ascending) ▾        [ Set Search Limits ]

| # | Name Heading | Author | Full Title | Date |
|---|---|---|---|---|
| ☐ [ 1 ] | Feig, Paul | | Feig-Kidd/Kessler collection : no. 1. | 1986 |
| ☐ [ 2 ] | Feig, Paul | | Freaks and geeks : no. 23-99-113, Discos and dragons / written and directed by Paul Feig. | 2000 |
| ☐ [ 3 ] | Feig, Paul | | Undeclared : no. 102, Full bluntal nugety / directed by Paul Feig. | 2001 |
| ☐ [ 4 ] | Feig, Paul | | Kick me : adventures in adolescence / Paul Feig. | 2002 |
| ☐ [ 5 ] | Feig, Paul | | I am David / by Paul Feig. | 2002 |
| ☐ [ 6 ] | Feig, Paul | | Arrested development : no. 1AJD04, Whistler's mother / directed by Paul Feig. | 2004 |
| ☐ [ 7 ] | Feig, Paul | | Arrested development : no. 1AJD21, Let them eat cake / directed by Paul Feig. | 2004 |
| ☐ [ 8 ] | Feig, Paul | | Nice guys; program / Artist: Paul Feig, as an employee-for-hire of Feigco, Inc., specifically ordered and commissioned by HBO Films, Inc. | 2004 |
| ☐ [ 9 ] | Feig, Paul | | Arrested development : no. 3AJD06, The ocean walker / directed by Paul Feig. | 2005 |
| ☐ [ 10 ] | Feig, Paul | | Arrested development : no. 2AJD10, Ready, aim, marry me! / directed by Paul Feig. | 2005 |
| ☐ [ 11 ] | Feig, Paul | | Superstud : or, How I became a 24-year-old virgin. | 2005 |
| ☐ [ 12 ] | Feig, Paul | | Office : no. 02006, Halloween / directed by Paul Feig. | 2005 |
| ☐ [ 13 ] | Feig, Paul | | Arrested development : no. 2AJD09, Burning love / directed by Paul Feig. | 2005 |
| ☐ [ 14 ] | Feig, Paul | | Office : no. 02004, Office olympics / directed by Paul Feig. | 2005 |
| ☐ [ 15 ] | Feig, Paul | | Office : no. 02003, The dundies / directed by Paul Feig. | 2005 |
| ☐ [ 16 ] | Feig, Paul | | Arrested development : no. 2AJD07, Switch hitter / directed by Paul Feig. | 2005 |
| ☐ [ 17 ] | Feig, Paul | | 30 rock : no. 120, Cleveland / directed by Paul Feig. | 2007 |
| ☐ [ 18 ] | Feig, Paul | | Office : 4011, Survivor Man. | 2007 |
| ☐ [ 19 ] | Feig, Paul | | WEEDS : 3007, HE TAUGHT ME HOW TO DRIVE-BY. | 2007 |
| ☐ [ 20 ] | Feig, Paul | | Ignatius MacFarland: Frequenaut! | 2008 |
| ☐ | Feig, Paul | | Office : 5010, Moroccan Christmas. | 2008 |

| [ 21 ] | | | | |
|---|---|---|---|---|
| ☐ [ 22 ] | Feig, Paul | | Nurse Jackie : 207, Silly String. | 2010 |
| ☐ [ 23 ] | Feig, Paul | | Nurse Jackie : 208, Monkey Bits. | 2010 |
| ☐ [ 24 ] | Feig, Paul | | Nurse Jackie : 209, P.O. Box. | 2010 |
| ☐ [ 25 ] | Feig, Paul | | Nurse Jackie : 210, Sleeping Dogs. | 2010 |

**Resort results by:** Date (ascending) ⌄          Set Search Limits

Clear Selected   Retain Selected

◀ previous   next ▶

| Save, Print and Email (**Help Page**) | |
|---|---|
| **Records** | Select Format: Full Record ⌄   Format for Print/Save |
| ○ All on Page<br>◉ Selected On Page<br>○ Selected all Pages | Enter your email address: [_____] Email |

**Search for:** Feig, Paul   **Search by:** Title (omit initial article A, An, The, El, La, Das etc.) ⌄   **Item type:** None ⌄

25 records per page ⌄          Submit   Reset

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit K



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Author = McGruder, Aaron
Search Results: Displaying 1 through 23 of 23 entries.



**Resort results by:** [          ]

Set Search Limits

| # | Name Heading | Author | Full Title | Date |
|---|---|---|---|---|
| [ 1 ] | McGruder, Aaron | | Birth of a nation : a comic novel / Aaron McGruder and Reginald Hudlin ; ill. by Kyle Baker. | 2004 |
| [ 2 ] | McGruder, Aaron | | Birth of a nation : a comic novel / Aaron McGruder and Reginald Hudlin ; ill. by Kyle Baker. | 2004 |
| [ 3 ] | McGruder, Aaron | | Boondocks : a.k.a. Boondocks / by Aaron McGruder. | 2010 |
| [ 4 ] | McGruder, Aaron | | Boondocks : because I know you don't read the newspapers / by Aaron McGruder. | 2000 |
| [ 5 ] | McGruder, Aaron | | Boondocks : no. 101, The trial of Robert Kelly. | 2005 |
| [ 6 ] | McGruder, Aaron | | Boondocks : no. 102, Guess hoe's coming to dinner. | 2005 |
| [ 7 ] | McGruder, Aaron | | Boondocks : no. 103, The garden party. | 2005 |
| [ 8 ] | McGruder, Aaron | | Boondocks : no. 104, Grandad's fight. | 2005 |
| [ 9 ] | McGruder, Aaron | | Boondocks : no. 105, The itis. | 2006 |
| [ 10 ] | McGruder, Aaron | | Boondocks : no. 105, The real. | 2006 |
| [ 11 ] | McGruder, Aaron | | Boondocks : no. 106, A date with the health inspector. | 2005 |
| [ 12 ] | McGruder, Aaron | | Boondocks : no. 107, The story of Gangstalicious. | 2005 |
| [ 13 ] | McGruder, Aaron | | Boondocks : no. 109, A Huey Freeman Christmas | 2005 |
| [ 14 ] | McGruder, Aaron | | Boondocks : no. 110, Return of the king. | 2006 |
| [ 15 ] | McGruder, Aaron | | Boondocks : no. 111, Wingmen. | 2006 |
| [ 16 ] | McGruder, Aaron | | Boondocks : no. 112, Let's nab Oprah. | 2006 |
| [ 17 ] | McGruder, Aaron | | Boondocks : no. 113, Riley wuz here. | 2006 |
| [ 18 ] | McGruder, Aaron | | Boondocks : no. 114, The block is hot. | 2006 |
| [ 19 ] | McGruder, Aaron | | Boondocks : no. 115, The passion of Reverend Ruckus. | 2006 |
| [ 20 ] | McGruder, Aaron | | Broke diaries / Created by Aaron McGruder, as a work made for hire of HBO Films, a division of Home Box Office, a division of Time Warner Entertainment Company, LP. | 2002 |
| [ 21 ] | McGruder, Aaron | | Gully Show. | 2007 |

# Exhibit L



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Gilligan, Vince
Search Results: Displaying 43 of 44 entries



**Labeled View**

***Breaking Bad :***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001603377 / 2008-04-15 |
| **Application Title:** | Breaking Bad: Pilot Premiere - Episode #100. |
| **Title:** | Breaking Bad : 100, Pilot Premiere. |
| **Description:** | Videocassette (Betacam SP) ; 1/2 in. |
| **Series:** | Breaking Bad |
| **Copyright Claimant:** | Sony Pictures Television Inc.. Address: 10202 West Washington Boulevard, Culver City, CA 90232-3195 United States |
| **Date of Creation:** | 2007 |
| **Date of Publication:** | 2008-01-20 |
| **Nation of First Publication:** | United States |
| **Alternative Title on Application:** | Breaking Bad: Premiere - Episode #100 |
| **Authorship on Application:** | Sony Pictures Television Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Names:** | Gilligan, Vince |
| | Sony Pictures Television Inc. |
| | Sony Pictures Television Inc. |





| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |

# Exhibit M



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Hunger Games
Search Results: Displaying 1 of 261 entries



---

Labeled View

### *The Hunger Games.*

|  |  |
|--|--|
| **Type of Work:** | Visual Material |
| **Registration Number / Date:** | VA0001823170 / 2011-08-09 |
| **Application Title:** | The Hunger Games. |
| **Title:** | The Hunger Games. |
| **Description:** | Book 374 p. |
| **Copyright Claimant:** | Scholastic Inc. Address: 557 Broadway, New York, NY, 10012. |
| **Date of Creation:** | 2008 |
| **Date of Publication:** | 2008-10-01 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Scholastic Inc., employer for hire; Domicile: United States; Citizenship: United States. Authorship: Jacket Art. |
| **Names:** | Scholastic Inc. |



| Save, Print and Email (**<u>Help Page</u>**) | |
|---|---|
| Select Download Format   Full Record   ⌄ | Format for Print/Save |
| Enter your email address: | Email |

---

| Help | Search | History | Titles | Start Over |

Exhibit N

**ANIME**NEWSNETWORK
THE INTERNET'S MOST TRUSTED ANIME NEWS SOURCE

USA & Canada ▾

Search



Ad by Good Smile Company • report

News   Views   New Anime   Encyclopedia   Forum   My ANN   About          Login or Register

## Encyclopedia
## Manga - A

⚙

# | **A** | B | C | D | E | F | G | H | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z

Manga anthology

---

A Channel
**A,A'**
*A-chan B-ko-chan Tankenki*
A-Girl
A-Size
A-Soko
A.C.D.C.II
**A.I. Love You**
**A.I. Revolution**
A.I.C.O. Incarnation
A.My.Sweets
A.S.
*Aa Goshujin-sama*
**Aa Itoshi no Banchō-sama**
**Aa Megami-sama**
Aa Onee-sama
*Aa! Yūtenji-ke*
AAA
Aaan Megami-sama
**Abandon the Old in Tokyo**
Abara
Abare Bunya
Abarenbō Darling
Abarenbow Shonagon
Abashiri Ikka
Abe-kun's Got Me Now!
Abekobe
**Abenobashi: Magical Shopping Arcade**
Abenoseimei Love Stories: Banquet of Flowers
Abenoseimei Love Stories: The Blossom Girl
Abenoseimei Love Stories: The Flower-Crown Princess
***Abigaile no Kemono-tachi***
Abiru Junjou
Abnormal
Abnormal Physiology Seminar
(The) Abnormal Super Hero Hentai Kamen
**About Love**
About the matter that a Japanese cartoonist went to Taiwan
**Absolute Boyfriend**
**Absolute Duo**
*Absolute Girl Amnesia Sanctuary*
**Absolute Monarch Syndrome**
Absolute Territory of the Succubus
Abunai Danjo Kousai
Abusan
ACCA 13-Ku Kansatsu-Ka P.S.
**ACCA 13-Territory Inspection Department**
**Accel World**
Accel World
Accelerando
AccelStar
Access-B
Acchi Kocchi
(The) Accidents
Accomplice
**Accomplishments of the Duke's Daughter**
**Ace of Diamond**
Ace of Diamond Act II
*Ace wo Nerae!*
Acma:Game

### Right sidebar

**REVIEW**   2 comments

## Fushigi Yugi: Byakko Senki vol. 1
Aug 8, 15:00   manga

Caitlin revisits *The Universe of the Four Gods* in the newest *Fushigi Yuugi* spin-off following the Priestess of Byakko.

**REVIEW**   1 comment

## Mujirushi: The Sign of Dreams GN
Aug 7, 15:00   manga

Mujirushi: The Sign of Dreams is the sort of bizarre story that only someone who has mastered his craft could really pull off, and it's a definite credit to Urasawa that he did

**FEATURE**   17 comments

## *Promare, BNA,* and the Outrage of the Oppressed
Aug 7, 14:16   anime

Jaylon Martin articulates his frustrations with Trigger's handling of its themes of oppression and "correct" protest.

**REVIEW**   5 comments

Akuma Sei Kareshi
Akuma ni Chikx Hack
*Akuma no Himitsu*
Akuma no Houteishiki
Akuma no Ikenie
*Akuma no Kuchizuke*
Akuma no Memumemu-chan
*Akuma no Omise - Shadow & Maria*
*Akuma no Ororon*
Akuma no Puzzle
*Akuma no Riddle*
**Akuma no Riddle: Riddle Story of Devil**
Akuma no Yōna Anata
*Akuma Shōjo Momo-chan*
Akuma to Dolce
*Akuma to Lovesong*
Akuma wa Hohoemu
Akuma wa Ude no Naka
Akuma-kun Black Minion
Akuma-kun Boku wa Tenshi ni Naritai
Akuma-kun Magic Bitter
Akuma-kun ni Onegai
Akuma-sama Help
***Akumagari ~Jakumetsu no Seishi Shouka Hen~***
***Akumajō Dracula: Yami no Juin***
Akumetsu
*Akumu no Sumu Ie - Ghosthunt*
Akunin wo Nakaseru Houhou
Akuryō
***Akusaga***
Akutare Giants
Akutō - Scandalous Honey
Akutō 2 - Akuma no Kuchibiru
Akutō Danshi Collection
*Akuyaku Ōji wa Koi ga Dekinai*
Alabaster
Alcázar: Ōjō
Alcbane
Alchemia
**(The) Alchemist Who Survived Now Dreams of a Quiet City Life**
**Alcohol, Shirt and Kiss**
**Aldnoah.Zero**
Alexander Daiou - Tenjou no Oukoku
Alfheim no Kishi
**Alice & Zoroku**
**Alice 19th**
Alice in Borderland
Alice in Borderland: Chi no Kyokuchi - Daiya no King-hen
***Alice in Junk Box ~Fujimaru Mamenosuke Alice Series Tanpenshū***
**Alice in Murderland**
*Alice in the Country of Clover*
**Alice in the Country of Clover: Ace of Hearts**
**Alice in the Country of Clover: Black Lizard and Bitter Taste**
**Alice in the Country of Clover: Bloody Twins**
**Alice in the Country of Clover: Cheshire Cat Waltz**
**Alice in the Country of Clover: Knight's Knowledge**
**Alice in the Country of Clover: March Hare**
**Alice in the Country of Clover: Nightmare**
**Alice in the Country of Clover: The Lizard Aide**
**Alice in the Country of Clover: The March Hare's Revolution**
**Alice in the Country of Clover: Twin Lovers**
**Alice in the Country of Clover: White Rabbit and the Clockwork Trap**
**Alice in the Country of Hearts**
**Alice in the Country of Hearts: Junk Box**
**Alice in the Country of Hearts: Love Labyrinth of Thorns**
**Alice in the Country of Hearts: My Fanatic Rabbit**
**Alice in the Country of Hearts: The Clockmaker's Story**
**Alice in the Country of Hearts: The Mad Hatter's Late Night Tea Party**
**Alice in the Country of Hearts: White Rabbit and Some Afternoon Tea**
*Alice in the Country of Joker*
**Alice in the Country of Joker: Circus and Liar's Game**
**Alice in the Country of Joker: Nightmare Trilogy**
**Alice in Twin World: Love, Storms, and Flower Clocks**
**Alice Love Fables: Toy Box**
Alice Lunch
Alice no 100° CC
Alice on Border Road
**Alice on Deadlines**
Alice or Alice
*Alice or Alice - Siscon Nii-san to Futago no Imōto*

Alice Gensō
Alichino
Alicia's Diet Quest
**Alien Nine**
**Alien Nine Emulators**
Alignment You! You!
Alive
**Alive**
All about J
All Esper Dayo!
**All My Darling Daughters**
**All Nippon Air Line**
All One
**All Out!!**
*All points are divided to VIT because a painful one isn't liked.*
**All Purpose Cultural Cat Girl Nuku Nuku**
**All You Need Is Kill**
**(The) All-New Tenchi Muyō!**
All-Rounder Meguru
Allegro Agitato
**Alley of First Love Love**
*Allez, je vais pas au travail aujourd'hui.*
Allison
**Allure**
**Alluring Woman**
*Ally of Justice*
*Almarya*
**Almost Crying**
(The) Almost Legendary Shannon
Alois
**Alone in my King's Harem**
Alpaca Mamma
Alpen Rose
*Alpha*
Altair: A Record of Battles
(The) Alternative Cure Magical Girl Behoimi-chan
"Alto" no "A"
*Always Misora*
*Always My Santa*
AM 8:00 Kimi ga Suki.
Am I In Love or Just Hungry?
*Ama Ero*
*Amaama to Inazuma*
Amaen Bō
Amaenaideyo!!
Amaenaideyo!! MS
Amaenaideyo!! R
Amaenbo
Amagami precious diary
Amai * Suppai * Horonigai
*Amai Chōbatsu: Watashi wa Kanshu Senyō Petto*
Amai Fukushū
Amai Himitsu Amai Shigeki
Amai Kankei
Amai Koi Shiyo
Amai Kusuri
Amai Niku Hida
*Amai Seikatsu*
Amai Seikatsu: 2nd Season
Amai Tsubomi
Amai, Sensei
Amakakeru Toki
Amaku Minnayo!
*Amakunai Karera no Nichijo wa*
Amakusa 1637
Amalgam of Distortion
Amami Dokoro
Amanchu!
Amane Atatameru
Amari Mawari
**Amasugi Monster**
Amaterasu
Amatsuki
Amayakana Toge
*Amazing Stranger*
*Amazing Three*
**Ama~i Nyūin Seikatsu♡**
Ambassador Magma
**Amber Silhouette**
**Ambiguous Relationship**

**ANIME** NEWS **NETWORK**
THE INTERNET'S MOST TRUSTED ANIME NEWS SOURCE

USA &
Canada

Search


Ad by Good Smile Company • report

News    Views    New Anime    Encyclopedia    Forum    My ANN    About        Login or Register

# Encyclopedia
## Manga - O

\#  A  B  C  D  E  F  G  H  I  J  K  L  M  N  **O**  P  Q  R  S  T  U  V  W  X  Y  Z

Manga anthology

---

O Banzai!
*O Espinafre de Yukiko*
O Maidens in Your Savage Season
**O-Parts Hunter**
*O-sora de Garden*
O/A
*Obaa-chan wa Idol*
Obaka-san Girl
Obake Tango
Obatarian
**Obedient One**
*Obedient!! Vampire Princess*
**Object of Desire**
**(The) Object of My Affection**
Obocchama-kun
Oboetate
Oboko
*Oboreru Knife*
Oboreru Knife: Yūgyo no Shizuku Iwa no Yume
Oboretai
*Obscene Face of Her Whom I do not Know*
*Obscene Missile*
*Obscurite*
*(The) Observation Diary of Scientifically-Existing Creature Girls*
Occult Zone
*Ocha Nigosu.*
Ochanoma
*Ochibi-san*
**Ochibure Shinshi ni Ai no Uta**
Ochikobore Fruit Tart
Ochiru Onna
***Ochiru Seija no Seppun***
Octave
**Octopus Girl**
Oda Cinnamon Nobunaga
Odaiji ni!
*Odayaka Kizoku no Kyūka Susume*
*Odd One's Out*
Odds GP!
**Ode to Kirihito**
Odin Sphere: Chiisana Yōsei Joō
Ôdo no Arashi
***Odorobo Jing***
Odunu
Oedo wa Nemurenai!
Ōeyama Kaden
Ōeyama Ryū Goshinjutsu Dōjō
*A of Alto*
**Of the Red, the Light, and the Ayakashi**
***Off Your Hand!***
**Offered**
*Office Hokkyokusei*
Office North Star
Office Paradise - Bijo to Office to Yokubō to
Offside Girl
Ogami Matsugoro
**Ogenki Clinic**
**Ogre Slayer**
Ōgui Kōshien
**Oh my god!**

Onna wa Kashikol!
Onsen Yōsei Hakone-chan
Ontama!
**Onward Towards Our Noble Deaths**
Oohashi Kaoru & Mayumi Sakuhin Shuu
Ookami ga Kuru!
Ookami no Hitomi
Ookiku Furikabutte
**Ōoku: The Inner Chambers**
Ookumo-chan Flashback
*Oónabara to Wadanohara*
*Oops! I Messed Up and Made the Wrong Person Into a Magical Girl!*
Open Sesame
*Opera-za de Mattete*
*Operation Aurora*
Operation Buran U.C.0079
*oPpai Living Dining Kitchen*
Oppai Party
OPUS
Oracle of Secret Shrine Maiden
**Orange**
Orange Chocolate
Orange Delivery
Orange Kiss
**Orange Planet**
Orange Star
*Orc Henshūsha to Onna Kishi Mangaka-san*
Order wa Boku de Yoroshii desu ka?
**Ordinary Crush**
**Ore Alice ~Danjo Gyakuten~**
*Ore Dake Haireru Kakushi Dungeon: Kossori Kitaete Sekai Saikyō*
Ore ga Heroine o Tasukesugite Sekai ga Little Apocalypse!?
**Ore ga Ojō-sama Gakkō ni "Shomin Sample" Toshite Rachirareta Ken**
Ore ga Suki nano wa Imōto dakedo Imōto ja nai
**Ore Monogatari!!**
Ore no Hahaoya
**Ore no Imōto ga Konnani Kawaii Wake ga Nai**
Ore no Kanojo ga Maid de Yome de, Iro Iro Nandemo Shichaimasu!?
Ore no Kanojo ga Otoko na Wake ga Nai!
**Ore no Kanojo ni Nanika Yōkai**
Ore no Kanojo to Osananajimi ga Shuraba Sugiru
Ore no Ko desu ka?
*Ore no Kouhai ga Konnani Kawaii Wake ga Nai*
Ore no My Ball
Ore no Sora
Ore no Sora '03
Ore no Sora Sanshiro Hen
Ore no Sora: Keiji-Hen
Ore no Sora: Yasuda Ippei, Arata naru Tabidachi
Ore no Tenshi wa Mayonaka wa Akuma
Ore no Yome Memorial
*Ore no Yome nante Inee!*
Ore no Yubi de Midarero, Heiten-go no Salon, Jjiwaru ni Jirasarete
**Ore no Zutto Suki na Hito**
Ore Satsujin Jiken!?
**Ore Sen Kanojo**
*Ore Space Dandy*
**Ore to Akuma no Blues**
**Ore wa Mada Honki Dashitenai Dake**
*Ore wa Mita*
*Ore wa Sarutobi da!*
**Ore wa Warukunai**
Ore wo Suki nano wa Omae Dake ka yo
Ore × Yome - Cupid no Itazura
Ore, Twintail ni Narimasu. Pai
Ore-sama Kingdom
**Ore-sama na Aitsu**
**Ore-sama no Toriko**
Ore-sama to Kōni
Ore-tachi ni Tsubasa wa Nai: Prelude
Ore-tachi ni Tsubasa wa Nai: Rhapsody
**Ore-tachi o Tenshi to Yobuna**
**Ore-tachi wa Koko de Koi o Suru**
Orebushi
**Oreimo**
Oreimo: Kuroneko
**Orenchi no Furo Jijō**
Orenji Yane no Chiisana Ie
Oresama Darling
**Oresama Teacher**



## This Week in Games - Back to Schools

Aug 6, 14:30  games

It's fighting games and swimsuits as *Street Fighter* lays out its future plans. Also who asked for more *Pikmin*?

COLUMN   5 comments



## This Week in Anime - Siege on Cybertron

Aug 6, 13:30  anime

Your beloved alien 'bot vehicle boys are back but this time the war is at home. Is this grittier entry in the kids' toy franchise a masterpiece in disguise?

FEATURE   1 comment



## Why You Should Watch *Ride Your Wave* With VA Merit Leighton

Aug 6, 10:15  anime

ANN's Jacki Jing talks to Merit Leighton about voicing Hinako, the protagonist of the Masaaki Yuasa's emotional movie Ride Your Wave.

REVIEW   4 comments



## How Do We Relationship? Volume 1

Aug 5, 15:00  manga

How Do We Relationship? walks a careful balance for its entire first volume. It addresses queer issues without being preachy while staying joyful.

NEWS   57 comments



Orfina
Orfina SAGA
Orga Mania
Orgasmus Addiction
Ori
Ori no Naka, Watashi wa Midara ni Kowasareru.
Orient
Original Chronicle Magical Girl Lyrical Nanoha The 1st
Original Quest - Miracle Tonchinkan Bangaihen
Orion
Orion no Shounen
Ōritsuin Kumomaru no Shōgai
Orochi
Orokamono no Koi
Orokamono wa Aka o Kirau
Orphen
Orpheus no Mado
Oruchuban Ebichu
Orurerian no Kishi-Hime
Osaka Hamlet
Osake wa Fūfu ni Natte kara
Ōsama Game
Ōsama Game
Ōsama Game: Kigen
Ōsama Game: Shūkyoku
Ōsama no Dinner
Ōsama no Lesson
Ōsama no Shichiya
Ōsama to Fushigi no Shiro
Ōsama wa Shitsuji-sama
Ōsama-tachi no Viking
Osamushi Kyōju no Jikenbo
Osananajimi ni Najimitai
Osen
Oshaberi Kaidan
Oshaberi na Amadeus
Oshare Kozō wa Hanamaru
Oshi ga Budōkan Ittekuretara Shinu
Oshi ga Watashi de Watashi ga Oshi de
Oshiete Nanoka
Oshiete! Galko-chan
Oshigoto
Oshikko Muhō Chitai
Oshiokii!
Oshiri no Ohime-sama
Ōshitsu Kyōshi Haine
Ōshitsu Kyōshi Heine
Osō
Ossan Idol!
Ossu! Haruka-chan
Ossu!! Karate Bu
Ostatni synowie ciemności
Otaku ni Koi wa Muzukashii
Otaku no Musume-san
Otaku-Type Delusion Girl
Ōtama
Otanko Nurse
Otenami Haiken
Otenba Tenshi
Otenki ni Koishite - Gakeppuchi Kishō Yohōshi Monogatari
Otenki Onee-san
Otenki to Issho
Othello
Othello
(The) Other Side of Secret
(The) Other Side of the Other Side
Otherside Picnic
Otherwordly Izakaya "Nobu"
Otherworld Barbara
Oto no Nai Ame wa Furitsuzuku
Otō-san, Chibi ga Inakunarimashita
Otodama - Voice from the Dead
Otodoke ni Agarimasu!
Otogi Matsuri
Otogi no Machi no Rena
Otogibanashi Battle Royale
Otogibanashi de Himitsu no Kiss
Otogibanashi o Anata ni
Otogibanashi o Anata ni: Tsukiyo no Maihime



**List of Shows, Films, Manga, Games Affected by COVID-19 (Updated August 8)**

Aug 2, 14:00   covid-19

All of ANN's coverage of works hit by new coronavirus disease

Exhibit O

Google

Ōru Yū Nīdo Izu Kiru

🔍 All   🖼 Images   ▶ Videos   📰 News   🗺 Maps   ⋮ More   Settings   Tools   SafeSearch o

About 3,690 results (0.82 seconds)

en.wikipedia.org › wiki › All_You_Need_Is_Kill ▾
**All You Need Is Kill - Wikipedia** ✓
Cover of the light novel released by Shueisha in December 2004. オール ユー ニード イズ キル
(**Ōru Yū Nīdo Izu Kiru**). Genre, Adventure, science fiction.
Genre: **Adventure, science fiction**   Original run: January 9, 2014 – May 29, 2014
Published: December 18, 2004   Volumes: 2
Plot · Media · Novel · Manga and graphic novel
You've visited this page 2 times. Last visit: 8/8/20

j-entonline.com › tag › oru-yu-nido-izu-kiru ▾
**Ōru Yū Nīdo Izu Kiru Archives - J!-ENT (j-entonline.com)** ✓
The storyline of "All You Need Is Kill" is action-packed, exciting and visually appealing thanks to
the manga art of Takeshi Obata. As a manga fan, especially for ...

**Images for Ōru Yū Nīdo Izu Kiru**

    

→ More images for Ōru Yū Nīdo Izu Kiru                    Report images

bookwormsshallruletheworld.wordpress.com › all-you-... ▾
**All you need is kill (Ōru Yū Nīdo Izu Kiru) by Hiroshi Sakurazaka** ⓘ
Oct 16, 2018 - All you need is kill (**Ōru Yū Nīdo Izu Kiru**) by Hiroshi Sakurazaka. All you need is kill
is described as a 'light novel' which is a genre in Japanese ...

allyouneediskill.fandom.com › wiki › All_You_Need_I... ▾
**All You Need Is Kill Wiki - Fandom** ✓
All You Need Is Kill (Japanese: オール・ユー・ニード・イズ・キル Hepburn: **Ōru Yū Nīdo Izu
Kiru**?) is a Japanese military science fiction light novel by Hiroshi ...

www.youtube.com › watch ▾
**All You Need Is Kill - YouTube** ✓
 All You Need Is Kill (オール・ユー・ニード・イズ・キル, **Ōru Yū Nīdo Izu
Kiru**) is a Japanese military ...
Jul 15, 2014 - Uploaded by Audiopedia

batchandnarrative.com › 2019/08/05 › great-movie-soli... ▾
**Great Movie, Solid Book, Two Awful Titles – BATCH ...** ✓
Aug 5, 2019 - And second, using one of the romanization systems for Japanese, the novel's
original title would be **Ōru Yū Nīdo Izu Kiru** (try sounding it out).

bookwormsshallruletheworld.tumblr.com › post › all-you... ▾
**Bookworms United — All you need is kill (Ōru Yū Nīdo Izu Kiru ...** ✓
Oct 17, 2018 - All you need is kill (**Ōru Yū Nīdo Izu Kiru**) by Hiroshi Sakurazaka ... /10/16/all-you-
need-is-kill-oru-yu-nido-izu-kiru-by-hiroshi-sakurazaka/ l;d ...

www.facebook.com › posts › ōru-yū-nīdo-izu-kiruhttp... ▾
**Pop-Cultured - Ōru Yū Nīdo Izu Kiru:... | Facebook** ✓
**Ōru Yū Nīdo Izu Kiru:** http://www.slashfilm.com/live-die-repeat-edge-of-tomorrow-title/

## All You Need Is Kill

Novel by Hiroshi Sakurazaka

Book preview
12/97 pages available     

**PREVIEW**

95% liked this book
Google users

All You Need Is Kill is a Japanese science fiction lig
Hiroshi Sakurazaka with illustrations by Yoshitoshi

**Originally published:** December 18, 2004
**Author:** Hiroshi Sakurazaka
**Original run:** January 9, 2014 – May 29, 2014
**Volumes:** 2
**English magazine:** NA Weekly Shonen Jump
**Illustrator:** Yoshitoshi ABe

Verify these facts to help others.

🖊 Publisher

### Get Book

 Audible
Premium subscription · audiobook

a  Kindle Store
$7.49 · ebook

⌄        More providers

### Borrow
• Near you

📌 Berkeley Public Library
E-book
Berkeley Public Library · North Branch, Berk...

📌 San Francisco Public Library
Paperback
Marina Branch Library, Anza Library, North ...

### Rate and review

 Steve Wilson Briggs
Posting publicly.

☆ ☆ ☆ ☆ ☆

What do you think about this book?

Google | Ōru Yū Nīdo Izu Kiru

The book was originally written in Japanese by Hiroshi Sakurazaka (born in Tokyo in 1970) as Ōru Yū Nīdo Izu Kiru, (All You Need Is Kill). The genre in Japan is ...

openlibrary.org › works › Ōru_yū_nīdo_izu_kiru ▾
**Ōru yū nīdo izu kiru — First published in 2009 - Open Library** ✓
**Ōru yū nīdo izu kiru** by Hiroshi Sakurazaka, unknown edition,

manga-and-stuff.tumblr.com › post › source-all-you-ne... ▾
**All You Need Is Kill / Ōru Yū Nīdo Izu... - Manga and Stuff — Source** ✓
Source: All You Need Is Kill / **Ōru Yū Nīdo Izu Kiru** オール・ユー・ニード・イズ・キル by Ryōsuke Takeuchi and Takeshi Obata. All You Need Is Kill Takeshi ...

fontana.nccardinal.org › opac › record ▾
**All you need is kill - Fontana Regional Library** ✓
Sakurazaka, Hiroshi, 1970- **Ōru yū nīdo izu kiru**. English. (Added Author). Ferguson, Lee, (illustrator). Image of item. Book. Place Hold on All you need is kill ...

www.latercera.com › mouse › edge-... ▾ Translate this page
**El título para la secuela de Edge of Tomorrow no pega - La ...** ✓
May 8, 2017 - Warner Bros. no la tuvo fácil a la hora de decidirse por un título para su adaptación de la novela **Ōru Yū Nīdo Izu Kiru** de Hiroshi Sakurazaka.

trove.nla.gov.au › version ▾
**All you need is kill / Hiroshi Sakurazaka ; translated by Joseph ...** ✓
**Ōru yū nīdo izu kiru**. English. Author. Sakurazaka, Hiroshi, 1970- (author.) Other Authors. Keeder, Joseph, (translator.) Smith, Alexander O., (translator.).

aminoapps.com › page › item › all-y... ▾ Translate this page
**All you need is kill #6 | Wiki | •Cómics• Amino** ✓
NOMBRE, オール ユー ニード イズ キル (**Ōru Yū Nīdo Izu Kiru**). AUTOR, Hiroshi Sakurazaka. ARTISTA, Yoshitoshi ABe. MI CLASIFICACIÓN ...

atashisekai.blogspot.com › 2014/05 › review-manga-all... ▾
**Review Manga : All You Need in Kill - My World** ✓
May 30, 2014 - All You Need Is Kill (オール・ユー・ニード・イズ・キル **Ōru Yū Nīdo Izu Kiru**) is a Japanese military science fiction light novel by Hiroshi ...

link.wwpl.lib.in.us › portal › All-you-need-is-kill-Hiros... ▾
**All you need is kill - Westfield Washington Public Library** ✓
1 Items in the Collection **Ōru yū nīdo izu kiru**. Cover art for item · All you need is kill, Hiroshi Sakurazaka ; translated by Alexander O. Smith · Borrow it. Data from ...

www.reddit.com › printSF › comments › im_a_big_fan... ▾
**I'm a big fan of Polish writer Stanislaw Lem, so here's a list of ...** ✓
All You Need Is Kill by Hiroshi Sakurazaka – 2004 – **Ōru Yū Nīdo Izu Kiru**. Battle Royale by Koushun Takami – 1999 – Batoru Rowaiaru. Cold Skin by Albert ...

www.reddit.com › roosterteeth › comments › i_noticed... ▾
**I noticed Edge of Tomorrow and RVB season 5 are kind of ...** ✓
All You Need Is Kill (オール・ユー・ニード・イズ・キル, **Ōru Yū Nīdo Izu Kiru** ?) is a Japanese military science fiction light novel by Hiroshi Sakurazaka with ...

www.kompasiana.com › Hiburan ▾
**Edge of Tomorrow, a Review - Kompasiana.com** ✓
It is Based on a Japanese manga called All You Need is Kill ((オール・ユー・ニード・イズ・キル **Ōru Yū Nīdo Izu Kiru**) by Hiroshi Sakurazaka. **Before I start ...



3 reviews

It was a cool concept, however we've all see groundhog's day trope before. However, All gives a different twist on it, with a whole en thing in the background. It generates a feeli and the ending feels satisfying. ...

 ★★★★★ Really Good manga. Has a ReZero touch to felt rushed though.

 ★★★★★ It's Fantastic, the concept the storytelling it

**People also search for**

  

Slum Online
Hiroshi Sakurazaka

Dorohedo...
Q Hayashida

Golden Kamuy
Satoru Noda

Death N Black Ec
Tsugumi Ohba



Sakurazaka, Hiroshi, 1970- **Ōru yū nīdo izu kiru**. English, 1. Śākya-thup-pa, --. SEE: Gautama, Buddha, 1. Sakya'i Dge-sbyon Bstan-'dzin-rgya-mtsho, Dalai ...

www.nlb.gov.sg › biblio ▾

**Edge of tomorrow /Warner Bros. Pictures presents ; in ...** ⊘

Sakurazaka, Hiroshi, 1970- **Ōru yū nīdo izu kiru**. English1970-. Publisher: [Burbank, California] : Warner Bros. Entertainment Inc.,InnoForm Media,[2014]. Format:.

japaneselit.net › 2015/08/08 › all-you-need-is-kill ▾

**All You Need Is Kill – Contemporary Japanese Literature** ⊘

Aug 8, 2015 - Japanese Title: オール・ユー・ニード・イズ・キル (**Ōru yū nīdo izu kiru**) Author: Sakurazaka Hiroshi (桜坂 洋) Translator: Joseph Reeder with ...

le0pard13.com › tag › live-die-repeat ▾

**Live Die Repeat | It Rains... You Get Wet** ⊘

Jan 29, 2016 - AKA **Ōru Yū Nīdo Izu Kiru**, or All You Need Is Kill to westerners. Published in 2004, the small novel, with illustrations by Yoshitoshi ABe, was as ...

blogs.evergreen.edu › week-one-rock-post-2-on-otaku ▾

**Rock: On "Otaku" – The Koohii Dragon** ⊘

Oct 1, 2017 - ... "Edge of Tomorrow" based upon the manga **Ōru Yū Nīdo Izu Kiru** and as far back as the western "The Magnificent Seven" based on the 1954 ...

miguelvaca.com › tag › oru-yu-nido-... · Translate this page

**Ōru Yū Nīdo Izu Kiru | La Vacación** ⊘

Jun 10, 2014 - ... interpretado por Tom Cruise, y está basado en el personaje de Hiroshi Sakurazaka que creó en la novela **Ōru Yū Nīdo Izu Kiru** (traducida al ...

www.slideshare.net › VedangAcharya ▾

**General Quiz February Monthly - SlideShare** ⊘

Feb 9, 2016 - All You Need Is Kill (Japanese: **Ōru Yū Nīdo Izu Kiru**?) is a military science fiction The novel was Sakurazaka's breakthrough science-fiction ...

twitter.com › polsedierta › status · Translate this page

**Pol Sedierta on Twitter: "All You Need Is Kill (オール ユー ...** ⊘

May 3, 2020 - All You Need Is Kill (オール ユー ニード イズ キル **Ōru Yū Nīdo Izu Kiru**?) de Hiroshi Sakurazaka per a @allioli_cat Una novel·la de ...

shopee.com.my › Ebook-All-You-Need-Is-Kill-Novel-... ▾

**Ebook | All You Need Is Kill Novel by Hiroshi Sakurazaka ...** ⊘

All You Need Is Kill (Japanese: オール・ユー・ニード・イズ・キル, Hepburn: **Ōru Yū Nīdo Izu Kiru**) is a Japanese science fiction light novel by Hiroshi ...

MYR 1.90 - In stock

---

**Yoshitoshi ABe books**


Robot 8


Robot Volume 7


Haibane Renmei


Yoshitoshi Abe Lain Illustratio...

---

**Manga books**                                        View 15+ more

# Exhibit P



[Home](#) » [Comics](#) » Oblivion, Based On The Non-Existing Graphic Novel

# Oblivion, Based On The Non-Existing Graphic Novel

Posted on [April 12, 2013](#) | by [Rich Johnston](#)



So there's this film, *Oblivion*. Based on a graphic novel published by Radical Publishing.



Except there was no graphic novel. In fact it's not clear that there was anything these illustrations and text, part of the Oblivion Preview given away at San Diego Comic Con a couple of years ago.



Wallin started drawing the graphic novel in 2009 and then moved to creating concept work for the film. But as for the comic that was meant to have started this off, this is all we got.

The Radical Publishing website promises it is coming in 2012. But it didn't.

On eBay this publication doesn't have the work "comic" or "graphic novel" in it, it's a concept book for the movie, and now sells from between $10 and $30.

Case 3:20-cv-01596-VC　　Document 92　　Filed 08/25/20　　Page 169 of 328

Now that the movie has hit the cinemas, will we ever see any more? Maybe an actual graphic novel as promised?



No. It's vapour ware. The San Diego freebie in 2010 was published to get interest in the film, the graphic novel was a smokescreen at a time when graphic novels were hot, and Radical Publishing were happy to get their cut when Tom Cruise's production company picked it up in their trawl of the booths. Back when more people were doing that kind of thing.

Empire Magazine reported writer/director Joseph Kosinski saying;

"It was just a stage in the project. The writers' strike occurred in 2007 so I had a treatment for a film but I had no way to actually write it. It couldn't be written by anyone in the guild so the partnership with Radical Comics allowed me to continue working on the story by developing a series of images and continuing to refine the story more over a period of years. Then I basically used all that development as a pitch kit to the studio. So even though we really never released it as an illustrated novel the story is being told as a film, which was always the intention."As for whether we'll ever see the printed version of the story? "I don't have any plans to do it right now. To me it's feels like it's in the rear-view mirror, you know? It's like part of the development process. The film is the end result. But never say never. Maybe at some point it will be fun to go back and show the steps and the journey."

There we are folks, we were all just one big workaround. Not only that, it was only ever meant to be an illustrated story.

But when you see that credit "based on the graphic novel", you know what to do.

Blow out a big, big raspberry. Look, we're happy with film people using comics as ways to explore ideas, mayb create a comic and the resultant publicity with the aim of turning it into a movie one day. But you know what? At least publish the comic book or graphic novel.

And also, if you're calling it a graphic novel to get publicity, it should probably be a graphic novel as well...

Enjoyed this article? Share it!

**About Rich Johnston**

Head writer and founder of Bleeding Cool. The longest-serving digital news reporter in the world. Living in London, father of two. Political cartoonist.

   

Posted in Comics | Tagged oblivion

←First Image Of Eva Green As 300: Rise Of An Empire's Big Bad

Two New, Very Different, Oz Comics For July →

## Follow Us

Exhibit Q



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0002044442
Search Results: Displaying 1 of 1 entries



Labeled View

*Billions :*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002044442 / 2017-05-08 |
| **Application Title:** | Billions - "Pilot" - Episode #101. |
| **Title:** | Billions : 101. |
| **Description:** | HDCAM ; 1/2 in. |
| **Notes:** | Pilot |
| **Copyright Claimant:** | Showtime Networks Inc., Transfer: By written agreement. Address: 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States. |
| **Date of Creation:** | 2016 |
| **Date of Publication:** | 2016-01-17 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Showtime Pictures Development Company, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture. |
| **Rights and Permissions:** | Showtime Networks Inc., 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States |
| **Names:** | Showtime Pictures Development Company |
| | Showtime Networks Inc. |



| Save, Print and Email (Help Page) |
|---|
| Select Download Format [ Full Record ∨ ] [ Format for Print/Save ] |
| Enter your email address: [                    ] [ Email ] |





**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0002044443
Search Results: Displaying 1 of 1 entries



Labeled View

*Billions :*

**Type of Work:** Motion Picture
**Registration Number / Date:** PA0002044443 / 2017-05-08
**Application Title:** Billions - "The Conversation" - Episode #112.
**Title:** Billions : 112, The Conversation.
**Description:** HDCAM ; 1/2 in.
**Copyright Claimant:** Showtime Networks Inc., Transfer: By written agreement. Address: 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States.
**Date of Creation:** 2016
**Date of Publication:** 2016-04-10
**Nation of First Publication:** United States
**Authorship on Application:** Showtime Pictures Development Company, employer for hire; Domicile: United States. Authorship: entire motion picture.
**Pre-existing Material:** preexisting music.
**Basis of Claim:** all other cinematographic material, production as a motion picture.
**Rights and Permissions:** Showtime Networks Inc., 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States
**Names:** Showtime Pictures Development Company
Showtime Networks Inc.





| **Save, Print and Email (<u>Help Page</u>)** |
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Baby Driver
Search Results: Displaying 1 of 45 entries



Labeled View

***BABY DRIVER.***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002044444 / 2017-06-30 |
| **Application Title:** | BABY DRIVER. |
| **Title:** | BABY DRIVER. |
| **Description:** | Videocassette (HDCAM SR) |
| **Copyright Claimant:** | TriStar Pictures, Inc. Address: 10202 W. Washington Blvd., Culver City, CA, 90232-3195, United States. |
| | MRC II Distribution Company L.P. Address: 9665 Wilshire Blvd., 2nd Floor, Beverly Hills, CA, 90212, United States. |
| **Date of Creation:** | 2017 |
| **Date of Publication:** | 2017-06-07 |
| **Nation of First Publication:** | France |
| **Authorship on Application:** | TriStar Pictures, Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| | MRC II Distribution Company L.P., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000008830 |
| **Previous Registration:** | 2016, PAu003845444. |
| | 2016, PAU003839366. |
| **Pre-existing Material:** | script/screenplay, preexisting music, French language (dubbed) soundtrack as released in the country of first publication. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture, Entire English language soundtrack as originally released in the United States. |
| **Copyright Note:** | C.O. correspondence. |
| | Regarding special handling request: Claim upgraded for special handling per request received on 07/14/2017 due to pending or prospective litigation. Registration decision and certificate issued on 7/25/2017. |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0002044445
Search Results: Displaying 1 of 1 entries

◀ previous    next ▶



*Billions :*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002044445 / 2017-05-08 |
| **Application Title:** | Billions - "Magical Thinking" - Episode #111. |
| **Title:** | Billions : 111, Magical Thinking. |
| **Description:** | HDCAM ; 1/2 in. |
| **Copyright Claimant:** | Showtime Networks Inc., Transfer: By written agreement. Address: 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States. |
| **Date of Creation:** | 2016 |
| **Date of Publication:** | 2016-04-03 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Showtime Pictures Development Company, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture. |
| **Rights and Permissions:** | Showtime Networks Inc., 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States |
| **Names:** | Showtime Pictures Development Company |
| | Showtime Networks Inc. |

◀ previous    next ▶

| **Save, Print and Email (Help Page)** |
|---|
| Select Download Format  Full Record ⌄    Format for Print/Save |
| Enter your email address:  [_____]  Email |



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0002044446
Search Results: Displaying 1 of 1 entries

[◀ previous]  [next ▶]

Labeled View

### *Billions :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002044446 / 2017-05-08 |
| **Application Title:** | Billions - "Where the F*ck is Donnie?" - Episode #109. |
| **Title:** | Billions : 109, Where the F*ck is Donnie. |
| **Description:** | HDCAM ; 1/2 in. |
| **Copyright Claimant:** | Showtime Networks Inc., Transfer: By written agreement. Address: 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States. |
| **Date of Creation:** | 2016 |
| **Date of Publication:** | 2016-03-20 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Showtime Pictures Development Company, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Pre-existing Material:** | preexisting music. |
| **Basis of Claim:** | all other cinematographic material, production as a motion picture. |
| **Rights and Permissions:** | Showtime Networks Inc., 10880 Wilshire Blvd., Suite 1600, Los Angeles, CA, 90024, United States |
| **Names:** | Showtime Pictures Development Company |
|  | Showtime Networks Inc. |

[◀ previous]  [next ▶]

| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ⌄   [Format for Print/Save] |
| Enter your email address:  [                    ]  [Email] |

Exhibit R

**Copyright | Search Copyright Records**

**All available connections to
the Online Catalog are currently in use**

Please try again in a few minutes.

While you are waiting, take a moment to read
our Help Files.

Home | Contact Us | Legal Notices | Freedom of Information Act (FOIA) | Library of Congress

U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000
(202) 707-3000

Revised: 13-Oct-2010



Copyright | Search Copyright Records

**All available connections to the Online Catalog are currently in use**

Please try again in a few minutes.

While you are waiting, take a moment to read our Help Files.

Home | Contact Us | Legal Notices | Freedom of Information Act (FOIA) | Library of Congress

U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000
(202) 707-3000

Revised: 13-Oct-2010

Exhibit S



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | **Titles** | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = All you need is Kill
Search Results: Displaying 1 through 25 of 28 entries.

 previous    next ▶

Resort results by: Date (ascending) ⌄                    Set Search Limits

| # | Title < | Full Title | Copyright Number | Date |
|---|---------|-----------|------------------|------|
| ☐ [1] | ALL YOU NEED IS KILL. | ALL YOU NEED IS KILL. | TX0008201246 | 2004 |
| ☐ [2] | All You Need Is Kill. | All You Need Is Kill. | TX0007748549 | 2009 |
| ☐ [3] | All you need is kill / by Dante Harper. | All you need is kill / by Dante Harper. | V3597D516 | 2010 |
| ☐ [4] | All you need is kill. | All you need is kill. | V3613D018 | 2012 |
| ☐ [5] | ALL YOU NEED IS KILL. | ALL YOU NEED IS KILL. | PAu003678041 | 2013 |
| ☐ [6] | All you need is kill / Dante Harper. | All you need is kill / by Dante Harper. | V3631D049 | 2013 |
| ☐ [7] | All you need is kill : motion picture. | All you need is kill : motion picture. | V3631D048 | 2013 |
| ☐ [8] | All you need is kill / by Hiroshi Sakurazaka. | All you need is kill / by Hiroshi Sakurazaka. | V3631D050 | 2013 |
| ☐ [9] | All you need is kill | Edge of tomorrow & 1 other title : p.k.a. All you need is kill. | V9912D001 | 2014 |
| ☐ [10] | ALL YOU NEED IS KILL | EDGE OF TOMORROW (Blue Re-locked Shooting Draft: September 12, 2012 with Rev. 09/28/12 - Rev. 08/20/13) | PAu003719581 | 2014 |
| ☐ [11] | All You Need Is Kill | Edge Of Tomorrow : p.k.a. All You Need Is Kill. | V9911D744 | 2014 |
| ☐ [12] | All You Need Is Kill | Edge of Tomorrow : p.k.a. All You Need Is Kill / By Christopher McQuarrie, et al. | V9911D655 | 2014 |
| ☐ [13] | All you need is kill | Edge of tomorrow : p.k.a. All you need is kill; motion picture / by Doug Liman, et al. | V3633D262 | 2014 |
| ☐ [14] | ALL YOU NEED IS KILL | EDGE OF TOMORROW (TEASER) | VA0001889115 | 2014 |
| ☐ [15] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D405 | 2014 |
| ☐ [16] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D402 | 2014 |
| ☐ [17] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D396 | 2014 |
| ☐ [18] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D395 | 2014 |
| ☐ [19] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D404 | 2014 |
| ☐ [20] | All You Need is Kill; novel / by Hiroshi Sakurazaka. | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D407 | 2014 |
|  | All You Need is Kill; novel / by | All You Need is Kill; novel / by Hiroshi Sakurazaka. | V9911D394 | 2014 |

Exhibit T



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|-----------|

## Public Catalog

Copyright Catalog (1978 to present)

Search Request: Left Anchored Title = All you need is Kill

Search Results: Displaying 1 of 28 entries



Labeled View

### *ALL YOU NEED IS KILL.*

| | |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0008201246 / 2015-11-05 |
| **Application Title:** | ALL YOU NEED IS KILL. |
| **Title:** | ALL YOU NEED IS KILL. |
| **Description:** | Book, 274 p. |
| **Copyright Claimant:** | Hiroshi Sakurazaka. Address: c/o 2-5-10 Hitotsubashi, Chiyoda-ku, Tokyo, 101-850, Japan. |
| | Yoshitoshi ABe. Address: c/o 2-5-10 Hitotsubashi, Chiyoda-ku, Tokyo, 101-850, Japan. |
| **Date of Creation:** | 2004 |
| **Date of Publication:** | 2004-12-18 |
| **Nation of First Publication:** | Japan |
| **Authorship on Application:** | Hiroshi Sakurazaka; Domicile: Japan. Authorship: text. |
| | Yoshitoshi ABe; Domicile: Japan. Authorship: artwork. |
| **Copyright Note:** | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |
| **Names:** | Sakurazaka, Hiroshi |
| | ABe, Yoshitoshi |





**Save, Print and Email (Help Page)**

| Select Download Format | Full Record ⌄ | Format for Print/Save |
|---|---|---|
| Enter your email address: | | Email |

Exhibit U



Copyright United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Wilson Briggs, Steve
Search Results: Displaying 1 through 5 of 5 entries.

previous next

Resort results by: Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| [ 1 ] | Wilson-Briggs, Steve, 1964- | Cyclones. | PAu001643251 | 1992 |
| [ 2 ] | Wilson-Briggs, Steve, 1964- | Tell her, & 8 other songs. | PAu001578386 | 1991 |
| [ 3 ] | Wilson-Briggs, Steve, 1964- | Turn around, walk away. | PAu001471570 | 1991 |
| [ 4 ] | Wilson Briggs, Steve Kenyatta, 1964- | Butterfly Driver. | PAu003683232 | 2013 |
| [ 5 ] | Wilson-Briggs, Steve Kenyatta, 1964- | On the corner in the rain / written by Steve Wilson-Briggs. | PAu001411291 | 1990 |

Resort results by: Set Search Limits

Clear Selected Retain Selected
previous next

**Save, Print and Email (Help Page)**

| Records | |
|---|---|
| All on Page | Select Format: Full Record — Format for Print/Save |
| Selected On Page | Enter your email address: — Email |
| Selected all Pages | |

Search for: Wilson Briggs, Steve Search by: Name (Crichton Michael; Walt Disney Company) Item type: None
25 records per page Submit Reset

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit V



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Butterfly Driver
Search Results: Displaying 1 of 1 entries



---

Labeled View

*Butterfly Driver.*

**Type of Work:** Dramatic Work and Music; or Choreography
**Registration Number / Date:** PAu003683232 / 2013-06-21
**Application Title:** Butterfly Driver.
**Title:** Butterfly Driver.
**Description:** Electronic file (eService)
**Copyright Claimant:** Steve Kenyatta Wilson Briggs, 1964- . Address: 681 Edna Way, San Mateo, CA, 94402, United States.
**Date of Creation:** 2005
**Alternative Title on Application:** Uberopolis: City of Light
**Authorship on Application:** Steve Kenyatta Wilson Briggs, 1964- ; Domicile: United States; Citizenship: United States. Authorship: text.
**Names:** Wilson Briggs, Steve Kenyatta, 1964-
Briggs, Steve Kenyatta Wilson, 1964-



---

| **Save, Print and Email (Help Page)** |
| Select Download Format  Full Record ⌄  Format for Print/Save |
| Enter your email address: [                    ] Email |

---

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page

# Exhibit W

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

**PAu 3-683-232**

**Effective date of registration:**

June 21, 2013

---

## Title ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Title of Work:** Butterfly Driver

**Previous or Alternative Title:** Uberopolis: City of Light

## Completion/Publication ━━━━━━━━━━━━━━━━━━━━

**Year of Completion:** 2005

## Author ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

■

**Author:** Steve Kenyatta Wilson Briggs

**Author Created:** text

**Citizen of:** United States          **Domiciled in:** United States

**Year Born:** 1964

## Copyright claimant ━━━━━━━━━━━━━━━━━━━━━━━━

**Copyright Claimant:** Steve Kenyatta Wilson Briggs

681 Edna Way, San Mateo, CA, 94402, United States

## Certification ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Name:** Steve Kenyatta Wilson Briggs

**Date:** June 21, 2013

---

# Exhibit X

**Copyright** | **Search Copyright Records**

**All available connections to
the Online Catalog are currently in use**

Please try again in a few minutes.

While you are waiting, take a moment to read
our Help Files.

Home | Contact Us | Legal Notices | Freedom of Information Act (FOIA) | Library of Congress

U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000
(202) 707-3000

Revised: 13-Oct-2010

Exhibit Y



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | **Titles** | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Parker, Trey
Search Results: Displaying 1 through 100 of 110 entries.

◀ previous    next ▶

Resort results by: Date (ascending) ⌄                              Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| ☐ [ 1 ] | Parker, Trey, 1969- | Kiss Johnny. | PAu001623416 | 1992 |
| ☐ [ 2 ] | Parker, Trey | Alferd Packer : the musical / by Randolph Parker 3rd, 1969- (Trey Parker) | TXu000573492 | 1993 |
| ☐ [ 3 ] | Parker, Trey | Baby, don't you know? | PA0000687106 | 1993 |
| ☐ [ 4 ] | Parker, Trey | Feelin' alright ; Black book ; The way you work it ; Straight mackin'. | PA0000664100 | 1993 |
| ☐ [ 5 ] | Parker, Trey | Get some. | PA0000664104 | 1993 |
| ☐ [ 6 ] | Parker, Trey | Musical. | PAu001845710 | 1993 |
| ☐ [ 7 ] | Parker, Trey | Nice and slow. | PA0000687104 | 1993 |
| ☐ [ 8 ] | Parker, Trey | Nice and slow ; Baby, don't you know? | PA0000664099 | 1993 |
| ☐ [ 9 ] | Parker, Trey | Straight mackin'. | PA0000664117 | 1993 |
| ☐ [ 10 ] | Parker, Trey | Swing my way (demo) | PA0000664103 | 1993 |
| ☐ [ 11 ] | Parker, Trey | Cannibal : the musical / the Avenging Conscience, Inc., presents a Cannibal Films, Ltd., production ; directed by Trey Parker. | PA0000908191 | 1995 |
| ☐ [ 12 ] | Parker, Trey | South Park : no. 210, Chicken pox / directed by Trey Parker. | PA0000911033 | 1998 |
| ☐ [ 13 ] | Parker, Trey | South Park : no. 211, Roger Ebert should lay off fatty foods / directed by Trey Parker. | PA0000911034 | 1998 |
| ☐ [ 14 ] | Parker, Trey | South Park : no. 213, Cow days / directed by Trey Parker. | PA0000911036 | 1998 |
| ☐ [ 15 ] | Parker, Trey | South Park : no. 214, Chef aid / directed by Trey Parker. | PA0000911037 | 1998 |
| ☐ [ 16 ] | Parker, Trey | South Park : no. 215, Spooky fish / directed by Trey Parker. | PA0000939899 | 1998 |
| ☐ [ 17 ] | Parker, Trey | South Park : no. 217, Gnomes / directed by Trey Parker. | PA0000939897 | 1998 |
| ☐ [ 18 ] | Parker, Trey | Orgazmo / an Avenging Conscience production of a Trey Parker movie ; written and directed by Trey Parker. | PA0000935638 | 1998 |
| ☐ [ 19 ] | Parker, Trey | South Park : a stickyforms adventure! / created by Trey Parker and Matt Stone. | VA0001090026 | 1998 |
| ☐ [ 20 ] | Parker, Trey | South Park : no. 112, Mecha Streisand / directed by Trey Parker. | PA0000785301 | 1998 |
| ☐ [ 21 ] | Parker, Trey | South Park : no. 113, Cartman's mom is a dirty slut / directed by Trey Parker. | PA0000785299 | 1998 |

| | | | | |
|---|---|---|---|---|
| [ 22 ] | Parker, Trey | South Park : no. 201, Not without my anus / directed by Trey Parker. | PA0000888140 | 1998 |
| [ 23 ] | Parker, Trey | South Park : no. 202, Cartman's mom is still a slut / directed by Trey Parker. | PA0000888137 | 1998 |
| [ 24 ] | Parker, Trey | South Park : no. 203, Reading is dumb / directed by Trey Parker. | PA0000916213 | 1998 |
| [ 25 ] | Parker, Trey | South Park : no. 205, Conjoined fetus lady / directed by Trey Parker. | PA0000894273 | 1998 |
| [ 26 ] | Parker, Trey | South Park : no. 206, Jimbo & Ned / directed by Trey Parker. | PA0000897438 | 1998 |
| [ 27 ] | Parker, Trey | South Park : no. 207, City on the edge of forever / directed by Trey Parker. | PA0000898225 | 1998 |
| [ 28 ] | Parker, Trey | South Park : no. 208, Summer sucks / directed by Trey Parker. | PA0000911823 | 1998 |
| [ 29 ] | Parker, Trey | South Park : no. 209, Chef's salty chocolate balls / directed by Trey Parker. | PA0000911032 | 1998 |
| [ 30 ] | Parker, Trey | South Park : no. 311, Starvin' Marvin in space / directed by Trey Parker. | PA0000970499 | 1999 |
| [ 31 ] | Parker, Trey | South Park : no. 312, Korn's groovy pirate mystery / directed by Trey Parker. | PA0000970500 | 1999 |
| [ 32 ] | Parker, Trey | South Park : no. 313, Hooked on monkey fonics / directed by Trey Parker. | PA0000970501 | 1999 |
| [ 33 ] | Parker, Trey | South Park : no. 314, Red badge of gayness / directed by Trey Parker. | PA0000970502 | 1999 |
| [ 34 ] | Parker, Trey | South Park : no. 315, Mr. Hankey's Christmas classic / directed by Trey Parker. | PA0000970503 | 1999 |
| [ 35 ] | Parker, Trey | Spirit of Christmas & 1 other title. | V3435D658 | 1999 |
| [ 36 ] | Parker, Trey | Spirit of Christmas; animated short film / Including the television series, South Park. Written by Trey Parker & Matt Stone. DCR 1995. PAu 2-177-588 (1996) | V3437D784 | 1999 |
| [ 37 ] | Parker, Trey | Uncle f**ka ; Up there ; Eyes of a child ; I can change. | PA0000967186 | 1999 |
| [ 38 ] | Parker, Trey | Are you ready? | PA0001045468 | 1999 |
| [ 39 ] | Parker, Trey | Mountain town ; It's easy, mmmkay ; Blame Canada ... [et al.] | PA0000967187 | 1999 |
| [ 40 ] | Parker, Trey | South Park : bigger, longer, & uncut / a Scott Rudin and Trey Parker, Matt Stone production in association with Comedy Central ; directed by Trey Parker. | PA0000945160 | 1999 |
| [ 41 ] | Parker, Trey | South Park : bigger, longer & uncut / Trey Parker, Mat Stone & Pam Brady. | PAu002400126 | 1999 |
| [ 42 ] | Parker, Trey | South Park : no. 301, Rainforest schmainforest / directed by Trey Parker, Eric Stough. | PA0000937380 | 1999 |
| [ 43 ] | Parker, Trey | South Park : no. 303, Chef's mama / directed by Trey Parker. | PA0000937378 | 1999 |
| [ 44 ] | Parker, Trey | South Park : no. 304, Tweek vs. Craig / directed by Trey Parker. | PA0000946679 | 1999 |
| [ 45 ] | Parker, Trey | South Park : no. 304, Tweek vs. Craig / directed by Trey Parker. | PA0000982773 | 1999 |
| [ 46 ] | Parker, Trey | South Park : no 307, Cat orgy / directed by Trey Parker. | PA0000970495 | 1999 |
| [ 47 ] | Parker, Trey | South Park : no. 308, Two guys naked in a hot tub / directed by Trey Parker. | PA0000970496 | 1999 |
| [ 48 ] | Parker, Trey | South Park : no. 309, Jewbilee / directed by Trey Parker. | PA0000970497 | 1999 |
| [ 49 ] | Parker, Trey | South Park : no. 310, Chinpoko mon / directed by Trey Parker, Matt Stone. | PA0000970498 | 1999 |
| [ 50 ] | Parker, Trey | South Park : no. 415, Fat camp / directed by Trey Parker. | PA0001020683 | 2000 |
| [ 51 ] | Parker, Trey | South Park : no. 416, Wacky molestation adventure / directed by Trey Parker. | PA0001020685 | 2000 |
| [ 52 ] | Parker, Trey | Why'd you lie to me? | PA0001065457 | 2000 |
| [ 53 ] | Parker, Trey | Mad bathroom companion / by "The Usual Gang of Idiots" ; edited by Nick Meglin & John Ficarra ; introd. by Trey Parker. | TX0005274623 | 2000 |
| | Parker, Trey | South Park : no 401, Cartman's funny hate crime 2000 / directed by Trey Parker, Eric Stough. | PA0000999454 | 2000 |

| | | | | |
|---|---|---|---|---|
| [ 54 ] | | | | |
| [ 55 ] | Parker, Trey | South Park : no 402, The tooth fairy's tats 2000 / directed by Trey Parker. | PA0000999455 | 2000 |
| [ 56 ] | Parker, Trey | South Park : no 403, Contouring quintuplets 2000 / directed by Trey Parker. | PA0000999456 | 2000 |
| [ 57 ] | Parker, Trey | South Park : no 404, Timmy 2000 / directed by Trey Parker. | PA0000999457 | 2000 |
| [ 58 ] | Parker, Trey | South Park : no 407, Cherokee hair tampons / directed by Trey Parker. | PA0001007060 | 2000 |
| [ 59 ] | Parker, Trey | South Park : no 408, Chef goes nanners / directed by Trey Parker, Eric Stough. | PA0001007061 | 2000 |
| [ 60 ] | Parker, Trey | South Park : no. 409, Something you can do with your finger / directed by Trey Parker. | PA0001007062 | 2000 |
| [ 61 ] | Parker, Trey | South Park : no. 410, Do the handicapped go to hell? / directed by Trey Parker. | PA0001002236 | 2000 |
| [ 62 ] | Parker, Trey | South Park : no 411, Probably / directed by Trey Parker. | PA0001007063 | 2000 |
| [ 63 ] | Parker, Trey | South Park : no 413, Trapper keeper / directed by Trey Parker. | PA0001021556 | 2000 |
| [ 64 ] | Parker, Trey | South Park : no 414, Helen Keller the musical / directed by Trey Parker. | PA0001021557 | 2000 |
| [ 65 ] | Parker, Trey | South Park : no. 513, Kenny dies / directed by Trey Parker. | PA0001074438 | 2001 |
| [ 66 ] | Parker, Trey | South Park : no. 514, Butter's very own episode / directed by Trey Parker. | PA0001074440 | 2001 |
| [ 67 ] | Parker, Trey | Why'd you lie to me? | PA0001051857 | 2001 |
| [ 68 ] | Parker, Trey | South Park : no. 501, Scott Tenorman must die / directed by Trey Parker. | PA0001068421 | 2001 |
| [ 69 ] | Parker, Trey | South Park : no. 502, It hits the fan / directed by Trey Parker. | PA0001068415 | 2001 |
| [ 70 ] | Parker, Trey | South Park : no. 503, Cripple fight / directed by Trey Parker. | PA0001068414 | 2001 |
| [ 71 ] | Parker, Trey | South Park : no. 504, The Super best friends / directed by Trey Parker. | PA0001068418 | 2001 |
| [ 72 ] | Parker, Trey | South Park : no. 505, Terrance & Phillip : behind the blow / directed by Trey Parker. | PA0001068416 | 2001 |
| [ 73 ] | Parker, Trey | South Park : no. 506, Cartmanland / directed by Trey Parker. | PA0001068420 | 2001 |
| [ 74 ] | Parker, Trey | South Park : no. 507, Proper condom use / directed by Trey Parker. | PA0001068417 | 2001 |
| [ 75 ] | Parker, Trey | South Park : no. 508, Towelie / directed by Trey Parker. | PA0001068419 | 2001 |
| [ 76 ] | Parker, Trey | South Park : no. 509, Osama Bin Laden has farty pants / directed by Trey Parker. | PA0001074439 | 2001 |
| [ 77 ] | Parker, Trey | South Park : no. 510, How to eat with your butt / directed by Trey Parker. | PA0001074436 | 2001 |
| [ 78 ] | Parker, Trey | South Park : no. 511, The entity / directed by Trey Parker. | PA0001074449 | 2001 |
| [ 79 ] | Parker, Trey | South Park : no. 512, Here comes the neighborhood / directed by Trey Parker. | PA0001074448 | 2001 |
| [ 80 ] | Parker, Trey | South Park : no. 616, My future self n' me / directed by Trey Parker, Erik Stouch. | PA0001124236 | 2002 |
| [ 81 ] | Parker, Trey | South Park : no. 617, Red sleigh down / directed by Trey Parker. | PA0001124201 | 2002 |
| [ 82 ] | Parker, Trey | South Park : no 601, Freak strike / directed by Trey Parker. | PA0001085912 | 2002 |
| [ 83 ] | Parker, Trey | South Park : no 602, Jared has Aids / directed by Trey Parker. | PA0001085911 | 2002 |
| [ 84 ] | Parker, Trey | South Park : no 603, Asspen / directed by Trey Parker. | PA0001085913 | 2002 |
| [ 85 ] | Parker, Trey | South Park : no 604, The new Terrance and Phillip movie trailer / directed by Trey Parker. | PA0001085908 | 2002 |
| | Parker, Trey | South Park : no 605, Fun with veal / directed by Trey Parker. | PA0001085909 | 2002 |

| | | | | |
|---|---|---|---|---|
| [ 86 ] | | | | |
| [ 87 ] | Parker, Trey | South Park : no 606, Professor Chaos / directed by Trey Parker. | PA0001085910 | 2002 |
| [ 88 ] | Parker, Trey | South Park : no. 608, Red hot Catholic love / directed by Trey Parker. | PA0001089075 | 2002 |
| [ 89 ] | Parker, Trey | South Park : no. 610, Bebe's boobs destroy society / directed by Trey Parker. | PA0001099298 | 2002 |
| [ 90 ] | Parker, Trey | South Park : no. 612, A ladder to Heaven / directed by Trey Parker. | PA0001124213 | 2002 |
| [ 91 ] | Parker, Trey | South Park : no. 613, The return of the fellowship of the ring to the two towers / directed by Trey Parker. | PA0001124205 | 2002 |
| [ 92 ] | Parker, Trey | South Park : no. 614, The death camp of tolerance / directed by Trey Parker. | PA0001124202 | 2002 |
| [ 93 ] | Parker, Trey | South Park : no. 615, The biggest douche in the universe / directed by Trey Parker. | PA0001124212 | 2002 |
| [ 94 ] | Parker, Trey | Make your own damn movie! : secrets of a renegade director / Lloyd Kaufman with Adam Jahnke and Trent Haaga. | TX0005782693 | 2003 |
| [ 95 ] | Parker, Trey | South Park : no 702, Krazy kripples / directed by Trey Parker. | PA0001197191 | 2003 |
| [ 96 ] | Parker, Trey | South Park : no 703, Toilet paper / directed by Trey Parker. | PA0001197192 | 2003 |
| [ 97 ] | Parker, Trey | South Park : no 704, Cancelled / directed by Trey Parker. | PA0001197193 | 2003 |
| [ 98 ] | Parker, Trey | Team America world police / a Scott Rudin, Matt Stone production ; directed by Trey Parker. | PA0001235613 | 2004 |
| [ 99 ] | Parker, Trey | South Park : the complete fifth season / directed by Trey Parker. | PA0001273829 | 2005 |
| [ 100 ] | Parker, Trey | Just Another Day. | PAu003344297 | 2007 |



Resort results by: Date (ascending) ⌄       Set Search Limits

Clear Selected    Retain Selected

◄ previous    next ►

| Save, Print and Email (Help Page) | | |
|---|---|---|
| **Records** | Select Format: Full Record ⌄ | Format for Print/Save |
| ○ All on Page <br> ● Selected On Page <br> ○ Selected all Pages | Enter your email address: | Email |

Search for: Parker, Trey   Search by: Name (Crichton Michael; Walt Disney Company) ⌄   Item type: None ⌄

100 records per page ⌄      Submit   Reset

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Parker, Trey
Search Results: Displaying 101 through 110 of 110 entries.



Resort results by: Date (ascending)

[ Set Search Limits ]

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---------------|-----------|------------------|------|
| [ 101 ] | Parker, Trey | South Park : 1102, Cartman Sucks. | PA0001608678 | 2007 |
| [ 102 ] | Parker, Trey | Hold My Heart. | PAu003463817 | 2008 |
| [ 103 ] | Parker, Trey | BOOK OF MORMON. | PA0001836498 | 2011 |
| [ 104 ] | Parker, Trey | BOOK OF MORMON. | PA0001836497 | 2011 |
| [ 105 ] | Parker, Trey | Book of Mormon: The Complete Book and Lyrics of The Broadway Musical. | TX0007446444 | 2011 |
| [ 106 ] | Parker, Trey | Hello!, et al. | PA0001757641 | 2011 |
| [ 107 ] | Parker, Trey | BOOK OF MORMON: THE TESTAMENT OF A BROADWAY MUSICAL. | TX0007721076 | 2013 |
| [ 108 ] | Parker, Trey | BOOK OF MORMON: THE TESTAMENT OF A BROADWAY MUSICAL. | TX0007722396 | 2013 |
| [ 109 ] | Parker, Trey, 1990- | Tea. | TXu001895188 | 2013 |
| [ 110 ] | Parker, Trey | Book of Mormon & 1 other title; musical play. | V9970D109 | 2018 |

Resort results by: Date (ascending)

[ Set Search Limits ]

[ Clear Selected ] [ Retain Selected ]





| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| **Records** | Select Format: Full Record | [ Format for Print/Save ] |
| ○ All on Page ● Selected On Page ○ Selected all Pages | Enter your email address: | [ Email ] |

Search for: Parker, Trey   Search by: Name (Crichton Michael; Walt Disney Company)   Item type: None

100 records per page    [ Submit ] [ Reset ]

| Help | Search | History | Titles | Start Over |

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit Z



# South Park Studios – It's Like AllSP, But Legal

**Michael Arrington**@arrington?lang=en / 3:32 pm PDT•March 24, 2008

Comment

http://media.mtvnservices.com/mgid:cms:item:southparkstudios.com:155193:

It hasn't been hard for people to watch the cult favorite show South Park (possibly the best show on television) online. Sites like Allsp (All South Park) have had the entire catalog available for some time. And episodes are always available on BitTorrent immediately after broadcast.

Instead of fighting BitTorrent and sites like Allsp, South Park creators Matt Stone and Trey Parker are simply going to try to make them irrelevant by offering something better. Along with Comedy Central, they've expanded South Park Studios, where viewers can stream any episode of South Park from the show's twelve seasons. The joint venture was announced last year, but added whole episode viewing today.

The main benefits: quality is significantly better than the clips on Allsp, and are searchable. Of course, there's also no question about copyright infringement when you watch shows on the sanctioned site. The downside is that the episodes are not embeddable (although clips like the one above are), and there are ads includes in the streams.

Revenues from the joint venture are being split 50/50 between Comedy Central and Stone/Parker.

The viewing experience is very similar to Hulu. But the fact that the entire catalog of episodes is available makes the site much more attractive. Hulu only shows the last few episodes of any particular show, so new viewers are unable to start from the beginning. If Hulu wants to be the long term default library for online television, they need to work out licensing deals that allow them to upload all historical shows, too.

Exhibit AA



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

 Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = interstellar
Search Results: Displaying 223 of 342 entries



---

### *INTERSTELLAR.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001920916 / 2014-11-05 |
| **Application Title:** | INTERSTELLAR. |
| **Title:** | INTERSTELLAR. |
| **Description:** | 8 film reels ; 35mm. |
| **Copyright Claimant:** | Paramount Pictures Corporation. Address: 5555 Melrose Avenue, Hollywood, CA, 90038, United States. |
| | Warner Bros. Entertainment Inc., Transfer: By written agreement. Address: 4000 Warner Blvd., Burbank, CA, 91522, United States. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-11-05 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Paramount Pictures Corporation, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| | Warner Bros. Pictures, a division of WB Studio Enterprises Inc., employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Preregistered as:** | PRE000007487 |
| **Copyright Note:** | C.O. correspondence. |
| **Names:** | Nolan, Christopher |
| | Paramount Pictures Corporation |
| | Warner Bros. Pictures. |
| | WB Studio Enterprises Inc. |
| | Warner Bros. Entertainment Inc. |





**Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. More.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = interstellar
Search Results: Displaying 224 of 342 entries



Labeled View

*Interstellar*

**Type of Work:** Preregistration
**Type of Work Preregistered:** Motion Picture
**Preregistration Number / Date:** PRE000007487 / 2014-09-26
**Application Title:** Interstellar
**Title:** Interstellar
**Copyright Claimant:** Paramount Pictures Corporation. Address: 5555 Melrose Avenue, Lubitsch 215, Hollywood, CA, 90038, United States.

Warner Bros. Entertainment Inc. Address: 4000 Warner Blvd., Burbank, CA, 91522, United States.
**Creation of Work Began:** 2013-08 (Approximate)
**Date of Anticipated Completion:** 2014-03 (Approximate)
**Projected Date of Publication:** 2014-11 (Approximate)
**Authorship on Application:** Paramount Pictures Corporation.

Warner Bros. Entertainment inc.
**Description of Work:** With our time on Earth coming to an end, a team of explorers undertakes the most important mission in human history; traveling beyond this galaxy to discover whether mankind has a future among the stars.
**Names:** Paramount Pictures Corporation
Warner Bros. Entertainment inc.
Warner Bros. Entertainment Inc.



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |

# Exhibit BB



# Exhibit CC

**The #1 Humorous Pop Cultural, Political &
Social Fitness Self-Test Book of All Time!!**



# Morons
# Don't Ride
# Harleys

Wilson Briggs





**The Only Book You Should Ever Read!**

# The Solution



**Stephen Hawking**

Solutions are hard. But if you spend 150 pages pointing at all of our nation's problems, you're sort of expected to offer one. And although it's nice to try to solve problems, it's even nicer to assign blame while you're at it. Stephen Hawking blamed mankind's stupidity and greed for the fix we're in. That sounds great, but it blames everyone—even me. Blame should be specific. Hitler blamed the Jews. Trump blames immigrants. Blame focuses a nation's rage on a convenient scapegoat. That's always nice. So, if I were to lay blame...

About 500 years ago, gun technology improved significantly. Emboldened, Europeans boarded ships

and went around the world, taking nations, slaves, and natural resources. A few centuries later, they opted to free those conquered lands (only after redrawing national boundaries, thereby destabilizing the newly liberated nations). Many, if not most, chronic international conflicts go back to these events. So that's where to lay blame: Guns.

As for a solution, you might start with a guy like Bayard Rustin.



**Bayard Rustin** 1912-1987

In 1941, when Bayard Rustin was only 19, he travelled from his home in New York City to California, to help protect the property of Japanese Americans, wrongly locked in internment camps

153

during World War II. A gay black man, Rustin spent his life fighting for the rights of Soviet Jews, Japanese, gays, workers, students, Blacks, socialists and anyone who needed an advocate.

 

**Andrew Goodman** and **Michael Schwerner,**
Jewish civil rights workers, were murdered in
1964, for defending the civil rights of Blacks.

In the 1960s, the Civil Rights Movement made huge advances, with the help of Jews, progressive Whites, and Latinos like Cesar Chavez. But in the 80s and 90s, still infuriated by the Beastie Boys, many Blacks move away from these former allies. This hindered the Movement's progress for decades

**The Solution:** learning from this, if good people take Bayard Rustin's lead and supports each other's causes, we'll all progress faster. But if this great idea doesn't work, it's because of all the agnostics, dwarfs, vegans, and fat kids we still have around here.

154

# Exhibit DD



*Extremism flourishes on Amazon's self-publishing arm. (Tom Gauld, special to ProPublica)*

# The Hate Store: Amazon's Self-Publishing Arm Is a Haven for White Supremacists

The company gives extremists and neo-Nazis banned from other platforms unprecedented access to a mainstream audience — and even promotes their books.

by Ava Kofman, ProPublica, and Francis Tseng and Moira Weigel for ProPublica, April 7, 5 a.m. EDT

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive <u>our biggest stories</u> as soon as they're published.*

*This story is a collaboration between ProPublica and The Atlantic and is not subject to our Creative Commons license.*

"Give me, a white man, a reason to live," a user posted to the anonymous message board 4chan in the summer of 2017. "Should I get a hobby. What interests can I pursue to save myself from total despair. How do you go on living."

A fellow user had a suggestion: "Please write a concise book of only factual indisputable information exposing the Jews," focusing on "their selling of our high tech secrets to China/Russia" and "their long track record of pedophilia and perversion etc."

The man seeking advice was intrigued. "And who would publish it and who would put it in their bookstores that would make it worth the trouble," he asked.

The answer came a few minutes later. "Self-publish to Amazon," his interlocutor replied.

"Kindle will publish anything," a third user chimed in.

They were basically right. It takes just a couple of minutes to upload one's work to Kindle Direct Publishing (KDP), Amazon's self-publishing arm; the e-book then shows up in the world's largest bookstore within half a day, typically with minimal oversight. Since its founding more than a decade ago, KDP has democratized the publishing industry and earned praise for giving authors shut out of traditional channels the chance to reach an audience that would have been previously unimaginable.

It has also afforded the same opportunity to white supremacists and neo-Nazis, an investigation by ProPublica and The Atlantic has found. Releases include "Anschluss: The Politics of Vesica Piscis," a polemic that praises the "grossly underappreciated" massacre of 77 people by the Norwegian neo-Nazi Anders Breivik in 2011, and "The White Rabbit Handbook," a manifesto linked to an Illinois-based militia group facing federal hate-crime charges for firebombing a mosque. (Amazon removed the latter last week following questions from ProPublica.) About 200 of the 1,500 books recommended by the Colchester Collection, an online reading room run by and for white nationalists, were self-published through Amazon. And new KDP acolytes are born every day: Members of fringe groups on 4chan, Discord and Telegram regularly tout the platform's convenience, according to our analysis of thousands of conversations on those message boards. There are "literally zero hoops," one user in 4chan's /pol/ forum told another in 2015. "Just sign up for Kindle Direct Publishing and publish away. It's shocking how simple it is, actually." Even Breivik, at the start of the 1,500-page manifesto that accompanied his terrorist attacks, suggested that his followers use KDP's paperback service, among others, to publicize his message.

That these books are widely available on Amazon does not seem to be an accident but the inevitable consequence of the company's business strategy. Interviews with more than two dozen former Amazon employees suggest that the company's drive for market share and philosophical aversion to gatekeepers have incubated an anything-goes approach to content: Virtually no idea is too inflammatory, and no author is off-limits. As major social networks and other publishing platforms have worked to ban extremists, Amazon has emerged as their safe space, a haven from which they can spread their message into mainstream American culture with little more than a few clicks.

*4chan message board screenshot. (Obtained by ProPublica)*

"There is a lot of extremist content on Amazon," said J. M. Berger, who studies such works as a fellow with the E.U.-funded VOX-Pol research network. "The platform has gone largely overlooked because, understandably, we think of books differently than other content. But these products are for sale and they're being algorithmically pushed." We tested the recommendations for many far-right texts and discovered several that could lead users down a hate-filled rabbit hole, where the suggested books reinforce a white nationalist worldview. For e-books that retail between $2.99 and $9.99, authors keep 70% of the profits and Amazon takes the rest. (Amazon doesn't break out revenue for book sales or its self-publishing arm.)

"As a bookseller, we believe that providing access to the written word is important," an Amazon spokesperson said in a statement. "That includes books that some may find objectionable, though we have policies governing which books can be listed for sale. We invest significant time and resources to ensure our guidelines are followed, and remove products that do not adhere to our guidelines. We also promptly investigate any book when a concern is raised."

The growing influence of social networks on political life has prompted a national debate about what should stay up on these platforms, what should come down, who's to blame and who decides. Following the deadly far-right violence in Charlottesville, Virginia, in 2017, Facebook, Twitter, Reddit and PayPal cracked down on the activities of white supremacists and hate groups on their platforms. In recent years, Amazon has barred several high-profile white supremacist authors, including former Klan leader David Duke, from its bookstore. It does occasionally pull extremist books from KDP, sometimes months or years after publication, and often in secret, without providing any explanation to authors or readers. But these removals appear to be the exception. KDP's terse policies do not address hate speech, racism or incitements to violence, though Amazon reserves the right to remove any items from its store, including "content that disappoints our customers" or fails to "provide an enjoyable reading experience." By and large, Amazon, which in the United States controls around half of the market for all books, and close to 90% for e-books, has become a gateway for white supremacists to reach the American reading public.

Case 3:20-cv-01596-VC Document 92 Filed 08/25/20 Page 216 of 328

The Southern Poverty Law Center calls Billy Roper "the uncensored voice of violent neo-Nazism"; Roper calls himself "the most widely read living fiction author in the white nationalist movement." For several decades, he has led some of the white-nationalist movement's most hardcore factions, and today he runs the ShieldWall Network, a group attempting to build a whites-only ethno-state in southern Missouri and northern Arkansas, where he lives. (The group made headlines last year for organizing a protest of a Holocaust-remembrance event, at which they shouted the slogan "6 million more.")



*Billy Roper, center, swears in a new member of the ShieldWall Network outside Atkins, Arkansas, on April 20, 2019. (Jim Urquhart/Reuters)*

Roper is also a prolific author. Since 2014, he has uploaded 17 books of fiction and nonfiction to Amazon's self-publishing platform. His best-known works are the "Hasten the Day" trilogy, which takes place in the years after the United States has balkanized into multiple warring ethno-states — an outcome Roper considers inevitable. "I was trying to find a fictional way of expressing my political ideas," Roper told us, "because a lot of people find fiction more palatable than nonfiction when it comes to accepting an idea that they're not otherwise comfortable with." For those who fail to grasp the trilogy's political message, racist quotations from Thomas Jefferson and David Duke are interspersed throughout the text. In "The Balk," an essay collection self-published in 2015, Roper asks readers to imagine themselves in the world he depicts in his fiction. "If your cousin showed up with his Mexican girlfriend and their half-Mexican kids in the middle of a race war and wanted refuge, that could put you automatically on a whole different side," he wrote, advising that "the best way to accomplish discrimination is through prejudice, beforehand. Be prejudiced, and discriminate."

7/25/2020
Case 3:20-cv-01596-VC Document 92 Filed 08/25/20 Page 217 of 328
The Hate Store: Amazon's Self-Publishing Arm Is a Haven for White Supremacists — ProPublica

In a phone interview in February, Roper said he has had his accounts suspended on Facebook, Twitter, YouTube and VK, a Russian alternative to Facebook — but not Amazon. Having his books on the platform, he said, grants him legitimacy and attracts new audiences. "My existence there has been beneficial in reaching people with my message and growing my organization," he said. "People can go to Amazon — which is mainstream and acceptable, there's nothing radical about that — order a book, and in the privacy of their own home they can read the book without ever having to visit a white-nationalist website."

Roper is also active on Goodreads, the Amazon-owned social network for readers, where he frequently posts about giveaways, pitches his novels to book clubs and tries to spark discussion of "pro-white" books — a popular recruiting tactic, according to Berger, the VOX-Pol researcher. Among the topics discussed in Roper's "European American Reading Group" are whether it's useful to read books by "jews and the opposition."

Before the internet, Roper's reach would have likely been limited by bookstores' shelf space and curatorial judgement. But in today's world of digital abundance, far-right authors have enjoyed a newfound visibility. Gary Lauck, the leader of NSDAP/AO, an American neo-Nazi party, used to rely on snail mail to smuggle neo-Nazi propaganda into Germany and other European countries where it's been banned. Today, several works published by his organization's press are available to anyone in the U.S. and Europe on Amazon and on Kindle Unlimited, a program that offers books to readers for a subscription fee. KDP has also revived an older white nationalist canon. Many works by historical Nazis and anti-Semites, no longer held by copyright and long out of print, have been reprinted through KDP. Members of far-right chatrooms often link to them.

Though books now compete with viral videos, memes and podcasts in the rapidly expanding universe of white-nationalist cultural production, they still play an important role. Roper himself was inspired by "The Turner Diaries," which depicts in gruesome detail the genocide of nonwhite people across the world. It was published in 1978 under a pseudonym by William Pierce, the founder of the National Alliance, then regarded as the most dangerous neo-Nazi group in the U.S. As of early April, it still ranked among the top 65,000 books sold on Amazon.

---

Jeff Bezos founded Amazon with the dream of selling people whatever they wanted, when they wanted it. This wasn't yet possible in 1994. So he started out with books, according to Brad Stone's 2013 history of Amazon, "The Everything Store." Bezos is an avid reader, especially of science fiction, but his decision was driven less by literary passion than by business acumen. Books were easy to ship yet endlessly variable. "If [Bezos] couldn't build a true everything store right away," Stone wrote, "he

could capture its essence — unlimited selection — in at least one important product category."

From the start, Bezos was determined that nothing should interfere with the company's relentless quest for scale. He instilled in employees an almost dogmatic rejection of gatekeepers — those intrusive editors and critics who stand between authors and readers, deciding what the public should or shouldn't consume. "We want to make every book available — the good, the bad, and the ugly," Bezos explained in a 1998 speech. "And when you're doing that you actually have an obligation — if you're going to make the shopping environment actually conducive to shopping — to sort of let truth loose."

Even in those early days, though, he encountered pushback. In the late '90s, a former Amazon employee told us, a rabbi wrote in to complain about the company selling "The Protocols of the Elders of Zion," the early-20th-century anti-Semitic text alleging a Jewish plan for world domination. "Jeff said: 'Who are we to decide? There's a comments section and people will comment on the fact that this is beneath them,'" the employee recalled, noting that Bezos was disgusted by such content but concerned about acting as a censor. (Bezos did not respond to request for comment.)

Ex-Amazonians who worked in the books and video divisions said that the same rationale guided the company's decision to stock "Mein Kampf" and the Nazi propaganda films of Leni Riefenstahl. (Many former and current employees, citing nondisclosure agreements, spoke with us anonymously.) But this desire to avoid gatekeeping occasionally conflicted with another corporate goal: to keep the site family-friendly. "We were always told that Bezos never wanted a customer to open something on their computer screen that they'd be embarrassed by at work," a former employee said. When the store's video division launched, Bezos decided not to sell hardcore-porn titles — one of the company's earliest efforts at moderation. If customers typed in a search term like "XXX," they would be redirected to softcore productions from Playboy and Penthouse instead.

Amazon soon realized that it didn't need to depend on publishers to control the supply of books; it could just as well print them itself. In 2005, the company purchased BookSurge, a pioneer of print-on-demand technology, for an undisclosed sum. Founded in 2000, BookSurge shared Amazon's populist philosophy: Its mission was to help anyone tell a story, free from the friction and costs of intermediaries. "We published everything from children's books to erotic novels to people with fringe political views and photo books that would include adult content as well," said Rick Jones, who directed operations for BookSurge from the beginning and stayed on after the acquistion until 2014. "It wasn't our job to judge whether something was right or wrong. Our whole goal was to let the market and the people decide what's of value." Content review was

anathema to this mission. Nothing was rejected, BookSurge co-founder Jeff Schwaner told us, except when a text file didn't meet the formatting specifications.

After the purchase, Amazon renamed the company CreateSpace and ramped up its paperback output. It soon launched what's now known as Kindle Direct Publishing to produce self-published e-books for its new Kindle e-reader and burgeoning e-book store. (In 2018, Amazon merged CreateSpace into KDP, which now encompasses both the e-book and paperback self-publishing operations.) As the number of books expanded from a few thousand each year to tens of thousands to millions, so did Amazon's legal risk. "It was just a mess of unregulated content, and no one was in charge of it," one former Kindle employee remembered of this period. "It was a free-for-all. It was the Wild, Wild West." To comb through the chaos, Amazon assembled teams to screen for copyright violations that might elicit lawsuits threatening its bottom line. According to former employees, the company's priority — making as much content as possible available to its customers — meant that essentially everything legal was permitted.



*Jeff Bezos at a press conference to unveil the Kindle 2 in New York on Feb. 9, 2009. (Emmanuel Dunand/AFP via Getty)*

That began to change in 2010, when "The Pedophile's Guide to Love and Pleasure" appeared in the Kindle store. An employee on the content evaluation team, given only a few minutes to check the self-published book for blatant copyright violations, assumed that it was a bizarre joke. He did not have the time to read it, he told us in an interview. If he had, he would have noticed that it described how to approach children and included erotic stories about positive sexual experiences between children and adults. Unsurprisingly, a PR fracas ensued. Amazon removed the book in response to the outcry — then reinstated it and then removed it again in

response to further outcry. The company introduced additional guidelines for sexual content, yet the process was still largely ad hoc, according to the former content reviewer, with decisions made by "a lot of business folks and software engineers" lacking subject-matter expertise. One debate concerned dalliances between relatives in 19th-century novels.

As copyright review has become increasingly automated, Amazon's moderators have spent more time evaluating other criteria for "content appropriateness." Still, several employees noted that the pre-publication review process continues to focus more on illegal or indecent content than on hateful, derogatory or defamatory speech. Authors uploading paperbacks are <u>asked</u> to self-report whether their content is "mature." If the answer is yes, teams stationed in time zones across the globe quickly check the cover, title and keywords for obscenities, sometimes evaluating up to 100 books an hour. "It's a pretty destructive job," said a former Amazonian who worked on Kindle's policy team. "You're seeing stuff you don't want to see."

———————

Amazon describes KDP as a printing service, not a publisher or social network. But Amazon's role is by no means passive. Its recommendation algorithm uses your purchasing, browsing and reading histories to steer you to the books you are most likely to buy, as opposed to what critics have championed or what publishers think you should read. "It actually drives me crazy when I hear Amazon's rhetoric about getting rid of the gatekeepers, because all they've done is replace 1,000 small gatekeepers with one big gatekeeper," said Shel Kaphan, who helped found Amazon and later served as its chief technology officer until 1999. "They use different criteria, but it's no more noble than other people's criteria. In a lot of ways, I'd prefer editorial decisions over a strategy of 'What makes me the most money today?'"

When we tested the recommendations for several of the books discussed in far-right chat rooms, we found that many of Amazon's suggestions reinforced and amplified the given book's political ideology. For instance, the first six recommendations for "Fascism for the Million" — and the subsequent associated recommendations — consist exclusively of defenses of fascism, even for users for whom Amazon has stored no browsing history. (The book, inspired by the remarks of Oswald Mosley, the leader of the British Union of Fascists, was published by a far-right press last year.) What's more, we found that recommendations for far-right books often overlap with and refer back to one another, creating a sort of echo chamber. Curious readers can easily click through several different clusters of books espousing anti-Semitism, nativism, Nazism and white nationalism without encountering a text from an opposing point of view. The search algorithm also groups radical texts together. If shoppers search

for the white-nationalist cult classic "Siege," by James Mason, the third and fourth results shown are for works by Julius Evola, the far-right Italian ideologue cited in a 2014 lecture by Steve Bannon.



*Tom Gauld, special to ProPublica*

Because of her research into far-right groups, Heidi Beirich, the co-founder of the Global Project Against Hate and Extremism, frequently encounters these polarized bubbles while browsing Amazon. "Amazon is pushing readers further down the road to a process of online radicalization and it doesn't need to do that," she told us.

For certain books, Amazon showed us not only what customers have also bought but what's "frequently bought together" — although it appears to have recently disabled the feature. When we browsed a revisionist account of the Auschwitz concentration camp in February, for instance, Amazon suggested combining it with compilations from primary sources: "Goebbels on the Jews" and "Hitler on the Jews." Even after users buy a book and log out, Amazon keeps pushing similar ones by sending promotional emails. When we purchased "The Balk," Roper's book of political essays, Amazon followed up to suggest other works of his, along with a self-published pamphlet by another far-right author that describes "the conspiracy to flood Europe with aliens."

Like other savvy authors, some white supremacists go beyond Amazon's automated assistance to boost sales. One technique is to "category squat" — that is, classify one's books in low-traffic or obscure categories such as "Ancient Greek History" to game their rankings. As a commentator on the 4chan /pol/ forum explained to someone interested in self-publishing on KDP, "If you pick a good niche and the book is good and you understand their search algorithm you can make a lot of money." "Jewish Privilege," by the anti-Semitic commentator E. Michael Jones, is ranked as the 10th-

most-popular book in "LGBT Political Issues," despite being about the alleged evils of Jewish people.

Other authors manipulate their ratings by making their self-published books temporarily free so that readers can "purchase" them and leave a positive review. "ALL of my books are available for FREE in e-book form this week in exchange for an honest review on Amazon later," Roper posted in 2017 on the neo-Nazi message board Stormfront. As a result of this behind-the-scenes lobbying, Berger said, far-right texts often seem to have better reviews than other kinds of books, which may affect how frequently Amazon recommends them. The first installment of Roper's trilogy has 70 reviews and a rating of four out of five stars. Roper even gave the book a five-star review on Goodreads: "I liked it so much that I'm currently working on the sequel!"

---

Amazon appears to take action against far-right texts primarily in response to high-profile complaints. Former Amazon employees have characterized the company's moves as "reactive." They say the company's aversion to policing its bookstore is both philosophical (who are we to judge?) and pragmatic (no automated system could accurately screen the millions of texts uploaded each year at scale).

Nevertheless, Amazon has begun to make some of the hard decisions it had previously avoided. In recent years, it has taken down hundreds of works of Holocaust denial, including a large portion of the catalog of Castle Hill Publishers, a revisionist press. In 2019, it banned several books by Greg Johnson and his white-nationalist publishing house, Counter-Currents. It has also removed works by the alt-right influencer known as Roosh and the Islamophobic author Tommy Robinson, both of whom had self-published through KDP. And in March, following decades of campaigns by Jewish organizations, the retailer blocked editions of "Mein Kampf" sold by third-party merchants or reprinted through KDP; the book can still be purchased directly through Amazon.

When the retailer decides to drop a publisher or remove a book, it offers no explanation, no appeals process and little to no warning. "Amazon will be as ambiguous as possible, and when they terminate or suspend accounts, they will essentially imply, You know what you did and shame on you," said Dale L. Roberts, who hosts a popular YouTube channel about the self-publishing business. Its notice to authors is "very generic copy and paste."

This opacity makes it difficult for authors and readers to know how and why these decisions are made. For instance, while books such as Johnson's "The White Nationalist Manifesto" have been removed from the site, self-published manifestos such as "The Declaration of White Independence" and "Foundations of The 21st Century: The Philosophy of White

Nationalism" remain for sale. We also came across nearly a dozen Holocaust-skeptic books still available on Amazon, including some for sale in Germany, where such texts can be illegal. In response to our questions, Amazon took three of them down. It declined to share information about the number of books it's taken down, its internal policies or how it enforces them.

Amazon's ambiguous guidelines are not without reason. Given the company's prominence in the marketplace, overly broad content restrictions might threaten literary expression as a whole. Louis-Ferdinand Céline, for instance, was a fascist, an anti-Semite and a Holocaust denier; he also wrote "Journey to the End of the Night," which is among the most acclaimed works of French fiction. "Even if a book contains hate speech, it may be that it's quoting other people's hate speech or has other social, historical or literary merit," said Eric Goldman, a leading First Amendment and content-moderation expert. It would be misguided to apply to a book-length essay or novel the same policies that attempt to govern tweets and Facebook posts, he adds.

Hate speech is also notoriously difficult to define. "There's still nothing like consensus about what extremism even is in general, let alone when you get down to what's considered to be a controversial and difficult decision about the whole of a book," Berger said. "Even I, who've studied elements of this, would be hesitant to say that there's any easy recipe to decide what stays and what goes."

Smaller self-publishing companies say they have taken a more proactive stance. Lulu, Smashwords and Kobo all explicitly prohibit authors from self-publishing discriminatory or hateful content through their platforms. Representatives from each company spoke with us about navigating the tension between free expression and fomenting hate. "We don't enjoy acting as a gatekeeper," the Smashwords founder and CEO Mark Coker said. "We don't enjoy serving as arbiter of what's acceptable and what's not. But it's a responsibility we have to take on."

Lulu and Smashwords have banned Roper from using their platforms in recent years. (Roper has not uploaded his works to Kobo.) When Smashwords terminated Roper's account, a representative explained that it was because his work was "advocating hateful, discriminatory or racist views or actions toward others," according to emails shared with us by Smashwords.

Even KDP has taken a second look at Roper's work. Last year, it removed two of the 17 books he's self-published on the platform, both compilations of nonfiction essays and blog posts, stating simply that the books were "in violation of our content guidelines." To Roper, these choices seem arbitrary and misguided, especially because one of the titles taken down, "The Ethnostate," includes a full reprinting of his book "The Balk," which

is still available for purchase. As he sees it, the two prohibited books are the least provocative of his writings. "My novels describe war and violence and bloodshed and death, and even, in a couple of the books, genocide — literal racial genocide — in no uncertain terms," Roper said. But based on its choices, he said, Amazon seems to find his essays more offensive "than me literally typing out 1,000 pages describing races torturing and murdering one another until one or the other become extinct."

In the two last weeks, as more Americans shelter in place to reduce the spread of the coronavirus, Roper said that he's seen a spike in his Amazon sales. He wonders whether it's because his vision of impending social collapse has begun to resonate with more readers. Or perhaps, he said, "people got bored with Netflix."

*Francis Tseng is lead independent researcher at the Jain Family Institute.*

*Moira Weigel is a postdoctoral researcher at the Harvard Society of Fellows.*



**Ava Kofman**

Ava Kofman reports on technology. To send Ava tips, email avak@protonmail.com, or call or Signal 347-410-0113.

✉ Ava.Kofman@propublica.org    🐦 @avakofman

🔒 Signal: 347-410-0113

Exhibit EE



# UNITED STATES OF AMERICA

# The State of Washington

## Secretary of State

**I, SAM REED,** Secretary of State of the State of Washington and custodian of its seal, hereby issue this

## CERTIFICATE OF EXISTENCE/AUTHORIZATION

## OF

## BLUE ORIGIN, LLC

**I FURTHER CERTIFY** that the records on file in this office show that the above named Limited Liability Company was formed under the laws of the State of WA and was issued a Certificate Of Formation in Washington on 9/8/2000.

**I FURTHER CERTIFY** that as of the date of this certificate, BLUE ORIGIN, LLC remains active and has complied with the filing requirements of this office.

Date: September 29, 2006

UBI: 602-064-321



Given under my hand and the Seal of the State of Washington at Olympia, the State Capital

Sam Reed, Secretary of State

200705910114

Exhibit FF



**State of California**
**Secretary of State**

File # 200705910114

FILED *cv*
In the office of the Secretary of State
of the State of California

FEB 0 5 2007

**LIMITED LIABILITY COMPANY**
**APPLICATION FOR REGISTRATION**

A $70.00 filing fee AND a certificate of good standing from an authorized
public official of the jurisdiction of formation must accompany this form.

IMPORTANT – Read instructions before completing this form.     This Space For Filing Use Only

**ENTITY NAME** (End the name in Item 1 with the words "Limited Liability Company," "Ltd. Liability Co." or the abbreviations "LLC" or "L.L.C.")

1. NAME UNDER WHICH THE FOREIGN LIMITED LIABILITY COMPANY PROPOSES TO REGISTER AND TRANSACT BUSINESS IN CALIFORNIA
   Blue Origin, LLC

2. NAME OF THE FOREIGN LIMITED LIABILITY COMPANY, IF DIFFERENT FROM THAT ENTERED IN ITEM 1 ABOVE
   (same name as item 1 above)

**DATE AND PLACE OF ORGANIZATION**

3. THIS FOREIGN LIMITED LIABILITY COMPANY WAS FORMED ON   09 - 08 - 00   IN   Washington
                                                         (MONTH) (DAY) (YEAR)      (STATE OR COUNTRY)
   AND IS AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES IN THAT STATE OR COUNTRY

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and both Items 4 and 5 must be completed. If
the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and
Item 4 must be completed (leave Item 5 blank).

4. NAME OF AGENT FOR SERVICE OF PROCESS   *which will do business in California as*
   Corporation Service Company ~~d/b/a~~/CSC-Lawyers Incorporating Service                    *RBM*

5. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA   CITY   STATE   ZIP CODE
                                                                                            CA

**APPOINTMENT** (The following statement is required by statute and may not be altered.)

6. IN THE EVENT THE ABOVE AGENT FOR SERVICE OF PROCESS RESIGNS AND IS NOT REPLACED, OR IF THE AGENT CANNOT BE FOUND OR
   SERVED WITH THE EXERCISE OF REASONABLE DILIGENCE, THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA IS HEREBY APPOINTED
   AS THE AGENT FOR SERVICE OF PROCESS OF THIS FOREIGN LIMITED LIABILITY COMPANY.

**OFFICE ADDRESSES** (Do not abbreviate the name of the city.)

7. ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE                    CITY AND STATE          ZIP CODE
   21218 - 76th Ave South                                      Kent, Washington        98032-2442

8. ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA, IF ANY         CITY        STATE       ZIP CODE
   (none)                                                                    CA

**EXECUTION**

9. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED

   _____                    10/6/06
   SIGNATURE OF AUTHORIZED PERSON               DATE

   Elizabeth W Korrell                          Authorized Representative of Blue Inc.
   TYPE OR PRINT NAME OF AUTHORIZED PERSON      TITLE OF AUTHORIZED PERSON       its Manager

**RETURN TO** (Enter the name and the address of the person or firm to whom a copy of the filed document should be returned.)

10. NAME    ⌈ Robert Millman                          ⌉
    FIRM       Blue Origin, LLC
    ADDRESS    21218 - 76th Ave South
    CITY/STATE/ZIP ⌊ Kent, WA 98032-2442              ⌋

LLC-5 (REV 03/2005)                                   APPROVED BY SECRETARY OF STATE

Exhibit GG

# STATE of WASHINGTON



# SECRETARY of STATE

*I, RALPH MUNRO,* Secretary of State of the State of Washington and custodian of its seal, hereby issue this

## CERTIFICATE OF FORMATION

to

### BLUE OPERATIONS, LLC

a Washington Limited Liability Company filed for record in this office on the date indicated below.

UBI Number:  602 064 321                    Date:   September 08, 2000



Given under my hand and the Seal of the State of Washington at Olympia, the State Capital



ilph Munro, Secretary of State

2-933864-7



APP

FILED
STATE OF WASHINGTON

SEP 8 2000

RALPH MUNRO
SECRETARY OF STATE

# CERTIFICATE OF FORMATION
## OF
## BLUE OPERATIONS, LLC

The undersigned, for the purpose of forming a limited liability company under Chapter 25.15 of the Revised Code of Washington, hereby executes this Certificate of Formation of Blue Operations, LLC.

## ARTICLE I.  NAME

The name of the limited liability company is Blue Operations, LLC.

## ARTICLE II.  REGISTERED AGENT AND OFFICE

The name of the registered agent of the limited liability company is Lawco of Washington, Inc., and the address of the registered agent of the limited liability company is 1201 Third Avenue, 40th Floor, Seattle, WA 98101-3099.

## ARTICLE III.  PRINCIPAL PLACE OF BUSINESS

The address of the principal place of business of the limited liability company in the State of Washington is 1201 Third Avenue, Suite 4800, Seattle, WA 98101-3099.

## ARTICLE IV.  DURATION

The duration of the limited liability company shall be perpetual.

## ARTICLE V.  MANAGEMENT

The management of the limited liability company shall be vested in one or more managers as provided in the limited liability company agreement.

## ARTICLE VI.  EFFECTIVE DATE OF CERTIFICATE

The effective date of this Certificate of Formation is the date of filing by the Secretary of State of the State of Washington.

## ARTICLE VII. SIGNATORS

This Certificate of Formation is executed by:

Name                    Address

Ian S. Thompson         1201 Third Avenue, Suite 4800
                        Seattle, WA 98101-3099

Dated: September 8, 2000.

Ian S. Thompson *execut*

Exhibit HH

WIKIPEDIA

# List of assets owned by NBCUniversal

**NBCUniversal Media, LLC** is a media conglomerate that is a subsidiary of Comcast and is headquartered at the Comcast Building in Midtown Manhattan, New York City.[1] It has film, television, cable networks, and publishing operations.

This is a listing of all of its brands, as shown at the company's website.

## NBCUniversal

The logo for Comcast's subsidiary NBCUniversal, in use since January 31, 2011.

## Contents

**NBCUniversal Television and Streaming**

**NBCUniversal News Group**

**NBCUniversal Content Studios**

**Universal Parks and Resorts**

**Universal Filmed Entertainment Group**

**Former assets**
    Divested
    Dormant or shuttered

**See also**

**References**

**External links**

# NBCUniversal Television and Streaming

- NBCUniversal Television Distribution
- International Media Distribution
- EMKA, Ltd.

### NBC Entertainment

- NBC - National Broadcasting Company
- NBC Studios
- Universal Television Alternative Studio

### NBCUniversal Telemundo Enterprises

- Telemundo
- Universo
- Telemundo of Puerto Rico Studios
- Telemundo Studios

Case 3:20-cv-01596-VC   Document 42   Filed 08/25/20   Page 235 of 328
List of assets owned by NBCUniversal - Wikipedia

- Underground Producciones
- Telemundo Internacional
- Telemundo Films[2]

## NBCUniversal Owned Television Stations

- Affiliate Relations
- NBC Owned Television Stations
  - Cozi TV
  - K15CU-D 15 – Salinas
  - KNBC 4 – Los Angeles
  - KNSD 39 (cable 7) – San Diego²
  - KNTV 11 – San Jose/San Francisco
  - KXAS 5 – Dallas/Fort Worth²
  - LXTV
  - NECN
  - WBTS-CD – Boston
  - WCAU 10 – Philadelphia
  - WMAQ 5 – Chicago
  - WNBC 4 – New York
  - WRC 4 – Washington
  - WTVJ 6 – Miami
  - WVIT 30 – Hartford
- Telemundo Station Group
  - KBLR – Las Vegas
  - KCSO – Sacramento
  - KDEN-TV – Longmont, Colorado
  - KHRR – Tucson
  - KNSO – Fresno
  - KSTS – San Jose/San Francisco
  - KTAZ – Phoenix
  - KTDO – El Paso
  - KTMD – Houston
  - KTMW – Salt Lake City
  - KUAN – San Diego
  - KVDA – San Antonio
  - KVEA – Los Angeles
  - KXTX – Dallas/Fort Worth
  - TeleXitos
  - WKAQ – Puerto Rico
  - WNEU – Boston/Merrimack
  - WNJU – New York
  - WRDM – Hartford
  - WRIW – Providence

List of assets owned by NBCUniversal - Wikipedia

- WRMD – Tampa
- WSCV – Miami
- WSNS – Chicago
- WTMO – Orlando
- WZDC – Washington
- Skycastle Entertainment

**NBC Sports Group**

- Golf Channel
- MLB Network (5.44%) joint venture with Major League Baseball and other providers
- NBC Olympics, LLC
  - NBC Olympic broadcasts
  - Olympic Channel
- NBC Sports
- NBCSN
- NHL Network (United States) (15.6%) joint venture with National Hockey League
- SportsEngine
- Telemundo Deportes
- NBC Sports Regional Networks
  - NBC Sports Bay Area (45%)
  - NBC Sports California
  - NBC Sports Chicago (20%)
  - NBC Sports Washington
    - NBC Sports Washington+
  - NBC Sports Boston
  - NBC Sports Northwest
  - NBC Sports Philadelphia
    - NBC Sports Philadelphia+
  - SportsNet New York (8%) joint venture with the New York Mets and Charter Communications
  - NBC Sports Films
- NBC Sports Digital
  - Playmaker Media
  - Allstar Stats LLC.
    - Rotoworld
  - Revolution Golf[3]
  - GolfPass[4][5]
  - NBC Sports Gold
  - GolfNow
  - NBC Sports Digital Network
- NBC Sports Ventures LLC.

Case 3:20-cv-01596-VC    Document 92   Filed 08/25/20   Page 237 of 328

- Alli Sports
- NBC Sports Radio
- World Long Drivers Association[6]

  - World Long Drive Championships
- American Century Championship[7]
- Father/Son Challenge (With IMG)
- National Dog Show
- Beverly Hills Dog Show[7]
- All-American Bowl[7][8]

## NBCUniversal Cable Entertainment Group

- E! Studios

  - Wilshire Studios, reality studio
- Entertainment Networks

  - Syfy
  - USA
- Lifestyle Entertainment Group

  - Bravo
  - E!
  - Oxygen
  - Universal Kids

## NBCUniversal Digital Enterprises

- Fandango (70%, joint venture with WarnerMedia)

  - FandangoNow (formerly M-GO)
  - Fandango Movieclips
  - Rotten Tomatoes
  - Fandango Latam
  - Movies.com
  - MovieTickets.com
  - Vudu[9][10][11]
- Stakes:

  - Snap
  - BuzzFeed
  - Vox Media

## Direct-to-Consumer

- Hayu
- Bluprint
- Hulu (33%, stake can be sold to The Walt Disney Company from January 2024)[12][13][14]

Case 3:20-cv-01596-VC    Document 92    Filed 08/25/20    Page 238 of 328

- Hulu Documentary Films
- Integrated Media Group
- Peacock
- PictureBox Films

**NBCUniversal International Networks**

- Universal TV
  - Latin America (operated and distributed by HBO Latin America Group)
  - Brazil (joint venture with Globosat (50%), distributed by Globosat)
  - United Kingdom and Ireland
  - Asia
    - Japan
    - Philippines
    - Turkey
- Syfy
  - Latin America (operated and distributed by HBO Latin America Group)
  - Brazil (joint venture with Globosat (50%), distributed by Globosat)
  - Sci Fi (Poland)
  - Sci Fi (Serbia)
  - Sci Fi (Slovenia)
- 13th Street Universal
  - 13th Street (Australia)
  - 13ème Rue Universal
  - 13th Street (Germany)
  - Calle 13 (Spain)
- Movies 24
  - Eastern Europe
  - Russia and Moldova
  - Movies 24+
- E! (Europe)
- E! (Asia)
- E! (Australia)
- Studio Universal
  - Latin America (operated and distributed by HBO Latin America Group)
  - Brazil (joint venture with Globosat (50%), distributed by Globosat)
- Diva
- Style Network (Australia)
- DreamWorks Channel

# NBCUniversal News Group

List of assets owned by NBCUniversal - Wikipedia

- CNBC
  - CNBC World
  - CNBC Latin America
  - CNBC Africa
  - CNBC Asia
  - CNBC Europe
  - CNBC Arabiya
  - CNBC TV18 (joint venture with Network 18)
  - CNBC Awaaz (joint venture with Network 18)
  - Nikkei CNBC (joint venture with The Nikkei and TV Tokyo)
  - SBS CNBC (joint venture with SBS Media Holdings)
  - CNBC Indonesia (joint venture with Trans Media)
  - Class CNBC (joint venture with Class Editori and Mediaset)
  - JKN-CNBC (licensed to JKN Global Media)
- NBC News
- MSNBC
- NBCNews.com
- NBCUniversal Archives

## NBCUniversal Content Studios

- Universal Television
  - SNL Studios (With Lorne Michaels)
- Universal Content Productions
  - UCP Audio (2020)[15]
- NBCUniversal International Studios
  - Chocolate Media (UK)
  - Lark Productions (Canada)
  - Lucky Giant (UK)[16]
  - Monkey Kingdom (UK)[17]
  - Matchbox Pictures (Australia)[18]

## Universal Parks and Resorts

- Universal Studios Hollywood[19]
- Universal Orlando Resort[20]
- Universal Studios Japan[21]
- Universal CityWalk
- Universal Studios Singapore.[22]
- Universal Creative
  - Universal Operations Group

List of assets owned by NBCUniversal - Wikipedia

# Universal Filmed Entertainment Group

- Universal Pictures
- Illumination
  - Illumination Mac Guff
- DreamWorks Animation
  - DreamWorks Animation Television
  - DreamWorks Classics
    - Big Idea Entertainment
    - Bullwinkle Studios (50%, joint venture with Jay Ward Productions)
    - Harvey Entertainment (name-only unit)
  - DreamWorks Live Theatrical Productions
  - DreamWorks New Media
    - DreamWorksTV
  - DreamWorks Press
- Focus Features
- Amblin Partners (minority stake; joint venture with The Amblin Group, Participant Media, Reliance Entertainment, Entertainment One, and Alibaba Pictures)[23]
  - DreamWorks Pictures
  - Amblin Entertainment
  - Amblin Television
- Working Title Films
  - WT$^2$ Productions
  - Working Title Television
- Carnival Films
- Universal Animation Studios
- Universal Pictures Home Entertainment
  - Universal Home Entertainment Productions
  - Universal 1440 Entertainment
  - DreamWorks Animation Home Entertainment
  - Universal Sony Pictures Home Entertainment Australia (joint venture with Sony Pictures Home Entertainment)
  - Universal Playback
- United International Pictures (50%, joint venture with ViacomCBS's Paramount Pictures)
- Rede Telecine (10%, joint venture with Globosat, Disney, Paramount Pictures and Metro-Goldwyn-Mayer)
- Universal Pictures International Entertainment
  - NBCUniversal Entertainment Japan
    - Paramount Home Media Distribution Japan
- Back Lot Music

List of assets owned by NBCUniversal - Wikipedia

- OTL Releasing
- Universal Brand Development

# Former assets

## Divested

- A&E Networks (15.8%, with The Walt Disney Company and Hearst)
  - A&E
  - Crime & Investigation Network
  - FYI (formerly The Biography Channel)
  - The History Network
    - History en Español
    - Military History Channel
  - Lifetime
    - LMN (formerly Lifetime Movie Network)
    - LRW (formerly Lifetime Real Women)
- American Movie Classics
- AwesomenessTV: sold to Viacom
- CIC Video: Paramount Home Entertainment acquired Universal's stake in the company and absorbed it in 1999
- Comcast SportsNet Houston
- Court TV
- Das Vierte
- Euronews (25%) - NBCUniversal sold its stake to other stakeholders
- ITC Entertainment: acquired as part of Seagram's purchase of PolyGram in 1998, then sold to Carlton Communications in 1999
- Qubo (with Ion Media Networks, Scholastic Entertainment, Classic Media and Corus Entertainment): A children's programming block launched in 2006. In 2012, NBC and Telemundo discontinued their Qubo blocks after Comcast acquired NBCUniversal.
- Rogue Pictures: sold to Relativity Media in 2009
- ShopNBC
- Sundance Channel
- TV One (50% joint venture with Radio One)
- Universal Music Group: retained by Vivendi following the merger of NBC and Universal in 2004
- Vivendi Universal Games: retained by Vivendi following the merger of NBC and Universal, then merged with Activision in 2008 to form Activision Blizzard
- The Weather Company – with private equity firms Bain Capital and The Blackstone Group: Originally a parent company of The Weather Channel. In January 2016, it was acquired by IBM.
- The Weather Channel – with private equity firms Bain Capital and The Blackstone Group: sold to Entertainment Studios.

## Dormant or shuttered

Case 3:20-cv-01596-VC   Document 92   Filed 08/25/20   Page 242 of 328

- American Sports Classics
- Anime Selects
- AZN Television: TV channel focused on Asian and Asian-American culture; formerly known as International Channel from its foundation in 1996 to 2005; shut down in 2008
- Chiller
    - Chiller Films
- Cloo
- The Comcast Network
- Comcast/Charter Sports Southeast (with Charter Communications)
- Comcast Sports Southwest
- Esquire Network
- Fearnet (with Lions Gate Entertainment and Sony Pictures Entertainment)
- MountainWest Sports Network (controlling stake)
- NBC Weather Plus
- NewSport
- Peacock Productions[24]
    - TOMORROW[25]
- Sky Vision
- SportsChannel
- Station Venture Holdings (79.62% with LIN Media)
- Television Without Pity: ceased its operations in May 31, 2014; relaunched under Tribune Media in 2016 later closed in 2017
- Trio
- Universal Sports Network (8% with InterMedia Partners)
- USA Cable Entertainment: folded into NBC Universal Television Studio in 2004
- G4 Media (88%, with Dish Network)
    - G4
- MCA TV
    - MTE
- Multimedia Entertainment: acquired by Universal Television in 1996
    - Multimedia Motion Pictures
- NBC Enterprises
    - NBC International Ltd.
- PolyGram Television
- DailyCandy
- iVillage
- Seeso
- Shift
- Chapman Entertainment: acquired by DreamWorks Animation in 2013
- Entertainment Rights
    - Carrington Productions International

Case 3:20-cv-01596-VC    Document 02   Filed 08/25/20   Page 243 of 328

- Link Entertainment
- Tell-Tale Productions

- FilmDistrict: folded into Focus Features in 2014

  - High Top Releasing

- Golden Books Family Entertainment: acquired by Classic Media in 2001

  - CST Entertainment
  - Shari Lewis Enterprises
  - Total Television

- Good Machine: sold to Universal Pictures and merged into Focus Features
- Gramercy Pictures
- October Films: merged into USA Films, which was later merged into Focus Features
- Optical Programming Associates: joint venture between Magnavox, MCA Videodisc, and Pioneer Video
- PolyGram Filmed Entertainment

  - Associated Film Distribution
  - PolyGram Pictures
  - Propaganda Films

- Savoy Pictures: library acquired by Focus Features in 2006
- Universal Eight
- UPA: acquired by Classic Media in 2000
- USA Home Entertainment
- Walter Lantz Productions: sold to MCA Inc. in 1984
- Diva TV
- KidsCo (51% with Corus Entertainment)
- Hallmark Channel International
- Premium Movie Partnership (with Sony Pictures Entertainment, ViacomCBS, News Corporation and Liberty Global)

  - Showtime Australian movie channels
  - Showcase
  - Showtime Greats

- Steel
- TV1 General Entertainment Partnership (with Sony Pictures Television and CBS Studios International)

  - TV1
  - SF

- Wet 'n Wild Orlando: closed on December 31, 2016 and replaced by Volcano Bay.

# See also

- Lists of corporate assets

# References

# Exhibit II

**WIKIPEDIA**

# MSNBC

**MSNBC** is an American news-based pay television cable channel, owned by the NBCUniversal Worldwide News Group division of NBCUniversal (all of which are ultimately owned by Comcast). It provides NBC News coverage as well as its own reporting and political commentary on current events.

MSNBC and its website were founded in 1996 under a partnership between Microsoft and General Electric's NBC unit, hence the network's naming.[3] Although they had the same name, msnbc.com and MSNBC maintained separate corporate structures and news operations. msnbc.com was headquartered on the Microsoft campus in Redmond, Washington, while MSNBC operated out of NBC's headquarters in New York City. Microsoft divested itself of its stakes in the MSNBC channel in 2005 and in msnbc.com in July 2012. The general news site was rebranded as NBCNews.com, and a new msnbc.com was created as the online home of the cable channel.[4]

In the late summer of 2015, MSNBC revamped its programming; the moves were in sharp contrast to previous programming decisions at the network. MSNBC sought to sharpen its news image by entering into a dual editorial relationship with its organizational parent NBC News. *MSNBC Live*, the network's flagship daytime news platform, was expanded to cover over eight hours of the day.[5] Phil Griffin is the president and director of day-to-day operations at MSNBC.[6] On June 29, 2015, MSNBC launched a 1080i high-definition feed.[7]

As of September 2018, approximately 87 million households in the United States (90.7 percent of pay television subscribers) were receiving MSNBC.[8] In 2019, MSNBC ranked second among basic cable networks averaging 1.8 million viewers, behind rival Fox News.[9][10][11]

| MSNBC | |
|---|---|
| **MSNBC** | |
| **Launched** | July 15, 1996 |
| **Owned by** | NBCUniversal Worldwide News Group |
| **Picture format** | 1080i HDTV (downscaled to letterboxed 480i for the SDTV feed) |
| **Slogan** | *This is who we are*[1] |
| **Country** | United States |
| **Language** | English |
| **Broadcast area** | United States |
| **Headquarters** | 30 Rockefeller Plaza New York City, New York |
| **Replaced** | America's Talking (1994–1996) MSNBC Canada (in Canada) |
| **Sister channel(s)** | CNBC CNBC World NBC NBCSN E! Golf Channel USA Network Syfy Bravo Sky News Oxygen |
| **Website** | www.msnbc.com (http://www.msnbc.com) |
| **Availability** | |
| **Terrestrial** | |

## Contents

History
    Development
    Early history
    2008–2015
    Return to hard news and alignment with NBC News: since 2015

**Carriage issues**

**MSNBC International**

**Online**
    Shift

**Radio**

**Criticism and controversy**
    Liberal bias
        Favoritism towards Barack Obama
        *Rise of the New Right* documentary
        Romney coverage during 2012 election
    Romney family grandchild
    Coverage of the 2020 Democratic Primary
    Suspensions of hosts
        Michael Savage
        Don Imus
        Keith Olbermann and Joe Scarborough
        Martin Bashir
        Alec Baldwin

**References**

**Sources**

**External links**

# History

## Development

MSNBC was established under a strategic partnership between NBC and Microsoft. NBC executive Tom Rogers was instrumental in developing this partnership. James Kinsella, a Microsoft executive, served as president of the online component, MSNBC.com, and represented the tech company in the joint venture.[12] Microsoft invested $221 million for a 50 percent share of the cable channel.[13] MSNBC and Microsoft shared the cost of a $200 million newsroom in Secaucus, New Jersey, for msnbc.com. The network took over the channel space of NBC's 2-year-old America's Talking (AT) network, although in most cases cable carriage had to be negotiated with providers who had never carried AT.

## Early history

| | |
|---|---|
| **Digital terrestrial television** | Channel 20.4 (Alexandria, Minnesota) |
| **Satellite** | |
| **DirecTV** | Channel 356 (SD) Channel 1356 (HD) |
| **Bell TV** (Canada) | Channel 1588 (HD) |
| **Shaw Direct** (Canada) | Channel 511 |
| **Cable** | |
| **Available on most cable providers** | Channel slots vary on each operator |
| **Satellite radio** | |
| **Sirius/XM** | Channel 118[2] |
| **IPTV** | |
| **AT&T U-verse / CenturyLink** | Channel 215 (SD) Channel 1215 (HD) |
| **Bell Aliant TV** (Canada) | Channel 243 |
| **Bell Fibe TV** (Canada) | Channel 1506 |
| **Google Fiber** | Channel 103 |
| **TELUS TV** (Canada) | Channel 97 |
| **Verizon FiOS** | Channel 103 (SD) Channel 603 (HD) |
| **VMedia** (Canada) | 185 (SD) |
| **Fetch** (Australia) | Channel 171 |
| **Streaming media** | |
| **fuboTV** | Live Stream (https://www w.fubo.tv/lp/nbcnews/?ti tle=Watch%20MSNBC &sr=watchLiveHPbutto n) |
| **DirecTV Now** | Internet Protocol television |

MSNBC was launched on July 15, 1996. The first show was anchored by Jodi Applegate and included news, interviews, and commentary.[14] During the day, rolling news coverage continued with *The Contributors*, a show that featured Ann Coulter and Laura Ingraham, as well as interactive programming coordinated by Applegate, John Gibson, and John Seigenthaler. Stories were generally longer and more detailed than the stories CNN was running. NBC also highlighted their broadcast connections by airing stories directly from NBC's network affiliates, along with breaking news coverage from the same sources.[15]

| Sling TV | Internet Protocol television |
| YouTube TV | Internet Protocol television |



MSNBC's most well known logo used from 1996 until 2009. The "N" in the logo was changed from red to black in 2002. This variant has occasionally been used after 2006 as an alternative logo in a horizontal form.

MSNBC gradually increased its emphasis on politics.[16] After completing its seven-year survey of cable channels, the Project for Excellence in Journalism said in 2007 that, "MSNBC is moving to make politics a brand, with a large dose of opinion and personality."[17]

In January 2001, Mike Barnicle's MSNBC show started, but it was canceled in June 2001 because of high production costs.[18] In June, Microsoft chief executive officer Steve Ballmer said that he would not have started MSNBC had he foreseen the difficulty of attracting viewers.[19]

After the September 11, 2001 attacks, NBC used MSNBC as an outlet for the up-to-the-minute coverage being provided by NBC News as a supplement to the longer stories on broadcast NBC. With little financial news to cover, CNBC and CNBC Europe ran MSNBC for many hours each day following the attacks. The year also boosted the profile of Ashleigh Banfield, who was present during the collapse of Building 7 while covering the World Trade Center on September 11.[20] Her *Region In Conflict* program capitalized on her newfound celebrity and showcased exclusive interviews from Afghanistan.[21]

In the aftermath of September 11, MSNBC began calling itself "America's NewsChannel" and hired opinionated hosts like Alan Keyes, Phil Donahue, Pat Buchanan, and Tucker Carlson;[22] This branding makeover, however, was followed by declining ratings.[23]

On December 23, 2005, NBC Universal announced its acquisition of an additional 32 percent share of MSNBC from Microsoft,[24] which solidified its control over television operations and allowed NBC to further consolidate MSNBC's backroom operations with NBC News and its other cable properties. (The news website msnbc.com remained a separate joint venture between Microsoft and NBC for another seven years.) NBC later exercised its option to purchase Microsoft's remaining 18 percent interest in MSNBC.

In late 2005, MSNBC began attracting liberal and progressive viewers as Keith Olbermann began critiquing and satirizing conservative media commentators during his *Countdown With Keith Olbermann* program. He especially focused his attention on the Fox News Channel and Bill O'Reilly, its principal primetime commentator.

On June 7, 2006, Rick Kaplan resigned as president of MSNBC after holding the post for two years.[25] Five days later, Dan Abrams, a nine-year veteran of MSNBC and NBC News, was named general manager of MSNBC with immediate effect. NBC News senior vice president Phil Griffin would oversee MSNBC while continuing to oversee NBC News' *Today* program, with Abrams reporting to Griffin.

On June 29, 2006, Abrams announced the revamp of MSNBC's early-primetime and primetime schedule. On July 10, _Tucker_ (formerly _The Situation with Tucker Carlson_) started airing at 4 p.m. and 6 p.m. ET (taking over Abrams' old timeslot), while Rita Cosby's _Live & Direct_ was canceled. Cosby was made the primary anchor for _MSNBC Investigates_ at 10 and 11 p.m. ET, a new program that took over Cosby and Carlson's timeslots. According to the press release, _MSNBC Investigates_ promised to "complement MSNBC's existing programming by building on [the channel's] library of award-winning documentaries."[26] The move to taped programming during 10 and 11 p.m. probably resulted from MSNBC's successful Friday "experiment" of replacing all primetime programming with taped specials.

On September 24, 2007, Abrams announced that he was leaving his general manager position so he could focus on his 9:00 p.m. ET talk show, _Live With Dan Abrams_. Oversight of MSNBC was shifted to Phil Griffin, a senior vice president at NBC.[27]

MSNBC and NBC News began broadcasting from their new studios at NBC's 30 Rockefeller Center complex in New York City on October 22, 2007.[28] The extensive renovations of the associated studios allowed NBC to merge its entire news operation into one building. All MSNBC broadcasts and _NBC Nightly News_ originate from the new studios. More than 12.5 hours of live television across the NBC News family originate from the New York studios daily. MSNBC also announced new studios near the Universal Studios lot.[29] MSNBC's master control did not make the move to 30 Rock. It remained in the old Secaucus headquarters until it completed its move to the NBC Universal Network Origination Center located inside the CNBC Global Headquarters building in Englewood Cliffs, New Jersey, on December 21, 2007. Shortly thereafter, Major League Baseball firmed up a long-term lease of the former MSNBC building to become the home studios of MLB Network, which launched from the facility on January 1, 2009.[30]


MSNBC's studio in NYC


The MSNBC studio

## 2008–2015

From mid-2007 to mid-2008, MSNBC enjoyed a large increase in its Nielsen ratings.[31] Primetime viewings increased by 61 percent.[31] In May 2008, NBC News president Steve Capus said, "It used to be people didn't have to worry about MSNBC because it was an also-ran cable channel.... That's not the case anymore."[31] Tim Russert's sudden death in June 2008 removed what _The Wall Street Journal_ called the "rudder for the network" and led to a period of transition.[32]


MSNBC logo used from 2009 to 2015; the current logo is a variant of this design.

During the 2008 presidential election, MSNBC's coverage was anchored by Olbermann, Chris Matthews, and David Gregory. They were widely viewed as the face of the channel's political coverage.[32] During the first three months of the presidential campaign, MSNBC's ratings grew by 158 percent.[33] Olbermann and Matthews, however, were criticized for expressing left-leaning opinions on the channel. Both were later removed from their anchor positions.[34] Audience viewership during the 2008 presidential campaign more than doubled from the 2004 presidential election, and the channel topped CNN in ratings for the first time during the last three months of the campaign in the key 25–54 age demographic.[35][36]

In September 2008, the channel hired political analyst and Air America Radio personality Rachel Maddow to host a new political opinion program called *The Rachel Maddow Show*. The move to create a new program for the channel was widely seen as a smart ratings move, where beforehand, MSNBC lagged behind in coveted primetime ratings.[37] The show regularly outperformed CNN's *Larry King Live*, and made the channel competitive in the program's time slot for the first time in over a decade.[38][39]

In the first quarter of 2010, MSNBC beat CNN in primetime and overall ratings, marking the first time doing so since 2001.[40] The channel also beat CNN in total adult viewers in March, marking the seventh out of the past eight months that MSNBC achieved that result.[40] In addition, the programs *Morning Joe*, *The Ed Show*, *Hardball with Chris Matthews*, *Countdown with Keith Olbermann*, and *The Rachel Maddow Show* finished ahead of their time slot competitors at CNN.[40][41]

In the third quarter of 2010, MSNBC continued its solid lead over CNN, beating the network in total day for the first time since the second quarter of 2001 in the key adult demographic.[42] The network also beat CNN for the fourth consecutive quarter, among both primetime and total viewers, as well as becoming the only cable news network to have its key adult demographic viewership grow over the last quarter, increasing by 4 percent. During this time, MSNBC also became the number-one cable news network in primetime among both African American and Hispanic viewers.[42]

On October 11, 2010, MSNBC unveiled a new televised advertising campaign and slogan called "Lean Forward". "We've taken on CNN and we beat them," MSNBC president Phil Griffin told employees at a series of celebratory "town hall" meetings. "Now it's time to take on Fox." Concerning the campaign, Griffin said, "It is active, it is positive, it is about making tomorrow better than today, a discussion about politics and the actions and passions of our time."[43] The new campaign embraces the network's politically progressive identity.[44] The two-year advertising campaign would cost $2 million and consist of internet, television, and print advertising.[43] The new positioning has created brand image issues for msnbc.com, the umbrella website for the television network. A *New York Times* article quotes Charlie Tillinghast, president of msnbc.com, a separate company, as saying, "Both strategies are fine, but naming them the same thing is brand insanity."[45] As a result, msnbc.com eventually changed its name to prevent confusion with the television network, MSNBC;[45] it rebranded the more news-driven msnbc.com as NBCNews.com in July 2012.[46]

On January 21, 2011, Olbermann announced his departure from MSNBC and the episode would be the final episode of *Countdown*.[47][48] His departure received much media attention.[49][50][51] MSNBC issued a statement that it had ended its contract with Olbermann, with no further explanation. Olbermann later revealed that he had taken his show to Current TV.[52]

During 2014, MSNBC's total ratings in the 25 to 54 age group declined 20 percent, falling to third place behind CNN. The only demographic in which MSNBC still led was among Hispanics and even more so among African-Americans.[53]

## Return to hard news and alignment with NBC News: since 2015

To help revive the struggling network, MSNBC in the summer of 2015 started transitioning from left-leaning, opinionated programming to hard news programming. Nearly all daytime opinionated news programs were replaced with more generic news programs. Ronan Farrow, Joy-Ann Reid, Krystal Ball, Touré, Abby Huntsman, Alex Wagner, Ed Schultz, and Al Sharpton lost their shows. News programs presented by established NBC News personalities such as Telemundo anchor Jose Diaz-Balart, *Meet the Press* anchor Chuck Todd, Sunday NBC Nightly News anchor Kate Snow, Thomas Roberts, and former

NBC Nightly News anchor Brian Williams replaced the opinion shows.[54] The revamped on-air presentation debuted in late summer 2015 and included a new logo, news ticker, and graphics package.[55][56] *MSNBC Live* had at least eight hours of programming each day, barring any breaking news that could extend its time. Daytime news coverage was led primarily by Brian Williams, Stephanie Ruhle, Jose Diaz-Balart, Andrea Mitchell, Craig Melvin, Thomas Roberts, and Kate Snow, in addition to "beat leaders" stationed throughout the newsroom. These included chief legal correspondent Ari Melber, primary political reporter Steve Kornacki, business and finance correspondent Olivia Sterns, and senior editor Cal Perry. Morning and primetime programming did not change and remained filled mostly by opinionated personalities.[57][58]

In April 2016, MSNBC launched a promotional ad campaign with the theme, "in order to know beyond, you have to go beyond." The campaign portrayed MSNBC's reporting and perspectives as "in depth" and an alternative to "talking points" coverage on other cable news outlets.[59]

In July 2016, the network debuted *Dateline Extra*, which was an abridged version of *Dateline NBC* and another step towards aligning MSNBC and NBC News. The new program was hosted by *MSNBC Live* anchor Tamron Hall.[60]

In September 2016, MSNBC launched *The 11th Hour with Brian Williams* as a nightly wrap-up of the day's news and a preview of the following day's headlines. This was MSNBC's first new primetime program in nearly four years.

In January 2017, MSNBC debuted a program in the 6 pm EST hour entitled *For the Record with Greta*, hosted by former Fox News Channel anchor Greta Van Susteren.[61] The program aired for six months before being cancelled in late June 2017. The network promoted Chief legal Correspondent Ari Melber to host *The Beat with Ari Melber* at 6pm.

In March 2017, MSNBC started rebranding its daytime shows as "NBC News" programs. The network logos started appearing on show opens, within the set design, and in commercials.[62] In May 2017, MSNBC launched a 4pm afternoon program entitled *Deadline: White House* and hosted by former White House communications director and NBC political analyst Nicolle Wallace.

For the first time, MSNBC in May 2017 became the highest rated American cable news network in primetime. MSNBC's increasing viewership was accompanied by declining numbers at Fox News Channel. MSNBC's May 15–19 programming topped the programming of both CNN and Fox News in total viewers and the advertiser-coveted younger demographic.[63][64]

Another significant change was made on April 16, 2018, when MSNBC completely removed the news ticker at the bottom of the screen on every program, citing the reason "for a cleaner view that puts our reporting more front and center ... and we want viewers to get the best possible experience". At the time of the change, CNN is still running the news ticker during live programming (although its sister network HLN does not), meanwhile Fox News only scraps the news ticker during daytime news programs.[65]

On March 2, 2020, Chris Matthews abruptly announced his resignation from *Hardball* effective immediately. The 7 p.m. hour was hosted by rotating anchors until July 20, when it was replaced by *The ReidOut*, a new evening program hosted by Joy Reid.[66][67]

# Carriage issues

Before 2010, MSNBC was not available to Verizon FiOS and AT&T U-verse television subscribers in the portions of New York State, northern New Jersey, and Connecticut that overlapped Cablevision's service area. One of several reasons for this was an exclusive carriage agreement between MSNBC and Cablevision that prohibited competing wired providers from carrying MSNBC.[68] The terms of the agreement were not publicly known.



In 2009, Verizon filed a formal "program-access complaint" with the Federal Communications Commission and petitioned for termination of the deal. In support of Verizon, Connecticut Attorney General Richard Blumenthal argued that the arrangement could be illegal.[69] After entering into a new contract, FiOS added the channel in New York City and New Jersey on February 2, 2010.[70]

MSNBC's former New Jersey headquarters studio, now the home of MLB Network

# MSNBC International



The monitors of the MSNBC newsroom are tuned into various global channels.

In southern Africa, MSNBC is distributed free-to-air on satellite on Free2View TV as MSNBC Africa, a joint venture between Great Media Limited and MSNBC. Free2View airs MSNBC's programming from 4 p.m. to midnight ET in a block that repeats twice (live for the first airing), with local Weather Channel forecasts.[71]

In Asia and Europe, MSNBC is not shown on a dedicated channel. When MSNBC started in 1996, they announced plans to start broadcasting in Europe during 1997. This never happened although MSNBC was seen occasionally on affiliate channel CNBC Europe until the end of the 2000s, showing the channel overnight at the weekend and during the afternoon on American public holidays as well as during breaking news events.

In Turkey, NTV-MSNBC is the news channel of the Turkish broadcaster NTV Turkey. The channel is a joint partnership between the two, although very little Turkish content is shown on English MSNBC. English content on MSNBC is translated into Turkish.[72]

# Online



MSNBC celebrated its 10th anniversary in 2006.

MSNBC and its website msnbc.com were launched concurrently. Unlike the network, msnbc.com was operated as the general online news outlet of NBC News in partnership with Microsoft's MSN.com portal. The network and website also remained editorially separate. The website



NBCNews.com's main newsroom in Redmond, Washington, 2007

did not adopt the network's increasingly liberal viewpoints and remained a joint venture with Microsoft even after it had sold its

stake in MSNBC.[73]

In July 2012, NBC acquired Microsoft's remaining stake in msnbc.com and re-branded it as NBCNews.com. After being redirected to the new name for a period, msnbc.com was re-launched in 2013 as the website for MSNBC. The website included opinion columns from hosts, correspondents, and guests, along with live and on-demand videos from MSNBC programs.[46][74]



NBCNews.com's newsroom in New York City, 2007

### Shift

In July 2014, msnbc.com launched *msnbc2*, a brand for several web-only series hosted by MSNBC personalities.[75] In December 2014, msnbc2 was renamed *shift*, with a programming schedule that was less focused on politics and more tailored to a younger audience.[76]

# Radio

MSNBC launched on XM Satellite Radio channel 120 and Sirius Satellite Radio channel 90 on April 12, 2010.[2] This is the second time MSNBC has been available on satellite radio. The channel was dropped from XM Radio on September 4, 2006.[77]

The simulcast of MSNBC's programming is on SiriusXM channel 118.[78]

# Criticism and controversy

### Liberal bias

In November 2007, a *New York Times* article stated that MSNBC's primetime lineup was tilting more to the left.[79] Since then, commentators have argued that MSNBC has a bias towards left-leaning politics and the Democratic Party. Fox News media analyst Howard Kurtz, while previously in the same role at *The Washington Post*, stated that the channel's evening lineup "has clearly gravitated to the left in recent years and often seems to regard itself as the antithesis of Fox News."[31] In 2011, *Politico* referred to MSNBC as "left-leaning",[80] and Steve Kornacki of *Salon.com* noted that, "MSNBC's prime-time lineup is now awash in progressive politics."[81] Regarding changes in the channel's evening programming, senior vice president of NBC News Phil Griffin claimed that "it happened naturally. There isn't a dogma we're putting through. There is a 'Go for it.'"[79]

In the February 2008 issue of *Men's Journal* magazine, an MSNBC interviewee quoted a senior executive as saying that liberal commentator Keith Olbermann "runs MSNBC" and that "because of his success, he's in charge" of the channel.[82] In 2007, *The New York Times* called Olbermann MSNBC's "most recognizable face".[79] In September 2008, MSNBC stated that Olbermann and Chris Matthews would no longer anchor live political events, with David Gregory assuming that role. MSNBC cited the growing criticism that they were "too opinionated to be seen as neutral in the heat of the presidential campaign."[83][84] Olbermann's show *Countdown* continued to run before and after the presidential and vice presidential debates, and both Matthews and Olbermann joined Gregory on the channel's election night coverage.

On November 13, 2009, in the days leading up to the release of 2008 Republican vice presidential candidate Sarah Palin's book *Going Rogue*, MSNBC's Dylan Ratigan used photoshopped pictures of Palin on the channel's *Morning Meeting* program. Ratigan apologized a few days later.[85]

In October 2010, MSNBC began using the tagline "Lean Forward". Some media outlets, including msnbc.com, claimed that the network was now embracing its politically progressive identity.[44][86][87]

In January 2012, MSNBC used Rachel Maddow, Chris Matthews, and other network commentators during its coverage of the Iowa Republican caucuses. Nando Di Fino of the Mediaite website said MSNBC was "giving up on the straight news coverage, and instead [appearing] to be aiming to create some controversy."[88]

In November 2012, *The New York Times* called MSNBC "The Anti-Fox" and quoted former President Bill Clinton as saying, "Boy, it really has become our version of Fox."[89] Citing data from the A.C. Nielsen TV ratings service, the article noted that while the Fox News Channel had a larger overall viewership than MSNBC, the two networks were separated by only around 300,000 viewers among the 25–54 age bracket most attractive to advertisers.

In the Pew Research Center's 2013 "State of the News Media" report, MSNBC was found to be the most opinionated news network, with 85 percent of the content being commentary or opinions and the remaining 15 percent being factual reporting. The report also stated that in 2012, MSNBC spent only $240 million on news production compared to CNN's $682 million and the Fox News Channel's $820 million.[90]

Others have argued that MSNBC has a bias against progressive politics. Phil Donahue's show was canceled in 2003 due to his opposition to the Iraq War, and Donahue later commented that the management of MSNBC required that "we have two conservative (guests) for every liberal. I was counted as two liberals."[91] Cenk Uygur, after his departure from MSNBC in 2011, said that MSNBC management had told him "people in Washington" were "concerned about [his] tone,"[92] and that he "didn't want to work in a place that didn't challenge power."[93]

## Favoritism towards Barack Obama

Some Democratic Party supporters, including former Pennsylvania governor Ed Rendell and Bill Clinton advisor Lanny Davis,[94] criticized MSNBC during and after the 2008 Democratic Party primaries as covering Barack Obama more favorably than Hillary Clinton. Rendell said, "MSNBC was the official network of the Obama campaign," and called their coverage "absolutely embarrassing".[95][96] Rendell later became an on-air contributor to MSNBC.[97]

A study done by the Project for Excellence in Journalism showed that MSNBC had less negative coverage of Obama (14 percent of stories versus 29 percent in the press overall) and more negative stories about Republican presidential candidate John McCain (73 percent of its coverage versus 57 percent in the press overall).[98] MSNBC's on-air slogan during the week of the 2008 presidential election, "The Power of Change", was criticized for being too similar to Obama's campaign slogan of "Hope and Change".[99] After the election, conservative talk show host John Ziegler made a documentary entitled *Media Malpractice.... How Obama Got Elected*, which was very critical of the media's role, especially MSNBC's, in the election. While promoting the documentary, he had an on-air dispute with MSNBC news anchor Contessa Brewer about how the media, especially MSNBC, had portrayed Sarah Palin.[100]

During MSNBC's coverage of the Potomac primary, MSNBC's Chris Matthews said, "I have to tell you, you know, it's part of reporting this case, this election, the feeling most people get when they hear Barack Obama's speech. My, I felt this thrill going up my leg. I mean, I don't have that too often." This led Fox News to assert that both he and MSNBC were biased toward Obama.[101]

### *Rise of the New Right* documentary

In June 2010, the MSNBC documentary *Rise of the New Right* aired. It featured interviews with right-wing figures, including Dick Armey, the former House majority Leader, Orly Taitz, a leading figure in the "birther" movement, and conspiracy theorist radio host Alex Jones. The documentary also showed the Michigan Militia's survival training camp and hit the campaign trail with Kentucky senatorial candidate Rand Paul.[102]

The documentary angered Tea Party movement figures and others on the right. After the documentary aired, FreedomWorks, chaired by Armey, called for a boycott of Dawn and Procter & Gamble, which advertised during *Hardball with Chris Matthews*.[103][104] The boycott was ineffective as Procter & Gamble continued to advertise on the show.

### Romney coverage during 2012 election

A study by the Pew Research Center's Project for Excellence in Journalism found that MSNBC's coverage of Mitt Romney during the final week of the 2012 presidential campaign (68 percent negative with no positive stories in the sample) was far more negative than the overall press, and even more negative than it had been during October 1 to 28, when 5 percent was positive and 57 percent was negative.[105] On the other hand, their coverage of Barack Obama improved in the final week before the presidential election. From October 1 to 28, 33 percent of stories were positive and 13 percent negative. During the campaign's final week, 51 percent of MSNBC's stories were positive while there were no negative stories at all about Obama in the sample.

## Romney family grandchild

Political commentator Melissa Harris-Perry and her guest panel, in a look back on the 2013 segment of her show, featured a picture of former Republican presidential candidate Mitt Romney and his extended family. Romney was holding on his knee his adopted grandchild, Kieran Romney, an African-American. Harris-Perry and her guests, including actress Pia Glenn and comedian Dean Obeidallah, joked about coming up with captions for the photo. Glenn sang out, "One of these things is not like the others, one of these things just isn't the same." Obeidallah said, "It sums up the diversity of the Republican Party and the [Republican National Committee], where they have the whole convention and they find the one black person." Afterwards, Harris-Perry gave an on-air apology as well as apologized in a series of tweets.[106][107]

## Coverage of the 2020 Democratic Primary

On February 2, 2019, NBC ran a story about presidential candidate Tulsi Gabbard claiming that her campaign was benefiting from Russian state media, stating that she had received twice as many mentions on RT, Sputnik News and Russia Insider compared to expected front-runners Bernie Sanders and Joe Biden.[108]

In March 2019, Yashar Ali, a journalist for *The Huffington Post* accused Dafna Linzer, a managing editor at MSNBC, of ceding editorial control to the Democratic National Committee. Ali, who planned to announce the locations of the DNC debates in advance of MSNBC, received a call attempting to dissuade him with the phrase "let them make a few phone calls," referring to party leaders.[109] A source quoted by CNN stated that this approach was necessary for any network that has enough of a relationship with the DNC to host its debates.[110]

Candidate Andrew Yang and his supporters have been critical of MSNBC's coverage of his campaign and the speaking time allocated to Yang at a November 2019 primary debate hosted by MSNBC.[111]

## Suspensions of hosts

### Michael Savage

Michael Savage briefly hosted a weekend talk show in 2003. That July, Savage responded to a prank caller on his show by calling him a "pig" and a "sodomite", and telling him he "should get AIDS and die." Savage's show was canceled and he was dismissed from MSNBC shortly thereafter.[112]

### Don Imus

Don Imus', radio show *Imus in the Morning* was simulcast on MSNBC for over ten years. In 2007, he described members of the Rutgers University women's basketball team as "some nappy-headed hoes." The racist remark was met with outrage, and advertisers withdrew from the show, with MSNBC canceling the simulcast. Both Imus and NBC News apologized to the Rutgers Basketball team for the remarks.[113]

### Keith Olbermann and Joe Scarborough

On November 5, 2010, MSNBC President Phil Griffin suspended Keith Olbermann indefinitely without pay for having contributed $2,400 (the maximum personal donation limit) to each of three Democratic Party candidates during the 2010 midterm election cycle.[114] NBC News policy prohibited contributions to political campaigns unless NBC News had given its prior permission. On November 7, 2010, Olbermann posted a thank you message to supporters via Twitter.[115] That same day, MSNBC announced that he would be back on the air starting on November 9.[116]

Two weeks later, Griffin announced the suspension of Joe Scarborough for similar misconduct. The *Morning Joe* host had donated $4,000 to Republican candidates in Florida. Like Olbermann's suspension, Scarborough's was brief, and he returned to the airwaves on November 24.[117]

### Martin Bashir

Host Martin Bashir resigned after making a controversial comment about Sarah Palin.[118] On November 15, 2013, Bashir criticized Palin for equating the federal debt to slavery.[119] Bashir referred to the cruel and barbaric punishment of slaves as described by slave overseer Thomas Thistlewood, specifically a punishment called "Derby's dose", which forced slaves to defecate or urinate into the mouth of another slave. Bashir then said, "When Mrs. Palin invokes slavery, she doesn't just prove her rank ignorance. She confirms if anyone truly qualified for a dose of discipline from Thomas Thistlewood, she would be the outstanding candidate."[120][121]

**Alec Baldwin**

Alec Baldwin's 2013 show *Up Late with Alec Baldwin* was suspended after five episodes because of a homophobic slur Baldwin made to a photographer in New York City.[122]

# References

1. "MSNBC Launches New Ads With 'This Is Who We Are' Tagline" (http://www.adweek.com/tvnewser/msnbc-launches-new-ads-with-this-is-who-we-are-tagline/323145). MSNBC. March 8, 2017. Retrieved May 12, 2016.
2. MSNBC Signs On With Sirius XM Radio – News Channel To Debut On Satellite Service April 12 (http://www.multichannel.com/content/msnbc-signs-sirius-xm-radio) *Multichannel News* April 7, 2010
3. Stelter, Brian (October 6, 2010). "MSNBC on the Web May Change Its Name" (https://www.nytimes.com/2010/10/07/business/media/07msnbc.html). *The New York Times*.
4. Stelter, Brian (July 15, 2012). "Microsoft and NBC Complete Web Divorce" (https://www.nytimes.com/2012/07/16/business/media/msnbccom-renamed-nbcnewscom-as-microsoft-and-nbc-divorce.html). *The New York Times*. Retrieved October 9, 2012.
5. Steel, Emily (September 17, 2015). "MSNBC Retools to Sharpen Its Focus on Hard News" (https://www.nytimes.com/2015/09/18/business/media/msnbc-changes-lineup-to-sharpen-hard-news-focus.html). *The New York Times*.
6. "MSNBC's year of standing up straight" (http://www.politico.com/media/story/2016/06/msnbc-year-of-standing-up-straight-004562). Politico. Retrieved January 20, 2017.
7. "MSNBC goes high definition - msnbc- NBCNews.com" (http://www.nbcnews.com/id/30015383/ns/msnbc/). *NBC News*. Comcast. June 29, 2015. Retrieved May 18, 2020.
8. "Nielsen coverage estimates for September see gains at ESPN networks, drops at MLBN and NFLN" (https://awfulannouncing.com/espn/nielsen-coverage-estimates-september-espn-nbcsn-nbatv-mlbn-nfln.html). September 10, 2018.
9. Joyella, Mark (December 11, 2019). "Fox News Ends 2019 With Biggest Prime Time Ratings Ever" (https://www.forbes.com/sites/markjoyella/2019/12/11/fox-news-ends-2019-with-highest-rated-prime-time-ratings-ever/#4abf6a873347). *Forbes*. Retrieved January 16, 2020.
10. Andreeva, Nellie; Johnson, Ted (December 27, 2019). "Cable Ratings 2019: Fox News Tops Total Viewers, ESPN Wins 18–49 Demo As Entertainment Networks Slide" (https://deadline.com/2019/12/cable-ratings-2019-list-fox-news-total-viewers-espn-18-49-demo-1202817561/). Deadline. Retrieved January 16, 2020.
11. Schneider, Michael (December 26, 2019). "Most-Watched Television Networks: Ranking 2019's Winners and Losers" (https://variety.com/2019/tv/news/network-ratings-top-channels-fox-news-espn-cnn-cbs-nbc-abc-1203440870/). Variety. Retrieved January 16, 2020.
12. Huhn, Mary (January 13, 1999). "MSNBC.com Nets Cyber Pioneer As Head" (https://nypost.com/1999/01/13/msnbc-com-nets-cyber-pioneer-as-head/). *New York Post*. Retrieved March 12, 2019.
13. "Network Meets Net: How big an audience is there for Microsoft and NBC's cable-Web news venture?" (http://www.businessweek.com/stories/1996-07-14/network-meets-net). *Businessweek*. July 15, 1996.
14. "Jodi Jodi Applegate WNYW biography" (https://web.archive.org/web/20121114033544/http://home.ease.lsoft.com/scripts/wa-home.exe?A2=ind0404a&L=wnn&T=0&P=1941). *Home.ease.lsoft.com*. Archived from the original (http://home.ease.lsoft.com/scripts/wa-home.exe?A2=ind0404a&L=wnn&T=0&P=1941) on November 14, 2012. Retrieved May 11, 2011.
15. Collins, Scott (2004). *Crazy Like A Fox: The Inside Story of How Fox News Beat CNN* (https://archive.org/details/crazylikefoxinsi00coll). ISBN 1-59184-029-5.
16. Moss, Linda (July 2, 2001). "MSNBC Shifts Shows". Cable World.

17. The State of the News Media 2007: Public Attitudes (http://stateofthemedia.org/2007/cable-tv-intro/public-attitude/) Archived (https://web.archive.org/web/20170630171923/http://www.stateofthemedia.org/2007/cable-tv-intro/public-attitude/) June 30, 2017, at the Wayback Machine. Project for Excellence in Journalism.

18. E! Online, Bits and Pieces (https://groups.google.com/forum/#!msg/alt.gossip.celebrities/EmCVows7rz0/sxxhsHAywSsJ), June 26, 2001. Archived (http://arquivo.pt/wayback/20110122130054/https://groups.google.com/forum/) January 22, 2011, at the Portuguese Web Archive

19. Ballmer: Would not launch MSNBC again (http://news.cnet.com/2100-1023-268073.html). CNET News.Com, June 7, 2001.

20. "Five years later, memories of a trying task" (http://www.today.com/popculture/five-years-later-memories-trying-task-wbna14783031). *TODAY.com*. Retrieved April 26, 2017.

21. "CNN Profiles – Ashleigh Banfield – Host, HLN's Primetime Justice with Ashleigh Banfield" (http://www.cnn.com/profiles/ashleigh-banfield-profile#about). CNN. Retrieved April 26, 2017.

22. Dana, Rebecca (March 25, 2013). "Slyer Than Fox" (https://newrepublic.com/article/112733/roger-ailes-msnbc-how-phil-griffin-created-lefts-fox-news) – via The New Republic.

23. Guido H. Stempel III; Thomas K. Hargrove (December 14, 2015). *The 21st-Century Voter: Who Votes, How They Vote, and Why They Vote [2 volumes]* (https://books.google.com/books?id=GHACCwAAQBAJ&pg=PA283). ABC-CLIO. ISBN 9781610692281.

24. Learmonth, Michael (December 23, 2005). "Peacock plucks MSNBC" (https://variety.com/2005/digital/markets-festivals/peacock-plucks-msnbc-1117935156/). *Variety*. Retrieved April 26, 2017.

25. "Rick Kaplan Exits: Effective Immediately, President Of MSNBC Steps Down" (http://www.mediabistro.com/tvnewser/rick-kaplan-exits-effective-immediately-president-of-msnbc-steps-down_b9986). 2006. Retrieved January 23, 2008.

26. "MSNBC Announcement" (http://nbcumv.com/release_detail.nbc/msnbc-20060629000000-msnbcannouncesprim.html). June 29, 2006. Retrieved January 23, 2008.

27. Kurtz, Howard (September 25, 2007). "MSNBC's Abrams Quits His Day Job". *The Washington Post*. p. C03.

28. "NBC News to Begin Broadcasting from New World Headquarters" (http://www.mediabistro.com/tvnewser/nbc-news-to-begin-broadcasting-from-new-world-headquarters-oct-22_b16529). October 22, 2007. Retrieved January 23, 2008.

29. Moss, Linda (October 11, 2007). "MSNBC to Move to New York City Studio" (https://www.multichannel.com/news/msnbc-move-new-york-city-studio-366532). *Multichannel*. Retrieved January 6, 2020.

30. Hill, Michael P. (October 20, 2008). "MLB Network taking over former MSNBC HQ" (https://www.newscaststudio.com/2008/10/20/mlb-network-taking-over-former-msnbc-hq/). *Newscast Studio*. Retrieved January 6, 2020.

31. Kurtz, Howard (May 28, 2008). "MSNBC, Leaning Left And Getting Flak From Both Sides" (https://www.washingtonpost.com/wp-dyn/content/article/2008/05/27/AR2008052703047_pf.html). *The Washington Post*. Retrieved August 28, 2008.

32. MSNBC Anchors' Fights Go Live (https://www.wsj.com/articles/SB121989105850778775). *The Wall Street Journal*. Published August 28, 2008. Retrieved August 28, 2008.

33. "At MSNBC, The 'M' Is For (Rachel) Maddow" (https://www.cbsnews.com/stories/2008/11/24/business/marketwatch/main4628803.shtml). CBS News. November 24, 2008. Retrieved July 30, 2010.

34. Stelter, Brian (September 7, 2008). "MSNBC Takes Incendiary Hosts From Anchor Seat" (https://www.nytimes.com/2008/09/08/business/media/08msnbc.html). *The New York Times*. Retrieved March 26, 2010.

35. Carter, Bill (November 15, 2008). "Election's Over, So What's Next for the Cable News Channels?" (https://www.nytimes.com/2008/11/15/arts/television/15netw.html). *The New York Times*. Retrieved May 13, 2010.

36. Stelter, Brian (September 8, 2008). "MSNBC Takes Incendiary Hosts From Anchor Seat" (https://www.nytimes.com/2008/09/08/business/media/08msnbc.html?pagewanted=1&partner=permalink&exprod=permalink). *The New York Times*. Retrieved May 13, 2010.

37. At MSNBC, The 'M' Is For (Rachel) Maddow MarketWatch Columnist Jon Friedman Says Network's New Star Is Opinionated, But Restrained (https://www.cbsnews.com/stories/2008/11/24/business/marketwatch/main4628803.shtml) CBS News Retrieved March 26, 2010.

38. When Left is Right Rachel Maddow always thought she was an outsider. How did she become a star? (http://www.thedailybeast.com/newsweek/2008/11/21/when-left-is-right.html) Archived (https://www.webcitation.org/6AKC9iVDM?url=http://www.thedailybeast.com/newsweek/2008/11/21/when-left-is-right.html) August 31, 2012, at WebCite *Newsweek* Retrieved March 26, 2010.

39. For first time, MSNBC tops CNN in primetime (http://www.politico.com/blogs/michaelcalderone/0309/For_first_time_MSNBC_tops_CNN_in_primetime_.html) *Politico* Retrieved March 26, 2010.

40. MSNBC Beats CNN in 1Q 2010 In Primetime; And In Total Day Among Adults In March, First Time Since 2001 (http://tvbythenumbers.zap2it.com/2010/03/30/msnbc-beats-cnn-in-1q-2010-in-primetime-and-in-total-day-among-adults-in-march-first-time-since-2001/46635/) *TV by the Numbers* Retrieved March 31, 2010.

41. Grynbaum, Michael M. (June 5, 2017). "Led by Rachel Maddow, MSNBC Surges to Unfamiliar Spot: No. 1 in Prime Time" (https://www.nytimes.com/2017/06/05/business/media/msnbc-rachel-maddow-andrew-lack-ratings.html). *The New York Times*. ISSN 0362-4331 (https://www.worldcat.org/issn/0362-4331). Retrieved June 14, 2017.

42. MSNBC Beats CNN In Total Day In 3Q Among A25-54, First Time Since 2Q 2001 (http://tvbythenumbers.zap2it.com/2010/09/28/msnbc-beats-cnn-in-total-day-in-3q-among-a25-54-first-time-since-2q-2001/65585/) *TV by the Numbers* Retrieved September 10, 2010

43. Phil Griffin: 'Lean Forward' Campaign 'Is Going to Define Us As MSNBC' (http://www.mediabistro.com/tvnewser/lean-forward-campaign-phil-griffi_b33894) *Media Bistro* Retrieved October 13, 2010

44. Msnbc to 'lean forward' in two-year brand campaign (https://www.nbcnews.com/id/39507182/ns/business-media_biz/) *MSNBC* Retrieved October 13, 2010

45. msnbc.com May Change Its Name (https://www.nytimes.com/2010/10/07/business/media/07msnbc.html) *The New York Times* Retrieved October 14, 2010

46. "NBC News Takes Back MSNBC.com From Microsoft" (http://www.broadcastingcable.com/article/487235-NBC_News_Takes_Back_MSNBC_com_From_Microsoft.php). *Broadcasting & Cable*. Retrieved July 17, 2012.

47. Schwartz, Carly (January 21, 2011). "Keith Olbermann And MSNBC Announce They Are Parting Ways" (https://www.huffingtonpost.com/2011/01/21/keith-olbermann-countdown-over_n_812506.html s). *Huffington Post*. Retrieved January 21, 2011.

48. "Keith Olbermann leaving MSNBC, ends 'Countdown' " (https://web.archive.org/web/20110125133632/http://news.yahoo.com/s/ap/20110122/ap_on_en_ot/us_tv_olbermann_9) Archived from the original (https://news.yahoo.com/s/ap/20110122/ap_on_en_ot/us_tv_olbermann_9) on January 25, 2011.

49. "The New York Times Saturday, January 22, 2011" (https://www.nytimes.com/indexes/2011/01/21/). *The New York Times*.

50. "Keith Olbermann, MSNBC part ways" (http://news.blogs.cnn.com/2011/01/21/keith-olbermann-leaving-msnbc/). *CNN*. January 21, 2011.

51. "Olbermann Announces Departure from MSNBC" (http://www.foxnews.com/entertainment/2011/01/21/olbermann-announces-leave-msnbc/). *Fox News Channel*. January 21, 2011.

52. Carter, Bill; Stelter, Brian (February 7, 2011). "Olbermann Said to Be Going to Current TV" (http://mediadecoder.blogs.nytimes.com/2011/02/07/olbermann-said-to-be-going-to-current-tv/?partner=rss&emc=rss) *The New York Times*.

53. "Fox News Dominates Cable News Ratings In 2014; MSNBC Tumbles" (https://www.huffingtonpost.com/2014/12/30/fox-news-cable-news-ratings_n_6398220.html). *Huffington Post*. December 31, 2014. Retrieved January 8, 2015.

54. "Brian Williams dropped from NBC's 'Nightly News,' will join MSNBC" (https://www.reuters.com/article/2015/06/18/us-media-brianwilliams-idUSKBN0OY22Y20150618). *Reuters*. June 18, 2015.

55. "MSNBC Rolls Out New On-Air Look" (http://www.adweek.com/tvnewser/msnbc-rolls-out-new-on-air-look/269746).

56. "Entertainment News, Celebrity and Pop Culture – ABC News" (https://abcnews.go.com/Entertainment/wireStory/kate-snow-appointment-complete-msnbc-transformation-3383292). ABC News.

57. "TV Schedule | MSNBC" (https://web.archive.org/web/20151015183413/http://www.msnbc.com/schedule). October 15, 2015. Archived from the original on October 15, 2015. Retrieved March 30, 2018.

58. "Craig Melvin" (https://www.imdb.com/name/nm4411797/). *IMDb*. Retrieved March 30, 2018.

59. "Greg Ganzerla" (https://www.facebook.com/newsbusters/posts/10154569887336178). *www.facebook.com*. Retrieved March 30, 2018.

60. "Dateline Extra with Tamron Hall on MSNBC weekends" (https://www.msnbc.com/documentaries/dateline-extra-tamron-hall-msnbc-weekends). *MSNBC*. Retrieved March 30, 2018.

61. Info, Msnbc. "GRETA VAN SUSTEREN JOINS MSNBC" (https://web.archive.org/web/20170121181152/http://info.msnbc.com/_news/2017/01/05/36576960-greta-van-susteren-joins-msnbc). Archived from the original (http://info.msnbc.com/_news/2017/01/05/36576960-greta-van-susteren-joins-msnbc) on January 21, 2017. Retrieved January 20, 2017.

62. Steinberg, Brian (March 23, 2017). "MSNBC Programs Start Giving More Space to NBC News Logos" (https://variety.com/2017/tv/news/msnbc-nbc-news-logos-1202015277/).

63. Otterson, Joe (May 22, 2017). "MSNBC Reaches No. 1 for First Time in Weekly Primetime Ratings, Fox News Drops to Third" (https://variety.com/2017/tv/news/msnbc-fox-news-ratings-cable-news-cnn-1202440320/). *Variety*. Retrieved May 23, 2017.

64. Grynbaum, Michael M. (June 5, 2017). "Led by Rachel Maddow, MSNBC Surges to Unfamiliar Spot: No. 1 in Prime Time" (https://www.nytimes.com/2017/06/05/business/media/msnbc-rachel-maddow-andrew-lack-ratings.html). *The New York Times*. Retrieved October 31, 2018.

65. Steinberg, Brian (April 16, 2018). "MSNBC Says On-Screen News Ticker Will No Longer Scroll" (https://variety.com/2018/tv/news/msnbc-removes-news-ticker-1202754729/). *Variety*. Retrieved April 18, 2018.

66. "Chris Matthews to Retire From MSNBC" (https://www.hollywoodreporter.com/news/chris-matthews-retire-msnbc-1282226). *The Hollywood Reporter*. Retrieved March 3, 2020.

67. Ryu, Jenna. "Joy Reid takes over Chris Matthews' MSNBC time slot to host nightly news show" (https://www.usatoday.com/story/entertainment/tv/2020/07/09/joy-reid-to-host-msnbc-show-chris-matthews-time-slot/5404429002/). *USA Today*. Retrieved July 9, 2020.

68. "Inside Cable News :: Cablevision has exclusive carriage deal with MSNBC... :: February :: 2007" (https://web.archive.org/web/20110413233648/http://insidecable.blogsome.com/2007/02/22/cablevision-has-exclusive-fios-deal-with-msnbc-in-nyc/). *Insidecable.blogsome.com*. Archived from the original (http://insidecable.blogsome.com/2007/02/22/cablevision-has-exclusive-fios-deal-with-msnbc-in-nyc//) on April 13, 2011. Retrieved May 11, 2011.

69. "Cablevision Hit On 'Exclusives' – 2009-07-11 06:00:00 | Multichannel News" (http://www.multichannel.com/content/cablevision-hit-exclusives%e2%80%99). *Multichannel.com*. Retrieved July 30, 2010.

70. FiOS TV Finally Gets MSNBC In NY DMA – Cablevision Loses Exclusive Terrestrial Distribution Rights To News Channel (http://www.multichannel.com/content/fios-tv-finally-gets-msnbc-ny-dma) *Multichannel News* January 28, 2010

71. "Southern Africa to Get MSNBC" (https://web.archive.org/web/20080203130441/http://insidecable.blogsome.com/2007/11/17/southern-africa-to-get-msnbc/). November 17, 2007. Archived from the original (http://insidecable.blogsome.com/2007/11/17/southern-africa-to-get-msnbc/) on February 3, 2008. Retrieved January 23, 2008.

72. "NTVMSNBC.com" (http://www.ntvmsnbc.com). 2008. Retrieved January 23, 2008.

73. Stelter, Brian (October 6, 2010). "MSNBC on the Web May Change Its Name" (https://www.nytimes.com/2010/10/07/business/media/07msnbc.html). *The New York Times*.

74. Rebecca Shapiro (October 15, 2012). "MSNBC Website Debuts New Look (PHOTO)" (https://www.huffingtonpost.com/2012/10/15/msnbc-debuts-new-website_n_1967916.html). *Huffington Post*.

75. "Krystal Clear on Iraq & Clinton" (https://www.msnbc.com/msnbc/watch/krystal-clear-on-iraq-clinton-283776579633). *MSNBC*.

76. Stephen Battaglio (December 16, 2014). "MSNBC targets young viewers with streaming video service Shift" (https://www.latimes.com/entertainment/envelope/cotown/la-et-ct-msnbc-online-20141216-story.html). *Los Angeles Times*.

77. XM and MSNBC part ways (http://www.orbitcast.com/archives/xm-and-msnbc-part-ways.html) Archived (https://web.archive.org/web/20110203211117/http://www.orbitcast.com/archives/xm-and-msnbc-part-ways.html) February 3, 2011, at the Wayback Machine *Orbitcast* April 14, 2010

78. "MSNBC – News And Analysis Focused On Politics – SiriusXM Radio" (http://www.siriusxm.com/msnbc). Retrieved January 20, 2017.

79. Cable Channel Nods to Ratings and Leans Left (https://www.nytimes.com/2007/11/06/business/media/06msnb.html?_r=2&oref=slogin&pagewanted=print&oref=slogin). *The New York Times*. Published on November 6, 2007. Retrieved August 24, 2008.

80. Barr, Andy (April 5, 2011) MSNBC host coaxes Ron Paul to run (http://www.politico.com/news/stories/0411/52608.html). *Politico*

81. Kornacki, Steve (January 21, 2011) Is Olbermann the victim of his own success? (http://www.salon.com/2011/01/22/countdown_rip/). *Salon.com*

82. "Olbermann Talks Office Politics, Other Politics" (http://www.mediabistro.com/tvnewser/olbermann-talks-office-politics-other-politics_b17699). *mediabistro.com*. January 10, 2008. Retrieved September 16, 2009.

83. Kurtz, Howard (September 8, 2008). "MSNBC Drops Olbermann, Matthews as News Anchors" (https://www.washingtonpost.com/wp-dyn/content/article/2008/09/08/AR2008090800008_pf.html). *The Washington Post*. Retrieved September 30, 2008.

84. Stelter, Brian (September 7, 2008). "MSNBC Takes Incendiary Hosts From Anchor Seat" (https://www.nytimes.com/2008/09/08/business/media/08msnbc.html?partner=permalink&exprod=permalink). *The New York Times*. Retrieved September 30, 2008.

85. Jay (November 16, 2009). "MSNBC apologizes for showing fake Palin photos | Jay Bookman" (https://web.archive.org/web/20100225074915/http://blogs.ajc.com/jay-bookman-blog/2009/11/16/msnbc-apologizes-for-showing-fake-palin-photos/?cxntfid=blogs_jay_bookman_blog). *Blogs.ajc.com*. Archived from the original (http://blogs.ajc.com/jay-bookman-blog/2009/11/16/msnbc-apologizes-for-showing-fake-palin-photos/?cxntfid=blogs_jay_bookman_blog) on February 25, 2010. Retrieved July 30, 2010.

86. "MSNBC's new slogan: What doesn't it even mean?" (https://theweek.com/article/index/207856/msnbcs-new-slogan-what-does-it-even-mean). *The Week*. October 6, 2010. Retrieved October 11, 2010.

87. Stelter, Brian (October 4, 2010). "With Tagline, MSNBC Embraces a Political Identity" (https://www.nytimes.com/2010/10/05/business/media/05adco.html). *The New York Times*. Retrieved October 11, 2010.

88. Di Fino, Nando. "MSNBC Hosting Lineup For Iowa Caucus Exchanges Neutral Journalism For Partisanship… And Fun" (http://www.mediaite.com/tv/msnbc-hosting-lineup-for-iowa-caucus-exchanges-neutral-journalism-for-partisanship-and-fun/). Mediaite. Retrieved December 29, 2011.

89. Stelter, Brian (November 11, 2012). "The Anti-Fox Gains Ground" (https://www.nytimes.com/2012/11/12/business/media/msnbc-its-ratings-rising-gains-ground-on-fox-news.html?pagewanted=1). *The New York Times*. Retrieved October 2, 2013.

90. Bercovici, Jeff (March 18, 2013). "Pew Study Finds MSNBC the Most Opinionated Cable News Channel By Far" (https://www.forbes.com/sites/jeffbercovici/2013/03/18/pew-study-finds-msnbc-the-most-opinionated-cable-news-channel-by-far/). *Forbes*. Retrieved July 17, 2013.

91. Poniewozik, James, "Watching the Not-Watchdogs," (http://entertainment.time.com/2007/04/26/im_n ot_generally_in_the/)*Time*, April 26, 2007.

92. "Cenk Uygur Leaves MSNBC After Being Told to 'Act Like an Insider' " (http://www.democracynow.or g/2011/7/22/rejecting_lucrative_offer_cenk_uygur_leaves). *Democracy Now!*. Retrieved September 17, 2018.

93. "Cenk Uygur Out at MSNBC" (https://www.mediaite.com/tv/cenk-uygur-on-why-he-left-msnbc-i-didnt-want-to-work-in-a-place-that-didnt-challenge-power/). *Mediaite*. July 21, 2011.

94. "Clinton confidant dismisses MSNBC as no longer fair and balanced" (https://web.archive.org/web/20 081208111648/http://thehill.com/in-the-know/clinton-confidant-dismisses-msnbc-as-no-longer-fair-an d-balanced-2008-05-05.html). *The Hill*. May 5, 2008. Archived from the original (http://thehill.com/in-t he-know/clinton-confidant-dismisses-msnbc-as-no-longer-fair-and-balanced-2008-05-05.html) on December 8, 2008. Retrieved April 18, 2014.

95. Rendell: Obama coverage was embarrassing (http://www.politico.com/blogs/michaelcalderone/0808/ Rendell_Obama_coverage_was_embarrassing.html). Politico.com. Published August 24, 2008. Retrieved August 24, 2008.

96. Dangerous Liaison (http://www.tnr.com/politics/story.html?id=b48a6936-fb3c-42b0-83c1-f91d1cb3a3 dc). *The New Republic* published May 27, 2008. Retrieved August 24, 2008. Archived (https://web.ar chive.org/web/20081216081623/http://www.tnr.com/politics/story.html?id=b48a6936-fb3c-42b0-83c1-f91d1cb3a3dc) December 16, 2008, at the Wayback Machine

97. "Ed Rendell Signs Deal With NBC" (https://www.huffingtonpost.com/2011/01/25/ed-rendell-signing-d eal-w_n_813519.html). *Huffington Post*. January 25, 2011. Retrieved November 5, 2012.

98. "The Color of News | Project for Excellence in Journalism (PEJ)" (http://www.journalism.org/node/13 436). *Journalism.org*. October 29, 2008. Retrieved July 30, 2010.

99. Stelter, Brian (November 10, 2008). "MSNBC's Tag for Now: 'The Power of Change' " (https://www.ny times.com/2008/11/10/business/media/10msnbc.html). *The New York Times*. Retrieved November 13, 2008.

00. Annie Barrett (June 10, 2009). "Contessa Brewer vs. John Ziegler re: Sarah Palin – 'Cut the mic, please' " (http://popwatch.ew.com/2009/06/10/contessa-brewer-vs-john-ziegler-cut-the-mic/). *PopWatch Blog*. Entertainment Weekly. Retrieved November 1, 2009.

01. "Bernie Goldberg on 'Love Affair' Between Obama and Media – Hannity" (https://web.archive.org/we b/20130724190016/http://www.foxnews.com/story/0,2933,483568,00.html). FOXNews.com. January 27, 2009. Archived from the original (http://www.foxnews.com/story/0,2933,483568,00.html) on July 24, 2013. Retrieved February 23, 2010.

02. Weigel, David (June 7, 2010). "MSNBC documentary on the 'New Right' profiles birthers, militias, Alex Jones" (http://voices.washingtonpost.com/right-now/2010/06/upcoming_msnbc_documentary_o n.html). *The Washington Post*. Retrieved June 20, 2010.

03. Weigel, David (June 17, 2010). "Tea partyers push back against 'The Rise of the New Right' with boycott" (http://voices.washingtonpost.com/right-now/2010/06/tea_partyers_push_back_against.htm l). *The Washington Post*. Retrieved June 20, 2010.

04. Montopoli, Brian (June 17, 2010). "Tea Party Groups Lash Out at MSNBC Over Special" (https://ww w.cbsnews.com/8301-503544_162-20008106-503544.html). CBS News. Retrieved June 20, 2010.

05. "THE FINAL DAYS OF THE MEDIA CAMPAIGN 2012: Final Weeks in the Mainstream Press" (http:// www.journalism.org/analysis_report/final_weeks_mainstream_press) (Press release). Pew Research Center's Project for Excellence in Journalism. November 19, 2012. Retrieved November 20, 2012.

06. Grier, Peter (December 31, 2013). "Melissa Harris-Perry apologizes for Romney grandchild jokes: Sincere?" (http://www.csmonitor.com/USA/Elections/Vox-News/2013/1231/Melissa-Harris-Perry-apol ogizes-for-Romney-grandchild-jokes-Sincere). *Christian Science Monitor*. Retrieved January 5, 2014.

07. Day, Patrick (December 31, 2013). "Melissa Harris-Perry apologizes for Mitt Romney grandchild comments" (https://www.latimes.com/entertainment/tv/showtracker/la-et-st-melissa-harris-perry-apologizes-for-mitt-romney-grandchild-comments-20131231,0,3504370.story#axzz2pUw9bwlb). *Los Angeles Times*. Retrieved January 4, 2014.

08. Windrem, Robert; Popken, Ben. "Russia's propaganda machine discovers 2020 Democratic candidate Tulsi Gabbard" (https://www.nbcnews.com/politics/2020-election/russia-s-propaganda-machine-discovers-2020-democratic-candidate-tulsi-gabbard-n964261). MSNBC.

09. Levine, Jon (March 29, 2019). "HuffPost Contributor Accuses NBC News Managing Editor of 'Unethical' Call About DNC Debates" (https://www.thewrap.com/huffpost-contributor-accuses-nbc-news-managing-editor-of-unethical-call-about-dnc-debates/). The Wrap. Retrieved May 7, 2019.

10. "Yafshar Ali calls out NBC (https://mailchi.mp/cnn/rs-mar-29-2019). CNN. March 29, 2019. Retrieved May 7, 2019.

11. ▪ Pitofsky, Marina (October 4, 2019). "Yang calls out CNN, MSNBC for leaving him off of fundraising graphics" (https://thehill.com/homenews/campaign/464349-yang-hits-back-after-appearing-to-be-left-out-of-cnn-msnbc-fundraising). *TheHill*. Archived (https://web.archive.org/web/20191005000232/https://thehill.com/homenews/campaign/464349-yang-hits-back-after-appearing-to-be-left-out-of-cnn-msnbc-fundraising) from the original on October 5, 2019. Retrieved October 4, 2019.

   ▪ Wulfsohn, Joseph (November 18, 2019). "Yang campaign rips MSNBC's apology after network snubbed him from polling graphic 'for the 15th time' " (https://www.foxnews.com/media/andrew-yang-msnbc-polling-graphic-15th-snub). *Fox News*. Retrieved November 19, 2019.

   ▪ Dorman, Sam (November 21, 2019). "Andrew Yang accuses MSNBC of 'hypocrisy' after latest Democratic debate" (https://www.foxnews.com/media/andrew-yang-msnbc-hypocrisy). *Fox News*. Retrieved November 23, 2019.

   ▪ Wulfsohn, Joseph (November 21, 2019). "Andrew Yang supporters gathered outside MSNBC debate blasting network's treatment of candidate" (https://www.foxnews.com/media/andrew-yang-protesters). *Fox News*. Retrieved November 23, 2019.

   ▪ "Dorman, Sam (November 23, 2019). "Andrew Yang won't return to MSNBC until they apologize 'on-air' to his campaign" (https://www.foxnews.com/media/andrew-yang-msnbc-apologize-on-air). *Fox News*. Retrieved November 23, 2019.

12. Lowry, Brian (July 8, 2003). "Savage gets the boot after on-air anti-gay outburst". *Los Angeles Times*. p. E1.

13. MSNBC drops simulcast of Don Imus show (http://www.today.com/id/17999196). msnbc.com. April 11, 2007.

14. Aujla, Simmi. "Keith Olbermann suspended after donating to Democrats." Politico.com. November 5, 2010 <http://www.politico.com/news/stories/1110/44734.html>

15. KEVIN DOLAK and RUSSELL GOLDMAN (@GoldmanRussell) (November 7, 2010). "Keith Olbermann Can Return to 'Countdown,' MSNBC Boss Says – ABC News" (https://abcnews.go.com/Politics/keith-olbermann-breaks-silence-twitter-feed/story?id=12082531). *Abcnews.go.com*. Retrieved November 5, 2011.

16. "NBC Media Centre – STATEMENT REGARDING KEITH OLBERMANN – SUNDAY, NOV. 7" (https://web.archive.org/web/20110316033151/http://www.nbcuniversal.presscentre.com/Content/Detail.aspx?ReleaseID=2458&NewsAreaID=2&ClientID=7). *Nbcuniversal.presscentre.com*. November 7, 2010. Archived from the original (http://www.nbcuniversal.presscentre.com/Content/Detail.aspx?ReleaseID=2458&NewsAreaID=2&ClientID=7) on March 16, 2011. Retrieved May 11, 2011.

17. "MSNBC Suspends 'Morning Joe' Host Scarborough for Political Donations" (https://blogs.wsj.com/speakeasy/2010/11/19/msnbc-suspends-morning-joe-host-scarborough-for-political-donations/) *Wall Street Journal* November 19, 2010

18. "Martin Bashir Resigns From MSNBC" (http://www.mediaite.com/tv/martin-bashir-resigns-from-msnbc/). *mediaite.com*. December 4, 2013.

19. "MSNBC not commenting on whether further action contemplated against Bashir" (https://www.washi ngtonpost.com/entertainment/tv/msnbc-not-commenting-on-whether-further-action-contemplated-aga inst-bashir/2013/11/19/ee3df924-518e-11e3-9ee6-2580086d8254_story.html), Associated Press. *The Washington Post* (November 19, 2013).

20. Williams, Rob. "Martin Bashir says Sarah Palin is an 'idiot' and suggests someone should defecate in her mouth" (https://www.independent.co.uk/news/world/americas/martin-bashir-says-sarah-palin-is-a n-idiot-and-suggests-someone-should-defecate-in-her-mouth-8946426.html), *The Independent* (November 18, 2013).

21. Millstein, Seth (December 4, 2013). "MSNBC's Martin Bashir Resigns Over Sarah Palin Slavery Comments" (http://www.bustle.com/articles/10104-msnbcs-martin-bashir-resigns-over-sarah-palin-sl avery-comments). *Bustle*. Retrieved August 25, 2017.

22. "Alec Baldwin's MSNBC Show Suspended After Gay Slur Controversy" (http://www.people.com/peop le/article/0,,20756802,00.html). *People*.

# Sources

- Ariens, Chris (November 15, 2007). "MSNBC Expands to South Africa" (http://www.mediabistro.com/ tvnewser/msnbc-expands-to-south-africa_b16978). *TVNewser*. Retrieved August 25, 2017.

# External links

- Official website (http://www.msnbc.com)
- Official YouTube channel (https://www.youtube.com/user/msnbcleanforward)

Retrieved from "https://en.wikipedia.org/w/index.php?title=MSNBC&oldid=970531478"

**This page was last edited on 31 July 2020, at 21:20 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Exhibit JJ

Case 3:20-cv-01596-VC   Document 42   Filed 08/25/20   Page 265 of 328

**Trending:** Washington state COVID-19 cases and testing hit new peak; scientists call it an 'explosive situation' (https://www.geekwire.com/2020/washington-state-covid-19-cases-testing-hit-new-peak-officials-warn-explosive-situation/)

# Microsoft releases new diversity numbers, says it's 'closer to the beginning of the journey than the end'

BY NAT LEVY (HTTPS://WWW.GEEKWIRE.COM/AUTHOR/NATLEVY/) on November 14, 2018 at 12:00 pm



Microsoft's headquarters.

Like much of the tech industry, Microsoft says it is focused on making its workplace more diverse and inclusive, and today the company gave a snapshot of how that effort is going.

In an update of its annual diversity numbers, the company is showing modest progress in getting better representation of women and minorities in technical and leadership roles, but executives say there is still a long way to go.

Case 3:20-cv-01596-VC Document 82 Filed 08/25/20 Page 266 of 328



Lindsay-Rae McIntyre, Microsoft's chief diversity officer. (Photo via Microsoft.)

Including LinkedIn, women represent 28 percent of the workforce at Microsoft as of June 30, up a percentage point from a year ago. Also on the rise is the share of women in technical roles — from 18.5 percent a year ago to 19.9 percent — and in leadership positions, from 18.8 percent a year ago to 19.7 percent today.

Minority representation grew slightly as well, with black employees rising from 3.8 percent of Microsoft's workforce to 4 percent, and Hispanic/Latinx employees increased from 5.5 percent to 5.7 percent.

"We are encouraged by our progress but clear that we are closer to the beginning of this journey than the end," said Lindsay-Rae McIntyre, Microsoft's chief diversity officer.

Looking at Microsoft's numbers compared to other tech giants makes it clear that no one has figured out how to build a truly diverse workforce, where people of color and women are represented well at all levels. Here are numbers from other tech giants:

- Amazon had the greatest female representation of the major companies at 40 percent, according to its diversity page (https://www.amazon.com/b?ie=UTF8&node=10080092011) that was last updated in July 2017. Among managers, the gap widens to 74 percent men, 26 percent women. In the U.S., the company is 42 percent white, 22 percent black, 14 percent Asian, 14 percent Hispanic and 8 percent "other." However, in management positions the breakdown changes to 63 percent white, 21 percent Asian, 6 percent black, 5 percent Hispanic and 4 percent other.

- Google is 69 percent male to 31 percent female company-wide, according to its 2018 Diversity Report (https://diversity.google/annual-report/#!#_our-workforce). Women represented 25.5 percent of leadership roles, compared to 74.5 percent men. Google is 53.1 percent white, 36.3 percent Asian, 3.6 percent Latinx, 2.5 percent black, 4.2 "two or more races" and 0.4 percent Native American. Leadership is 67 percent white, 26 percent Asian, 2 percent black, 1.8 percent Latinx, 2.7 percent two or more races and 0.4 percent Native American.

7/21/2020                    Microsoft releases new diversity numbers, says it's closer to the beginning of the journey than the end – GeekWire

Case 3:20-cv-01596-VC Document 92 Filed 08/25/20 Page 267 of 328

- As of June 30 (https://www.facebook.com/careers/diversity-report), Facebook was 64 percent men to 36 percent women. The split grew to 70/30 when looking at senior leadership roles. Facebook in the U.S. is about 47 percent white, 41 percent Asian, 5 percent Hispanic, 3.5 percent  black, 3 percent "2 or more" and 0.6 percent other. As with other companies, management is significantly whiter, with the breakdown changing to 69.7 percent white, 21.6 percent Asian, 3.3 percent Hispanic, 2.4 percent black, 2.4 percent "2 or more" and 0.5 percent other.

- In 2017 (https://www.apple.com/diversity/), Apple had a 68/32 percent gender split in favor of men, and the ratio for leadership is 71 percent men to 29 percent women. The company at that time was 52 percent white, 21 percent Asian, 13 percent Hispanic, 9 percent black, 3 percent multiracial and 1 percent other. Approximately 66 percent of leadership is white, versus 23 percent Asian, 7 percent Hispanic, 3 percent black and 1 percent multiracial.

In an interview with GeekWire, McIntyre said Microsoft isn't competing with its peers on these numbers. She framed the importance of building diverse and inclusive workforces in the tech world as an issue that goes beyond battles for marketshare and new product innovations. McIntyre, who joined Microsoft from IBM four months ago, envisions working not just with partners and customers but competitors on new initiatives.

While policies and procedures can help with diversity and inclusion, McIntyre says it's important to weave these efforts into the day-to-day operations at the company to really make a difference. Microsoft recently added to its performance evaluation system criteria on how each employee can personally foster diversity.

"I think it's the perfect gesture of inclusion, that every single employee at Microsoft would have a role to play in making us more diverse and more inclusive," McIntyre said.

McIntyre said fixing issues of women and minority representatives is not necessarily hard, but there's no cure-all. It takes finding new pipelines to hire from, supporting educational programs that teach people technical skills, implementing the right programs and policies and just having the tough, candid conversations about the issues.

Microsoft is dealing with multiple gender discrimination lawsuits. One dates back to 2015 (https://microsoftgendercase.com/) and concerns how women in technical roles are treated. The plaintiff in another lawsuit filed just last week (https://www.geekwire.com/2018/ex-microsoft-employee-sues-company-former-manager-gender-discrimination/) claims she was discriminated against based on her gender and marital status and ultimately terminated because of what she called "unfair and even false employment reviews."

# Exhibit KK



EDITORS' PICK  |  416 views  |  Aug 11, 2020, 04:54pm EDT

# Fox News To Launch 'Fox News International' Streaming Service



**Mark Joyella** Senior Contributor ⓘ

Media

*I cover political media--and media politics.*



GLóRIA DE DOURADOS, BRAZIL – 2020/06/15: In this photo illustration the Fox News Channel logo
seen ... [+]    SOPA IMAGES/LIGHTROCKET VIA GETTY IMAGES

Fox News Media announced Tuesday plans to launch a new digital
streaming service, Fox News International, which will bring Fox News
Channel and Fox Business Network programming to twenty countries by the
end of 2020. The direct-to-consumer service will debut in Mexico on August
20, followed by Spain, Germany and the United Kingdom on September 17.



The Fox News International logo    FOX NEWS

"We are excited to debut Fox News International, enabling our devoted audience overseas access to their trusted source for news and insightful analysis," said Fox News Media chief executive officer Suzanne Scott in a statement. "With a catalog of more than 20 signature programs on-demand and live streams of our linear networks, this new digital streaming service will ensure our viewers around the world never miss out on the latest from America's leading news channel."

### Recommended For You

**Confirmed: Extra $400 Unemployment Benefit Extension Slashed To $300; State Match Optional**

**U.S. Immigration Shutdown Imminent As Congress Talks Collapse**

**Trump Says He's Ready To Send Out $1,200 Stimulus Checks, Again Blames Democrats For The Delay**



BETA

NEW YORK, NY – AUGUST 31: Sean Hannity on the set of FOX News Channel's 'Hannity' at FOX Studios on … [+]   GETTY IMAGES

The new service, priced at $6.99 per month, will bring FNC's top-rated prime time programs like *Hannity*, *Tucker Carlson Tonight* and *The Ingraham Angle* to viewers around the world, along with the network's news programs and FBN's business-focused shows like *Maria Bartiromo's Wall Street* and *Lou Dobbs Tonight*.

Cookies on Forbes



BETA

Christiane Amanpour, CNN Chief International Correspondent, with CNN founder Ted Turner at an event ... [+]　PA IMAGES VIA GETTY IMAGES

Cable news rival CNN has long had a foothold overseas, with CNN International being carried on cable and satellite providers in countries around the world since 1985. Unlike the initial plans for Fox News International, which will carry the tagline "America's News Channel," CNNI produces its own daily schedule of international-focused programming with hosts like Christiane Amanpour, along with re-broadcasts of some of CNN's domestic programs.

## C-Suite News, Analysis And Advice for Top Decisionmakers

Sign up for the Forbes CxO Newsletter sent every Sunday morning.

Cookies on Forbes

| Title | ⌄ |
| Enter e-mail address | Sign up |

You may opt out any time. Terms and Conditions and Privacy Policy

Exhibit LL

EDITORS' PICK | 2,924 views | Aug 5, 2020, 06:54am EDT

# Microsoft Paid Hackers More Than $13 Million In Past 12 Months



**Davey Winder** Senior Contributor ⓘ

Cybersecurity

*I report and analyse breaking cybersecurity and privacy stories*



Microsoft has paid hackers $13 million for security vulnerabilities    LIGHTROCKET VIA GETTY IMAGES

Microsoft has confirmed that during the past 12 months it paid hackers a total of $13.7 million (£10.4 million) which is three times as much as it did the year before.

Cookies on Forbes

8/16/2020                Microsoft Paid Hackers More Than $13 Million In Past 12 Months...

Case 3:20-cv-01596-VC   Document 92   Filed 08/25/20   Page 275 of 328

So, why is Microsoft paying hackers at all? It's a good question, and the answer is simple: to help safeguard users of Microsoft products and services.

Like every vendor or service provider who takes security seriously, Microsoft has a bug bounty program that encourages "white hat" hackers to find and disclose flaws that could open a window to attackers.

These security researchers report the bugs they find to Microsoft, through a process of coordinated vulnerability disclosure, and depending on the product together with the nature and criticality of the vulnerability, get paid out.

| Recommended For You                                                     ^ |
| --- |

**Second Stimulus Check Bill Weekend Update – What's The Holdup?**

**Trump Says He's Ready To Send Out $1,200 Stimulus Checks, Again Blames Democrats For The Delay**

**Confirmed: Extra $400 Unemployment Benefit Extension Slashed To $300; State Match Optional**

MORE FROM FORBES

**'BootHole' Secure Boot Threat Found In Most Every Linux Distro, Windows 8 And 10**

By **Davey Winder**

During the past 12 months, Microsoft said that across all of its 15 bounty programs, it had seen a higher than average report volume during the first months of the pandemic. Launching six new bounty programs, 1,226 eligible reports in total were filed by 327 hackers.

The $13.7 million paid out by Microsoft dwarfes the $4.4 million (£3.3 million) it paid during the same period for the previous 12 months. This doesn't mean there are more security problems with Microsoft products than ever.

Instead, more researchers are doing a better job of finding and disclosing them, encouraged by the emergence of new bounty programs.

The biggest single reward paid was $200,000 (£153,000), although the biggest Microsoft bounty on offer is $250,000 (£190,000) for finding critical remote code execution, information disclosure and denial of services vulnerabilities in Hyper-V.

---

MORE FROM FORBES

### Windows 10 Security Game-Changer As Microsoft Reveals New Hacker Protection

By **Davey Winder**



---

Microsoft has thanked all those who shared their research, saying that "millions of customers, and the broader ecosystem, are more secure thanks to their efforts."

---

## The Evolving Role of Finance Chiefs

Sign up for The Balance Sheet, Forbes' biweekly newsletter from CFO Network Editor Ezequiel Minaya.

| Enter e-mail address | Sign up |

You may opt out any time. Terms and Conditions and Privacy Policy

---

*Follow me on* Twitter *or* LinkedIn. *Check out my* website.



**Davey Winder**

Follow

I'm a three-decade veteran technology journalist and have been a contributing editor at PC Pro magazine since the first issue in 1994. A three-time winner of the BT...

**Read More**

| Site Feedback | Tips | Corrections | Reprints & Permissions | Terms | Privacy |

© 2020 Forbes Media LLC. All Rights Reserved.     Report a Security Issue     AdChoices

# Exhibit MM



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | **Titles** | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = tropic thunder
Search Results: Displaying 1 through 25 of 30 entries.

◄ previous    next ►

Resort results by: Date (ascending) ▼                    Set Search Limits

| # | Title < | Full Title | Copyright Number | Date |
|---|---------|-----------|------------------|------|
| [ 1 ] | Tropic thunder. | Tropic thunder. | PAu003078092 | 2007 |
| [ 2 ] | Tropic thunder : motion picture project. | Tropic thunder : motion picture project. | V3547D861 | 2007 |
| [ 3 ] | Tropic thunder. | Tropic thunder. | V3549D710 | 2007 |
| [ 4 ] | Tropic thunder. | Tropic thunder. | V3549D711 | 2007 |
| [ 5 ] | Tropic thunder. | Tropic thunder. | V3559D500 | 2007 |
| [ 6 ] | Tropic thunder. | Tropic thunder. | V3559D499 | 2007 |
| [ 7 ] | Tropic thunder. | Tropic thunder. | V3559D501 | 2007 |
| [ 8 ] | Tropic thunder. | Tropic thunder. | V3572D754 | 2008 |
| [ 9 ] | Tropic thunder. | Tropic thunder. | V3573D380 | 2008 |
| [ 10 ] | Tropic thunder. | Tropic thunder. | V3572D753 | 2008 |
| [ 11 ] | tropic thunder. | Tropic thunder. | PAu003356991 | 2008 |
| [ 12 ] | Tropic Thunder (Press Kit) | Tropic Thunder (Press Kit) | VA0001653517 | 2008 |
| [ 13 ] | Tropic thunder & 1 other title. | Tropic thunder & 1 other title. | V3573D349 | 2008 |
| [ 14 ] | Tropic thunder & 1 other title. | Tropic thunder & 1 other title. | V3573D380 | 2008 |
| [ 15 ] | Tropic thunder & 1 other title. | Tropic thunder & 1 other title. | V3573D348 | 2008 |
| [ 16 ] | Tropic Thunder (Poster One Sheet Downey Jr.) | Tropic Thunder (Poster One Sheet Downey Jr.) | VA0001647478 | 2008 |
| [ 17 ] | Tropic Thunder (Stiller One Sheet Poster) | Tropic Thunder (Stiller One Sheet Poster) | VA0001647522 | 2008 |
| [ 18 ] | Tropic Thunder. | Reel Comedy : 137, Tropic Thunder. | PAu003362944 | 2008 |
| [ 19 ] | Tropic thunder. | Tropic thunder. | V3573D349 | 2008 |
| [ 20 ] | Tropic Thunder. | Tropic Thunder. | PA0001603754 | 2008 |
| | TROPIC THUNDER | TROPIC THUNDER | PRE000001427 | 2008 |



| [21] | | | | |
|------|--|--|--|--|
| ☐ [22] | Tropic thunder. | Tropic thunder. | V3573D348 | 2008 |
| ☐ [23] | Tropic thunder. | Tropic thunder. | V3574D272 | 2008 |
| ☐ [24] | TROPIC THUNDER. | TROPIC THUNDER (Final Shooting Draft with revisions dated 5/1/2007 through 11/04/2007) | PAu003350637 | 2008 |
| ☐ [25] | Tropic Thunder Skit. | Champion Road, et al. | SRu000919574 | 2009 |

**Resort results by:** Date (ascending) ▾      Set Search Limits

Clear Selected   Retain Selected

◀ previous   next ▶

| **Save, Print and Email (Help Page)** | |
|---|---|
| **Records** | Select Format: Full Record ▾   Format for Print/Save |
| ○ All on Page<br>◉ Selected On Page<br>○ Selected all Pages | Enter your email address: [_____] Email |

**Search for:** tropic thunder   **Search by:** Title (omit initial article A, An, The, El, La, Das etc.) ▾   **Item type:** None ▾

25 records per page ▾     Submit   Reset

Help   Search   History   **Titles**   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit NN



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = tropic thunder
Search Results: Displaying 1 of 30 entries



Labeled View

*Tropic thunder.*

**Type of Work:** Dramatic Work and Music; or Choreography
**Registration Number / Date:** PAu003078092 / 2007-04-12
**Title:** Tropic thunder.
**Notes:** Screenplay.
**Copyright Claimant:** Dreamworks Films, LLC
**Date of Creation:** 2007
**Copyright Note:** Cataloged from appl. only.
**Names:** Dreamworks Films, LLC





**Save, Print and Email (Help Page)**
Select Download Format  | Full Record ⌄ | Format for Print/Save
Enter your email address: | | Email

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page

Exhibit OO



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More...**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Simple Search = Stiller, Ben
Search Results: Displaying 1 through 13 of 13 entries.



◄ previous    next ►

Resort results by: Date (ascending) ▼      Set Search Limits

| # | Name Heading | Author | Full Title | Date |
|---|--------------|--------|------------|------|
| ☐ [ 1 ] | Stiller, Ben | | Adventures of Howie / by Ben Stiller and Jeffrey A. Kahn. | 1989 |
| ☐ [ 2 ] | Stiller, Ben | | Reality bites / a Jersey Films production ; directed by Ben Stiller. | 1994 |
| ☐ [ 3 ] | Stiller, Ben | | Cable guy / a Bernie Brillstein, Brad Grey production ; a Licht/Mueller Film Corporation production ; directed by Ben Stiller. | 1996 |
| ☐ [ 4 ] | Stiller, Ben | | Zoolander / by Ben Stiller & Drake Sather. | 1999 |
| ☐ [ 5 ] | Stiller, Ben | | Derek Zoolander; character / By Paramount Pictures Corporation. | 1999 |
| ☐ [ 6 ] | Stiller, Ben | | Jews who rock / Guy Oseary ; foreword by Ben Stiller ; afterword by Perry Farrell ; Mike Shea, editor. | 2000 |
| ☐ [ 7 ] | Stiller, Ben | | Zoolander / directed by Ben Stiller. | 2001 |
| ☐ [ 8 ] | Stiller, Ben | | Cugini; film & screenplay. | 2003 |
| ☐ [ 9 ] | Stiller, Ben | | Untitled Ben Stiller project; program / Services rendered by Ben Stiller, employee of Smooth Daddy, Inc., as a work-made-for-hire for HBO Films, Inc. | 2004 |
| ☐ [ 10 ] | Stiller, Ben | | BEN STILLER. | 2007 |
| ☐ [ 11 ] | Stiller, Ben | | Tropic Thunder. | 2008 |
| ☐ [ 12 ] | Stiller, Ben | | Roman And Williams Buildings and Interiors: Things We Made. | 2012 |
| ☐ [ 13 ] | Stiller, Ben | | ZOOLANDER 2. | 2016 |

Resort results by: Date (ascending) ▼      Set Search Limits

Clear Selected    Retain Selected

◄ previous    next ►



| Save, Print and Email (**Help Page**) | | |
|---|---|---|
| **Records** | Select Format: Full Record ▼   Format for Print/Save | |
| ○ All on Page | | |
| ● Selected On Page | Enter your email address: [                    ] Email | |
| ○ Selected all Pages | | |

Search for: Stiller, Ben    Search by: Title (omit initial article A, An, The, El, La, Das etc.) ▼    Item type: None ▼

# Exhibit PP

# UCLA
## UCLA Entertainment Law Review

**Title**
Substantial Similarity in Literary Infringement Cases: A Chart for Turbid Waters

**Permalink**
https://escholarship.org/uc/item/0m10v6t3

**Journal**
UCLA Entertainment Law Review, 21(1)

**ISSN**
1939-5523

**Author**
Helfing, Robert F.

**Publication Date**
2014

Peer reviewed

eScholarship.org                    Powered by the California Digital Library
                                    University of California

# Substantial Similarity in Literary Infringement Cases:
# A Chart for Turbid Waters

Robert F. Helfing[*]

*As home to that fictional piece of real estate known as Hollywood, the Ninth Circuit has dealt with the copyright law issue of substantial similarity more than any other jurisdiction, yet it has not developed useful principles for analyzing it. This article examines the history of the Ninth Circuit's two-step test for substantial similarity in literary infringement cases, showing how a quirk in the evolution of the test has created a confusing and ineffectual body of law on the subject. The article argues that the courts have underestimated the complexity of the issue and have given too much credit to their own judgment, unaided by expert input. The absence of a genuine understanding of the issue has led courts to look for substantial similarity where it cannot be found: in the individual elements of literary works. The article presents a proposed rule to re-direct the court's inquiry from the individual elements of the work, where copyright protection cannot be found, to the artistic structure of the work, where it must be found if it exists at all.*

[*] Robert F. Helfing is a senior partner and head of the Intellectual Property Department of Sedgwick LLP. Mr. Helfing represented the plaintiffs in the appeals in *Metcalf v. Bochco*, 294 F.3d 1070 (9th Cir. 2002) and *Funky Films v. Time Warner Entertainment Co.*, 462 F.3d 1072 (9th Cir. 2006).

I. INTRODUCTION ................................................................. 2
II. THE PROBLEM: WHEN DOES COPYING BECOME INFRINGEMENT? ..... 3
III. THE "ABSTRACTIONS TEST" ............................................... 4
IV. THE *KROFFT* TEST OF SUBSTANTIAL SIMILARITY ........................... 6
V. THE *KROFFT* TEST IGNORED, MISAPPLIED AND TRANSFORMED ........ 8
    A.  *A District Court Shall (Mis)Lead Them* . . . ........................ 8
    B.  *. . . And the Ninth Circuit Shall Follow* ............................ 10
VI. THE CHANGE ACKNOWLEDGED ...................................... 12
VII. LOOKING FOR PROTECTED SIMILARITY IN THE WRONG PLACES ... 13
VIII. PROTECTION IN THE UNPROTECTED ................................... 16
IX. THE COURT GETS IT RIGHT ............................................ 18
X. THE NEGATION OF METCALF V. BOCHCO ....................... 19
XI. THE WEIGHT OF DIFFERENCES ...................................... 23
XII. THE PROPOSED RULE ................................................. 25
XIII. THE COURTS SHOULD NOT GO IT ALONE ....................... 29

## I.  INTRODUCTION

"We delve once again," wrote Ninth Circuit Judge Alex Kozinski in 2002, "into the turbid waters of the 'extrinsic test' for substantial similarity under the Copyright Act."[1] Judge Kozinski had before him a claim of screenplay infringement, where the waters of substantial similarity are especially cloudy. A common sequel to the latest hit motion picture or television series is a lawsuit asserting copyright infringement, almost invariably ending with a pretrial ruling that the plaintiff failed to show substantial similarity as matter of law. In the Ninth Circuit, no type of claim is dismissed with greater regularity or dispatch than those asserting that a popular work of entertainment has infringed a literary copyright: in the past 35 years, Ninth Circuit courts have allowed only three such cases to avoid summary dismissal, and no case has avoided it since 2002.[2] How, then, to explain the unending parade of cases asserting a type of claim that is essentially dead on arrival at the courthouse?

For the plaintiffs, the answer lies in "that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be as-

---

[1] Metcalf v. Bochco, 294 F.3d 1070, 1071 (9th Cir. 2002).

[2] *Id.*; Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327, 1328 (9th Cir. 1983); Shaw v. Lindheim, 919 F.2d 1353, 1355 (9th Cir. 1990).

cribed to plagiarism."[3]  For the attorneys who take these cases, only part of the answer lies in dreams of headlines and financial reward. The rest can be attributed to the sad fact that the law on the subject is confusing and self-contradictory, lacking clear principles to help lawyers evaluate the merits of the claims presented to them.  The same messy precedent that prevents lawyers from effectively evaluating the claims brought to them empowers judges to resolve these claims as a matter of law.  Judicial zeal in extinguishing the usually frivolous literary infringement cases has undoubtedly resulted in the elimination of well-grounded ones as well.  Without effective guidance, lawyers will continue to file frivolous cases, and judges will continue to dismiss valid ones.

As home to that fictional piece of real estate known as Hollywood, the Ninth Circuit has dealt with the issue more than any other jurisdiction, yet it has not developed useful principles for analyzing it.[4]  This article examines the history of the Ninth Circuit's two-step test for substantial similarity in literary infringement cases, showing how a quirk in the evolution of the test has created a confusing and ineffectual body of law on the subject.  The article argues that the courts have underestimated the complexity of the issue and have given too much credit to their own judgment, unaided by expert input.  The absence of a genuine understanding of the issue has led courts to look for substantial similarity where it cannot be found: in the individual elements of literary works.  The article presents a proposed rule to re-direct the court's inquiry from the individual elements of the work, where copyright protection cannot be found, to the artistic structure of the work, where it must be found if it exists at all.

## II.  THE PROBLEM: WHEN DOES COPYING BECOME INFRINGEMENT?

A copyright is the exclusive right to copy an artistic work; it is infringed when someone who does not possess the copyright copies the work protected by it.[5]  This proposition is clear in the utterance but often unclear in the application.  The confusion begins with the elusiveness of the definition of copying.

The issue would be simple if, in the dialect of copyright law, the verb "copy" meant what it means most everywhere else: to duplicate an original.  But copyright infringement does not require literal dupli-

---

[3] Dellar v. Samuel Goldwyn, Inc., 150 F.2d 612, 613 (2d Cir. 1945).

[4] *See* Murray Hill Pubs. v. Twentieth Century Fox, 361 F.3d 312, 317 (6th Cir. 2004).

[5] 17 U.S.C. § 501(a) (2002).

cation; the creation of something equivalent or even similar might do.[6] With literary works,[7] the vagueness of the issue is particularly acute because they consist entirely of language, the most elastic of human creations. A literary work can be effectively reproduced without duplicating a single word of the original.[8] Further, a finding of infringement does not require the "copying" of an entire work: the unauthorized reproduction of only a part of the work, or even of a single element, might be enough.[9] On the other hand, one might duplicate a literary work verbatim, in its entirety, and not infringe.[10]

Where the defendant copies an entire protected work, and the copying is verbatim, a finding of infringement is indisputable. But if the defendant copies less than the entire work, how much copying is needed for there to be infringement? Even more perplexing, what sort of likeness is required if the copying is not verbatim? It is in addressing these questions that the courts have stumbled into uncertainty. They tell us that there must be similarity and that the similarity must be substantial. What sort of similarity is substantial? The answer appears to be likeness in *protected* content.[11] But what is protected?

## III. THE "ABSTRACTIONS TEST"

To be protected, an artistic work must be original, meaning that it is not copied from something else and that it is sufficiently creative.[12] In evaluating creativity, the courts refer to a conceptual dichotomy: ide-

---

[6] "[A]n infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." Universal Pictures Co. v. Harold Lloyd Corp., 162 F. 2d 354, 360 (9th Cir. 1947) (quoting 18 C.J.S. COPYRIGHT AND LITERARY PROPERTY § 34); *see also* Sid & Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1167 (9th Cir. 1977) ("Duplication or near identity is not necessary to establish infringement.").

[7] In this article, "literary works," will not be used to refer to all works falling within the term as specifically limited by 17 U.S.C. § 102(1), but, rather, more specifically to books, screenplays, plays, motion pictures, television programs, and videogames, i.e., works that are "based on the elements of theme, plot, characters, sequence of events, dialogue, mood, setting, and pace." See Gable v. Nat'l Broad. Co., 727 F. Supp. 2d 815, 834 n.14 (C.D. Cal. 2010).

[8] Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930).

[9] *See* Harper Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 548-549 (1985) (verbatim copying of 300 to 400 words of book held to infringe); Situation Mgmt. Sys., Inc. v. Asp. Consulting LLC, 560 F.3d 53, 59 (1st Cir. 2009).

[10] *See* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 490 U.S. 340, 361 (1991); Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985) ("It is well established that, as a matter of law, certain forms of literary expression are not protected against copying.").

[11] *See* Cavalier v. Random House, 297 F.3d 815, 822 (9th Cir. 2002).

[12] Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 490 U.S. 340, 345 (1991).

as—in this context, usually described as "mere" ideas—are not protected, while the *expression* of ideas is protected.[13]  So, when there are similarities between works, how do we tell whether the similarity is in an idea or in the expression of an idea?  In addressing this question in 1930, Judge Learned Hand wrote:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.[14]

This language has been called the "abstractions test,"[15] but it describes no test at all.  Judge Hand showed us the path that leads from idea to expression, but he proposed no means to identify when the destination is reached.  Two decades later, he was equally unspecific in stating the converse—"[N]o one infringes unless he descends so far into what is concrete [in a work] as to invade   . . . [its] expression."[16]  Another decade later, he acknowledged the impossibility of specificity, stating:

> The test for infringement of a copyright is of necessity vague . . . . Obviously, no principle can be stated as to when an imitator has gone beyond copying the "idea," and has borrowed its "expression."  Decisions must therefore inevitably be ad hoc.[17]

In the five decades since Judge Hand threw up his hands and consigned the issue to the realm of *ad hoc*, no court has attempted to define the point at which idea becomes expression.  In 1977, however,

---

[13]  17 U.S.C. § 102 (1990) ("[I]n no case does copyright protection for an original work of authorship extend to any idea . . . ."); *see also* Mazer v. Stein, 347 U.S. 201, 217-18 (1954); Baker v. Selden, 101 U.S. 99, 102 (1879).

[14]  Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930).

[15]  Sid & Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1163 (9th Cir. 1977).

[16]  Nat'l Comics Publ'ns v. Fawcett Publ'ns, 191 F.2d 594, 600 (2d Cir. 1951).

[17]  Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

6        UCLA ENTERTAINMENT LAW REVIEW        [Vol. 21:1

the Ninth Circuit established a framework to analyze the question.

## IV. THE *KROFFT* TEST OF SUBSTANTIAL SIMILARITY

The history of literary infringement in the Ninth Circuit effectively began in 1977. In *Sid and Marty Krofft Television v. McDonald's Corp.*,[18] the producers of "H. R. Pufnstuff" sued McDonald's, the restaurant chain, for copyright infringement, claiming that the anthropomorphic hamburgers and other features of its "McDonaldland" television commercials were copied from their animated fantasy program.[19] In reviewing the judgment against defendant McDonald's, the Ninth Circuit established an analytic framework for evaluating substantial similarity.

The court began by stating the traditional dual elements of infringement: ownership of copyright by the plaintiff and copying by the defendant.[20] It said that the second element, copying, could be established by proof of the defendant's access to the copyrighted work and substantial similarity between that work and the defendant's work.[21] In examining prior cases, the Ninth Circuit found that courts had stated those principles as mere "boilerplate" in their opinions.[22] Literally applied, proof of mere access and substantial similarity would produce "untenable results."[23] As an example, the court noted that the copyright owner of a cheap plaster statue of a nude could readily establish infringement against subsequent manufacturers who had access to it "since most statues of nudes would in probability be substantially similar to the cheaply manufactured plaster one."[24] "A limiting principle," stated the court, "is needed."[25] The court found that limiting principle in the "classic distinction between an 'idea' and the 'expression' of that idea."[26] The purpose of this distinction is to reward individual creativity and cultural growth without diminishing the collective right to exploit a copyright owner's source—the world of ideas. The "real task" in copyright litigation, therefore, is to determine whether the defendant copied the copyrighted work's expression of an idea or just the idea it-

---

[18] 562 F.2d 1157 (9th Cir. 1977).

[19] *Id.* at 1161.

[20] *Id.* at 1162.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1162-63 (9th Cir. 1977).

[25] *Id.* at 1163.

[26] *Id.*

self.[27]

   To accomplish that purpose, the *Krofft* court prescribed a two-step test.  First, the copyright owner must prove substantial similarity in the ideas of the respective works.[28]  The *Krofft* court dubbed this initial step the "extrinsic test."[29]  The test is extrinsic, said the court, "because it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed."[30]  Due to the nature of the test, it was appropriate for courts to dissect the works and to consider expert testimony on the issue.[31]  The court stated that the determination was often a simple one, and because the determination was factual, the issue "may often be decided as a matter of law."[32]

   If there is no protection for ideas, why test their similarity at all?  The *Krofft* court specifically explained the purpose of its extrinsic test: infringement requires copying in the broad literal sense of the word, that is, that the defendant created the infringing work, at least in part, by duplicating the plaintiff's copyrighted work.  Substantial similarity between the ideas of the works shows copying in that sense.[33]

   A showing of literal copying, however, is only part of the proof required for a finding of infringement.  In addition, the copying must be unlawful in the sense that it extends to *protected* content—in other words, there must be substantial similarity "not only of general ideas but of the expressions of those ideas as well."[34]  For that determination, the court prescribed an "intrinsic test."[35]  This second step was to be a subjective determination of whether the defendant had "captured the total concept and feel" of the plaintiff's work, determined by the "response of the ordinary reasonable person."[36]  Similarity of expression is "more subtle and complex" than similarity of ideas,[37] and presents "an issue of fact which a jury is peculiarly fitted to determine."[38]  The court

---

[27] *Id.*

[28] *Id.* at 1164.

[29] *Id.*

[30] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir. 1977).

[31] *Id.*

[32] *Id.*

[33] *Id.* at 1164-65 (citing Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)).

[34] *Id.*

[35] *Id.*

[36] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1164-67 (9th Cir. 1977).

[37] *Id.* at 1164.

[38] *Id.* at 1165 (quoting Arnstein v. Porter, 154 F.2d 464, 472-473 (2d Cir. 1946)).

also noted that "analytic dissection and expert testimony are not appropriate" to the determination of protected similarity by the intrinsic test.[39]

In *Krofft*, there was no need to consider similarity of ideas under the extrinsic test because defendant McDonald's conceded that it had copied the idea of the *H. R. Pufnstuf* series.[40]  McDonald's argued, however, that it did not copy protected expression.  It attempted to support its position by dissecting the copyrighted series into its constituent parts—specifically, the characters, setting, and plot of its commercials—and by attempting to demonstrate that the corresponding parts of its television commercials were not similar.[41]  The Ninth Circuit rejected that approach, stating that it was improper to apply an extrinsic test to determine whether the defendant had copied protected expression of the plaintiff's work.[42]  The court affirmed the finding of infringement, deferring to the jury's subjective determination that the defendant had copied protected content.  As stated by the court, "[t]he more vague the test, the less inclined we are to intervene" with the jury's determination of this exceedingly vague test.[43]

The purposes and methods of the two-step *Krofft* test, painstakingly described and explained by the Ninth Circuit, would shortly be turned on their collective head.

## V.  THE *KROFFT* TEST IGNORED, MISAPPLIED AND TRANSFORMED

### A.  *A District Court Shall (Mis)Lead Them . . .*

In the first ruling on a literary infringement claim in the Ninth Circuit after *Krofft*, *Miller v. CBS*, the plaintiff claimed that his three-page treatment was infringed by the television series *Kaz*.[44]  The district court dismissed the claim on summary judgment, finding that the common element between the two works consisted of an unprotected element, "the idea of an ex-convict studying law while in prison."[45]  In reaching its decision, the court followed pre-*Krofft* precedent in which district courts in the Ninth and Second Circuits had dismissed claims

---

[39]  *Id.*

[40]  *Id.*

[41]  *Id.*

[42]  Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1165 (9th Cir. 1977).

[43]  *Id.* at 1166 (quoting Williams v. Kaag Mfrs., Inc., 338 F.2d 949, 951 (9th Cir. 1964)).

[44]  Miller v. Columbia Broad. Sys., Inc., No. CV 78-4291-RMT(Sx), 1980 WL 1179, at *1 (C.D. Cal. June 5, 1980).

[45]  *Id.* at *3.

based upon the finding that the similarities between the works were limited to ideas.[46]   That conclusion directly contradicted the binding precedent of *Krofft*, under which similarity of ideas was precisely what the plaintiff needed to prove in order to *avoid* summary judgment under the extrinsic test.  The *Miller* court also dissected the parties' works and analyzed whether there was similarity in protected elements.[47]   As we have seen, the district court's means of reaching that determination had been specifically rejected by the Ninth Circuit in *Krofft,* which stated that the issue was for subjective determination by the jury and that analytic dissection was inappropriate.[48]   Though issued nearly three years later, the *Miller* opinion makes no reference to *Krofft*.

The next district court to consider a literary infringement claim acknowledged *Krofft* but dismissed the case with an analysis no less contradictory than the one applied in *Miller*.  At issue in *Jason v. Fonda*[49] was a claim that the motion picture, *Coming Home*, infringed the copyright in a book written by the plaintiff.  Both of the parties' works dealt with "subjects such as morality and the effects of war on women, injured veterans and soldiers."[50]   Quoting liberally from the *Krofft* opinion, the court carefully set forth the essential attributes of the test,[51] then it deviated from them.  It acknowledged that the determination of substantial similarity involved a two-step inquiry, each fundamentally different in its purpose.  Then it analyzed the issue in a single passage without differentiating the two tests.[52]   It expressly recognized that the extrinsic test looked for similarity in ideas and not in protected expression.  Then it found that the plaintiff had failed to meet the test because the similarities consisted only of ideas and other unprotectable elements.[53]   It stated that the intrinsic test was applied, not through analysis of specific objective criteria, but by the subjective response of the ordinary reasonable person.  Then it applied the test by dissecting the works into their specific objective criteria.[54]   It stated that the intrinsic

---

[46] *Id.* at *4-5.  The two cases were *Midas Prods., Inc. v. Baer*, 437 F. Supp. 1388 (C.D. Cal. 1977) and *Bevan v. Columbia Broad. Sys., Inc.*, 329 F. Supp. 601 (S.D.N.Y. 1971).

[47] *Id.* at 506-07.

[48] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1165 (9th Cir. 1977).

[49] 526 F. Supp. 774 (C.D. Cal. 1981).

[50] *Id.* at 777.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

test was "uniquely suited for determination by the trier of fact."[55]  Then it dismissed the case, ruling upon the issue as a matter of law.[56]

In only one published opinion would a district court in the Ninth Circuit ever apply the *Krofft* test as set forth in *Krofft*.[57]  The approach of the district court in *Jason v. Fonda*—fundamentally different from *Krofft* in almost every respect—would soon become the law of the land.

## B.  . . . And the Ninth Circuit Shall Follow

The Ninth Circuit would follow the precepts of its own *Krofft* test in only one case.  In *Twentieth Century-Fox Film Corp. v. MCA, Inc.*,[58] the court reversed a summary judgment against the plaintiff, who claimed that defendant's outer space television series, *Battlestar Galactica*, had infringed its copyright in *Star Wars*.  With passing mention to *Krofft* (but no analysis), the Ninth Circuit found that reasonable minds could differ on whether thirty four cited similarities between the works were "substantially similar in either idea or expression" and left the issue to the jury.[59]  The court added unhelpfully that summary judgment was appropriate only where the parties' works were "so dissimilar that a claim of infringement is without merit."[60]

In its decisions published after the *Star Wars* case, the Ninth Circuit would invariably cite *Krofft* and correctly describe the *Krofft* court's conception of the extrinsic and intrinsic tests, but it would apply the contradictory approach of the district court in *Jason v. Fonda*.  Under that framework, seven years would pass before the Ninth Circuit allowed another literary infringement claim to escape summary judgment.

In *Litchfield v. Spielberg*,[61] for instance, the plaintiff claimed that the motion picture, *E.T. the Extra-Terrestrial*, infringed her copyright in *Lokey from Maldemar*, a one-act "musical play" that also involved

---

[55] Jason v. Fonda, 526 F. Supp. 774, 777 (C.D. Cal. 1981).

[56] The Ninth Circuit affirmed the ruling without analysis.  Jason v. Fonda, 698 F.2d 966 (9th Cir. 1982).

[57] In *Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*, 543 F. Supp. 1134 (C.D. Cal. 1982), the court issued a preliminary injunction in favor of the producers of the blockbuster movie, *Jaws*, against an alleged knock-off called *Great White*.  The court found that the extrinsic test was satisfied by the parties' stipulation that the underlying ideas of the two movies were the same: "a terror fish attacking a coastal town on the Atlantic seaboard." *Id.* at 1140.

[58] 715 F.2d 1327 (9th Cir. 1983).

[59] *Id.* at 1329.

[60] *Id.* at 1330.

[61] 736 F.2d 1352 (9th Cir. 1984).

an alien stranded on Earth.  The Ninth Circuit affirmed the grant of summary judgment to defendants, finding that the plaintiff had failed to satisfy the extrinsic test as a matter of law.  "Viewed in the light most favorable to the plaintiffs," the court found similarities in what "may be more than stock scenes."[62]  Nonetheless, it found that there was no substantial similarity in the specific criteria examined as part of the extrinsic test.  It did not elaborate upon this broad conclusion, except in stating that the similarities of plot "exist only at the general level for which plaintiff cannot claim copyright protection," citing *Jason v. Fonda* for authority.[63]  The court followed *Jason* (though it did not cite it) in ruling that the plaintiff had also failed to satisfy the intrinsic test as a matter of law, finding that "[t]he concept and feel of the works here are completely different."[64]  Passing unmentioned was the fact that, under the *Krofft* formulation of the two-step test, the court was not meant to rule upon the protectability of similarities under the extrinsic test and did not apply the intrinsic test at all.  The opinion, however, repeatedly cites *Krofft* and makes no suggestion that it is applying an inconsistent analysis.

The deviation from the *Krofft* test continued without acknowledgment, but grew even more apparent in *Berkic v. Crichton*.[65]  Again purporting to follow the *Krofft* formulation, the court found similarities in "general plot ideas" but held that the plaintiff failed to meet the test as a matter of law because "[g]eneral plot ideas are not protected by copyright law . . . ."[66]  The court punctuated its inconsistency with the *Krofft* formulation by criticizing the plaintiff's attorney for arguing that the extrinsic test was satisfied by the similarity of ideas, the very function of the test espoused in *Krofft*.[67]

In the two literary infringement decisions following *Litchfield* and *Berkic*, the Ninth Circuit continued to characterize the extrinsic test as a test of substantial similarity of ideas, but it dismissed literary infringement claims because the plaintiffs failed to show similarity in protected content—in the "concrete elements" of the works.[68]  It was only in the next case that the Ninth Circuit recognized—and notified

---

[62] *Id.* at 1356.

[63] *Id.* at 1357.

[64] *Id.*

[65] 761 F.2d 1289 (9th Cir. 1985).

[66] *Id.* at 1293.

[67] *Id.* at 1293-94.

[68] Narell v. Freeman, 872 F.2d 907, 912 (9th Cir. 1989); Olson v. Nat'l Broad. Co., Inc., 855 F.2d at 1446, 1450 (9th Cir. 1988).

the public—that it had long since departed from *Krofft*.

## VI. THE CHANGE ACKNOWLEDGED

In *Shaw v. Lindheim*,[69] the Ninth Circuit abandoned any pretense of consistency with *Krofft*. In that case, the plaintiff, a professional television writer and producer, claimed that the television series, *The Equalizer*, infringed the copyright in his script. In applying the extrinsic test, the court specifically acknowledged that it was not the extrinsic test prescribed by *Krofft*, stating, "Now that it includes virtually every element that may be considered concrete in a literary work, the extrinsic test as applied to books, scripts, plays, and motion pictures can no longer be seen as a test for mere similarity of ideas."[70] Instead, said the court, the extrinsic and intrinsic tests "are more sensibly described as objective and subjective analyses of *expression*, having strayed from *Krofft*'s division between expression and ideas."[71]

The *Shaw* court's explanation for the deviation from *Krofft* was unsatisfying. The mere fact that the extrinsic test examined the specific, concrete elements of a literary work did not call for a change in its function. Indeed, *Krofft* expressly called for the examination of such elements—or, as the *Krofft* court had called them, "specific criteria"—as the method for examining similarity of ideas.[72] Whatever the reason for the change from *Krofft*'s extrinsic test, however, the deviation was salutary. An inquiry limited solely to similarity of unprotected content—the function of the extrinsic test as conceived by *Krofft*—is unnecessary, as demonstrated by the fact that the courts' longstanding failure to apply it had not raised even a ripple of attention. It is, however, essential to a finding of copyright infringement that the defendant has copied *protected* content. The original two-part *Krofft* test did not provide a reliable method for reaching that determination. Under *Krofft*, copying of protected content was to be determined through the intrinsic test, based upon the subjective impression of a jury. In applying their subjective impression, however, jurors do not distinguish be-

---

[69] 919 F.2d 1353 (9th Cir. 1990).

[70] *Id.* at 1357.

[71] *Id.* (emphasis in original). The court's language suggests that the deviation from the *Krofft* framework is particular to analyses of literary works. In this context, however, there is no reason to distinguish literary works from other works of art. Indeed, in developing its analysis, the *Shaw* court found it necessary to harmonize its ruling with earlier cases involving plush animals and videogames. *Id.* at 1359-60.

[72] 562 F.2d at 1164. The *Jason v. Fonda* court had, in fact, specifically relied upon that language in identifying plot, theme, dialogue and other components as the concrete elements to be examined. 526 F. Supp. 774, 777 (C.D. Cal. 1981) (quoting *Krofft*'s call for the examination of "specific criteria which can be listed and analyzed").

tween protected and unprotected matter.  *Krofft's* two-step process, therefore, allowed for a finding of infringement even where the defendant had copied nothing but ideas and other unprotectable matter.[73] To avoid that untenable result, a threshold evaluation was needed to assure that the jury is responding at least in part to works that are substantially similar in *protected* content.  That assurance is provided by an extrinsic test that dissects and analyzes the points of similarity.

Thus, whether or not the courts that initially evaluated substantial similarity after *Krofft* were aware that they were not faithfully applying that precedent, the change wrought by *Jason v. Fonda* was necessary to correct a serious flaw in *Krofft's* two-step framework.  The courts' failure to acknowledge that change, however, created an evolutionary quirk that would install judges as the first, last and only arbiters of substantial similarity in literary infringement cases, a fact that has led to almost unvarying results.

## VII.  LOOKING FOR PROTECTED SIMILARITY IN THE WRONG PLACES

The *Krofft* court expressed its expectation that judges would play a primary role in resolving the extrinsic test by stating that the test "may often be decided as a matter of law."[74]  The *Krofft* court, however, was referring to an extrinsic test that addressed only whether there was substantial similarity in ideas and other unprotected content.  As we have seen, the test was almost never applied to that purpose but rather has been used by the courts to resolve the more "subtle and complex" issue of whether the works were substantially similar in protected content.  Because, however, the transformation of the test was not initially acknowledged, the courts continued to apply the transformed test under some of the procedural directions of *Krofft*.  Most notably, the courts continued to rely upon *Krofft* for authority to rule upon substantial similarity in protected content as a matter of law.[75]  The result has been a line of cases notable for the consistency of their results: dismissal.

---

[73] *See* Olson v. Nat'l Broad. Co., Inc., 855 F.2d 1446, 1453 (9th Cir. 1988) (quoting Aliotti v. R. Dakin & Co., 831 F.2d 898, 901 (9th Cir. 1987)) (stating that, even if a reasonable jury were to find substantial similarity in total concept and feel, there is no infringement "where analytic dissection demonstrates that all similarities in expression arise from the use of common ideas").

[74] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir. 1977).

[75] *See, e.g.*, Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1076 (9th Cir. 2006); Berkic v. Crichton, 761 F.2d 1289, 1292 (9th Cir. 1985); Wild v. NBC Universal, Inc., 788 F. Supp. 2d 1083, 1098 (C.D. Cal. 2011); Bernal v. Paradigm Talent and Literary Agency, 788 F. Supp. 2d 1043, 1060 (C.D. Cal. 2010).

14          UCLA ENTERTAINMENT LAW REVIEW          [Vol. 21:1

In evaluating substantial similarity under the extrinsic test, the courts are enjoined to consider only "protectable elements, standing alone."[76] They must "filter out and disregard the non-protectable elements in making [the] substantial similarity determination."[77] As applied by most of the courts that have considered the issue, these guidelines leave no chance for a literary infringement claim to satisfy the extrinsic test. Whether described as "specific criteria,"[78] "specific expressive elements,"[79] "actual concrete elements," [80] or "objective details,"[81] almost none of the components examined under the extrinsic test are, by themselves, entitled to protection. There is no protection for a theme, a setting, a mood, or the pace of a literary work.[82] As to dialogue, protection exists only where it is sufficiently developed or distinctive.[83] Essentially, substantial similarity can be found in dialogue only where the defendant has copied verbatim one or more extended passages.[84]

Absent verbatim copying, character and plot are the only concrete elements that individually present even a potential for protection. As to literary characters, however, the courts tell us that they are "ordinarily" not protected; protection applies only where the bundle of personal attributes that comprise a character is "especially distinctive" or consti-

---

[76] Cavalier v. Random House, 297 F.3d 815, 822 (9th Cir. 2002) (quoting Williams v. Crichton, 84 F.3d 581, 588 (2d Cir. 1985); *see also* Rice v. Fox Broad. Co., 330 F.3d 1170, 1174 (9th Cir. 2003) ("[A] party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'" (quoting Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1446 (9th Cir. 1994)).

[77] Cavalier v. Random House, 297 F.3d at 822-823.

[78] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir. 1977).

[79] Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994).

[80] Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985).

[81] Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984).

[82] *See* Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976), *cert. denied*, 429 U.S. 980 (1976) (no individual protection for theme); Williams v. Crichton, 84 F.3d 581, 589 (2d Cir. 1986) (same regarding pace); Doody v. Penguin Grp. (USA) Inc., 673 F. Supp. 2d 1144, 1159 (D. Haw. 2009); Anderson v. Stallone, No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) (same regarding theme and mood); McMahon v. Prentice-Hall, Inc., 486 F. Supp. 1296, 1302 (E.D. Mo. 1980) (same regarding "style"); Alexander v. Haley, 460 F. Supp. 40, 46 (S.D.N.Y. 1978) (same regarding theme and setting).

[83] 37 C.F.R. § 202.1(a) (2013) (words and short phrases not subject to copyright); Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541 (2d Cir. 1959) (same); Wild v. NBC Universal, Inc., 788 F. Supp. 2d 1083, 1106 (C.D. Cal. 2011) (ordinary words and phrases not protected); *but see* Narell v. Freeman, 872 F.2d 907, 911 (9th Cir. 1989) (same as to "ordinary" phrases, but "original" phrase may be protected).

[84] *See* Olson v. Nat'l Broad. Co., Inc., 855 F.2d 1446, 1450 (9th Cir. 1988).

tutes the "story being told."[85]  In fact, even those stringent conditions do not fully describe the difficulty of securing protection for literary characters; as a practical matter, protection is given only where a character is not only highly developed and distinctive, but also is the central feature of an extended series of literary works.[86]  Even then, protection may be denied.[87]

No Ninth Circuit court applying the extrinsic test has found substantial similarity in the element of plot, though it is here that protection would most likely be found.  In this context, plot means more than the general idea of the work.  There is no protection for boy-meets-girl, or big-ape-from-forbidden-island-comes-to-New York-and-gets-shot-off-skyscraper-by-biplanes.  These are "mere plot ideas," and, as the courts often remind us, there is no protection for a plot idea.[88]  Protection for plot may be provided only to "the 'sequence of events by which the author expresses his theme or idea' in sufficiently concrete terms . . . ."[89]  In examining plot, however, the courts generally do not make a meaningful analysis of the "sequence of events."  Instead, they dissect the sequence of events into its own individual elements, then filter out each one as an unprotectable idea or scenes à faire—that is, stock scenes that "flow naturally" from the premise of the work.[90]

This process of reduction leaves nothing to satisfy the extrinsic test.  "Lest 'every song [be] merely a collection of basic notes, every painting a derivative work of color and stroke, and every novel merely an unprotected jumble of words,' a court cannot assess the originality of a work solely from the originality of the individual component parts."[91]

---

[85] Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003); Olson v. Nat'l Broad. Co., Inc., 855 F.2d at 1446, 1452 (9th Cir. 1988).

[86] *See* Metro-Goldwyn-Mayer v. Am. Honda Motor Co., 900 F. Supp. 1287 (C.D. Cal. 1995) (James Bond); Anderson v. Stallone, No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) (Rocky Balboa); Toho Co. v. William Morrow & Co. 33 F. Supp. 2d 1206 (C.D. Cal. 1998) (Godzilla).

[87] *See* Warner Bros. Pictures Inc. v. Columbia Broad. Sys., 216 F.2d 945, 950 (9th Cir. 1954) (Sam Spade).

[88] *See* Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985); Bernal v. Paradigm Talent and Literary Agency, 788 F. Supp. 2d 1043, 1066 (C.D. Cal. 2010).

[89] Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1135 (C.D. Cal. 2007).

[90] *See, e.g.*, Cavalier v. Random House, 297 F.3d 815, 824 (9th Cir. 2002); *Berkic*, 761 F.2d at 1293.

[91] Diamond Direct, LLC v. Star Diamond Grp., Inc., 116 F. Supp. 2d 525, 528 (S.D.N.Y. 2000) (quoting Yurman Design Inc., v. PAJ, Inc., 93 F. Supp. 2d 449, 457 (S.D.N.Y. 2000)); *see also* Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1003 (2d Cir. 1995) ("[I]f we took this argument to its logical conclusion, we might have to decide that 'there can be no originality in painting, because all colors of paint have been used somewhere in the past.'").

When the courts carve literary works down to their molecules, they are looking for protected similarity where it does not exist. What, then, is the appropriate object of inquiry under the extrinsic test? The answer was provided at the very beginning of the substantial similarity saga.

## VIII. PROTECTION IN THE UNPROTECTED

In *Krofft*, the Ninth Circuit rejected the use of analytic dissection in determining the existence of protected similarity. The Court explained:

> Lest we fall prey to defendants' invitation to dissect the works, however, we should remember that it is the combination of many different elements which may command copyright protection because of its particular subjective quality. "While any one similarity taken by itself seems trivial, I cannot say at this time that it would be improper for a jury to find that the overall impact and effect indicate substantial appropriation."[92]

This critical principle was promptly disregarded, the extrinsic test was transformed and, applying the *Jason v. Fonda* analysis, Ninth Circuit courts proceeded to dissect literary works, looking for protected similarity in their elemental units. For more than 12 years following *Krofft*, the Ninth Circuit applied that divergent analysis in every case but one, *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, the *Star Wars* case.[93] It is no coincidence that the *Star Wars* case was also the only case during that period in which the court reversed the summary judgment of a literary infringement claim. The court did not disclose the method it applied, stating only that reasonable minds could differ upon whether there was substantial similarity in a list of thirty-four similarities cited by the plaintiff.[94] There is every reason to believe, however, that had the court done nothing more examine each of the thirty-four similarities for individual protectability, the dismissal would have been affirmed.

The next time the Ninth Circuit would restore a literary infringement claim from dismissal, the court left no doubt that its holding was based upon the potential protectability, not of any individual element,

---

[92] Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1169 (9th Cir. 1977) (citations omitted) (quoting Malkin v. Dubinsky, 146 F. Supp. 111, 114 (S.D.N.Y. 1956)).

[93] 715 F.2d 1327 (9th Cir. 1983) (the *Star Wars* case, discussed *supra*).

[94] *Id.* at 1329.

but of a combination of elements.  The case was *Shaw v. Lindheim*,[95] involving *The Equalizer* series.  In applying the extrinsic test, the Ninth Circuit stated that, although no similar plot element in the works at issue was "remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression."[96]  Quoting a treatise and a 50-year-old Second Circuit case, the court stated, "Where plot is . . . properly defined as the sequence of events by which the author expresses his 'theme' or 'idea,' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff's and defendant's works."[97]

One year later, the Supreme Court recognized the principle.  In *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*,[98] the court stated that copyright protection applied to an original "selection and arrangement" of the decidedly unprotectable individual elements of a telephone directory.  The Ninth Circuit adopted the *Feist* language, first applying it in a case involving the alleged infringement of a computer display.[99]  By the year 2000, the principle was so entrenched that, without even citing *Feist* or any case applying its language, the Ninth Circuit declined to reverse a jury's determination of musical infringement because it was "well settled that a jury may find a combination of unprotectable elements to be protectable under the extrinsic test . . . ."[100]  The Ninth Circuit, however, did *not* apply the principle in either of the two literary infringement cases presented to it in the twelve years following *Feist*.[101]  The omission was particularly conspicuous in the second of those cases, where the court expressly considered the "selection and arrangement" of similar elements in analyzing whether the defendant had infringed the graphic content of the plaintiff's work but not in analyzing the literary content.[102]

Then came *Metcalf v. Bochco*.[103]

---

[95] 919 F.2d 1353 (9th Cir. 1990).

[96] *Id.* at 1363.

[97] *Id.* (internal quotes omitted) (quoting MELVILLE NIMMER, NIMMER ON COPYRIGHT § 1303[A], at 13-31 (1989) and Shipman v. RKO Pictures, Inc., 100 F.2d 533, 537 (2d Cir. 1938)).

[98] Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 490 U.S. 340, 349 (1991).

[99] Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1446 (9th Cir. 1994).

[100] Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000).

[101] Cavalier v. Random House, 297 F.3d 815, 824 (9th Cir. 2002); Kouf v. Walt Disney Pictures & Television, 16 F.3d 1043, 1043 (9th Cir. 1994).

[102] *Cavalier*, 297 F.3d at 825-826.

[103] Metcalf v. Bochco, 294 F.3d 1070, 1071 (9th Cir. 2002).

## IX. THE COURT GETS IT RIGHT

In 2000, a novice husband-and-wife screenwriting team named Jerome and Laurie Metcalf asserted that famed television producer/writer Steven Bochco had infringed their unsold television scripts with his short-lived television series, *City of Angels.* The district court dismissed their claim for lack of substantial similarity, but, for only the third time since the adoption of the two-part test in 1977, the Ninth Circuit reversed.

On appeal, the Metcalfs relied upon similarities in setting (an overburdened county hospital in Los Angeles with a mostly black staff), characters (a young, handsome black surgeon, raised in the hospital community, and romantically involved with a thirtyish, formerly married, childless, career-oriented hospital administrator), theme (the surgeon's struggle between the emotional rewards of a county hospital position and a more lucrative private practice) and plot (a pivotal kiss; an equally consequential incident of seeming infidelity between the surgeon and his former love interest, witnessed by the current love interest; a challenge to the hospital's accreditation by a Hispanic politician).[104]   The court acknowledged that none of these similarities were protectable "when considered individually."[105]   They were "either too generic or constitute 'scenes à faire'."[106]   The court nonetheless found a genuine issue of substantial similarity, stating that "the presence of so many generic similarities and the common patterns in which they arise do help the Metcalfs satisfy the extrinsic test."[107]   The court noted that an original selection and arrangement of elements may itself be protectable, even where protection did not exist for any of those elements individually.[108]   In justifying its ruling, the court quoted *Shaw v. Lindheim* in finding that "the totality of the similarities . . . goes beyond the necessities of the . . . theme and belies any claim of literary accident."[109]

In reaching its conclusion, the *Metcalf* court had inquired past the point where almost all previous courts had prematurely stopped, applying an extrinsic test based upon *Feist* and illuminated by *Krofft* and *Shaw.* *Metcalf* offered an analytic corrective to the benighted body of precedent, presenting an approach appropriately directed to the struc-

---

[104]  *Id.* at 1073-74.

[105]  *Id.* at 1074.

[106]  *Id.*

[107]  *Id.*

[108]  Metcalf v. Bochco, 294 F.3d 1070, 1071 (9th Cir. 2002).

[109]  *Id.*

ture of the works rather than to their individual elements.

In the twelve years following its publication, the case has been all but rejected outright.

## X. THE NEGATION OF METCALF V. BOCHCO

Since *Metcalf v. Bochco*, courts in the Ninth Circuit have applied the extrinsic test to literary infringement claims in nearly thirty cases.[110]  In every one, at each level, the courts have found that the plaintiff failed to meet the test as a matter of law.  In the opinions supporting these dismissals, the *Metcalf* decision has been mischaracterized, distinguished or simply ignored.

In *Rice v. Fox Broadcasting Co.*,[111] the first such case considered by the Ninth Circuit, the court distinguished *Metcalf* in its finding that the result in *Metcalf* had depended upon application of the "inverse-ratio rule."[112]  The *Metcalf* opinion does not support that reading.  Un-

---

[110] *See* Mandeville-Anthony v. Walt Disney Co., 474 F. App'x. 651, 652 (9th Cir. 2012); Radin v. Hunt, 499 F. App'x. 684, 685 (9th Cir. 2012); Benay v. Warner Bros. Entm't, Inc., 607 F.3d 620, 624 (9th Cir. 2009); Mestre v. Vivendi Universal U.S. Holding Co., 273 F. App'x. 631, 632 (9th Cir. 2008); Lassiter v. Twentieth Century Fox Film Corp., 238 F. App'x. 194, 195 n.3 (9th Cir. 2007); Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1077 (9th Cir. 2006); Rice v. Fox Broad. Co., 330 F.3d 1170, 1174 (9th Cir. 2003); Quirk v. Sony Pictures Entm't, No. C 11–3773 RS, 2013 WL 1345075, at *4 (N.D. Cal. Apr. 2, 2013); Kennedy v. Paramount Pictures Corp., Civil No. 12cv372–WQH–WMc, 2013 WL 1285109, at *4 (S.D. Cal. Mar. 27, 2013); Schkeiban v. Cameron, No. CV 12–0636–R (MANx), 2012 WL 5636281 at *2 (C.D. Cal. Oct. 4, 2012); Coble v. Renfroe, No. C11–0498 RSM, 2012 WL 503860, at *3 (W.D. Wa. Feb. 15, 2012); Goldberg v. Cameron, 787 F. Supp. 2d 1013, 1019 (N.D. Cal. 2011); Wild v. NBC Universal, Inc., 788 F. Supp. 2d 1083, 1098 (C.D. Cal. 2011); Buggs v. Dreamworks, Inc., No. CV 09-07070 SJO (AGRx), 2010 WL 5790251, at *4 (C.D. Cal. Dec. 28, 2010); Clements v. Screen Gems, Inc., No. CV10-220-R (JEMx), 2010 WL 5174376, at *3 (C.D. Cal. Dec. 13, 2010); Bissoon-Dath v. Sony Computer Entm't Am., Inc., 694 F. Supp. 2d 1071, 1079 (N.D. Cal. 2010); Bernal v. Paradigm Talent and Literary Agency, 788 F. Supp. 2d 1043, 1059 (C.D. Cal. 2010); Gable v. Nat'l Broad. Co., 727 F. Supp. 2d 815, 831 (C.D. Cal. 2010), *aff'd*, 438 F.App'x. 587, 588 (9th Cir. 2011); Doody v. Penguin Grp. (USA) Inc., 673 F. Supp. 2d 1144, 1154 (D. Haw. 2009); Gilbert v. New Line Prods., Inc., No. CV 09-02231 RGK (RZx), 2009 WL 7422458, at *2 (C.D. Cal. Nov. 16, 2009); Rosenfeld v. Twentieth Century Fox, No. CV 07-7040 AHM (FFMx), 2009 WL 212958, at *2 (C.D. Cal. Jan. 28, 2009); Capcom Co. v. MKR Grp., Inc., No. C 08-0904 RS, 2008 WL 4661479, at *5 (N.D. Cal. Oct. 20, 2008); Walker v. Viacom Int'l, Inc., No. C 06-4931 SI, 2008 WL 2050964, at *5 (N.D. Cal. May 13, 2008); Milano v. NBC Universal, Inc., 584 F. Supp. 2d 1288, 1294 (C.D. Cal. 2008); Thomas v. Walt Disney Co., No. C-07-4392 CW, 2008 WL 425647, at *2 (N.D. Cal. Feb. 14, 2008); Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007); Benjamin v. Walt Disney Co., No. CV 05-2280GPS, 2007 WL 1655783, at *4 (C.D. Cal. Jun. 5, 2007); Identity Arts v. Best Buy Enter. Serv. Inc., Nos. C 05-4656 PJH, C 06-1631 PJH, 2007 WL 1149155, at *8 (N.D. Cal. Apr. 18, 2007); Bethea v. Burnett, No. CV04-7690JFWPLAX, 2005 WL 1720631, at *2 (C.D. Cal. June 28, 2005).

[111] *Rice*, 330 F.3d 1170 (9th Cir. 2003).

[112] *Id.* at 1179; *see also Bethea*, 2005 WL 1720631 at *15.

der the inverse-ratio rule, the degree of similarity required to establish infringement stands in inverse proportion to the degree of access shown—the more access shown, the less similarity required.[113]   In *Metcalf*, the court did state that the plaintiff's case was "strengthened considerably" by Bochco's concession of access.[114]   The court did not suggest, however, that its reversal of summary judgment depended upon the concession of access, let alone that protection for a combination of unprotected elements depended upon that concession.   To the contrary, by that point in the opinion, the court had already found that the "totality" of the similarities confirmed that they were attributable to copying and that their "cumulative weight" allowed the Metcalfs to survive summary judgment.[115]   The court's comment that the plaintiffs' case was strengthened by Bochco's concession of access appears as an afterthought, representing the court's reflection on how the trier of fact might ultimately decide the ultimate issue of substantial similarity after remand to the district court.[116]   It will be recalled that the ruling in *Metcalf* was grounded upon *Feist*'s "selection and arrangement" principle.   Although the defendant in that case undoubtedly had access to the plaintiff's work,[117] the Supreme Court said nothing in *Feist* to suggest that the application of its principle depended upon heightened proof of access, let alone an express concession.   If an original selection and arrangement of unprotected elements is entitled to protection at all, no reason appears that a plaintiff must satisfy the element of access with proof anything more than the standard level of evidence.[118]

In distinguishing *Metcalf v. Bochco*, the *Rice* court did not rely solely upon the inverse-ratio rule.   It also noted that the works at issue did not present "the same pattern of generic similarities as in *Metcalf*."[119]   The court, however, did not explain what pattern that might be.   In two subsequent unpublished decisions, the Ninth Circuit again attributed a sort of self-evident significance to the similarities re-

---

[113] *See, e.g.*, Shaw v. Lindheim, 919 F.2d 1353, 1361 (9th Cir. 1990).

[114] *Rice*, 330 F.3d at 1179.   In moving for summary judgment, Bochco and the other defendants had not, in fact, conceded access; they merely stated that they were not disputing it for purposes of their motion.

[115] Metcalf v. Bochco, 294 F.3d 1070, 1074 (9th Cir. 2002).

[116] *Id.* at 1075.

[117] *See* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 490 U.S. 340, 361 (1991).

[118] Cases applying the selection and arrangement rule in non-literary infringement claims have not referred to any such requirement. *See, e.g.*, Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1146-47 (9th Cir. 2003) (sculpture); Satava v. Lowry, 323 F.3d 805, 811-12 (9th Cir. 2003) (sculpture); Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1446 (9th Cir. 1994) (computer graphical user interface).

[119] *Rice*, 330 F.3d at 1179.

cited in *Metcalf*, avoiding meaningful analysis to support the conclusion that the unprotected similarities in the works before them did not attain that level.[120]

A few opinions have added the comment that the similarities did not constitute a protectable selection and arrangement because they were "random."[121]  There was, however, no want of significant similarities between the works at issue in the next published Ninth Circuit opinion to analyze a literary infringement claim, and they were anything but random.

The plaintiff in *Funky Films v. Time Warner Entertainment Co.*[122] was another industry outsider who asserted that acclaimed television series *Six Feet Under* infringed the copyright in her screenplay, *The Funk Parlor*.  The similarities cited by the court were extensive.  Both works centered upon a small funeral home and the lives of the family members who operated it.  Both were set in motion by the sudden death of the father, who had run the funeral home for decades.  In both works, the older son, decidedly heterosexual, has long ago moved out of town and maintained no involvement in the family business, while the younger son, homosexual, has remained behind to assist his father in running it.  After the father's death, the two sons inherit the business, which is deeply in debt and operating from a deteriorating facility with obsolete equipment, including a malfunctioning hearse.  Initially, the older brother wants no part of the business and announces his intention to sell it.  He changes his mind, however, after the overbearing female head of a rival funeral home attempts to force the brothers to accept a low-ball offer to purchase given at the father's funeral.  The brothers manage to fend off the competitor and keep the business afloat, in part by the unconventional methods of the older brother.[123]

Describing these similarities as merely "apparent," the Court stated that there were few "real" similarities.[124]  In the analysis that followed,

---

[120] Gable v. Nat'l Broad. Co., 727 F. Supp. 2d 815, 831 (C.D. Cal. 2010); Mestre v. Vivendi Universal U.S. Holding Co., 273 F. App'x. 631, 632 (9th Cir. 2008).  Some district courts have taken the same tack.  *See* Buggs v. Dreamworks, Inc., No. CV 09-07070 SJO (AGRx), 2010 WL 5790251, at *4 (C.D. Cal. Dec. 28, 2010); Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007) ("[M]any courts have been reluctant to expand [the *Metcalf* rule] beyond the clear-cut case in Metcalf.").

[121] *Buggs*, 2010 WL 5790251 at *7; Bernal v. Paradigm Talent and Literary Agency, 788 F. Supp. 2d 1043, 1067 (C.D. Cal. 2010); *Zella*, 529 F. Supp. 2d at 1138; Bethea v. Burnett, No. CV04-7690JFWPLAX, 2005 WL 1720631, at *14 (C.D. Cal. June 28, 2005).

[122] Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1075 (9th Cir. 2006).

[123] *See id.* at 1075-78.

[124] *Id.* at 1078.

however, the court did not deny that the cited similarities were elements of setting, plot, sequence of events, character, and theme that formed a "selection and arrangement" at least as numerous and structurally related as those of *Metcalf*. Further, the court did not deny that the "totality" of those similarities went "beyond the necessities of defendant's theme" or that it "belied any claim of literary accident," factors that the *Metcalf* court found significant.[125] The court simply avoided any discussion at all of the similarity in the selection and arrangement of unprotected elements between the parties' works. Although the court cited *Metcalf* for unrelated points,[126] it made no reference to the central concept of that case, despite the fact that the plaintiffs had relied upon it as the basis of their appeal. The next Ninth Circuit case to apply the extrinsic test to a literary infringement claim did not refer to *Metcalf* at all, let alone address the selection and arrangement principle.[127]

Following the example set by the Ninth Circuit, approximately half of the district courts applying the extrinsic test have cited *Metcalf* only for principles other than the protectability of a combination of unprotected elements, or have ignored the case altogether.[128] No case following *Metcalf* has found protection in the selection and arrangement of unprotectable similarities. Indeed, after the single interruption of Metcalf, the courts have continued the virtually automatic rejection of literary infringement claims under extrinsic test scrutiny. They do so, in part, by doggedly dissecting works to reach the continually renewing

---

[125] Metcalf v. Bochco, 294 F.3d 1070, 1070 (9th Cir. 2002).

[126] The published opinion in *Funky Films* cites *Metcalf* only in support of the court's reference to an unrelated rule and in rejecting the plaintiffs' invocation of the inverse-ratio rule. 462 F.3 at 1077, 1081 n.4.

[127] Benay v. Warner Bros. Entm't, Inc., 607 F.3d 620, 624 (9th Cir. 2009).

[128] *See* Mandeville-Anthony v. Walt Disney Co., 474 F. App'x. 651, 652 (9th Cir. 2012); Radin v. Hunt, 499 F. App'x. 684, 684 (9th Cir. 2012); Lassiter v. Twentieth Century Fox Film Corp., 238 F. App'x. 194, 195 (9th Cir. 2007); Quirk v. Sony Pictures Entm't, No. C 11–3773 RS, 2013 WL 1345075, at *4 (N.D. Cal. Apr. 2, 2013); Kennedy v. Paramount Pictures Corp., Civil No. 12cv372–WQH–WMc, 2013 WL 1285109, at *4 (S.D. Cal. Mar. 27, 2013); Schkeiban v. Cameron, No. CV 12–0636–R (MANx), 2012 WL 5636281 at *2 (C.D. Cal. Oct. 4, 2012); Coble v. Renfroe, No. C11–0498 RSM, 2012 WL 503860, at *3 (W.D. Wa. Feb. 15, 2012); Wild v. NBC Universal, Inc., 788 F. Supp. 2d 1083, 1098 (C.D. Cal. 2011); Goldberg v. Cameron, 787 F. Supp. 2d 1013, 1019 (N.D. Cal. 2011); Clements v. Screen Gems, Inc., No. CV10-220-R (JEMx), 2010 WL 5174376, at *3 (C.D. Cal. Dec. 13, 2010); Bissoon-Dath v. Sony Computer Entm't Am., Inc., 694 F. Supp. 2d 1071, 1079 (N.D. Cal. 2010); Rosenfeld v. Twentieth Century Fox, No. CV 07-7040 AHM (FFMx), 2009 WL 212958, at *2 (C.D. Cal. Jan. 28, 2009); Walker v. Viacom Int'l, Inc., No. C 06-4931 SI, 2008 WL 2050964, at *5 (N.D. Cal. May 13, 2008); Thomas v. Walt Disney Co., No. C-07-4392 CW, 2008 WL 425647, at *2 (N.D. Cal. Feb. 14, 2008); Benjamin v. Walt Disney Co., No. CV 05-2280GPS, 2007 WL 1655783, at *4 (C.D. Cal. Jun. 5, 2007); Identity Arts v. Best Buy Enter. Serv. Inc., Nos. C 05-4656 PJH, C 06-1631 PJH, 2007 WL 1149155, at *8 (N.D. Cal. Apr. 18, 2007).

discovery that the individual elements of similarity are not entitled to protection. Following *Funky Films*, however, they have increasingly come to justify the dismissals upon grounds having no place in the extrinsic test analysis.

## XI. THE WEIGHT OF DIFFERENCES

In *Funky Films*, the court recited at length the similarities between the parties' works.[129] It then observed that, while "at first blush" they appeared significant, "an actual reading of the two works reveals greater, more significant differences . . . ."[130] Unmistakably, the court's finding that the works lacked substantial similarity was based principally upon that determination.[131] Usually supported by reference to *Funky Films*, subsequent courts have adopted that rationale in dismissing literary infringement claims.[132] Differences between the works, however, carry no weight in the extrinsic test analysis.

With literary infringement claims, it is often the case that the defendant has developed the allegedly infringing work far beyond the scope of the plaintiff's copyrighted work.[133] As a result, there will necessarily be numerous differences between the works at issue. But just as unprotected similarities are filtered out of the extrinsic test analysis, the same rule should apply to differences. The role of the extrinsic test is solely to determine whether there is substantial similarity in protected content; where it exists, the test is satisfied, irrespective of the number or relative weight of differences. As noted by the Second Circuit,

---

[129] 462 F.3d at 1077-78.

[130] *Id.* at 1078.

[131] Most of the court's analysis of substantial similarity was devoted to describing those differences. *Id.* at 1078-81.

[132] *See Benay*, 607 F.3d at 625 ("many more differences than similarities"); *Lassiter*, 238 F. App'x. at 195 ("significant differences and few real similarities"); *Coble*, 2012 WL 503860, at *3 ("greater, more significant differences"); *Wild*, 788 F. Supp. 2d at 1109 ("[o]ne cannot imagine how two works could be substantially similar without a story that focuses on the actions of similar characters"); *Goldberg*, 787 F. Supp. 2d at 1021 (the works "tell fundamentally different stories"); *Clements*, 2010 WL 5174376, at *3 ("many more differences than similarities"); *Bernal*, 788 F. Supp. 2d at 1068 (the differences "are vastly more substantial than the similarities"); *Gable*, 727 F. Supp. 2d at 842 (the "similarities pale in comparison" to differences); *Gilbert*, 2009 WL 7422458, at *3 (the similarities "pale in comparison to vast differences" between the works).

[133] In *Metcalf v. Bochco*, the plaintiffs claimed that the copyrights in their film treatment and two screenplays were infringed by the defendants' television series consisting of 21 hour-long episodes. 294 F.3d 1070, 1071-72 (9th Cir. 2002). In *Funky Films*, the plaintiffs asserted that their single screenplay was infringed by a sixty-one-episode series. 462 F.3d 1072, 1075-76 (9th Cir. 2006).

"No plagiarist can excuse the wrong by showing how much of his work he did not pirate."[134]  Thus, if, for instance, the defendant copied verbatim a chapter of plaintiff's 40-chapter book, it would not matter that the other 39 chapters show no similarity at all, or that the similarities of that single chapter are outweighed by the differences of the others, either in number or in significance.  The only question necessary to address in this scenario is whether the copied chapter is entitled to protection; if it is, then the extrinsic test is satisfied.  Differences are relevant only where the plaintiff mischaracterizes elements of the works to create an illusion of similarity; in that circumstance, an objective analysis should point out the differences in those elements to demonstrate that the claimed similarity is not similarity at all.  In themselves, however, differences between the works are irrelevant to the extrinsic test.

Differences do play a role in the *intrinsic* test, probably a determinative one.  If differences overwhelm the impression of copying created by protected similarity, then the infringement claim will fail at the second step of the substantial similarity analysis because the defendant's work has not "captured the total concept and feel" of the copyrighted work.[135]  Indeed, the courts' current emphasis upon differences appears to be the legacy of early decisions in which they mistakenly ruled upon the intrinsic test as a matter of law.[136]  It was, here again, the *Shaw v. Lindheim* court that pointed out that the courts had taken a detour, reminding us that, because intrinsic similarity was measured by the response of the ordinary reasonable person, the test was not to be

---

[134] Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936); *see also* Bethea v. Burnett, No. CV04-7690JFWPLAX, 2005 WL 1720631, at *11 n.2 (C.D. Cal. June 28, 2005) ("The court recognizes that it cannot rely on an analysis or comparison of the dissimilarities between the two works in reaching its conclusion with respect to the extrinsic test."); *see also* 4 MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.03[B][1][a] at 13-67-13-68) ("It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.").

[135] *See* Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 913 (2d Cir. 1980) ("As a matter of logic as well as law, the more numerous the differences between two works, the less likely it is that they will create the same aesthetic impact so that one will appear to have been appropriated from the other.").

[136] *See, e.g.*, Narell v. Freeman, 872 F.2d 907, 913 (9th Cir. 1989) ("Because of the fundamental differences between the works and the insubstantial nature of the copied passages, no reasonable reader could conclude that the works are substantially similar."); Berkic v. Crichton, 761 F.2d 1289, 1294 (9th Cir. 1985) ("Our own, independent review of the works satisfies us that they are substantially dissimilar in 'the mood evoked . . . as a whole . . . .'"); Litchfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir. 1984) ("The concept and feel of the works here are completely different."); Jason v. Fonda, 526 F.Supp.774, 777 (C.D. Cal. 1981) (finding that the works being "substantially dissimilar" was a basis for finding against plaintiff on both tests).

decided as a matter of law but "must be left to the trier of fact."[137]  Later courts accepted that correction, leaving the intrinsic test to the jury. The courts should likewise have left behind consideration of differences as relevant only to that test.  Again, however, due to confusion caused by the insufficiently examined deviation from the original *Krofft* framework, the courts adopted the analysis of differences as part of the extrinsic test.[138]

A meaningful extrinsic test to determine substantial similarity of protected content in literary infringement cases does not consider differences.  It identifies and examines individual elements of similarity, but not simply to produce the finding that they are individually unprotectable.  Rather, if none of the customarily examined elements of similarity are entitled to protection, as is almost invariably the case, then the test evaluates whether the selection and arrangement of those elements is itself a protectable element.

As to this last inquiry, a new standard is needed.  As Judge Hand said more than fifty years ago, any standard for determining protectability must of necessity be vague, and decisions should be *ad hoc*.[139] But to retrieve this active area of law from the muddle of its precedent, more specific guidance is needed.

## XII.  The Proposed Rule

The *Metcalf* court applied an appropriate analysis, but it only hinted at a useful standard.  The court stated:

> The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.  Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection. A common "pattern" [that] is sufficiently concrete . . . warrants a finding of substantial similarity.[140]

In applying a similar analysis twelve years earlier, the *Shaw* court

---

[137]  Shaw v. Lindheim, 919 F.2d 1353, 1361 (9th Cir. 1990).

[138]  One court went so far off the mark as to analyze "total concept and feel"—the object of the intrinsic test—as an extrinsic test factor.  *See* Capcom Co. v. MKR Grp., Inc., No. C 08-0904 RS, 2008 WL 4661479, at *10 (N.D. Cal. Oct. 20, 2008).

[139]  Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

[140]  Metcalf v. Bochco, 294 F.3d 1070, 1074 (9th Cir. 2002) (quoting *Shaw*, 919 F.2d at 1363).

also found protection for a pattern of similarities because it was "sufficiently concrete."[141]  In fact, the courts have often stated the requirement that similarities be "concrete," whatever form their analysis might take.[142]  But if the only requirement were that the similarities are "concrete," then the word must mean more than its definition conveys: one can readily conceive a list of shared elements that are specific, real and tangible, but so loosely connected as to fall short of the barest requirements of creativity.

Perhaps the closest that the Ninth Circuit has come to articulating a useful standard was in *Satava v. Lowry,*[143] a case involving sculptures. There, the Ninth Circuit stated that "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."[144] As to the first factor, the *Metcalf* court, too, found the volume of similarities an important factor.[145]  An extensive list of similarities, however, can be strained out of virtually any two literary works, no matter how dissimilar they are overall.  The number of potential similarities is limited only by the resolve of plaintiff's counsel to find them.  Indeed, in *Shaw*, the court noted that defendants had provided "a list of similarities between 'The Wizard of Oz' and 'Star Wars' that is virtually as compelling as the [plaintiff's list]."[146]  What matters in the analysis, therefore, is not the number of similarities, but the number of meaningful similarities.  In this context, the number of similarities is meaningful only if, in combination, the similarities form a protectable selection and arrangement.  So in addition to requiring that the similarities be numerous enough, the *Satava* court properly required that they also be original enough.  This additional requirement means that the work was not copied from something else and that it is sufficiently creative.[147] As has already been discussed, the question of whether the plaintiff

---

[141] *Shaw*, 919 F.2d at 1363.

[142] *See, e.g.,* Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1081 (9th Cir. 2006); Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985); Sid and Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157, 1163 (9th Cir. 1977).

[143] Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003)

[144] *Id.* (citing *Metcalf*, 294 F.3d at 1074; Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1446 (9th Cir. 1994); and Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 490 U.S. 340, 358 (1991) ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection.")).

[145] "The presence of so many generic similarities . . . help[s] the Metcalfs satisfy the extrinsic test." *Metcalf*, 294 F.3d at 1074.

[146] *Shaw*, 919 F.2d at 1363.

[147] *Feist*, 499 U.S. at 345.

copied from another source is no longer directly addressed by the extrinsic test. Whether a similar selection and arrangement of unprotectable elements is sufficiently creative to warrant protection, however, lies at the heart of the test, and it is here that guidance is needed.

The courts have developed a clear standard for determining whether artistic works are sufficiently creative: "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."[148]  That forgiving standard, however, is the one applied when courts consider the protectability of an artistic work. The justification for setting the bar nearly at ground level in weighing protectability was stated by Justice Holmes at the turn of the last century. In reversing a lower court's snub of circus posters as a subject worthy of copyright protection, he wrote, "It would be a dangerous undertaking for persons trained only to the law to constitute themselves judges of the worth of pictorial illustration outside of the narrowest and most obvious limits."[149]

It is not suggested that the mysteries of artistic creation warrant the same degree of deference in determining whether a list of similarities is entitled to protection under the extrinsic test. The adoption of a standard that grants protection to a selection and arrangement of similarities only one notch more expressive than a "mere idea" would dial the extrinsic test almost all the way back to the original *Krofft* formulation. A higher level of originality is required for the extrinsic test because the courts are not simply attempting to determine protectability: they are looking for similarity that is substantial enough to warrant a finding of infringement. Where the selection and arrangement of shared elements barely registers on the scale of creativity, that finding is not justified.[150]

What standard of creativity should apply? Courts that have rejected "lists" of unprotected similarities as a basis to satisfying the extrin-

---

[148] *Id.* (quoting 1 MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §1.08[C][1] (1990)).

[149] Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903); *see also* Pivot Point Int'l, Inc. v. Charlene Prods., Inc., 372 F.3d 913, 924 (7th Cir. 2004) (stating that artistic analysis is "a function for which judicial office is hardly a qualifier").

[150] Indeed, the Second Circuit has stated that "[o]riginality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the author's addition, it is enough if it be his own." Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (2d Cir. 1951) (citations omitted). This humble standard has no value for the extrinsic test analysis, whose very purpose is to determine whether there has been copying.

sic test provide the most useful guidance on the matter. The Ninth Circuit addressed such a list in *Litchfield*, dispensing it with the oft-quoted statement that the court is "particularly cautious where . . . the list emphasizes random similarities scattered throughout the works."[151] Since then, Ninth Circuit courts have routinely dismissed a list of individual similarities invariably proffered by plaintiffs to avoid summary judgment, stating that the list is random, or that it consists of "disconnected facts," with no "concrete" or "common" pattern or "qualitative significance."[152] The unstated but clearly implied corollary is that, where the list of similarities is *not* random or disconnected—where the similarities in the list are related in a way essential to the work—they form a combination that is potentially entitled to protection. This is what the *Metcalf* court meant when it illustrated its rule by stating that, while the individual notes of a scale are not protectable, "a pattern of notes in a tune may earn copyright protection."[153] In the world of literary infringement, a cohesive, sufficiently delineated artistic structure is the equivalent of a tune.

Taking into account what the courts have said, or have failed to say, or have failed to say clearly, the following rule is proposed for evaluating substantial similarity of non-verbatim copying under the extrinsic test:

> *The extrinsic test is satisfied where a combination of unprotected elements shared by the works constitutes a cohesive artistic structure sufficiently delineated and distinct from those of other works of its type to warrant protection.*

Why the focus upon structure? Because it is structure—that is, how the similar elements relate to each other—that stamps a list of

---

[151] Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984).

[152] Cavalier v. Random House, 297 F.3d 815, 825 (9th Cir. 2002); Lane v. Universal City Studios, Inc., No. 93-56093, 1994 WL 465834, at *2 (9th Cir. Aug. 29, 1994); Kouf v. Walt Disney Pictures & Television, 16 F.3d 1043, 1045-46 (9th Cir. 1994); Olson v. Nat'l Broad. Co., 855 F.2d 1446, 1450 (9th Cir. 1988); Buggs v. Dreamworks, Inc., No. CV 09-07070 SJO (AGRx), 2010 WL 5790251, at *7 (C.D. Cal. Dec. 28, 2010); Bernal v. Paradigm Talent and Literary Agency, 788 F. Supp. 2d 1043, 1063 (C.D. Cal. 2010); Gable v. Nat'l Broad. Co., 727 F. Supp. 2d 815, 841 (C.D. Cal. 2010); Doody v. Penguin Grp. (USA) Inc., 673 F. Supp. 2d 1144, 1159 (D. Haw. 2009); Capcom Co. v. MKR Grp., Inc., No. C 08-0904 RS, 2008 WL 4661479, at *8 (N.D. Cal. Oct. 20, 2008); Gilbert v. New Line Prods., Inc., No. CV 09-02231 RGK (RZx), 2009 WL 7422458, at *5 (C.D. Cal. Nov. 16, 2009); Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007); Bethea v. Burnett, No. CV04-7690JFWPLAX, 2005 WL 1720631, at *14 (C.D. Cal. June 28, 2005).

[153] Metcalf v. Bochco, 294 F.3d 1070, 1074 (9th Cir. 2002) (quoting Shaw v. Lindheim, 919 F.2d 1353, 1363 (9th Cir. 1990)).

similarities as something more than random. Where the combination of similarities forms an artistic framework, it is a defining element of the literary work, the very opposite of a random list. Such a creation is not a "mere idea," but rather it is the blueprint for the expression of an idea, protectable in its own right. It is a thing of genuine value, warranting protection not only due to theoretic principles of copyright law, but also due to the realities of the literary marketplace.[154]

The proposed rule assures that the test focuses upon the only literary component where non-verbatim infringement may be found—in the selection and arrangement of similar elements. It also addresses the concerns that have properly been raised by the courts. The requirement that the structure be sufficiently delineated and distinct from other works assures that protection will be given only where the combination is original to the claimed author and that protection will be withheld where it is too broad or insufficient in creativity or in the number of its parts. The requirement of cohesiveness eliminates any potential for protection of random similarities. The rule provides that as more detailed similarities comprising an artistic structure are found in the defendant's work, the closer the defendant's work comes to substantial similarity.[155] While absolute specificity is neither possible nor even desirable for an inquiry whose method is essentially subjective, it is specific about the object of the inquiry.

## XIII. THE COURTS SHOULD NOT GO IT ALONE

Though often presented under its alias, the "objective test," the extrinsic test is objective only in its method. It requires the trier of fact to dissect the works to identify similarity, while the intrinsic test calls only for an emotional response to the undifferentiated whole of the works. In determining whether the similarity is "substantial," however, the extrinsic test is no less subjective than the intrinsic test.

Until now, Ninth Circuit courts have made little if any use of expert testimony in applying the extrinsic test. Two district courts have even referred to authority outside the Ninth Circuit that "cast doubt on whether expert testimony regarding substantial similarity is *ever* help-

---

[154] For validation of that fact, it need only be observed that, in Hollywood, a project usually depends upon a successful pitch for its funding—a presentation describing the structure of the proposed work.

[155] The proposed rule adopts language used in evaluating the protectability of characters. *See, e.g.,* Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003) (characters must be "sufficiently delineated").

ful in a case involving the comparison of two literary works."[156]  The rationale is that, unlike a patent involving technical devices or a copyright involving software or music, movies and television series "are targeted at a general audience and deal with subject matter readily understandable by any ordinary persons, including the Court."[157]  The rejection of expert assistance should be reconsidered.

Historically, the courts' rejection of expert assistance in this area has largely been justified.  When plaintiffs have used experts at all, they have used them only to identify similarities in the works.  There is no need for that type of expert testimony.  Similarities are objective facts, and, as one court has stated, a list of similarities is something that the plaintiff can directly present to the court without an expert acting as an intermediary.[158]  That same court suggested, however, that expert testimony would be useful to explain "why such alleged similarities are qualitatively important to the two works."[159]  Precisely.  Movies and other literary works are not necessarily less complex or nuanced than, say, music, painting, or sculpture, which themselves are often works of popular entertainment.  Judges are no better qualified to evaluate the originality or the significance of similarities in a literary work than they are to write a play, edit an anthology of literary criticism, or teach a film class.  The proof is that few courts have gone further in their analyses than to simply identify similarities and differences.  The few courts that have attempted to go further have not supplied meaningful support for their conclusions.

The Ninth Circuit's opinion, *Kouf v. Walt Disney Pictures & Television*,[160] typifies the superficial treatment generally given to the issue.  In that case, the plaintiff claimed that the motion picture, *Honey, I Shrunk The Kids*, infringed his screenplay.  The court found that the "idea" of the works in question consisted of the shrinking of young children to miniscule size and their struggle against resultant life-threatening dangers.  To support its claim of substantial similarity, the

---

[156] *Bernal*, 788 F. Supp. 2d at 1062 (emphasis in original) (citing Nichols v. Universal Pictures Corp., 45 F.2d 119, 123 (2d Cir.1930); Stromback v. New Line Cinema, 384 F.3d 283, 295 (6th Cir. 2004); Kindergartners Count Inc. v. Demoulin, 249 F. Supp. 2d 1214, 1232 (D. Kan. 2003)); *Gable*, 727 F. Supp. 2d at 836 n.18 (emphasis in original) (citing *Nichols*, 45 F.2d at 123; *Stromback*, 384 F.3d at 295; *Demoulin*, 249 F. Supp. 2d at 1232); *see also Capcom*, 2008 WL 4661479, at *6 n.4 (justifying a grant of motion to dismiss despite plaintiff's lack of opportunity to present expert testimony, stating that it did not "see how [expert] testimony would be either necessary or useful").

[157] *Bernal*, 788 F. Supp. 2d at 1062; *Gable*, 727 F.Supp.2d at 836 n.18.

[158] *Bernal*, 788 F. Supp. 2d at 1063.

[159] *Id.*

[160] Kouf v. Walt Disney Pictures & Television, 16 F.3d 1043, 1045 (9th Cir. 1994).

plaintiff identified a list of similarities including "a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents and kids sleeping outside overnight." In finding that the list failed to satisfy the extrinsic test, the court stated simply that the similarities were random.[161] As may readily be seen, however, the similarities were by no means random. Each one related directly to the "idea" of the work, and in combination formed a cohesive selection and arrangement expressing that idea. If these were the only similarities between the works, the court might have been justified in rejecting them as insufficient in number and in creative distinction from other narratives involving imperiled children. The court's language, however, reflected that these were *not* the only similarities, and there is no way to confirm that either of the grounds for rejection was justified.

Certainly, expert testimony is not always required to apply the test. Some works present an "artistic structure" requiring no great depth of analysis or specialized knowledge to divine, such as an instructional video for magic tricks,[162] treatments for a reality show,[163] or a cooking show.[164] Even a structurally humble work, however, may require expert testimony to explain how it differs from those that preceded it—to show how original it is.

---

[161] *Id.* at 1045-46.

[162] Rice v. Fox Broad. Co., 330 F.3d 1170, 1173 (9th Cir. 2003).

[163] Milano v. NBC Universal, Inc., 584 F. Supp. 2d 1288, 1290 (C.D. Cal. 2008).

[164] Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1125 (C.D. Cal. 2007).

32        UCLA ENTERTAINMENT LAW REVIEW      [Vol. 21:1

Exhibit QQ

By STEVEN T. LOWE

# DEATH
## OF COPYRIGHT

Copyright infringement may be the only remaining area of law in which courts seem increasingly willing to decide material facts on summary judgment

**COPYRIGHT INFRINGEMENT** claims against motion picture studios and television networks, for all intents and purposes, are dead. Of the 48 copyright infringement cases against studios or networks that resulted in a final judgment within the Second and Ninth Circuits (and the district courts within those circuits) in the last two decades,[1] the studios and networks prevailed in all of them—and nearly always on motions for summary judgment. (See "Perfect Storm," at 34.) In fact, in the last 20 years, only two publicly available copyright infringement cases (published or unpublished) against studios or networks proceeded to jury trial—with verdicts for the defendants.[2]

Were all these cases without merit, or did the studios and networks simply have far superior counsel in each case? These suppositions are very unlikely. The case law governing these actions simply has become so amorphous that for almost every principle of law favorable to creators, the courts have endorsed and applied an opposite principle.

As a result, the determination of each case now rests almost entirely in the unfettered discretion of trial judges, who have consistently dismissed plaintiffs' claims. Unless the current trend changes, longstanding principles once favorable to creators may be eclipsed by an evolving body of law so unfavorable to them that the studios and networks are essentially immunized from liability except in cases of identical copying and conceded access to the plaintiff's work.

Since direct evidence of copying rarely is available in a copyright infringement suit,[3] plaintiffs typically must establish that the defendant had access to the plaintiff's work and that the two works are substantially similar.[4] Proof of access requires only a "reasonable possibility" to view or copy the plaintiff's work.[5] However, courts commonly cite to the countervailing principle that "mere speculation or conjecture" is insufficient. Because the analysis of a reasonable possibility necessarily includes some conjecture and speculation, the "line between a 'bare' pos-

sibility and a 'reasonable' possibility of access is difficult to draw."[6] If the work has not been widely disseminated—which is usually the case for unpublished screenplays—"a particular chain of events" must be established between the plaintiff's work and the defendant's access to that work.[7]

Early cases outside of the Ninth Circuit found access even when the plaintiff could not actually place the work in the hands of the defendant. For example, in the First Circuit case of *Morrissey v. Procter & Gamble Company*, the plaintiff offered evidence that he had mailed his copyrighted work to the defendant's principal office. The court held that this mailing created "an inference that the letter reached its proper destination," and to require the plaintiff to show that the "particularly

Steven T. Lowe is a principal of Lowe Law, a boutique entertainment litigation firm in Los Angeles. He wishes to thank Daniel Lifschitz, Chris Johnson, and Michael Salvatore for their assistance in the preparation of this article.

AMANE KANEKO



responsible employees had received his communication" would have been unfair.[8] Similarly, in 1971, a New York district court held in *Bevan v. Columbia Broadcasting System, Inc.*, that corporate receipt could be "sufficient to raise a triable issue, despite plaintiff's inability to show receipt by the responsible employee,"[9] because it would be unfair to "saddle a plaintiff with disproving non-access within a corporate structure foreign to him and with witnesses not his own."[10]

Unfortunately for creators, the *Bevan* holding was rejected by some courts.[11] For example, in *Meta-Film Associates, Inc. v. MCA, Inc.*, a 1984 case, the Central District of California identified only three circumstances that would meet the type of close relationship between coworkers necessary to give rise to a reasonable opportunity of access. The person who received the plaintiff's work must 1) be "a supervisor with responsibility for the defendant's project," or 2) "part of the same work unit as the copier," or 3) have "contributed creative ideas or material to the defendant's work."[12] By limiting, as a matter of law, the instances in which a plaintiff can prove access within a corporate structure, the *Meta-Film* court effectively precluded plaintiffs from establishing access in numerous scenarios in which there is actual

access but the facts do not fall into one of the court's enumerated categories.[13]

The *Meta-Film* court also recognized situations in which a third-party intermediary not of the same business enterprise as the alleged infringer may be found to have passed along the plaintiff's work.[14] The court limited such situations, however, to instances when the third-party intermediary "provided creative suggestions and ideas" concerning the allegedly infringing work, and "the dealings between the three entities (plaintiff, defendants, and [intermediary])…related to the identical subject matter."[15] Although *Meta-Film*'s effect in the Ninth Circuit has been limited to several district court cases[16]—and the Ninth Circuit has not adopted its holding[17]—*Meta-Film* has been influential in the Second Circuit, which expressly relied on the case when it overruled the *Bevan* holding.[18] Thus, *Meta-Film* remains a prominent example of why commentators note that "many courts set an unrealistically high bar as to what constitutes a close relationship" for establishing access.[19]

**Substantial Similarity**

Even when access is established, the path to a favorable judgment remains perilous for plaintiffs.[20] In fact, in many cases in which

summary judgment has been granted for defendants, the courts simply presumed that access existed.[21] This is because "even massive evidence of access cannot by itself avoid the necessity of also proving the full measure of substantial similarity."[22] And this full measure has become virtually impossible to establish under recent case law.

To determine whether substantial similarity exists between works at the summary judgment phase, the Ninth Circuit has instructed that courts perform an "extrinsic" analysis of the works' objective elements, focusing on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."[23] In application, however, this analysis has been unpredictable and has resulted in wildly conflicting case law and results. In addition, in recent years, the Ninth Circuit has ignored established case law that requires the court to not only include "unprotectable elements" in its analysis[24] but also exclude dissimilarities between the two works.[25]

A long line of copyright infringement cases holds that a plaintiff and defendant's works should be compared in their entirety, including both protectable and unprotectable elements,[26] to determine whether a qualitatively (or quantitatively) significant portion of

## Perfect Storm

**In the last 20 years, in the Second and Ninth Circuits and the lower courts within those circuits, 48 copyright infringement cases against studios or networks were litigated to final judgment. In all 48 cases, the victors were the studio and network defendants. Most of the cases were determined by a grant of summary judgment.**

✖ *Arden v. Columbia Pictures Industries*, 908 F. Supp. 1248 (S.D. N.Y. 1995) (summary judgment for defendant) (*Groundhog Day*).

✖ *Benay v. Warner Bros. Entertainment, Inc.*, 607 F. 3d 620 (9th Cir. 2010) (summary judgment for defendant affirmed) (*The Last Samurai*).

✖ *Benjamin v. Walt Disney Company*, 2007 U.S. Dist. LEXIS 91710 (C.D. Cal. 2007) (summary judgment for defendant) (*Sweet Home Alabama*).

✖ *Bethea v. Burnett*, 2005 WL 1720631 (C.D. Cal. 2005) (summary judgment for defendant) (*The Apprentice*).

✖ *Blakeman v. Walt Disney Company*, 613 F. Supp. 2d 288 (E.D. N.Y. 2009) (summary judgment for defendant) (*Swing Vote*).

✖ *Burns v. Imagine Films Entertainment, Inc.*, 2001 U.S. Dist. LEXIS 24653 (W.D. N.Y. 2001) (summary judgment for defendant) (*Backdraft*).

✖ *Brown v. Perdue*, 177 Fed. Appx. 121 (2d Cir. 2006) (summary judgment for defendant affirmed) (*The Da Vinci Code*).

✖ *Bunick v. UPN*, 2008 U.S. Dist. LEXIS 35536 (S.D. N.Y. 2008) (summary judgment for defendant) (*South Beach*).

✖ *Cabell v. Sony Pictures Entertainment, Inc.*, 2010 U.S. Dist. LEXIS 54667 (S.D. N.Y. 2010) (summary judgment for defendant) (*You Don't Mess with the Zohan*).

✖ *Cox v. Abrams*, 1997 U.S. Dist. LEXIS 6687 (S.D. N.Y. 1997) (summary judgment for defendant) (*Regarding Henry*).

✖ *Flaherty v. Filardi*, 2009 U.S. Dist. LEXIS 22641 (S.D. N.Y. 2009) (summary judgment for defendant) (*Bringing Down the House*).

✖ *Flynn v. Surnow*, 2003 U.S. Dist. LEXIS 26973 (C.D. Cal. 2003) (summary judgment for defendant) (*24*).

✖ *Funky Films v. Time Warner Entertainment*, 462 F. 3d 1072 (9th Cir. 2006) (summary judgment for defendant) (*Six Feet Under*).

✖ *Gable v. NBC*, 2010 WL 2990977 (C.D. Cal. 2010) (summary judgment for defendant) (*My Name Is Earl*).

✖ *Gilbert v. New Line Productions*, 2010 U.S. Dist. LEXIS 27134 (C.D. Cal. 2010) (summary judgment for defendant) (*Monster in Law*).

✖ *Gregory v. Murphy*, 1991 U.S. App. LEXIS 4893 (9th Cir. 1991) (summary judgment for defendant affirmed) (*Coming to America*).

✖ *Grosso v. Miramax Film Corporation*, 2001 U.S. Dist. LEXIS 26199 (C.D. Cal. 2001) (summary judgment for defendant) (*Rounders*).

✖ *Historical Truth Productions v. Sony Pictures Entertainment*, 1995 U.S. Dist. LEXIS 17477 (S.D. N.Y. 1995) (summary judgment for defendant) (*Universal Soldier*).

✖ *Hudson v. Universal Pictures Corporation*, 2004 U.S. Dist. LEXIS 11508 (E.D. N.Y. 2004) (summary judgment for defendant) (*Life*).

✖ *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d (C.D. Cal. 2001) (summary judgment for defendant) (*The Peacemaker*).

✖ *Kodadek v. MTV Networks*, 1996 U.S. Dist. LEXIS 20776 (C.D. Cal. 1996) (summary judgment for defendant) (*Beavis & Butthead*).

a plaintiff's work was appropriated.[27] This comports with basic principles of copyright law and is known as the "selection and arrangement" test.[28]

In the seminal 1991 case *Feist Publications Inc. v. Rural Telephone Services Company*, the U.S. Supreme Court held that when dealing with works largely (or even entirely) composed of unprotectable elements, "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original."[29] Transposed to the literary arts, the test provides that although copyright law does not generally protect basic plot premises in literary works or commonly used expressions that flow naturally from those premises ("scenes a faire"), the original selection and arrangement of these elements can constitute a protectable work in and of itself.[30] Therefore, the wholesale exclusion of all "unprotectable" elements improperly limits the scope of copyright protection. The Ninth Circuit has recognized this principle on numerous occasions but has spent the better part of the past decade aggressively denying its use to plaintiffs in copyright infringement cases against studios and networks.

*Metcalf v. Bochco*, decided in 2002, is one of only two copyright infringement cases against a studio or network in the last 20 years that proceeded to trial. (The other is *Shaw v. Lindheim*.[31]) In *Metcalf*, the plaintiff offered evidence that the defendant had misappropriated many elements of the plaintiff's screenplay to create a television series for NBC. The court recognized that "the similarities proffered by [the plaintiff] are not protectable when considered individually; they are either too generic or constitute 'scenes a faire.'"[32] However, "the presence of so many generic similarities and the common patterns in which they arise help satisfy the extrinsic test."[33] The court memorably compared the elements of literary works to those of musical compositions:

The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection.[34]

The court did not strip the works of their unprotectable elements before diving into an extrinsic analysis of substantial similarity, consistent with the general purpose of the selection and arrangement test (that is, to protect in combination that which cannot

be protected separately).[35] In the years since its publication, however, the analysis of *Metcalf* has proven to be the exception and not the rule.

The 2003 case of *Rice v. Fox Broadcasting Company* may have played the heaviest hand against the use of the selection and arrangement test. The *Rice* court stated that "similarities derived from the use of common ideas cannot be protected."[36] This assertion ignored the holdings and rationales of the cases that the court cited, including *Metcalf*, but the *Rice* court attempted to distinguish *Metcalf* by stating that it was "based on a form of inverse ratio rule analysis" (i.e., the rule whereby more access requires less substantial similarity and vice versa) and seemed to imply that the selection and arrangement test is only applicable when access is conceded.[37] This implication, which limits *Metcalf* to its facts, overlooks that nowhere in *Metcalf* (or any case prior to it) is the inverse ratio rule required for the application of the selection and arrangement test.[38] Nevertheless, Rice's misinterpretation of *Metcalf* has been repeatedly followed by the Ninth Circuit in subsequent opinions.

Indeed, in the 2006 case of *Funky Films, Inc. v. Time Warner Entertainment Company, L.P.*, the Ninth Circuit once again ignored the

✖ *Kouf v. Walt Disney Pictures and Television*, 16 F. 3d 1042 (9th Cir. 1994) (summary judgment for defendant affirmed) (*Honey, I Shrunk the Kids*).

✖ *Kretschmer v. Warner Bros.*, 1994 U.S. Dist. LEXIS 7805 (S.D. N.Y. 1994) (summary judgment for defendant) (*Defending Your Life*).

✖ *Lane v. Universal City Studios*, 1994 U.S. App. LEXIS 23769 (9th Cir. Cal. 1994) (summary judgment for defendants affirmed) (*Kojak: Fatal Flaw*).

✖ *Laskay v. New Line Cinema*, 1998 U.S. App. LEXIS 23461 (C.D. Cal. 1998) (summary judgment for defendant) (*The Biggest Loser*).

✖ *Lassiter v. Twentieth Century Fox Film Corporation*, 238 Fed. Appx. 194 (9th Cir. 2007) (summary judgment for defendant affirmed) (*Drumline*).

✖ *Mallery v. NBC Universal, Inc.*, 331 Fed. Appx. 821 (2d Cir. 2009) (summary judgment for defendant affirmed) (*Heroes*).

✖ *Merrill v. Paramount Pictures Corporation*, 2005 U.S. Dist. LEXIS 45401 (C.D. Cal. 2005) (summary judgment for defendant) (*Crossroads*).

✖ *Mestre v. Vivendi Universal U.S. Holding Co.*, 273 Fed. Appx. 631 (9th Cir. 2008) (summary judgment for defendant) (*Billy Elliot*).

✖ *Metcalf v. Bochco*, 294 F. 3d 1069 (9th Cir. 2002) (jury verdict in favor of defendant studio), aff'd, Metcalf v. Bochco, 200 Fed. Appx. 635 (9th Cir. 2006) (*City of Angels*).

✖ *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Cal. 2008) (summary judgment for defendant) (*The Biggest Loser*).

✖ *Mowry v. Viacom International, Inc.*, 2005 U.S. Dist. LEXIS 15189 (S.D. N.Y. 2005) (summary judgment for defendant) (*The Truman Show*).

✖ *Novak v. National Broadcasting Company*, 752 F. Supp. 164 (S.D. N.Y. 1990) (summary judgment for defendant) (*Saturday Night Live*).

✖ *Ostrowski v. Creative Artists Agency*, 1994 U.S. App. LEXIS 23732 (9th Cir. Cal. 1994) (summary judgment for defendant affirmed) (*To Forget Palermo*).

✖ *Pelt v. CBS, Inc.*, 1993 U.S. Dist. LEXIS 20464 (C.D. Cal. 1993) (summary judgment for defendant) (*Listen Up! Young Voices for Change*).

✖ *Rice v. Fox Broadcasting Company*, 330 F. 3d 1170 (9th Cir. 2003) (summary judgment for defendant affirmed) (*The Mystery Magician*).

✖ *Robinson v. Viacom International*, 1995 U.S. Dist. LEXIS 9781 (S.D. N.Y. 1995) (summary judgment for defendant) (*Hi Honey*).

✖ *Rodriguez v. Heidi Klum Company, LLC*, 2008 U.S. Dist. LEXIS 80805 (S.D. N.Y. 2008) (summary judgment for defendant) (*Project Runway*).

✖ *Rosenfeld v. Twentieth Century Fox Film*, 2009 U.S. Dist. LEXIS 9305 (C.D. Cal. 2009) (summary judgment for defendant) (*Robots*).

✖ *Shaw v. Lindheim*, 809 F. Supp. 1393 (C.D. Cal. 1992) (upon remand, judgment as a matter of law in favor of defendant studio) (*The Equalizer*).

✖ *Stewart v. Wachowski*, 574 F. Supp. 2d 1074 (C.D. Cal. 2005) (summary judgment for defendant) (*The Matrix*).

✖ *The Sheldon Abend Revocable Trust v. Steven Spielberg*, 2010 WL 3701343 (S.D. N.Y. 2010) (summary judgment for defendants) (*Disturbia*).

✖ *Thomas v. Walt Disney Company*, 337 Fed. Appx. 694 (9th Cir. 2009) (defendant's motion to dismiss affirmed) (*Finding Nemo*).

✖ *Walker v. Viacom International, Inc.*, 2010 U.S. App. LEXIS 1475 (9th Cir. 2010) (summary judgment for defendant) (*SpongeBob SquarePants*).

✖ *Weygand v. CBS*, 1997 U.S. Dist. LEXIS 19613 (C.D. Cal. 1997) (summary judgment for defendant) (*Charlie*).

✖ *Williams v. Crichton*, 84 F. 3d 581 (2d Cir. 1996) (summary judgment for defendant affirmed) (*Jurassic Park*).

✖ *Willis v. HBO*, 2001 U.S. Dist. LEXIS 17887 (S.D. N.Y. 2001) (summary judgment for defendant) (*Arli$$*).

✖ *Zella v. E. W. Scripps Company*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007) (defendant's motion to dismiss granted) (*Rachael Ray*).—S.T.L.

selection and arrangement test, holding that: [Courts] must take care to inquire only whether the *protectable elements, standing alone*, are substantially similar. In so doing, [courts] filter out and disregard the non-protectable elements in making [their] substantial similarity determination.[39]

Moreover, in one flourish of its pen, the *Funky Films* court created a whole new defense for alleged infringers where none previously existed and which has been heav-

arrangement test, comfortably stripping all unprotected elements from the works and ultimately using the new *Funky Films* dissimilarity analysis as a basis to rule against the plaintiffs on their copyright claim.[49]

In the end, the *Benay* plaintiffs only were able to continue to pursue their state law claim of breach of implied contract.[50] Though this claim can be satisfied when copying does not rise to a level of substantial similarity, it requires a higher level of access to establish an implied contract, as well as privity between

favored on the substantial similarity issue in copyright cases,"[54] the overwhelming majority of copyright cases are dismissed on exactly that issue. Admissible expert testimony normally can defeat summary judgment against the party it supports.[55] When two expert witnesses reasonably contradict one another, the contradiction should create a material issue of fact that a jury is required to resolve.[56] However, courts inexplicably have carved out literary analysis as an exception to this rule. Courts have become more willing to

# Not only has the ad hoc use of substantial dissimilarity and the refusal to acknowledge selection and arrangement stripped creators of the doctrines that once protected them, but it also effectively endorses creative theft whenever the elements of an implied contract are not satisfied.

ily relied upon in subsequent court opinions. The court stated that a "reading of the two works reveal[ed] greater, more significant differences" than similarities.[40] In essence, the court constructed a brand new test of "substantial dissimilarity" in the context of copyright infringement, one that completely contravenes the well-established principle that dissimilarity is irrelevant as long as the plaintiff makes a showing of the defendant work's similarity to a substantial element of the plaintiff's work.[41]

It appears that the old Learned Hand chestnut that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate" may no longer be true.[42] The result of this shift in copyright law is that third parties now have the freedom to steal from screenplays with impunity, provided they cover their tracks by creating sufficient dissimilarities in what is, in reality, a "derivative work."[43] The recent case of *Benay v. Warner Bros.* illustrates this point.[44]

In *Benay*, decided in June 2010, the plaintiffs' agent pitched and provided a copy of their screenplay *The Last Samurai* to the president of production at Warner Bros.[45] The studio declined to proceed further with the screenplay but later produced and released a film with the exact same title and premise as the plaintiffs' work.[46] Despite compelling evidence that actual copying of the plaintiff's screenplay occurred,[47] the court deemed it "insufficient to overcome the overall lack of similarities between protected elements of the works."[48] The Ninth Circuit's extrinsic analysis once again ignored the selection and

the parties.[51] Furthermore, even if established, the remedies available in a breach of implied contract claim are not as broad as those for copyright claims.[52] Overall, the state claim is a poor substitute for the once robust protections offered to creators under copyright law. The claim also has been limited extensively by the application of the preemptive effect of federal copyright law—the very law creators hoped it would supplement.[53]

**Phasing Out Experts and Juries**

The outcome in *Benay* is emblematic of just how far copyright decisions have strayed from maintaining a balance between the interests of creators and the interests of producers. Not only has the ad hoc use of substantial dissimilarity and the refusal to acknowledge selection and arrangement stripped creators of the doctrines that once protected them, but it also effectively endorses creative theft whenever the elements of an implied contract are not satisfied. If more juries were exposed to the facts of these cases, creators might hope to reverse the imbalance. However, the determination of appropriation has time and again been allocated to the presiding judge of each case instead. Indeed, copyright infringement may be the only remaining area of the law in which judges seem increasingly willing to decide material facts on summary judgment, effectively removing both experts and juries from the process entirely.

While courts repeatedly cite the proposition that "summary judgment is not highly

dismiss expert witnesses to screenplay copyright infringement claims and analyze the works themselves.[57]

In 2001, the Central District of California stated in *Fleener v. Trinity Broadcasting Network* (a case that was not against a major studio), "There is abundant case-law establishing that expert testimony is particularly appropriate in summary judgment motions under the copyright 'extrinsic test.'"[58] However, judges have become comfortable with disregarding this type of testimony when they believe they can do their own comparison, regardless of how it comports with well-established legal standards.[59]

Many troubling questions arise from this trend. Why do judges believe they can perform the extrinsic analysis of literary works better than plaintiffs' experts?[60] An extrinsic analysis is no easy feat. A judge who dismisses an expert witness, believing the subject matter within his or her grasp, effectively acts as a self-appointed expert. This is a disservice to the creators of literary works. It implies that writing a screenplay is a less complex and involved undertaking than writing a song or a software program. Moreover, the judge essentially deprives plaintiffs of their constitutional right to a jury trial. Nevertheless, this is the current state of copyright law for literary works, with no signs of rebalancing anytime soon.

In copyright infringement cases, judges are supposed to play the role of gatekeeper to the jury. Their task in analyzing substantial similarity is supposed to be extrinsic—that is, objective.[61] If a plaintiff can show objective

similarity, a jury is brought in to determine whether the total concept and feel—the intrinsic test—of the plaintiff's and defendant's works are substantially similar. In practice, however, the extrinsic test has been devoured by an intrinsic test performed by the judge. Simply put, with judges able to substitute their opinions for those of experts and juries on issues of material fact, all other witnesses to the case become effectively redundant.

Case law has provided defendants with an impenetrable shield of confusing and often contradictory principles that thwart plaintiffs in nearly every instance, with only tiny cracks in that shield providing a mere glimpse of hope. Unless the Ninth Circuit seriously reexamines where courts have taken the law of copyright infringement, the cards will remain completely stacked in favor of the studios and networks. ∎

---

[1] One case arguably did not result in a clear-cut victory for the defendant studio. *See* Miller v. Miramax Film Corp., 2001 U.S. Dist. LEXIS 25967, at *28 (2001). However, the case achieved no final judgment on the merits. The court denied summary judgment to the defendant on the plaintiff's copyright infringement claim (much like two other cases discussed *infra*) before the case disappeared from the docket entirely.

[2] *See* Shaw v. Lindheim, 809 F. Supp. 1393 (C.D. Cal. 1992) (upon remand, judgment as a matter of law in favor of defendant studio); Metcalf v. Bochco, 294 F. 3d 1069 (9th Cir. 2002) (jury verdict in favor of defendant studio, *aff'd* Metcalf v. Bochco, 200 Fed. Appx. 635 (9th Cir. 2006)).

[3] *See* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §13.02[A] (2007).

[4] Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F. 2d 1157, 1162 (9th Cir. 1977); Berkic v. Crichton, 761 F. 2d 1289, 1291 (9th Cir. 1985); Apple Computer, Inc. v. Microsoft Corp., 35 F. 3d 1435, 1442 (9th Cir. 1994); Three Boys Music Corp. v. Bolton, 212 F. 3d 477, 481 (9th Cir. 2000).

[5] *Id.*

[6] *Id.*

[7] Three Boys Music, 212 F. 3d at 482.

[8] Morrissey v. Procter & Gamble Co., 379 F. 2d 675, 677 (1st Cir. 1967).

[9] Bevan v. Columbia Broad. Sys., 329 F. Supp. 601, 609 (D.C. N.Y. 1971).

[10] *Id.* at 610.

[11] *See* Jorgensen v. Epic/Sony Records, 351 F. 3d 46 (2d Cir. 2003); Meta-Film Assocs., Inc. v. MCA, Inc., 586 F. Supp. 1346 (C.D. Cal. 1984).

[12] Meta-Film, 586 F. Supp. at 1355-56.

[13] *See* Mestre v. Vivendi Universal U.S. Holding Co., 2005 WL 1959295 (D. Ore. 2005), *aff'd*, 273 Fed. Appx. 631 (9th Cir. 2008); Merrill v. Paramount Pictures Corp., 2005 WL 3955653 (C.D. Cal. 2005).

[14] Meta-Film, 586 F. Supp. at 1358.

[15] *Id.* at 1359 (analyzing and distinguishing Kamar Int'l, Inc. v. Russ Berrie & Co., 657 F. 2d 1059 (9th Cir. 1981)).

[16] *See* Merrill, 2005 WL 3955653, at *8 (citing only Meta-Film's three categories as a requirement for access); Mestre, 2005 WL 1959295, at *5 (applying the three categories as limiting but adding the requirement that "at a minimum, the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some

overlap in subject matter"); Weygand v. CBS Inc., 4 U.S.P.Q. 2d 1120, 1123 (C.D. Cal. 1997) (ignoring the three categories altogether, and instead citing general *Meta-Film* language as a catch-all provision: "courts have found access when…an individual in a position to provide suggestions or comments with respect to the defendant's work…had the opportunity to view the plaintiff's work").

[17] The Ninth Circuit has cited *Meta-Film* but never for this proposition. *See* Cleary v. News Corp., 30 F. 3d 1255, 1263 (9th Cir. 1994); E. W. French & Sons v. General Portland, 885 F. 2d 1392, 1401 (9th Cir. 1989); Lloyd v. Schlag, 884 F. 2d 409, 414 (9th Cir. 1989); Little Oil Co. v. Atlantic Ritchfield Co., 852 F. 2d 441, 445 (9th Cir. 1988).

[18] Jorgensen v. Epic/Sony Records, 351 F. 3d 46 (2d Cir. 2003).

[19] Nick Gladden, *When California Dreamin' Becomes a Hollywood Nightmare; Copyright Infringement and the Motion Picture Screenplay: Toward an Improved Framework*, 10 J. INTELL. PROP. L. 359, 359-84 (2003).

[20] One unreported case may offer some hope for creators. *See* Miller v. Miramax Film Corp., 2001 U.S. Dist. LEXIS 25967, at *28 (2001) (holding that evidence of a screenplay submitted to Universal Pictures, along with evidence that agents were common to the writers of both works, was sufficient to preclude summary judgment on access).

[21] *See* Benay v. Warner Bros. Entm't, Inc., 607 F. 3d 620 (9th Cir. Cal. 2010); Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F. 3d 1072 (9th Cir. 2006); Mestre, 2005 WL 1959295, at *5; Zella v. E. W. Scripps Co., 529 F. Supp. 2d 1124 (C.D. Cal. 2007).

[22] 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §13.03[D] (2007).

[23] Kouf v. Walt Disney Pictures & Television, 16 F. 3d 1042, 1045 (9th Cir. 1994) (citation and internal quotation marks omitted).

[24] Metcalf v. Bochco, 294 F. 3d 1069, 1074 (9th Cir. 2002), *aff'd* Metcalf v. Bochco, 200 Fed. Appx. 635 (9th Cir. 2006) ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.").

[25] *See* Shaw v. Lindheim, 919 F. 2d 1353, 1362 (1990) (quoting Sheldon v. Metro-Goldwyn Pictures Corp., 81 F. 2d 49, 56 (2d Cir. 1936)); Aliotti v. R. Dakin & Co., 831 F. 2d 898, 901 (9th Cir. 1987) ("Dissection of dissimilarities is inappropriate because it distracts a reasonable observer from a comparison of the total concept and feel of the works."); 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.03[B][1][a] (2007).

[26] *See* Weitzenkorn v. Lesser, 256 P. 2d 947 (Cal. 1953) (en banc); Morse v. Fields, 127 F. Supp. 63 (S.D. N.Y. 1954); Roth Greeting Cards v. United Card Co., 429 F. 2d 1106 (9th Cir. 1970); United States v. Hamilton, 583 F. 2d 448 (9th Cir. 1978); Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991); Shaw, 809 F. Supp. 1393; Three Boys Music Corp. v. Bolton, 212 F. 3d 477, 481 (9th Cir. 2000); Fleener v. Trinity Broad. Network, 203 F. Supp. 2d 1142 (C.D. Cal. 2001); Metcalf, 294 F. 3d 1069; Satava v. Lowry, 323 F. 3d 805 (9th Cir. 2003); Swirsky v. Carey, 376 F. 3d 841 (9th Cir. 2004).

[27] Baxter v. MCA, 812 F. 2d 421, 425 (9th Cir. 1987); 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §13.03[B][1][a] (2007).

[28] 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §2.11 (2007).

[29] Feist Publ'ns, 499 U.S. 340.

[30] Metcalf, 294 F. 3d at 1074.

[31] Shaw v. Lindheim, 809 F. Supp. 1393 (C.D. Cal. 1992).

[32] Metcalf, 294 F. 3d at 1074.

[33] *Id.* at 1073.

[34] *Id.* at 1074.

[35] *See* Fleener v. Trinity Broad. Network, 203 F. Supp. 2d 1142, 1150 (C.D. Cal. 2001) ("[C]opyright also protects the expressive act of arranging completely unprotected works. *See* Apple Computer, Inc. v. Microsoft Corp., 35 F. 3d 1435, 1445 (9th Cir. 1994).").

[36] Rice v. Fox Broad. Co., 330 F. 3d 1170, 1174-75 (2003) ("In analyzing the scope of copyright protection afforded to The Mystery Magician, we note at the outset that ideas generally do not receive protection, only the expression of such ideas do."); Metcalf, 294 F. 3d at 1074 ("It is true that this dichotomy between an idea and its expression is less clear when the idea and expression are "merged" or practically indistinguishable. However, we have held that 'similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market.' Apple, 35 F. 3d at 1443.").

[37] Rice, 330 F. 3d at 1179. *See* Mestre v. Vivendi Universal U.S. Holding Co., 273 Fed. Appx. 632 (9th Cir. 2008) ("Moreover, even if '[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element' in certain contexts, Mestre has not demonstrated sufficient similarities in sequence to qualify for such protection.") (citations omitted).

[38] While the plaintiff's case in *Metcalf* was "strengthened considerably" by the defendant's concession of access, the *Metcalf* court never actually invoked the inverse ratio rule, nor did it hold that finding substantial similarity through selection and arrangement was contingent on access being admitted.

[39] Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F. 3d 1072, 1077 (9th Cir. 2006) (citations omitted) (emphasis in original).

[40] *Id.* at 1078.

[41] 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §13.03[B][1][a] (2007).

[42] Shaw v. Lindheim, 919 F. 2d 1353, 1362 (1990) (quoting Sheldon v. Metro-Goldwyn Pictures Corp., 81 F. 2d 49, 56 (2d Cir. 1936)).

[43] A "derivative work," as defined by 17 U.S.C. §101, is "a work based upon one or more pre-existing works…including any form in which a work may be recast, transformed, or adapted." 17 U.S.C. §106 provides that, subject to other sections of the Copright Act, a copyright owner "has the exclusive rights to do and to authorize…derivative works based upon the copyrighted work."

[44] Benay v. Warner Bros. Entm't, Inc., 607 F. 3d 620 (9th Cir. 2010).

[45] *Id.* at 622.

[46] *Id.* at 622-23.

[47] Benay v. Warner Bros. Entm't, 2008 U.S. 9th Cir. Briefs 55719 (9th Cir. June 9, 2009) ("Defendants copied plaintiffs' work right down to the historical inaccuracy of cannons being new when in fact cannons date back to the fourteenth century.").

[48] Benay, 607 F. 3d at 629.

[49] *Id.* at 625("We agree with the district court that '[w]hile on cursory review, these similarities may appear substantial, a closer examination of the protectable elements including plot, themes, dialogue, mood, setting, pace, characters, and sequence of events, exposes many more differences than similarities between Plaintiffs' Screenplay and Defendants' film.'").

[50] *Id.* at 629, 633.

[51] *See* Rokos v. Peck, 182 Cal. App. 3d 604, 617-18 (1986) (holding that an implied-in-fact contract between the plaintiff and the writer was effective only between them).

[52] While copyright law allows for recovery of actual damages and profits resulting from the infringement, a breach of contract allows recovery of damages only for the amount the plaintiff would have received under the contract. *See* 17 U.S.C.A. §504; RESTATEMENT

(SECOND) OF CONTRACTS §345; Benay, 607 F. 3d 620.

[53] In *Montz v. Pilgrim Films & TV, Inc.*, decided less than a week before *Benay*, the court affirmed the defendants' motion to dismiss on the grounds that the plaintiff's implied-in-fact contract claim was "merely derivative" of the plaintiff's rights under 17 U.S.C. §106 and was thus preempted by federal copyright law. Montz v. Pilgrim Films & TV, Inc., 606 F. 3d 1153, 1159 (9th Cir. 2010). *Montz* thus stands as another major blow for creators, who saw a chance to protect their works through implied contract claims based on earlier Ninth Circuit cases. *See* Grosso v. Miramax Film Corp., 2004 U.S. App. LEXIS 28043 (holding that the implied promise to pay constituted an extra element for preemption purposes that transformed the action from one arising under the ambit of federal copyright law to one sounding in contract).

[54] *See* Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F. 3d 1072, 1076 (9th Cir. 2006); Berkic v. Crichton, 761 F. 2d 1289, 1292 (9th Cir. 1985); Litchfield v. Spielberg, 736 F. 2d 1352, 1355 (9th Cir. 1984); Shaw v Lindheim, 809 F. Supp. 1393, 1355 (C.D. Cal. 1992).

[55] In re Apple Computer Sec. Litig., 886 F. 2d 1109, 1116 (9th Cir. 1989) (citing Bieghler v. Kleppe, 633 F. 2d 531, 534 (9th Cir. 1980) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.").

[56] Wyler Summit P'ship v. Turner Broad. Sys., Inc. 235 F. 3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury.").

[57] *See* Rice v. Fox Broad. Co., 330 F. 3d 1170 (2003) (holding that district court did not abuse its discretion in disregarding the testimony of plaintiff's expert); Bethea v. Burnett, 2005 WL 1720631, at *12 (C.D. Cal. 2005) (ignoring plaintiff's expert's testimony, finding it unhelpful to the court's own analytic dissection); Shaw v. Lindheim, 809 F. Supp. 1393 (C.D. Cal. 1992) (disregarding plaintiff's expert's testimony in overturning jury verdict in favor of plaintiff); Funky Films, 462 F. 3d at 1076 ("[T]he district court conducted an independent analysis of [the works]."); Gable v. NBC, 2010 U.S. Dist. LEXIS 77772, at *59 (C.D. Cal. 2010) ("Expert testimony is far less critical in a case like this than it is in a case where specialized knowledge is required to dissect the objective components of the copyrighted work.").

[58] Fleener v Trinity Broad. Network, 203 F. Supp. 2d 1142, 1147 (C.D. Cal. 2001) (denying defendants' requests for reconsideration and summary adjudication based on substantial similarities between the two works).

[59] *But see* Swirsky v. Carey, 376 F. 3d 841, 846 (9th Cir. 2004) (The district court's dismissal of expert testimony and use of its own substantial similarity analysis to discount similarities between the two works as scenes a faire was erroneous.) (quoting Brown Bag Software v. Symantec Corp., 960 F. 2d 1465, 1472 (9th Cir. 1992)).

[60] *See* Brown Bag Software, 960 F. 2d at 1473-74 (relying on expert testimony in order to identify the objective points of comparison among different computer software programs); Swirsky, 376 F. 3d at 847-48 (relying on expert testimony comparing the objective elements—pitch, melodies, baselines, tempo, chords, structure, and harmonic rhythm—of musical works).

[61] In re Apple Sec. Litig., 886 F. 2d 1109, 1442 (9th Cir. 1989) (citing Brown Bag Software, 960 F. 2d at 1475; Shaw v. Lindheim, 919 F. 2d 1353, 1357 (9th Cir. 1990)) ("[T]he extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.").



## TRUST DEED FORECLOSURES

*"Industry Specialists For Over 23 Years"*

At Witkin & Eisinger we specialize in the Non-Judicial Foreclosure of obligations secured by real property or real and personal property (mixed collateral). When your client needs a foreclosure done professionally and at the lowest possible cost, please call us at:

## 1-800-950-6522

*We have always offered free advice to all attorneys.*

## WITKIN & EISINGER, LLC

RICHARD G. WITKIN, ESQ. ✦ CAROLE EISINGER

## WANT RESULTS?

### COLLECTION OF JUDGMENTS AND DEBTS

**Specializing in statewide pre- and post-judgment collection litigation:** lawsuits, arbitrations, writs, liens, levies, examinations, garnishments, attachments, asset searches and seizures. Contingent fees available.

**Law Offices of Matthew C. Mickelson**
www.mickelsonlegal.com
mattmickelson@bizla.rr.com • 818.382.3360

*—Taking On the Hard Cases Others Refuse—*



# Anita Rae Shapiro

SUPERIOR COURT COMMISSIONER, RET.

## PRIVATE DISPUTE RESOLUTION

PROBATE, CIVIL, FAMILY LAW
PROBATE EXPERT WITNESS

TEL/FAX: **(714) 529-0415**   CELL/PAGER: **(714) 606-2649**
E-MAIL: **PrivateJudge@adr-shapiro.com**
**http://adr-shapiro.com**

# INVESTIGATIONS

— DISCRETION AND CONFIDENTIALITY —

## Locates
## Asset Investigations
## Rush & Difficult Service of Process
## Surveillance



## SHORELINE Investigations

The Power of Knowledge.

*23 Years of Experience*

**818.344.2193** *tel* | **818.344.9883** *fax* | **ken@shorelinepi.com**

*PI 14084*

## www.shorelinepi.com

## 800.807.5440

Exhibit RR

FOX NEWS

FOX NEWS

# WHY IS WILLIAM BARR MEETING WITH RUPERT MURDOCH?

The president's attorney general, known for pushing foreign officials to help discredit the Russia investigation, met with the head of Fox News, where some anchors have begun to speak out against Trump.

BY ERIC LUTZ

OCTOBER 11, 2019



Do Not Sell My Personal Information

Accept Cookies

We use cookies and other technologies to collect data about your browser, device and location. We share this data with advertising, social media and analytics partners to help us understand how the site is used and to personalize our content and the advertising you see on this and other sites. For more information see our Privacy Policy and Cookie Statement. California law consider some of this activity to be a "sale" of personal data. To learn more and make choices, click: "Do Not Sell My Personal Information"

It was against this backdrop that **William Barr,** Trump's dutiful attorney general, met with Fox News mogul **Rupert Murdoch** on Wednesday night. Why they met, or what they discussed, is not clear, according to the *New York Times,* which first reported the rendezvous. But the timing of the meeting—as Trump, under siege from Democrats, ramps up his criticism of Fox News—raised eyebrows, leading to questions about whether the administration is attempting to get the network back in line. "What is the Attorney General of the United States doing meeting with the owner of a private television network?" CNN's **Vicky Ward** tweeted Thursday.

The tête-à-tête underscores the ties between the Trump administration and the conservative network where, as NPR's **David Folkenflik** noted, several former Trump aides (**Hope Hicks, Raj Shah, Sarah Huckabee Sanders**) are now on the payroll. That relationship has come under strain as Smith and Wallace cut through Trump allies' efforts to spin the president's Ukraine scandal. Even some of the typically supportive opinion hosts on the network, like **Tucker Carlson** and **Steve Doocy,** have shown small cracks in their support; Carlson co-wrote an op-ed opining that "there's no way to spin" the president's July 25 phone call with Volodymyr Zelensky (though he then implied impeaching Trump would be a bridge too far), and Doocy has suggested it would be "off the rails wrong" if Trump did indeed seek a quid pro quo with Kiev.

Criticism from these and other Fox mainstays like **Andrew Napolitano** had already rattled the president, but a poll released by the network released Wednesday showing record support for his impeachment really sent him over the edge. According to the survey, 51% of voters support impeachment—up from 42% in July. Those would be ominous numbers for Trump in any poll, but seem especially so coming from a network that has more or less acted as his mouthpiece and which employs several of his former staffers. "Whoever their Pollster is, they suck," a scorned Trump tweeted Thursday morning. "[Fox News] doesn't deliver for US anymore...Oh well, I'm President!"

Whether the visit from Barr, who has done things like meet with foreign intelligence officials to urge them to aid in an investigation Trump hoped would discredit **Robert Mueller,** was an attempt to talk Murdoch into minding his anchors is unclear. But by Thursday evening, the network appeared to be back in Trump's good graces; during a predictably batty campaign rally in Minneapolis, the president went on an extended rant promoting the various Fox hosts he likes, including **Jesse Watters**, **Lou Dobbs**, and **Jeanine Pirro**. "Some really great people," he told the cheering crowd.

Do Not Sell My Personal Information

Accept Cookies

We use cookies and other technologies to collect data about your browser, device and location. We share this data with advertising, social media and analytics partners to help us understand how the site is used and to personalize our content and the advertising you see on this and other sites. For more information see our Privacy Policy and Cookie Statement. California law consider some of this activity to be a "sale" of personal data. To learn more and make choices, click: "Do Not Sell My Personal Information"