1 Steve Wilson Briggs
2 4322 Chico Ave.,
  Santa Rosa, CA 95407
3 510 200 3763
4 snc.steve@gmail.com
  PLAINTIFF In Propria Persona
5
6
7
8 **UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA,**
9 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 10 STEVE WILSON BRIGGS, | Civ No: 20-CV-1596-VC |
| 11 Plaintiff, | |
| 12 vs | Plaintiff's Fifth Motion In Limine To |
| 13 JAMES CAMERON et al, | Include New Facts And Evidence |
| 14 Defendants. | |
| 15 | |

16 **INTRODUCTION**

17        Recently, the Plaintiff submitted an *amended fourth motion in limine* which revealed

18 possible improper financial ties between the Defendants (**Defs**) and their film industry

19 associates, Librarian of Congress **Carla Hayden**, former Register of Copyrights **Karyn**

20 **Temple**, a businessman named **Terrence Shea**, President **Donald Trump**, and three

21 **Russian/Ukrainian businessmen**. That motion also presented facts and evidence that the

22 Defendants' subsidiary, ***MovieLabs*** (formed in 2006) employed numerous elite hackers

23 (such as Steve Weinstein). Plaintiff believes—as the evidence indicates—that MovieLabs

24 hacked into his personal devices from 2006 forward. The aforementioned uncalendared

25 motion also presented evidence that prior to joining MovieLabs, those same hackers worked

26 at *Liberate Technologies* (**Liberate**), a hacking "company" created by Oracle in 1996; in

27 1999 *Liberate* began working with Defendant News Corporation. From the end of 1999

28 forward, News Corp used Liberate to hack into the Plaintiff's computer and phone.

1     Pages 123 and 124 of the Complaint explain how the Defs and their associates may

2 have been laterally motivated by Plaintiff's idea of a national surveillance and crime

3 prevention system based on mass "data aggregation" (a concepted conceived of by the

4 Plaintiff). Consistent with this, the new evidence related to President Donald Trump

5 indicates that Trump, three Russian/Ukrainians, a Florida businessman, and the Defendants

6 and their associates (including Google and Microsoft), are engaged in a private plan to

7 collect the private/personal data of Americans, and this plan appears to have been financed

8 by Russia.* Since filing the previously mentioned uncalendared fourth motion in limine, the

9 Plaintiff has discovered evidence that Trump has taken action in furtherance of this plan, by

10 publishing at least 26 falsified documents related to the theft of the Plaintiff's intellectual

11 property, on federal websites. Further, Trump has used Defendant (**Def**) Internet Archive

12 (**IA**) to produce fraudulent crawls of these false web pages, in the same manner that the

13 Defs produced fake crawls to infringe the Plaintiff's work (documented in the Complaint).

14     These new facts pertain to the infringement of the Plaintiff's intellectual property,

15 but are not presented to expand the claims in this action. Rather, they are presented for the

16 following five reasons:

17     1.  to document facts regarding Trump's publishing of fraudulent documents in

18         furtherance of the Defs'/conspirators' theft of the Plaintiff's ideas;

19     2.  to document the new facts concerning Liberate Technologies and MovieLabs;

20     3.  because these new facts and evidence tend to make the facts, evidence and

21         allegations (presented in the Complaint) more probable, per FRE 401;

22     4.  to preserve these facts and evidence.

23     5.  the facts concerning President Trump should be available to the public.

24     All of the documents attached hereto, and referred to herein, are incorporated herein,

25 and made part hereof by reference, as if fully set forth herein.

26     *New evidence that Donald Trump, while in the Office of the Presidency, unlawfully
27 acted in furtherance of the conspirators' theft of the Plaintiff's ideas, is presented on pages
23 to 25. (Specifically, Trump used government websites and the Internet Archive to
28 produce and publish false documents related to the infringement of the Plaintiff's work).]

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

| | |
|---|---|
| 1 | **TABLEOF CONTENTS** |

2 Introduction……………………………………………………………….... 1

3 Table……………………………………………………………………….. 3

4 MEMORANDUM OF POINTS AND AUTHORITIES…………………………….. 3

5 STATEMENT OF FACTS (Facts & Evidence To Include)…………….………… 4

6 Falsification At The Us Copyright Office Under Carla Hayden and Karyn Temple ……... 4

7 All American Entertainment……………………………………………… 8

8 The Film Industry Fraudulently Backdated *All American Entertainment*………………… 10

9 The Trump Connection………………………...……………………………... 11

10 The  Russian Connection…………………………...…………………………..... 12

11 Ongoing Document Falsification and Fraud At The US Copyright Office

12     a.  Re: Reed Hastings'/Netflix's *Altered Carbon*……………………………... 15

13     b.  Re: "What We Do In The Shadows"…………………………………… 18

14 Supplemental Facts & Evidence:

15     a.  Liberate Technology…………………………………….……... 21

16     b.  The Lobby……………………………….……………………… 22

17 <u>Donald Trump Uses Government Agencies And The IA To Publish False Documents</u>….. 23

18 Conclusion…………………………………………………………… 25

19 <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

20      Plaintiff submits this *Fourth Motion In Limine To Include New Facts And*

21 *Evidence*," pursuant to Federal Rules of Evidence (FRE) Rule 401 and 402. FRE Rule 401

22 instructs that, "Evidence is relevant if: (a) it has any tendency to make a fact more or less

23 probable than it would be without the evidence; and (b) the fact is of consequence in

24 determining the action." FRE Rule 402 instructs that, "Relevant evidence is admissible

25 unless any of the following provides otherwise: (The United States Constitution, a federal

26 statute, these rules; or other rules prescribed by the Supreme Court.)"

27      California Rules of Court, rule 3.1112(f) instructs that: "a motion in limine filed

28 before or during a trial need not be accompanied by a notice of hearing."

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

**STATEMENT OF FACTS**

**FACTS & EVIDENCE TO INCLUDE**

In recent weeks the Plaintiff has filed several *motions to include*, *request for judicial notice*, and *declarations*, all with numerous evidentiary exhibits attached, indicating fraud and document falsification occurring at the US Copyright Office. While conducting follow-up research associated with the US Copyright Office's improper handling of many copyright registrations connected with the infringement of the Plaintiff's intellectual property, the Plaintiff discovered the following facts and evidence, described in, and attached to, this motion to include new facts and evidence.

FALSIFICATION AT THE US COPYRIGHT OFFICE

Under Carla Hayden and Karyn Temple

June 1, 2011, Maria Pallante was appointed as the Register of Copyrights, where she served with honor and distinction for just over 5 years, resigning October 21, 2016. (See **Exhibit A**, a Wikipedia article about "Maria Pallante.")

As Maria Pallante approached completion of her fourth year at the Copyright Office, on April 29, 2015, she went before the House Judiciary Committee (**HJC**) to read a prescient statement, titled *The Register's Perspective on Copyright Review*. (See **Exhibit B**, Maria Pallante's Statement to the House Judiciary Committee, April 29, 2015.) [NOTE: The Register of Copyrights is under the Librarian of Congress (**LOC**) and serves at the pleasure of the LOC (meaning the LOC can fire or re-deploy the Register of Copyrights, as they see fit.]

At the time, Maria Pallante was serving under LOC James H Billington, who was in the final few months of a distinguished 28 year career. However, Maria Pallante's letter/testimony suggests that she may have already observed foul-play at the US Copyright Office, under Mr Billington, as her letter to the House Judiciary Committee recommended that the Copyright Office cease operating under the Library of Congress and become an autonomous agency, with a director appointed by the President and confirmed by the

1   Senate. Specifically, Maria Pallante's letter/testimony stated:

2       (6) To properly administer the copyright laws in the digital era, facilitate
3       the marketplace, and serve the Nation, the United States Copyright Office
    must be positioned for success. As stated by one Member of this
4       Committee, "it is time to enact a restructured, empowered and more
5       autonomous Copyright Office that's genuinely capable of allowing
    America to compete and protect our citizen's property in the global
6       marketplace." (See Exhibit B.)

7       A few months after Maria Pallante's testimony, LOC James H Billington, retired;

8   September 2015. The timing of Maria Pallante's testimony (April 29, 2015) coincides with

9   the earliest known incident of document falsification, cited in Plaintiff's recent filing,

10  *Amended Second Declaration Of Steve Wilson Briggs (Plaintiff) In Support Of Complaint*

11  (also see "Amended Second Declaration," p 13, concerning the fraudulent book *All You*

12  *Need Is Kill*, <u>November 5, 2015</u>). By the time this first known incident of falsification at the

13  Copyright Office occurred, Mr James H Billington had retired, and the acting Acting

14  Librarian of Congress was Davis S. Mao, who was replaced after less than a year, on

15  September 14, 2016.

16      Perhaps more troubling than the fact that the US Congress failed to act on Maria

17  Pallante's testimony is the fact that a month before Maria Pallante testified before the HJC,

18  she sent a letter to the late Congressman John Conyers, in which, regarding the Copyright

19  Office operating under the Library of Congress, Ms. Pallante stated, directly: **"There are**

20  **mounting operational tensions with this arrangement."** (See **<u>Exhibit C</u>**, Ms Pallante's

21  letter to Rep John Conyers.) Ms Pallante then attached a footnote to this statement which

22  tactfully illuminated the problems:

23      "As discussed at the hearing, information technology is governed according
24      to central Library processes and priorities, although the Copyright Office's
    needs are distinct. Copyright Office staffing allocations and pay are subject
25      to the Library's decisions and rules. The Library's salaries for top officials
    throughout the agency are considerably lower than salaries for comparable
26      positions in executive agencies, including for <u>copyright</u> officials at the U.S.
27      Patent and Trademark Office."

28

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1    It sounds as if Ms Pallante was trying to tell Congressman Conyers that the Librarian

2    of Congress can use her *information technology* authority to alter and override the

3    Copyright Office's work, according to the Librarian of Congress' "priorities." (Was Pallante

4    alluding to document falsification?) Pallante also informed Mr. Conyers that the staff at the

5    Copyright Office were unduly underpaid compared to other intellectual property branches.

6    A year later, a new Librarian of Congress was appointed, **Carla Hayden**.

7    Almost as if Carla Hayden had a predetermined objective, just 5 weeks after she

8    became the new LOC, she fired Maria Pallante as the Register of Copyrights, by demoting

9    Pallante to "senior advisor for digital strategy," a position that Pallante did not accept.

10   As Wikipedia explains:

11   "On October 21, 2016, Pallante was abruptly removed from her position.
     Librarian of Congress Carla Hayden said she had been appointed senior
12   advisor for digital strategy, an appointment made without Pallante's prior
13   knowledge. Rather than accept the position, Pallante submitted her
     resignation on October 24, 2016. (Wikipedia: "Maria Pallante")
14

15   Thus, Congress did not act on Maria Pallante's advice to make the Copyright Office

16   independent of the LOC; A year later, a seemingly corrupt LOC (Carla Hayden) was

17   appointed; A month later, Maria Pallante was fired.

18   In Maria Pallante's place, Carla Hayden appointed **Karyn Temple** as the new

19   Register of Copyrights. Karyn Temple was appointed on the very day Maria Pallante was

20   fired, October 21, 2016.

21   Most of the fraud and falsification at the US Copyright Office (which the Plaintiff

22   has recently documented in his various *declarations*, *motions in limine* and *requests for*

23   *judicial notice*) occurred under Karyn Temple, between 2016 and 2019.

24   Interestingly, the Complaint documents how the Plaintiff discovered he was being

25   hacked by the Defendants as he wrote the Complaint, and documents how the Plaintiff

26   observed that many parties associated with the Defendants began resigning and closing their

27   businesses as the Plaintiff wrote his Complaint. These incidents occurred between Late

28   August 2019 and March 3, 2020. And like all of the previously noted resignations, the

1  Wikipedia entry on *Karyn Temple* explains that Temple resigned from the US Copyright
2  Office on January 3, 2020 (the same period when many people associated with the
3  infringement of the Plaintiff's property were suddenly resigning).

4  Extremely suspiciously, immediately after leaving the US Copyright Office, Karyn
5  Temple was hired at the **Motion Picture Association** (**MPA**). The MPA is the same
6  organization that formed **Motion Picture Laboratories, Inc** (commonly known as
7  **MovieLabs**), in 2006/2007, shortly after the Plaintiff's screenplay was accessed. On August
8  25, 2020 the Plaintiff filed a document titled *Plaintiff's Third Motion In Limine For The*
9  *Inclusion Of New Facts And Evidence*, which explained:

10  Plaintiff discovered that 6 months after Defendants Zero Gravity Management
    LLC (ZGM), News Corp and Twentieth Century Fox (20CFOX) accessed his
11  work, the "Big 6" Hollywood film studios (Disney, 20CFOX, Paramount,
    Universal, Warner Bros and Sony Pictures) created the company *Motion*
12  *Picture Laboratories Inc* (MovieLabs). This company directly connects all 6
13  major film companies to the ongoing Access and Infringement of the
    Plaintiff's work. MovieLabs was/is composed of elite hackers, including
14  founder **Steve Weinstein**, who teaches hacking at Stanford University in a
15  program called "Hacking For Defense," a program that prepares qualified
    University students to hack for US intelligence agencies and the military.
16  MovieLabs also employed Defendant 20CFOX's Chief Technology Officer
17  (Hanno Basse) on its board for 7 years, and currently employs Sony Pictures'
    former Chief Technology Officer (Richard Berger) as its CEO. Although the
18  Plaintiff has no obligation to prove the existence of, or locate, any "hackers"
19  that the Defendants and their associates may employ, the evidence indicates
20  that MovieLabs true purpose was to hack into the Plaintiff's phones,
    computers, online storage and email.
21

22  Thus, it appears that the Defendants and their associates, who comprise the American
23  FIlm Industry, gave Karyn Temple a comfortable job at the MPA, seemingly as a reward for
24  using the US Copyright Office to produce falsified documents for the film industry.

25  It is unlikely that Carla Hayden and Karyn Temple devised this plan to use the US
26  Copyright Office to falsify documents for the film industry. Rather, the Plaintiff' suspects
27  the plan was coordinated by Rahm Emanuel (who worked for the Clinton and Obama
28  administrations), and Rahm's brother Ari Emanuel (who started working in the film industry

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1  in the 1980s). It should also be observed that before going to the Copyright Office, Karyn

2  Temple worked for *Williams & Connolly, LLP*, perhaps the most exclusive and respected

3  law firm in the US; representing many Hollywood studios (Disney, etc).

<div align="center">All American Entertainment</div>

5      While researching these matters, the Plaintiff discovered that the current Librarian of

6  Congress, **Carla Hayden**, is listed on the website of a talent agency called *All American*

7  *Entertainment* (**AAE**), at https://www.allamericanentertainment.com. Carla Hayden's page

8  indicated that she was represented by AAE, and indicated that Hayden was available for

9  speaking engagements though AAE's website. The Plaintiff has worked in or around the

10  entertainment industry, on and off, for several decades, however he had never heard of

11  AAE. The AAE "About Us" web page looked as if the company, and the website, were a

12  family-run outfit. But the AAE client list is unparalleled in its breadth of A-list celebrities.

13  (See **Exhibit D**, AllAmericanEntertainment.com's "About Us" page.)

14      The Court might observe that Defendant **Google** (a Defendant herein) and **Microsoft**

15  are both client/sponsors of the AAE website (see Exhibit D), precisely as they were named

16  as clients/sponsors of Defendant Michael Pierce's 212dfc.com website.

17      AAE seems to be dedicated to arranging speaking engagements for these celebrities.

18  But from the Plaintiff's research, most of AAE's talent seems to come from Ari Emanuel's

19  WME (William Morris Endeavor) talent agency (a subsidiary of Endeavor). Surprisingly,

20  many of the parties named in this action are listed on AAE's website. Among the

21  billionaire technology CEOs listed on AAE's website are Amazon's Jeff Bezos, Microsoft's

22  Bill Gates, Google's Larry Page and Sergey Brin, Richard Branson, Palantir's Peter Thiel

23  and Alex Karp, and many others.

24      The Plaintiff found no other publicly appointed or elected officials on the AAE

25  website, except Carla Hayden. The Plaintiff has attached **Exhibit E**: the contact/booking

26  pages of 24 celebrities listed on the *All American Entertainment* website—all of whom are

27  connected to the infringement of the Plaintiff's intellectual property. The Court will find

28  Carla Hayden's contact/booking page is on the first page of this group. Exhibit E includes

<div align="center">Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence</div>

the following A-list celebrities and technology innovators, listed sequentially:

1. Carla Hayden (Librarian of Congress)
2. Alex Karp (Palantir)
3. Ari Emanuel (MRC, WME, Endeavor)
4. Ben Affleck
5. Bill Gates (Microsoft)
6. Bob Iger (Disney)
7. **Brewster Kahle** (owner of Defendant Internet Archive)
8. Christopher Nolan
9. Dana Brunetti
10. **Eric Trump**
11. George Lucas
12. James Murdoch (son of Rupert Murdoch—owner of Def **News Corp** and **20CFOX**)
13. Jeff Bezos (Amazon.com)
14. Jon Feltheimer (Liongate)
15. Jonathan Nolan
16. Larry Page (Owner of Defendant Google LLC)
17. Matt Damon
18. Peter Thiel (owner of Palantir)
19. Reed Hastings (Netflix)
20. Richard Branson (Virgin Galactic)
21. Sergey Brin (owner of Defendant Google LLC)
22. Simon Kinberg
23. Steven Spielberg (the first infringer of Plaintiff's work)
24. Suzanne Collins
- The most telling personality on this list is Brewster Kahle, founder/CEO of Def Internet Archive. Kahle is a quiet, little-known personality, who is only on this list to receive payments for falsifying web crawls (see Complaint) for the other conspirators.

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1    It is odd that these celebrities are on this site, because most, perhaps all of these

2    celebrity actors and directors (Ben Affleck, Matt Damon, Chistopher Nolan, Jonathan

3    Nolan….) are already represented by other talent agencies, such as WME and CAA, and

4    these talent agencies have <u>exclusive</u> representation contracts. Another problem with the

5    AAE website is it is redundant, as all major talent agencies have their own websites/pages

6    for booking clients for *speaking* engagement. (See **Exhibit F**: a PDF of WME's "speakers"

7    site/page, showing an extensive list of clients available for speaking engagements.)

8    <div align="center">The Film Industry Fraudulently Backdates</div>

9    <div align="center">*All American Entertainment*</div>

10    Like many of the companies that infringe the Plaintiff's work, All American

11    Entertainment fraudulently tries to backdate its existence by creating a fraudulent backstory

12    that the company was created by Greg Friedlander in 2002 (in either North Carolina or

13    New York; the story is not clear). (See Exhibit D.) However, by going to the

14    **OpenCorporates.com** website, the Plaintiff discovered that *All American Entertainment*

15    was not created in 2002.  Rather, like many of the infringers of the Plaintiff's work (who

16    rushed out and formed new companies after January 20, 2006—the day that Zero Gravity

17    Management first accessed the Plaintiff's work), *All American Entertainment, Inc* was

18    formed in Florida, <u>March 14, 2006</u>**. (See Exhibit G**, *All American Entertainment, Inc*'s

19    OpenCorporates.com business entity statement.) This business entity statement indicates

20    that **Terrence Shea** is the true President of *All American Entertainment, Inc.* (**AAEI**)

21    (OpenCorporates.com is a web service that aggregates business statements and information

22    from all 50 United States, and many foreign nations, into a single online source.)

23    The Plaintiff's research showed that there was never an *All American Entertainment*

24    formed in North Carolina, and the *All American Entertainment Inc* in New York was

25    created in 1985, and has been **inactive** for untold years. Although the Plaintiff found 11

26    companies called "All American Entertainment" (with an *Inc*, *LLC* or *Corp* suffix), the

27    Plaintiff deduced that the Florida based business was the correct business by looking for

28    "Active" companies (many/most of the companies were inactive or defunct), and by

<div align="center">Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence</div>

1　analyzing the remaining companies' transaction activity on CorporationWiki.com.

2　　　　Because All American Entertainment's website's "About Us" page stated that Greg

3　Friedlander created the company in 2002, the Plaintiff also searched OpenCorporates for all

4　businesses with an officer named *Greg Friedlander*. That search returned 7 results. (See

5　**Exhibit H**.) Exhibit H shows Greg Friedlander is connected to 7 businesses; 6 of these

6　businesses were created between 2011 and 2017. One of these businesses, *Entertainment*

7　*Venture Group LLC*, was created on **March 9, 2006**, seven weeks after the Defendant Zero

8　Gravity Management LLC accessed the Plaintiff's work. (See Exhibit H, bottom listing.)

9　However, *Entertainment Venture Group LLC* dissolved in 2010 (see Exhibit H).

10　　　　According to WhoIs.net (www.whois.net) the AAE website was created December

11　2006, the same year that the Florida *All American Entertainment, Inc* company was created

12　(see **Exhibit I**), 11 months after the Plaintiff's screenplay was unlawfully accessed.

13　　　　By going to CorporationWiki (www.corporationwiki.com) and entering the words

14　"All American Entertainment, Inc" into the search browser, then clicking "search", the

15　CorporationWiki results provide a business transaction cash-flow chart that shows a

16　number of people and companies transferring money to *All American Entertainment Inc*,

17　and to Terrence Shea. This cash flow chart also shows Shea sends money to *All American*

18　*Entertainment, Inc*. (See **Exhibit J**, a PDF of said AAEI CorporationWiki cash flow chart.)

19　　　　The Complaint speculates that the Defendants may intend to actualize the Plaintiff's

20　vision of a world where immortality through technology is possible, and where a virtual

21　time Machine (*the Accelerator*) is achieved by making an exact digital replica/simulation

22　of Earth and the Universe, which intakes all available real data (from purchases, weather,

23　GPS, satellites, cameras, cell-phone, internet, etc.), complimented by an advanced *MRI*

24　*scanning* technology that takes precise brain/soul/body scans of all known actual citizens,

25　then converts these scans into perfect digital reproductions ("neuro-gens") of the actual

26　people, then inserts the neuro-gens into the *Accelerator*—which can then be accelerated

27　thousands of times faster than the actual world; necessary to predict crime and other events.

28　　　　If the Plaintiff is correct that the Defendants/conspirators intend to develop his ill

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1  advised technologies, it would not be surprising that, according to the CorporationWiki

2  cash-flow chart (Ex J), among the businesses that are connected to **All American**

3  **Entertainment, Inc** are: (1) a scanning company, **Imaging Equipment International, Ltd**;

4  (2) biomedical companies, **American Biomedical Corporation**, and **Minimatic Implant**

5  **Technology**; (3) a technology company, **It - Innovation Technologies, Inc**; (4) an

6  entertainment entity, **Luxor Entertainment, Inc**; and (5) a gaming company, **Games On**

7  **The Go Franchising, LLC**.

8      Terrence Shea (also known as Terry Shea) is also identified as the "president" of 3

9  other companies based in Deerfield Beach, Florida. The companies that name Terrence

10  Shea as "president" are: 1. *Games On The Go Franchising LLC*, 2. *Luxor Entertainment*

11  *Inc*, 3. *Sheaboats Incorporated*. (See **Exhibit K**: OpenCorprate's business entity statements

12  for 1. Games On The Go Franchising, LLC, 2. Luxor Entertainment Inc, 3. Sheaboats

13  Incorporated.)

14      A person named *Ingo K Kozak* is named as the vice-president of Luxor

15  Entertainment Inc, and Sheaboats Incorporated.

16      All four of Terrence Shea's businesses are located in Deerfield Beach, Florida.

17                              The Trump Connection

18      Terrence Shea's businesses, located in Deerfield Beach Florida, are only 29 miles

19  from US President Donald Trump's residence, at Mar-a-Lago, Palm Beach, Florida.

20      The proximity of Shea's businesses to Trump's Mar-a-Lago home is relevant

21  because **Eric Trump** is listed as a client of All American Entertainment (see page 8, or see

22  Exhibit E). This is relevant because the Complaint shows that **Steven Mnuchin** (US

23  Secretary of the Treasury, appointed by Donald Trump) is named on the *Avatar* Copyright,

24  central in this action. This is also relevant because prior to being elected President, Donald

25  Trump was personally represented by famed talent agent Ari Emanual (who was named in

26  Plaintiff's prior suit *Briggs v Spacey*). The Complaint also explains that Ari Emanuel and

27  WME also represented Wayne Kramer, who is identified in the Complaint as a member of

28  Zero Gravity Management, LLC, the company that unlawfully accessed the Plaintiff's

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1  screenplay and delivered it to the other Defendants and infringers.

2   From these facts, it is quite possible that **Eric Trump** uses AAE/AAEI to collect

3  payments for his father, Donald Trump. Terrence Shea's businesses' proximity to Trump's

4  Mar-a-Lago residence (29 miles) would make managing affairs much easier.

5  <div align="center">The Russian Connection</div>

6   On the previous CorporationWiki *cash flow* graphic web page for "All American

7  Entertainment, Inc" (Exhibit J), if one clicks on the rectangle with the business entity name

8  "Imaging Equipment International, Ltd," the screen will direct to a new cash flow chart,

9  showing the cash flow trends between *Imaging Equipment International Ltd* and its nearest

10  business partners. (See **Exhibit L**.) This chart shows that 3 parties, who appear to be

11  Russian/Ukrainians, (Yury Mamtze, Vadim Grishchenko, and Robert Chmielinski), all pay

12  money into *Imaging Equipment International, Ltd.*

13   OpenCorporates.com's page for *Imaging Equipment International, Ltd*, also

14  indicates that Vadim Grishchenko is the company's president, and Yury Mamtzev is the

15  director and treasurer, and Robert Chmielinski is the Secretary. (See **Exhibit M**.)  This

16  company is located at: 4625 WEST NEVSO DR STE 2, LAS VEGAS, NV, 89103.

17   Robert Chmielinski is also the secretary of *It - Innovation Technologies, Inc*, also

18  located at 4625 WEST NEVSO DR STE 2, LAS VEGAS, NV, 89103. (See **Exhibit N**, the

19  OpenCorporates.com business entity statement for *It - Innovation Technologies, Inc.*)

20   Vadim Grishchenko's *LinkedIn* webpage indicates he is Ukrainian. (See **Exhibit O**.)

21  The Plaintiff suspects these individuals are Russians.

22   Thus, if the Court re-examines Exhibit J, (the cash flow chart of *All American*

23  *Entertainment Inc*), it will see that *Imaging Equipment International, Ltd* sends money to

24  Robert Chmielinski, and Chmielinski sends money to *All American Entertainment, Inc*.

25   *Imaging Equipment International Ltd* is listed on *BizStanding.com*

26  (at https://bizstanding.com/directory/MA/IM/44/). (See **Exhibit P**.) This BizStanding

27  listing shows that Vadim Grishchenko is the president of *Imaging Equipment International,*

28  *Ltd*, and Yury Mamtzev is director and treasurer, and Robert Chmielinski is the secretary.

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

| | |
|---|---|
| 1 | Quid Pro Quo |
| 2 | As the preceding cash-flow charts suggest, **All American Entertainment Inc** was |
| 3 | created to receive money from **Imaging Equipment International Ltd** and **It - Innovation** |
| 4 | **Technologies, Inc**. Again, the Plaintiff believes these companies intend to actualize his |
| 5 | ideas (specifically, the conspirators appear intent to develop: 1. the mind/soul/body |
| 6 | scanner; 2. *the Accelerator*; 3. lunar mining/refining technology; 4. anti-aging therapeutics; |
| 7 | 5. Comet and/or asteroid harnessing and mining; 6. a satellite city for the ultra-rich; 6. |
| 8 | space tourism). The Plaintiff is uncertain if *All American Entertainment Inc*, *Imaging* |
| 9 | *Equipment International Ltd*, or *It - Innovation Technologies Inc* make any material |
| 10 | contributions toward producing these technologies, or if they just move money to the actual |
| 11 | product developers. But, because Google and Microsoft have been very involved in 3D |
| 12 | brain image scanning, for some time (see Exhibit HH), the Plaintiff believes Microsoft and |
| 13 | Google are the actual technology developers. |
| 14 | Again, the cash-flow charts indicate Russia is financing these projects. So, logically, |
| 15 | between now and the time the conspirators might develop any technology, Russia will |
| 16 | expect access to all data collected on Americans. Plaintiff predicts that conspirators like |
| 17 | Bill Gates, Jeff Bezos, Peter Thiel and Alex Karp (all listed on the AAE *talent* website) |
| 18 | receive payments for their role in stealing the personal data of private American citizens. |
| 19 | Another Donald Trump Connection? |
| 20 | The Complaint shows that in January 2006 the Defs accessed the Plaintiff's script, |
| 21 | and shortly thereafter they began forming various new businesses and partnerships. |
| 22 | Consistent with this, in 2006, 2007, 2008 and 2009, Donald Trump branded several new |
| 23 | Trump towers in Florida, and he and his children began to visit Russia more often. |
| 24 | **Trump Takes Action In Furtherance Of The Defs'/Conspirators' Plan** |
| 25 | Evidence that Donald Trump acted in furtherance of the conspirators' theft of the |
| 26 | Plaintiff's ideas (to create a mass aggregated data based surveillance system), by using |
| 27 | government websites and the Internet Archive to publish and fraudulently backdate false |
| 28 | documents related to the infringement of the Plaintiff's work, is presented on pp 23 to 25. |

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

| | |
|---|---|
| 1 | <u>Ongoing Document Falsification and Fraud</u> |
| 2 | <u>At The US Copyright Office</u> |
| 3 | The Plaintiff provides the following information regarding ongoing and expanding |
| 4 | fraud and document falsification at the US Copyright Office, related to the Plaintiff's |
| 5 | works, to inform the Court and the public of the extent and nature of the Defendants and |
| 6 | their film industry associates' routine infringement of the Plaintiff's works, and their |
| 7 | reliance on the US Copyright Office to support this scheme. Although these facts are |
| 8 | related to the infringement of the Plaintiff's work, these facts are not necessarily related to |
| 9 | the defendants in this action. The Plaintiff presents these facts because they tend to make |
| 10 | the facts and allegations of the Complaint more probable, per FRE Rule 401. |
| 11 | <u>Fraud at the Copyright Office & Nielsen</u> |
| 12 | <u>Re: Reed Hastings'/Netflix's *Altered Carbon*</u> |
| 13 | On August 27, 2020, the Plaintiff found a story on his Google news-feed that Netflix |
| 14 | and Reed Hastings were cancelling the Netflix series Altered Carbon. The Plaintiff then |
| 15 | read a brief description of the plot and determined that there was sufficient similarity to his |
| 16 | original work to sustain an Infringement action. |
| 17 | Like others of the Defendants' and their associates' infringing derivative works, |
| 18 | Hastings and Netflix included a false backstory on the Wikipedia entry for *Altered Carbon*, |
| 19 | explaining that Altered Carbon was based on an eponymous book by Richard Morgan. |
| 20 | The Wikipedia entry for the "Altered Carbon" book (see **Exhibit Q**) indicated that |
| 21 | the book was published in 2002, only in the UK, by a smaller publisher, *Victor Gollancz* |
| 22 | *LTD*, a subsidiary of *Orion Publishing Group*. |
| 23 | The Plaintiff then checked the UK copyright records for "Altered Carbon" and |
| 24 | found nothing to suggest it was published before 2015. (See **Exhibit R**: an "Altered |
| 25 | Carbon" copyright search on the UK's Copyright Licensing Agency's website, at: |
| 26 | <u>https://www.cla.co.uk/check-permissions/search-publications?query=Altered%20Carbon&li</u> |
| 27 | <u>cenceType=132</u> .) In fact, the UK system only had thirteen digit ISBN numbers for the |
| 28 | book. Thirteen digit ISBN numbers were not issued until 2007. Before 2007 ISBN numbers |

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1   were 10 digits long. Since Altered Carbon alleges to have been published in 2002, but it

2   does not have a ten digit ISBN, but a 13 digit ISBN—issued after 2007, the claim that the

3   Altered Carbon book was released in 2002 is clearly false.

4          Another problem is that the earliest ISBN listed in the UK system indicated that

5   Altered Carbon was issued in the United States. By comparing the various UK Altered

6   Carbon Copyright Licensing Agency's ISBN numbers, listed in Exhibit R, one sees that the

7   earliest number is associated with listing #3 indicates the Country of Publication is the USA.

8   [NOTE: The ISBN system is easy to abuse. Book publishers can buy thousands of ISBNs in

9   advance, then assign them to books 10, 20 or 30 years later. This happens often. But most

10  book publishers are not using this flaw in the ISBN system to backdate books; rather, they

11  are just using up their supply of pre-purchased ISBNs.]

12         When the Plaintiff checked "Altered Carbon" in the US Copyright Office he found

13  broad signs of falsification. In a recently filed *declaration* and a recently filed *request for*

14  *judicial notice*, the Plaintiff showed, using his own copyright registration, that the US

15  copyright office does not ordinarily back-file (or backdate) registrations that claim an earlier

16  completion date. However, when the Plaintiff entered the title "Altered Carbon" into the

17  Copyright Office's website search browser, then clicked "search," and arranged the results

18  sequentially, the earliest *Altered Carbon* document indicated it was filed in 2002. (See

19  **Exhibit S**: Copyright Office "Altered Carbon" search). But when the Plaintiff clicked the

20  link to this copyright registration, the registration clearly indicated it was not submitted until

21  **September 2015**. (See **Exhibit T**, *Altered Carbon* copyright registration.) Thus, yet again,

22  the US Copyright Office has fraudulently back-filed a foreign registration to 2002.

23         If the Court examines the Plaintiff's original *Altered Carbon* Copyright Office

24  website search (Exhibit S), the Court will notice that the first document listed is a text

25  document, identified with a "TX," followed by ten numerical digits. This item, again, was

26  fraudulently listed as being a 2002 document; when, in fact, it was submitted in 2015. The

27  next problem is the 6 registrations that are listed immediately below the top copyright

28  registration. (See **Exhibit U**, six "V notice" registrations for Altered Carbon.)

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

If the Court examines these "V-notices", the Court will notice that each of their registration numbers begin with a capital "V," followed by four numbers, then a letter, then three numbers. In 1965 the US Copyright Office began using the single capital "V" designation in its *Administrative Classification System* to indicate "**Notice Of Intention To Use**." (See **Exhibit V**, the Copyright Office's *Administrative Classification System* guide; see final page.) According to the classification system a *Notice Of Intention To Use* is filed when someone intends to use a copyrighted work. However, as the Plaintiff understands this, a copyrighted work associated with these V-notices must FIRST be registered with the Copyright Office. For example, if the Court examines **Exhibit W**, they will find a copyright registration for *The Abominable Snow Rabbit* (an old Bugs Bunny cartoon). The Court will notice that the cartoon was first registered in 1961. And if the Court examines **Exhibit X** (V-notices associated with Abominable Snow Rabbit), the Court will observe that the V notices were filed long after the original registration.

Therefore, the six *Altered Carbon* V notices **must be falsified and fake** because they all allege to have been filed between 2002 and 2009, but the first properly filed *copyright registration* for Altered Carbon was not submitted until September 16, 2015. They would also be fake because no actual *Altered Carbon* book existed until 2015.

The Defendants Use **Nielsen** To Commit Fraud

The Wikipedia entry on "International Standard Book Numbers" (**Exhibit Y**) explains that the UK's exclusive ISBN agency is ***Nielsen* Book Services Ltd**, also known as **Nielsen Bookscan**, which was purchased by MRC Data, which is owned by MRC (Media Rights Capital), a central defendant in *Briggs v Blomkamp* and *Briggs v Spacey*.

Thus, as MRC waited for the Ninth's *Briggs v Blomkamp* decision, MRC purchased Nielsen Holdings/Nielsen Bookscan, to falsify data and help Reed Hasings and Netflix infringe the Plaintiff's work, underline. Worse, as *Briggs v Universal* and *Briggs v Spacey* were being litigated (2017 to 2018), as MRC insisted the Plaintiff's claims were improper, MRC was arranging for the US Copyright Office to falsify documents, to steal the Plaintiff's work, yet again (re *Baby Driver*). (See Plaintiff's Second Request For Judicial Notice.)

| | |
|---|---|
| 1 | <div align="center">Fraud at the Copyright Office</div> |
| 2 | <div align="center">Re: "What We Do In The Shadows"</div> |
| 3 | Given that the Defendants may be engaged in some intrigue involving Russians and |
| 4 | Donald Trump, any facts and evidence about fraud at the US Copyright Office may seem |
| 5 | tame by comparison. Nonetheless, the Plaintiff discovered that the Defendants used the |
| 6 | Copyright Office to falsify filings related to the 2014 film *What We Do In The Shadows*. |
| 7 | The 2014 film *What We Do In The Shadows* infringes the Plaintiff's screenplay |
| 8 | "Sweeter Nectar Cherries," written circa 2009, and revised, periodically, until 2012. |
| 9 | To support their theft of the Plaintiff's work, in a move that at this point may seem |
| 10 | routine, Paramount Pictures disseminated a false story that  Jemaine Clement and Taika |
| 11 | Waititi wrote the *What We Do In The Shadows* screenplay. (See **Exhibit Z**: the Wikipedia |
| 12 | entry for the 2014 film *What We Do In The Shadows*.) Lacking the artistry of many of the |
| 13 | other infringers, Paramount claims Clement and Waititi wrote the script in the first sentence |
| 14 | of the Wikipedia entry: |
| 15 | "What We Do in the Shadows is a 2014 New Zealand mockumentary horror |
| 16 | comedy film **written** and directed by Jemaine Clement and Taika Waititi and the first installment in the What We Do in the Shadows franchise." |
| 17 | |
| 18 | But this story disintegrates quickly. |
| 19 | By going to the Copyright Office (**CRO**) website and running a "name" search of |
| 20 | *Jemaine Clement* ("Clement, Jemaine"), then organizing these results in ascending |
| 21 | (sequential) order, we see that Clement has registered 18 of his copyright protected works. |
| 22 | (See **Exhibit AA**, CRO search results for Jemaine Clement.) But we also see much more |
| 23 | important information: (1) all of Clement's copyright registrations are for music or songs; |
| 24 | (2) Clement has no registrations for any films or screenplays; (3) all of Clement's |
| 25 | registrations were submitted between 2007 and 2010 (nothing after 2010); (4) none of |
| 26 | Clement's registrations are for a work titled "What We Do In The Shadows"; (5) Jemaine |
| 27 | Clement has <u>never</u> submitted a copyright registration for a <u>literary or written</u> work. |
| 28 | By examining Clement's search results (Exhibit AA) , the Court will observe that |

<div align="center">Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence</div>

1    the first two items begin with a "V", thus, these are "Notice Of Intention To Use"

2    registrations (as explained earlier), referred to herein as "V-notices". These V-notices are

3    attached to Clement's <u>2005</u> performance on HBO show "One Night Stand," in which

4    Clement performed with his band "Flight of the Conchords." (See **Exhibit BB**, 2005 HBO,

5    *Flight of the Conchords* copyright registration.).

6          From the preceding facts, Jemaine Clement had nothing to do with writing "What

7    We Do In The Shadows."

8          By going to the Copyright Office website and running a "name" search of *Taika*

9    *Waititi* ("Waititi, Taika"), then organizing these results in ascending sequential order, the

10   Court can see that Clement has registered 9 of his copyright protected works. (See **Exhibit**

11   **CC**: a copyright registration search for *Taika Waititi*.) By clicking the links to these search

12   results, one learns: (1) Four of Taika Waititi registered works are for screenplays; (2) Taika

13   Waititi registered his works in the years 2005, 2007, 2018 and 2019.

14         Examining Ex CC, we also see (bottom row) that Taik Waititi has **one** registration

15   with the words "What We Do In The Shadows" in its title. That work, titled *WHAT WE DO*

16   *IN THE SHADOWS : Episode 7 : 106, THE TRIAL*, was registered in 2019. Clicking the

17   link directs to its copyright registration (**Exhibit DD**). By examining this registration (Ex

18   DD) the Court can see that Waititi did not write any work related to What We Do In The

19   Shadows until 2019, and *that* script is for the seventh episode of the 2019 FX TV series.

20         Thus, it is clear that Taiko Waititi had nothing to do with writing the 2014 film.

21         Should the Court have any remaining doubt that Clement and Waititi had nothing to

22   do with writing the 2014 film "What We Do In The Shadows," the Plaintiff also performed

23   a simple "title" search for "What We Do In The Shadows" on the US Copyright Office

24   website, organized in sequential order. (See **Exhibit EE**: ascending CRO search results for

25   "What We Do In The Shadows".)

26         By examining Exhibit EE, the Court can see that the first result, in the top row, is a

27   2014 V-notice (Notice Of Intention To Use). The Plaintiff has already demonstrated that

28   V-notices can be falsified through the US Copyright Office; thus these are unreliable, and

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1  apparently fraudulent, as they are not associated with any verifiable prior work.

2  The first seemingly valid copyright registration in Exhibit EE is in the second row,

3  indicating a copyright registration registered in 2014. However, when the Plaintiff clicked

4  the link in row 2, the link directed to a motion picture registration for "What We Do In The

5  Shadows" that was registered in **2018**. (See **Exhibit FF**, 2018 motion picture registration

6  for What We Do In The Shadows.) <u>The fact that the CRO search page indicated that this</u>

7  <u>document was registered in 2014, when the document was NOT in fact registered until</u>

8  <u>2018, is further evidence that the US Copyright Office engaged in fraud and falsification</u>.

9  **Also, the court can see from examining Exhibit FF that neither Jemaine Clement nor**

10  **Taika Waititi are mentioned on the registration.**

11  The Plaintiff then checked the next copyright registration, listed in sequence, on the

12  third row of Exhibit FF. As the Court can see, the *search results* page indicates that this

13  document was created in 2014. However, when the Plaintiff clicked the link, the page

14  directed to a motion picture copyright registration for a film called "What We Do In The

15  Shadows," which was not registered until April 2016. (See **Exhibit GG**, 2016 motion

16  picture registration for What We Do In The Shadows.) <u>The fact that the search page</u>

17  <u>indicated that this registration was registered in 2014, but the document was not in fact</u>

18  <u>registered until 2016, is further evidence that the US Copyright Office engaged in fraud and</u>

19  <u>falsification</u>. **Also, the court can see from examining Exhibit GG that, again, neither**

20  **Jemaine Clement nor Taika Waititi are mentioned on the registration.**

21  Examining Exhibits FF and GG, one sees that the filer alleged the film was based on

22  a 2005 short film ("What We Do In The Shadows - some interviews with some vampires"

23  (2005)"). But the Plaintiff found no registration on the CRO website for a short film named

24  "What We Do In The Shadows," from before 2016, and he found no registration for a film

25  called "Some Interviews With Some Vampires," period. The person who filled out this

26  falsified copyright registration did not name the writer of this non-existent short film.

27  Jemaine Clement and Taika Waititi had nothing to do with writing the 2014 film,

28  "What We Do In The Shadows."

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

**SUPPLEMENTAL FACTS & EVIDENCE**

**Liberate Technologies**

The facts contained under this heading are presented to show that Defs News Corp and 20th Century Fox began working with the elite hackers of MovieLabs (Steve Weinstein, Raymond Drewry, Craigs Seidel, Jim Helman) back in 1999, when News Corp partnered with Oracle's secret hacking company *Liberate Technologies* (**Liberate**), where Weinstein and the others then worked. Liberate closed in 2005, and was re-opened in July 2006, renamed "MovieLabs," and Weinstein, Drewry, Seidel and Helman moved to MovieLabs.

MovieLabs' founding *executives* (Weinstein, Drewry, Seidel, Helman) worked together, between 1995 and 2006, 11 years earlier than previously known, at *Liberate Technologies*. (See **Exhibit HH**: MovieLabs' "Team" bios showing Drewry, Seidel, Helman worked at Liberate.) Liberate's SEC Form 10-K (**Exhibit II**) says it formed in 1995, and was originally named *Network Computer, Inc.* ("**NCI**"), a subsidiary of **Oracle Corp**. NCI changed its name to *Liberate Technologies*, May of 1999.

Steve Weinstein, on his Stanford University faculty page (see **Exhibit JJ**), claims he was "a founding executive and Chief Strategist and Technologist at Liberate Technologies."

The Plaintiff also found, online, *IEEE Security*'s final program for the *1999 IEEE Symposium on Security and Privacy Special 20th Anniversary Program*. The convention involved a large number of hackers and technology specialists. NCI (*Liberate*) participated, represented by **Steve Weinstein**, and led a presentation called "NCI Security Architecture." This program is not attached, as it may contain classified information.

November 1999, Defendant News Corporation partnered with Liberate, via Star TV. (See **Exhibit KK**.) Plaintiff contends that News Corporation, one of Liberate's only known "*clients*," or *partners,* used Liberate to hack into Plaintiff's files from late 1999 to 2006.

Sept 2004, *SFGate* reported (**Exhibit LL**) that federal prosecutors indicted Liberate Technologies' COO, Donald Fitzpatrick, alleging Liberate used its own funds to create the false appearance of legitimate revenue. Since a hacking company cannot afford *bad press* and federal investigations, 4 months later, Jan 2005, Comcast bought all of Liberate's assets.

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1    July 2006 ***MovieLabs*** was formed, with Weinstein, Drewry, Seidel and Helman.

2    September 2006, Liberate tried to take-over **USA Truck, Inc**, but *USA Truck*

3  refused, and released a statement pointing out that Liberate had been a public company that

4  sold all of its assets in 2005. (See **Exhibit MM**, *USA Truck Inc*'s statement from

5  LawInsider.com.) This shows Comcast/NBCU (then owners of Liberate, and co-owners of

6  MovieLabs) tried to buy *USA Truck Inc*, in Liberate's name, to make Liberate appear as if it

7  were still in business. This was done to keep observers from noticing that all of Liberate

8  Technologies elite hackers (Weinstein, Drewry, Seidel, Helman) had moved to MovieLabs.

9                              **The Lobby**

10    The Complaint explains that from December 2006 to around August 2007 the

11  Plaintiff posted a revised version of his script (featuring a detailed explanation of the

12  mind/soul scanner and the Accelerator) on TriggerStreet.com. Upon reading that revised

13  script, the Defendants/conspirators (who had already accessed this screenplay a year earlier,

14  January 20, 2006) were suddenly inspired to move very swiftly. Thus, Spring 2007, many of

15  the Defendants/conspirators began planning an exclusive convention, to occur later in 2007.

16    May 2, 2007, VentureBeat.com reported that a huge convention called "the Lobby"

17  would occur in late 2007, on the big island of Hawaii, and hundreds of the most powerful

18  figures in technology, film and financing would be present. The article included a lengthy

19  list of technology leaders, by name and title, including: **Jeff Bezos** CEO of Amazon, **Mark**

20  **Zuckerberg** CEO of Facebook, **Sergey Brin** and **Larry Page** CEOs of Google,  **Peter**

21  **Thiel**, now with *Palantir*, and many more. (See **Exhibit NN**: The 2007 VentureBeat.com

22  article, titled "**The Lobby — are you on the list?**".)

23    "The Lobby" convention would not occur until October 24 through 26, 2007. (See

24  **Exhibit OO**, an announcement about "The Lobby" convention from a "*The Lobby*" web

25  posting, at https://thelobby.typepad.com.)

26    Although the event planners included many divergent companies, and may have

27  had secondary and tertiary objectives, one of the three giveaways that the event's primary

28  objective concerned infringing the Plaintiff's concept of *data aggregation* and his

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

screenplay is the fact that major representatives from every major film studio were present (Viacom, Disney, 20th Century Fox, Sony Pictures, Warner Brothers, NBC Universal, Turner Broadcasting Systems, CBS, ABC, Apple, Microsoft, MTV), as were representatives from all of the new technology powerhouses. Meanwhile, older industries (telephone, cellphones, oil, air, car companies, etc) were conspicuously absent. Another giveaway that *The Lobby*'s true mission involved finding partners to develop the Plaintiff's concepts, is the presence of all of the now-known big-tech infringers of the Plaintiff's concepts (Microsoft, Google, Amazon, Palantir). But the **dead giveaway** that *the Lobby*'s true mission involved infringing the Plaintiff's work, is the presence of **Steve Weinstein**, CEO of **MovieLabs**. Again, Weinstein teaches hacking for America's intelligence agencies at Stanford University, in a program called *Hacking For Defense*. When this VentureBeats article was released, May 2007, MovieLabs was less than a year old, and Weinstein had been its CEO for less than a year. An unknown CEO, who was also the former Chief Strategist for the failed *Liberate Technologies* (a company that had just been through a federal fraud investigation), would be invited to this elite convention. Weinstein presence would be needed to teach the tech and film industry infringers how to use his hacking tools to access the Plaintiff's work, or to explain how he would distribute the stolen works/concepts.

Is *The Lobby* convention evidence of a tech and film industry plot to steal the Plaintiff's ideas? Who knows? Possibly. But the Plaintiff is not responsible for explaining all of the Defs' machinations. He is only responsible for showing *access* and *substantial similarity* between the Defs' work and his work(s).

**While In Office, Donald Trump Took Actions In Furtherance**

**Of The Conspirator's Theft Of The Plaintiff's Ideas, And Used Government**

**Agencies And The Internet Archive To Produce/Publish False Documents**

Shortly after discovering the facts and evidence indicating that (1) Trump may be connected to three Russian/Ukrainian men through a company called *All American Entertainment, Inc*, (see pp 1-14), and shortly after discovering the facts and evidence that (2) Trump may be involved in a private and probably unlawful private plan to create a

1   National surveillance and defense system based on aggregated data (see pp 1-14), the

2   Plaintiff found new evidence that President Trump took action in furtherance of the

3   intellectual property theft of the Plaintiff's concept of an aggregated data based defense and

4   surveillance system, while in the Office of the Presidency. The evidence of this follows.

5   First, the Plaintiff believes he is (and is) the conceiver of the concept of "aggregate

6   data" and/or "data aggregation." The following facts and evidence support this. However,

7   whether the Plaintiff conceived of *data aggregation*, or not, is of secondary importance.

8   What is important, in this section, is that the evidence indicates that the Trump

9   administration used various websites, including federal and state sites, to publish false

10   documents. These false documents purport that the concept and terms "data aggregation" or

11   "aggregated data" were in the public lexicon before December 2006. (The Plaintiff

12   conceived of data aggregation in 2004, but introduced the terms "data aggregation" and/or

13   "aggregated data" in, or around, December 2006, in his screenplay *Butterfly Drive*r.)

14   On September 16, 2020, after discovering Donald Trump's connection to three

15   Ukrainian/Russians, and other related facts, the Plaintiff decided to *google* (perform a

16   Google Chrome web search) the phrase "**data aggregation**." He then modified this search,

17   by selecting the date parameters of January 1970 to December 2006. Google returned **128**

18   **results**. (See **Exhibit PP**: Google search results of the exact phrase "data aggregation.")

19   Because the Plaintiff is the actual conceiver of the concept of *data aggregation*, he

20   suspected that all of the search results would be fraudulent. Thus, the Plaintiff video-taped

21   himself running the first 26 Google search results of the phrase "data aggregation" through

22   the Internet Archive app.* The Plaintiff uploaded this video to YouTube.com, for the

23   Court's inspection; at **https://youtu.be/8E3qt2facA0**. The Plaintiff also produced a second

24   NOTE: The Complaint shows that the Internet Archive is a condemnable company
25   that produces fake web crawls for anyone who knows the secret handshake and pays
    enough money. The Plaintiff uses the IA search results, featured in the video evidence, to
26   show that (1) the fraud related to the Plaintiff's work is expansive, (2) the Defs and their
    associates (Microsoft, Amazon, etc) were compelled by the Plaintiff's ideas of a
27   surveillance system and an Earth/Universe simulator based data aggregation, (3) the IA is
28   continuing to produce fraudulent crawls, even as the Plaintiff writes this motion.

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

1   video, that more closely analyzes the fake CDC page, and compares the fake IA crawls of

2   the fake page to the IA's actual CDC website crawl, at **https://youtu.be/2XTHKDMbrWs**.

3        In the first video, the Plaintiff explains why each of the 26 web pages is either

4   fraudulent, or fails to show that the web page existed before 2006. The Plaintiff only

5   checked the first 26 results, because checking all 128 would have taken countless hours. As

6   it is, the video of the 26 Google results is <u>over an hour</u>, and it took another 2 hours to set

7   up, trim, upload, etc. In the end, **ALL 26 Google Search results of the phrase "data**

8   **aggregation" were fraudulent** or insufficient, because of one of the following failings:

9     1. **The Internet Archive crawl was fraudulent** (the IA produced fraudulent web

10        crawls of eight (8) of these 26 Google search results, by using the same falsified

11        "year and asterisk" URL method described repeatedly in the complaint).

12     2. The Internet Archive had never crawled the page; or

13     3. The page was crawled by the IA, but not until years after December 2006.

14        Another sign of fraud is that the 26 Google results feature no social media results,

15   no chat rooms, no University discussion pages, no Amazon.com book reviews, and no

16   magazine or comic or sci-fi board discussions of the concept of "data aggregation."

17        President Trump is clearly behind these 26 fraudulent web pages, because three of

18   the 26 search results are on federal websites: 1. The CDC's website; 2. The Department of

19   Health and Human Services; and 3. The Department of Homeland Security (the PDF

20   located at https://us-cert.cisa.gov/sites/default/files/publications/Data-Agg-120605.pdf is

21   located on the DHS website.). Only the President of the United States has the authority to

22   order the publication of falsified information on all (or any) of these federal websites.

23                                    **CONCLUSION**

24      For the foregoing reasons, the Plaintiff respectfully requests that the Court grant the

25   Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence.

26   Dated: September 22, 2020.                    Respectfully Submitted,

27                                    /s/ Steve Wilson Briggs

28                                    Plaintiff, In Propria Persona

Plaintiff's Fifth Motion In Limine To Include New Facts And Evidence

# Exhibit A

WIKIPEDIA

# Maria Pallante

**Maria A. Pallante** (born February 5, 1964)[2] is the president and chief executive officer of the Association of American Publishers, a publishing industry trade association.[3] Pallante is an American attorney who previously served as the 12th United States Register of Copyrights. She was appointed Acting Register effective January 1, 2011, succeeding Marybeth Peters, who retired effective December 31, 2010.[4] On June 1, 2011, she was appointed to the position which was intended to be permanent.[5]

Prior to her appointment, Pallante had served in the Copyright Office as Associate Register for Policy and International Affairs (2008–2010); Deputy General Counsel (2007–2008); and Policy Advisor (1996–1997).[5]

Pallante had been a resident of Westville, New Jersey.[6]

Aside from working for the Copyright Office, Pallante had been intellectual property counsel for the Guggenheim Museums (1999-2007),[7] Executive Director of the National Writers Union (1993-1995),[7] and Assistant Director of the Authors Guild (1991-1993).[7]

Shortly after becoming the Register of Copyrights, Pallante proposed an ambitious plan to reinvent and update copyright law and move the Copyright Office into the 21st century. In her paper, titled *The Next Great Copyright Act* she states in part "it is difficult to see how a twenty-first century copyright law could function well without a twenty-first century agency".[8] In a letter to congressman John Conyers Jr. she said that the copyright office should no longer be part of the library, citing several concerns including "mounting operational tensions."[9]

On October 21, 2016, Pallante was abruptly removed from her position. Librarian of Congress Carla Hayden said she had been appointed senior advisor for digital strategy, an appointment made without Pallante's prior knowledge. Rather than accept the position, Pallante submitted her resignation on October 24, 2016.[10] Recording artist Don Henley said Pallante's ouster was "an enormous blow" to artists, and that Pallante was "a champion of copyright and stood up for the creative community." [11]. Pallante was criticized by public interest groups for having supported controversial legislation such as the Stop Online Piracy Act, having objected to a proposal by the FCC to enable an open platform for television set-top boxes, based on consultation with the content industry, and the Office having spent $12 million over five years on a failed attempt to implement a new computer system at the Copyright Office.[12] Karyn Temple became acting register of copyrights.[1][13]

| Maria Pallante | |
|---|---|
|  | |
| Maria Pallante, Register of Copyrights | |
| **12th Register of Copyrights** | |
| **In office** | |
| June 1, 2011 – October 21, 2016[1] | |
| Appointed by | James H. Billington |
| Succeeded by | Karyn Temple (acting) |
| **Acting Register of Copyrights** | |
| **In office** | |
| January 1, 2011 – May 31, 2011 | |
| Preceded by | Marybeth Peters |
| **Personal details** | |
| Born | February 5, 1964 |
| Alma mater | George Washington University Law School (J.D.), Misericordia University |
| Occupation | Attorney |

# References

1. "Librarian of Congress Makes Senior-Level Appointments" (https://www.loc.gov/today/pr/2016/16-189.html).

2. "Pallante, Maria A., 1964-", *Public Catalog*, United States Copyright Office

3. "The Association of American Publishers (AAP) Names Maria A. Pallante as President and CEO" (http://newsroom.publishers.org/the-association-of-american-publishers-aap-names-maria-a-pallante-as-president-and-ceo). *AAP Newsroom*. Association of American Publishers. January 12, 2017. Retrieved January 17, 2017.

4. "Maria Pallante Appointed Acting Register of Copyrights" (https://www.loc.gov/today/pr/2010/10-272.html). *News from the Library of Congress*. Library of Congress. 2010-12-17. Retrieved 2011-06-01.

5. "Maria Pallante Appointed 12th Register of Copyrights" (https://www.loc.gov/today/pr/2011/11-111.html). *News from the Library of Congress*. Library of Congress. 2011-06-01. Retrieved 2011-06-01.

6. Staff. "Copyright chief eyes web conflict" (http://www.seattlepi.com/national/politico/article/Copyright-chief-eyes-web-conflict-1411676.php). *Seattle Post-Intelligencer*, June 6, 2011. Accessed October 26, 2015. "A native of Westville, N.J., Pallante, who has two children, has spent most of her career hopping back and forth between New York and Washington."

7. "Maria Pallante, Acting Register of Copyrights, Biographical Information" (https://www.copyright.gov/about/registers/pallante/pallante.html). U.S. Copyright Office. Retrieved 2018-01-16.

8. Pallante, Maria. "The Next Great Copyright Act" (http://copyright.gov/docs/next_great_copyright_act.pdf) (PDF). *Copyright.gov*. Retrieved 6 October 2015.

9. "Librarian of Congress Removes Head of Copyright," *Roll Call* Oct. 21, 2016. (http://www.rollcall.com/news/policy/librarian-congress-reassigns-head-copyright)

10. Robert Levine, "Maria Pallante's Departure From the Copyright Office: What It Means and Why It Matters," *Hollywood Reporter* (Oct. 25, 2016). (http://www.hollywoodreporter.com/thr-esq/maria-pallantes-departure-copyright-office-what-means-why-matters-941249)

11. [1] (https://www.washingtonpost.com/entertainment/music/with-change-at-the-top-of-copyright-office-a-battle-brews-over-free-content/2016/11/07/a8c0b140-a4ea-11e6-8042-f4d111c862d1_story.html)

12. "Big content cheers as Congress votes on changes to US Copyright Office" (https://arstechnica.com/tech-policy/2017/04/congress-may-make-the-us-register-of-copyrights-a-presidential-appointment/). *Ars Technica*. Retrieved 27 April 2017.

13. Levine, Robert (October 21, 2016). "Maria Pallante Removed as U.S. Register of Copyrights" (http://www.billboard.com/articles/business/7549978/maria-pallante-removed-us-register-of-copyrights). *Billboard*. Retrieved October 24, 2016.

## External links

- "Copyright Society's Eleventh Christopher A. Meyer Memorial Lecture, Guest Speaker Maria Pallante" (https://web.archive.org/web/20140202110143/http://www.copyrightalliance.org/2013/11/copyright_societys_eleventh_christopher_meyer_memorial_lecture_features_maria_pallante). Copyright Alliance. November 20, 2013. Archived from the original (http://www.copyrightalliance.org/2013/11/copyright_societys_eleventh_christopher_meyer_memorial_lecture_features_maria_pallante) on February 2, 2014. Retrieved January 19, 2014. "Drafts of a newly revised edition of the *Compendium of Copyright Office Practices* is expected to be made available to the public sometime in January 2014 according to remarks made by the current Register of Copyrights, Maria Pallante"

| Government offices | | |
|---|---|---|
| Preceded by<br>**Marybeth Peters** | **Register of Copyrights**<br>2011 – 2016 | Succeeded by<br>**Karyn Temple**<br>**(acting)** |

Retrieved from "https://en.wikipedia.org/w/index.php?title=Maria_Pallante&oldid=958077807"

This page was last edited on 21 May 2020, at 21:55 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# Exhibit B

Statement of

**MARIA A. PALLANTE**

**UNITED STATES REGISTER OF COPYRIGHTS AND
DIRECTOR OF THE U.S. COPYRIGHT OFFICE**

BEFORE THE

**COMMITTEE ON THE JUDICIARY
United States House of Representatives**

"THE REGISTER'S PERSPECTIVE ON COPYRIGHT REVIEW"

April 29, 2015

Statement of

**MARIA A. PALLANTE**

**UNITED STATES REGISTER OF COPYRIGHTS AND
DIRECTOR OF THE U.S. COPYRIGHT OFFICE**

BEFORE THE

**COMMITTEE ON THE JUDICIARY
United States House of Representatives**

"THE REGISTER'S PERSPECTIVE ON COPYRIGHT REVIEW"

April 29, 2015

Chairman Goodlatte, Ranking Member Conyers, and Members of the Judiciary Committee:

It is a great honor to appear before you again to discuss issues of copyright law and copyright administration. My staff and I wish to thank you for the attention this Committee has invested in reviewing the Copyright Act and related provisions of Title 17 during the past two years. During this time, you convened twenty hearings and traversed the formidable span of Title 17. This represents the most comprehensive focus on copyright issues in over four decades.

## I. BACKGROUND AND THEMES

Although copyright law has grown more legally complex and economically important in recent years, Congress is uniquely positioned to sort through the many competing equities that comprise the public interest in this modern era.[1] Questions include: how best to secure for authors the exclusive rights to their creative works; how to ensure a robust copyright marketplace; how to craft essential exceptions, safe harbors, and limitations; and how to provide appropriate direction, oversight, and regulation. This balancing act is not

---

[1]The United States Congress is not alone in this undertaking. In the past few years, the European Commission and numerous countries have turned to questions of copyright policy, and several countries, including Canada, India, Malaysia, Taiwan, and the United Kingdom, have enacted amendments. *See, e.g.*, Copyright Modernization Act, S.C. 2012, c. 20 (Can.); The Copyright (Amendment) Act, 2012, No. 27, Acts of Parliament, 2012 (India); Copyright (Amendment) Act 2012, Act A1420 (2012) (Malay.); Copyright Act (2014) (Republic of China); Enterprise and Regulatory Reform Act, 2013, c. 24 (U.K.).

easy,[2] but, as the Supreme Court has stated, it is critical: "[T]he Copyright Clause empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause."[3]

Many of the Committee's hearings touched upon not only policy matters but also the operational and organizational challenges of the Copyright Office in recent years.  Thus we are especially grateful that the Committee chose to hold two hearings on the Office itself, specifically a September 2014 oversight hearing, at which I testified, and a February 2015 review hearing, at which both copyright association representatives and legal experts testified.  We very much appreciate the Committee's open and deliberative leadership on questions regarding the role and goals of a twenty-first century Copyright Office.  As former Subcommittee Chairman Howard Coble observed, these matters merit a robust public discourse.[4]

## Themes

Some general themes have emerged from the Committee's outstanding copyright review process:

---

[2] For some perspective on this point, see the Copyright Revision Roundtable of 1961, during which Cyril Brickfield, Counsel to the House Judiciary Committee, spoke with Abraham Kaminstein, Register of Copyrights:

> Mr. Brickfield:  The House Judiciary Committee is 100 percent behind the Copyright Office in its revision of the copyright law. . . . Now, the legislative road ahead may be long and it may be hard, and it may be bumpy in spots, and somewhere along the way there may be a detour or two—

> Mr. Kaminstein:  And blood.

> Mr. Brickfield:  And blood, too.  But in the end this present endeavor will give us all a feeling of accomplishment and a sense of being proud that we played a part in the promulgation of a statute that will have become the supreme law of the land.

STAFF OF H. COMM. ON THE JUDICIARY, 88TH CONG., COPYRIGHT LAW REVISION PART 2: DISCUSSION AND COMMENTS ON REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 44 (Comm. Print 1963).

[3] *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003).

[4] *See Oversight of the U.S. Copyright Office: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Rep. Howard Coble, Chairman, Subcomm. on Courts, Intellectual Prop., & the Internet) ("This discussion needs to be a public one, and it needs to be approached with an open mind, with the clear objective of building a 21st century digital Copyright Office"); *A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 8 (2013) (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) ("It is my intention to conduct this broad overview by hearing from everyone interested in copyright law, as we begin by holding hearings on important fundamentals before we begin to look at more specific issues.").

(1) The constitutional purpose of copyright law informs all aspects of the debate.[5]  In announcing the review process in 2013, the Chairman said that copyright law "is a fundamental economic principle enshrined in our Constitution.  It has become a core part of our economy and society in ways the framers of our Constitution could never have imagined."[6]

(2) To support this purpose, it is essential that authors are incentivized to contribute to our culture and society at large, and that they be appropriately credited and compensated for the music, art, movies, literature, theater, photography, art, news, commentary, and computer code that we so appreciate and enthusiastically monetize as a nation.  The point is that a connected and intelligent world depends heavily upon authors and their creative disciplines.[7]

(3) Likewise, a sound copyright law must recognize and promote the many businesses that identify, license, and disseminate creative works.  These sectors are the heart of copyright commerce.  The law should provide the flexibility they require to innovate and the certainty they need to protect and enforce their investments.[8]  An investment in copyright law is an investment in the global marketplace.

(4) But of course the ultimate beneficiary of copyright law is the public at large, from individuals who are captivated by a book or film to libraries that collect and provide access to our cultural heritage for communities around the country.  Thus, while the rights of authors largely coincide with the interests of the public, a sound copyright law will balance the application of exclusive rights with the availability of necessary and reasonable exceptions, and it will ensure the ongoing availability of a flexible fair use defense.[9]

---

[5] U.S. CONST. art. I, § 8, cl. 8 (the full reads "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.").

[6] Press Release, House Comm. on the Judiciary, Judiciary Committee Announces Next Round of Copyright Review Hearings (Nov. 13, 2013), *available at* http://judiciary.house.gov/index.cfm/2013/11/judiciary-committee-announces-next-round-of-copyright-review-hearings.

[7] *See, e.g.*, *Innovation in America; The Role of Copyrights: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2013) (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) ("U.S. copyright owners have created millions of high-skilled, high-paying U.S. jobs, have contributed billions to our economy, and have led to a better quality of life with rich entertainment and cultural experiences for citizens.").

[8] *See, e.g.*, *id.* at 5 (statement of Sandra Aistars, Executive Director, Copyright Alliance) ("[T]he creative community does not view copyright and technology as warring concepts in need of balancing.  To the contrary, we are partners and collaborators with the technology community.").

[9] *See, e.g.*, *A Case Study for Consensus Building: The Copyright Principles Project* at 22 (prepared statement of Daniel Gervais, Professor of Law, Vanderbilt University Law School) ("Modernizing copyright law should not involve just trade-offs between those who want more rights and those who want more exceptions.  Today's copyright system should create benefits for *all* stakeholders."); *id.* at 76 (statement of Pamela Samuelson, Richard M. Sherman Distinguished Professor of Law, Berkeley Law School, Faculty Director, Berkeley Center

(5) In general, a balanced copyright law can be achieved through a mix of meaningful exclusive rights and necessary exceptions.  However, where the law is silent or non-specific, interested parties may at times bridge the gaps in limited ways by undertaking best practices or voluntary solutions to defined problems.[10]  Such work supports the role of Congress in crafting a functional law, but does not remove its legislative or oversight powers.

(6) To properly administer the copyright laws in the digital era, facilitate the marketplace, and serve the Nation, the United States Copyright Office must be appropriately positioned for success.  As stated by one Member of this Committee, "it is time to enact a restructured, empowered, and more autonomous Copyright Office that's genuinely capable of allowing America to compete and to protect our citizen's property in a global marketplace."[11]

### Copyright Office Policy Studies and Reports

As always, the Copyright Office has been active in studying and discussing these broad themes and fine points of law.  Since the most recent Copyright Act was enacted in 1976, the Office has issued more than thirty reports and studies on various aspects of the law (sixteen since the passage of the Digital Millennium Copyright Act ("DMCA") in 1998), and engaged in countless rulemakings and public discussions.  Policy studies have examined such diverse issues as works of architecture, rental of computer software, waiver of moral rights in visual artworks, legal protections for computer databases, distance education, and treatment of orphan works.

During my tenure of the past four years, Copyright Office experts have:

- Worked with the public on nine policy studies (seven of which are complete);

---

for Law & Technology) ("I think something that came out of our deliberations which I think is something that can carry forward is a notion that if we find a way to articulate what the right balance is and we identify exclusive rights and some exceptions to those rights that become comprehensible, that become predictable, that they can, in fact, advance over time and get applied to new things."); *Innovation in America (Part II): The Role of Technology: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 155 (2013) (statement of Jim Fruchterman, CEO/Founder, Benetech) ("intellectual property laws at their best can encourage technological advances, reward creativity, and bring benefits to society.  To make this possible, we must keep the balance in copyright.  We need to defend fair use as a laboratory for creativity . . . .").

[10] *See, e.g.*, *The Role of Voluntary Agreements in the U.S. Intellectual Property System: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2013) (reviewing voluntary initiatives).

[11] *U.S. Copyright Office: Its Functions and Resources: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 98 (2015) (statement of Rep. Ted Deutch, Member, Subcomm. on Courts, Intellectual Prop., & the Internet).

- Completed a multi-year technology report;
- Published and implemented a new schedule of fees for services;
- Completed and implemented a wholly revised *Compendium of U.S. Copyright Office Practices*, including registration practices for digital authorship, for the benefit of our examiners, copyright owners, the general public, and the courts; and
- Completed a free, user-friendly database of major fair use holdings.[12]

In this work, Copyright Office lawyers have sought and obtained input from broad swaths of the public, holding multiple public roundtables in Washington, D.C., New York, Nashville, Los Angeles, and Palo Alto, and speaking with or addressing a diversity of stakeholders in countless meetings in these same cities as well as in Berkeley, Redmond, Chicago, Mountain View, and several international locations.

My Office has provided expert staff to the United States treaty delegations for the Beijing Treaty on Audiovisual Performances and the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise Print Disabled. Additionally, we have supported the trade agenda of the United States, serving as part of the negotiating team on intellectual property issues for the Trans-Pacific Partnership and the Trans-Atlantic Trade and Investment Partnership.  And, as always, we have assisted the work of the Department of Justice, including in *American Broadcasting Companies, Inc. v. Aereo, Inc.*,[13] *Petrella v. Metro-Goldwyn-Mayer, Inc.*,[14] and *Golan v. Holder*.[15]

---

[12] The seven completed policy studies and publication dates are as follows:  (1) Copyright and the Music Marketplace (2015); (2) Transforming Document Recordation at the U.S. Copyright Office (2014); (3) Resale Royalties: An Updated Analysis (2013); (4) Copyright Small Claims (2013); (5) Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document (2011); (6) Federal Copyright Protection for Pre-1972 Sound Recordings (2011) (commenced by former Register Peters); and (7) Satellite Television Extension and Localism Act (2011) (commenced by former Register Peters).  These are available under "Policy Reports" at http://copyright.gov/policy/policy-reports.html.

The two forthcoming studies are:  (1) Making Available Right Under U.S. Law (forthcoming 2015); and (2) Updated Solutions for Orphan Works and Mass Digitization (forthcoming 2015).  Information regarding these is available under "Active Policy Studies" at http://copyright.gov/policy.

The Report and Recommendations of the Technical Upgrades Special Project Team is available under "Technology Reports" at http://copyright.gov/technology-reports/.  (The Reports of the Government Accountability Office and the Responses of the Librarian of Congress and Register of Copyrights, respectively, are also available here).

The Schedule of Fees is available under "About Us" at http://copyright.gov/docs/fees.html, and the Public Study is available at http://copyright.gov/docs/newfees/USCOFeeStudy-Nov13.pdf.

The *Compendium of U.S. Copyright Office Practices* is available at http://copyright.gov/comp3/comp-index.html.

The Copyright Office commenced its fair use database in support of the Joint Strategic Plan of the Office of the Intellectual Property Enforcement Coordinator.  *See* U.S. INTELLECTUAL PROPERTY ENFORCEMENT COORDINATOR, 2013 JOINT STRATEGIC PLAN ON INTELLECTUAL PROPERTY ENFORCEMENT 18 (2013), *available at* https://www.whitehouse.gov/sites/default/files/omb/IPEC/2013-us-ipec-joint-strategic-plan.pdf.

[13] 134 S. Ct. 2498 (2014).

## II. COPYRIGHT OFFICE MODERNIZATION

Through its oversight powers, and during the course of hearings over the past two years, the House Judiciary Committee has explored a number of questions relating to the Copyright Office's governance and operations, including the scope of statutory functions, constitutional organization, staffing, regulatory authorities, accountability, funding, and technology.[16]  Members of Congress on the House and Senate Appropriations Committees (the Subcommittees on Legislative Branch Appropriations) have also identified pertinent issues in recent months.[17]  Among other matters, Congress is examining the relationship of the Copyright Office to the Library of Congress.

Congress created the Copyright Office and the position of Register of Copyrights just before the dawn of the 20th century.[18]  By statute, the Register and all Copyright Office employees are appointed by and accountable to the Librarian, working under the Librarian's general direction and supervision.[19]  As with the Copyright Royalty Judges, the Register serves at the Librarian's pleasure and may be removed without cause.  At the same time, the law vests statutory and regulatory responsibilities specifically with the Register, including registering copyrights, recording copyright documents, administering statutory licenses, providing legal and policy advice, and reviewing the determinations of the Copyright Royalty Judges for legal error.[20]

---

[14] 134 S. Ct. 1962 (2014).

[15] 132 S. Ct. 873 (2012).

[16] As I mentioned during the September 2014 Copyright Office oversight hearing, and as highlighted by witnesses at the February 2015 hearing, the constitutional placement of the Copyright Office within the Library presents a complex set of challenges.  *See Oversight of the U.S. Copyright Office* at 54 (statement of Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office); *U.S. Copyright Office: Its Functions and Resources* at 52 (statement of Robert Brauneis, Professor, George Washington University Law School).  These constitutional issues have arisen in the courts as well.  *See Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012) (discussing the Library's functions vis-à-vis the copyright system, and concluding that "[i]n this role the Library is undoubtedly a 'component of the Executive Branch'") (quoting *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3163 (2010)).

[17] *See, e.g., Fiscal Year 2016 Budget Hearing on the Architect of the Capitol and Library of Congress Before the H. Subcomm. on Legis. Branch of the H. Comm. on Appropriations*, 114th Cong. (2015), oral testimony at 1:15:04, *available at* http://appropriations.house.gov/calendar/eventsingle.aspx?EventID=393997 (statement of Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office) (responding affirmatively to Ranking Member Wasserman Schultz that it would be beneficial for the Copyright Office to separate out its budget from the Library of Congress and submit it directly to Congress).

[18] This followed a brief period, from 1870-1896, during which the Library administered copyright registration services directly.  Before this, from 1790 to 1870, registration was handled by the disparate federal courts.

[19] 17 U.S.C. § 701(a).

[20] *See, e.g., id.* §§ 203(a)(4)(B), 408, 701, 802(f)(1)(D).

The Copyright Office also serves the broader government, that is, not only Congress but also the Department of Justice, the Department of State, the Office of the United States Trade Representative, and other federal agencies.  As intellectual property has grown more and more important to the Nation, Congress has been consistently mindful of the Copyright Office's longstanding role.  For example, when it converted the director of the U.S. Patent and Trademark Office into an Undersecretary position in 1999, Congress provided that "nothing shall derogate from the duties and functions of the Register of Copyrights," and required the Director to "consult with the Register of Copyrights on all copyright and related matters."[21]  The courts have long cited and deferred to the work of the Copyright Office on substantive as well as administrative issues.

Notwithstanding its growing mission, the Copyright Office has one of the smallest staffs within the government generally or the Library specifically.  The Library is currently operating with or seeking approximately 3400 full-time employees ("FTEs") overall.  Of these, 1371 are allocated to staff carrying out functions of the national library and 622 are allocated to the Congressional Research Service.  The Copyright Office will have 411 FTEs to carry out its basic mission in Fiscal Year 2016, reduced from 439 last year.[22]  Since 2007, the Office's FTE ceiling has dropped precipitously.

Although the Copyright Office has a separate line appropriation, its budget is part of the Library's budget, is presented to Congress by the Library, and is weighed and prioritized by the Library alongside other needs of the Library.  This is a standard means of budget formulation for many agencies, but it generally has not served the copyright system well.  The Copyright Office budget is consistently in the neighborhood of $50 million, of which $30 million is derived from fees paid by customers for registration and other services.[23]  The Library's overall budget for 2015 is approximately $630 million, inclusive of the Copyright Office.[24]  Without taking anything away from the important duties or funding deficiencies in the rest of the Library, the Copyright Office's resources are inadequate to support the digital economy it serves.  Some but not all of this situation may be remedied through future fee schedules or by permitting the Office to assess future capital costs.  Although the Copyright Act currently limits the Office in this regard, I have suggested

---

[21] *See* 35 U.S.C. § 2(c)(3), (5); *see also* 15 U.S.C. § 8111(b)(3)(A)(ii) (creating the position of Intellectual Property Enforcement Coordinator in 2008 and making the Register of Copyrights a member of the advisory committee).

[22] LIBRARY OF CONGRESS, LIBRARY OF CONGRESS FISCAL 2016 BUDGET JUSTIFICATION 7 (2015) (referencing staffing over past couple of years), *available at* http://copyright.gov/about/budget/2015/loc-fy2016-budget-justification.pdf.

[23] For a more detailed discussion, *see* Statement of Maria A. Pallante, United States Register of Copyrights, Before the Subcommittee on Legislative Branch Appropriations, United States Senate, Fiscal 2016 Budget Request 4 (Mar. 17, 2015), *available at* http://copyright.gov/about/budget/2015/budget-senate-fy16.pdf.

[24] LIBRARY OF CONGRESS FISCAL 2016 BUDGET JUSTIFICATION at 1.

previously, as have others, that it may be prudent to review this issue, particularly through discussions with larger copyright owners.[25]

The Office's current organizational structure is under strain because the copyright system has evolved and because digital advancements have changed the expectations of the public. The Committee explored these themes at its February 2015 hearing, and at the request of the Ranking Member, I provided my views regarding the hearing testimony, specifically whether and how the Office might be modernized to operate with greater legal and operational independence.[26]  There, I explained that the Office serves an economically significant marketplace, requires a sophisticated technology enterprise, has funding needs that are distinct from the Library's, and would benefit from the kind of management authority that would allow an expert staff to adapt nimbly and responsibly to the changing landscape.  A new structure must be consistent with the constitutional requirements that have been identified by Members of Congress, the courts, and legal experts, and it should respect the century-old tradition of the Office providing expert legal interpretation and impartial policy advice to both Congress and federal agencies.[27]

Difficulties have been most pronounced in the area of information technology.  Witnesses have stressed the importance of technology to the proper administration of the copyright law, points well known to myself and my staff.[28]  As mentioned above, I prioritized technology concerns early in my tenure and commissioned stakeholder feedback and a major report on these issues.  Moreover, consistent with the advice we received from users as well as public interest organizations,[29] I created and filled the position of Chief

---

[25] *FY16 Library of Congress & Architect of the Capitol Budget: Hearing Before the Subcomm. on the Legis. Branch of the S. Comm. on Appropriations*, 114th Cong. (prepared statement of Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office), *available at* http://www.appropriations. senate.gov/sites/default/files/hearings/031715%20LOC%20Register%20of%20Copyrights%20Testimony %20-%20LegBranch.pdf (at 11) (concluding that the Copyright Office would benefit from more flexibility in both its retention and spending of fee revenues, particularly in relation to longer-term capital improvements); *U.S. Copyright Office: Its Functions and Resources* at 52 (2015) (testimony of Robert Brauneis, Professor, George Washington University Law School) (recommending that "Congress explicitly authorize the Copyright Office to collect fees that cover capital investments and to build a reserve fund that is not depleted annually by an adjustment to the Office's appropriation").

[26] *See* Letter from Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office, to Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary (Mar. 23, 2015), *available at* http://copyright.gov/laws/testimonies/022615-testimony-pallante.pdf (discussing benefits of an independent agency structure for copyright functions).

[27] *See id.*

[28] *See, e.g.*, *U.S. Copyright Office: Its Functions and Resources* at 24 (statement of Lisa A. Dunner, Partner, Dunner Law PLLC, on behalf of the Section of Intellectual Property Law of the American Bar Association) ("The Copyright Office needs a sophisticated, efficient IT system responsive to its needs and those of its users.").

[29] *See, e.g.*, Michael Weinberg et al., Public Knowledge, A Copyright Office for the 21st Century: Recommendations to the New Register of Copyrights (2010), *available at* https://www.publicknowledge.org/ files/docs/ACopyrightOfficefortthe21stCentury.pdf; Pamela Samuelson & Members of the Copyright Principles Project, *The Copyright Principles Project: Directions for Reform*, 25 Berkeley Tech. L.J. 1175, 1205 (2010)

Information Officer within the Copyright Office, not merely to better coordinate with the Library's central IT department, but to ensure that the Office plays more of a direct role in the targeted planning and development that is necessary. My goal is to empower the Copyright Office CIO to build a professional team that is both fully conversant in up-to-date technology and standards, and fully integrated into the actual business of the Copyright Office. I believe that the Copyright Office can and should operate leanly, but at least a third of the Register's future staff should be experts in technology, data standards, and information management concerns.

Notwithstanding the logic of building a tech-savvy copyright staff, and the loud support of copyright stakeholders for this vision, auditors have advised the Library to move in the opposite direction, *i.e.*, to correct general weaknesses in its core operations, it should exert more direct control and decision making over its departments, including with respect to technology.[30] The impact of this strategy on the Register's statutory authority is unknown, but requires serious analysis to avoid diluting or compromising the singular goals of the copyright system.

Moreover, the Library's technology governance and capabilities are seriously and systematically deficient.[31] And though the Library may well make incremental improvements, it is difficult to see how further centralization of the Copyright Office needs will facilitate the flexible and efficient copyright system we urgently need to create.[32] The mission of the Copyright Office is fundamentally different from the mission of the Library, and I believe that the Copyright Office must have its own CIO, technology staff, and management autonomy, including the ability to implement IT investment and planning practices that focus not on agency-wide goals but on its own specific mission.[33] As noted in

---

(recommending that the Office develop additional policy expertise and research capabilities in the areas of economics and technology).

[30] *See, e.g.*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, LIBRARY OF CONGRESS: STRONG LEADERSHIP NEEDED TO ADDRESS SERIOUS INFORMATION TECHNOLOGY MANAGEMENT WEAKNESSES 96-100 (2015), *available at* http://copyright.gov/technology-reports/reports/gao-lc-report-2015.pdf (recommending that the Library hire a permanent CIO responsible for the Library's information technology agency-wide).

[31] *See generally id.*

[32] *See U.S. Copyright Office: Its Functions and Resources* at 43 (statement of Nancy J. Mertzel, Schoeman Updike Kaufman & Stern LLP, on behalf of the American Intellectual Property Law Association) ("As the [Copyright Office's] technical upgrades report explains, '[t]he Office's technology infrastructure impacts all of the Office's key services and is the single greatest factor in its ability to administer copyright registration, recordation services, and statutory licenses effectively.' Yet, the Copyright Office does not control its technology. Rather, it is controlled by the Library of Congress, and housed on the Library's servers. In fact, even equipment purchased by the Copyright Office with its appropriated funds, is controlled by the Library. Additionally, the Office is dependent upon the Library's IT staff. However, the Library IT staff has other responsibilities, and is not well-versed in the needs of the copyright community. AIPLA urges this Committee to explore ways to give the Copyright Office greater autonomy over its IT infrastructure and services." (citations omitted)).

[33] In completing the Technical Upgrades Report mentioned previously, the Copyright Office CIO and project team recommended, among other things, that the Office have a separate enterprise architecture and technological infrastructure. *See U.S. COPYRIGHT OFFICE, REPORT AND RECOMMENDATIONS OF THE TECHNICAL*

my prior testimony to this committee, the Copyright Office sits at the center of a dynamic marketplace in which creative content drives a sophisticated chain of business in the information and entertainment sectors.

A faster and more nimble Copyright Office must be a priority.

### III. POLICY ISSUES THAT ARE READY FOR LEGISLATIVE PROCESS

Based upon the past two years of congressional review, as well as the extensive research and study of my own staff, I believe the following issues are ripe for action, meaning that Congress has at its disposal the necessary legal analysis and a clear public record.  If the Committee is prepared to act, it is in a strong position to develop legislation.

### Music Licensing

The United States has the most innovative and influential music culture in the world.  But music creators and users are struggling with outmoded licensing practices—many of them government-mandated—that have not kept step with the digital age.  As is recognized by industry participants on all sides, we need to fix this broken system.

This Committee has long recognized the need to update the copyright laws governing the music marketplace.  Nearly a decade ago, Representative Smith, then-Chairman of the Subcommittee on Courts, the Internet, and Intellectual Property, observed: "The laws that set out the framework for the licensing of musical rights in [the music] industry are outdated, and some say beyond repair."[34]  Similar views have been expressed by many other Members during the current copyright review.[35]

---

UPGRADES SPECIAL PROJECT TEAM (2015), *available at* http://copyright.gov/docs/technical_upgrades/usco-technicalupgrades.pdf.  When the Senate Legislative Branch Appropriations Committee requested the Government Accountability Office to review the Library's technology, it referenced the Office's request for public comments on technology.  *See* S. REP. NO. 113-196, at 40 (2014), *available at* https://www.congress.gov/113/crpt/srpt196/CRPT-113srpt196.pdf.

[34] *Copyright Office Views on Music Licensing Reform: Hearing Before the Subcomm. on Courts, the Internet, & Intellectual Prop. of the H. Comm. on the Judiciary*, 109th Cong. 1 (2005) (statement of Rep. Lamar Smith, Chairman, Subcomm. on Courts, the Internet, & Intellectual Prop.).

[35] *See, e.g.*, *Music Licensing Under Title 17 (Part I & II): Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 1 (2014) (statement of Rep. Howard Coble, Chairman, Subcomm. on Courts, Intellectual Prop., & the Internet) ("[T]he current licensing system hasn't changed.  Many feel that our music licensing laws were designed for a world that existed decades ago and have become outdated."); *id.* at 3 (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) ("Interested parties from across the spectrum have recognized a need for changes in how our nation's copyright laws, as they pertain to music, are structured."); *id.* at 4 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("Unfortunately, the existing landscape is marred by inconsistent rules that place new technologies at a disadvantage against their competitors and inequities that deny fair compensation to music creators.").

Last year, the Copyright Office undertook a comprehensive study to assess the impact of copyright law on the music marketplace.  The Office's resulting report[36] is very highly regarded, and has been characterized in the media as "a rare instance of a government agency getting out in front of moving technology."[37]  Stakeholders across the spectrum have been similarly impressed.[38]  While there is probably no single constituent that agrees with every conclusion of the report, it is widely viewed as an enormous step forward toward a more equitable and rational system.

In the report, the Office suggests a series of balanced changes to our government processes to promote more efficient licensing practices, greater parity among competing platforms, and fair compensation for creators.[39]  We recommended greater free market activity while preserving the benefits of collective licensing for those smaller actors who may still need to rely upon it.  The report also reflects the Office's longstanding view that the United States must join other developed nations in recognizing a full public performance right for sound recordings.  In addition, consistent with our earlier report to Congress on pre-1972 recordings, it affirms that we should bring pre-1972 sound recordings under federal copyright protection.[40]  The groundwork has thus been laid for a follow-on process, under the oversight of this Committee, to develop comprehensive legislation to modernize our music licensing laws.

---

[36] U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE (2015), *available at* http://copyright.gov/ policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf.

[37] Miles Raymer, *The U.S. Copyright Office Wants to Update Our Music Licensing Laws*, ENTERTAINMENT WEEKLY (Feb. 5, 2015).

[38] For example, Pandora applauded the Office's call for transparency, SAG-AFTRA commended the Office's "call for broad reform to make music licensing work better for everyone," and SoundExchange remarked that, "the report contains a wealth of ideas and proposals, all of which will surely help spur discussion and hopefully inspire movement towards a better path forward for the entire industry."  Glenn Peoples, *'A Lot to Digest': The Industry Reacts to Proposed Music Copyright Changes*, BILLBOARD (Feb. 6, 2015), http://www. billboard.com/articles/6465427/industry-reactions-copyright-music (reflecting statement of Dave Grimaldi, Pandora Director of Public Affairs); Press Release, SAG-AFTRA, SAG-AFTRA Statement on the Release of the Report "Copyrights and the Music Marketplace" (Feb. 4, 2015), *available at* http://www.sagaftra.org/press-releases/february-05-2015/sag-aftra-statement-release-report-%E2%80%9Ccopyrights-and-music-marketplace; Press Release, SoundExchange, SoundExchange Response to U.S. Copyright Office Proposed Reforms to Music Licensing System (Feb. 5, 2015), *available at* http://www.soundexchange.com/pr/ soundexchange-response-to-u-s-copyright-office-proposed-reforms-to-music-licensing-system/.

[39] COPYRIGHT AND THE MUSIC MARKETPLACE at 1-11.

[40] *See Music Licensing Under Title 17* at 247 (statement of Cary Sherman, Chairman and CEO, Recording Industry Association of America) (calling on Congress to "make sure artists who are recorded before 1972 are paid"); *id.* at 344 (statement of Michael Huppe, President and CEO, SoundExchange Inc.) ("Congress must address the current royalty crisis facing legacy artists with recordings made before 1972."); *id.* at 390 (statement of David J. Frear, Chief Financial Officer, SiriusXM Holdings Inc.) ("I would be supportive of closing the loophole that Mr. Conyers referred to.  That loophole includes terrestrial radio, as well as pre-72."); *id.* at 407 (statement of Chris Harrison, Vice President, Business Affairs, Pandora Media Inc.) ("Pandora would be in favor of following the Copyright Office's recommendation, which is fully federalizing pre-72 recordings to allow both consumers to benefit from the protections, like fair use under the Copyright Act, allow recording artists to exercise their rights to terminate their transfers.").

Meanwhile, the Department of Justice continues to review one aspect of the music landscape, namely, the judicially-imposed consent decrees that govern the authority and licensing practices of the two largest performing rights societies, ASCAP and BMI.  By all accounts, the DOJ process could continue for several months or longer and even then will face a process of judicial review.  While the DOJ's input is critical, it is this Committee that enjoys plenary responsibility for music copyright issues.  The Committee may have its own views on how best to address issues relating to the consent decrees, which are intertwined with many other music licensing concerns that are not before the DOJ.  While the ongoing DOJ process—and any eventual outcome of that process—are certainly relevant to the discussion, legislative work to modernize our music licensing system should be on the very near horizon.

### Small Claims

The problem of copyright small claims is ready for a legislative solution.  As Representative Coble noted in the July 2014 hearing, "[a]s much as larger copyright owners find the civil litigation system expensive, smaller copyright owners find it not worth their time or money" to pursue infringement remedies through litigation.[41]  As a result, "[h]aving to choose to go out and earn income by working or staying home to consider contracting an attorney to file a lawsuit on their behalf that they cannot afford in the first place is not much of a choice at all."[42]  And as Representative Chu noted, "[A]lthough we use the term 'small claims,' often, really, these claims are not small to the individual creator whose livelihood is being threatened by the theft of their work and property."[43]

The Committee identified the problem of small copyright claims as far back as 2006, holding a hearing focused on the possible alternative dispute resolution systems such as a copyright "small claims court."[44]  Then, in 2011, the Committee asked the Copyright Office to conduct a detailed study of the problem of small copyright claims, and recommend appropriate legal changes to improve the adjudication of such claims.

The Copyright Office's 2013 report to this Committee highlighted the daunting challenges faced by copyright owners seeking to pursue small copyright claims through the federal court process, and recommended the creation of an alternative, administrative tribunal.[45]

---

[41] *See Copyright Remedies*: *Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Rep. Howard Coble, Chairman, Subcomm. on Courts, Intellectual Prop., & the Internet).

[42] *Id.*

[43] *Id.* at 98 (statement of Rep. Judy Chu).

[44] *See Remedies for Small Copyright Claims: Hearing Before the Subcomm. on Courts, the Internet, & Intellectual Prop. of the H. Comm. on the Judiciary*, 109th Cong. (2006).

[45] U.S. COPYRIGHT OFFICE, COPYRIGHT SMALL CLAIMS 4 (2013), *available at* http://www.copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf.

As reflected in the draft legislation appended to our report, the tribunal would be a wholly voluntary alternative to federal court, focused on small infringement cases valued at no more than $30,000, and it would award damages in non-precedential decisions, with no injunctive powers.[46]  Like the Register of Copyrights and Copyright Royalty Judges, the small claims adjudicators would be inferior officers and would therefore need to be appointed by, and operate under the supervision of, the Librarian of Congress, who is a principal officer of the United States accountable to the President of the United States.[47]

### Felony Streaming

It is time for Congress to bring the criminal penalties for unlawful streaming in line with those for other criminal acts of copyright infringement, an issue that has been emphasized by those responsible for enforcement of our laws.

The Department of Justice has stressed that "[t]o deter pirate streaming websites from illegally profiting from others' efforts and creativity, the Administration recommends that Congress amend the law to create a felony penalty for unauthorized Internet streaming."[48] The Copyright Office also has testified as to the importance of this issue[49] and the U.S. Intellectual Property Enforcement Coordinator agrees.[50]

Currently, criminals who engage in unlawful internet streaming can only be charged with a misdemeanor, even though those who unlawfully reproduce and distribute copyrighted material can be charged with a felony.  This distinction makes no sense.  As streaming becomes a dominant method of obtaining content online, unlawful streaming has no less of an adverse impact on the rights of copyright owners than unlawful distribution.

While Congress should carefully consider the operation of this amendment to ensure appropriate legal processes, there is no question that the change is warranted and overdue.

---

[46] *See id.* at 133-54.

[47] *See generally Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012).

[48] *Copyright Remedies* at 24 (statement of David Bitkower, Acting Deputy Assistant Att'y Gen., Crim. Div., U.S. Dep't of Justice).

[49] *See generally Promoting Investment and Protecting Commerce Online: The ART Act, the NET Act and Illegal Streaming: Hearing Before the H. Subcomm. on Intellectual Prop., Competition, & the Internet of the H. Comm. on the Judiciary*, 112th Cong. (2011) (statement of Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office).

[50] Intellectual Property Enforcement Coordinator, Administration's White Paper on Intellectual Property Enforcement Legislative Recommendations 2 (2011), *available at* https://www.whitehouse.gov/sites/default/files/ip_white_paper.pdf  ("The Administration recommends three legislative changes to give enforcement agencies the tools they need to combat infringement [including to] [c]larify that, in appropriate circumstances, infringement by streaming, or by means of other similar new technology, is a felony").

### Section 108 (Library Exceptions)

We are ready to update the exception that provides a safe harbor for libraries and archives.

Section 108 was enacted in 1976, and tweaked in 1998.  Efforts to recalibrate it have been ongoing over the past ten years.  In 2005, the Copyright Office and the National Digital Information Infrastructure and Preservation Program of the Library of Congress co-sponsored an independent study group that met for nearly three years and examined every aspect of the provision, from legislative history to shortcomings and solutions for the next era.  The Group published its extremely comprehensive analysis and a list of partial recommendations in 2008 during the tenure of my predecessor.[51]  In 2012, I reconvened the group for a day-long meeting to review the recommendations and to discuss intervening litigation involving libraries.[52]  In 2013, the Office partnered with Columbia Law School to present a public symposium on Section 108 reform.[53]

In its current state, Section 108 is replete with references to analog works and fails to address the ways in which libraries really function in the digital era, including the copies they must make to properly preserve a work and the manner in which they share or seek to share works with other libraries.  Witnesses last year testified about both the importance and the deficiencies of this exception.[54]  A former publisher told the Subcommittee that Section 108 "is so outdated and inadequate as to no longer serve its function."[55]  A former

---

[51] SECTION 108 STUDY GROUP, THE SECTION 108 STUDY GROUP REPORT (2008).  The Study Group included a cross-section of experts and representatives.  *See* MEMBERS OF THE SECTION 108 STUDY GROUP, THE SECTION 108 STUDY GROUP, http://www.section108.gov/members.html.

[52] *See, e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014); *Authors Guild, Inc. v. Google, Inc.* 721 F.3d 132 (2d Cir. 2013), *on remand*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013), *appeal docketed*, No. 13-4829 (2d Cir. Dec. 23, 2013).

[53] *See* Symposium, *Copyright Exceptions for Libraries in the Digital Age: Section 108 Reform*, Kernochan Center for Law, Media, and the Arts, Columbia Law School (Feb. 8, 2013), http://web.law.columbia.edu/kernochan/symposia/section-108-reform.

[54] *See, e.g.*, *Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 28 (2014) (statement of Richard S. Rudick, Co-Chair, Section 108 Study Group) ("[O]ur mission was to re-examine Section 108 (enacted in 1976 to deal with the then new technology of the photocopying machine); to define what it would take to make its provisions useful and fair in light of the evolving impact of digital technologies . . . ."); *id.* at 6 (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) ("[L]ike many of the 1976 provisions, section 108 is woefully outdated for the digital age."); *id.* at 8 (statement of Gregory Lukow, Chief, Packard Campus for Audio Visual Conservation, Library of Congress) ("Section 108 needs to be updated for the digital age with language applicable to all formats.").

[55] *Id.* at 30 (statement of Richard S. Rudick, Co-Chair, Section 108 Study Group); *see also, e.g.*, THE SECTION 108 STUDY GROUP REPORT at 28 ("Section 108 is out of date and in many respects unworkable in the digital environment.").

librarian observed that the absence of an adequate exception has led libraries to rely too heavily on the fair use doctrine.[56]

Section 108 has always had a savings clause for fair use, ensuring that both would be available as appropriate to the libraries and courts that must apply them.  The point of Section 108 is not to negate fair use but rather to provide greater statutory guidance to those who need it most in the ordinary course of business.  As stated by the Chairman of this Committee, "it is probably true that there are clear-cut cases in which fair use would apply to preservation activities, [but] fair use is not always easy to determine, even to those with large legal budgets.  Those with smaller legal budgets or a simple desire to focus their limited resources on preservation may prefer to have better statutory guidance than exists today."[57]

Based on the entirety of the record to date, the Office has concluded that Section 108 must be completely overhauled.  One enduring complaint is that it is difficult to understand and needlessly convoluted in its organization.[58]  The Office agrees that the provisions should be comprehensible and should relate logically to one another, and we are currently preparing a discussion draft.  This draft will also introduce several substantive changes, in part based upon the recommendations of the Study Group's 2008 report.  It will address museums,[59] preservation exceptions[60] and the importance of "web harvesting" activities.[61]

---

[56] *See, e.g.*, *A Case Study for Consensus Building: The Copyright Principles Project* at 15 (statement of Lolly Gasaway, Co-Chair, Section 108 Study Group) ("Sometimes I think academic law librarians and academic librarians at large institutions, which have legal counsel to advise them, would like to rely solely on fair use . . . .  If only copyright lawyers can understand and apply the Act, something is fundamentally wrong.").  *But see Preservation and Reuse of Copyrighted Works* at 32 (statement of James G. Neal, Vice President for Information Services and University Librarian, Columbia University) ("My overarching point is that the existing statutory framework, which combines the specific library exceptions in section 108 with the flexible fair use right, works well for libraries and does not require amendment.").

[57] *See Preservation and Reuse of Copyrighted Works* at 6 (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary).

[58] *See, e.g.*, THE SECTION 108 STUDY GROUP REPORT at ix ("Many practitioners find section 108's organization confusing and are not always certain of the relationship among its provisions."); *A Case Study for Consensus Building: The Copyright Principles Project* at 15 (Lolly Gasaway, Co-Chair, Section 108 Study Group) ("The current act is bewildering, to say the least, often even to copyright lawyers.").

[59] *See* THE SECTION 108 STUDY GROUP REPORT at 31-33 (recommending that museums be eligible for the Section 108 exceptions).

[60] *See id.* at 69-79 (recommending that certain libraries, archives, and museums be permitted to make a reasonable number of preservation copies of published and publicly disseminated works).

[61] *See id.* at 80-87 (recommending that libraries, archives, and museums be permitted to capture and preserve "publicly available" online works); *see also id.* at 85-87 (explaining how rightsholders can opt out of having their online works captured and/or preserved, under the Study Group's recommendation).

### Orphan Works

Orphan works is ripe for a legislative solution.

The United States has studied and debated both the problem of orphan works and a variety of potential solutions for more than a decade, starting with a 2005 request from Senate and House Judiciary Leadership for a formal Copyright Office study.  This study led to a Report we published in 2006.[62]  In October 2012, we reopened our study of orphan works, to assess changes in the business and legal landscapes, this time pairing it with an equally complex study of mass digitization, fair use, and licensing.  In addition to our own research into domestic and foreign developments, we solicited several rounds of comments over a two-year period, and held two days of public hearings in 2014.[63]

As before, the Copyright Office favors a legislative framework in which liability is limited or eliminated for a user who conducts a good-faith, diligent search for the copyright owner, similar to the approach set out in the Shawn Bentley Orphan Works Act passed by the Senate in 2008.  We also have considered recent technological changes that provide some additional online tools in the quest to find owners, as well as legal issues regarding how to best make a record of orphan uses.

The public dialogue on orphan works over many years has confirmed that too many works languish in legal uncertainty.  Moreover, this kind of marketplace gridlock—the kind caused by an absent or nonexistent copyright owner—does not serve the overall objectives of the copyright law.  Indeed the public record has shown that many good-faith users will choose to forgo use of an orphaned work entirely rather than face the prospect of costly litigation.[64]  As in the case of filmmakers, they are unable to risk "lawsuits, injunctions, and

---

[62] *See* United States Copyright Office, Report on Orphan Works (2006), *available at* http://www.copyright. gov/orphan/orphan-report.pdf; *see also Promoting the Use of Orphan Works: Balancing the Interests of Copyright Owners and Users: Hearing Before the Subcomm. on Courts, the Internet, & Intellectual Prop. of the H. Comm. on the Judiciary*, 110th Cong. (2008); Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008).

[63] For the complete docket of the current Copyright Office study on Orphan Works, including written comments, hearing transcripts, proposed legislation, and written testimony, *see* http://copyright.gov/ orphan/.

[64] *See, e.g.*, *Preservation and Reuse of Copyrighted Works* at 81 (statement of Michael C. Donaldson, International Documentary Association and Film Independent) ("Donaldson Statement") ("[N]arrative filmmakers often seek to use orphan works to create adaptations, sequels, or remakes.  That's not a fair use. Filmmakers must license such third party materials, but are unable to do so when the rightsholder to those materials cannot be identified or located.  Filmmakers cannot even begin their projects because no rights can be obtained."); *Promoting the Use of Orphan Works: Balancing the Interests of Copyright Owners and Users* at 33 (written statement of Allan Adler, Vice President for Legal & Government Affairs, Association of American Publishers) (". . . book publishers fully understand the frustration that can arise when the desire to incorporate a third-party work as part of a new work being prepared for publication is thwarted by a concern over potential infringement liability based not on the copyright owner's refusal to authorize such use of the third-party work but on the inability of the publisher—or author—of the new work to identify or locate that copyright owner in order to request the permission that is necessary to legally make the intended use.").

catastrophic damages."[65]  The orphans problem is of paramount concern for the libraries, archives, and museums that collect and preserve critically important works.[66]  A significant part of the world's cultural heritage may be falling into a "20th-century black hole,"[67] unavailable to the public for enjoyment or social utility.[68]

An issue as complex as orphan works requires congressional attention because there are numerous and competing equities at stake, equities that cannot be reconciled through litigation or voluntary measures.  Although orphan works are a clear problem, it is also true that authors, copyright owners and their heirs enjoy exclusive rights under the Copyright Act.  While we should be cautious when constraining these rights, good-faith users need some way to bridge the legal gaps that arise when dealing with orphan works so they can address the liability, indemnification, and insurance requirements upon which routine transactions depend.  Multiple foreign jurisdictions,[69] and even U.S. courts, have made these observations.[70]

---

[65] Donaldson Statement at 85.

[66] *See Preservation and Reuse of Copyrighted Works* at 11 (statement of Gregory Lukow, Chief, Packard Campus for Audio Visual Conservation, Library of Congress) ("The dilemma of orphan works plagues audiovisual collections daily."); *Promoting the Use of Orphan Works: Balancing the Interests of Copyright Owners and Users* at 66 (written statement of Karen Coe, Associate Legal Counsel, United States Holocaust Memorial Museum) ("If a work is historically or culturally unique, we might allow it to be used but in doing so we expose the Museum to an unknown liability.  Even if the risk is minimal, we do have to account for the fact that only one lawsuit or one public allegation of infringement could have a permanent, negative impact on the institution.  Thus even a minimal, unknown risk has a chilling effect on all our decisions regarding the use of orphan works.").

[67] Maurizio Borghi and Stavroula Karapapa, Copyright and Mass Digitization 70 (2013) (citing James Boyle, *A Copyright Black Hole Swallows our Culture*, Financial Times, (Sept. 6, 2009), *available at* http://www.ft.com/ cms/s/0/6811a9d4-9b0f-11de-a3a1-00144feabdc0.html); *see also* Rebecca J. Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish*, The Atlantic (Mar. 30, 2012), *available at* http://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-copyright-protection-makes-books-vanish/255282/; Society of American Archivists, Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 4, *available at* http://copyright.gov/orphan/ comments/noi_10222012/Society-American-Archivists.pdf ("[T]he unfortunate result of [archivists'] caution is that the scope of online cultural resources that could be used for new studies and innovation is much smaller than it ought to be, and would be if an orphan works exception were recognized in the statute.").

[68] *See, e.g.*, Institute for Intellectual Property and Social Justice, Comments Submitted in Response to U.S. Copyright Office's Oct. 22, 2012 Notice of Inquiry at 1, *available at* http://copyright.gov/orphan/comments/ noi_10222012/Institute-for-Intellectual-Property-and-Social-Justice.pdf ("many orphan works nevertheless remain out of print and largely unavailable to the public, manifesting the greatest obstacle to copyright social utility in the developed world").

[69] *See, e.g.*, Directive 2012/28, of the European Parliament and of the Council of 25 October 2012 on Certain Permitted Uses of Orphan Works, 2012 O.J. (L 299) 5; Copyright Act, R.S.C. 1985, c. C-42, § 77 (Can.); 1999. évi LXXVI. törvény a szerzői jogról (Act LXXVI of 1999 on Copyright), §§ 41/A – 41/K (Hung.) (translation unavailable); Chosakuken Hō [Copyright Law], Law No. 48 of 1970, *as amended up to* Law No. 43 of 2012, arts. 67–73 (Japan), *translated at* http://www.cric.or.jp/english/clj/doc/20130819_July,2013_Copyright_Law _of_Japan.pdf (unofficial translation); Jeojakkwonbeop [Copyright Act], Act No. 432, Jan. 28, 1957, *amended up to* Act No. 12137, Dec. 30, 2013, art. 50 (S. Kor.), *translated at* http://elaw.klri.re.kr/eng_service/lawView.do? hseq=32626&lang=ENG (unofficial translation); Copyright Law, Promulgated by Royal Decree No. M/41 of 2

The Copyright Office continues to believe that an orphan works framework should be a supplement to other available provisions in the law that may be applicable, including the ability of a user to assert the doctrine of fair use as an affirmative defense in any given instance. However, fair use is not a complete solution in this context. It provides no industry-appropriate instruction as to how diligently a user must search for a copyright owner (*e.g.*, for a photographer, writer, or television producer) before declaring that person missing,[71] and it lacks a standard as well as a mechanism by which the user would have to pay the emerging copyright owner when such payment is legally appropriate. For all of these reasons, the Office believes the orphan works problem is a legislative priority.

### Resale Royalty

The time is ripe for a legislative decision on the issue of resale royalties for visual artists.[72]

The Copyright Office first issued a report on the topic in 1992, and recommended against adopting a resale royalty right.[73] In 2013, however, the Office issued an updated analysis of resale royalty rights in the United States. As part of that update, the Copyright Office concluded that certain visual artists operate at a disadvantage under the copyright law

---

Rajab, 1424, Aug. 30, 2003, art. 16 (Saudi Arabia), *translated at* http://www.wipo.int/wipolex/en/text.jsp?file_id=129516 (unofficial translation); Copyright and Rights in Performances (Licensing of Orphan Works) Regulations, 2014, S.I. 2014/2863 (U.K.).

[70] *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011) ("The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties.").

[71] *See, e.g.*, *Preservation and Reuse of Copyrighted Works* at 3 (2014) (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("Ongoing uncertainty regarding how to deal with orphan works also played a part in a related case brought by the Authors Guild against HathiTrust where the inability of several universities to create a procedure that accurately identified orphan works resulted in suspension of efforts to digitize these works. This would seem to confirm that orphan works continue to be a problem in need of a solution, and I look forward to hearing from our witnesses on what we should do."); *id.* at 55 (testimony of Jan Constantine, General Counsel, The Authors Guild, Inc.) ("HathiTrust sidestepped Congress and started its own orphan works project . . . . Congress has carefully crafted rules for copying, including detailed rules for library copying. Ad hoc approaches to things as momentous as mass digitization of books or the distributing of so-called orphan books is wildly inappropriate."); Transcript, U.S. Copyright Office, Public Roundtable on Orphan Works and Mass Digitization 101:14-17 (Mar. 10, 2014), *available at* http://copyright.gov/orphan/transcript/0310LOC.pdf (statement of Sarah Michalak, HathiTrust Digital Library) (regarding the orphan works aspect of the HathiTrust Digital Library: "However, the process was—the project was curtailed because it was discovered to be an erroneous approach to finding—to identifying rights.").

[72] An artist resale royalty provides artists with an opportunity to benefit from the increased value of their works over time by granting them a percentage of the proceeds from the resale of their original works of art. U.S. COPYRIGHT OFFICE, RESALE ROYALTIES: AN UPDATED ANALYSIS 2 (2013), *available at* http://copyright.gov/docs/resaleroyalty/usco-resaleroyalty.pdf.

[73] U.S. COPYRIGHT OFFICE, *DROIT DE SUITE*: THE ARTIST'S RESALE ROYALTY xv-xvi (1992), *available at* http://www.copyright.gov/history/droit_de_suite.pdf.

relative to authors of other types of creative works.  Visual artists often do not share in the long-term financial success of their works because—unlike books, films, and songs, which frequently generate additional income through their reproduction and wide dissemination—works of visual art typically are valued for their singularity and scarcity.[74]  Consequently, in many instances only the initial sale of a work of visual art inures to the benefit of the artist, and it is only collectors and other purchasers who reap any increase in that work's value over time.  Thus, without a resale royalty, "many if not most visual artists will not realize a benefit proportional to the success of their work."[75]  The Office also highlighted the fact that more than seventy foreign countries—twice as many as in 1992 when the Copyright Office issued its first report on the topic—have enacted a resale royalty provision of some sort.[76]

The Office's report concluded that there are sound policy reasons to address this inequity, but also noted that the administrative and enforcement costs of a resale right might be substantial.  Thus, the Office suggested that, in addition to a resale royalty right, Congress may wish to consider a number of possible alternative or complementary options for supporting visual artists within the broader context of art industry norms, art market practices, and other pertinent data.  In the report, and in subsequent testimony before the Subcommittee on Courts, Intellectual Property, and the Internet, the Office provided some specific recommendations for any legislation in this area.[77]  Several of these recommendations have been included in a recent bill introduced by Representative Nadler.[78]

---

[74] Due to a work of visual art's unique nature, "[f]or most visual artists . . . the opportunity to generate additional revenue from a work permanently ends, as a practical matter, with that first sale."  RESALE ROYALTIES: AN UPDATED ANALYSIS at 36.  In addition to selling copies and entering into licensing arrangements, non-visual artists enjoy a number of other ways to make profits.  For instance, "[a] play will make a profit if many people come to see it, despite the fact that additional copies are not made for their enjoyment [and] . . . [p]erformers in a concert may play a work from memory without using any copies, yet the entire audience will buy tickets for the pleasure of hearing it."  Shira Perlmutter, *Resale Royalties for Artists: An Analysis of the Register of Copyrights' Report*, 16 COLUM.-VLA J.L. & ARTS 395, 405 (1991-1992).

[75] RESALE ROYALTIES: AN UPDATED ANALYSIS at 32.  The Office noted that visual artists don't reap the same benefits from the exploitation of exclusive rights available to authors in general, and it pointed out that the Copyright Act does not specifically account for the difference between the market for works of visual art and markets for other artistic works.

[76] *See id.*, App. E: Selected Countries with Laws Containing Provisions on the Resale Right.

[77] The Office's legislative recommendations are meant to benefit the greatest number of artists with the least amount of disruption to the art market.  The recommendations include: setting a minimum threshold value within the $1,000 and $5,000 range; applying the resale royalty to "work[s] of visual art" as currently defined in Section 101 of the Copyright Act; and creating a resale royalty rate that falls between 3 and 5%.  *Id.* at 73-81; *see also Moral Rights, Termination Rights, Resale Royalty, and Copyright Term: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 16 (2014) (statement of Karyn Temple Claggett, Associate Register of Copyrights and Director of Policy and International Affairs, U.S. Copyright Office).

[78] American Royalties Too Act of 2015, H.R. 1881, 114th Cong. (2015).  The legislation would establish a resale royalty for visual artworks sold at auction by a person other than the author for $5,000 or more, and

If the Committee is prepared to act on legislation in this area, the foundation is in place.

## Improvements for Persons with Print Disabilities

The Office continues to support congressional attention aimed at crafting a digital age update to exceptions in copyright law for persons who are blind or visually impaired,[79] although the Office is not offering a specific legislative proposal at this time.  It is our view that the Chafee Amendment, which was first adopted in 1996 and codified in Section 121 of the Act, would benefit from immediate attention through a legislative process.  An update to these provisions would not only reduce the need for judicial intervention in this area,[80] but would better address the current needs of the visually impaired community and developments in the commercial marketplace.[81]

In addition, the Office fully supports swift ratification of the recent Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise Print Disabled,[82] and is currently working with the Administration to achieve that result.[83]  Prompt treaty ratification will permit the United States to both send and receive accessible format copies of works worldwide, thereby harnessing the technological

---

the royalty amount would be the lesser of 5% of the sale price or $35,000, plus cost-of-living adjustments.  *Id.* § 3.

[79] The principal exception is found in 17 U.S.C. § 121, also known as the Chafee Amendment.  *See* Maria A. Pallante, *The Next Great Copyright Act*, 36 COLUM. J.L. & ARTS 315, 332 (2013) (noting that future discussions on copyright exceptions and limitations must include "crafting a digital age Chafee amendment (for print disabilities).").

[80] For example, the case of *Authors Guild Inc. v. HathiTrust* was driven in part by questions of whether the University of Michigan was an "authorized entity" under the Chafee amendment.  The district court ruled that it was (*Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 465 (S.D.N.Y. 2012)), and the appeals court ruled that, because fair use covered the defendant's conduct, there was no need to determine if the Chafee Amendment applied (*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 103 n.7 (2d. Cir. 2014)).

[81] *See, e.g.*, U.S. DEP'T OF EDUC., REPORT OF THE ADVISORY COMMISSION ON ACCESSIBLE INSTRUCTIONAL MATERIALS IN POSTSECONDARY EDUCATION FOR STUDENTS WITH DISABILITIES 27(2011); *Copyright Issues in Education and for the Visually Impaired: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 40 (2014) (statement of Scott C. LaBarre, State President, Colorado National Federation for the Blind) ("But we in this technical revolution have the opportunity to make every single published work accessible from the beginning.  That is the promise that technology holds, and that is what the copyright system needs to support.").

[82] *See Copyright Issues in Education and for the Visually Impaired* at 40 (statement of Scott C. LaBarre, State President, Colorado National Federation for the Blind) ("We strongly urge the United States Senate and, if it comes as an executive agreement, this House to ratify and adopt the Marrakesh Treaty.").

[83] The Office is also working with the Administration for swift ratification of the Beijing Treaty on Audiovisual Performances.

advances of the digital age and providing huge benefits for visually impaired persons here and abroad.[84]

## Section 1201 (Regulatory Presumption for Existing Exemptions)

The public record supports amending Section 1201 to make it easier to renew exemptions that have previously been adopted and are in force at the time of the triennial rulemaking proceeding.[85]  As reflected in the September 2014 hearing before this Committee, a wide range of stakeholders have expressed frustration that the Section 1201 statutory framework requires that, to continue an existing exemption, proponents must bear the legal and evidentiary burden of justifying the exemption anew in each subsequent rulemaking proceeding.[86]

The Copyright Office agrees that the process of renewing existing exemptions should be adjusted to create a regulatory presumption in favor of renewal.  Thus, it would be beneficial for Congress to amend Section 1201 to provide that existing exemptions will be presumptively renewed during the ensuing triennial period in cases where there is no opposition.  Additionally, we believe that other aspects of Section 1201 warrant further study and analysis, and address these in the next section of this testimony.

## IV. POLICY ISSUES THAT WARRANT NEAR-TERM STUDY AND ANALYSIS

In this section, we address those copyright issues that are important to a twenty-first century copyright system, but require more foundational study and analysis.  These issues

---

[84] "[T]he rapid entry into force of the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise Print Disabled (The Marrakesh VIP Treaty), concluded in June 2013, will affect the lives of [an estimated 6 million children around the globe with visual impairment] and generally improve equality of access to knowledge and information."  Catherine Jewell, *Removing Barriers to Literacy: How the Marrakesh VIP Treaty Can Change Lives*, WIPO Magazine at 16 (Feb. 2015), *available at* http://www.wipo.int/export/sites/www/wipo_magazine/en/pdf/2015/wipo_pub_121_2015_01.pdf.

[85] Legislation has recently been introduced on this issue.  Breaking Down Barriers to Innovation Act of 2015, S. 990, 114th Cong. (2015); Breaking Down Barriers to Innovation Act of 2015, H.R. 1883, 114th Cong. (2015).

[86] *Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 19-20 (2014) (statement of Mark Richert, Director of Public Policy, American Foundation for the Blind) ("[W]e we urge Congress to take action to relieve the burden of repeatedly seeking re-approval of uncontroversial exemptions like the one we must re-propose during each review.").  Representatives of copyright owners likewise agreed that the process of renewing uncontroversial exemptions could be streamlined.  *Id.* at 64 (statement of Christian Genetski, Senior Vice President and General Counsel, Entertainment Software Association) ("I think that we all share the frustration expressed by Mr. Richert in his testimony about the need to return repeatedly and use extensive resources to seek a renewal of an exemption where no one is opposing the exemption."); *id.* at 79 (statement of Jonathan Zuck, President, ACT | The App Association) ("I certainly think that the renewal process of an exemption is something that could be modified and streamlined especially when there are no objections to that renewal which is very often the case."); *id.* at 125 (written statement of Allen Adler, General Counsel & Vice President for Government Affairs, Association of American Publishers) (noting that "stakeholders broadly agree that reauthorization of non-controversial exemptions could be more efficient").

have been repeatedly referenced or addressed by Members of Congress, the Copyright Office, other agencies, academics, and stakeholders.  In the view of the Copyright Office, it is time to study these issues to document technological and business developments, analyze court opinions, review stakeholder perspectives, and provide a sufficient foundation for Congress.  The Copyright Office is available, as always, to assist Congress in this regard.

### Section 1201 (Other Issues)

There are a number of Section 1201 issues that are not yet ripe for legislative action but would benefit from a focused legal and policy analysis at this time.

It should be recognized at the outset that the anticircumvention provisions in Section 1201 have played an important role in facilitating innovation and providing consumers with a wide range of content delivery options.  As Representative Marino observed in the June 2014 hearing on chapter 12, "[t]he digital economy has enabled wide distribution of movies, music, eBooks and other digital content," and "[c]hapter 12 seems to have a lot to do with [that] economic growth."[87]  Representative Nadler made the same point, noting that the anticircumvention provisions have "been successful by promoting the creation of many new legal online services in the United States that consumers use to access movies and TV shows."[88]  A witness representing mobile app developers likewise remarked that "[t]he explosive growth in technological innovations and content delivery options prove that the DMCA has created an environment in which these things are possible."[89]  Many of our free trade agreements also include anticircumvention provisions.[90]

But while Section 1201 has been a success in many respects, experience since its enactment in 1998 has revealed issues that call for examination.  The Copyright Office has done what it can within the existing statutory framework to consider the frustrations of stakeholders and revise the triennial rulemaking process to make it more accessible and understandable to the public.  I believe we have been successful in this effort.  During the current Section 1201 rulemaking proceeding, we are considering twenty-seven proposed exemptions, with respect to which we have so far received almost 40,000 comments from the public.

---

[87] *Id. at* 2 (statement of Rep. Tom Marino, Vice Chairman, Subcomm. on Courts, Intellectual Prop., & the Internet).

[88] *Id.* at 2 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop., & the Internet).

[89] *Id.* at 21 (statement of Jonathan Zuck, President, ACT | The App Association).

[90] *See, e.g.*, United States-Korea Free Trade Agreement, U.S. Kor., art. 18.4, para. 7, Apr. 1, 2007, 46 I.L.M. 642 (May 2007) (entered into force Mar. 15, 2012), *available at* https://ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text; United States-Australia Free Trade Agreement, U.S.-Austl., art. 17.4, para. 7, May 18, 2004, 43 I.L.M. 1248 (2004) (entered into force Jan. 1, 2005), *available at* https://ustr.gov/trade-agreements/free-trade-agreements/australian-fta/final-text; United States-Singapore Free Trade Agreement, U.S.-Sing., art. 16.4, para. 7, May 6, 2003, 42 I.L.M. 1026 (2003) (entered into force Jan. 1, 2004), *available at* https://ustr.gov/trade-agreements/free-trade-agreements/singapore-fta/final-text.

But the rulemaking process nonetheless merits congressional attention.  The permanent exemptions in Section 1201 relating to reverse engineering, encryption research, and security testing are an ongoing issue, with some stakeholders suggesting that they are too narrow in scope[91] and others of the view that they strike an appropriate balance.[92]  For its part, the Office has previously highlighted the limited nature of the existing security testing exemptions and supported congressional review of the problem.[93]  We have also, in recent years, noted that some public policy issues are outside the reach of the rulemaking and can only be addressed by legislation.[94]

Some stakeholders are concerned that intended beneficiaries of exemptions lack the practical ability to engage in the permitted circumvention themselves.[95]  Others suggest a disconnect between the original purpose of Section 1201—protecting access to creative works—and its effect on a wide range of consumer goods that today contain copyrighted software.[96]

Finally, consumers have voiced discomfort that Section 1201 prevents them from engaging in activities, such as the repair of their automobiles and farm equipment, which previously

---

[91] *See, e.g.*, Erik Stallman, *The Current DMCA Exemption Process is a Computer Security Vulnerability*, CENTER FOR DEMOCRACY & TECHNOLOGY (Jan. 21, 2015), https://cdt.org/blog/the-current-dmca-exemption-process-is-a-computer-security-vulnerability/.

[92] *Chapter 12 of Title 17* at 66 (statement of Christian Genetski, Senior Vice President and General Counsel, Entertainment Software Association); *id.* at 81 (statement of Jonathan Zuck, President, ACT | The App Association).

[93] U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2008-8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 205-06 (June 11, 2010), *available at* http://www.copyright.gov/1201/2010/initialed-registers-recommendation-june-11-2010.pdf.

[94] *See, e.g.*, U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 24 (Oct. 12, 2012), *available at* http://copyright.gov/1201/2012/Section_1201_Rulemaking_2012_Recommendation.pdf ("The Register notes that several provisions in Section 121 appear ill-suited to the digital world and could benefit from comprehensive review by Congress."); U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2002-4; Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 84 (Oct. 27, 2003), *available at* http://copyright.gov/1201/docs/registers-recommendation.pdf (concluding that adoption of "use-based" or "user-based" exemptions, rather than exemptions focused on a class of works, required "Congressional action").

[95] *Chapter 12 of Title 17* at 19 (statement of Mark Richert, Director of Public Policy, American Foundation for the Blind) (noting that any exemption adopted after the triennial rulemaking "will only provide limited relief, as it leaves unaffected the DMCA's trafficking ban, which prevents us from creating and distributing advanced tools and services to people with disabilities who don't have the ability to circumvent DRM to make works accessible on their own.").

[96] *See, e.g.*, *id.* at 77 (statement of Rep. Blake Farenthold, Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("Traditionally, you have been able to buy a thing and do with it what you want, but with some of these licensing agreements you can't do with it what you want.").

had no implications under copyright law.[97]  Various legislative proposals have been introduced in an effort to address a number of these concerns, and last year Congress passed the Unlocking Consumer Choice and Wireless Competition Act to broaden the exemption for cellphone unlocking.[98]  It may be time for a broader review of the impact and efficacy of Section 1201 and its exemption process.

## Section 512 (Notice and Takedown and Safe Harbor)

The scope and efficacy of the DMCA safe harbors embodied in Section 512 of the Copyright Act are an ongoing source of concern and consternation for copyright owners and online providers.  In the nearly twenty years since Congress enacted the DMCA, courts have stepped in to fill perceived gaps in the statutory framework, often interpreting provisions in ways that some believe run counter to the very balance that the DMCA sought to achieve.[99]  Accordingly, the Office believes a formal and comprehensive study—to consider what is working and what is not, along with potential legislative improvements—is advisable to assess the Section 512 system and ensure that it is properly calibrated for the internet as we know it today.  The current online environment is vastly changed from the bulletin-board era in which Congress enacted the DMCA in 1998.[100]

Section 512 was designed to address the emerging threat of infringement on the internet, while at the same time providing appropriate safeguards and greater legal certainty for online service providers.[101]  This balanced approach has served both copyright and

---

[97] *Id.* at 44 (statement of Corynne McSherry, Intellectual Property Director, Electronic Frontier Foundation) ("From phones to cars to refrigerators to farm equipment, software is helping our stuff work better and smarter but, if that software is protected by TPMs, repair and recycling of those goods may require circumvention.  Putting repair and recycling at risk is bad for consumers and it's bad for the environment.").

[98] *See* Unlocking Consumer Choice and Wireless Competition Act, Pub. L. No. 113–144, 128 Stat. 1751 (2014); Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. (2015); You Own Devices Act, H.R. 862, 114th Cong. (2015); Breaking Down Barriers to Innovation Act of 2015, H.R. 1883, 114th Cong. (2015); Breaking Down Barriers to Innovation Act of 2015, S. 990, 114th Cong. (2015).

[99] *See, e.g.*, *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010) (finding that "awareness of pervasive copyright-infringing, however flagrant and blatant, does not impose liability on the service provider"); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 718 F.3d 1006, 1022 (9th Cir. 2013) (holding that "merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement under §512(c)(1)(A)(i)"); *Disney Enters., Inc. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339, at *26 (S.D. Fla. Aug. 28, 2013) ("[T]he statute does not focus on the general characteristics of the network, does not require affirmative action to police content, and does not preclude a grant of immunity even if the operator knew or should have known of infringement generally.").

[100] Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998).

[101] *See* H.R. REP. NO. 105-551, pt. 2, at 49-50 (1998) (Section 512 "preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment.  At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.").

technology stakeholders well during a time of dramatic change online.[102]  As several witnesses and Committee Members observed, the safe harbors provided by Section 512 have done much to facilitate the development of the internet, including the creation of online platforms through which copyright owners can reach new audiences for their works.[103]  And, as Ranking Member Nadler noted, "[t]he notice and takedown system has resulted in the quick removal of infringing content on countless occasions."[104]

Nevertheless, witnesses also identified a number of important challenges that seemingly call for more detailed discussion and consideration.  Grammy-award-winning composer Maria Schneider highlighted the difficulties individual authors face when enforcing their rights under the current notice and takedown regime, stating that "my livelihood is threatened by illegal distribution of my work, and I cannot rein it in."[105]  Witnesses described the mounting costs of sending millions of DMCA notices—costs that are borne both by the senders as well as the online providers who receive them.[106]  Recently, the U.S.

---

[102] *See, e.g., Section 512 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 16 (2014) (statement of Annemarie Bridy, Alan G. Shepard Professor of Law, University of Idaho College of Law) ("Bridy Statement") ("[T]he balancing of interests struck in Section 512 is both sound copyright policy and sound innovation policy."); *id.* at 42 (statement of Katherine Oyama, Senior Copyright Policy Counsel, Google Inc.) ("Oyama Statement") ("Google's experience shows that the DMCA's notice and takedown system of shared responsibilities strikes the right balance in promoting innovation and protecting creators' rights online."); *id.* at 92 (statement of Rep. Ted Deutch) ("I agree with, I think, most of the witnesses that the balance struck by the DMCA to encourage cooperation and to preserve protections for technology companies acting in good faith is the right one.").

[103] *See, e.g.*, Bridy Statement at 16 ("As the Internet has grown and thrived, so too have the copyright industries, which have successfully adapted their business models to meet robust consumer demand for music and films distributed online at reasonable prices in digital formats."); Oyama Statement at 42 ("Online services have created new markets and generated billions of dollars for the content industry, and this has only been made possible because of the legal foundation that is provided by the DMCA."); *Section 512 of Title 17* at 109 (statement of Rep. Zoe Lofgren, Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("I am thinking back to when we crafted the DMCA, and clearly, without safe harbor notice and takedown, there would not be an Internet.  It wouldn't exist.  So I think it is important that we recognize that and, as with the doctors, first do no harm.").

[104] *Section 512 of Title 17* at 3 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop., & the Internet).

[105] *Id.* at 54 (statement of Maria Schneider, Grammy Award Winning Composer/Conductor/Producer, Member of the Board of Governors, New York Chapter of the Recording Academy); *see also id.* at 3 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("Maria Schneider . . . has been unable to stop online infringement of her works.  The resulting loss of income, combined with the cost of monitoring the Internet and sending takedown notices, threatens her ability to continue creating her award-winning music.").

[106] *See, e.g., id.* at 88 (statement of Sandra Aistars, Chief Executive Officer, Copyright Alliance) ("For the hundreds of thousands of independent authors who lack the resources of corporate copyright owners, the situation is even more dire.  These entrepreneurs cannot dream of the robust enforcement programs that larger companies can afford.  Instead, they pursue issuing takedown notices themselves, taking time away from their creative pursuits, or give up enforcement efforts entirely."); Oyama Statement at 47 ("In 2013 . . . [Google] received takedown notices for approximately 230 million items."); *Section 512 of Title 17* at 224 (responses to questions for the record by Annemarie Bridy) ("Enforcing copyrights online is a significant

Department of Commerce Internet Policy Task Force has encouraged the development of additional voluntary practices to help streamline and improve the notice and takedown system.[107]  While several witnesses before the Committee acknowledged the role that voluntary initiatives may play in helping to address some of the costs and burdens of the takedown process,[108] others observed that these solutions can only go so far.[109]  It is time to take stock of Section 512.

<div align="center">**Mass Digitization**</div>

Related to the problem of orphan works, the Office is completing its analysis of copyright issues inherent to mass digitization projects.  In our study, witnesses have described some of the difficulties presented by mass digitization projects under current copyright law, and proposed specific statutory solutions.[110]

As hearing testimony indicated, the problem with respect to mass digitization is not so much a lack of information as a lack of efficiency in the licensing marketplace.[111]  For a digitization project involving hundreds, thousands, or millions of copyrighted works, the costs of securing *ex ante* permissions from every rightsholder individually often will exceed the value of the use to the user.  Thus, even where a library or other repository agrees that a use requires permission and would be willing to pay for a license (*e.g.*, to offer online access to a particular collection of copyrighted works), the burdens of rights clearance may effectively prevent it from doing so.  To the extent that providing such access could serve valuable informational or educational purposes, this outcome is difficult to reconcile with the public interest.

---

challenge for copyright owners of all sizes, particularly small copyright owners.  It is also a significant challenge for OSPs of all sizes, particularly small OSPs.").

[107] Department of Commerce DMCA Multistakeholder Forum, *DMCA Notice-and-Takedown Processes: List of Good, Bad, and Situational Practices* (Apr. 7, 2015), *available at* http://www.ntia.doc.gov/files/ntia/publications/dmca_good_bad_and_situational_practices_document.pdf.

[108] *See Section 512 of Title 17* at 261 (statement of the Association of American Publishers) ("AAP recognizes that voluntary 'best practices' and agreements among the key stakeholders in the online ecosystem are likely to be the most practical, effective and achievable ways to improve the daily operation of the notice-and-takedown system . . . .").

[109] *See id.* at 32 (statement of Paul F. Doda, Global Litigation Counsel, Elsevier, Inc.) ("Elsevier remains concerned, however, that notwithstanding a government-mandated process to create voluntary measures, some sites that need them the most will drag their feet.").

[110] *See Preservation and Reuse of Copyrighted Works* at 25-26 (statement of Richard S. Rudick, Co-Chair, Section 108 Study Group) ("Rudick Statement"); *id.* at 55-57 (statement of Jan Constantine, General Counsel, Authors Guild, Inc.) ("Constantine Statement").

[111] *See* Constantine Statement at 56 ("Collective licensing organizations such as ASCAP and BMI make sense when there is a limited set of rights to be licensed and it is too costly to ask individuals whether a use is okay. . . For mass digitization of books, one also needs a simple, one-stop shopping solution.").

While fair use may provide some support for limited mass digitization projects—up to a point—the complexity of the issue and the variety of factual circumstances that may arise compel a legislative solution.[112]  In the Office's view, the legitimate goals of mass digitization cannot be accomplished or reconciled under existing law other than in extremely narrow circumstances.  For example, access to copyrighted works, something many view as a fundamental benefit of such projects,[113] will likely be extremely circumscribed[114] or wholly unavailable.[115]  For this reason, as part of its orphan works and mass digitization report, the Office will recommend a voluntary "pilot program" in the form of extended collective licensing ("ECL") that would enable full-text access to certain works for research and education purposes under a specific framework set forth by the Copyright Office, with further conditions to be developed through additional stakeholder dialogue and discussion.  Such input is critical, we believe, because ECL is a market-based system intended to facilitate licensing negotiations between prospective users and collective management organizations representing copyright owners.  Thus, the success of such a system depends on the voluntary participation of stakeholders.

## Moral Rights

The issue of moral rights for authors was covered briefly in the recent hearings,[116] but is an essential consideration of copyright law.  The Office believes that this issue is a critical

---

[112] *See* Rudick Statement at 30 (arguing that "a provision so dependent on analyses of individual facts and circumstances is not well suited to major projects typical of Mass Digitization" and that "the doctrine of fair use as codified in Section 107 does not begin to address many of the content owners' concerns, such as security").

[113] *See, e.g.*, Constantine Statement at 56 (collective licensing proposal for mass digitization "is about providing access to . . . books at every college, university, community college, public school, and public library in the country so those institutions could provide access to the vital communities they serve"); *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 670 (S.D.N.Y. 2011) (benefits of Google Books program include the fact that "[b]ooks will become more accessible" and that "[l]ibraries, schools, researchers, and disadvantaged populations will gain access to far more books").

[114] *See Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013) (finding Google Books' display of "snippets" to be transformative for purposes of fair use because "it is not a tool to be used to read books").

[115] *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (finding it "[i]mportant[]" for fair use analysis that digital library did "not allow users to view any portion of the books they are searching," but "simply permit[ted] users to 'word search'—that is, to locate where specific words or phrases appear in the digitized books").

[116] The Subcommittee on Courts, Intellectual Property, and the Internet examined moral rights, along with termination rights, resale royalty, and copyright term, during its July 15, 2014 hearing.  In his opening statement, Representative Howard Coble, former chairman of the Subcommittee, asked witnesses "to examine whether the current approach to moral rights in the United States is sufficient."  *Moral Rights, Termination Rights, Resale Royalty, and Copyright Term* at 2-3 (statement of Rep. Howard Coble, Chairman, Subcomm. on Courts, Intellectual Prop., & the Internet); *see also id.* at 3 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) (discussing the "patchwork approach to moral rights in the United States" and asking witnesses "whether they believe the [*Dastar Corp. v. Twentieth Century Fox Film*

topic for further analysis.[117]  As I noted in the first copyright review hearing, in the past, the rights of individual authors "have been lost in the conversation. . . . [T]hey should be the focus."[118]  Many members and witnesses throughout the hearings identified the issues of individual authors, including attribution and the ability to say no to specific uses, as some of the most important elements of a well-functioning copyright system.[119]  While the United States is obligated to recognize the moral rights of authors under several existing treaties, recent case law in the U.S. Supreme Court has led some academics to question the strength of moral rights protection in the United States.[120]

In the Office's view, any comprehensive review of the functioning of the copyright system must give serious and sustained attention to the individual rights of authors—apart from corporate interests—and the need to ensure that those personal interests are adequately protected.  For this reason, the Office believes that further formal study of moral rights in the United States is an appropriate next step in the congressional process.

## V. ADDITIONAL POLICY ISSUES THAT WARRANT ATTENTION

This copyright review process has touched on almost every aspect of the Copyright Act and has included an impressive expression of perspectives and priorities.  The fact that we have not addressed all of the issues here or positioned them for immediate legislative action does not mean that they are unimportant or that Congress cannot in its discretion decide to elevate them.  Rather, these issues lack consensus as to the problem, require preliminary research or consultation to identify issues, or reflect agreement that a legislative solution is premature.

Indeed, certain issues are of paramount importance, but in our view should be left to the courts to develop.  Fair use falls squarely into this category.  First articulated by the courts

---

*Corp.*, 539 U.S. 23 (2003)] decision has weakened the United States' protection of moral rights, and if so, what we might need to do to address this potential challenge.").

[117] Moral rights generally refer to certain non-economic rights that are considered personal to an author, typically including rights of attribution or paternity (the right to be credited as the author of one's work), and the right of integrity (the right to prevent prejudicial distortions of one's work).  *See* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8D.01[A] (2015).

[118] *The Register's Call For Updates to U.S. Copyright Law: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 62 (2013) (statement of Maria A. Pallante, Register of Copyrights and Director of the U.S. Copyright Office).

[119] *See, e.g.*, *Section 512 of Title 17* at 83 (statement of Rep. Judy Chu, Member, Subcomm. on Courts, Intellectual Prop., & the Internet) ("[H]ow do smaller and independent creators with limited resources expect to have any impact[?]"); *see also* Ali Qassim, *Authors Should Have Attribution Rights Columbia's Ginsburg Says*, BLOOMBERG BNA: PATENT, TRADEMARK & COPYRIGHT LAW DAILY (Apr. 14, 2015), http://news.bna.com/ptdm/ PTDMWB/split_display.adp?fedfid=66988793&vname=ptdbulallissues&jd=a0g5c2y6v7&split=0.

[120] *See* Jane C. Ginsburg, *Moral Rights in the U.S.: Still in Need of a Guardian Ad Litem*, 30 CARDOZO ARTS & ENT L.J. 73 (2012) (noting that the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) "has probably left authors worse off").

in the nineteenth century,[121] and subsequently codified by Congress in 1976, fair use is a critical safeguard of the Copyright Act.[122]  The United States has a rich and comprehensive body of jurisprudence in this area, which our courts continue to develop to respond to ever new fact patterns.  Fair use is not a panacea or replacement for a properly balanced statute, but witnesses agree, as does the Copyright Office, that further codification of the doctrine is ill-advised at this time.[123]  That said, fair use should be as accessible as possible to both good faith users and copyright owners and the government can play a role by providing resources or guidance.  As noted above, the Copyright Office has recently completed a public database of fair use holdings with this in mind.

Similarly, the Copyright Office will release shortly a major report on the exclusive right of "making available."[124]  This right, which is reflected in two treaties[125] and multiple free

---

[121] *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901);  *see also* Lloyd L. Weinreb, *Fair Use*, 67 FORDHAM L. REV. 1291 (1999) (revised version of the 1998 Donald C. Brace Memorial Lecture) ("our understanding of fair use has not progressed much beyond Justice Story's observation in *Folsom v. Marsh*, the case usually cited as the source of the doctrine in this country . . . ." (footnote omitted)).

[122] Act of Oct. 19, 1976, Pub. L. No. 94-553, § 107, 90 Stat. 2541, 2546 (1976) (codified at 17 U.S.C. § 107); S. REP. NO. 94-473, at 61 (1975) ("The judicial doctrine of fair use . . .  would be given express statutory recognition for the first time in section 107").

[123] *See, e.g.*, *The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 32 (2014) (statement of David Lowery, Singer/Songwriter and Lecturer, Terry College of Business, University of Georgia) ("As a professional singer-songwriter, I believe that fair use doctrine, as intended by Congress, is working in the music business and music industry and should not be expanded."); *id.* at 8 (prepared statement of Peter Jaszi, Professor, Faculty Director, Glushko-Samuelson Intellectual Property Clinic, Washington College of Law, American University) ("I've come to the conclusion that fair use is definitely alive and well in U.S. copyright law, and that, after a rocky start, the courts are doing an excellent job implementing the congressional direction contained in Sec. 107.  Fair use doesn't need legislative 'reform,' but . . . it might benefit from certain kinds of legislative support in years to come—especially relief from the operation of other statutory provisions (such as the current law of statutory damages) that have the unintended consequence of discouraging its legitimate exercise."); *id.* at 22 (prepared statement of June M. Besek, Executive Director, Kernochan Center for Law, Media and the Arts and Lecturer-in-Law, Columbia Law School) ("Despite the concerns just voiced, fair use remains a rule whose application is best made by judges, as Congress recognized in codifying the doctrine in section 107 . . . . Without altering the text of section 107, Congress might separately address the problems of mass digitization, including whether authors should be compensated for publicly beneficial uses . . . ."); *id.* at 40 (statement of Kurt Wimmer, General Counsel, Newspaper Association of America) ("[T]his is an issue that we think can be remedied by the courts rather than Congress. We believe the current state of the Copyright Act, including the formulation of fair use, strikes the right balance and should not be changed."); *id.* at 24 (statement of Naomi Novik, Author and Co-Founder, Organization for Transformative Works) ("In general, I strongly urge Congress to resist any suggestion of narrowing fair use, including by trying to replace it with licensing.").

[124] *See* Study on the Right of Making Available; Comments and Public Roundtable, 79 Fed. Reg. 10,571 (Feb. 25, 2014).  Specifically, Representative Watt requested that the Office address:  (1) how the existing bundle of exclusive rights under Title 17 covers the making available and communication to the public rights in the on-demand digital environment (such as peer-to-peer networks, streaming services, and music downloads); (2) how foreign laws have interpreted and implemented relevant provisions of the World Intellectual Property Organization (WIPO) Internet Treaties, to which the United States is a party; and (3) whether (and if so, how) Congress should amend Title 17 to strengthen or clarify U.S. law in this area.  *Id.* at 10,572.

trade agreements,[126] requires the United States to provide authors of works, producers of sound recordings, and performers whose performances are fixed in sound recordings with the exclusive right to authorize the transmission of their works and sound recordings.  In the specific context of on-demand transmissions, the treaties provide members with flexibility in the manner in which they implement this right.[127]

Despite unanimous agreement across the U.S. government as to the scope and breadth of this right,[128] some courts in the United States have struggled to apply the right appropriately in the digital age.[129]  Although participants in the Office's study, as well as witnesses at the hearing on this topic, generally agreed that the complexity of the issue has led to some contradictory court decisions,[130] most rejected any need for specific legislative

---

[125] WIPO Copyright Treaty art. 8, Dec. 20, 1996, 36 I.L.M. 65; WIPO Performances and Phonograms Treaty arts. 10 & 14, Dec. 20, 1996, 36 I.L.M. 76.

[126] *See, e.g.*, U.S.-Austl. FTA arts. 17.4.1, 17.5 (May 18, 2004); U.S.-Bahr. FTA arts. 14.4.2, 14.5 (Sep. 14, 2004); U.S.-Chile FTA arts. 17.5.2, 17.5.3 (June 6, 2003); U.S.-Colom. TPA arts. 16.5.3, 16.5.4 (Nov. 22, 2006); U.S.-Dom. Rep.-Cent. Am. FTA (CAFTA-DR) arts. 15.5.2, 15.6 (Aug. 5, 2004); U.S.-Jordan FTA arts. 4(1)(c)-(d) (Oct., 24, 2000) (incorporating provisions of the WCT and WPPT); U.S.-Kor. FTA arts. 18.4.2, 18.5 (Feb. 10, 2011); U.S.-Morocco FTA arts. 15.5.3, 15.6 (June 15, 2004); U.S.-Oman FTA arts. 15.4.2, 15.5 (Nov. 15, 2004); U.S.-Pan. TPA arts. 15.5.2, 15.6 (June 28, 2007); U.S.-Peru TPA arts. 16.5.3, 16.5.4 (Apr. 12, 2006); U.S.-Sing. FTA arts. 16.4.2(a), 16.4.3 (May 6, 2003), *all available at* http://www.ustr.gov/trade-agreements/free-trade-agreements.

[127] This flexible approach is known as the "umbrella solution."  *See* Mihály Ficsor, WIPO, Guide to the Copyright and Related Rights Treaties Administered by WIPO and Glossary of Copyright and Related Rights Terms 209-10, 247-48 (2003), *available at* http://www.wipo.int/edocs/pubdocs/en/copyright/891/wipo_pub_891.pdf.

[128] *See, e.g.*, Internet Policy Task Force, U.S. Dep't of Commerce, Copyright Policy, Creativity, and Innovation in the Digital Economy 15–16 (2013), *available at* http://www.uspto.gov/sites/default/files/news/publications/copyrightgreenpaper.pdf (stating that the distribution right provided in the U.S. Copyright Act was intended to include "the mere offering of copies to the public," which is considered to be part of making available); *Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcomm. on Courts, the Internet, & Intellectual Prop. of the H. Comm. on the Judiciary*, 107th Cong. 114 (2002) (Letter from Marybeth Peters, Register of Copyrights, U.S. Copyright Office, to Rep. Howard Berman) ("While Section 106 of the U.S. Copyright Act does not specifically include anything called a 'making available' right, the activities involved in making a work available are covered under the exclusive rights of reproduction, distribution, public display and/or public performance . . . ."); H.R. Rep. No. 105-551, pt. 1, at 9 (1998) (concluding that the WIPO Internet Treaties "do not require any change in the substance of copyright rights or exceptions in U.S. law.").

[129] *Compare Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 203 (4th Cir. 1997) ("When a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public."), *and A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."), *with London-Sire Records, Inc. v. Doe 1,* 542 F. Supp. 2d 153, 168 (D. Mass 2008) ("Merely because the defendant has 'completed all the steps necessary for distribution' does not necessarily mean that a distribution has occurred." (citation omitted)), *and Capitol Records, Inc. v. Thomas,* 579 F. Supp. 2d 1210, 1227 (D. Minn. 2008) (holding that § 106(3) of the Copyright Act does not encompass mere offers to distribute).

[130] *See, e.g.*, Jane C. Ginsburg, Morton L. Janklow Professor of Literary and Artistic Property Law, Columbia Law School, Comments Submitted in Response to U.S. Copyright Office's Feb. 25, 2014 Notice of Inquiry at 3-

action.[131]  The Copyright Office trusts that our report will in and of itself provide useful guidance to the courts on the manner in which the making available right should be interpreted and recognized in the United States.  However, we remain available to Congress should it wish to further consider the question.

Moving to topics of copyright administration, the Copyright Office has led active public discussions about the future evolution of both copyright registration[132] and copyright recordation.[133]  In today's world, copyright owners want to register on mobile devices and assert their authorship and licensing information based upon data that is readily accessible to other actors around the globe.  And companies who aggregate, disseminate, or otherwise use copyright data want the Copyright Office to supply timely and accurate information and facilitate interoperable applications.  This is an appropriately exciting vision for the twenty-first century; as witnesses explained, robust information technology structures will support any number of new copyright transactions.[134]  Thus, these sorts of paradigm shifts are necessarily tied to decisions regarding Copyright Office improvements generally.

The mandatory deposit provisions, which require publishers to submit copies of works in support of the national collection of the Library of Congress, are also out of date and require attention.  Issues include the operation and relationship of mandatory deposit

---

5, *available at* http://copyright.gov/docs/making_available/comments/docket2014_2/Jane_Ginsburg.pdf; *The Scope of Copyright Protection: Hearing Before the Subcomm. on Courts, Intellectual Prop., & the Internet of the H. Comm. on the Judiciary* 10 (2014) (statement of David Nimmer, Professor from Practice, UCLA School of Law & Of Counsel, Irell & Manella, LLP); *The Scope of Copyright Protection* at 41 & n.15 (statement of Glynn S. Lunney, Jr., McGlinchey Stafford Professor of Law, Tulane University Law School).

[131] *See, e.g.*, Transcript, U.S. Copyright Office, Public Roundtable on the Right of Making Available 231:10-14 (May 5, 2014), *available at* http://copyright.gov/docs/making_available/public-roundtable/transcript.pdf (statement of Jonathan Band, Counsel, Library Copyright Alliance) ("[M]aybe there is some ambiguity, but we are probably better off letting the courts deal with the cases as they arise, as opposed to trying to deal with it legislatively . . . ."); *id.* at 235:13-15 (statement of Keith Kupferschmid, General Counsel & Senior Vice President for Intellectual Property, Software & Information Industry Association) ("[W]e do not think that any type of further clarification or amendment to the statute is necessary.").  *But see, e.g.*, Peter S. Menell, Koret Professor of Law, University of California, Berkeley School of Law, Comments Submitted in Response to U.S. Copyright Office's Feb. 25, 2014 Notice of Inquiry at 2, *available at* http://copyright.gov/docs/making_available/comments/docket2014_2/Peter_Menell.pdf ("Congress should clarify the scope of the distribution right.  The dissensus surrounding the 'making available' issue needlessly creates uncertainty and increases the costs of litigation.").

[132] *See* 17 U.S.C. § 408.

[133] *See* 17 U.S.C. §§ 203, 205, 304.

[134] *See U.S. Copyright Office: Its Functions and Resources* at 97 (statement of Robert Brauneis, Professor, George Washington University Law School & Abraham L. Kaminstein Scholar-in-Residence, U.S. Copyright Office) (noting that the Copyright Office "would see a large number of new copyright transactions, particularly smaller transactions"); Letter from Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office, to John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary 6 (Mar. 23, 2015), *available at* http://copyright.gov/laws/testimonies/022615-testimony-pallante.pdf (summarizing witness statements regarding the benefits of a well-functioning Copyright Office).

requirements to copyright registration requirements,[135] the viability of "best edition" requirements in the digital age,[136] security of electronic works, and consideration of the Library's stated goals.[137]  We will need to meet with the Library and stakeholders regarding both the statute and applicable regulations before advising Congress further.

There are multiple other issues that will take time.  For example, witnesses have offered opinions about statutory damages, the first sale doctrine, compulsory video licenses, term of protection, termination rights, and the copyrightability of public standards and codes. We have not prioritized these for either immediate legislative action or immediate study at this time.  However, we agree that they are important issues and if the Committee desires further analysis, we are of course available to assist.

Finally, we have identified a list of corrections that we recommend the Committee adopt to address some technical concerns in the statute.  That list is attached as a rider to my statement.

## VI. Conclusion

As the Committee continues to assess not only themes and conclusions of the past twenty hearings, but the experiences of the past four decades, the Copyright Office is here to assist you.  Thank you for your leadership on copyright policy.

---

[135] *See* 17 U.S.C. §§ 407, 408.

[136] The "best edition" of a work is defined in the Copyright Act as "the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes."  17 U.S.C. § 101.

[137] *See generally* Letter from James H. Billington, Librarian of Congress, to Rep. Robert W. Goodlatte, Chairman, H. Comm. on the Judiciary 5 (Apr. 23, 2015) (in part discussing mandatory deposit provisions in relation to the national collection).

## Proposed Technical Amendments

- **§ 109(e)**

  This provision is an exception to the rights of public performance and public display for electronic audiovisual games intended for use in coin-operated equipment.  It was added by the Computer Software Rental Amendments Act of 1990, which stated that the exception "shall not apply to public performances or displays that occur on or after October 1, 1995."[1]  Although set forth in the Act as passed by Congress, the termination of the exception was not codified in section 109(e).  Because this exception no longer applies, it should be repealed to avoid confusion.

- **§ 408(c)(3)**

  This provision allows a claimant to obtain a single renewal registration for certain groups of works by the same individual author that were in their first copyright term on January 1, 1978, provided that the claim is submitted within the last year of that term.[2]  This provision can no longer be applied because the first term for all such works expired on or before December 31, 2005.  It thus should be repealed.

- **§ 508**

  Section 508 requires United States court clerks to notify the Register of Copyrights when any action under Title 17 is filed.[3]  When any final order or judgment is issued in such a case, the clerks must similarly notify the Register, as well as send a copy of the order or judgment, along with any written opinion.

---

[1] Pub. L. No. 101-650, § 804(c), 104 Stat. 5089, 5135, *amended by* Uruguay Round Agreements Act, Pub. L. No. 103-465, § 511, 108 Stat. 4809, 4974 (1994).

[2] *See* 17 U.S.C. §408(c)(3)(C) (providing that "the renewal application and fee are received not more than twenty-eight or less than twenty-seven years after the thirty-first day of December of the calendar year in which all of the works were first published").

[3] Section 508 provides in full:

> Notification of filing and determination of actions

> (a) Within one month after the filing of any action under this title, the clerks of the courts of the United States shall send written notification to the Register of Copyrights setting forth, as far as is shown by the papers filed in the court, the names and addresses of the parties and the title, author, and registration number of each work involved in the action. If any other copyrighted work is later included in the action by amendment, answer, or other pleading, the clerk shall also send a notification concerning it to the Register within one month after the pleading is filed.

> (b) Within one month after any final order or judgment is issued in the case, the clerk of the court shall notify the Register of it, sending with the notification a copy of the order or judgment together with the written opinion, if any, of the court.

> (c) Upon receiving the notifications specified in this section, the Register shall make them a part of the public records of the Copyright Office.

17 U.S.C. § 508.

Section 508 also requires the Register to make these filings part of the public record of the Copyright Office. This section should be eliminated because the paper-based Section 508 filing system has become obsolete in an era of electronic court information resources such as PACER, Lexis, and Westlaw. There is no efficient way to search the voluminous paper Section 508 filings and, perhaps not surprisingly, in recent years there has been virtually no demand to access them. In sum, the administrative costs to the courts of preparing and sending these notices, and the costs to the Office of receiving and maintaining these records, far outweigh any usefulness to the public.

- **§ 708(a), final paragraph, first sentence**

  This section sets forth the procedure for fixing various fees allowed to be charged by the Copyright Office. The sentence in question follows a list of specific fees that are proposed by the Register and submitted to Congress (Section 708(a)(1)-(9)) and the establishment of fees for the filing of cable and satellite statements of account (Section 708(a)(10)-(11)).[4] The sentence reads: "The Register is authorized to fix fees for other services, including the cost of preparing copies of Copyright Office records, whether or not such copies are certified, based on the cost of providing the service."[5] The Office proposes a technical change whereby the last phrase of the sentence would be amended to read "based on the cost*s* of providing the service*s*." The pluralization of "costs" and "services" would permit the Office greater flexibility in fixing its fees because it could consider the total costs of all of its "other" services in establishing its fee schedule for those services, thus permitting the Office to consider the public need for, and individual benefits of, particular services. This is the procedure for the fee schedule submitted to Congress for the fees enumerated in Section 708(a)(1)-(9).[6] The proposed technical change would thus eliminate a statutory discrepancy in the treatment of different categories of fees for fee-setting purposes.

- **§ 801(b)(2)(D)**

  The reference to "section 111(d)(1)(C) and (D)" in section 801(b)(2)(D) should instead be a reference to "section 111(d)(1)(E) and (F)" to reflect changes made by the Satellite Television Extension and Localism Act of 2010.[7]

---

[4] *See* 17 U.S.C. § 708(a).

[5] *Id.*

[6] *See* 17 U.S.C. §§ 708(b)(2) ("the Register may, on the basis of the study under paragraph (1), and subject to paragraph (5), adjust fees to not more than that necessary to cover the reasonable costs incurred by the Copyright Office for the services described in paragraph (1), plus a reasonable inflation adjustment to account for any estimated increase in costs"); 708(b)(5).

[7] Pub. L. No. 111-175, § 104, 124 Stat. 1218, 1233 (setting forth gross receipts limitations in Section 111(d)(1)(E) and (F)).

3

- **§ 802(i)**

  Title 17 should be amended to reflect the Librarian of Congress's authority to remove Copyright Royalty Judges under the determination of the United States Court of Appeals for the District of Columbia in the 2012 case *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board* that "without the unrestricted ability to remove the Copyright Royalty Judges, Congress's vesting of their appointment in the Librarian rather than in the President violates the Appointments Clause."[8]  In its opinion, the court of appeals expressly stated that it was "invalidat[ing] and sever[ing] the portion of [section 802] limiting the Librarian's ability to remove the Judges."[9]  The Office is available to assist Congress with an appropriate conforming amendment.

- **Miscellaneous typographical errors**

  o  Section 111(a):  Paragraphs (a)(1) and (2) each have "or" after the semicolon at the end but (3) and (4) do not; the use of "or" in these paragraphs should be corrected.

  o  Section 111(e):  In paragraph (e)(1), delete the superfluous "the" in the first line before "subsection (f)(2)."

  o  Section 119(d)(10)(A):  Delete "of" at the end of subparagraph (d)(10)(A) introducing clauses (i) and (ii).

---

[8] 684 F.3d 1332, 1342 (D.C. Cir. 2012).

[9] *Id.*

# Exhibit C



**The Register of Copyrights of the United States of America**

United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000 · (202) 707-8350

The Honorable John Conyers, Jr.
Ranking Member
Committee on the Judiciary
United States House of Representatives
2426 Rayburn House Office Building
Washington, DC 20515

March 23, 2015

Re: The U.S. Copyright Office: Its Functions and Resources
February 26, 2015

Dear Ranking Member Conyers:

I am writing to submit my views for the official record of the above-referenced hearing in accordance with your request.[1] Specifically, you asked me to respond to the testimony of the witnesses on the subject of "whether and how reorganizing the Copyright Office would benefit the copyright community."[2] It is a privilege to assist you and Chairman Goodlatte as you evaluate these important questions. Thank you for the opportunity to do so.

For a number of reasons, my view as the current Register of Copyrights is that the Copyright Office requires congressional direction to meet the challenges and opportunities of the twenty-first century.[3] I am assuming for purposes of this letter that the Judiciary Committee will be further deliberating on the issues discussed at the hearing, and I am assuming further that the Committee is likely to alter the status quo, in which all Copyright Office staff are part of the Library of Congress and the Librarian appoints, supervises, and may remove the Register and other subordinate officers. This framework was uniformly questioned by the Committee's Members and rejected by all of the hearing's witnesses, who

---

[1] *The U.S. Copyright Office: Its Functions and Resources: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (2015) ("2015 USCO Hearing"). Witnesses were Robert Brauneis (Professor, George Washington University Law School), Lisa Dunner (Partner, Dunner Law PLLC, on behalf of the American Bar Association Section of Intellectual Property Law), Keith Kupferschmid (General Counsel, Software & Information Industry Association), and Nancy Mertzel (Partner, Schoeman Updike Kaufman & Stern LLP, on behalf of the American Intellectual Property Law Association).

[2] 2015 USCO Hearing, oral testimony at 1:07:21, *available at* http://judiciary.house.gov/index.cfm/hearings?ID=517A06E1-2222-42C6-87B2-05D64633F62D (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary).

[3] In arriving at the conclusions outlined in this letter, I consulted with my predecessor, Marybeth Peters, who served as Register of Copyrights from 1994-2010. She agrees with the views presented here, including restructuring the Copyright Office as an independent agency.

1

noted concerns about budget independence, administrative authority, and mission effectiveness.[4]

In light of these concerns, it would be helpful if Congress could decide the Copyright Office's organizational structure soon, so that both the Library and the Copyright Office know whether and how to plan for the capital projects the Copyright Office so sorely needs. As the Committee is aware, major technology investments must be routed through the Library's central departments and infrastructure, a paradigm that presents significant challenges for all involved.  Moreover, the Library is under pressure to tighten its existing processes and controls in this area in order to further leverage economies of scale throughout the agency and adopt other "best practices" of the federal government.[5]  The combination of these developments makes rather pressing the question of whether the Copyright Office should continue to be subject to the Library's agency-wide goals.

---

[4] During the hearing, Representative Nadler observed that, "[f]rom the witness testimony, I gather there's agreement that the Copyright Office as currently structured faces a variety of challenges in executing the basic functions stakeholders expect from it, and that it lacks independent budget and administrative authority.  While the Copyright Office . . . has taken the initiative to address some of these challenges, only Congress can provide the resources and flexibility the Office needs to continue serving the public and Congress." *Id.* at 1:18:16 (statement of Rep. Jerrold Nadler, Member, H. Comm. on the Judiciary).

Additionally, Representative Issa asked the witnesses whether they believed that the Copyright Office is "structured to be efficient, nimble, modern, and progressive in a way that the twenty-first century would demand." *Id.* at 1:11:06 (statement of Rep. Darrell Issa, Member, H. Comm. on the Judiciary).  The witnesses unanimously agreed "a hundred percent" that they did not believe it to be so structured.  *Id.* at 1:11:18.  Representative Deutch also expressed his concerns over the current structure, noting that "[i]t's time to enact a restructured, empowered, and more autonomous Copyright Office that's genuinely capable of allowing America to compete and to protect our citizens' property in a global marketplace."  *Id.* at 1:36:40 (statement of Rep. Ted Deutch, Member, H. Comm. on the Judiciary).

Similar questioning took place at recent budget hearings.  During the House Legislative Branch Subcommittee hearing on the Library budget, Ranking Member Wasserman Schultz asked whether the Copyright Office's "current structure and [its] budget . . . [is] sufficient for [the Copyright Office] to perform the duties that [it is] responsible for, meet the user community's concerns and their needs." *Fiscal Year 2016 Budget Hearing on the Architect of the Capitol and Library of Congress Before the H. Subcomm. on Legis. Branch of the H. Comm. on Appropriations*, 114th Cong., oral testimony at 1:13:56 (2015), *available at* http://appropriations.house.gov/calendar/eventsingle.aspx?EventID= 393997 (statement of Rep. Debbie Wasserman Schultz, Ranking Member, Subcomm. on Legis. Branch).

In the Subcommittee on the Legislative Branch of the Senate Appropriations Committee, Ranking Member Schatz stated that, while it did at one time make sense for the Library and the Copyright Office to share the same "roof," "reality has changed," he is "worried that the Copyright Office may be outgrowing its home within the Library of Congress," and the Library "may no longer be the right fit" for the Copyright Office.  It is time, he recommended, to "reevaluate whether this fit . . . makes sense anymore." *FY16 Library of Congress & Architect of the Capitol Budget: Hearing Before the Subcomm. on the Legis. Branch of the S. Comm. on Appropriations*, 114th Cong., oral testimony at 51:57 (2015), *available at* http://www.appropriations.senate.gov/webcast/legislative-branch-subcommittee-hearing-fy16-library-congress-architect-capitol-budget (statement of Sen. Brian Schatz, Ranking Member, Subcomm. on the Legis. Branch).

[5] At the request of appropriators, the Government Accountability Office has in recent months performed two audits involving information technology challenges in the Library and Copyright Office.  GAO will publish its reports and recommendations, as well as agency responses, on or around March 31, 2015.

Although several alternative paths emerged at the hearing, my staff and I focused specifically on the long-term interests of the nation's copyright system. We believe that these interests would be served best by establishing an independent copyright agency to administer the law, and by designating a leader that is appointed by the President with the advice and consent of the Senate. This would: provide a sound constitutional foundation for both new and existing copyright functions; ensure that Congress, federal agencies, and the public continue to benefit from the Copyright Office's expert legal proceedings and impartial policy advice; and attract future qualified leaders able to interact at the highest levels of a modern government.

<center>*Eliminating Constitutional Challenges*</center>

Professor Brauneis's testimony presents what he calls the "constitutional predicament" that is presented by the Copyright Office's placement as a subordinate department of the national library.[6] His statements highlight the somewhat unusual nature of the Library of Congress in the modern administrative state—the fact that it encompasses both purely executive functions (exercised through the Copyright Office and the Copyright Royalty Board) and purely legislative ones (exercised through the Congressional Research Service). This bifurcated structure has recently been subject to constitutional challenges in the courts.

The Department of Justice has defended against those challenges by concluding and asserting that the Library as a whole is within the executive branch, a view adopted in recent court decisions.[7] As a legal construct, it has to be this way, because the Librarian of Congress is removable by the President alone and there is no particular congressional committee that has similar or shared supervisory authority over the Librarian. As Professor Brauneis notes, this conclusion runs counter to the assumption of many who "consider the Library of Congress to be part of the legislative branch of government."[8] The prospect that the President can assert plenary authority over the Library of Congress may be cause for concern for Members of Congress.[9]

More fundamentally for me, this confusion has the potential to compromise confidence in the copyright system at the very time we need to plan it forward. It is quite possible there will be further litigation involving the disposition of copyright functions and authorities,

---

[6] 2015 USCO Hearing (written statement of Robert Brauneis at 9-15, *available at* http://judiciary.house.gov/_cache/files/4f8fc2a0-10de-4075-9b4b-26cbe1f1e05c/revised-brauneis-testimony.pdf) ("Brauneis Statement").

[7] *See id.* at 10-12 (citing *Eltra Corp. v. Ringer*, 579 F.2d 294 (4th Cir. 1978); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012)).

[8] *Id.* at 9.

[9] *Id.* at 12.

<center>3</center>

and it is also possible that the courts will weigh in with further decisions on this matter. It would be better for Congress to address the equities prospectively, namely, what is the best way to meet the overall objectives of the copyright law.[10]

### Creating an Independent Agency

Many people, including Members of Congress, are surprised to find that the copyright system is currently accountable to the national library.[11] There are mounting operational tensions with this arrangement[12] and, as discussed at the hearing, a number of legal concerns.[13] In considering the issues and the options, we have come to believe that the national copyright system would be better served by an independent copyright agency.

An independent agency would both solve the current administrative challenges and position the copyright system for future success. It would also recognize and continue the Copyright Office's extensive but impartial role in domestic and international affairs.

---

[10] The appropriate organizational and reporting structure for the Library itself, aside from the copyright system, is beyond the purview of our analysis. When Congress created the position of Librarian in 1802, it specified that the Librarian was to be appointed by the President acting alone. Then, when Congress created the Copyright Office in 1897, it insisted on Senate confirmation of the Librarian to satisfy Appointments Clause requirements. John Russell Young was the first Librarian to be formally appointed in this manner.

[11] 2015 USCO Hearing, oral testimony at 2:16:23 (statement of Rep. Dr. Judy Chu, Member, H. Comm. on the Judiciary) ("I think most people are surprised when they learn that our nation's Copyright Office is housed under the Library of Congress, because the missions are so different.").

[12] As discussed at the hearing, information technology is governed according to central Library processes and priorities, although the Copyright Office's needs are distinct. Copyright Office staffing allocations and pay are subject to the Library's decisions and rules. The Library's salaries for top officials throughout the agency are considerably lower than salaries for comparable positions in executive agencies, including for copyright officials at the U.S. Patent and Trademark Office.

[13] As Lisa Dunner, speaking on behalf of the American Bar Association Section of Intellectual Property Law, noted, "there is an inherent conflict of interest in having the Library sign off on and control regulations formulated by the Office, especially since the Library, like other libraries, often takes position[s] on policy matters that are the subject of the Office's studies and rulemaking proceedings." *Id*. at 0:49:21; *see also id*. (written statement of Lisa Dunner at 9-10, *available at* http://judiciary.house.gov/_cache/files/9614a33b-39fd-4b57-b053-055362b611d4/dunner-testimony.pdf) (voicing concern over potential conflicts of interest regarding copyright issues).

This is not a new concern; instead it has been voiced by some in the copyright community for decades. *See, e.g.*, *Copyright Reform Act of 1993: Hearing on H.R. 897 Before the Subcomm. on Intell. Prop. & Jud. Admin. of the H. Comm. on the Judiciary*, 103d Cong. 118 (1993) (statement of Steven J. Metalitz, Vice President & General Counsel, Information Industry Association) ("[W]e think it is time for Congress to consider severing the link between effective copyright protection and the acquisitions objectives of the Library. Those are important objectives, but we simply don't feel that a creator's right to obtain effective copyright protection should depend on how quickly he or she gives a free copy of the work, or two free copies of the work, to the Library of Congress."); *see also* 2015 USCO Hearing (written statement of Keith Kupferschmid at 6-7, *available at* http://judiciary.house.gov/_cache/files/998864fa-c779-494d-998e-44859ec3911a/kupferschmid-siia-testimony.pdf) (stating that many newspapers no longer register their works because the Library continues to require microfilm copies when newspapers no longer use microfilm, thus making registration a financial and administrative burden).

Countless Members of Congress, the Department of Justice, the Department of State, the United States Trade Representative, the Department of Commerce and, most recently, the Intellectual Property Enforcement Coordinator, have turned to the Copyright Office to interpret and advise on copyright legislation, litigation, trade agreements, and treaties arising under the Copyright Act and related provisions of Title 17.  An independent agency would be free to serve all branches of government without political restraint, including especially through expert studies and congressional testimony.[14]  It could lead, participate in, or analyze issues relating to a variety of international meetings and negotiations, not only assisting the President in representing the intellectual property interests of the United States, but also assisting Congress in assessing the impact and implementation requirements for domestic laws.  And, an independent agency could ably carry out executive functions (such as registration and rulemakings) without the complications that arise from being organized in the Library and treated for certain purposes as a legislative branch entity.

As explored at the hearing, an independent copyright agency would also give Congress something it has never had before, a dedicated agency that is capable of absorbing more of the detail and administration of the copyright code.[15]  This is a considerable advantage for a law that is both critical to the economy and invariably complex, not only for individual members of the public, but also for the many authors, businesses, and public interest

---

[14] We should recognize that, over the years, the Library has offered a form of shelter to the Copyright Office with respect to its legal work and policy analyses, and that multiple Librarians have exercised a largely hands-off approach with respect to this portion of the Register's portfolio.  This deference helped the Copyright Office "to be an independent voice for ensuring balanced treatment of copyright-related matters."  *The Omnibus Patent Act of 1996: Hearing on S. 1961 Before the S. Comm. on the Judiciary*, 104th Cong. 18 (1996) (statement of Marybeth Peters, Register of Copyrights, quoting a letter to Sen. Hatch from the library, book publishing, and scholarly communities) ("1996 Hearing").  The same result can be achieved by creating an independent agency, albeit one with greater responsibilities and safeguards appropriate to the digital age.

[15] *See, e.g.*, 2015 USCO Hearing, oral testimony at 1:19:56 (statement of Lisa Dunner) ("if the Copyright Office had more autonomy and was given more control over its own rules and regulations I think it would have great improvements to the Act . . . if the Copyright Office had the strongest voice where its rules and regulations were given more deference it would ultimately help to clear up the Act."); *see also* Sandra M. Aistars, *The Next Great Copyright Act, or a New Great Copyright Agency? Responding to Register Maria Pallante's Manges Lecture*, COLUM. J. L. OF L. & THE ARTS at 304 (forthcoming 2015) (entered into the 2015 USCO Hearing record by Rep. Nadler) (noting that "empowering an entity to exercise appropriate regulatory authority could serve an important role and reduce the need for and scope of legislative action").

The possibility of using regulations to improve copyright law has been considered since the beginning of the copyright review process, and before.  *See The Register's Call for Updates to U.S. Copyright Law: Hearing Before the H. Subcomm. on Courts, Intell. Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 35 (2013) (incorporating *The Next Great Copyright Act* Manges lecture) ("As more than one professor has noted, the Office has had very little opportunity to apply its expertise, leading Congress to write too much detail into the code on matters that are constantly changing, such as economic conditions and technology.").

organizations that must regularly navigate and apply it.  Moreover, creating an independent agency does not necessarily preclude later steps, for example, congressional consideration of an Intellectual Property Office, along the lines of previous congressional thinking on this subject.[16]

Although the Copyright Office is a small operation and would be a rather small agency, we see this as a significant benefit.  An independent agency configuration would allow the Copyright Office to operate in a lean and innovative manner that befits the innovative needs of the copyright system.  The Copyright Office could control its own budget and apply its fees in a targeted manner that does not dilute its mission or statutory duties.  It could also harness synergies from across the government.  For example, in the federal government today, there is no reason that the Copyright Office could not share or purchase services from other agencies, including office space, financial systems, cloud services, and other needs.  At the same time, the Copyright Office would be much better able to harness the considerable talents of the copyright community, particularly when investing in the enterprise architecture, data management strategies, and business-to-business services that copyright stakeholders require.

Congress is in an exciting situation here.  It has an opportunity to position the Copyright Office to act nimbly and efficiently, and in doing so to facilitate the extraordinary digital economy of the United States.  As the witnesses noted, a well-functioning Copyright Office that is able to effectively service its constituents would produce significant benefits to the United States, including by generating "a large number of new copyright transactions,"[17] "more licensed projects,"[18] and "increased registration[s]."[19]  In short, a "properly-functioning Copyright Office would be just a huge boon to the U.S. economy, to the creative community, and certainly to the public."[20]

Although the costs of a small agency are difficult to assess, they are surely manageable, especially when considered with the possibility of new fee models.[21]  At Congress's direction, my staff and I would be pleased to create and submit a summary of other financial considerations.  Otherwise, at this very early stage in the discussion, we would

---

[16] *See* Omnibus Patent Act of 1996, S. 1961, 104th Cong. (1996) (legislation that would have established a single government corporation to formulate policy and administer patents, trademarks, and copyrights). Senator Hatch stated that it would be difficult to increase the Copyright Office's executive powers, given its current "anomalous position in the legislative branch."  1996 Hearing, at 2 (statement of Sen. Orrin Hatch, Chairman, S. Comm. on the Judiciary).

[17] 2015 USCO Hearing, oral testimony at 1:34:30 (statement of Robert Brauneis).

[18] *Id*. at 1:34:42 (statement of Nancy Mertzel).

[19] *Id*. at 1:35:04 (statement of Lisa Dunner).

[20] *Id*. at 1:35:17 (statement of Keith Kupferschmid).

[21] *Id*. at 1:04:39 (witnesses discussing potential fee differentiation).

observe that any new plan should accomplish three things: (1) it should codify Congress's decision regarding leadership and reorganization; (2) it should include an effective date for any change as well as a transition period for operations; and (3) it should require agency leaders to commission and present short-term and long-term priorities and investment justifications, including on such issues as office space, data centers, staffing priorities, and urgent IT expenditures.[22]  We know that other agencies and businesses in the copyright and technology sectors, which are extraordinarily talented and forward-thinking, have already expressed an interest in helping and would be invaluable to leaders undertaking these processes.

### Creating a Sub-Agency

Some have suggested that the Register could be a Presidential appointee within a sub-agency of the Library of Congress.  This approach would be an improvement over the current structure.  For example, it would help with certain accountability issues,[23] and it would presumably provide the Register with more of a voice in appropriations requests, technology investments, and other management decisions that affect Copyright Office staff.  However, this model would leave other concerns unresolved.  The Librarian would remain the constitutional head of the agency and the copyright system, and the Register would not necessarily have autonomy over copyright policy and regulations.[24]  The Register also would not be able to appoint inferior officers—for example, judges on a small copyright claims court, if Congress decided to create such a body—because the Register would not be considered a Head of Department for purposes of the Appointments Clause.[25]  These positions would instead be accountable to the Librarian, and, perhaps more to the point, it would unambiguously make the Librarian, and therefore the entire Library of Congress, part of the executive branch.

---

[22] The question of funding has arisen throughout congressional discussion of the Copyright Office, with Members stating that the Copyright Office should be fully funded.  *See*, *e.g.*, *U.S. Copyright Office: Hearing Before the Subcomm. on Courts, Intell. Prop., & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 25 (2014) ("2014 USCO Hearing") (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("And most importantly, a strong copyright system requires that we fully fund the Copyright Office, and in that regard the Chairman of this Committee, Bob Goodlatte, joins me in supporting that idea.").  More specifically, Members have inquired about the need for funds for the Copyright Office's IT needs, including the scope of necessary funding.  *See*, *e.g.*, *id*. at 44 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intell. Prop., & the Internet).

[23] 2015 USCO Hearing, oral testimony at 1:21:36 (statement of Keith Kupferschmid) (noting that a presidential appointment would help with transparency and accountability).

[24] Lisa Dunner, speaking on behalf of the American Bar Association Section of Intellectual Property Law, observed that the "Librarian's broad authority over Copyright Office functions is problematic on multiple levels," including because the Librarian need not be a copyright expert.  *Id*. at 0:49:11.

[25] *See*, *e.g.*, *Intercollegiate Broad.*, 684 F.3d 1332 (discussing Appointments Clause issues, including that Heads of Departments may appoint inferior officers).

In general, Congress could indicate its preference that the Library remove the sub-agency from central Library priorities and workloads, especially if these would present a legal or practical conflict, *i.e.*, participating in Library committees regarding acquisitions strategies or budget needs. This would be helpful because Copyright Office staff are frequently called upon to support the Library's broader mission, including participating in agency–wide protocols and projects that have little to do with administering the Copyright Act.

Nonetheless, in a sub-agency, it would still be the case that the Librarian could, in his or her discretion, exert influence or control over the Register's management or policy decisions. This is not necessarily an unusual dynamic within large or cabinet-level agencies, but in this case, where the Librarian's primary duty is always going to be the agency's mission as a library, it would be difficult for Congress to protect against either a real or potential conflict of interest.[26]  Congress could not enact a legal wall between the two parts of the agency, as is sometimes done to deal with potential conflicts of interest within an institution, because this would effectively remove the Librarian from the very role he or she is constitutionally responsible for as the agency head.  It is therefore difficult to imagine how a sub-agency would stabilize or solve the current problems for very long.

<div align="center">*Considering the Department of Commerce*</div>

Although witnesses spoke against the possibility[27] and the Copyright Office does not recommend it, Congress could relocate the Copyright Office to the Department of Commerce as a sibling to the U.S. Patent and Trademark Office.  This would ameliorate constitutional concerns and combine the administration of intellectual property laws under one roof.  Congress would need to be clear about the longstanding policy role of the Register, which otherwise could be compromised or even eliminated, as the case may be, depending on how reporting lines are established.

---

[26] Although the Librarian serves at the pleasure of the President, Librarians have enjoyed lengthy careers and tenures in modern times.  Current Librarian of Congress James H. Billington was appointed in 1987 by President Reagan, and former Librarian Lawrence Quincy Mumford served from 1954-1974.  Additionally, while the President has the power to remove the Librarian, this has happened only rarely.  *See About the Librarian, Previous Librarians of Congress, George Watterston and John Silva Meehan*, *available at* http://www.loc.gov/about/about-the-librarian/previous-librarians-of-congress/george-watterston/ *and* http://www.loc.gov/about/librarianoffice/meehan.html (upon election to the presidency, both President Andrew Jackson and President Lincoln removed the Librarian of Congress).

[27] *See* 2015 USCO Hearing, oral testimony at 2:25:23 (statement of Rep. Hakeem Jeffries, Member, H. Comm. on the Judiciary) (asking whether placing the Copyright Office within the Department of Commerce or combining it with the U.S. Patent and Trademark Office would present "incompatibility problems"); *id*. at 2:25:52 (statement of Nancy Mertzel) (noting that placing the Copyright Office in the Department of Commerce or incorporating it into the U.S. Patent and Trademark Office "feels a little bit like back to the future because it came up twenty-two years ago," and further noting that patents, trademarks, and copyrights have very different legal schemes, and combining them would cause funding challenges).

On a different point, Congress would want to consider whether the copyright law itself would be lost or compromised in an agency as large as Commerce—specifically whether administrative and policy priorities would be subsumed.  And, while Congress (and for that matter the Department of Justice) would still have access to a Copyright Office located in the Department of Commerce, the Copyright Office's views would not be independent.  Rather, its policy advice and legal interpretations would be subject to the coordination, clearances, and, as applicable, restraints that are normal for executive branch officials.  This would fundamentally change the role the Copyright Office has always played in the copyright system generally and with Congress specifically.[28]  Additionally, as former Register Marybeth Peters noted when testifying two decades ago, copyright law and policy go beyond promoting commerce and, indeed, have "a unique influence on culture, education, and the dissemination of knowledge," and "may be slighted if . . . wholly determined by an entity dedicated to the furtherance of commerce."[29]

*Honoring the Library of Congress*

We would also make a point that was not raised at the hearing.  An independent agency would ensure the most flexibility to continue the Copyright Office's relationship with the Library of Congress, which is the beneficiary of mandatory deposit provisions administered by the Register as well as certain works submitted by authors and other copyright owners for registration purposes.  Although both of these provisions must be recalibrated for the digital age, we can assume that they will continue to exist in some form.  The Register and the Librarian will therefore need to continue to work together on regulatory parameters and practices, either informally or through statutorily mandated committees or consultations.[30]  At the core, what we are recommending is that Congress codify the structure that many assume to be the case already, by conferring independent agency

---

[28] "Among other key duties, the Register serves as the principal adviser to Congress on matters of copyright law and policy."  2014 USCO Hearing, at 27 (statement of Rep. Howard Coble, Chairman, Subcomm. on Courts, Intell. Prop., & the Internet).  The Copyright Office "provides expert copyright advice to Congress . . . and the Office recommends much-needed improvements to the copyright system based on its research and analysis."  2015 USCO Hearing, oral testimony at 0:32:43 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary).

[29] 1996 Hearing, at 19, 24 (prepared statement of Marybeth Peters, Register of Copyrights).

[30] Congress has already created statutory relationships between the Copyright Office and other federal entities.  For example, the Undersecretary of Commerce for Intellectual Property (who is also the Director of the U.S. Patent and Trademark Office), a Senate-confirmed advisor to the President on intellectual property, must by law "consult with the Register of Copyrights on all copyright and related matters."  35 U.S.C. § 2(c)(5) (2014).  Likewise, the Register serves as a statutory advisor to the Intellectual Property Enforcement Coordinator, a Senate-confirmed position that was created by Congress in 2008 and is in the Executive Office of the President.  15 U.S.C. § 8111(a), (b)(3) (2014).

status on the Copyright Office and making it a partner with, rather than a subordinate to, the Library.

The Library, of course, is a singularly important bibliographic institution known around the world for its unparalleled collections, curators, and scholars. Many Librarians and many Registers over the years have worked together appropriately and respectfully, to the mutual benefit of the public. Concerns about how to position the Copyright Office for the digital age certainly should not be framed as criticism of the Library. These issues more aptly reflect the unprecedented importance and complexity of the copyright law in modern times.

*Conclusion*

My staff and I are indebted to the Committee for its timely attention to the nation's copyright system, including the United States Copyright Office. It is a privilege to assist with the forward-thinking questions you are exploring and addressing. At your request, we would be pleased to provide additional documentation or analysis in support of the operational and policy views expressed above.

Respectfully,

Maria A. Pallante
Register of Copyrights and Director
U.S. Copyright Office

cc: Hon. Bob Goodlatte
    Chairman
    U.S. House of Representatives, Committee on the Judiciary
    2138 Rayburn House Office Building
    Washington, DC 20515

# Exhibit D

**AAE**
SPEAKERS

1.800.698.2536    Login

Your Location:   Home   >   About AAE

# ABOUT AAE

All American Entertainment (AAE) is a full-service talent booking agency, specifically focused on the needs of event professionals looking to book keynote speakers and corporate entertainment for their events. Our mission is to provide a best-in-class talent booking experience from start to finish. We connect audiences with innovative minds and powerful messages, regardless of the industry. Our team thrives on keeping up with the latest trends and forward thinkers in order to identify and book the best keynote speakers for every client and every specific event. We love what we do, and we are passionate about helping our clients create the most successful event time and time again.

Contact Us

## LEADERSHIP

The idea for the company that would later become All American Entertainment was hatched in 2002. Our founder, Greg Friedlander, was working as a sports agent in New York City, a position in which he dealt with top speakers bureaus, advertising agencies, and public relations firms. He quickly realized there was a power disparity between agents and organizations wanting to work with high profile talent. Deals tended to be one-sided and significantly in favor of the talent.

Recognizing this gap in the market and rejecting the inevitable conflict of interest when a company tries to represent both the talent buyer and the talent themselves, Greg decided to start a booking agency that exclusively focused on representing the interests of talent buyers.



## COMPANY GROWTH



Thanks to 15+ years of exponential growth, All American Entertainment is one of the largest full-service talent booking agencies in the world today. We exclusively represent the interests of event professionals and meeting planners to identify and secure high-profile speakers, celebrities, and entertainers for personal appearances, speaking engagements, and endorsements.

We have had the privilege of representing more than half of the Fortune 500, over 300 Universities, and numerous top associations, meeting planners and non-profits, resulting in 5,000+ bookings in more than 60 countries and all 50 states. Thanks to our success, AAE has grown to employ an amazing team of 30 dedicated professionals. Meet Our Team >>



## WHY WORK WITH US

All American Entertainment is changing the game for how event professionals book speakers. Instead of exclusively representing talent, we focus on the different needs of our clients and offer unbiased recommendations for the best possible keynote speakers, celebrities, and entertainers. Thanks to this unique approach, our clients have access to virtually any speaker or celebrity regardless of their speaking agency or exclusive bureau affiliation.

At all times, clients can be assured that we have no conflicts of interest and no motivation other than to build long-term relationships by providing excellent customer service and acting as an advocate and partner throughout the entire booking process. Read more >>



**Contact Us**

## OUR CLIENTS

We partner with our clients to find the best speaker for each specific event, taking into account event type, theme, budget and location. Our #1 goal is to make event planners' job easier, more efficient and more enjoyable. To achieve this, we provide access to the world's largest database of speakers, plus tools and hands-on support throughout every stage of the booking process.

Our approach to booking speakers is driven by an unwavering dedication to event planners. We help our clients select, book, and execute events with speakers and entertainment that will leave a lasting impact on their audiences. An effort that is reflected in the fact that 96% of our clients would recommend us to others.

View Client

## AWARDS & ACCOLADES

All American Entertainment is regularly receiving national and regional recognition for our growth as a top speakers bureau, and for our highly regarded workplace culture. We are excited to rank on the Inc. 5000 of America's Fastest-Growing Private Companies, and proud to be recognized by both Inc. Magazine and Triangle Business Journal as one of the Best Places To Work.

Take a look at some of our most recent awards and accolades. Read more >>



About | All American Speakers Bureau

## TALK TO US ABOUT YOUR EVENT

Please fill out the form below

**All American Speakers Bureau**, a division of All American Entertainment (AAE), is a full-service talent booking agency dedicated to representing the interests of meeting and event planners. We respect the different needs of our clients and offer unbiased recommendations for the best possible keynote speakers, celebrities, and entertainers.

Looking for the perfect speaker for your event? Trying to find the right celebrity to represent your brand or make a personal appearance?

Our extensive relationships and reputation in the industry allow us to book virtually any speaker or celebrity in the world.

Name *

Email Address *

Phone Number

Organization

Event Location

Event Budget

Tell us about your event

SUBMIT

Contact Us

### Popular Topics

| | |
|---|---|
| Business Speakers | Political Speakers |
| Celebrity Speakers | Sales & Marketing |
| Diversity Speakers | Sports Speakers |
| Education Speakers | Technology Speakers |
| Health & Wellness | TED Speakers |
| Leadership Speakers | University Speakers |
| Motivational Speakers | Women Speakers |

### Talent Finder

| | |
|---|---|
| Advanced Search | Author Catalog |
| Keynote Speaker Lists | Entertainment Catalog |
| Speakers by Fee | Music Catalog |
| Speakers by Industry | Speakers Catalog |
| Speakers by Location | Sports Catalog |
| Speakers by Topics | |

### About AAE

| | |
|---|---|
| About Us | AAE Advantage |
| Testimonials | Our Philosophy |
| Speakers Bureau FAQs | Contact Us |
| Speaker News & Blog | |

### Quick Links

| | |
|---|---|
| Speakers Bureau Home | Request Booking Info |
| Event Planner Resources | View all Speakers |
| Weekly TV Shows Lineups | Client Login |
| Motivational Speakers Bureau | |

AAE is one of the premier celebrity booking agencies and top keynote speakers bureaus in the world.

Let us help you find the perfect motivational speaker, celebrity, or entertainer for your next corporate event.



Copyright © 2020 All American Speakers Bureau. All rights reserved.

Sitemap  |  Privacy Policy

# Exhibit E

Carla Hayden Speaker & Booking Agent | Bureau and Speaking Fee



# CARLA HAYDEN

*14th Librarian of Congress, Former President of the American Library Association (ALA)*



✈ **Washington, DC, USA**

$   Live Event: **Please Contact** ⓘ
     Virtual Event: **Please Contact**

⛃ **Categories:**

_____   _____   ____   _____   _____

REQUEST BOOKING INFORMATION

✎ Carla Hayden Biography

Carla Hayden was sworn in as the 14th Librarian of Congress on September 14, 2016. Hayden, the first woman and the first African American to lead the national library, was nominated to the position by President Barack Obama on February 24, 2016, and her nomination was confirmed by the U.S. Senate on July 13.

Prior to her latest post she served, since 1993, as CEO of the Enoch Pratt Free Library in Baltimore, Maryland. Hayden was nominated by President Obama to be a member of the National Museum and Library Services Board in January 2010 and was confirmed

| 1.800.698.2536 | CONTACT US |



☰　　Login

1.800.698.2536

Your Location:　Home　>　Speakers　>　Alex Karp

🖨　|　⭐



# ALEX KARP

*Co-founder and Chief Executive Officer of Palantir Technologies*

✈ **Travels From:**　Please Contact

$ **Speaking Fee:**　Live Event: Please Contact ⓘ
　　　　　　　　　　Virtual Event: Please Contact

⛓ **Categories:**　Government, Political Speakers, Technology Speakers

| 📋 PROFILE | NEWS | | 📅 CHECK AVAILABILITY |

## Alex Karp Biography

Dr. Alex Karp is co-founder and Chief Executive Officer of Palantir Technologies. Prior to Palantir, Dr. Karp founded the Caedmon Group. He earned his law degree from Stanford University and his Ph.D. from the University of Frankfurt, Germany. A U.S. citizen, Dr. Karp is bilingual in English and German, and also speaks French.

**Contact a speaker booking agent** to check availability on Alex Karp and other top speakers and celebrities.

---

### FAQs on booking Alex Karp　　　　　　　　　　　　　　　⌄

---

## Speakers Similar to Alex Karp

   

‹　　Peter Thiel　　　　Marc Andreessen　　　Brian Chesky　　　›

This website is a resource for event professionals and strives to provide the most comprehensive catalog of thought leaders and industry experts to consider for speaking engagements. A listing or profile on this website does not imply an agency affiliation or endorsement by the talent.



≡   **AAE** SPEAKERS      1.800.698.2536   Login

Your Location:   <u>Home</u>  >  <u>Speakers</u>  >  Ari Emanuel

 |  ★



# ARI EMANUEL

*Co-CEO and Director of William Morris Endeavor Entertainment Agency*

✈ **Travels From:**   Beverly Hills, CA, USA

$ **Speaking Fee:**   Live Event: <u>Please Contact</u> ⓘ
            Virtual Event: <u>Please Contact</u>

⊟ **Categories:**   <u>Arts & Humanities</u>, <u>Creativity Speakers</u>

| 🗐 PROFILE | VIDEOS | |  📅 CHECK AVAILABILITY |

## Ari Emanuel Biography

Ari Emanuel is co-CEO and director of William Morris Endeavor Entertainment agency, one of the world's top global talent agencies. He is also co-founder of Raine Group, a boutique bank whose private equity fund investors include Facebook founding president Sean Parker and former Google CEO Eric Schmidt. Emanuel has been ranked #4 on the Entertainment Weekly "Smartest People in Hollywood" list and also serves as the basis for the character Ari Gold on HBO's hit-series Entourage.

**Contact a speaker booking agent** to check availability on Ari Emanuel and other top speakers and celebrities.

## Ari Emanuel Videos

      

**Ari Emanuel & Patrick Whitesell - US Zeitgeist 2010**    **Ari Emanuel speaks at Abu Dhabi Media Summit 2012 - YouTube**    **Lab School Gala - Speech by Ari Emanuel - YouTube**

**See All Videos »**

**Speaker Lists Featuring Ari Emanuel**   ⌄

**FAQs on booking Ari Emanuel**   ⌄

Case 3:20-cv-01596-VC   Document 103   Filed 09/22/20   Page 85 of 264



1.800.698.2536   Login

Your Location:   **Home**   ›   **About**   ›   Request Booking Info

**See Full Speaker Profile »**

| Information from WikiPedia |
|---|

### Ben Affleck



Affleck at the 2017 San Diego Comic-Con

| | |
|---|---|
| Born | Benjamin Géza Affleck-Boldt<br>August 15, 1972 (age 48)<br>Berkeley, California, U.S. |
| Alma mater | Occidental College |
| Occupation | Actor<br>director<br>producer<br>writer |
| Years active | 1981–present |
| Works | Full list |
| Political party | Democratic |
| Spouse(s) | Jennifer Garner |

## Have questions? Need speaker recommendations?

**Connect with an agent today:**

 1-800-698-2536

✉ Send a message

## REQUEST BOOKING INFO ON BEN AFFLECK

We are happy to assist you with your interest in booking **Ben Affleck** for your next live or virtual event. Please provide details about your organization, the type of event, or the talent you would like to secure, and an agent will be in touch shortly.

Feel free to call us at **1-800-698-2536** if you need immediate assistance.

## Tell us about your event!

*During normal business hours, we respond to most inquiries within 4 hours.*

Ben Affleck

Event Date

Case 3:20-cv-01596-VC　　Document 103　　Filed 09/22/20　　Page 86 of 264



☰ 　 **AAE** SPEAKERS　　　　　　　　　　　1.800.698.2536　　Login

Your Location:  Home　>　 Speakers　>　Bill Gates

🖶 | ⭐



# BILL GATES

*Co-Founder of Microsoft; Co-Chair of the Bill & Melinda Gates Foundation*

✈ **Travels From:**　Seattle, WA, USA

$ **Speaking Fee:**　Live Event: $100,000 - $200,000 ⓘ
　　　　　　　　　　　Virtual Event: Please Contact

⛭ **Categories:**　Authors, Business Leaders, Education, Entrepreneurism,
　　　　　　　　　Innovation, Inspirational Speakers, Technology Speakers,
　　　　　　　　　TED, University Speakers, Viral Marketing

| 📋 PROFILE | VIDEOS | NEWS |　　　　　　　　📅 CHECK AVAILABILITY

## Bill Gates Biography

Bill Gates is one of the best-known entrepreneurs and pioneers of the microcomputer revolution of the 1970s and 1980s. Gates is known for co-founding Microsoft Corporation. During his career at Microsoft, Gates held the positions of chairman, chief executive officer (CEO), president and chief software architect, while also being the largest individual shareholder until May 2014. After stepping down from Microsoft, Gates has pursued a number of philanthropic endeavors.

In 1975, Gates and Paul Allen co-founded Microsoft, which became the world's largest PC software company. During his career at Microsoft, Gates held the positions of chairman, CEO and chief software architect, while also being the largest individual shareholder until May 2014. Gates stepped down as CEO of Microsoft in January 2000, but he remained as chairman and created the position of chief software architect for himself. In June 2006, Gates announced that he would be transitioning from full-time work at Microsoft to part-time work and full-time work at the Bill & Melinda Gates

Read more +

## Bill Gates Videos



**How the pandemic will shape the near future | Bill Gates**

Bill Gates talks best (and worst) case scenarios for the coronavirus pandemic in the months ahead, explaining the challenges of reducing virus...



**Bill Gates and Stephanie Mehta - Aspen Ideas Festival**

Since its founding, the Bill & Melinda Gates Foundation has committed billions of dollars to the search for and distribution of vaccines across the...



**Talking Tech and 2020 with Bill Gates!**

Bill Gates is Back! We talk YouTube, Porsche Taycan, Coronavirus and tackling his inbox.



☰  **AAE** SPEAKERS                                          1.800.698.2536   Login

Your Location: <u>Home</u>  >  <u>Speakers</u>  >  Bob Iger

 | 



# BOB IGER

*Former Chairman & CEO of Walt Disney Co.*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: <u>$100,000 - $200,000</u> ⓘ
                      Virtual Event: $50,000 - $100,000

👥 **Categories:**   <u>Architecture and Design</u>, <u>Arts & Humanities</u>, <u>Business Growth</u>, <u>Creativity Speakers</u>, <u>Economy and Finance</u>, <u>Entertainment</u>, <u>Futurists</u>, <u>Innovation</u>, <u>Leadership Speakers</u>, <u>Sales, Marketing and Branding</u>, <u>Virtual Speakers</u>

| PROFILE | VIDEOS | NEWS |                                    📅 CHECK AVAILABILITY

## Bob Iger Biography

Robert A. Iger is the former Chairman and Chief Executive Officer of The Walt Disney Company. In 2020, he was succeeded by Bob Chapek. As Chairman and CEO, Mr. Iger was the steward of the world's largest media company and some of the most respected and beloved brands around the globe. His strategic vision for The Walt Disney Company focused on three fundamental pillars: generating the best creative content possible; fostering innovation and utilizing the latest technology; and expanding into new markets around the world. Mr. Iger has built on Disney's rich history of unforgettable storytelling with the acquisition of Pixar (2006), Marvel (2009), and Lucasfilm (2012), three of the entertainment industry's greatest storytelling companies. Always one to embrace new technology, Mr. Iger has made Disney an industry leader through its creative content offerings across new and multiple platforms.

Mr. Iger officially joined the Disney senior management team in 1996 as Chairman of the Disney-

Read more +

## Bob Iger Videos



Bob Iger: Never Been a Better Time for Content Creators - YouTube



Bob Iger Disney - YouTube



Leaders on Leadership: Bob Iger - YouTube

See All Videos »

## Speaker Lists Featuring Bob Iger                                             ⌄

https://www.allamericanspeakers.com/speakers/395982/Bob-Iger                                            1/3

Your Location:   Home  /  Speakers  /  Brewster Kahle



# BREWSTER KAHLE  ★★★★★ 1 rating

*Keynote Speaker: Founder & Director, The Internet Archive; Inventor, Philanthropist, Digital Librarian & Internet Advocate & Entrepreneur*

✈ **Travels From:**   San Francisco, CA, USA

$ **Speaking Fee:**   Live Event Fee: Below $10,000
                      Virtual Event Fee: Below $10,000

🖧 **Categories:**     Science & Technology, STEM, Entrepreneurship

| Profile | Video | Reviews | News |

🗓 CHECK AVAILABILITY

## Brewster Kahle Biography

Brewster Kahle, Digital Librarian and Founder of the Internet Archive, has been working to provide universal access to all knowledge for more than 25 years.

Kahle's stated goal is "Universal access to all knowledge," and his catalog of inventions and institutions created for this purpose read like a Web's Greatest Hits list. Since the 1980s, Kahle has focused on developing technologies for information discovery and digital libraries. In 1982 he helped start Thinking Machines, a supercomputer company specializing in text searching and would go on to invent the Internet's first publishing and distributed search system, WAIS (Wide Area Information Server), whose customers included the New York Times and the United States Senate.

In 1996, Kahle founded the Internet Archive which may be the largest digital library. At the same time, he co-founded Alexa Internet which helps catalog the Web in April 1996, which was sold to Amazon.com in 1999. In 2012, Kahle and banking veteran Jordan Modell created the Internet Archive Federal Credit Union.

*Read More +*

## Brewster Kahle Videos


Brewster Kahle: A digital library, free to the world


Bitcoin 2013 conference - Brewster Kahle, Jordan Modell - Internet ...


An Interview with Brewster Kahle - YouTube

*See All Videos »*

**Brewster Kahle Books**                                              ⌄

**FAQs on booking Brewster Kahle**                                    ⌄

## Speakers Similar to Brewster Kahle



☰  **AAE**
   SPEAKERS

1.800.698.2536   | Login |

Your Location: __Home__ > __Speakers__ > Christopher Nolan

 | 



# CHRISTOPHER NOLAN

*British Film Director, Screenwriter and Producer*

✈ **Travels From:**   __Please Contact__

$ **Speaking Fee:**   Live Event: __$200,000 and above__ ⓘ
                      Virtual Event: __Please Contact__

⛶ **Categories:**   __Arts & Humanities__, __Producers and Directors__, __Television Personalities__

|  PROFILE | VIDEOS | NEWS |

 🗓 CHECK AVAILABILITY

## Christopher Nolan Biography

Christopher Nolan was born in London on July, 30th in 1970 as a child of a British father and an American mother. He began making war movies with his older brother Matt using his father's super 8mm camera and an assortment of male action figures. At the age of seven Star Wars came out and influenced him to do short science fiction films in the verge of George Lucas space saga.

Nolan was living in Chicago at that time and also made films together with Adrien and Roko Belic

While an undergraduate at University College in London his super 8mm surreal short "Tarantella" was shown in the US on PBS' "Image Union" in 1989. Nolan then studied English Literature at University College London. Meanwhile he continued making film, now at the college film society and in 16mm.

By the mid-90s, he had hooked up with Jeremy Theobald who appeared in the short movie"Larceny" (which was shown at the Cambridge Film Festival in 1996) and the three-minute surreal film

__Read more +__

## Christopher Nolan Videos



The Hateful Eight DGA Q&A with Quentin Tarantino and Christopher ...



Christopher Nolan: The full interview - Newsnight - YouTube



Christopher Nolan speach at handprint ceremony in Hollywood ...

__See All Videos »__

## Speaker Lists Featuring Christopher Nolan                     ⌄



Your Location: **Home** › **Speakers** › Dana Brunetti

 | 



# DANA BRUNETTI

*Producer Known For Works Like "The Social Network," "House of Cards" and the Upcoming "50 Shades of Grey"*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: $100,000 - $200,000 ⓘ
          Virtual Event: Please Contact

⛓ **Categories:**   Arts & Humanities, Producers and Directors

| PROFILE | VIDEOS | NEWS | | CHECK AVAILABILITY |
| --- | --- | --- | --- | --- |

## Dana Brunetti Biography

Dana Brunetti is an American film producer and social networking entrepreneur. He is the president of Trigger Street Productions.

Brunetti grew up in Covington, Virginia, but attended secondary school at Alleghany County High School. Brunetti left Covington in 1992 when he joined the U.S. Coast Guard. During his enlistment, Brunetti moved to New York. Later, he met actor Kevin Spacey through a chance introduction from a mutual friend while Brunetti was working at a startup digital wireless network company.

Shortly after that first introduction, Spacey hired Brunetti as his executive assistant. Brunetti worked with Spacey through several feature films, including 1999's "American Beauty" and 2001's "The Shipping News."

In 2001, Brunetti transformed Spacey's Trigger Street Productions website into a platform for young

Read more +

## Dana Brunetti Videos



"House Of Producer Dana Brunetti On What Hollywood Can ...



Web Summit 2014 Day Two - Dana Brunetti and Matt Garrahan ...



WEBN Interviews Dana Brunetti - YouTube

See All Videos »

## FAQs on booking Dana Brunetti   ⌄



☰  **AAE** SPEAKERS

1.800.698.2536    Login

Your Location: <u>Home</u>  ›  <u>Speakers</u>  ›  Eric Trump

 | 



# ERIC TRUMP

*Executive Vice President of The Trump Organization & Philanthropist*

✈ **Travels From:**   New York, NY, USA

$ **Speaking Fee:**   Live Event: <u>$50,000 - $100,000</u> ⓘ
Virtual Event: <u>Please Contact</u>

⛭ **Categories:**   <u>Entertainers</u>, <u>Health and Wellness</u>, <u>Reality TV Stars</u>

 PROFILE    VIDEOS

 CHECK AVAILABILITY

## Eric Trump Biography

Eric Frederick Trump is an American businessman, philanthropist, and former reality television personality. He is the third child and second son of President Donald Trump.

A fourth-generation businessman, he currently serves as a trustee and executive vice president of The Trump Organization, running the company alongside his older brother Donald Jr. He also served as a boardroom judge on his father's TV show *The Apprentice* from 2010 to 2015.

Eric F. Trump joined the Trump Organization in 2006 after graduating with honors from Georgetown University with a degree in Finance and Management and a minor in Psychology.

As the Executive Vice President of Development and acquisitions, Eric Trump is actively involved in all aspects of real estate development, both nationally and internationally. From the initial acquisitions and development partnership to final design, sales, and marketing functions, Eric Trump plays a

Read more +

## Eric Trump Videos



Eric Trump's entire Republican convention speech - YouTube

See All Videos »

## FAQs on booking Eric Trump          ⌄



☰    **AAE** SPEAKERS       **1.800.698.2536**    Login

Your Location:   Home   ›   Speakers   ›   George Lucas

 



# GEORGE LUCAS

*Filmmaker & Director; Best Known as the Creator of the "Star Wars" Saga*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: $200,000 and above ⓘ
Virtual Event: Please Contact

⛓ **Categories:**   Arts & Humanities, Authors, Entertainers, Health and Wellness, Producers and Directors

| PROFILE | VIDEOS | NEWS |   | 📅 CHECK AVAILABILITY |

## George Lucas Biography

George Walton Lucas, Jr. is an American filmmaker, creator of the film sagas of "Star Wars" and "Indiana Jones," and former president of Lucasfilm Limited, LucasArts Entertainment Company, Lucas Digital Ltd, Lucas Licensing, LucasBooks and Lucas Learning Ltd. He was considered, for two consecutive years, the fourth most powerful person in the entertainment industry, behind the owners of Time Warner, Turner and Steven Spielberg.

Upon graduating from the University of Southern California in 1967, Lucas co-founded American Zoetrope with his fellow filmmaker Francis Ford Coppola. Around the time of his graduation, when he was 23, Lucas was also drafted for the Vietnam War. However, during his physical, the doctors discovered that he had Type 2 diabetes and told him that he couldn't go. Lucas wrote and directed "THX 1138" (1971), based on his student short Electronic Labyrinth "THX 1138 4EB," which was a critical success, but a financial failure. His next job as a screenwriter-director was the movie

Read more +

## George Lucas Videos



**A Conversation with George Lucas and Michael Eisner**

Director George Lucas and Aspen Institute Trustee Michael Eisner discuss the LucasFilm Lmtd. sale to Disney, Lucas' early days in cinema and his...



**George Lucas Inspirational Speech - Creator of Star Wars**

George Lucas Inspirational Speech - Creator of Star Wars. George Lucas is a writer, producer and director known for his creation of the...



☰ **AAE** SPEAKERS

1.800.698.2536 | Login

Your Location: <u>Home</u> › <u>Speakers</u> › James Murdoch

🖨 | ⭐



# JAMES MURDOCH

*CEO, 21st Century Fox*

✈ **Travels From:** <u>Please Contact</u>

$ **Speaking Fee:** Live Event: <u>Please Contact</u> ⓘ
Virtual Event: <u>Please Contact</u>

🗂 **Categories:** <u>Business Speakers</u>

 PROFILE | NEWS

📅 **CHECK AVAILABILITY**

## James Murdoch Biography

James Murdoch is Chief Executive Officer of 21st Century Fox, the world's premier portfolio of cable, broadcast, film, pay-TV and satellite assets. Mr. Murdoch has held a succession of leadership roles over his nearly two-decade career with the Company, culminating in his appointment to CEO in 2015. Over that period, he has been a key driver of the Company's domestic and international expansion, having previously served as Co-Chief Operating Officer, and, prior to that, as Chairman and CEO for Europe and Asia, as well as Chairman of BSkyB, Sky Deutschland, and Sky Italia, the businesses that now comprise the pan-European Sky group. His significant operational experience also includes tenures as CEO of both BSkyB and STAR, India's number one entertainment broadcaster.

As 21st Century Fox's Co-Chief Operating Officer, Mr. Murdoch had a broad purview across the Company's global portfolio of businesses, and direct responsibility for its cable and broadcasting networks and properties, which reach more than 1.8 billion subscribers every day. From 2011 to 2014

Read more +

### Speaker Lists Featuring James Murdoch ⌄

### FAQs on booking James Murdoch ⌄

## Speakers Similar to James Murdoch

‹                                                                                   ›

Case 3:20-cv-01596-VC   Document 103   Filed 09/22/20   Page 94 of 264



☰   **AAE** SPEAKERS        **1.800.698.2536**    Login

Your Location: <u>Home</u> | <u>Speakers</u> | Jeff Bezos

 | 



# JEFF BEZOS

*Founder and CEO of Amazon*

✈ **Travels From:**   Seattle, WA, USA

💲 **Speaking Fee:**   Live Event: <u>$200,000 and above</u> ⓘ
                   Virtual Event: <u>Please Contact</u>

🗂 **Categories:**   <u>Business Growth</u>, <u>Business Leaders</u>, <u>Innovation</u>,
               <u>Technology Speakers</u>, <u>TED</u>, <u>Virtual Speakers</u>

| 📋 PROFILE | VIDEOS | NEWS |

📅 **CHECK AVAILABILITY**

## Jeff Bezos Biography

Jeffrey Preston Bezos is an American technology and retail entrepreneur, investor, computer scientist, and philanthropist who is best known as the founder, chairman, and chief executive officer of Amazon.com, the world's largest online shopping retailer. The company began as an Internet merchant of books and expanded to a wide variety of products and services, most recently video streaming and audio streaming. Amazon.com is currently the world's largest Internet sales company on the World Wide Web, as well as the world's largest provider of cloud infrastructure services, which is available through its Amazon Web Services arm.

Bezos' other diversified business interests include aerospace and newspapers. He is the founder and manufacturer of Blue Origin (founded in 2000) with test flights to space which started in 2015, and plans for commercial suborbital human spaceflight beginning in 2018. In 2013, Bezos purchased The Washington Post newspaper. A number of other business investments are managed through Bezos

Read more +

## Jeff Bezos Videos



**JFK Space Summit: Fireside Chat with Jeff Bezos**

Jeff Bezos, Founder of Blue Origin, will join Ambassador Caroline Kennedy for a fireside chat about his vision for going to space to benefit Earth.



**Jeff Bezos At The Economic Club Of Washington**



**One of the Greatest Speeches Ever | Jeff Bezos**

Jeff Bezos's Life Changing Advice (Must Watch!!) The $160 billion dollar man share's his greatest advice with you.



&#9776;    **1.800.698.2536**    Login

Your Location:   <u>Home</u>  ›  <u>Speakers</u>  ›  Jon Feltheimer

 



# JON FELTHEIMER

*CEO, Lionsgate Entertainment*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: <u>Please Contact</u> ⓘ
                      Virtual Event: <u>Please Contact</u>

🗂 **Categories:**   <u>Entertainment</u>

 PROFILE    VIDEOS                        CHECK AVAILABILITY

## Jon Feltheimer Biography

During his 30-year entertainment industry career, Jon Feltheimer has held leadership positions at Lionsgate, Sony Pictures Entertainment and New World Entertainment and has been responsible for tens of thousands of hours of television programming and hundreds of films, including the global blockbuster Hunger Games franchise, the launch of the Divergent franchise and Academy Award winners Crash, Monster's Ball and Precious.

Mr. Feltheimer was named Chief Executive Officer of Lionsgate in March 2000. During his 14-year tenure as CEO, Lionsgate has grown from its independent studio roots into a leading next generation global content leader with a reputation for innovation. The Company's market capitalization has grown from $80 million in 2000 to nearly $4 billion today, and its revenue has increased more than 15 times over.

During Mr. Feltheimer's tenure as CEO, Lionsgate has established a reputation for leadership in films

<div align="right">Read more +</div>

## Jon Feltheimer Videos



**Keynote Speech - CTAM Summit**

<div align="right">See All Videos »</div>

## Speaker Lists Featuring Jon Feltheimer     ⌄

Your Location:   Home / Speakers / Jonathan Nolan



# JONATHAN NOLAN

*Keynote Speaker: Co-Creator, Co-Showrunner & Executive Producer of Westworld*

$ **Speaking Fee:**   Live Event Fee: $200,000 and above
Virtual Event Fee: Contact us for details

**Categories:**   Television & Film

| Profile | Video |

☑ CHECK AVAILABILITY

## Jonathan Nolan Biography

Jonathan Nolan crafts stories that explore both the power and mysteries of technology. As half of the visionary team propelling HBO's ground-breaking western sci-fi thriller Westworld, Nolan uses his popular television and film projects to examine subjects like artificial intelligence, human-machine relationships, and the ethics of machine learning. He saw early success (and an Academy Award nomination) by co-writing Memento alongside his brother, Christopher. As a writing team, the duo has also racked up writing credits for The Prestige, The Dark Knight, The Dark Knight Rises, and Interstellar. With his wife, Lisa Joy, Nolan runs production company Kilter Films. Nolan and Joy are currently working on Season 2 of Westworld while also juggling various film projects.

Jonathan "Jonah" Nolan is an English-American screenwriter, television producer, director and author. He is the creator of the science fiction television series Person of Interest (2011–2016) and co-creator of Westworld (2016–present).

He has collaborated on several films with his brother, director Christopher Nolan, who adapted Jonathan's short story "Memento

**Read More +**

## Jonathan Nolan Videos



Nouveau Science Fiction: The Screenwriter Jonathan Nolan ...

**See All Videos »**

## FAQs on booking Jonathan Nolan    

# Speakers Similar to Jonathan Nolan



☰ | 1.800.698.2536 | Login

Your Location: Home > Speakers > Larry Page

 | 



# LARRY PAGE

*CEO of Alphabet & Co-Founder of Google*

✈ **Travels From:** Los Altos, CA, USA

$ **Speaking Fee:** Live Event: $100,000 - $200,000 ⓘ
Virtual Event: Please Contact

⛭ **Categories:** Arts & Humanities, Authors, Business Leaders, Creativity Speakers, Innovation, Leadership Speakers, Media, Religion, Religious Speakers, Social Media and Social Networking, Technology, Technology Speakers, TED, Virtual Speakers

| 📋 PROFILE | VIDEOS | TOPICS | NEWS | | 📅 CHECK AVAILABILITY |

## Larry Page Biography

Larry Page was the former CEO and cofounder of Google, making him one of the ruling minds of the web. He is currently the CEO of Alphabet, the larger subsidiary of which Google is under.

Larry Page and Sergey Brin met in grad school at Stanford in the mid-'90s, and in 1996 started working on a search technology based on a new idea: that relevant results come from context. Their technology analyzed the number of times a given website was linked to by other sites — assuming that the more links, the more relevant the site — and ranked sites accordingly. In 1998, they opened Google in a garage-office in Menlo Park. In 1999 their software left beta and started its steady rise to web domination.

Beyond the company's ubiquitous search, including AdSense/AdWords, Google Maps, Google Earth and the mighty Gmail. In 2011, Page stepped back into his original role of chief executive officer. He now leads Google with high aims and big things, and finds time to devote to his projects like Google X, the idea lab for the out-there experiments that keep Google pushing the limits.

**Contact a speaker booking agent** to check availability on Larry Page and other top speakers and celebrities.

---

## Larry Page Videos



**Larry Page Commencement Speech at University of Michigan**
May 05, 2017 ... Larry Page Commencement Speech at



**Larry Page at Zeitgeist Americas 2011**



**Larry Page & Q&A with Eric Schmidt at Zeitgeist Americas 2011**

          1.800.698.2536    Login

Your Location: **Home** | **Speakers** | Matt Damon



# MATT DAMON

*Actor, Screenwriter & Producer; Co-Founder of Water.org; Expert Advocate on Global Water & Sanitation Crisis*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: $200,000 and above ⓘ
        Virtual Event: $200,000 and above

⛶ **Categories:**   Actors, Arts & Humanities, Entertainers, Green and
        Sustainability, Innovation, Politics, Producers and
        Directors, Virtual Speakers

| **📋 PROFILE** | **VIDEOS** | **NEWS** | | **📅 CHECK AVAILABILITY** |

## Matt Damon Biography

Matthew Damon is an American actor, film producer and screenwriter. He is ranked among Forbes magazine's most bankable stars and is one of the highest-grossing actors of all time. Damon has received various accolades, including an Academy Award from five nominations, two Golden Globe Awards from eight nominations, and has been nominated for three British Academy Film Awards and seven Emmy Awards.

Damon began his acting career by appearing in high school theater productions. He made his professional acting debut in the film *Mystic Pizza*. He came to prominence in 1997, when he wrote and starred in *Good Will Hunting*, alongside Ben Affleck, which won them the Academy and Golden Globe awards for Best Screenplay and earned Damon a nomination for the Academy Award for Best Actor. He continued to garner praise from critics for his roles as the eponymous character in *Saving Private Ryan*, the antihero in *The Talented Mr. Ripley*, a fallen angel in *Dogma* and *Jay and Silent Bob*

**Read more +**

## Matt Damon Videos

      

**Matt Damon Felt Very Foolish Walking on Set for 'Ford V Ferrari'**
I've just come off a long hiatus from acting and wrestling with a new perspective on life in the midst of grieving the loss of his father, Matt ...

**ENGLISH SPEECH | MATT DAMON: What We Do Matters (English ...**
Learn English with Matt Damon. Matt Damon gives a heartfelt commencement address at the Massachusetts Institute of Technology. Damon is ...

**Matt Damon's full commencement address at MIT - YouTube**
Matt Damon gives a heartfelt commencement address at the Massachusetts Institute of Technology.



☰   **AAE** SPEAKERS      1.800.698.2536    Login

Your Location:   <u>Home</u>   ›   <u>Speakers</u>   ›   Peter Thiel

 | 



# PETER THIEL

*Former CEO and Co-founder of PayPal; Technology Entrepreneur, Investor and Philanthropist*

✈ **Travels From:**   Palo Alto, CA, USA

$ **Speaking Fee:**   Live Event: <u>$100,000 - $200,000</u> ⓘ
             Virtual Event: <u>Please Contact</u>

⛭ **Categories:**   <u>Authors</u>, <u>Business Leaders</u>, <u>Economy and Finance</u>, <u>Entrepreneurism</u>, <u>Environmental Policy</u>, <u>Finance</u>, <u>Foreign Policy</u>, <u>Futurists</u>, <u>Health and Wellness</u>, <u>Healthcare and Medical</u>, <u>Innovation</u>, <u>International Business</u>, <u>Internet</u>, <u>Internet and New Media</u>, <u>Journalists</u>, <u>Leadership Speakers</u>, <u>Political Speakers</u>, <u>Politics</u>, <u>Public Policy</u>, <u>Science and Engineering</u>, <u>Social Media and Social Networking</u>, <u>Technology</u>, <u>Technology Speakers</u>, <u>Venture Capital</u>, <u>Virtual Speakers</u>

| 📋 PROFILE | VIDEOS | NEWS |      📅 CHECK AVAILABILITY |

## Peter Thiel Biography

As a venture capitalist and entrepreneur, Peter has been involved with some of the most dynamic companies to emerge from Silicon Valley in the past decade. Peters first start-up was PayPal, which he co-founded in 1998, and led as Chairman and CEO. Peters tenure culminated in PayPals sale to eBay for $1.5 billion in 2002. After the eBay acquisition, Peter founded Clarium Capital Management, a global macro hedge fund. Peter also helped launch Palantir Technologies, an analytical software company, and serves as the chairman of that companys board.

Before launching Founders Fund with his PayPal partners Ken Howery and Luke Nosek, Peter was an active venture capitalist in his personal capacity, funding companies like Facebook, where Peter was that companys first outside investor and director. Peters contributions to technology, entrepreneurship, and finance have been widely recognized, including by the World Economic Forum, which honored Peter as a Young Global Leader, and by BusinessWeek, which named him one of the

<u>Read more +</u>

## Peter Thiel Videos



**The World According to Thiel**

Peter Thiel, the co-founder of PayPal and Palantir; early investor in Facebook, LinkedIn, and SpaceX; and the founder of the Thiel Fellowship, which...



**Education as Signalling — Peter Thiel on the Economics and …**



**Peter Thiel on the Global Economy, the State of Our Technology …**



☰   **AAE** SPEAKERS      1.800.698.2536   Login

Your Location:   **Home**   ›   **Speakers**   ›   Reed Hastings

🖨 | ⭐



# REED HASTINGS

*Co-Founder & Co-CEO of Netflix, Advocate for Education Reform Through Creation of Charter Schools*

✈ **Travels From:**   San Francisco, CA, USA

$ **Speaking Fee:**   Live Event: $100,000 - $200,000 ⓘ
                Virtual Event: Please Contact

⛫ **Categories:**   Authors, Business Growth, Business Leaders, Business Speakers, Economy and Finance, Entrepreneurship, Innovation, Internet and New Media, Science and Technology, Technology Speakers, University Speakers, Virtual Speakers

| 📋 PROFILE | VIDEOS | NEWS | | 📅 CHECK AVAILABILITY |

## Reed Hastings Biography

Reed Hastings co-founded Netflix in 1997 and launched the subscription service in 1999. Netflix grew to one million subscribers in less than four years, and, as of April 2019, had over 148 million paid subscriptions worldwide, including 60 million in the United States.

Hastings has headed Netflix while the company underwent major changes, including the transition from a company focused on renting out DVDs to what is today primarily a streaming service, albeit one that still has an option for a subscription that includes DVD and Blu-Ray rentals. Today, Netflix is in transition once more, preparing for the saturation of the streaming service industry with more competitors.

In 2012, Netflix introduced "Lilyhammer," their first series, entering the content-production industry, which they are now dominant in. In 2016, Netflix released an estimated 126 original series and films, more than any other network or cable channel. Their Netflix originals include hits such as "Stranger

Read more +

## Reed Hastings Videos



**Netflix Co-Founder on CEO Reed Hastings: He's courageous and ...** Reed Hastings was named Yahoo Finance's CEO of the decade. Yahoo Finance's Zack Guzman, Brian Cheung and Netflix ...



**International Keynote – Reed Hastings | RTS Cambridge - YouTube** Netflix CEO Reed Hastings talks to Kirsty Wark about the investment in storytelling, production and talent which helps Netflix keep its crown...



**Reed Hastings | 7 Super Tips**



☰   **AAE** SPEAKERS                    1.800.698.2536    Login

Your Location:   Home   Speakers   Richard Branson

 | 



# RICHARD BRANSON   ⭐⭐⭐⭐⭐   5 out of 5

1 review

*Businessman, Founder of Virgin Group*

✈ **Travels From:**   British Virgin Islands

$ **Speaking Fee:**   Live Event: Please Contact ⓘ
Virtual Event: Please Contact

⛭ **Categories:**   Activists, Arts & Humanities, Business Leaders, Business Speakers, Corporate Responsibility, Creativity Speakers, Economy and Finance, Entertainment, Environmental Policy, Featured Business Speakers, Featured Celebrities, Featured Overall Speakers, Foreign Policy, Futurists, Generation Issues, Health and Wellness, Inspirational Speakers, Journalists, Media, Music, Pol Columnists and Journalists, Social Media and Social Networking, Technology, Technology Speakers, Virtual Speakers

|  PROFILE | VIDEOS | TOPICS |           CHECK AVAILABILITY

## Richard Branson Biography

Sir Richard Branson is a British business magnate, investor, author and philanthropist. He founded the Virgin Group in the 1970s, which controls more than 400 companies in various fields.

Branson expressed his desire to become an entrepreneur at a young age. His first business venture, at the age of 16, was a magazine called Student. In 1970, he set up a mail-order record business. He opened a chain of record stores, Virgin Records—later known as Virgin Megastores—in 1972. Branson's Virgin brand grew rapidly during the 1980s, as he started Virgin Atlantic airline and expanded the Virgin Records music label. In 2004, he founded spaceflight corporation Virgin Galactic, based at Mojave Air and Space Port, noted for the SpaceShipTwo suborbital spaceplane designed for space tourism.

In March 2000, Branson was knighted at Buckingham Palace for "services to entrepreneurship". For his work in retail, music and transport (with interests in land, air, sea and space travel), his taste for

**Read more +**

## Richard Branson Videos



**Richard Branson, Keynote Address, 2019 Air, Space & Cyber**
Richard Branson, Founder, Virgin Group delivers the keynote address to the 2019 Air Space & Cyber Conference



**Sir Richard Branson and Michael Milken in Conversation with Kevin O'Leary**
What makes some of the world's most successful companies. Michael Milken financed thousands of



**Sir Richard Branson | A Force for Good | Skoll Foundation Interview**
Sir Richard Branson is Founder of the Virgin Group. Virgin is one of the world's most recognized brands, with more

Sergey Brin, Speaker | Business Leaders and Technology Agent | Page



☰   **AAE**       **1.800.698.2536**   | Login |
SPEAKERS

Your Location:   <u>Home</u>   ›   <u>Speakers</u>   ›   Sergey Brin

🖨  |  ★



# SERGEY BRIN

*Co-Founder of Google & President, Alphabet Inc.*

✈ **Travels From:**   Los Altos, CA, USA

💲 **Speaking Fee:**   Live Event: <u>$200,000 and above</u> ⓘ
                 Virtual Event: <u>Please Contact</u>

🏛 **Categories:**   <u>Arts & Humanities</u>, <u>Business Leaders</u>, <u>Creativity Speakers</u>, <u>Entrepreneurism</u>, <u>Environmental Policy</u>, <u>Innovation</u>, <u>Jewish Speakers</u>, <u>Technology</u>, <u>Technology Speakers</u>, <u>TED</u>

| PROFILE | VIDEOS | NEWS |     📅 **CHECK AVAILABILITY** |

## Sergey Brin Biography

Sergey Brin is the co-founder and President of Alphabet Inc. Brin is a computer scientist and entrepreneur who created, along with Larry Page, the online search engine Google, one of the most successful sites on the Internet.

Brin's family moved from Moscow to the United States in 1979. After receiving degrees in computer science and mathematics at the University of Maryland in 1993, he entered Stanford University's graduate program, where he met Page, a fellow graduate student.

The two were both intrigued by the idea of enhancing the ability to extract meaning from the mass of data accumulating on the Internet. They began working from Page's dorm room to devise a new type of search technology that leveraged Web users' own ranking abilities by tracking each site's "backing links" — that is, the number of other pages linked to them. Brin received a master's degree in 1995, but he went on leave from Stanford's doctorate program to continue working on the search engine

**Read more +**

## Sergey Brin Videos



**VK interviews Google Founders Larry Page and Sergey Brin**



**Sergey Brin: No Big Deal. Just Give It a Shot!**

In the first episode of our series looking back over the greatest conversations to take place at the World Economic Forum, we join Google co-founder...



**Sergey Brin interviewed at Web 2.0 Summit 2011 - YouTube**

Simon Kinberg | Speakers Bureau and Booking Agent Info



☰    **AAE** SPEAKERS      1.800.698.2536   Login

Your Location:   Home   ›   Speakers   ›   Simon Kinberg

🖨 | ⭐



# SIMON KINBERG

*Writer, Producer*

✈ **Travels From:**   Los Angeles, CA, USA

$ **Speaking Fee:**   Live Event: Please Contact ⓘ
               Virtual Event: Please Contact

⛓ **Categories:**   Arts & Humanities, Producers and Directors

| 📋 PROFILE | 📅 CHECK AVAILABILITY |

## Simon Kinberg Biography

Simon David Kinberg (born August 2, 1973) is a British-born American screenwriter and film producer. He is best known for his work on the X-Men film franchise, and has also written such films as Mr. & Mrs. Smith and Sherlock Holmes. He has served as a producer on others including Cinderella, and The Martian, for which he was nominated for an Academy Award for Best Picture. His production company is Genre Films (usually credited as Kinberg Genre), which has a first-look deal with 20th Century Fox.

Kinberg was born in London, England, the son of Monica Menell-Kinberg and Jud Kinberg, a New York City-born writer and producer. His father's first wife was French actress Suzanne Dalbert. From age six, he was raised in Los Angeles, California. Simon Kinberg graduated from Brentwood High School, and then from Brown University, Phi Beta Kappa, Magna Cum Laude; in 2003 received his MFA from Columbia University School of the Arts, where he won the Zaki Gordon Fellowship for Screenwriting.

Read more +

## Speaker Lists Featuring Simon Kinberg   ⌄

## FAQs on booking Simon Kinberg   ⌄

## Speakers Similar to Simon Kinberg

‹          ›



☰    **AAE** SPEAKERS                    1.800.698.2536    Login

Your Location:   Home  >  Speakers  >  Steven Spielberg

🖨 | ⭐



# STEVEN SPIELBERG

*Oscar Award-Winning Filmmaker*

✈ **Travels From:**   Los Angeles, CA, USA

💲 **Speaking Fee:**   Live Event: $200,000 and above ⓘ
                        Virtual Event: Please Contact

🏷 **Categories:**   Arts & Humanities, Diversity Speakers, Jewish Speakers,
                      Producers and Directors

| PROFILE | VIDEOS | NEWS |    CHECK AVAILABILITY

## Steven Spielberg Biography

Steven Spielberg is an Oscar Award-winning filmmaker. He is considered one of the founding pioneers of the New Hollywood era and one of the most popular directors and producers in film history.

Spielberg started in Hollywood directing television and several minor theatrical releases. He became a household name as the director of *Jaws* (1975), which was critically and commercially successful and is considered the first summer blockbuster. His subsequent releases focused typically on science fiction/adventure films such as *Close Encounters of the Third Kind* (1977), *Raiders of the Lost Ark* (1981), *E.T. the Extra-Terrestrial* (1982), and *Jurassic Park* (1993), which became archetypes of modern Hollywood escapist filmmaking.

Spielberg transitioned into addressing serious issues in his later work with *The Color Purple* (1985), *Empire of the Sun* (1987), *Schindler's List* (1993), *Amistad* (1997), and *Saving Private Ryan* (1998). He has largely adhered to this practice during the 21st century, with 2005's *Munich*, 2012's *Lincoln*, 2015's

Read more +

## Steven Spielberg Videos



**Steven Spielberg on the threat of Netflix, computer games and new...**
The Oscar winning director sat down with ITV News Arts Editor Nina Nannar to talk about his upcoming VR movie, Ready Player One - and how thanks to...



**The Post Press Conference - Steven Spielberg, Tom Hanks & Meryl ...**



**Filmmaker Steven Spielberg Speech | Harvard Commencement 2016**
Director, producer, and screenwriter Steven Spielberg, gave his speech at Harvard's 365th Commencement on May 26, 2016/



☰        1.800.698.2536    Login

Your Location:   <u>Home</u>   ›   <u>Speakers</u>   ›   Suzanne Collins

🖨   |   ★



# SUZANNE COLLINS

*Author of "The Hunger Games" Trilogy*

✈ **Travels From:**   Connecticut, USA

💲 **Speaking Fee:**   Live Event: <u>Please Contact</u> ⓘ
Virtual Event: <u>Please Contact</u>

⛙ **Categories:**   <u>Authors</u>, <u>University Speakers</u>

| 📋 PROFILE | VIDEOS | | 📅 CHECK AVAILABILITY |

## Suzanne Collins Biography

Since 1991, Suzanne Collins has been busy writing for children's television. She has worked on the staffs of several Nickelodeon shows, including the Emmy-nominated hit Clarissa Explains it All and The Mystery Files of Shelby Woo. For preschool viewers, she penned multiple stories for the Emmy-nominated, Little Bear and Oswald. She also co-wrote the critically acclaimed Rankin/Bass Christmas special, Santa, Baby! Most recently she was the Head Writer for Scholastic Entertainment's Clifford's Puppy Days,and a freelancer on Wow! Wow! Wubbzy!

While working on a Kids WB show called Generation O! she met children's author James Proimos, who talked her into giving children's books a try.

Thinking one day about Alice in Wonderland, she was struck by how pastoral the setting must seem to kids who, like her own, lived in urban surroundings. In New York City, you're much more likely to fall down a manhole than a rabbit hole and, if you do, you're not going to find a tea party. What you might

Read more +

## Suzanne Collins Videos



**Suzanne Collins Answers Questions about The Hunger Games Trilogy**
Suzanne Collins answers questions about the New York Times bestselling The Hunger Games trilogy.

See All Videos »

Exhibit F



# Search All Speakers

| By Name | By Category |
|---|---|
| +Q | Select a category |

## Browse All Speakers

**Search**

ALL   A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

 **Jill Abramson**

 **Ben Affleck**

 **Riz Ahmed**

 **Troy Aikman**

 **Amani Al-Khatahtbeh**

 **Mahershala Ali**

 **Danielle Allen**

 **Cristela Alonzo**

 **Camila Alves**

 **Sophia Amoruso**

1 2 3 ...



# Exhibit G

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# opencorporates

The Open Database Of The Corporate World

Company name or number [Search]

● Companies ○ Officers

- Log in/Sign up

## ALL AMERICAN ENTERTAINMENT, INC.

Company Number
    P06000037216
Status
    Active
Incorporation Date
    14 March 2006 (over 14 years ago)
Company Type
    Domestic for Profit
Jurisdiction
    Florida (US)
Agent Name
    TERRENCE SHEA
Agent Address
    1211 S. MILITARY TRAIL, DEERFIELD BEACH, FL 33442
Directors / Officers

- TERRENCE SHEA, president
- TERRENCE SHEA, director
- TERRENCE SHEA, agent

**Source** Florida Department of State Division of Corporations, http://www.sunbiz.org, 1 Jul 2020
Add data *(website, address, etc)*

## Company Addresses

Head Office Address

1121 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

Mailing Address

1121 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

## **Explore company network**



## Company network

Not yet available for this company. Click to find out more

## Latest Events

2006-03-14 - 2018-12-31
    Addition of officer TERRENCE SHEA, agent
2006-03-14 - 2018-12-31
    Addition of officer TERRENCE SHEA, director
2006-03-14 - 2018-12-31
    Addition of officer TERRENCE SHEA, president

See all events

**Corporate Grouping** **User Contributed**

None known. Add one now?
See all corporate groupings

## Similarly named companies

Found 29. Showing first 10

- 🇺🇸 ALL AMERICAN ENTERTAINMENT, INC. (Oklahoma (US), 2 Jun 1994- )
- 🇺🇸 nonprofit ALL-AMERICAN ENTERTAINMENT, INC. (South Carolina (US), 25 Nov 2003- )
- 🇺🇸 ALL AMERICAN ENTERTAINMENT, INC. (Missouri (US), 19 Mar 1982- )
- 🇺🇸 inactive ALL AMERICAN ENTERTAINMENT, INC. (Florida (US), 6 Sep 2000- )
- 🇺🇸 inactive ALL AMERICAN ENTERTAINMENT, INC. (California (US), 21 Jun 2006- )
- 🇺🇸 inactive ALL AMERICAN ENTERTAINMENT, INC. (Texas (US), 1 Oct 1986-15 Feb 1994)
- 🇺🇸 inactive A-ALL AMERICAN ENTERTAINMENT, INC. (Michigan (US), 15 Jun 1993-15 Jul 1996)
- 🇺🇸 inactive branch ALL AMERICAN ENTERTAINMENT, INC. (New York (US), 17 Dec 1985- )
- 🇺🇸 ALL AMERICAN CABINETS & ENTERTAINMENT CENTERS, INC. (Florida (US), 7 Feb 2011- )
- 🇺🇸 ALL AMERICAN MEDIA AND ENTERTAINMENT GROUP INC. (New Jersey (US), 3 Oct 2002- )

### Identifiers alpha

| Identifier System | Identifier | Categories | |
| --- | --- | --- | --- |
| US Federal EIN/TIN number | 204483526 | Tax | details |

* While we strive to keep this information correct and up-to-date, it is not the primary source, and the company registry (see source, above) should always be referred to for definitive information
Data on this page last changed July 30 2020

**Problem/question about this data?** Click here

🔴API **Open Data**

Get this info as json, xml, rdf

# About us

- About
- Blog
- Team
- Governance
- Jobs

# Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

# Help

- API Reference
- Glossary
- Status

# Contact

- Twitter
- Medium
- Newsletter
- Problems with our data?
- Temporary redaction

# Impact

- Impact

# Exhibit H

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# opencorporates

The Open Database Of The Corporate World

Officer's name [          ] [ Search ]

○ Companies    ● Officers

- Log in/Sign up

## Found 7 officers

Greg Friedlander [ Go ]

☐ exclude inactive Advanced Options

- inactive Friedlander, Greg agent,  inactive branch New Age Media Ventures LLC (North Carolina (US), 21 Jul 2011- )
- GREG FRIEDLANDER president, 🇺🇸 FEDERATED TECHNOLOGY SOLUTIONS INC. (Texas (US), 19 Oct 2016- )
- GREG FRIEDLANDER director, 🇺🇸 FEDERATED TECHNOLOGY SOLUTIONS INC. (Texas (US), 19 Oct 2016- )
- GREG FRIEDLANDER president, 🇺🇸 FEDERATED TALENT, LLC (Texas (US), 24 Mar 2015- )
- GREG FRIEDLANDER director, 🇺🇸 FEDERATED TALENT, LLC (Texas (US), 24 Mar 2015- )
- Greg Friedlander president, 🇺🇸 AAE Holdings Inc. (North Carolina (US), 1 Sep 2017- )
- inactive Greg Friedlander manager, 🇺🇸 inactive Entertainment Venture Group LLC (North Carolina (US), 9 Mar 2006- )

*Sorted by officer name*
Sort by relevance

Results per page  30  ⌄    Enterprise users only

## Filtered by jurisdiction

- 3 North Carolina (US)
- 4 Texas (US)

## Filter by position

- 1 agent
- 2 director
- 1 manager
- 3 president

## Filter by nationality

- 7 *[blank]*

## Filter by occupation

- 7 *[blank]*

## About us

- About
- Blog
- Team
- Governance
- Jobs

## Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

## Help

Exhibit I



Your Domain Starting Place...

Type here for whois, domain and keyword results    

# WHOIS LOOKUP

 **allamericanentertainment.com is** *already registered**

Domain Name: ALLAMERICANENTERTAINMENT.COM
Registry Domain ID: 712127785_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2019-12-15T15:41:08Z
Creation Date: 2006-12-15T22:39:57Z
Registry Expiry Date: 2021-12-15T22:39:57Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: 480-624-2505
Domain Status: clientDeleteProhibited https://icann.org/epp#clientDeleteProhibited
Domain Status: clientRenewProhibited https://icann.org/epp#clientRenewProhibited
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProhibited
Name Server: NS.LIQUIDWEB.COM
Name Server: NS1.LIQUIDWEB.COM
DNSSEC: unsigned
URL of the ICANN Whois Inaccuracy Complaint Form: https://www.icann.org/wicf/
>>> Last update of whois database: 2020-08-30T11:32:16Z <<<

For more information on Whois status codes, please visit https://icann.org/epp

NOTICE: The expiration date displayed in this record is the date the
registrar's sponsorship of the domain name registration in the registry is
currently set to expire. This date does not necessarily reflect the expiration
date of the domain name registrant's agreement with the sponsoring
registrar. Users may consult the sponsoring registrar's Whois database to
view the registrar's reported date of expiration for this registration.

TERMS OF USE: You are not authorized to access or query our Whois
database through the use of electronic processes that are high-volume and
automated except as reasonably necessary to register domain names or
modify existing registrations; the Data in VeriSign Global Registry
Services' ("VeriSign") Whois database is provided by VeriSign for
information purposes only, and to assist persons in obtaining information
about or related to a domain name registration record. VeriSign does not
guarantee its accuracy. By submitting a Whois query, you agree to abide
by the following terms of use: You agree that you may use this Data only
for lawful purposes and that under no circumstances will you use this Data
to: (1) allow, enable, or otherwise support the transmission of mass
unsolicited, commercial advertising or solicitations via e-mail, telephone,
or facsimile; or (2) enable high volume, automated, electronic processes
that apply to VeriSign (or its computer systems). The compilation,
repackaging, dissemination or other use of this Data is expressly
prohibited without the prior written consent of VeriSign. You agree not to
use electronic processes that are automated and high-volume to access or
query the Whois database except as reasonably necessary to register
domain names or modify existing registrations. VeriSign reserves the right
to restrict your access to the Whois database in its sole discretion to ensure
operational stability. VeriSign may restrict or terminate your access to the
Whois database for failure to abide by these terms of use. VeriSign
reserves the right to modify these terms at any time.

The Registry database contains ONLY .COM, .NET, .EDU domains and
Registrars.

## Popular

| | | |
|---|---|---|
| ☐ | allamericanentertainment.cc | $29.99 |
| ☐ | allamericanentertainment.net | $15.49 |

🛒 **BUY SELECTED**

## Professional

| | | |
|---|---|---|
| ☐ | allamericanentertainment.ceo | $99.99 |

🛒 **BUY SELECTED**

## Filters

- ☑ Popular
- ☐ Arts and Culture
- ☐ Audio and Video
- ☐ Businesses
- ☐ Colors
- ☐ Computers and Internet
- ☐ Descriptive
- ☐ Educational and Academic
- ☐ Financial and Banking
- ☐ Food and Drink
- ☐ Fun and Unique
- ☐ Geographic
- ☐ Health and Fitness
- ☐ Lifestyles and Relationships
- ☐ Marketing and Sales
- ☐ Media and Music
- ☐ Organizations
- ☐ Personal
- ☐ Products
- ☑ Professional
- ☐ Real Estate
- ☑ Services
- ☐ Shopping
- ☐ Sports and Hobbies
- ☐ Trades and Construction
- ☑ Travel and Tourism



COPYRIGHT © 1999-2020    SITEMAP | PRIVACY POLICY | TERMS AND CONDITIONS

* NTT America endeavors to make the domain name availability search process reliable; however, NTT America does not guarantee availability of domain names or the accuracy or security of the WHOIS system. There are several factors that could cause a WHOIS.NET query to incorrectly display that a currently registered domain is available regardless, if a domain name is available, WHOIS.NET will not be able to register the domain or gain possession of the registration from the current registrar without the permission of the current owner. The registration process is not complete until the domain name requested by you has been registered in your name with the appropriate registry. Because there are delays in the actual registration of a domain name with the appropriate registry, NTT America is not responsible if domain names requested by you are actually registered to third parties. Registration of the domain name through NTT America is not complete until you receive the final confirmation e-mail from NTT America. All registrations through NTT America are subject to NTT America's Global Term and Conditions.

Exhibit J



# Exhibit K

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# open corporates

The Open Database Of The Corporate World

Company name or number   [ Search ]

● Companies   ○ Officers

- Log in/Sign up

## GAMES ON THE GO FRANCHISING, LLC

Company Number
    L09000081831
Status
    Active
Incorporation Date
    24 August 2009 (about 11 years ago)
Company Type
    Florida Limited Liability
Jurisdiction
    Florida (US)
Agent Name
    TERRENCE W SHEA
Agent Address
    1121 S. MILITARY TRAIL, DEERFIELD BEACH, FL 33442
Directors / Officers

- TERRANCE W SHEA
- TERRENCE W SHEA, agent

**Source** Florida Department of State Division of Corporations, http://www.sunbiz.org, 1 Jul 2020
Add data *(website, address, etc)*

## Company Addresses

Head Office Address

1121 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

Mailing Address

1121 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

## **Explore company network**



## Company network

Not yet available for this company. Click to find out more

## Latest Events

2009-08-24
    Incorporated
2009-08-24 - 2018-12-31
    Addition of officer TERRANCE W SHEA, agent
2019-01-01 - 2019-09-30
    Addition of officer TERRENCE W SHEA, agent

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# opencorporates

The Open Database Of The Corporate World

Company name or number | Search

◉ Companies ○ Officers

- Log in/Sign up

# LUXOR ENTERTAINMENT, INC.

Company Number
P13000031812
Status
Inactive
Incorporation Date
8 April 2013 (over 7 years ago)
Company Type
Domestic for Profit
Jurisdiction
Florida (US)
Agent Name
TERRENCE W SHEA
Agent Address
312 S. MILITARY TRAIL, DEERFIELD BEACH, FL 33442
Inactive Directors / Officers

- INGO K KOZAK
- INGO K KOZAK, vice president
- INGO K KOZAK, director
- TERRENCE W SHEA
- TERRENCE W SHEA, president
- TERRENCE W SHEA, agent
- TERRENCE W SHEA, director

**Source** Florida Department of State Division of Corporations, http://www.sunbiz.org, 1 Jul 2020
Add data *(website, address, etc)*

## Company Addresses

Head Office Address

312 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

Mailing Address

312 S. MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

## **Explore company network**



## Company network

Not yet available for this company. Click to find out more

## Latest Events

2013-04-08 - 2018-12-31
Addition of officer INGO K KOZAK, director

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# open corporates

● ● ● ●

The Open Database Of The Corporate World

| Company name or number | Search |

● Companies    ○ Officers

- Log in/Sign up

## SHEABOATS, INCORPORATED

Company Number
    P15000022113
Status
    Inactive
Incorporation Date
    6 March 2015 (over 5 years ago)
Company Type
    Domestic for Profit
Jurisdiction
    Florida (US)
Agent Name
    TERRENCE W SHEA
Agent Address
    312 S MILITARY TRAIL, DEERFIELD BEACH, FL 33442
Inactive Directors / Officers

- INGO K KOZAK, vice president
- INGO K KOZAK, president
- TERRENCE W SHEA, president
- TERRENCE W SHEA, agent

**Source** Florida Department of State Division of Corporations, http://www.sunbiz.org, 1 Jul 2020
Add data *(website, address, etc)*

## Company Addresses

Head Office Address

312 S MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

Mailing Address

312 S MILITARY TRAIL, DEERFIELD BEACH, FL, 33442

## **Explore company network**



## Company network

Not yet available for this company. Click to find out more

## Latest Events

2015-03-06 - 2018-12-31
    Addition of officer INGO K KOZAK, president
2015-03-06 - 2018-12-31
    Addition of officer INGO K KOZAK, vice president
2015-03-06 - 2018-12-31

# Exhibit L



# Exhibit M

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# opencorporates

The Open Database Of The Corporate World

Company name or number   [Search]

◉ Companies   ○ Officers

- Log in/Sign up

## IMAGING EQUIPMENT INTERNATIONAL, LTD.

Company Number
    E0448672008-1
Native Company Number
    E0448672008-1
Status
    Active
Incorporation Date
    16 July 2008 (about 12 years ago)
Company Type
    Domestic Corporation
Jurisdiction
    Nevada (US)
Agent Name
    REGISTERED AGENT SOLUTIONS, INC
Agent Address
    4625 WEST NEVSO DR STE 2, LAS VEGAS, NV, 89103
Directors / Officers

- REGISTERED AGENT SOLUTIONS, INC, agent
- ROBERT W CHMIELINSKI, secretary
- VADIM GRISHCHENKO, president
- YURY MAMTZEV, treasurer
- YURY MAMTZEV, director



### Recent filings for IMAGING EQUIPMENT INTERNATIONAL, LTD.

12 May 2019
Annual List

2 May 2018
Annual List

4 May 2017
Annual List

2 May 2016
Annual List

5 Jul 2015
Annual List

4 Jul 2014
Annual List

5 Jun 2013
Annual List

22 Jun 2012
Annual List

see all filings

**Source** Nevada Secretary of State's Office, https://esos.nv.gov/EntitySearch/Onli..., 4 Jul 2019
Add data *(website, address, etc)*

**Explore company network**



### Company network

Not yet available for this company. Click to find out more

### Latest Events

2008-07-16 - 2018-11-11
    Addition of officer REGISTERED AGENT SOLUTIONS, INC, agent
2008-07-16 - 2018-11-11
    Addition of officer YURY MAMTZEV, director
2008-07-16 - 2018-11-11
    Addition of officer YURY MAMTZEV, treasurer

See all events

### Corporate Grouping **User Contributed**

None known. Add one now?
See all corporate groupings
\* While we strive to keep this information correct and up-to-date, it is not the primary source, and the company registry (see source, above) should always be referred to for definitive information
Data on this page last changed July 16 2019

**Problem/question about this data?** Click here

**API** Open Data

Get this info as json, xml, rdf

# About us

- About
- Blog
- Team
- Governance
- Jobs

## Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

## Help

- API Reference
- Glossary
- Status

## Contact

- Twitter
- Medium
- Newsletter
- Problems with our data?
- Temporary redaction

## Impact

Exhibit N

Now available: over 400m key company lifecycle events, from officer changes to gazette notices. Read more on our blog.

# opencorporates

The Open Database Of The Corporate World

| Company name or number | Search |

○ Companies   ○ Officers

- Log in/Sign up

## IT- INNOVATION TECHNOLOGIES, INC.

Company Number
    E0313262008-0
Native Company Number
    E0313262008-0
Status
    Active
Incorporation Date
    9 May 2008 (over 12 years ago)
Company Type
    Domestic Corporation
Jurisdiction
    Nevada (US)
Agent Name
    REGISTERED AGENT SOLUTIONS, INC
Agent Address
    4625 WEST NEVSO DR STE 2, LAS VEGAS, NV, 89103
Directors / Officers

- EGIDIO P BRUSA, president
- EGIDIO P BRUSA, director
- MARIELLA C MENNI, treasurer
- MARIELLA C MENNI, director
- REGISTERED AGENT SOLUTIONS, INC, agent
- ROBERT W CHMIELINSKI, secretary



## Recent filings for IT- INNOVATION TECHNOLOGIES, INC.

2 Mar 2018
Annual List

2 Mar 2017
Annual List

2 Mar 2016
Annual List

14 Mar 2015
Annual List

13 Mar 2014
Annual List

5 Jun 2013
Annual List

24 Jul 2012
Annual List

28 Mar 2011
Annual List

see all filings

**Source** Nevada Secretary of State's Office, https://esos.nv.gov/EntitySearch/Onli..., 18 Feb 2019

Add data *(website, address, etc)*

## Explore company network



## Company network

Not yet available for this company. Click to find out more

## Latest Events

2008-05-09 - 2019-02-18
    Addition of officer EGIDIO P BRUSA, director
2008-05-09 - 2019-02-18
    Addition of officer EGIDIO P BRUSA, president
2008-05-09 - 2019-02-18
    Addition of officer ROBERT W CHMIELINSKI, secretary

See all events

## Corporate Grouping **User Contributed**

None known. Add one now?
See all corporate groupings
* While we strive to keep this information correct and up-to-date, it is not the primary source, and the company registry (see source, above) should always be referred to for definitive information
Data on this page last changed February 22 2019

**Problem/question about this data?** Click here

**API** Open Data

Get this info as json, xml, rdf

# About us

- About
- Blog
- Team
- Governance
- Jobs

# Using our data

- Our data
- Our purpose
- Legal/Licence
- User/Cookie privacy policy
- Public records privacy policy

# Help

- API Reference
- Glossary
- Status

# Contact

- Twitter
- Medium
- Newsletter
- Problems with our data?
- Temporary redaction

Exhibit O



| People ▼ | Vadim | Grishchenko | 🔍 | Join now | Sign in |



## People also viewed

 **Irina Kovalenko**
Digital Marketing Manager, CMO at SmartyAds
Ukraine

 **Viacheslav Yeromenko**
PPC Team Lead & Marketing Specialist
Ukraine

 **Andrii Senko**
Head of Digital Marketing Manager at Voicespin
Ukraine

 **Michael Yakovenko**
SEO manager | SEM strategist | Product manager | 7+ years of experience
Ukraine

### Vadim Grishchenko

Digital Marketing Manager at Devellar

Ukraine · 500+ connections

**Connect with Vadim**

**Devellar**

**National Technical University of Ukraine 'Kyiv Polytechnic...**

 **Liza Shoma**
Digital Marketing Manager - FUIB
Ukraine

 **Dan Shcherbatyi**
Digital Marketing Manager | IT, High-tech, Fintech, Blockchain
Ukraine

 **Nikita Egozha**
Performance Marketing Manager – OLX Group
Ukraine

## About

Experience in E-Commerce, Gambling, Cybersport

- Setting up and controlling advertising campaigns in:
- social networks (Facebook, Instagram)
- display networks (Google, Yandex)
- search engines (Google, Yandex, Bing)
- Analytics and follow to key metrics
- Strategy planning and control tasks at jira, trello
- Reporting metrics, content, and media plan, giveaways

Location:
- North America
- South America
- Europe

- Google ads: More than $1,000,000 managed in the last 12 months.
- Facebook ads: More than $500,000 managed in the last 12 months.
- Instagram ads: More than $100,000 managed in the last 12 months.

 **Liubov Perysta**
Digital brand manager - Royal Canin
Ukraine

 **Artyom Lazarev**
Media Buying (Affiliate Marketing) – Promo.ua
Ukraine

 **Kate Klymenko**
Project Marketing Manager at Doctor Online - Assistant
Ukraine

Show more profiles ⌄

### Others named **Vadim**

## Activity

 Пару місяців назад у мене був офіс у центрі Києва. Я сидів у дорогій сорочці і зі свого робочого місця дивився на Хрещатик коли пив смачну...
Liked by **Vadim Grishchenko**

 Today is my Day 1 as Amazon's US Head of AI Business Development for Startups and Venture Capital. I'm feeling excited, nervous, and ready to be...
Liked by **Vadim Grishchenko**

 Internet Explorer vs Google Chrome 
Liked by **Vadim Grishchenko**


**You're signed out** ✕
Sign in for the full experience
**Sign in**
**Join now**

 **Linked**in

| People ▾ | Vadim | Grishchenko | 🔍 |

Join now    Sign in

## Experience


**Digital Marketing Manager**
Devellar
Jun 2019 – Present · 1 year 3 months

Kiev Region, Ukraine


**Digital Marketing Specialist in Ekingdom.Tech**
The Coingaming Group
Jan 2019 – Apr 2019 · 4 months

Kiev Region, Ukraine

Main duties:
• Deliver weekly and monthly performance reports to eMarketing team and Project Management team;
• Help drive the strategy and implementation of in-house technologies to execute & optimise PPC campaigns;
• Improve the tools and methods used to collect and report on the performance of digital media;
• Keyword analysis - build seasonal keyword lists, analyze search volume, and make recommendations to eMarketing team;
• Manage budgeting, billing and invoicing;
• Work...

Show more ⌄


**PPC Manager**
Starvex agency
Aug 2017 – Jan 2019 · 1 year 6 months

Kiev Region, Ukraine

Main duties:
• Implement and manage tags and code on multiple websites using a tag management tool;
• Manage strategy across various search engines and ad networks, including Google, Yandex, Bing, Facebook, Instagram (geo: USA, PL, World, UA, RU / lang: EN, PL, RU, UA / avg. 30 days budget: > $100.000);
• Perform market research using search tools to monitor competition;
• Plan, manage, and execute paid search/ PPC campaigns, including but not limited to account setup,...

Show more ⌄

**Promo.ua**
11 months

**PPC Team Lead**
Dec 2016 – Mar 2017 · 4 months

Kiev Region, Ukraine
Subordinates: 2 PPC specialists, 2 Juniors
Main duties:
• Provide strategic insight to develop commercial opportunities with existing clients (market share, conversions, revenue, ROI forecast);
• Support the generation new paid search campaigns, ad groups, and accounts and aid in the creation of new paid search marketing initiatives;
• Responsible for all PPC managers activity including performance monitoring, regular performance scoring.

### Add new skills with these courses

 SEO: Ecommerce

 SEO: Link Building

 International SEO

See all courses

### Vadim's public profile badge

Include this LinkedIn profile on other websites



Vadim Grishchenko
Digital Marketing Manager at Devellar

Digital Marketing Manager at Devellar

National Technical University of Ukraine 'Kyiv Polytechnic Institute'

View profile    Linked**in**

View profile badges



You're signed out ✕

Sign in for the full experience

**Sign in**

**Join now**



| People ⌄ | Vadim | Grishchenko | 🔍 |

Join now    **Sign in**

Kiev Region, Ukraine
Main duties:
• Analysing the performance of assigned campaigns, identifying new opportunities, &
facilitating change in order to hit & exceed client expectations & KPI's;
• Campaign implementation and planning;
• Daily campaign bid management with detailed attention to ROI and budget;
• Keyword research and analysis;
• Provide strategic insight to develop long and short term execution plans for new and
expanding search campaigns.



**Internet Marketing Specialist**
Kleynod.ua - Ukrainian watches internet store
Feb 2014 – Jun 2016 · 2 years 5 months

Украина

Main duties:
• Analyse keyword search volumes to identify strong, appropriate keywords for campaigns;
• Collate & report back monthly performance statistics for all digital communications across all
channels;
• Devising strategies to drive quality traffic to company websites & track conversions;
• Manage a range of digital instruments:Pay Per Click (PPC), Social Media Marketing, Search
Engine Optimisation (SEO) & Email Marketing;
• Manage the delivery of reporting (ad-hoc, weekly...

Show more ⌄



**PROFFI.co**
10 months

**Project Manager**
Aug 2015 – Feb 2016 · 7 months
Kiev Region, Ukraine
Main duties:
• Create reports and present to client;
• Develop dashboards, executive summaries, and weekly/monthly reports to measure against
KPIs and other performance metrics;
• Create key performance indicators and develop dashboards and visualizations to illustrate key
metrics and explain trends against these KPI's.

**Paid Search Specialist**
May 2015 – Aug 2015 · 4 months
Kiev Region, Ukraine
Main duties:
• Analysing the performance of assigned campaigns, identifying new opportunities, &
facilitating change in order to hit & exceed client expectations & KPI's;
• Campaign implementation and planning;
• Daily campaign bid management with detailed attention to ROI and budget;
• Keyword research and analysis;
• Provide strategic insight to develop long and short term execution plans for new and
expanding search campaigns.



**Internet Marketing Specialist**
webstudio.guru
Jun 2014 – Sep 2015 · 1 year 4 months

Kiev Region, Ukraine

Main duties:
• Keyword, market and competitor research and analysis;
• Monitor and troubleshoot SEO related issues;



**You're signed out**      ✕
Sign in for the full experience

**Sign in**

**Join now**



| People ▾ | Vadim | Grishchenko | 🔍 |

Join now    Sign in

• Promotion of websites and services using social media marketing techniques;
• Set up sites on different CMS like Word Press, Joomla and other;
• Working...

Show more ⌄



**SEO Specialist**
Trionika
Jul 2013 – Feb 2014 · 8 months

Kiev Region, Ukraine

Main duties:
• Create dashboards and reports to systematically track and improve SEO performance;
• On page and off page optimization (link building, linking structure optimization, content optimization etc.);
• Perform full keyword research and develop SEM strategies;
• Perform on and off page technical SEO audits and present recommendations to site owners.



**SEO specialist**
UaMaster
2012 – 2013 · 1 year

Kiev Region, Ukraine

Main duties:
• Website auditing;
• Keyword Research;
• Traffic Analytics;
• Market Research;
• Working with link Exchanges;
• Internal Links Analysis and Auditing;
• Linkbuilding;
• Search Engine Algorithms Monitoring;
• Managing SEO Copywriting Processes;
• Work with Sales Manager Department;
• Simple HTML, CSS corrections.

## Education



**National Technical University of Ukraine 'Kyiv Polytechnic Institute'**

## Groups

Обучение новой профессии "Администратор Инстаграм аккаунтов"
Обучение новой профессии "Администратор Инстаграм аккаунтов"



## View Vadim's full profile

See who you know in common

Get introduced

Contact Vadim directly



**You're signed out**    ✕
Sign in for the full experience

**Sign in**

**Join now**

Exhibit P



Exhibit Q

**WIKIPEDIA**

# Altered Carbon

**Altered Carbon** is a 2002 cyberpunk novel by British writer Richard K. Morgan. Set in a future in which interstellar travel is facilitated by transferring consciousnesses between bodies ("sleeves"), it follows the attempt of Takeshi Kovacs, a former U.N. elite soldier turned private investigator, to investigate a rich man's death. It is followed by the sequels *Broken Angels* and *Woken Furies*.

The book was adapted as a Netflix television series, also titled *Altered Carbon*, in 2018.[1] In 2019 a graphic novel was created with Dynamite Comics.[2]

## Contents

Premise
Plot summary
Reception
In other media
   Television
   Film
References
External links

## Premise

In the future, humans have achieved virtual immortality. Most people have cortical stacks in their spinal columns that store their consciousness. If their body dies, their stack can be stored indefinitely. Their stacks can be downloaded into new bodies, or "sleeves", after death. Roman Catholics do not allow their stacks to be re-sleeved after death, as they believe that the soul goes to Heaven when they die, and so would not pass on to the new sleeve. This makes Catholics easy targets for murder, since killers know their victim may not be re-sleeved to testify. At the start of the novel, UN Resolution 653 is being debated. This proposition reverses precedent and would allow authorities to temporarily re-sleeve a deceased Catholic woman to testify in a murder trial. Dual-sleeving, or controlling two bodies with one personality, is strictly prohibited by U.N. law.

| **Altered Carbon** | |
|---|---|
|  | |
| **Author** | Richard K. Morgan |
| **Country** | United Kingdom |
| **Language** | English |
| **Series** | Takeshi Kovacs |
| **Genre** | Science fiction, mystery |
| **Publisher** | Victor Gollancz Ltd |
| **Publication date** | 28 February 2002 |
| **Media type** | Print (hardback & paperback) |
| **Pages** | 416 pp (Hardback), 375 (Paperback) |
| **ISBN** | 0-575-07321-7 |
| **OCLC** | 48236269 (https://www.worldcat.org/oclc/48236269) |
| **Followed by** | *Broken Angels* |

While most people can afford to get resleeved at the end of their lives, they are unable to update their bodies and most go through the full aging process each time, which discourages most from resleeving more than once or twice. Thus, while people can live indefinitely in theory, most choose not to. Only the wealthy are able to acquire replacement bodies on a continual basis. Those who have lived for multiple lifespans are called Meths, a reference to the Biblical figure Methuselah. The very rich are also able to keep copies of their minds in remote storage, which they update regularly. This ensures that even if their stack is destroyed, they can be re-sleeved. People who commit serious crimes are imprisoned "on stack". Their consciousness is preserved and stored virtually, sometimes for decades, while their body is sold to the highest bidder to be used for re-sleeving another person.

Numerous colony planets exist apart from Earth; many were previously inhabited by an extinct alien civilization referred to as the Martians. In order to deal with the challenges of interspace warfare, the U.N. created the Envoys. They are an elite military group with extensive training in re-sleeving and psychological modification, as well as combat. Envoys are so successful and dangerous that they are generally prohibited from holding elected office on any world.

## Plot summary

On the colony planet of Harlan's World, Takeshi Kovacs and his partner Sarah Sachilowski, former Envoys who had returned to a life of crime, are killed by a U.N. colonial commando unit. Kovacs is sentenced to a long term in stack storage. On Earth, a Meth named Laurens Bancroft has died in mysterious circumstances in Bay City (formerly San Francisco). The re-sleeved Bancroft has no memories of the previous two days, including his own death. Though police officer Kristin Ortega believes he committed suicide, Bancroft is convinced he was murdered. He hires Kovacs to investigate. Kovacs discovers that Bancroft has been involved with numerous prostitutes, including recent murder victim Elizabeth Elliot. Elizabeth's mother Irene was imprisoned for illegally hacking Bancroft's memories. Elizabeth's father is too poor to re-sleeve Elizabeth or to free his wife from the stacks.

Laurens' wife, Miriam, seduces Kovacs and bribes him to end the investigation. A high-level Russian operative named Kadmin tries to assassinate Kovacs, but fails and is captured. Kovacs investigates the brothel where Elizabeth worked. He learns he is wearing the sleeve of Elias Ryker, a corrupt police officer and Ortega's lover. He is tortured by physicians from the Wei Clinic, who deal in black market sleeve theft. He tells his interrogators that he is an Envoy and they release him. A mysterious woman named Trepp says she will bring Kovacs to Ray, who is behind the clinic's operations. Kovacs escapes, destroys the brothel and clinic, and murders the employees in the process.

Kovacs and Ortega are injured in an explosion orchestrated by Kadmin, who has escaped police custody. Trepp brings Kovacs to "Ray", or Reileen Kawahara. Kawahara is a Meth mob boss with whom Kovacs has dealt in the past. He had rejected her offers of partnership, believing her to be cruel and manipulative. Kawahara orders Kovacs to end his investigation, or she will torture Sarah, who is currently in virtual storage.

Kovacs and Ortega begin sleeping together and form a partnership. Kovacs agrees to convince Bancroft he committed suicide. His version of the story is as follows. Bancroft contracted the Rawlings virus from a brothel. The Rawlings virus is designed to scramble cortical stacks and prevent re-sleeving, causing permanent death. To prevent it from contaminating his clones, Bancroft committed suicide. Kawahara agreed to procure a copy of the virus for Kovacs. With Kawahara's help, he retrieves Irene Elliot from stack, and hires her to implant the Rawlings virus into a brothel.

Kovacs learns that Bancroft went to an airship-turned-brothel named Head in the Clouds on the night he died. This establishment is run by Kawahara. Kadmin kidnaps Ortega and threatens to kill her unless Kovacs trades himself for her. Ortega is released, and Kovacs is forced to fight in a duel against Kadmin. Trepp and the police arrive, killing Kadmin. Kovacs destroys Kadmin's stack.

Kovacs double-sleeves, controlling both Ryker and a second body simultaneously. The copy in Ryker's sleeve leaves with Miriam to draw away surveillance. Ortega and Kovacs infiltrate Head in the Clouds. Irene spikes Kawahara's personality backup with the Rawlings virus, destroying all of her clones. Kovacs forces a confession from Kawahara. After a Catholic prostitute was murdered at Head in the Clouds, her resurrection would have revealed Kawahara's illegal activity. As part of her cover-up, Kawahara framed Ryker for corruption, since he was investigating the murder. She asked Bancroft to help her kill Resolution 653 to prevent the prostitute from testifying, but he refused. Kawahara and Miriam had Bancroft drugged; out of his mind, he killed a prostitute and then killed himself in order to erase the memory out of guilt and self-preservation. With his memories gone, Kawahara's involvement could not be traced.

Assisted by Trepp, Kovacs blows out the side of the airship. As he falls to the ocean below, he uses a grenade to destroy Kawahara's stack, ensuring her permanent death.

In the aftermath, Bancroft is cleared by the U.N. for his involvement with Kawahara. The copy of Kovacs that stayed with Miriam is erased, as double sleeving is illegal, but he makes the surviving copy of Kovacs promise to cover up Miriam's involvement. Irene Elliot gets her body back, Elizabeth and Ryker are freed from the stacks, Resolution 653 passes, and Kovacs is freed and returned to Harlan's World.

# Reception

Describing the book, *Kirkus Reviews* said that "The body count is high, the gadgetry pure genius, the sex scenes deliriously overwrought, and the worn cynicism thoroughly distasteful: a welcome return to cyberpunk's badass roots."[3]

The book won the Philip K. Dick Award for Best Novel in 2003.[4]

# In other media

## Television

A television adaptation was announced in 2016. An initial 10-episode season had been ordered by Netflix.[5] The first season premiered on Netflix on 2 February 2018.[6]

Extensive and significant changes to the source material were made in the adaptation.[7]

In the series Envoys are presented as having been trained, deployed and led by Quellcrist Falconer as part of a revolution (called "the Unsettlement") that she leads on Harlan's World (Kovacs' home planet). Kovacs is shown as having been trained as an Envoy by, and serving as a revolutionary under, Falconer. The Quellist Revolution is crushed by the Protectorate (the established, inter-planetary government) in an apocalyptic assault. Kovacs, the only survivor, is presented as the last Envoy. In the books, Envoys were and are the elite forces of the Protectorate (which would have been fighting against the revolution); Falconer did lead a revolution but died long before Kovacs was born; Kovacs trained as an Envoy under a different woman; and the Envoy Corps is still very much in use by the Protectorate and remains widely feared, although Kovacs is no longer a member of Corps.

The makers of the show have also chosen to expand the roles of many characters, particularly female characters.

In the book, the hotel in which Kovacs stays while investigating Bancroft's murder is themed after Jimi Hendrix. Since the Hendrix estate does not approve of licensing his image for anything they consider violent, the show instead chose the figure of Edgar Allan Poe and named the hotel The Raven.[8]

## Film

On 8 November 2018, Netflix announced an animated companion film, *Altered Carbon: Resleeved*,[9][10] set in the same universe and exploring new elements of the story mythology. On 10 February 2020, it was unveiled that the exclusive Netflix "anime featured" spin-off would debut on 19 March 2020. The film was directed by Jo Nakajima at Anima; Yoshiyuki Okada designed the characters, Ren Kikuchi supervised the CG animation, and MONACA composed the music. The Japanese cast includes Tatsuhisa Suzuki as Takeshi Kovacs, Rina Satou as Gina, Ayaka Asai as Holly Togram, Jouji Nakata as Ogai, Kenji Yamauchi as Hideki Tanaseda, Kanehira Yamamoto as Shinji, and Kōji Ishii as Genzo.[11]

# References

1. Hale, Mike (1 February 2018). "Review: 'Altered Carbon,' Netflix's 'Blade Runner' Replicant" (https://www.nytimes.com/2018/02/01/arts/television/altered-carbon-review-netflix-blade-runner.html) – via NYTimes.com.

2. Spry, Jeff (15 April 2019). "Exclusive: Richard K. Morgan returns to cyberpunk roots in Altered Carbon graphic novel" (https://www.syfy.com/syfywire/exclusive-richard-k-morgan-returns-to-cyberpunk-roots-in-altered-carbon-graphic-novel). *SYFY WIRE*.

3. "*Altered Carbon* by Richard K. Morgan" (https://www.kirkusreviews.com/book-reviews/richard-k-morgan/altered-carbon/). *Kirkus Reviews*. 1 December 2002.

4. "2003 Philip K. Dick Award Winner" (https://www.philipkdickaward.org/2004/04/2003_philip_k_d.html). *Philip K. Dick Award*. 9 April 2004.

5. "Netflix Orders 'Altered Carbon' Sci-Fi Series From Laeta Kalogridis & Skydance" (https://deadline.com/2016/01/altered-carbon-drama-series-laeta-kalogridis-netflix-skydance-1201684680/). *Deadline*. 20 January 2016. Retrieved 20 January 2016.

6. Hibberd, James (4 December 2017). "Altered Carbon: First teaser trailer for stunning Netflix sci-fi series" (https://ew.com/tv/2017/12/04/altered-carbon-trailer-netflix/). *Entertainment Weekly*. Retrieved 4 December 2017.

7. Kyriazis, Stefan (16 February 2018). "Altered Carbon book vs show: How much did they change? 19 major differences EXPLAINED" (https://www.express.co.uk/entertainment/books/919030/Altered-Carbon-book-show-different-changes-torture-scene-Richard-Morgan-sequel-book-two). *Express.co.uk*. Retrieved 14 August 2019.

8. Holloway, Daniel (7 June 2018). "Why 'Altered Carbon' Boss Replaced Hendrix With Poe for Netflix Adaptation" (https://variety.com/2018/tv/features/altered-carbon-laeta-kalogridis-adaptation-edgar-allan-poe-interview-1202830788/). *Variety*. Retrieved 14 August 2019.

9. Ramos, Dino-Ray (8 November 2018). "Netflix Unveils 'Pacific Rim', 'Altered Carbon' & More In New Lineup Of Anime Originals" (https://deadline.com/2018/11/netflix-anime-pacific-rim-altered-carbon-caster-of-an-insect-cage-yasuke-trese-1202498191/). *Deadline*. Retrieved 8 November 2018.

10. "NETFLIX UNVEILS 17 NEW ORIGINALS FROM ASIA" (https://media.netflix.com/en/press-releases/netflix-unveils-17-new-originals-from-asia-1). *Netflix Media Center*. Retrieved 8 November 2018.

11. "Altered Carbon: Resleeved Anime Unveils Trailer, Japanese Cast, March 19 Debut" (https://www.ani menewsnetwork.com/news/2020-03-09/altered-carbon-resleeved-anime-unveils-trailer-japanese-cas t-march-19-debut/.157340). *Anime News Network*. Retrieved 10 March 2020.

# External links

- *Altered Carbon* (http://www.isfdb.org/cgi-bin/title.cgi?23041) title listing at the Internet Speculative Fiction Database
- *Altered Carbon* (https://www.goodreads.com/book/show/40792913-altered-carbon) at goodreads.com

Retrieved from "https://en.wikipedia.org/w/index.php?title=Altered_Carbon&oldid=974299335"

**This page was last edited on 22 August 2020, at 05:57 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Exhibit R

We use cookies on this site to help us provide a better service. By navigating the site you are accepting the cookies

See our cookie policy for more details.

x



Menu

Sign in or Register

# CHECK PERMISSIONS

Find out what can be copied, shared or re-used under your licence.

| Altered Carbon | X |
|---|---|



## Search Results for 'Altered Carbon'

| 25 results per page | ▼ |
|---|---|

| Sort by Relevance | ▼ |
|---|---|

⏮  ◀  **1**  2  3  4  5  ▶  ⏭

## Altered Carbon

**ISBN:** 9781409146834
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

| SHOW FURTHER EDUCATION PERMISSIONS |
|---|

## Altered Carbon

**ISBN:** 9780575085688

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## ALTERED CARBON

**ISBN:** 9780345457684

**Publication Type:** Book

**Publication Form:** Print

**Country of Publication :** United States of America

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780575081246

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780575073227

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780575073906
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780575073210
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780575081123
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9780752856469
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Altered Carbon Netflix Altered Carbon book 1

**ISBN:** 9781473223677
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Broken Angels Netflix Altered Carbon book 2

**ISBN:** 9780575073234
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Broken Angels Netflix Altered Carbon book 2

**ISBN:** 9780575073241
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Woken Furies Netflix Altered Carbon book 3

**ISBN:** 9780575073265
**Publication Type:** Book
**Publication Form:** Print

Case 3:20-cv-01596-VC Document 103 Filed 09/22/20 Page 148 of 264

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

---

SHOW FURTHER EDUCATION PERMISSIONS

---

## Woken Furies Netflix Altered Carbon book 3

**ISBN:** 9780575076525

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

---

SHOW FURTHER EDUCATION PERMISSIONS

---

## Broken Angels Netflix Altered Carbon book 2

**ISBN:** 9780575081253

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

---

SHOW FURTHER EDUCATION PERMISSIONS

---

## Woken Furies Netflix Altered Carbon book 3

**ISBN:** 9780575081277

**Publication Type:** Book

**Publication Form:** Print

**Publisher:** Orion Publishing Group Limited

**Country of Publication :** United Kingdom of Great Britain & N. Ireland

---

SHOW FURTHER EDUCATION PERMISSIONS

---

## Woken Furies Netflix Altered Carbon book 3

**ISBN:**  9780575073258

**Publication Type:**  Book

**Publication Form:**  Print

**Publisher:**  Orion Publishing Group Limited

**Country of Publication :**   United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Broken Angels Netflix Altered Carbon book 2

**ISBN:**  9780575075504

**Publication Type:**  Book

**Publication Form:**  Print

**Publisher:**  Orion Publishing Group Limited

**Country of Publication :**   United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Altered Carbon: The Art and Making of the Series

**ISBN:**  9781789092189

**Publication Type:**  Book

**Publication Form:**  Print

**Publisher:**  Titan Publishing Group Limited

**Country of Publication :**   United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

## Thin Air From the author of Netflix's Altered Carbon

**ISBN:**  9780575088573

**Publication Type:**  Book

**Publication Form:**  Print

**Publisher:**  Orion Publishing Group Limited

**Country of Publication :**   United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

---

# Thin Air From the author of Netflix's Altered Carbon

**ISBN:** 9780575075146
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

# Thin Air From the author of Netflix's Altered Carbon

**ISBN:** 9780575088566
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** Orion Publishing Group Limited
**Country of Publication :** United Kingdom of Great Britain & N. Ireland

SHOW FURTHER EDUCATION PERMISSIONS

# ALTERED

**ISBN:** 9780316214506
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** HACHETTE BOOK GROUP, INC
**Country of Publication :** United States of America

SHOW FURTHER EDUCATION PERMISSIONS

# ALTERED

**ISBN:** 9780316214490
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** HACHETTE BOOK GROUP, INC
**Country of Publication :** United States of America

Case 3:20-cv-01596-VC Document 108 Filed 09/22/20 Page 151 of 264

| | |
|---|---|
| **SHOW FURTHER EDUCATION PERMISSIONS** | |

---

# ALTERED

**ISBN:** 9780316197090
**Contributor:** Rush, Jennifer
**Publication Type:** Book
**Publication Form:** Print
**Publisher:** HACHETTE BOOK GROUP, INC
**Country of Publication :** United States of America

| | |
|---|---|
| **SHOW FURTHER EDUCATION PERMISSIONS** | |

---

⏮   ◀   **1** 2 3 4 5   ▶   ⏭

## Show Results by Licence Sector

| Further Education | ▼ |
|---|---|

## Refine Results By

## Publication Type

Book (4161)

Journal/Magazine (56)

## Country Of Publication

### Search Filters...

United Kingdom of Great Britain & N. Ireland (3477)

United States of America (650)

Canada (28)

Switzerland, Swiss Confederation (9)

France, French Republic (8)

Germany (6)

Singapore, Republic of (5)

Japan (4)

Netherlands, Kingdom of the (4)

Spain, Spanish State (4)

Sweden, Kingdom of (3)

Australia, Commonwealth of (2)

## Publisher

### Search Filters...

Taylor and Francis (Books) Limited UK (685)

Springer Nature BV (Springer) (486)

BSI Standards Limited (351)

John Wiley and Sons Limited (Books) (338)

Elsevier Books Limited (304)

Cambridge University Press (231)

Taylor and Francis Group LLC (Books) US (132)

Stationery Office Limited (125)

American Welding Society (110)

Georg Thieme Verlag KG (103)

TAYLOR & FRANCIS GROUP LLC - BOOKS (65)

JOHN WILEY & SONS - BOOKS (51)

Copyright notice
Privacy policy

Terms of use
Accessibility policy
Anti Slavery policy

Work for us
Code of conduct
Contact us

The Copyright Licensing Agency Ltd
5th Floor, Shackleton House
4 Battle Bridge Lane
London
SE1 2HX

Registered in England No. 1690026

Copyright. Made Simple.

Exhibit S



United States Copyright Office

Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog
is available. More.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = altered carbon
Search Results: Displaying 1 through 25 of 36 entries.


◄ previous    next ►

Resort results by:  Date (ascending)  ⌄

Set Search Limits

| # | Title < | Full Title | Copyright Number | Date |
|---|---------|------------|------------------|------|
| [ 1 ] | ALTERED CARBON. | ALTERED CARBON. | TX0008121077 | 2002 |
| [ 2 ] | Altered carbon / Written by Richard Morgan. | Altered carbon / Written by Richard Morgan. | V3492D570 | 2002 |
| [ 3 ] | Altered carbon. | Altered carbon. | V3492D250 | 2003 |
| [ 4 ] | Altered carbon. | Altered carbon. | V3492D167 | 2003 |
| [ 5 ] | Altered carbon; novel / Written by Richard Morgan. | Altered carbon; novel / Written by Richard Morgan. | V3510D769 | 2004 |
| [ 6 ] | Altered carbon / by Richard Morgan. | Altered carbon / by Richard Morgan. | V3566D356 | 2007 |
| [ 7 ] | Altered carbon / by Richard Morgan. | Altered carbon / by Richard Morgan. | V3581D395 | 2009 |
| [ 8 ] | Altered Carbon. | Altered Carbon. | V9933D886 | 2016 |
| [ 9 ] | Altered Carbon : 101, Out of the Past. | Altered Carbon : 101, Out of the Past. | PAu003793364 | 2016 |
| [ 10 ] | Altered carbon; script / Laeta Kologridis & Patrick Lussier. | Altered carbon; script / Laeta Kologridis & Patrick Lussier. | V9933D885 | 2016 |
| [ 11 ] | Altered carbon series out of the past, episode (#101) / Reg. PAu3793364. | Altered carbon series out of the past, episode (#101) / Reg. PAu3793364. | V9935D894 | 2016 |
| [ 12 ] | Altered Carbon. | Altered Carbon. | SRu001287706 | 2017 |
| [ 13 ] | Altered Carbon | Altered Carbon : 101, Out of the Past. | PA0002102503 | 2018 |
| [ 14 ] | Altered Carbon | Altered Carbon : 102, Fallen Angel. | PA0002102511 | 2018 |
| [ 15 ] | Altered Carbon | Altered Carbon : 103, In a Lonely Place. | PA0002102516 | 2018 |
| [ 16 ] | Altered Carbon | Altered Carbon : 104, Force of Evil. | PA0002102524 | 2018 |
| [ 17 ] | Altered Carbon | Altered Carbon : 105, The Wrong Man. | PA0002102529 | 2018 |
| [ 18 ] | Altered Carbon | Altered Carbon : 106, Man with My Face. | PA0002102537 | 2018 |
| [ 19 ] | Altered Carbon | Altered Carbon : 107, Nora Inu. | PA0002102636 | 2018 |
| [ 20 ] | Altered Carbon | Altered Carbon : 108, "Clash by Night". | PA0002104660 | 2018 |
|  | Altered Carbon | Altered Carbon : 109, Rage in Heaven. | PA0002102541 | 2018 |

| | | | | |
|---|---|---|---|---|
| ☐ [21] | | | | |
| ☐ [22] | Altered Carbon | Altered Carbon : 110, The Killers. | PA0002102543 | 2018 |
| ☐ [23] | Altered carbon | Clash by night - episode 108; Entire motion picture / Skydance Productions, LLC; (In Altered carbon) | V9957D494 | 2018 |
| ☐ [24] | Altered carbon | Fallen angel - episode 102; Entire motion picture / Skydance Productions, LLC; (In Altered carbon) | V9957D494 | 2018 |
| ☐ [25] | Altered carbon | Force of evil - episode 104; Entire motion picture / Skydance Productions, LLC; (In Altered carbon) | V9957D494 | 2018 |

Resort results by:  Date (ascending)  ⌄                                    Set Search Limits

Clear Selected    Retain Selected

◄ previous          next ►

| Save, Print and Email (Help Page) | |
|---|---|
| **Records** | Select Format:  Full Record  ⌄    Format for Print/Save |
| ◯ All on Page ◉ Selected On Page ◯ Selected all Pages | Enter your email address:                                    Email |

**Search for:**  altered carbon              **Search by:**  Title (omit initial article A, An, The, El, La, Das etc.)  ⌄    **Item type:**  None  ⌄

25 records per page  ⌄                                    Submit    Reset

Help    Search    History    **Titles**    Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit T



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = altered carbon
Search Results: Displaying 1 of 36 entries



---

Labeled View

### *ALTERED CARBON.*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0008121077 / 2015-09-16 |
| **Application Title:** | ALTERED CARBON. |
| **Title:** | ALTERED CARBON. |
| **Description:** | Book. |
| **Copyright Claimant:** | Richard K. Morgan, 1965- . Address: c/o The Orion Publishing Group Ltd., Carmelite House, 50 Victoria Embankment, London, EC4Y 0DZ, England. |
| **Date of Creation:** | 2001 |
| **Date of Publication:** | 2002-01-01 |
| **Nation of First Publication:** | United Kingdom |
| **Authorship on Application:** | Richard K. Morgan, 1965- ; Citizenship: United Kingdom. Authorship: text. |
| **Rights and Permissions:** | Del Rey, 1745 Broadway, 15th Floor, New York, NY, 10019, United States |
| **ISBN:** | 9780345457684 |
| **Names:** | Morgan, Richard K., 1965- |



---

| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record ⌄     Format for Print/Save |
| Enter your email address:                      Email |

---

Help   Search   History   Titles   Start Over

---

Exhibit U



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 2 of 36 entries



Labeled View

*Altered Carbon.*

| | |
|---|---|
| **Type of Work:** | Recorded Document |
| **Document Number:** | V9933D886 |
| **Date of Recordation:** | 2016-02-01 |
| **Entire Copyright Document:** | V9933 D886 P1-4 |
| **Date of Execution:** | effective as of 22Jan16; 26Jan161 |
| **Title:** | Altered Carbon. |
| **Notes:** | Short-form license. |
| **Party 1:** | Skydance Productions, LLC |
| **Party 2:** | Netflix, Inc. |
| **Names:** | Skydance Productions, LLC |
| | Netflix, Inc. |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record ⌄ | Format for Print/Save |
| Enter your email address: | Email |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

Help    Search    History    Titles    Start Over

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 3 of 36 entries



Labeled View

*Altered carbon.*

| | |
|---|---|
| **Type of Work:** | Recorded Document |
| **Document Number:** | V3492D250 |
| **Date of Recordation:** | 2003-04-28 |
| **Entire Copyright Document:** | V3492 D216-298 P1-891 |
| **Title:** | Altered carbon. |

**Title appears in Document:**

| # | **Full Title** |
|---|---|
| [_1_ ] | Abominable snow rabbit & 30,007 other titles. (Part 035 of 083) |



| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format   Full Record  ⌄ | Format for Print/Save |
| Enter your email address: | Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|---|---|---|---|---|

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 4 of 36 entries





*Altered carbon.*

|  |  |
|---|---|
| **Type of Work:** | Recorded Document |
| **Document Number:** | V3492D167 |
| **Date of Recordation:** | 2003-04-28 |
| **Entire Copyright Document:** | V3492 D133-215 P1-891 |
| **Title:** | Altered carbon. |

| **Title appears in Document:** | # | **Full Title** |
|---|---|---|
| | [_1_] | Abominable snow rabbit & 30,007 other titles. (Part 035 of 083) |



| **Save, Print and Email (Help Page)** | |
|---|---|
| Select Download Format  Full Record  ∨ | Format for Print/Save |
| Enter your email address: | Email |

| Help | Search | History | Titles | Start Over |
|---|---|---|---|---|

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page





## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 5 of 36 entries



### *ALTERED CARBON.*

|  |  |
|---|---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TX0008121077 / 2015-09-16 |
| **Application Title:** | ALTERED CARBON. |
| **Title:** | ALTERED CARBON. |
| **Description:** | Book. |
| **Copyright Claimant:** | Richard K. Morgan, 1965- . Address: c/o The Orion Publishing Group Ltd., Carmelite House, 50 Victoria Embankment, London, EC4Y 0DZ, England. |
| **Date of Creation:** | 2001 |
| **Date of Publication:** | 2002-01-01 |
| **Nation of First Publication:** | United Kingdom |
| **Authorship on Application:** | Richard K. Morgan, 1965- ; Citizenship: United Kingdom. Authorship: text. |
| **Rights and Permissions:** | Del Rey, 1745 Broadway, 15th Floor, New York, NY, 10019, United States |
| **ISBN:** | 9780345457684 |
| **Names:** | Morgan, Richard K., 1965- |

| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format   Full Record  ˅   Format for Print/Save |
| Enter your email address:     Email |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 6 of 36 entries



**Labeled View**

*Altered Carbon :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002102503 / 2018-02-13 |
| **Application Title:** | "Out of the Past" - Episode 101. |
| **Title:** | Altered Carbon : 101, Out of the Past. |
| **Appears in:** | Altered Carbon |
| **Description:** | Videocassette (Betacam SP) ; 1/2 in. |
| **Copyright Claimant:** | Skydance Productions, LLC. Address: 1661 Lincoln Boulevard, Fourth Floor, SANTA MONICA, CA, 90404. |
| **Date of Creation:** | 2018 |
| **Date of Publication:** | 2018-02-02 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Skydance Productions, LLC, employer for hire; Citizenship: United States. Authorship: entire motion picture. |
| **Names:** | Skydance Productions, LLC |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format  Full Record  ⌄ | Format for Print/Save |
| Enter your email address: | Email |

| Help | Search | History | Titles | Start Over |

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page



*Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available.* **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Altered Carbon
Search Results: Displaying 7 of 36 entries



Labeled View

*Altered Carbon :*

**Type of Work:** Motion Picture
**Registration Number / Date:** PA0002102511 / 2018-02-13
**Application Title:** "Fallen Angel" - Episode 102.
**Title:** Altered Carbon : 102, Fallen Angel.
**Appears in:** Altered Carbon
**Description:** Videocassette (Betacam SP) ; 1/2 in.
**Copyright Claimant:** Skydance Productions, LLC. Address: 1661 Lincoln Boulevard, Fourth Floor, SANTA MONICA, CA, 90404.
**Date of Creation:** 2018
**Date of Publication:** 2018-02-02
**Nation of First Publication:** United States
**Authorship on Application:** Skydance Productions, LLC, employer for hire; Citizenship: United States. Authorship: entire motion picture.
**Names:** Skydance Productions, LLC



| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format  Full Record ⌄ | Format for Print/Save |
| Enter your email address: | Email |

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

Exhibit V


United States Copyright Office

# Administrative Copyright Classification Systems

The classification system employed by the Copyright Office to further identify the form of a given deposit has always been an internal policy, considered part of the Office "housekeeping", and considered not to have any bearing on the copyright itself. It can be a very useful tool in limiting searches and identifying sparsely cataloged entries with few descriptors. The system has evolved over the years; new classes were established and older designations were phased out. As a response to Revision and to make as clean a break as possible between "old law" and "new law" registrations, the Copyright Office developed the following system which went into effect on January 1, 1978:

### Class TX: Nondramatic Literary Works

This category is very broad. Except for dramatic works and certain kinds of audiovisual works, Class TX included all types of published and nonpublished works written in words (or other verbal or numerical symbols). A few of the many examples of "nondramatic literary works" include: fiction, nonfiction, poetry, periodicals, textbooks, reference works, directories, catalogs, advertising copy, and compilations of information.

### Class PA: Works of the Performing Arts

This category includes published and unpublished works prepared for the purpose of being "performed" directly before an audience of indirectly "by means of any device or process". Examples of works of the performing arts are: musical works, including any accompanying words; dramatic works, including any accompanying music; pantomimes and choreographic works; and motion pictures and other audiovisual works.

### Class VA: Works of the Visual Arts

This category consists of published and unpublished "pictorial, graphic, or sculptural works", including two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, technical drawings, diagrams, and models. Within this class are pictorial or graphic labels and advertisements, as well as "works of artistic craftsmanship". The "design of a useful article" may be registrable in Class VA, but "only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article".

## Class SR: Sound Recordings

This category is appropriate for registration for both published and unpublished works in two situations: (1) where the copyright claim is limited to the sound recording itself; and (2) where the same copyright claimant is seeking to register not only the sound recording but also the musical, dramatic, or literary works embodied in the sound recording. With one exception, "sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds. The exception is for the audio portions of audiovisual works, such as a motion picture soundtrack or an audio cassette accompanying a filmstrip; these are considered an integral part of the audiovisual work as a whole and are registrable in Class PA. Sound recordings fixed before February 15, 1972 are not eligible for registration, but may be protected by State law.

## Class RE: Renewal Registration

This category covers renewal registration for copyrights that are already in their first term on January 1, 1978 (that is, renewals for works originally copyrighted between January 1, 1950 and December 31, 1977). Class RE is appropriate for all renewal registrations, regardless of the class in which the original registration was made.

In dealing with pre-1978 registrations, it is necessary to be aware of the administrative classes that had evolved prior to Revision. The following is a brief description of each class, along with a history of numbering systems. NOTE: None of these classes are in effect at the present time. If a class was phased out prior to December 31, 1977, the end date is indicated.

## 1870 − 1894

### No Classification

One letter of the alphabet used before the numbers each year through the entire alphabet, omitting "J". The letters did not indicate the class of material registered but, rather, the year.

| Beginning date | Closing No. |
| --- | --- |
| July 1, 1870 | A 1 − 5600 |
| Jan. 1, 1871 | B 1 − 12831 |
| Jan. 1, 1872 | C 1 − 14180 |
| Jan. 1, 1873 | D 1 − 15648 |
| Jan. 1, 1874 | E 1 − 16206 |
| Jan. 1, 1875 | F 1 − 14197 |
| Jan. 1, 1876 | G 1 − 14883 |
| Jan. 1, 1877 | H 1 − 15758 |
| Jan. 1, 1878 | I 1 − 15799 |
| Jan. 1, 1879 | K 1 − 18125 |
| Jan. 1, 1870 | L 1 − 20687 |
| Jan. 1, 1881 | M 1 − 21085 |

| Beginning date | Closing No. |
|---|---|
| Jan. 1, 1882 | N 1 − 22929 |
| Jan. 1, 1883 | O 1 − 25294 |
| Jan. 1, 1884 | P 1 − 26895 |
| Jan. 1, 1885 | Q 1 − 28411 |
| Jan. 1, 1886 | R 1 − 31241 |
| Jan. 1, 1887 | S 1 − 35084 |
| Jan. 1, 1888 | T 1 − 38228 |
| Jan. 1, 1889 | U 1 − 40985 |
| Jan. 1, 1890 | V 1 − 42798 |
| Jan. 1, 1891 | W 1 − 48917  *(prior to this year non-resident foreigners could not register claims for copyright)* |
| Jan. 1, 1892 | X 1 − 54748 |
| Jan. 1, 1893 | Y 1 − 58973 |
| Jan. 1, 1894 | Z 1 − 62803 |

## 1895 − 1897

**No Classification**

One letter followed by small figure 2 before the number, as a symbol of the year.

1895 AA 1 − 67574
1896 B2 1 − 72482
1897 C2 1 − 74191

## 1898 − 1899

**No Classification**

No letters before the numbers.

1898 1 − 77621
1899 1 − 85602

## 1900

**Four classes**

Letter before the numbers indicating the class.

| | |
|---|---|
| A (Books and dramas) | A 1 − 31965 |
| B (Periodicals) | B 1 − 21589 |
| C (Music) | C 1 − 20024 |
| *D (Miscellaneous) | D 1 − 24642 |

*Miscellaneous included maps, charts, chromos, lithographs, engravings, prints, photographs and fine arts.*

## 1901 – June 30, 1909

**Nine classes\***

Letter before the numbers indicated the class. Letter followed by xxc (i.e., twentieth century) and the number.

| | |
|---|---|
| A (Books) | A xxc 1 – 243564 |
| B (Periodicals) | B xxc 1 – 189240 |
| C (Music) | C xxc 1 – 210861 |
| D (Drama) | D xxc 1 – 16208 |
| E (Maps and Charts) | E xxc 1 – 15227 |
| F (Engravings, cuts & prints) | F xxc 1 – 78218 |
| G (Chromos & Lithographs) | G xxc 1 – 21857 |
| H (Photographs) | H xxc 1 – 129497 |
| I (Orig. works of art) | I xxc 1 – 30269 |

*\*Numbering was continued after July 1, 1909, with the changes given below. Numbers between closing numbers here and beginning numbers in 1909 were unused.*

## 1904

Books and works of art deposited and registered at the Louisiana Purchase Exposition, St. Louis, Missouri.

| | |
|---|---|
| Books | LPE Group 1 No. 1 – 183 |
| Works of art | LPE Group 2 No. 1 – 178 |

## 1905

April 11 separate numbering started for deposits of foreign books for reservation of copyright.

Act of March 3, 1905.

Res. No. 1 – 3073 (Completed June 30, 1909)

## 1909

**Changes in classes, and Renewals Notice of Uses added.** (Act of March 4, 1909) Effective July 1, 1909.

Numbering continued 1901 series above.

| | | Completed Date |
|---|---|---|
| *A (Domestic books) | A xxc 243600 – 1087999 (1057000-1060999 unused) | Oct. 13, 1928 |
| | AA and AO Pamphlets, small books, leaflets, etc. | Oct. 6, 1928 |
| | A5 Contributions to periodicals | Nov. 21, 1928 |
| | A5ct Contributions in Chicago Tribune | Feb. 18, 1929 |
| | A5nt Contributions in New York Times | Aug. 29, 1929 |

*\*Certain records books were assigned to particular classes of books but were numbered as a single class.*

|  |  | **Completed Date** |
|---|---|---|
| A for. (Foreign books) | A For. xxc 1 – 39999 | Oct. 1928 |
| A int. (Ad interim books) | A int. xxc 1 – 12999 | Jul. 3, 1929 |
| B (Periodicals) | B xxc  189300 – 900999 | Oct. 2, 1928 |
| C (Lectures, sermons) | C xxc 1 – 4115 | Oct. 1, 1928 |
| *D (Drama & Dramatico-Mus.) | D xxc 16206 **- 87999 | Feb. 28, 1929 |

*Certain record books were assigned to particular kinds of drama but numbered as one class:*

> D1c Unpublished drama
>
> D2c Published drama
>
> DM Dramatico-musical comp.

**16206. 7, 8, are dup. nos. of old series*

| *E (Music) | **E xxc 211000-704999 | Sept., Oct. 1928 |
|---|---|---|

*After no. E xxc 264703 (1911) certain record books were assigned to published, unpublished and foreign music but were numbered as a single class.*
***This numbering was a continuation of Class C of the 1901 group.*

| *F (Maps and Charts) | **F xxc 15228-56999 | Sept. 23, 1929 |
|---|---|---|

*Certain record books were assigned to maps from the Sanborn Map Co. and marked FS- the last book was completed Sept. 15, 1929.*
***This numbering was a continuation of Class E of 1901 group.*

| *G (Works of art) | G xxc 30270 – 84999 | Jan. 2, 1929 |
|---|---|---|

*This is a continuation of Class I of the 1901 group.*

| H (Reproductions) | H xxc 1 – 1072 | June 30, 1925 |
|---|---|---|
| I (Drawings of plastic works of scientific or technical character) | I xxc 1 – 15999 | Dec. 11, 1928 |
| *J (Photographs) | **J xxc 129500 – 300999 | Nov. 24, 1928 |

*Certain record books were assigned to unpublished photographs and marked Jo but numbered as a single class.*
***This numbering was a continuation of Class H of the 1901 group.*

| *K (Prints and pictorial illustrations) | K xxc 1 – 246999 | Dec. 3, 1928 |
|---|---|---|

*Certain record books were assigned to pictorial illustrations from the Chicago Tribune and marked Kct but were numbered as a single class.*

| *R (Renewals) | R xxc 1 – 49999 | **Sept. 4, 1928 |
|---|---|---|

*Certain record books were assigned to renewals from the West Publishing Co. and marked RW but were numbered as a single class.*
***A new numbering was begun in Sept. 1928 but the one book assigned to the West Publishing Co. entries was not completed until Jan. 1933.*

| *U (Notice of use) | Not numbered | |
|---|---|---|

*Started Sept. 2, 1909*

## 1912

Act of Aug. 24, 1912 following classes added:

| | | Completed Date |
|---|---|---|
| L (Motion pictures – photoplays) | Lxxc 1 – 25999 | Jan. 12, 1929 |
| M (Motion pictures – not photoplays) | Mxxc – 5999 | Mar. 23, 1929 |

### 1913

Registration made at Panama Pacific International Exposition (Act of Sept. 18, 1913).

### 1915

No. 1, July 25, 1915, pages 27-33 inclusive entries, 1 certificate.

## 1928 – Dec. 31, 1945

Closing the xxc series and beginning the series without xxc.

| Class | Beginning Date | Numbering |
|---|---|---|
| A | Oct. 14, 1928 | A 1 – 192186 |
| AO | Oct. 8, 1928 | AO 1 – 4325 (Discontinued Dec. 4, 1928) |

[*These registration numbers are bound with the AA registration*]

| | | |
|---|---|---|
| AA | Sept. 27, 1928 | AA 4326 – 501314 |
| A5 | Dec. 12, 1928 | A5 1 – 140664 |
| A5ct | Feb. 18, 1929 | A5ct 1 – 2999 Discontinued Dec. 3, 1930 |
| A int. | July 3, 1929 | A int. 13000 – 29298 |
| A for. | July 16, 1928 | A for. 1 – 51150 |
| B | Oct. 1, 1928 | B 1 – 705364 (704269 – 704999 not used) |
| C | Oct. 1, 1928 | B 4116 – 18031 |
| *D | April 11, 1930 | D 1 – 96581 |

*Published drama marked D pub.; Unpublished drama marked D unp.; certain record books assigned to Dramatico-musicals and marked DM.*

| | | |
|---|---|---|
| E pub. | Oct. 20, 1928 | E pub. 1 – 137736 |
| E unpubl. | Oct. 6, 1928 | E unp. 1 – 451923 |
| E for. | Sept. 22, 1928 | E for. 1 – 71662 |
| *F | Sept. 23, 1928 | F 1 – 20127 |

*Certain record books assigned to maps from Sanborn Map Co. and marked F.*

| **Class** | **Beginning Date** | **Numbering** |
|---|---|---|
| G | Jan. 2, 1929 | G 1 – 46841 |
| *H | Oct. 23, 1937 | H 1073-3060 |

*No registrations made from June 30, 1925-1937

| *I | Dec. 17, 1928 | I 1 – 37139 |

*Published entries marked I pub. Unpublished entries marked I unpub.

| *J | Nov. 24, 1928 | J 1 – 3900 |

*Certain record books assigned to unpublished entries and marked Jo – discontinued and same numbering with unpub. marked J unpub.

| K | Dec. 3, 1928 | K 1 – 60530 |
| K ct* | Dec. 3, 1928 | Kct – 8402 Discontinued |

*ct – Chicago Tribune

| L | Jan. 14, 1929 | L 1 – 13711 |
| M | March 26, 1929 | M 1 – 16613 |
| *R | September 5, 1929 | R 1 – 146584 |

*Certain books assigned to West Publishing Co., and marked RW

| U | Not numbered | |

**1940**

Following classes added – (Act of July 31, 1939) – effective July 1, 1940: closed Dec. 31, 1945.

| KK (Prints and labels) | KK 1 – 36703 |
|---|---|
| RR (Renewals of Prints and labels) | RR 1 – 151 |

## 1946

January 1 all classes began numbering with No. 1 – Following the Act of June 3, 1949, a separate series of numbers for foreign works deposited without fee was set up (AFO, BFO . . . ) These works were registered upon receipt of application and deposit. In general, F means foreign, P published, U unpublished, I ad interim.

| Books A | 1 - | |
|---|---|---|
| Pamphlets, etc. AA | 1 – 230874 | Discontinued Dec. 31, 1952 |
| AF | 1 - | |
| AFO | 1 - | Began July 28, 1949 |
| AI | 1 - | |
| AIO | 1 - | Began Aug. 16, 1949 |
| Periodical contribution A5 | 1 – 6699 | Changed to B5 May 1947 |
| Periodical B | 1 - | |
| Periodical contribution B5 | 1 – 33161 | May 13, 1947 – Jan. 9, 1956 (Changed to BB) |

| | | |
|---|---|---|
| BB | 1 - | Began Jan. 9, 1956 |
| BF | 1 - | Began Feb. 14, 1952 |
| BFO | 1 - | Began July 26, 1951 |
| BI | 1 - | Began July 25, 1951 |
| BIO | 1 - | Began July 25, 1951 |
| Lectures, sermons, addresses C | 1 - | |
| Dramatic compositions D | 1-23811 | Discontinued Apr. 5, 1950 |
| DF | 1 - | Began Jan. 19, 1951 |
| DFO | 1 - | Began Sept. 8, 1949 (Nos. 1-58 DPO) |
| DP | 1 - | Began Apr. 6, 1950 |
| DU | 23812 | Began Apr. 6, 1950 |
| E = music) | | |
| EP | 1 - | |
| EU | 1 - | |
| EF | 1 - | |
| EFO | 1 - | Began Aug. 5, 1949 |
| Maps F | 1 - | |
| FF | 1 | Began Mar. 17, 1966 |
| FFO | 1 - | Began Oct. 5, 1949 (Nos. 1-20 FO) |
| Works of art G | 1 − 16006 | Discontinued Apr. 5, 1950 |
| GF | 1 - | Began July 30, 1962 |
| GFO | 1 - | Began Dec. 13, 1955 |
| GP | 1 - | Began Apr. 6, 1950 |
| GU | 16007 | Began Apr. 6, 1950 |
| Reproductions of art H | 1 - | |
| HF | 1 - | Began Feb. 22, 1966 |
| HFO | 1 - | Began Sept. 12, 1949 (Nos. 1-3 HO) |
| Drawings I | 1 − 6768 | Discontinued Apr. 5, 1950 |
| IFO | 1 - | Began Jan. 26, 1950 (Nos. 1-3 IPO) |
| IP | 1 - | Began Apr. 6, 1950 |
| IU | 6769 | Began Apr. 5, 1950 |
| Photographs J | 1 − 6329 | Discontinued Apr. 5, 1950 |
| JFO | 1 - | Began Feb. 23, 1950 (No. 1-15, JO; No. 16-44, JPO) |
| JP | 1 - | Began Apr. 6, 1950 |
| JU | 6330 | Began Apr. 6, 1950 |
| Prints and pictorial illustrations K | 1 - | |
| KF | 1 - | Began Oct. 4, 1966 |

| | | |
|---|---|---|
| KFO | 1 - | Began Nov. 14, 1949 (No. 1-19, KO) |
| Prints and labels KK | 1 - | |
| KKF | 1 - | Began Apr. 20, 1967 |
| KKFO | 1 - | Began Jan. 6, 1959 |
| Photoplays L | 1 – 2973 | Discontinued Apr. 5, 1950 |
| LP | 1 - | Began Apr. 7, 1950 |
| LU | 2974 | Began Apr. 13, 1950 |
| LF | 1 - | Began Apr. 8, 1966 |
| LFO | 1 - | Began Mar. 8, 1965 |
| Motion pictures M | 1 – 5133 | Discontinued Apr. 5, 1950 |
| MP | 1 - | Began Apr. 7, 1950 |
| MU | 5134 | Began Apr. 13, 1950 |
| MFO | 1 - | Began Aug. 31, 1965 |
| Sound recordings N | 1 - | Began Feb. 15, 1972 |
| Renewals R | 1 - | |

## 1965

November 26 started numbering "NOTICE OF INTENTION TO USE", using the letter "V" preceding the number.

| | | |
|---|---|---|
| V | 1 - | |

# Exhibit W



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = abominable snow rabbit
Search Results: Displaying 1 of 174 entries



Labeled View

*The Abominable Snow Rabbit; motion picture. By Warner Brothers Pictures, Inc.*

|   |   |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | RE0000434281 / 1989-04-04 |
| | Renewal registration for: LP0000024813 / 1961-05-20 |
| **Title:** | The Abominable Snow Rabbit; motion picture. By Warner Brothers Pictures, Inc. |
| **Series:** | Looney Tunes Bugs Bunny |
| **Copyright Claimant:** | Warner Brothers, Inc. (PWH) |
| **Variant title:** | The Abominable Snow Rabbit |
| **Other Title:** | Bugs Bunny |
| **Names:** | Warner Brothers Pictures, Inc. |
| | Warner Brothers, Inc. |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record  ∨   Format for Print/Save |
| Enter your email address:  [                    ]  Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page

Exhibit X



**Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. <u>More</u>.**

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

---

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Document Number = V3492D214
Search Results: Displaying 16 of 259 entries



---

Labeled View

### *A family stolen.*

| | |
|---|---|
| **Type of Work:** | Recorded Document |
| **Document Number:** | V3492D214 |
| **Date of Recordation:** | 2003-04-28 |
| **Entire Copyright Document:** | V3492 D133-215 P1-891 |
| **Title:** | A family stolen. |

**Title appears in Document:**

| # | Full Title |
|---|-----------|
| [ 1 ] | Abominable snow rabbit & 30,007 other titles. (Part 082 of 083) |



| **Save, Print and Email (<u>Help Page</u>)** | |
|---|---|
| Select Download Format   Full Record ∨ | Format for Print/Save |
| Enter your email address: | Email |

---

Help    Search    History    Titles    Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |
Copyright Office Home Page  |  Library of Congress Home Page



Library buildings are closed to the public until further notice, but the U.S.
Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

# Public Catalog

Copyright Catalog (1978 to present)

Search Request: Left Anchored Document Number = V3492D214

Search Results: Displaying 16 of 259 entries



Labeled View

*A family stolen.*

**Type of Work:** Recorded Document

**Document Number:** V3492D214

**Date of Recordation:** 2003-04-28

**Entire Copyright Document:** V3492 D133-215 P1-891

**Title:** A family stolen.

**Title appears in Document:**

| # | Full Title |
|------|------------|
| [ 1 ] | Abominable snow rabbit & 30,007 other titles. (Part 082 of 083) |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format   Full Record   ∨ | Format for Print/Save |
| Enter your email address: | Email |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page

# Exhibit Y

**WIKIPEDIA**

# International Standard Book Number

The **International Standard Book Number** (**ISBN**) is a numeric commercial <u>book</u> <u>identifier</u> which is intended to be unique.[a][b] Publishers purchase ISBNs from an affiliate of the International ISBN Agency.[1]

An ISBN is assigned to each separate edition and variation (except reprintings) of a publication. For example, an <u>e-book</u>, a <u>paperback</u> and a <u>hardcover</u> edition of the same book will each have a different ISBN. The ISBN is ten digits long if assigned before 2007, and thirteen digits long if assigned on or after 1 January 2007.[c] The method of assigning an ISBN is nation-specific and varies between countries, often depending on how large the publishing industry is within a country.

The initial ISBN identification format was devised in 1967, based upon the 9-digit **Standard Book Numbering** (**SBN**) created in 1966. The 10-digit ISBN format was developed by the <u>International Organization for Standardization</u> (ISO) and was published in 1970 as international standard ISO 2108 (the 9-digit SBN code can be converted to a 10-digit ISBN by prefixing it with a zero digit '0').

Privately published books sometimes appear without an ISBN. The International ISBN Agency sometimes assigns such books ISBNs on its own initiative.[3]

Another identifier, the <u>International Standard Serial Number</u> (ISSN), identifies periodical publications such as <u>magazines</u> and <u>newspapers</u>. The <u>International Standard Music Number</u> (ISMN) covers <u>musical scores</u>.

## International Standard Book Number



A 13-digit ISBN, 978-3-16-148410-0, as represented by an <u>EAN-13 bar code</u>

| | |
|---|---|
| **Acronym** | ISBN |
| **Organisation** | International ISBN Agency |
| **Introduced** | 1970 |
| **No. of digits** | 13 (formerly 10) |
| **Check digit** | Weighted sum |
| **Example** | 978-3-16-148410-0 |
| **Website** | <u>isbn-international .org (http://ISBN-international.org)</u> |

# Contents

**History**

**Overview**

How ISBNs are issued

Registration group identifier

Registrant element

    Pattern for English language ISBNs

**Check digits**

ISBN-10 check digits

ISBN-10 check digit calculation

ISBN-13 check digit calculation

ISBN-10 to ISBN-13 conversion

Errors in usage

eISBN

**EAN format used in barcodes, and upgrading**

**See also**

**Notes**

**References**

**External links**

# History

The Standard Book Number (SBN) is a commercial system using nine-digit code numbers to identify books. It was created by Gordon Foster, Emeritus Professor of Statistics at Trinity College, Dublin,[4] for the booksellers and stationers WHSmith and others in 1965.[5] The ISBN identification format was conceived in 1967 in the United Kingdom by David Whitaker[6][7] (regarded as the "Father of the ISBN")[8] and in 1968 in the United States by Emery Koltay[6] (who later became director of the U.S. ISBN agency R. R. Bowker).[8][9][10]

The 10-digit ISBN format was developed by the International Organization for Standardization (ISO) and was published in 1970 as international standard ISO 2108.[5][6] The United Kingdom continued to use the nine-digit SBN code until 1974. ISO has appointed the International ISBN Agency as the registration authority for ISBN worldwide and the ISBN Standard is developed under the control of ISO Technical Committee 46/Subcommittee 9 TC 46/SC 9. The ISO on-line facility only refers back to 1978.[11]

An SBN may be converted to an ISBN by prefixing the digit "0". For example, the second edition of *Mr. J. G. Reeder Returns*, published by Hodder in 1965, has "SBN 340 01381 8", where "340" indicates the publisher, "01381" is the serial number assigned by the publisher, and "8" is the check digit. By prefixing a zero, this can be converted to ISBN 0-340-01381-8; the check digit does not need to be re-calculated. Some publishers, such as Ballantine Books, would sometimes use 12-digit SBNs where the last three digits indicated the price of the book;[12] for example, *Woodstock Handmade Houses* had a 12-digit Standard Book Number of 345-24223-8-595 (valid SBN: 345-24223-8, ISBN: 0-345-24223-8),[13] and it cost US$5.95.[14]

Since 1 January 2007, ISBNs have contained thirteen digits, a format that is compatible with "Bookland" European Article Numbers, which have 13 digits.[2]

# Overview

A separate ISBN is assigned to each edition and variation (except reprintings) of a publication. For example, an ebook, audiobook, paperback, and hardcover edition of the same book will each have a different ISBN assigned to it.[15]:12 The ISBN is thirteen digits long if assigned on or after 1 January 2007, and ten digits long if assigned before 2007.[c][2] An International Standard Book Number consists of four parts (if it is a 10-digit ISBN) or five parts (for a 13-digit ISBN).

Section 5 of the International ISBN Agency's official user manual[15]:11 describes the structure of the 13-digit ISBN, as follows:

1. for a 13-digit ISBN, a prefix element – a *GS1 prefix*: so far 978 or 979 have been made available by GS1,
2. the *registration group element* (language-sharing country group, individual country or territory),[d]
3. the *registrant* element,
4. the *publication element*, and
5. a *checksum* character or check digit.

A 13-digit ISBN can be separated into its parts (*prefix element*, *registration group*, *registrant*, *publication* and *check digit*), and when this is done it is customary to separate the parts with hyphens or spaces. Separating the parts (*registration group*, *registrant*, *publication* and *check digit*) of a 10-digit ISBN is also done with either hyphens or spaces. Figuring out how to correctly separate a given ISBN is complicated, because most of the parts do not use a fixed number of digits.[e]

## How ISBNs are issued

ISBN issuance is country-specific, in that ISBNs are issued by the ISBN registration agency that is responsible for that country or territory regardless of the publication language. The ranges of ISBNs assigned to any particular country are based on the publishing profile of the country concerned, and so the ranges will vary depending on the number of books and the number, type, and size of publishers that are active. Some ISBN registration agencies are based in national libraries or within ministries of culture and thus may receive direct funding from government to support their services. In other cases, the ISBN registration service is provided by organisations such as bibliographic data providers that are not government funded.[17]

The parts of a 10-digit ISBN and the corresponding EAN-13 and barcode. Note the different check digits in each. The part of the EAN-13 labeled "EAN" is the Bookland country code.

A full directory of ISBN agencies is available on the International ISBN Agency website.[18] Partial listing:

- Australia – the commercial library services agency Thorpe-Bowker;[19][20]
- Brazil – The National Library of Brazil;[21] (Up to 28 February 2020)[22]
- Brazil – Câmara Brasileira do Livro;[23] (From 1 March 2020)[22]
- Canada – English Library and Archives Canada, a government agency; French Bibliothèque et Archives nationales du Québec;
- Colombia – Cámara Colombiana del Libro, an NGO;
- Hong Kong – Books Registration Office (BRO), under the Hong Kong Public Libraries;[24]
- India – The Raja Rammohun Roy National Agency for ISBN (Book Promotion and Copyright Division), under Department of Higher Education, a constituent of the Ministry of Human Resource Development;[25]
- Iceland – Landsbókasafn (National and University Library of Iceland);
- Israel – The Israel Center for Libraries;[26]
- Italy – *EDISER srl*, owned by *Associazione Italiana Editori* (Italian Publishers Association);[27][28]
- Maldives – The National Bureau of Classification (NBC);
- Malta – The National Book Council (Maltese: *Il-Kunsill Nazzjonali tal-Ktieb*);[29][30][31]
- Morocco – The National Library of Morocco

- New Zealand – The National Library of New Zealand;[32]
- Pakistan – National Library of Pakistan
- Philippines – National Library of the Philippines;[33]
- South Africa – National Library of South Africa
- Spain – Spanish ISBN Agency – Agencia del ISBN (https://www.agenciaisbn.es/)
- Turkey – General Directorate of Libraries and Publications, a branch of the Ministry of Culture;[34]
- United Kingdom and Republic of Ireland -*Nielsen Book Services Ltd*, part of Nielsen Holdings N.V.;[35]
- United States – R. R. Bowker.[6][36]

## Registration group identifier

The ISBN registration group identifier is a 1- to 5-digit number that is valid within a single prefix element (i.e. one of 978 or 979),[15]:11 and can be separated between hyphens, such as "978-1-...". Registration group identifiers have primarily been allocated within the 978 prefix element.[37] The single-digit group identifiers within the 978-prefix element are: 0 or 1 for English-speaking countries; 2 for French-speaking countries; 3 for German-speaking countries; 4 for Japan; 5 for Russian-speaking countries; and 7 for People's Republic of China. An example 5-digit group identifier is 99936, for Bhutan. The allocated group IDs are: 0–5, 600–625, 65, 7, 80–94, 950–989, 9917–9989, and 99901–99983.[38] Books published in rare languages typically have longer group identifiers.[39]

Within the 979 prefix element, the registration group identifier 0 is reserved for compatibility with International Standard Music Numbers (ISMNs), but such material is not actually assigned an ISBN.[40] The registration group identifiers within prefix element 979 that have been assigned are 8 for the United States of America, 10 for France, 11 for the Republic of Korea, and 12 for Italy.[41]

The original 9-digit standard book number (SBN) had no registration group identifier, but prefixing a zero (0) to a 9-digit SBN creates a valid 10-digit ISBN.

## Registrant element

The national ISBN agency assigns the registrant element (cf. Category:ISBN agencies) and an accompanying series of ISBNs within that registrant element to the publisher; the publisher then allocates one of the ISBNs to each of its books. In most countries, a book publisher is not legally required to assign an ISBN, although most large bookstores only handle publications that have ISBNs assigned to them.[42][43][44]

A listing of more than 900,000 assigned publisher codes is published, and can be ordered in book form. The web site of the ISBN agency does not offer any free method of looking up publisher codes.[45] Partial lists have been compiled (from library catalogs) for the English-language groups: identifier 0 and identifier 1.

Publishers receive blocks of ISBNs, with larger blocks allotted to publishers expecting to need them; a small publisher may receive ISBNs of one or more digits for the registration group identifier, several digits for the registrant, and a single digit for the publication element. Once that block of ISBNs is used, the publisher may receive another block of ISBNs, with a different registrant element. Consequently, a publisher may have different allotted registrant elements. There also may be more than one registration group identifier used in a country. This might occur once all the registrant elements from a particular registration group have been allocated to publishers.

By using variable block lengths, registration agencies are able to customise the allocations of ISBNs that they make to publishers. For example, a large publisher may be given a block of ISBNs where fewer digits are allocated for the registrant element and many digits are allocated for the publication element; likewise, countries publishing many titles have few allocated digits for the registration group identifier and many for the registrant and publication elements.[46] Here are some sample ISBN-10 codes, illustrating block length variations.

| ISBN | Country or area | Publisher |
|------|-----------------|-----------|
| 99921-58-10-7 | Qatar | NCCAH, Doha |
| 9971-5-0210-0 | Singapore | World Scientific |
| 960-425-059-0 | Greece | Sigma Publications |
| 80-902734-1-6 | Czech Republic; Slovakia | Taita Publishers |
| 85-359-0277-5 | Brazil | Companhia das Letras |
| 1-84356-028-3 | English-speaking area | Simon Wallenberg Press |
| 0-684-84328-5 | English-speaking area | Scribner |
| 0-8044-2957-X | English-speaking area | Frederick Ungar |
| 0-85131-041-9 | English-speaking area | J. A. Allen & Co. |
| 93-86954-21-4 | English-speaking area | Edupedia Publications Pvt Ltd. |
| 0-943396-04-2 | English-speaking area | Willmann–Bell |
| 0-9752298-0-X | English-speaking area | KT Publishing |

## Pattern for English language ISBNs

English-language registration group elements are 0 and 1 (2 of more than 220 registration group elements). These two registration group elements are divided into registrant elements in a systematic pattern, which allows their length to be determined, as follows:[47]

International Standard Book Number - Wikipedia

| Publication element length | 0 – Registration group element | | | 1 – Registration group element | | | Total Registrants |
|---|---|---|---|---|---|---|---|
| | **From** | **To** | **Registrants** | **From** | **To** | **Registrants** | |
| **6 digits** | 0-00-xxxxxx-x | 0-19-xxxxxx-x | 20 | 1-01-xxxxxx-x | 1-06-xxxxxx-x | 6 | 26 |
| **5 digits** | 0-200-xxxxx-x 0-229-xxxxx-x 0-370-xxxxx-x 0-640-xxxxx-x 0-649-xxxxx-x 0-656-xxxxx-x | 0-227-xxxxx-x 0-368-xxxxx-x 0-638-xxxxx-x 0-647-xxxxx-x 0-654-xxxxx-x 0-699-xxxxx-x | 495 | 1-000-xxxxx-x 1-100-xxxxx-x 1-714-xxxxx-x | 1-009-xxxxx-x 1-397-xxxxx-x 1-716-xxxxx-x | 311 | 806 |
| **4 digits** | 0-2280-xxxx-x 0-3690-xxxx-x 0-6390-xxxx-x 0-6550-xxxx-x 0-7000-xxxx-x | 0-2289-xxxx-x 0-3699-xxxx-x 0-6398-xxxx-x 0-6559-xxxx-x 0-8499-xxxx-x | 1,539 | 1-0700-xxxx-x 1-3980-xxxx-x 1-6860-xxxx-x 1-7170-xxxx-x 1-7900-xxxx-x 1-8672-xxxx-x 1-9730-xxxx-x | 1-0999-xxxx-x 1-5499-xxxx-x 1-7139-xxxx-x 1-7319-xxxx-x 1-7999-xxxx-x 1-8675-xxxx-x 1-9877-xxxx-x | 2,502 | 4,041 |
| **3 digits** | 0-85000-xxx-x | 0-89999-xxx-x | 5,000 | 1-55000-xxx-x 1-74000-xxx-x 1-77540-xxx-x 1-77650-xxx-x 1-77770-xxx-x 1-80000-xxx-x 1-86760-xxx-x | 1-68599-xxx-x 1-77499-xxx-x 1-77639-xxx-x 1-77699-xxx-x 1-78999-xxx-x 1-86719-xxx-x 1-86979-xxx-x | 25,420 | 30,420 |
| **2 digits** | 0- | 0- | 50,000 | 1- | 1- | 113,894 | 163,894 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 900000-<br>xx-x | 949999-<br>xx-x | | 869800-<br>xx-x<br>1-<br>916506-<br>xx-x<br>1-<br>987800-<br>xx-x | 915999-<br>xx-x<br>1-<br>972999-<br>xx-x<br>1-<br>998999-<br>xx-x | | |
| **1 digit** | 0-<br>6399000-<br>x-x<br>0-<br>6480000-<br>x-x<br>0-<br>9500000-<br>x-x | 0-<br>6399999-<br>x-x<br>0-<br>6489999-<br>x-x<br>0-<br>9999999-<br>x-x | 511,000 | 1-<br>7320000-<br>x-x<br>1-<br>7750000-<br>x-x<br>1-<br>7764000-<br>x-x<br>1-<br>7770000-<br>x-x<br>1-<br>9160000-<br>x-x<br>1-<br>9990000-<br>x-x | 1-<br>7399999-<br>x-x<br>1-<br>7753999-<br>x-x<br>1-<br>7764999-<br>x-x<br>1-<br>7776999-<br>x-x<br>1-<br>9165059-<br>x-x<br>1-<br>9999999-<br>x-x | 107,060 | 618,060 |
| | | Total | 568,054 | | Total | 249,193 | 817,247 |

# Check digits

A check digit is a form of redundancy check used for error detection, the decimal equivalent of a binary check bit. It consists of a single digit computed from the other digits in the number. The method for the 10-digit ISBN is an extension of that for SBNs, so the two systems are compatible; an SBN prefixed with a zero (the 10-digit ISBN) will give the same check digit as the SBN without the zero. The check digit is base eleven, and can be an integer between 0 and 9, or an 'X'. The system for 13-digit ISBNs is not compatible with SBNs and will, in general, give a different check digit from the corresponding 10-digit ISBN, so does not provide the same protection against transposition. This is because the 13-digit code was required to be compatible with the EAN format, and hence could not contain an 'X'.

## ISBN-10 check digits

According to the 2001 edition of the International ISBN Agency's official user manual,[48] the ISBN-10 check digit (which is the last digit of the 10-digit ISBN) must range from 0 to 10 (the symbol 'X' is used for 10), and must be such that the sum of the ten digits, each multiplied by its (integer) weight, descending from 10 to 1, is a multiple of 11. That is, if $x_i$ is the $i$th digit, then $x_{10}$ must be chosen such that:

$$\sum_{i=1}^{10} (11-i)x_i \equiv 0 \pmod{11}$$

For example, for an ISBN-10 of 0-306-40615-2:

$$s = (0 \times 10) + (3 \times 9) + (0 \times 8) + (6 \times 7) + (4 \times 6) + (0 \times 5) + (6 \times 4) + (1 \times 3) + (5 \times 2)$$
$$= 0 + 27 + 0 + 42 + 24 + 0 + 24 + 3 + 10 + 2$$
$$= 132 = 12 \times 11$$

Formally, using modular arithmetic, this is rendered:

$$(10x_1 + 9x_2 + 8x_3 + 7x_4 + 6x_5 + 5x_6 + 4x_7 + 3x_8 + 2x_9 + x_{10}) \equiv 0 \pmod{11}.$$

It is also true for ISBN-10s that the sum of all ten digits, each multiplied by its weight in *ascending* order from 1 to 10, is a multiple of 11. For this example:

$$s = (0 \times 1) + (3 \times 2) + (0 \times 3) + (6 \times 4) + (4 \times 5) + (0 \times 6) + (6 \times 7) + (1 \times 8) + (5 \times 9)$$
$$= 0 + 6 + 0 + 24 + 20 + 0 + 42 + 8 + 45 + 20$$
$$= 165 = 15 \times 11$$

Formally, this is rendered:

$$(x_1 + 2x_2 + 3x_3 + 4x_4 + 5x_5 + 6x_6 + 7x_7 + 8x_8 + 9x_9 + 10x_{10}) \equiv 0 \pmod{11}.$$

The two most common errors in handling an ISBN (e.g. when typing it or writing it down) are a single altered digit or the transposition of adjacent digits. It can be proven mathematically that all pairs of valid ISBN-10s differ in at least two digits. It can also be proven that there are no pairs of valid ISBN-10s with eight identical digits and two transposed digits. (These proofs are true because the ISBN is less than eleven digits long and because 11 is a prime number.) The ISBN check digit method therefore ensures that it will always be possible to detect these two most common types of error, i.e., if either of these types of error has occurred, the result will never be a valid ISBN – the sum of the digits multiplied by their weights will never be a multiple of 11. However, if the error were to occur in the publishing house and remain undetected, the book would be issued with an invalid ISBN.[49]

In contrast, it is possible for other types of error, such as two altered non-transposed digits, or three altered digits, to result in a valid ISBN (although it is still unlikely).

## ISBN-10 check digit calculation

Each of the first nine digits of the 10-digit ISBN—excluding the check digit itself—is multiplied by its (integer) weight, descending from 10 to 2, and the sum of these nine products found. The value of the check digit is simply the one number between 0 and 10 which, when added to this sum, means the total is a multiple of 11.

For example, the check digit for an ISBN-10 of 0-306-40615-*?* is calculated as follows:

$$s = (0 \times 10) + (3 \times 9) + (0 \times 8) + (6 \times 7) + (4 \times 6) + (0 \times 5) + (6 \times 4) + (1 \times 3) + (5 \times 2)$$
$$= 130$$

Adding 2 to 130 gives a multiple of 11 (because $132 = 12 \times 11$) – this is the only number between 0 and 10 which does so. Therefore, the check digit has to be 2, and the complete sequence is ISBN 0-306-40615-2. If the value of $x_{10}$ required to satisfy this condition is 10, then an 'X' should be used.

Alternatively, modular arithmetic is convenient for calculating the check digit using modulus 11. The remainder of this sum when it is divided by 11 (i.e. its value modulo 11), is computed. This remainder plus the check digit must equal either 0 or 11. Therefore, the check digit is (11 minus the remainder of the sum of the products modulo 11) modulo 11. Taking the remainder modulo 11 a second time accounts for the possibility that the first remainder is 0. Without the second modulo operation, the calculation could result in a check digit value of $11 - 0 = 11$, which is invalid. (Strictly speaking, the *first* "modulo 11" is not needed, but it may be considered to simplify the calculation.)

For example, the check digit for the ISBN-10 of 0-306-40615-*?* is calculated as follows:

$$\begin{aligned}
s &= (11 - (((0 \times 10) + (3 \times 9) + (0 \times 8) + (6 \times 7) + (4 \times 6) + (0 \times 5) + (6 \times 4) + (1 \times 3) + \\
&= (11 - ((0 + 27 + 0 + 42 + 24 + 0 + 24 + 3 + 10) \bmod 11)) \bmod 11 \\
&= (11 - ((130) \bmod 11)) \bmod 11 \\
&= (11 - (9)) \bmod 11 \\
&= (2) \bmod 11 \\
&= 2
\end{aligned}$$

Thus the check digit is 2.

It is possible to avoid the multiplications in a software implementation by using two accumulators. Repeatedly adding `t` into `s` computes the necessary multiples:

```c
// Returns ISBN error syndrome, zero for a valid ISBN, non-zero for an invalid one.
// digits[i] must be between 0 and 10.
int CheckISBN(int const digits[10])
{
        int i, s = 0, t = 0;

        for (i = 0; i < 10; i++) {
                t += digits[i];
                s += t;
        }
        return s % 11;
}
```

The modular reduction can be done once at the end, as shown above (in which case `s` could hold a value as large as 496, for the invalid ISBN 99999-999-9-X), or `s` and `t` could be reduced by a conditional subtract after each addition.

## ISBN-13 check digit calculation

Appendix 1 of the International ISBN Agency's official user manual[15]:33 describes how the 13-digit ISBN check digit is calculated. The ISBN-13 check digit, which is the last digit of the ISBN, must range from 0 to 9 and must be such that the sum of all the thirteen digits, each multiplied by its (integer) weight, alternating between 1 and 3, is a multiple of 10.

Formally, using modular arithmetic, this is rendered:

$$(x_1 + 3x_2 + x_3 + 3x_4 + x_5 + 3x_6 + x_7 + 3x_8 + x_9 + 3x_{10} + x_{11} + 3x_{12} + x_{13}) \equiv 0 \pmod{1}$$

The calculation of an ISBN-13 check digit begins with the first twelve digits of the 13-digit ISBN (thus excluding the check digit itself). Each digit, from left to right, is alternately multiplied by 1 or 3, then those products are summed modulo 10 to give a value ranging from 0 to 9. Subtracted from 10, that leaves a result from 1 to 10. A zero (0) replaces a ten (10), so, in all cases, a single check digit results.

For example, the ISBN-13 check digit of 978-0-306-40615-*?* is calculated as follows:

```
s = 9×1 + 7×3 + 8×1 + 0×3 + 3×1 + 0×3 + 6×1 + 4×3 + 0×1 + 6×3 + 1×1 + 5×3
  =  9 + 21 +  8 +  0 +  3 +  0 +  6 + 12 +  0 + 18 +  1 + 15
  = 93
93 / 10 = 9 remainder 3
10 -  3 = 7
```

Thus, the check digit is 7, and the complete sequence is ISBN 978-0-306-40615-7.

In general, the ISBN-13 check digit is calculated as follows.

Let

$$r = \big(10 - \big(x_1 + 3x_2 + x_3 + 3x_4 + \cdots + x_{11} + 3x_{12}\big) \bmod 10\big).$$

Then

$$x_{13} = \begin{cases} r & ; r < 10 \\ 0 & ; r = 10. \end{cases}$$

This check system – similar to the UPC check digit formula – does not catch all errors of adjacent digit transposition. Specifically, if the difference between two adjacent digits is 5, the check digit will not catch their transposition. For instance, the above example allows this situation with the 6 followed by a 1. The correct order contributes 3×6+1×1 = 19 to the sum; while, if the digits are transposed (1 followed by a 6), the contribution of those two digits will be 3×1+1×6 = 9. However, 19 and 9 are congruent modulo 10, and so produce the same, final result: both ISBNs will have a check digit of 7. The ISBN-10 formula uses the prime modulus 11 which avoids this blind spot, but requires more than the digits 0–9 to express the check digit.

Additionally, if the sum of the 2nd, 4th, 6th, 8th, 10th, and 12th digits is tripled then added to the remaining digits (1st, 3rd, 5th, 7th, 9th, 11th, and 13th), the total will always be divisible by 10 (i.e., end in 0).

## ISBN-10 to ISBN-13 conversion

An ISBN-10 is converted to ISBN-13 by prepending "978" to the ISBN-10 and recalculating the final checksum digit using the ISBN-13 algorithm. The reverse process can also be performed, but not for numbers commencing with a prefix other than 978, which have no 10-digit equivalent.

## Errors in usage

Publishers and libraries have varied policies about the use of the ISBN check digit. Publishers sometimes fail to check the correspondence of a book title and its ISBN before publishing it; that failure causes book identification problems for libraries, booksellers, and readers.[50] For example, ISBN 0-590-76484-5 is

shared by two books – *Ninja gaiden®: a novel based on the best-selling game by Tecmo* (1990) and *Wacky laws* (1997), both published by Scholastic.

Most libraries and booksellers display the book record for an invalid ISBN issued by the publisher. The Library of Congress catalogue contains books published with invalid ISBNs, which it usually tags with the phrase "Cancelled ISBN".[51] However, book-ordering systems such as Amazon.com will not search for a book if an invalid ISBN is entered to its search engine. OCLC often indexes by invalid ISBNs, if the book is indexed in that way by a member library.

### eISBN

Only the term "ISBN" should be used; the terms "eISBN" and "e-ISBN" have historically been sources of confusion and should be avoided. If a book exists in one or more digital (e-book) formats, each of those formats must have its own ISBN. In other words, each of the three separate EPUB, Amazon Kindle, and PDF formats of a particular book will have its own specific ISBN. They should not share the ISBN of the paper version, and there is no generic "eISBN" which encompasses all the e-book formats for a title.[52]

# EAN format used in barcodes, and upgrading

Currently the barcodes on a book's back cover (or inside a mass-market paperback book's front cover) are EAN-13; they may have a separate barcode encoding five digits called an EAN-5 for the currency and the recommended retail price.[53] For 10-digit ISBNs, the number "978", the Bookland "country code", is prefixed to the ISBN in the barcode data, and the check digit is recalculated according to the EAN-13 formula (modulo 10, 1x and 3x weighting on alternating digits).

Partly because of an expected shortage in certain ISBN categories, the International Organization for Standardization (ISO) decided to migrate to a 13-digit ISBN (ISBN-13). The process began on 1 January 2005 and was planned to conclude on 1 January 2007.[54] As of 2011, all the 13-digit ISBNs began with 978. As the 978 ISBN supply is exhausted, the 979 prefix was introduced. Part of the 979 prefix is reserved for use with the Musicland code for musical scores with an ISMN. The 10-digit ISMN codes differed visually as they began with an "M" letter; the bar code represents the "M" as a zero (0), and for checksum purposes it counted as a 3. All ISMNs are now thirteen digits commencing 979-0; 979-1 to 979-9 will be used by ISBN.

Publisher identification code numbers are unlikely to be the same in the 978 and 979 ISBNs, likewise, there is no guarantee that language area code numbers will be the same. Moreover, the 10-digit ISBN check digit generally is not the same as the 13-digit ISBN check digit. Because the GTIN-13 is part of the Global Trade Item Number (GTIN) system (that includes the GTIN-14, the GTIN-12, and the GTIN-8), the 13-digit ISBN falls within the 14-digit data field range.[55]

Barcode format compatibility is maintained, because (aside from the group breaks) the ISBN-13 barcode format is identical to the EAN barcode format of existing 10-digit ISBNs. So, migration to an EAN-based system allows booksellers the use of a single numbering system for both books and non-book products that is compatible with existing ISBN based data, with only minimal changes to information technology systems. Hence, many booksellers (e.g., Barnes & Noble) migrated to EAN barcodes as early as March 2005. Although many American and Canadian booksellers were able to read EAN-13 barcodes before 2005, most general retailers could not read them. The upgrading of the UPC barcode system to full EAN-13, in 2005, eased migration to the ISBN-13 in North America.

# See also

- ASIN (Amazon Standard Identification Number)
- BICI (Book Item and Component Identifier)
- CODEN (serial publication identifier currently used by libraries; replaced by the ISSN for new works)
- DOI (Digital Object Identifier)
- ESTC (English Short Title Catalogue)
- ETTN (Electronic Textbook Track Number)
- ISAN (International Standard Audiovisual Number)
- ISMN (International Standard Music Number)
- ISRC (International Standard Recording Code)
- ISSN (International Standard Serial Number)
- ISTC (International Standard Text Code)
- ISWC (International Standard Musical Work Code)
- ISWN (International Standard Wine Number)
- LCCN (Library of Congress Control Number)
- License number (East German books) (Book identification system used between 1951 and 1990 in the former GDR)
- List of group-0 ISBN publisher codes
- List of group-1 ISBN publisher codes
- List of ISBN identifier groups
- OCLC number (Online Computer Library Center number)[56]
- Registration authority
- SICI (Serial Item and Contribution Identifier)
- VD 16 (*Verzeichnis der im deutschen Sprachbereich erschienenen Drucke des 16. Jahrhunderts*, "Bibliography of Books Printed in the German Speaking Countries of the Sixteenth Century")
- VD 17 (*Verzeichnis der im deutschen Sprachraum erschienenen Drucke des 17. Jahrhunderts*, "Bibliography of Books Printed in the German Speaking Countries of the Seventeenth Century")

# Notes

a. Occasionally, publishers erroneously assign an ISBN to more than one title—the first edition of *The Ultimate Alphabet* and *The Ultimate Alphabet Workbook* have the same ISBN, 0-8050-0076-3. Conversely, books are published with several ISBNs: A German second-language edition of *Emil und die Detektive* has the ISBNs 87-23-90157-8 (Denmark), 0-8219-1069-8 (United States), 91-21-15628-X (Sweden), 0-85048-548-7 (United Kingdom) and 3-12-675495-3 (Germany).

b. In some cases, books sold only as sets share ISBNs. For example, the Vance Integral Edition used only two ISBNs for 44 books.

c. Publishers were required to convert existing ISBNs from the 10-digit format to the 13-digit format (in their publication records) by 1 January 2007. For *existing* publications, the new 13-digit ISBN would only need to be added if (and when) a publication was reprinted. During the transition period, publishers were recommended to print *both* the 10-digit and 13-digit ISBNs on the verso of a publication's title page, but they were required to print *only* the 13-digit ISBN after 1 January 2007.[2]

d. Some books have several codes in the first block: e.g. A. M. Yaglom's *Correlation Theory...*, published by Springer Verlag, has two ISBNs, 0-387-96331-6 and 3-540-96331-6. Though Springer's 387 and 540 codes are different for English (0) and German (3); the same item number 96331 produces the same check digit for both (6). Springer uses 431 as the publisher code for Japanese (4), and 4-431-96331-? also has a check digit of 6. Other Springer books in English have publisher code 817, and 0-817-96331-? would also have a check digit of 6. This suggests that special considerations were made for assigning Springer's publisher codes, as random assignments of different publisher codes would

not be expected to lead by coincidence to the same check digit every time for the same item number. Finding publisher codes for English and German, say, with this effect would amount to solving a linear equation in modular arithmetic.

e. The International ISBN Agency's *ISBN User's Manual* says: "The ten-digit number is divided into four parts of variable length, which must be separated clearly, by hyphens or spaces", although omission of separators is permitted for internal data processing. If present, hyphens must be correctly placed.[16] The actual definition for hyphenation contains more than 220 different registration group elements with each one broken down into a few to several ranges for the length of the registrant element (more than 1,000 total). The document defining the ranges, listed by agency, is 29 pages.

# References

1. "The International ISBN Agency" (https://www.isbn-international.org/). Retrieved 20 February 2018.

2. TC 46/SC 9. "Frequently Asked Questions about the new ISBN standard from ISO" (https://web.archive.org/web/20070610160919/http://www.lac-bac.gc.ca/iso/tc46sc9/isbn.htm). *lac-bac.gc.ca*. Library and Archives Canada. Archived from the original (http://www.lac-bac.gc.ca/iso/tc46sc9/isbn.htm) on 10 June 2007.

3. Bradley, Philip (1992). "Book numbering: The importance of the ISBN" (http://www.theindexer.org/files/18-1/18-1_025.pdf) (PDF [245KB]). *The Indexer*. **18** (1): 25–26.

4. Foster, Gordon (1966). "International Standard Book Numbering (ISBN) System original 1966 report" (https://www.archive.org/web/20110430024722/http://www.informaticsdevelopmentinstitute.net/isbn.html). informaticsdevelopmentinstitute.net. Archived from the original (http://www.informaticsdevelopmentinstitute.net/isbn.html) on 30 April 2011. Retrieved 20 April 2014.

5. "ISBN History" (http://www.isbn.org/ISBN_history). isbn.org. 20 April 2014. Archived (https://web.archive.org/web/20140420232459/http://www.isbn.org/ISBN_history) from the original on 20 April 2014. Retrieved 20 April 2014.

6. *Manwal ghall-Utenti tal-ISBN* (https://web.archive.org/web/20160817083617/http://ktieb.org.mt/wp-content/uploads/2016/02/Manwal-ghall-Utenti-tal-ISBN-Maltese.pdf) (PDF) (in Maltese) (6th ed.). Malta: Kunsill Nazzjonali tal-Ktieb. 2016. p. 5. ISBN 978-99957-889-4-0. Archived from the original (http://ktieb.org.mt/wp-content/uploads/2016/02/Manwal-ghall-Utenti-tal-ISBN-Maltese.pdf) (PDF) on 17 August 2016.

7. "International Publishers Association—'It was an idea whose time had come.' David Whitaker on the birth of ISBN" (https://www.internationalpublishers.org/standards-news/318-it-was-an-idea-whose-time-had-come-david-whitaker-on-the-birth-of-isbn). International Publishers Association. Retrieved 6 August 2019.

8. "Emery Koltay, David Whitaker Named NISO Fellows" (https://web.archive.org/web/20140804153745/http://www.niso.org/apps/group_public/download.php/6294/ISQ_vol8_no3_July1996.pdf) (PDF), *Information Standards Quarterly*, National Information Standards Organization, **8** (3): 12–13, July 1996, archived from the original (http://www.niso.org/apps/group_public/download.php/6294/ISQ_vol8_no3_July1996.pdf) (PDF) on 4 August 2014

9. US ISBN Agency. "Bowker.com – Products" (http://commerce.bowker.com/standards/home/isbn/about_information_standards.asp). Commerce.bowker.com. Retrieved 11 June 2015.

10. Gregory, Daniel. "ISBN" (http://arquivo.pt/wayback/20160516011735/http%3A//www.printrs.com/isbn.htm). PrintRS. Archived from the original (http://www.printrs.com/isbn.htm) on 16 May 2016. Retrieved 11 June 2015.

11. *ISO 2108:1978* (https://www.iso.org/standard/6898.html) (PDF), ISO

12. https://archive.org/search.php?query=%22SBN%20345%22&sin=TXT

13. https://archive.org/details/woodstockhandmad00robe/page/n3/mode/2up?q=SBN+345-24223-8-595 - by Ballantine Books, ISBN 0-345-24223-8 links to http://www.worldcat.org/oclc/2057258

14. https://archive.org/details/woodstockhandmad00robe - "Ballantine/Craft [...] 5.95"

15. *ISBN Users' Manual, International Edition* (https://www.kb.se/download/18.71dda82e160c04f1cc412b c/1531827912246/ISBN%20International%20Users%20Manual%20-%207th%20edition.pdf) (PDF) (7th ed.). London: International ISBN Agency. 2017. ISBN 978-92-95055-12-4.

16. "ISBN Ranges" (https://www.isbn-international.org/range_file_generation). International ISBN Agency. 2014.

17. "ISBN Canada" (http://www.bac-lac.gc.ca/eng/services/isbn-canada/Pages/isbn-canada.aspx). *www.bac-lac.gc.ca*. LAC. Retrieved 19 January 2016.

18. "Find an agency – International ISBN Agency" (https://www.isbn-international.org/agencies). *isbn-international.org*.

19. "About the Australian ISBN Agency" (https://www.myidentifiers.com.au/isbn/US_isbn_agency). THORPE-Bowker.

20. "Bowker – ISBN" (https://www.myidentifiers.com.au/isbn/main). Thorpe-Bowker. 5 January 2009. Retrieved 29 March 2012.

21. "Tabela de preços dos serviços" (http://www.isbn.bn.br/website/tabela-de-precos) [Table of service prices] (in Portuguese). Biblioteca Nacional do Brasil. Retrieved 8 September 2015.

22. "Changes in arrangements for ISBN in Brazil" (https://www.isbn-international.org/content/changes-arr angements-isbn-brazil). Retrieved 20 January 2020.

23. "ISBN Brasil" (http://www.isbn.org.br) (in Portuguese). Retrieved 20 January 2020.

24. "Introduction to Books Registration" (https://www.hkpl.gov.hk/en/about-us/services/book-registration/in troduction.html). HKPL. Retrieved 12 January 2017.

25. "Union HRD Minister Smt. Smriti Zubin Irani Launches ISBN Portal" (http://pib.nic.in/newsite/PrintRele ase.aspx?relid=138686). MHRD. 7 April 2016.

26. "What is an ISBN ?" (https://www.icl.org.il/isbn-eng). *ICL – 7. מרכז הספר והספריות*. April 2015.

27. "ISBN – Chi siamo e contatti" (http://www.isbn.it/LAGENZIA.aspx) [ISBN – Who we are and contacts] (in Italian). EDISER srl. Retrieved 3 January 2015.

28. "ISBN – Tariffe Servizi ISBN" (http://www.isbn.it/TARIFFE.aspx) [ISBN Service Tariffs] (in Italian). EDISER srl. Retrieved 3 January 2015.

29. "ISBN" (https://web.archive.org/web/20161023123140/http://ktieb.org.mt/?page_id=22). Kunsill Nazzjonali tal-Ktieb. 2016. Archived from the original (http://ktieb.org.mt/?page_id=22) on 23 October 2016.

30. *Manwal ghall-Utenti tal-ISBN* (https://web.archive.org/web/20160817083617/http://ktieb.org.mt/wp-co ntent/uploads/2016/02/Manwal-ghall-Utenti-tal-ISBN-Maltese.pdf) (PDF) (in Maltese) (6th ed.). Malta: Kunsill Nazzjonali tal-Ktieb. 2016. pp. 1–40. ISBN 978-99957-889-4-0. Archived from the original (htt p://ktieb.org.mt/wp-content/uploads/2016/02/Manwal-ghall-Utenti-tal-ISBN-Maltese.pdf) (PDF) on 17 August 2016.

31. "Gazzetta tal-Gvern ta' Malta" (https://web.archive.org/web/20161123220053/https://govcms.gov.mt/e n/Government/Government%20Gazette/Documents/2015/01/Government%20Gazette%20-%2023%2 0January.pdf) (PDF). Government Gazette. 23 January 2015. p. 582. Archived from the original (http s://govcms.gov.mt/en/Government/Government%20Gazette/Documents/2015/01/Government%20Ga zette%20-%2023%20January.pdf) (PDF) on 23 November 2016.

32. "ISBNs, ISSNs, and ISMNs" (http://natlib.govt.nz/publishers-and-authors/isbns-issns-and-ismns). National Library of New Zealand. Retrieved 19 January 2016.

33. "International Standard Book Number" (http://web.nlp.gov.ph/nlp/?q=node/645). NLP. Retrieved 25 December 2017.

34. "ISBN – Kültür ve Turizm Bakanlığı Kütüphaneler ve Yayımlar Genel Müdürlüğü OS" (http://ekygm.go v.tr/isbn.html). *ekygm.gov.tr*.

35. "Nielsen UK ISBN Agency" (https://www.nielsenisbnstore.com). Nielsen UK ISBN Agency. Retrieved 2 January 2015.

36. "Bowker – ISBN" (http://www.bowker.com/en-US/products/servident_isbn.shtml). R. R. Bowker. 8 March 2013. Retrieved 8 March 2013.

37. "ISBN Ranges" (https://www.isbn-international.org/range_file_generation). *isbn-international.org*. 29 April 2014. Select the format you desire and click on the Generate button. Archived (https://web.archive.org/web/20140429101326/https://www.isbn-international.org/range_file_generation) from the original on 29 April 2014. Retrieved 29 April 2014.

38. See a complete list of group identifiers (https://www.isbn-international.org/range_file_generation). ISBN.org sometimes calls them *group numbers*. Their table of identifiers now refers to *ISBN prefix ranges*, which must be assumed to be group identifier ranges.

39. Hailman, Jack Parker (2008). *Coding and redundancy: man-made and animal-evolved signals*. Harvard University Press. p. 209. ISBN 978-0-674-02795-4.

40. *ISBN Users' Manual, International Edition* (https://www.isbn-international.org/sites/default/files/ISBN%20Manual%202012%20-corr.pdf) (PDF) (6th ed.). London: International ISBN Agency. 2012. p. 23. ISBN 978-92-95055-02-5.

41. International ISBN Agency (5 December 2014). "International ISBN Agency – Range Message (pdf sorted by prefix)" (https://www.isbn-international.org/export_rangemessagebyprefix.pdf) (PDF). *isbn-international.org*. p. 29. Retrieved 15 December 2014.

42. "Independent Publishers" (https://www.waterstones.com/help/independent-publishers/48). *Waterstones*. Retrieved 2 February 2020. "Before submitting any titles to our central buying team for consideration, your book must have the following: An ISBN..."

43. "How to obtain an ISBN" (https://help.barnesandnoble.com/app/answers/detail/a_id/1262/~/how-to-obtain-an-isbn). *Barnes & Noble*. Retrieved 2 February 2020. "We use ISBNs to track inventory and sales information. All books Barnes & Noble transacts on must have an ISBN."

44. "Product ID (GTIN) requirements for Books" (https://sellercentral.amazon.com/gp/help/external/200786200). *Amazon.com*. Retrieved 2 February 2020. "Effective June 1, 2017, you must provide an ISBN, EAN, or JAN to list a book in the Amazon catalog, regardless of the book's publication date."

45. See Publisher's International ISBN Directory (http://www.isbn-international.org/page/directory) Archived (https://web.archive.org/web/20130921085436/http://isbn-international.org/page/directory) 21 September 2013 at the Wayback Machine

46. Splane, Lily (2002). *The Book Book: A Complete Guide to Creating a Book on Your Computer*. Anaphase II Publishing. p. 37. ISBN 978-0-945962-14-4.

47. "ISBN Ranges" (https://www.isbn-international.org/range_file_generation). *isbn-international.org*. International ISBN Agency. 15 September 2014. Retrieved 15 September 2014.

48. "ISBN Users' Manual (2001 edition) – 4. Structure of ISBN" (https://web.archive.org/web/20130522043458/http://www.isbn.org/standards/home/isbn/international/html/usm4.htm). International ISBN Agency. Archived from the original (http://www.isbn.org/standards/home/isbn/international/html/usm4.htm) on 22 May 2013.

49. For example, *I'saka: a sketch grammar of a language of north-central New Guinea*. Pacific Linguistics. ISBN "0-85883-554-4".

50. Lorimer, Rowland; Shoichet, Jillian; Maxwell, John W. (2005). *Book Publishing I*. CCSP Press. p. 299. ISBN 978-0-9738727-0-5.

51. "020 – International Standard Book Number (R) – MARC 21 Bibliographic – Full" (https://www.loc.gov/marc/bibliographic/bd020.html). Library of Congress. September 2013.

52. "The Myth of the eISBN Why Every eBook Edition Needs a Unique Number – Publishing services for self publishing authors and businesses" (http://www.sellbox.com/myth-eisbn-every-ebook-edition-needs-unique-number/). *Publishing services for self publishing authors and businesses*. 28 June 2013. Retrieved 16 January 2017.

53. *Frequently asked questions* (https://web.archive.org/web/20140416211950/http://www.isbn-us.com/blog/2014/03/12/isbn-information-frequently-asked-questions/), US: ISBN, 12 March 2014, archived from the original (http://www.isbn-us.com/blog/2014/03/12/isbn-information-frequently-asked-questions/) on 16 April 2014 — including a detailed description of the EAN-13 format.

54. "ISBN" (http://www.collectionscanada.ca/iso/tc46sc9/isbn.htm), *ISO TC49SC9* (FAQ), CA: Collections

55. "Are You Ready for ISBN-13?" (http://www.isbn.org/standards/home/isbn/transition.asp), *Standards*, ISBN

56. "xISBN (Web service)" (https://web.archive.org/web/20110501074452/http://xisbn.worldcat.org/xisbna dmin/xoclcnum/index.htm). Xisbn.worldcat.org. Archived from the original (http://xisbn.worldcat.org/xis bnadmin/xoclcnum/index.htm) on 1 May 2011. Retrieved 27 May 2013.

# External links

- ISO 2108:2017 – International Standard Book Number (ISBN) (http://www.iso.org/standard/65483.htm l)
- International ISBN Agency (https://www.isbn-international.org/)—coordinates and supervises the worldwide use of the ISBN system
  - Numerical List of Group Identifiers (https://www.isbn-international.org/range_file_generation)—List of language/region prefixes
  - Free conversion tool: ISBN-10 to ISBN-13 & ISBN-13 to ISBN-10 (http://www.isbn.org/converterpu b.asp) from the ISBN agency (http://www.isbn.org/). Also shows correct hyphenation & verifies if ISBNs are valid or not.
- "Guidelines for the Implementation of 13-Digit ISBNs" (https://web.archive.org/web/20040912203458/ http://www.isbn-international.org/en/download/implementation-guidelines-04.pdf) (PDF). Archived from the original (http://isbn-international.org/en/download/implementation-guidelines-04.pdf) (PDF) on 12 September 2004
- "Are You Ready for ISBN-13?" (http://www.isbn.org/standards/home/isbn/transition.asp). R. R. Bowker LLC.
- RFC 3187 (https://tools.ietf.org/html/rfc3187)—Using International Standard Book Numbers as Uniform Resource Names (URN)

---

Retrieved from "https://en.wikipedia.org/w/index.php?title=International_Standard_Book_Number&oldid=975122897"

---

**This page was last edited on 26 August 2020, at 21:13 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Exhibit Z

WIKIPEDIA

# What We Do in the Shadows

**What We Do in the Shadows** is a 2014 New Zealand mockumentary[4] horror comedy film written and directed by Jemaine Clement and Taika Waititi and the first installment in the *What We Do in the Shadows* franchise. The film also stars Clement and Waititi, along with Jonathan Brugh, Ben Fransham, Cori Gonzalez-Macuer, Stu Rutherford, and Jackie van Beek. The film's plot concerns several vampires who live together in a flat in Wellington.[5]

*What We Do in the Shadows* premiered at the Sundance Film Festival in January 2014.[6][7] It was released theatrically on 18 August 2014 by Madman Entertainment, and received critical acclaim. The film earned $6.9 million on a $1.6 million budget.

## Contents

**Plot**

**Cast**

**Production**

**Music**

**Release**
   Critical response
   Box office
   Home media

**Proposed sequel**

**Short films**

**Television spin-offs**
   *Wellington Paranormal*
   *What We Do in the Shadows*

**References**

**External links**

## Plot

A documentary crew follows four vampire roommates—Viago, Vladislav, Deacon, and Petyr— who share a flat in the Wellington suburb of Te Aro. All of the vampires possess supernatural powers, including levitation and the ability to transform into animals. Viago is a 379-year-old dandy from the 18th century, who originally traveled to New Zealand in the 1910s in search of the love of his life Katherine; Vladislav is an 862-year-old known as "Vladislav the Poker", who is haunted by memories of his nemesis "the Beast"; and Deacon is a 183-year-old former peddler and the "young rebel" of the group who was turned into a vampire by Petyr—a reclusive, 8,000-year-old vampire who behaves like a feral animal.

Each night, Viago, Vladislav, and Deacon take the bus into town and prowl the streets of Wellington for people to kill. Deacon's human familiar, Jackie, runs errands for the vampires and cleans up the gore left behind by their feeding. A married mother, Jackie hopes to attain immortality—but is frustrated that Deacon will not turn her into a vampire as promised. Deacon requests that Jackie bring virgins to the flat so that the vampires can feed on them. She lures a woman who insulted her in primary school and Nick, her ex-boyfriend from childhood, to the flat. Though neither are actually virgins, the woman is killed, and Nick is attacked by Petyr. Nick survives the attack and is made into a vampire by Petyr.

Two months later, the vampires accept Nick into their group and bond with his human friend Stu—a computer analyst who introduces them to modern technology such as the Internet and cameras. Viago uses the Internet to find Katherine, who is now a 96-year-old widow living in a rest home in Wellington, and also briefly reconnects with his old servant Philip. Despite being able to get his new friends into popular bars and clubs, Nick struggles to adapt to life as a vampire. Nick is also held in contempt by Deacon, who resents Nick's newfound popularity and his careless revealing of his vampirism to strangers he meets. One of these strangers, a vampire hunter, breaks into the flat basement during the day and kills Petyr by exposing him to sunlight.

The vampires are furious when they discover Nick has indirectly caused Petyr's death, and Deacon tries to kill Nick before being interrupted by a police welfare check. The police, whom Viago hypnotises, warn the vampires about numerous fire hazards inside the flat. Once the police leave, Nick is banished from the flat by the remaining vampires, though Stu is permitted to come as he pleases.

| | **What We Do in the Shadows** |
|---|---|
| |  |
| | Theatrical release poster |
| **Directed by** | Jemaine Clement<br>Taika Waititi |
| **Produced by** | Taika Waititi<br>Chelsea Winstanley<br>Emanuel Michael |
| **Written by** | Jemaine Clement<br>Taika Waititi |
| **Starring** | Jemaine Clement<br>Taika Waititi<br>Jonathan Brugh<br>Cori Gonzalez-Macuer<br>Stu Rutherford |
| **Music by** | Plan 9 |
| **Cinematography** | D.J. Stipsen<br>Richard Bluck |
| **Edited by** | Jonathan Woodford-Robinson<br>Yana Gorskaya<br>Tom Eagles |
| **Production companies** | Resnick Interactive Development<br>Unison Films<br>Defender Films<br>Funny or Die<br>New Zealand Film Commission |
| **Distributed by** | Madman Entertainment (New Zealand)<br>Paramount Pictures |

Several months later, the vampires receive an invitation to the annual Unholy Masquerade, hosted for the local undead population of vampires, zombies, and witches. Vladislav refuses to attend after learning that "the Beast" will be the guest of honor. When Viago and Deacon arrive at the ball, they find in attendance Nick, Stu and Jackie, the latter of whom has been turned into a vampire by Nick. "The Beast" is revealed to be Vladislav's ex-girlfriend Pauline, and when Stu and the camera crew are discovered to be living humans, the party guests threaten to kill and feed on them. Vladislav arrives and fights with Pauline's new boyfriend Julian. Stu impales Julian on a flagpole, and the vampires and camera crew escape the ball with him, only to encounter a rival pack of werewolves who transform under the full moon. One cameraman is ripped in half by a werewolf, and Stu is viciously mauled. Believing Stu to be dead, the vampires run away and grieve for him.

After an indeterminate amount of time, Nick leaves a voice-message with the vampires saying he has a "Surprise that will blow them away" and returns to the flat with Stu. Deacon answers the front-doorbell knocking and is thrilled to see Stu standing there, greeting him with a big hug and telling him how cool his new scars are, which are very visible. Stu reveals that he survived the attack and transformed into a werewolf. With Stu's urging, the pack visits the vampires along with Stu and Nick's banishment is rescinded, as well. Though momentarily apprehensive, Deacon invites the werewolf pack inside, making jokes like "Please don't urinate on everything," they meet all the other vampires and have a visit to celebrate Stu's return to the flat and his recovery most of all. Viago also reconnects with Katherine, whom he turns into a vampire and their romance is rekindled despite the fact that she is now 96 years old (although he mentions that he is much older than her). Scenes during the credits reveal that Vladislav has gotten back together with Pauline, repeating his cycle of self-inflicted torture over his relationship with her; and Jackie has made her husband her familiar. A post-credits scene shows Deacon attempting to hypnotize the audience to forget the events of the film.

| | The Orchard (North America) |
|---|---|
| Release date | 19 January 2014 (Sundance) 19 June 2014 (New Zealand) 13 February 2015 (United States) |
| Running time | 85 minutes[1] |
| Country | New Zealand United States[2] |
| Language | English |
| Budget | $1.6 million |
| Box office | $7 million[3] |

## Cast

- Taika Waititi as Viago Von Dorna Schmarten Scheden Heimburg (né von Blitzenberg), aged 379 – an uptight member of the household. Waititi based his performance on his own mother.[8]
- Jemaine Clement as Vladislav the Poker, aged 862 – a former tyrant with extreme powers. Clement based his performance on Gary Oldman's Dracula.[8]
- Jonathan Brugh as Deacon Brucke, aged 183 – the "young rebel" of the group who is fond of knitting, erotic dancing, and "being cool".
- Ben Fransham as Petyr, aged 8,000 – a Nosferatu-like vampire who lives on the bottom floor of the flat in a stone coffin and generally keeps to himself.[9][10]
- Cori Gonzalez-Macuer as Nick – an intended victim who is turned into a vampire by Petyr.
- Stu Rutherford as Stu – Nick's best friend who introduces the vampires to modern technology.
- Jackie van Beek as Jackie – a human and Deacon's familiar who cleans up after the vampires and connects them with potential victims.
- Rhys Darby as Anton – the leader of a local pack of werewolves.
- Ethel Robinson as Katherine Heimburg – the love of Viago's life.
- Elena Stejko as Pauline – Vladislav's ex-girlfriend whom he calls "The Beast".
- Jason Hoyte as Julian - Pauline's new boyfriend when she broke up with Vladislav.
- Karen O'Leary as Officer O'Leary – a police officer who gets called to the vampires' house.
- Mike Minogue as Officer Minogue – a police officer who gets called to the vampires' house.

## Production

The film is based on a 2005 short film—What We Do In The Shadows: Interviews With Some Vampires—written and directed by Waititi and Clement, and starring Jonny Brugh, Cori Gonzalez-Macuer and Stu Rutherford in their roles of Deacon, Nick and Stu respectively.[11] The feature film adaptation was shot in Wellington in September 2012, and was Waititi's first feature since Boy.[6][7]

Stu Rutherford, an IT technician and high school friend of Waititi's in real life, was initially told he would only have a bit part in the film so he would act more natural when filming. He did not realise his role was so important until the film's premiere.[12]

According to Waititi and Clement their favourite vampire films were The Lost Boys, Bram Stoker's Dracula and Interview with the Vampire.[13] All of those movies are heavily quoted or referenced in the film, along with many other genre films such as Blade, Twilight and Buffy The Vampire Slayer.

## Music

The score for the film was composed by Plan 9.[14] The film's opening credits feature the song "You're Dead" by Norma Tanega, after Clement and Waititi were introduced to the song by film editor Tom Eagles.[15][16] The film's trailer and ending feature the song "Lastochka" by the Russian rock band Leningrad.

## Release

The film was released in a limited release on 13 February 2015 in New York City and Los Angeles, followed by a screening in San Francisco, Irvine, Philadelphia, Boston, Seattle, and Washington, D.C.[17] The film received a regional release in the U.S. in March 2015, by Unison Films, The Orchard, and Paramount Pictures in association with Funny or Die and Paladin Pictures.[18]

The film was heavily pirated. After the shutting down of a piracy website based in Mount Wellington, Auckland, the website revealed that, at 277,000 downloads, *What We Do in the Shadows* was one of its most heavily pirated films.[19]

### Critical response

On Rotten Tomatoes the film holds an approval rating of 96% based on 179 reviews, with an average rating of 7.85/10. The site's critical consensus reads: "Smarter, fresher, and funnier than a modern vampire movie has any right to be, *What We Do in the Shadows* is bloody good fun."[20] On Metacritic the film has a weighted average score of 76 out of 100, based on 33 critics, indicating "generally favorable reviews".[21]

Fearnet called the film "a great vampire comedy".[22] Film School Rejects wrote a predominantly positive review, commenting that some of the film's broader moments fell flat but compared it favorably to similar mockumentaries such as *Best in Show*.[23] The film was warmly received by UK newspapers, with *The Guardian*'s film critic Peter Bradshaw describing it as "the best comedy of the year",[24] while *The Telegraph*'s Tim Robey found it "desperately funny".[10] *Film International*, in a positive review, commended the film for noting, with a double of Count Orlok locked in the vampires' basement, that the true vampire film tradition is repressed by the current craze.[25] *Variety* was more critical, writing that "Some genre fans who prefer the silly to the satiric may bite, but the anemic pic isn't remotely weird or witty enough for cult immortality."[14]

However Mark Kermode gave the film a negative review,[26] until a couple years later, when, on the BFI Player, Kermode chose this film on his BFI Player choice's film and gave a positive review.[27]

### Box office

*What We Do in the Shadows* grossed US$2 million[28] in New Zealand and $3.4 million in the US.

### Home media

*What We Do in the Shadows* was released on DVD and Blu-ray on 26 November 2014 by Weltkino Filmverleih.

## Proposed sequel

A sequel to the film, focused on the werewolves depicted in *What We Do in the Shadows*, was in development, but stopped due to some unresolved production issues. Originally rumoured to be titled *What We Do in the Moonlight*, the working title was later announced as *We're Wolves*.[29][30]

In May 2019, Waititi said "'*We're Wolves*' is the film that Jemaine and I keep pretending that we're making. Every couple of years we say, we're making this new film called '*We're Wolves*' which follows the werewolves from the film," said Waititi. "I feel bad to even mention it now because we keep saying it, [but] it's like a dad saying, 'Yeah, I'll be home for Christmas.' I suppose we're just two dads out on the road enjoying our lives and going, 'We're not coming home for Christmas.' We'll send a postcard. It's not like we don't want to come home for Christmas. We would like nothing more but we have a lot of shit going on. When are you going to die? Do you have a deadline before your death? I guarantee it before then. Five years, ten years? It took us seven years to write the [first] film, so you do the math. That was a sad thing to say." [31]

## Short films

In 2005, Waititi and Clement wrote and directed a short film titled *What We Do in the Shadows: Interviews with Some Vampires*, which was a precursor to the feature-length film. The short stars Jonny Brugh, Cori Gonzalez-Macuer and Stu Rutherford in their roles of Deacon, Nick and Stu respectively.

In June 2014, Waititi, in conjunction with Discover New Zealand, produced a promotional short film titled *Vampire's Guide to Wellington*, in which he reprises his role as Viago von Blitzenberg.[32][33]

## Television spin-offs

### Wellington Paranormal

In September 2016, it was revealed that Waititi and Clement were planning a procedural comedy series based on the police officers, O'Leary and Minogue, who had minor roles in the film, titled *Wellington Paranormal*.[34] The series producers granted Waititi and Clement $1 million to produce six 30-minute episodes for the series, which aired on TVNZ 2 from 11 July 2018.[34][35][36] The character Nick from the film also appeared in the episode "A Normal Night".[37] New Zealand On Air announced that a second series with thirteen episodes would air in 2019.[38]

### What We Do in the Shadows

An American version of the film was developed as a television series. A pilot was ordered by FX, which featured Kayvan Novak, Matt Berry, Natasia Demetriou, Harvey Guillén and Mark Proksch. Executive producers of the show include Clement, Waititi, Scott Rudin, Paul Simms, Garrett Basch, and Eli Bush.[39] On 3 May 2018, FX picked up the Waititi-directed pilot, with an order of ten 30-minute episodes which

premiered on 27 March 2019.[40] In May 2019, FX renewed the series for a 10-episode second season that debuted in 2020. [41] In May of 2020, FX announced that they have renewed the series for a third season. The show was grown in its audience since the initial series take-off, with average viewing tolling to about 3.2 million. [42]

## References

1. "WHAT WE DO IN THE SHADOWS (15)" (https://bbfc.co.uk/releas es/what-we-do-shadows-film). British Board of Film Classification. 14 October 2014. Retrieved 19 October 2014.

2. "What We Do in the Shadows (2014)" (https://www.bfi.org.uk/films-t v-people/542b2b696bee8). British Film Institute. Retrieved 16 April 2020.

3. "What We Do in the Shadows (2015) - International Box Office Results" (https://boxofficemojo.com/movies/?page=intl&id=whatwed ointheshadows.htm). Box Office Mojo. Retrieved 10 May 2015.

4. "Review: 'What We Do in the Shadows' is the First Must-See of 2015" (http://www.firstshowing.net/2015/review-what-we-do-in-the-s hadows-is-the-first-must-see-of-2015/). FirstShowing.net. 27 February 2015. Retrieved 3 June 2015.

5. "Review: What We Do in The Shadows" (http://mancunion.com/201 6/11/08/review-what-we-do-in-the-shadows/). Mancunion, William Green, 15 November 2016

6. "Taika and Jemaine unleash vampires in USA" (http://www.nzheral d.co.nz/entertainment/news/article.cfm?c_id=1501119&objectid=111 68254). The New Zealand Herald. Auckland. 6 December 2013. Retrieved 17 December 2013.

7. "Sundance debut for Kiwi vampire spoof" (http://www.stuff.co.nz/ent ertainment/film/9524289/Sundance-debut-for-Kiwi-vampire-spoof). Stuff.co.nz. The Dominion Post. 17 December 2013. Retrieved 17 December 2013.

8. Darren Richman (29 March 2017). "Movies You Might Have Missed: Taika Waititi and Jemaine Clement's What We Do in the Shadows" (https://www.independent.co.uk/arts-entertainment/films/features/m ovies-you-might-have-missed-taika-waititi-jemaine-clement-what-w e-do-in-the-shadows-a7656181.html). The Independent. Retrieved 28 March 2019

9. "What We Do In The Shadows DVD Review" (http://www.thehollyw oodnews.com/2015/04/10/what-we-do-the-shadows-dvd-review/). The Hollywood News, By Jazmine Sky Bradley - 10 April 2015

10. Robey, Tim (21 November 2014). "What We Do in the Shadows, review: 'Desperately funny' " (https://www.telegraph.co.uk/culture/fil m/filmreviews/11245531/What-We-Do-in-the-Shadows-review-Desp erately-funny.html). The Daily Telegraph. London.

11. "What We Do In The Shadows: Interviews With Some Vampires (2005)" (https://www.imdb.com/title/tt4963986/).

12. "IT guy turns accidental film star" (http://www.stuff.co.nz/entertainm ent/film/10127770/IT-guy-turns-accidental-film-star). Stuff.co.nz. 8 June 2014. Retrieved 28 March 2019.

13. "Vampire mockumentary What We Do in the Shadows heading for cult status" (https://www.theglobeandmail.com/arts/film/vampire-mo ckumentary-what-we-do-in-the-shadows-heading-for-cult-status/arti cle22956380/) – via The Globe and Mail.

14. Nelson, Rob (24 January 2014). "Sundance Film Review: 'What We Do in the Shadows' " (https://variety.com/2014/film/reviews/sundanc e-film-review-what-we-do-in-the-shadows-1201070008/). Variety. Retrieved 19 March 2014.

15. Rob Hunter. "32 Things We Learned From the What We Do In the Shadows Commentary" (https://filmschoolrejects.com/32-things-we-learned-from-the-what-we-do-in-the-shadows-commentary-1a3a4a 339681/). Film School Rejects. Retrieved 31 May 2017.

16. Ashley Hefnawy (1 February 2015). "Jemaine Clement and Taika Waititi Shine a Light on 'What We Do in the Shadows' " (https://ww w.shutterstock.com/blog/jemaine-clement-and-taika-waititi-shine-a-li ght-on-what-we-do-in-the-shadows). Shutterstock. Retrieved 31 May 2017.

17. Barton, Steve (29 January 2015). "What We Do in the Shadows Is Quote Critics!" (https://dreadcentral.com/news/87710/shadows-quot e-critics/). Dread Central. Retrieved 19 March 2014.

18. Gingold, Michael (13 February 2015). " 'WHAT WE DO IN THE SHADOWS' creators reveal what they didn't do Critics!" (http://www. fangoria.com/new/what-we-do-in-the-shadows-creators-reveal-what -they-didnt-do/). Fangoria. Retrieved 19 March 2014.

19. Drinnan, John (5 November 2015). "Global piracy site run out of house in Mt Wellington" (https://www.nzherald.co.nz/business/new s/article.cfm?c_id=3&objectid=11540096). NZ Herald. Retrieved 16 June 2018.

20. "What We Do in the Shadows (2015)" (https://rottentomatoes.com/ m/what_we_do_in_the_shadows/). Rotten Tomatoes. Fandango Media. Retrieved 1 April 2020.

21. "What We Do in the Shadows Reviews" (https://metacritic.com/movi e/what-we-do-in-the-shadows). Metacritic. CBS Interactive. Retrieved 3 June 2015.

22. Weinberg, Scott (17 March 2014). "FEARNET Movie Review: 'What We Do in the Shadows' " (https://web.archive.org/web/2014031908 3458/http://www.fearnet.com/news/review/fearnet-movie-review-wh at-we-do-shadows-sxsw-2014). Fearnet. Archived from the original (http://www.fearnet.com/news/review/fearnet-movie-review-what-we -do-shadows-sxsw-2014) on 19 March 2014. Retrieved 19 March 2014.

23. Campbell, Christopher (13 March 2014). "SXSW 2014 Review: 'What We Do In The Shadows' Is Also a New Vampire Classic" (htt p://filmschoolrejects.com/reviews/sxsw-2014-review-what-we-do-in-the-shadows-is-also-a-new-vampire-classic.php). Film School Rejects. Retrieved 19 March 2014.

24. Bradshaw, Peter (20 November 2014). "What We Do in the Shadows review – best comedy of the year" (https://www.theguardi an.com/film/2014/nov/20/what-we-do-in-shadows-review). The Guardian. London. Retrieved 9 April 2015.

25. Sorrento, Matthew (28 February 2015). "So It Goes in What We Do in the Shadows (2014)" (http://filmint.nu/?p=14674). Film International. Retrieved 9 April 2015.

26. "Mark Kermode reviews What We Do in the Shadows" (https://www. youtube.com/watch?v=Toq4M4SOuW8). YouTube. 21 November 2014. Retrieved 21 November 2014.

27. "Mark Kermode reviews What We Do in the Shadows (2014)" (http s://www.youtube.com/watch?v=h9NyAfpb6rc). YouTube. 27 December 2019. Retrieved 27 December 2019.

28. "What We Do in the Shadows" (https://boxofficemojo.com/movies/? page=intl&id=whatwedointheshadows.htm). Box Office Mojo.

29. Chavez, Danette (17 August 2015). "What We Do in the Shadows Is Getting a Sequel." (https://avclub.com/article/what-we-do-shadow s-getting-sequel-223968) AVClub.com. Retrieved 2016-01-04.

30. Saathoff, Evan (25 January 2016). "What We Do in the Shadows Follow-up Gets A Snappy Title" (http://birthmoviesdeath.com/2016/ 01/25/what-we-do-in-the-shadows-follow-up-gets-a-snappy-title).

31. "27" (https://www.indiewire.com/2019/05/taika-waititi-what-we-do-in-the-shadows-werewolves-emmys-fx-1202144458/). Indie Wire. 24 May 2019.

32. Vampire's Guide to Vellington (https://www.youtube.com/watch?v= WGvyjKLLnp4). 8 June 2014 – via YouTube.

33. "Wellington Vampires make their mark as capital turns into 'Vellington' " (https://web.archive.org/web/20180926212553/https:// www.wellingtonnz.com/about-wreda/media/newsroom/local-vampire s-as-capital-turns-into-vellington/). wellingtonnz.com. 10 June 2014. Archived from the original (https://www.wellingtonnz.com/about-wre da/media/newsroom/local-vampires-as-capital-turns-into-vellington/) on 26 September 2018.

34. Miska, Brad (19 December 2017). " 'What We Do In the Shadows' Police Spinoff Retitled to "Wellington Paranormal" " (https://bloody-d isgusting.com/tv/3475458/shadows-paranormal-spinoff-retitled-welli ngton-paranormal/). Bloody Disgusting. Retrieved 11 January 2018.

# Exhibit AA



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Clement, Jemaine
Search Results: Displaying 1 through 18 of 18 entries.

 previous   next

Resort results by: Date (ascending) ⌄               Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| [ 1 ] | Clement, Jemaine | Flight of the conchords. | V3559D412 | 2007 |
| [ 2 ] | Clement, Jemaine | Flight of the conchords. | V3559D413 | 2007 |
| [ 3 ] | Clement, Jemaine | Inner City Pressure. | PA0001623112 | 2007 |
| [ 4 ] | Clement, Jemaine | Robots. | PA0001623113 | 2007 |
| [ 5 ] | Clement, Jemaine Atea | I told you I was freaky. | PA0001718122 | 2009 |
| [ 6 ] | Clement, Jemaine Atea Mahana | Angels. | PA0001796104 | 2009 |
| [ 7 ] | Clement, Jemaine Atea Mahana | Demon Woman. | PA0001796110 | 2009 |
| [ 8 ] | Clement, Jemaine Atea Mahana | Fashion Is Danger . | PA0001796160 | 2009 |
| [ 9 ] | Clement, Jemaine Atea Mahana | Friends. | PA0001796102 | 2009 |
| [ 10 ] | Clement, Jemaine Atea Mahana | Hurt Feelings. | PA0001796106 | 2009 |
| [ 11 ] | Clement, Jemaine Atea Mahana | I Told You I Was Freaky. | PA0001796109 | 2009 |
| [ 12 ] | Clement, Jemaine Atea Mahana | Petrov, Yelyena and Me. | PA0001796355 | 2009 |
| [ 13 ] | Clement, Jemaine Atea Mahana | Rambling Through The Avenues Of Time. | PA0001796159 | 2009 |
| [ 14 ] | Clement, Jemaine Atea Mahana | Sugalumps. | PA0001796107 | 2009 |
| [ 15 ] | Clement, Jemaine Atea Mahana | Too Many Dicks (On The Dance Floor) | PA0001796357 | 2009 |
| [ 16 ] | Clement, Jemaine Atea Mahana | We're Both In Love With A Sexy Lady. | PA0001796108 | 2009 |
| [ 17 ] | Clement, Jemaine Atea Mahana | You Don't Have To Be A Prostitute. | PA0001796360 | 2009 |
| [ 18 ] | Clement, Jemaine Atea | I told you I was freaky; as performed by Flight of the Conchords / Subpop / HBO / by Bret Peter McKenzie, Jemaine Atea Clement. | PA0001396779 | 2010 |

Resort results by: Date (ascending) ⌄               Set Search Limits



Clear Selected    Retain Selected

◀ previous    next ▶

| Save, Print and Email (Help Page) | | |
|---|---|---|
| **Records** | Select Format: Full Record ⌄ | Format for Print/Save |
| ○ All on Page<br>◉ Selected On Page<br>○ Selected all Pages | Enter your email address: | Email |

**Search for:** Clement, Jemaine   **Search by:** Name (Crichton Michael; Walt Disney Company) ⌄   **Item type:** None ⌄

25 records per page ⌄         Submit   Reset

Help | Search | History | **Titles** | Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit BB



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = flight of the conchords
Search Results: Displaying 1 of 44 entries

◄ previous    next ►


Labeled View

*One night stand : directed by Linda Mendoza.*

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001280662 / 2005-07-18 |
| **Title:** | One night stand : no. 57, Flight of the conchords / directed by Linda Mendoza. |
| **Description:** | Videocassette {Betacam SP} |
| **Copyright Claimant:** | Home Box Office, Inc. (employer for hire) |
| **Date of Creation:** | 2005 |
| **Date of Publication:** | 2005-06-23 |
| **Previous Registration:** | Some footage, still photos & music preexisting. |
| **Basis of Claim:** | New Matter: all other cinematographic material. |
| **Other Title:** | Flight of the conchords |
| | Betacam SP |
| **Names:** | Mendoza, Linda |
| | Home Box Office, Inc. |

◄ previous    next ►



| Save, Print and Email (Help Page) |
|---|
| Select Download Format   Full Record ⌄   [Format for Print/Save] |
| Enter your email address:        [Email] |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit CC



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Waititi, Taika
Search Results: Displaying 1 through 9 of 9 entries.

◀ previous    next ▶

Resort results by:  Date (ascending)  ⌄          Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| [ 1 ] | Waititi, Taika | Choice : screenplay/motion picture / screenplay written by Taika Waititi. | V3526D442 | 2005 |
| [ 2 ] | Waititi, Taika | Choice : screenplay/motion picture / screenplay written by Taika Waititi. | V3526D442 | 2005 |
| [ 3 ] | Waititi, Taika | Flight of the Conchords. | V3558D787 | 2007 |
| [ 4 ] | Waititi, Taika | FLIGHT OF THE CONCHORDS : 10, NEW FANS. | PA0001593006 | 2007 |
| [ 5 ] | Waititi, Taika David | Eagle vs. shark : Something beginning with love. | PAu003142686 | 2007 |
| [ 6 ] | Waititi, Taika | JOJO RABBIT. | PAu003923880 | 2018 |
| [ 7 ] | Waititi, Taika | JoJo rabbit & 1 other title. | V9957D951 | 2018 |
| [ 8 ] | Waititi,Taika | JOJO RABBIT. | PA0002210037 | 2019 |
| [ 9 ] | Waititi, Taika | WHAT WE DO IN THE SHADOWS : Episode 7 : 106, THE TRIAL. | PA0002195685 | 2019 |

Resort results by:  Date (ascending)  ⌄          Set Search Limits

Clear Selected    Retain Selected

◀ previous    next ▶

| **Save, Print and Email (Help Page)** | |
|---|---|
| **Records** | Select Format:  Full Record  ⌄    Format for Print/Save |
| ○ All on Page  ● Selected On Page  ○ Selected all Pages | Enter your email address: _____  Email |

Search for: Waititi, Taika    Search by: Name (Crichton Michael; Walt Disney Company) ⌄    Item type: None ⌄

25 records per page  ⌄          Submit    Reset

Help | Search | History | Titles | Start Over

Exhibit DD



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Waititi, Taika
Search Results: Displaying 9 of 9 entries



Labeled View

### *WHAT WE DO IN THE SHADOWS : Episode 7 :*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002195685 / 2019-05-23 |
| **Application Title:** | WHAT WE DO IN THE SHADOWS Series - THE TRIAL Episode (TV - MOTION PICTURE) |
| **Title:** | WHAT WE DO IN THE SHADOWS : Episode 7 : 106, THE TRIAL. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | FX Productions, LLC. Address: P.O. Box 900, Beverly Hills, CA 90213 United States. |
| **Date of Creation:** | 2019 |
| **Date of Publication:** | 2019-05-08 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | FX Productions, LLC, employer for hire; Domicile: United States. Authorship: entire motion picture. |
| **Previous Registration:** | 2018, PAu 3-954-543. |
| **Pre-existing Material:** | script/screenplay. |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Waititi, Taika |
|  | FX Productions, LLC |



| Save, Print and Email (**Help Page**) |
|---|
| Select Download Format  Full Record  ⌄  Format for Print/Save |
| Enter your email address:  Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

# Exhibit EE



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More.**

| Help | Search | History | Titles | Start Over |

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = what we do in the shadows
Search Results: Displaying 1 through 25 of 45 entries.



◀ previous | next ▶

Resort results by: Date (ascending) ∨

Set Search Limits

| # | Title < | Full Title | Copyright Number | Date |
|---|---------|-----------|------------------|------|
| [ 1 ] | WHAT WE DO IN THE SHADOWS. | WHAT WE DO IN THE SHADOWS. | V3628D097 | 2014 |
| [ 2 ] | WHAT WE DO IN THE SHADOWS. | WHAT WE DO IN THE SHADOWS. | PA0002075977 | 2014 |
| [ 3 ] | WHAT WE DO IN THE SHADOWS. | WHAT WE DO IN THE SHADOWS. | PA0002090774 | 2014 |
| [ 4 ] | What we do in the shadows. | What we do in the shadows. | V3631D501 | 2015 |
| [ 5 ] | What we do in the shadows; motion picture. | What we do in the shadows; motion picture. | V9931D347 | 2015 |
| [ 6 ] | What We Do in the Shadows; motion picture. | What We Do in the Shadows; motion picture. | V9924D263 | 2015 |
| [ 7 ] | What We Do in the Shadows; motion picture. | What We Do in the Shadows; motion picture. | V9924D264 | 2015 |
| [ 8 ] | What We do in the shadows. | What We do in the shadows. | V9956D812 | 2018 |
| [ 9 ] | WHAT WE DO IN THE SHADOWS : 101, PILOT. | WHAT WE DO IN THE SHADOWS : 101, PILOT. | PAu003917499 | 2018 |
| [ 10 ] | WHAT WE DO IN THE SHADOWS : 105, Baron's Night Out. | WHAT WE DO IN THE SHADOWS : 105, Baron's Night Out. | PAu003955149 | 2018 |
| [ 11 ] | What We Do In The Shadows : 106, The Trial. | What We Do In The Shadows : 106, The Trial. | PAu003954543 | 2018 |
| [ 12 ] | WHAT WE DO IN THE SHADOWS : 107, Citizenship. | WHAT WE DO IN THE SHADOWS : 107, Citizenship. | PAu003955351 | 2018 |
| [ 13 ] | What We Do In The Shadows : 108, Animal Control. | What We Do In The Shadows : 108, Animal Control. | PAu003954545 | 2018 |
| [ 14 ] | What We Do In The Shadows : 109, The Orgy. | What We Do In The Shadows : 109, The Orgy. | PAu003954542 | 2018 |
| [ 15 ] | WHAT WE DO IN THE SHADOWS : 110, ANCESTRY. | WHAT WE DO IN THE SHADOWS : 110, ANCESTRY. | PAu003955014 | 2018 |
| [ 16 ] | WHAT WE DO IN THE SHADOWS, MANHATTAN NIGHT CLUB. | WHAT WE DO IN THE SHADOWS, MANHATTAN NIGHT CLUB. | PAu003955339 | 2018 |
| [ 17 ] | WHAT WE DO IN THE SHADOWS Series - CITY COUNCIL Episode # 102. | WHAT WE DO IN THE SHADOWS Series - CITY COUNCIL Episode # 102. | PAu003947581 | 2018 |
| [ 18 ] | WHAT WE DO IN THE SHADOWS Series - WEREWOLF FEUD Episode (TV - SCREENPLAY) | WHAT WE DO IN THE SHADOWS, WEREWOLF FEUD. | PAu003955340 | 2018 |
| [ 19 ] | WHAT WE DO IN THE SHADOWS : 101, Pilot. | WHAT WE DO IN THE SHADOWS : 101, Pilot. | PA0002185340 | 2019 |
| [ 20 ] | WHAT WE DO IN THE SHADOWS : 102, CITY COUNCIL. | WHAT WE DO IN THE SHADOWS : 102, CITY COUNCIL. | PA0002185304 | 2019 |
| | WHAT WE DO IN THE SHADOWS : 103 - UTA103, | WHAT WE DO IN THE SHADOWS : 103 - UTA103, | PA0002197223 | 2019 |



| [ 21 ] | MANHATTAN NIGHT CLUB. | MANHATTAN NIGHT CLUB. | | |
| [ 22 ] | WHAT WE DO IN THE SHADOWS : 104 : UTA104, WEREWOLF FEUD. | WHAT WE DO IN THE SHADOWS : 104 : UTA104, WEREWOLF FEUD. | PA0002197224 | 2019 |
| [ 23 ] | WHAT WE DO IN THE SHADOWS : 107 : UTA107, CITIZENSHIP. | WHAT WE DO IN THE SHADOWS : 107 : UTA107, CITIZENSHIP. | PA0002197225 | 2019 |
| [ 24 ] | WHAT WE DO IN THE SHADOWS : 108, ANIMAL CONTROL. | WHAT WE DO IN THE SHADOWS : 108, ANIMAL CONTROL. | PA0002195146 | 2019 |
| [ 25 ] | WHAT WE DO IN THE SHADOWS : 109 : UTA109, THE ORGY. | WHAT WE DO IN THE SHADOWS : 109 : UTA109, THE ORGY. | PA0002197226 | 2019 |

**Resort results by:** Date (ascending) ⌄

Set Search Limits

Clear Selected     Retain Selected

◄ previous     next ►

| **Save, Print and Email (Help Page)** | |
| **Records** | Select Format: Full Record ⌄     Format for Print/Save |
| ○ All on Page<br>● Selected On Page<br>○ Selected all Pages | Enter your email address:                    Email |

**Search for:** what we do in the shadows     **Search by:** Title (omit initial article A, An, The, El, La, Das etc.) ⌄     **Item type:** None ⌄

25 records per page ⌄                    Submit   Reset

Help   Search   History   **Titles**   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit FF



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |
|------|--------|---------|--------|------------|

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = what we do in the shadows
Search Results: Displaying 2 of 45 entries



Labeled View

***WHAT WE DO IN THE SHADOWS.***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002075977 / 2018-02-06 |
| **Application Title:** | WHAT WE DO IN THE SHADOWS. |
| **Title:** | WHAT WE DO IN THE SHADOWS. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | Shadow Pictures Limited. Address: 50 Randolph Street, Eden Terrace, Auckland, New Zealand. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-01-19 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Shadow Pictures Limited, employer for hire; Domicile: New Zealand; Citizenship: New Zealand. Authorship: Motion picture and video. |
| **Pre-existing Material:** | Central characters originate from associated prior short film "What We Do In The Shadows - some interviews with some vampires" (2005). |
| **Basis of Claim:** | all other cinematographic material. |
| **Names:** | Shadow Pictures Limited |



| Save, Print and Email (**Help Page**) | |
|---|---|
| Select Download Format   Full Record   ⌄ | Format for Print/Save |
| Enter your email address: | Email |

Help   Search   History   Titles   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

Exhibit GG



Library buildings are closed to the public until further notice, but the U.S. Copyright Office Catalog is available. **More**.

| Help | Search | History | Titles | Start Over |

---

## Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = What We Do In The Shadows
Search Results: Displaying 3 of 45 entries



---

Labeled View

---

***WHAT WE DO IN THE SHADOWS.***

| | |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0002090774 / 2016-04-08 |
| **Application Title:** | WHAT WE DO IN THE SHADOWS. |
| **Title:** | WHAT WE DO IN THE SHADOWS. |
| **Description:** | Videodisc (DVD) |
| **Copyright Claimant:** | Shadow Pictures Limited, Transfer: By written agreement. Address: 50 Randolph St., Eden Terrace, Auckland, New Zealand. |
| **Date of Creation:** | 2014 |
| **Date of Publication:** | 2014-01-19 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Shadow Pictures Limited, employer for hire; Domicile: New Zealand; Citizenship: New Zealand. Authorship: entire motion picture, script/screenplay. |
| **Pre-existing Material:** | The work is based on the short film (approx. 25 mins.) "What We Do In The Shadows - some interviews with some vampires" (2005). The work's central characters Viago, Deacon and Vladislav originate from the short film. |
| **Basis of Claim:** | all other cinematographic material, additional new footage, production as a motion picture, revisions/additions to script, The current work is a feature-length film (approx. 96 minutes) that consists of many additional scenes, additional characters, and overall development of the plot and the characters' story arcs. |
| **Rights and Permissions:** | Shadow Pictures Limited, 50 Randolph St., Eden Terrace, Auckland, New Zealand |
| **Copyright Note:** | C.O. correspondence. |
| | Regarding new material included: characters as such not registrable. Registration based on deposited authorship describing, depicting, or embodying such character(s). Compendium 313.4(H). |
| | Regarding new material included: ideas not copyrightable. Authority 17 USC 102(b). |
| **Names:** | Shadow Pictures Limited |



---

| **Save, Print and Email (Help Page)** | | |
|---|---|---|
| Select Download Format | Full Record ⌄ | Format for Print/Save |
| Enter your email address: | | Email |

---

Help   Search   History   Titles   Start Over

---

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Exhibit HH



WHO WE ARE    WHAT WE DO    SPECIFICATIONS & RESOURCES    INNOVATION    NEWS    CONTACT US

# MEET OUR LEADERSHIP TEAM

HOME › WHO WE ARE › **TEAM**



### RICH BERGER
Chief Executive Officer
**READ BIO**



### JIM HELMAN
Chief Technology Officer
**READ BIO**



### CRAIG SEIDEL
Senior Vice President,
Technology
**READ BIO**



### RAYMOND DREWRY
Vice President, EMEA
Operations & Principal Scientist
**READ BIO**



### M. KIP WELCH
Senior Vice President, Business
Development
**READ BIO**



### DANIEL LUCAS
Vice President, Business
Intelligence Technology
**READ BIO**



WHO WE ARE   WHAT WE DO   SPECIFICATIONS & RESOURCES   INNOVATION   NEWS   CONTACT US

### Chief Technology Officer

Jim Helman is an experienced technologist who brings to MovieLabs an extensive background in building entertainment-related products and a passion for innovation. At MovieLabs, Jim has led cross-industry initiatives including driving worldwide standards for high dynamic range video and building the Entertainment Identifier Registry (EIDR). He leads MovieLabs' security work, including cloud security and the development of the MovieLabs Enhanced Content Protection Specification, which established a hardware level of robustness for 4K consumer devices.

Jim was a founder and chief software architect at Liberate Technologies, where he led the development of a web platform for delivering interactive cable services. Prior to Liberate, he was a software architect at Silicon Graphics, developing real-time 3D systems for VR, location-based entertainment, and visual simulation.

Jim has also consulted extensively on intellectual property, R&D spin-offs, and video technologies for leading venture capitalists and companies such as Comcast, NEC Research Labs and Xerox PARC. Jim holds Ph.D. and M.S. degrees in Applied Physics from Stanford University and a B.A. in Physics and Math from Washington University.



WHO WE ARE   WHAT WE DO   SPECIFICATIONS & RESOURCES   INNOVATION   NEWS   CONTACT US

## CRAIG SEIDEL

### Senior Vice President, Technology

Craig Seidel is Senior Vice President, Technology with a diverse entertainment technology background. At MovieLabs Craig focuses on production, all aspects of the digital supply chain including interactivity, metadata, file delivery and business rules (e.g., Avails). He architected and authored the Common Metadata family of specifications and defined much of the UltraViolet system. Craig also specializes in technologies applicable to fingerprinting, content protection and Digital Cinema.

Prior to MovieLabs, Craig led a variety of engineering and operations project, including peer-to-peer anti-piracy (Hawkeye), software licensing (FlexLM), DVR (TiVo), Interactive Television (Liberate), electronic publishing (EFI Fiery), survivable networks, and satellite ground stations. Craig holds a B.S. Electrical Engineering and Computer Science from University of California, Berkeley and an M.S. in Computer Science from Stanford University.



WHO WE ARE   WHAT WE DO   SPECIFICATIONS & RESOURCES   INNOVATION   NEWS   CONTACT US

### RAYMOND DREWRY

**Vice President, EMEA Operations & Principal Scientist**

Raymond has been in the industry for 25 years primarily as a technologist. He has designed and implemented systems that range from the first fully interactive digital cable network in Europe, through the first-ever networked digital video system for journalists at an international sporting event, to real-time robotics systems for special effects and mechanical-industrial performance pieces. He also was a prime contributor to early versions of the X11 window system and Microsoft Windows 1.0.

Before joining MovieLabs Raymond was CTO at Aggregator TV, a UK-based IPTV content company, and before that CTO and VP of engineering at Liberate Technologies. He has also been Director of Technology for New Media at Sybase; Principal Engineer and Architect for graphics systems at Digital Equipment Corporation, working in both research and product groups; and an engineering manager at Microsoft. As a consultant he has worked on large-scale networked multimedia systems, US and EU patents, interactivity for mobile devices, and commercial applications of novel mathematics. His patents, publications, and contributions to technical standards cover distributed multimedia systems and graphics hardware and software. Raymond has a BA in Classics (Latin) and Computer Science from Yale University.

Exhibit II

NOTICE:
This site contains REAL records (court records of citations, speeding ticket nies, misdemeanors, sexual es, mugshots, etc.), back reports, photos, court do address information, phone and much more. Please BE when conducting a sea

I Understand

QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### FOR ANNUAL AND TRANSITION REPORTS PURSUANT
### TO SECTIONS 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

#### (MARK ONE)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934 FOR THE FISCAL YEAR ENDED MAY 31, 2002

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO _____.

#### COMMISSION FILE NUMBER 000-26565

# LIBERATE TECHNOLOGIES
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **DELAWARE** | **94-3245315** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **2 Circle Star Way, San Carlos, California** | **94070-6200** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(650) 701-4000**
Registrant's Telephone Number, Including Area Code

#### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: NONE
#### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

#### COMMON STOCK, $0.01 PAR VALUE PER SHARE
#### (Title of Class)

Indicate by check mark whether the Company (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Company was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒      No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Company's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

As of June 30, 2002, the aggregate market value of the voting stock held by non-affiliates of the Company was $195,380,000 based on the last reported sale price of the Company's common stock on the Nasdaq National Market System, and there were 107,618,302 shares of common stock outstanding (including shares held by affiliates).

#### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's Proxy Statement for the Annual Meeting of Stockholders to be held on October 29, 2002 are incorporated by reference in Items 10, 11, 12, and 13 of Part III of this Report.

**LIBERATE TECHNOLOGIES**
**ANNUAL REPORT ON FORM 10-K**
**FOR THE FISCAL YEAR ENDED MAY 31, 2002**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 19 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 20 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 50 |
| Item 8. | Financial Statements and Supplementary Data | 51 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 91 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 92 |
| Item 11. | Executive Compensation | 93 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 93 |
| Item 13. | Certain Relationships and Related Transactions | 93 |
| **PART IV** | | |
| Item 14. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 94 |
| Signatures | | 99 |

## PART I.

### Item 1. Business

The discussion in this Annual Report on Form 10-K ("Form 10-K") filed on behalf of Liberate Technologies and its wholly owned subsidiaries ("Liberate," "we," "us," or "our") contains statements that involve expectations or intentions (such as those relating to future business or financial results, new products or features, anticipated deployments, or management strategies). These are forward-looking statements that are subject to risks and uncertainties. We assume no obligation to update any forward-looking statements. Actual results may vary materially due to the risks listed below, risks listed in our other filings with the Securities and Exchange Commission, and unforeseen other factors. You should consider our forward-looking statements in conjunction with those risks discussed below, as well as with our financial statements, related notes, and the other financial information appearing elsewhere in this Form 10-K.

### Overview

Liberate Technologies is the premier provider of standards-based software platforms for delivering enhanced digital content and services to television viewers around the world. Network operators (such as cable and satellite television operators and telecommunications companies), broadcasters, content providers, and manufacturers of information-oriented consumer devices such as television set-top boxes and game consoles ("consumer devices") use our software to deliver enhanced digital content and services. Our software also facilitates network management and interoperability of third-party applications.

We began our operations in late 1995 as a division of Oracle, developing client and server software for the consumer, enterprise, and educational markets. We incorporated in Delaware in April 1996 when Oracle spun off our division as Network Computer, Inc. ("NCI"). NCI's initial focus was selling software to original equipment manufacturers of network computer products for enterprise customers. In August 1997, NCI merged with a Netscape Communications subsidiary, Navio Communications, Inc. ("Navio"), which was developing Internet application and server software for the consumer market. NCI was the surviving entity in the merger. After the merger, we changed our strategic direction and restructured our operations to focus our development and marketing efforts on products targeted primarily at the consumer device market, targeting sales to a limited number of large network operators and consumer device manufacturers. In May 1999, we changed our name from NCI to Liberate Technologies.

Since our incorporation, we have raised a significant amount of capital by selling small equity positions to a number of investors, including some major network operators. This has provided us with the financial resources we needed to continue our growth, given us resources to pursue investments and acquisitions, and reinforced our relationships with participating network operators. In order to continue to fund our growth, we decided to offer our stock to the public and became a publicly traded company on July 28, 1999. In January 2000, we effected a two-for-one split of our stock. We raised additional capital in February 2000 through a secondary public offering, and again in July 2000 when Cisco Systems ("Cisco") invested $100.0 million through a private placement.

We have made two acquisitions since becoming a publicly traded company. In March 2000, we acquired the VirtualModem assets of SourceSuite LLC ("SourceSuite"), a company based in Canada. In June 2000, we acquired MoreCom, Inc. ("MoreCom"), based in Horsham, Pennsylvania.

In July 2002, we entered into an agreement to acquire Sigma Systems Group (Canada) ("Sigma"), which develops and licenses operations support systems software to cable operators to permit them to create, deploy, monitor, and maintain subscriber services. See Note 17 of Notes to Consolidated Financial Statements.

1

We operate solely in one segment and generate revenues by licensing our client and server products, applications, and tools, and providing related services. Our fiscal year runs from June 1 to May 31, with each fiscal year ending on May 31 of the corresponding calendar year. Our stock is traded on the Nasdaq National Market under the symbol "LBRT."

We have offices in the United States, Canada, Europe, Asia, and Australia. Our headquarters and primary development offices are located in San Carlos, California. We have a development office in London, Ontario, Canada. We also have sales offices in London, England; Tokyo, Japan; Sydney, Australia; and Beijing, China.

### Technology and Products

**Technology**

Our software platform includes a full range of client and server products, tools, and applications. These solutions enable network operators, broadcasters, content and applications developers, and consumer device manufacturers to deliver enhanced content and applications to TV viewers. Deploying these solutions requires a depth of knowledge in a broad range of technical fields. Over the past six years, we have acquired expertise in technologies such as the following:

- Digital television;

- Standards-based technology;

- Efficient client technology;

- Portable client architecture;

- Reliable software architecture; and

- Integration technologies.

*Digital television.* Much of the technology we offer is specifically engineered to deliver enhanced TV applications for digital television. For example, we have developed the software technology to manage the triggers that are used to signal the presence of interactive content in a digital broadcast stream. Each aspect of deploying an application—creating it, delivering it over a network, and running it on a set-top box—requires specialized knowledge of how digital TV systems work. We routinely use this digital TV know-how in the development of our products and the delivery of our services.

*Standards-based technology.* From our inception, we recognized the important role that standards have played in the major advances in television and other consumer electronics markets. Consequently, we became an early proponent of standards in this industry and built our products around them. For example, Liberate® TV Navigator™ software was the first certified Java-compliant software client in the industry. Our products use many existing broadcast and Internet standards, and where standards do not exist, we help to create them. We have contributed to industry standards activities such as Advanced Television Enhancement Forum ("ATVEF"), Digital Video Broadcast-Multimedia Home Platform ("DVB-MHP"), OpenCable Application Platform ("OCAP"), and the TV Linux Alliance.

Since our products are based on the same technologies that form the basis of DVB-MHP and OCAP (notably, Java), Liberate is well positioned to provide solutions where these standards are adopted. By offering standards-based solutions, we further ensure that application developers can use widely available and highly refined tools designed for other purposes (for example, Java or HTML development) to develop for TV. This promotes a broader array of content and applications, and thus creates a better experience for the consumer.

*Efficient client technology.* We have engineered our client software to support a range of digital devices. With products that run in less than 400 kilobytes of memory, we offer some of the smallest,

<div align="center">2</div>

---

most efficient client engines available. Even on resource-constrained hardware platforms, these client engines can support such advanced features as a Java applications environment, video-on-demand, and electronic program guides. We also offer small and efficient implementations of our higher-end products that offer substantial feature sets.

*Portable client architecture.* We have developed porting technology and tools that streamline the process of making our software run across a variety of digital hardware platforms and operating systems. This approach maximizes the number of devices that can run our software.

*Reliable software architecture.* Our software typically operates in always-on environments, where reliability, security, and privacy are of utmost importance. Accordingly, we design our software to function under extended use and extreme loads. For example, we use deployment-proven technologies (such as load balancers) and established standards (such as SSL).

*Integration technologies.* Recognizing that digital network operators, broadcasters, and application developers have their own specific needs (and unique existing infrastructures), we have developed a modular architecture that uses interchangeable components and industry-standard interconnections. Further, we have pre-integrated our server technology with related software solutions to facilitate integration with the systems used by our network operators.

**Overview of Products**

Cable, satellite, terrestrial broadcast, and telephony-based digital television network infrastructures are quite varied. In response to this diversity, we have created a modular suite of products that we can adapt to meet the specific needs of each operator.

**Client and Server Products**

Our client software products and their accompanying servers form the core of our offerings. The client components, collectively called Liberate TV Navigator, run on digital set-top boxes of various types, such as cable, satellite, digital terrestrial broadcast, and DSL (Digital Subscriber Lines), and create an application environment. Since our client software needs to run on a variety of set-top boxes, we offer Liberate® TV Porter™ software, which is used to create porting layers typically implemented by the set-top box manufacturers. In aggregate, the set-top box's operating system, the porting layer, and Liberate TV Navigator software control the function of the set-top box, turning a conventional digital device into one capable of providing interactive and enhanced services. We offer Liberate TV Navigator software in three basic configurations, depending on the capability of the consumer device:

- Compact, for resource-constrained devices (such as the Motorola DCT-2000);

- Micro, for mid-range devices requiring a Java-only profile; and

- Standard, which includes a wider range of features (including HTML) for an array of higher capacity digital devices.

We provided a variety of server software to support Liberate TV Navigator software and other set-top box clients. Liberate® Transcoder™ server software lets many set-top boxes that are limited in functionality provide a richer user experience by offloading some processing to a remote server. Liberate® Datapoint™ server software manages subscribers and set-top boxes, while continually sending data that a user can access from different set-top boxes. Liberate® Mediacast™ server software efficiently transfers data to set-top boxes using a minimum of network resources. Liberate® Command™ server software lets operators manage their server infrastructure and data. Collectively, these products comprise a software suite called Liberate® Connect™.

<div align="center">3</div>

---

**Application Infrastructure Products**

Exhibit JJ

| ENGINEERING

Management Science and Engineering

## People

| Faculty |
| Adjuncts |
| Emeriti Faculty |
| PhD Students |
| Staff |
| Spotlight Profiles |

# Steve Weinstein

## Lecturer



Lecturer, Management Science and Engineering

## Contact

**Email: sweinstein@stanford.edu**

Linked In Profile »

With a background that spans technology, product development, and entertainment, Steve Weinstein has been focused on where media meets technology. Currently Steve is the founder and CEO of MovieLabs. Steve is also the co-founder of KineTrope a small design shop for small consumer and professional electronics. Additionally, Steve is currently teaching entrepreneurship at U.C. Berkeley and at Stanford.

Previously, Steve served as CTO of Deluxe Entertainment, a 6,000 person post production house, and CTO at Rovi Corporation where he guided the transition from physical technologies to e-commerce, connected home, secure and subscription services. Additionally, Steve held the role of Chief Technology Officer at Vicinity, a mapping company acquired by Microsoft in 2002. Steve was also a founding executive and Chief Strategist and Technologist at Liberate Technologies, an interactive television software company. Further back in his career, Steve held executive-level positions at Microprose/Spectrum HoloByte (game company), Electronics for Imaging (print processing), and Media Cybernetics (image processing). Steve also was chief architect at Ship Analytics for real time ship, sub and helicopter trainers. Steve started his career at Naval Research Laboratory in the area of advanced signal processing, computer language design, and real time os development.



View full profile on Stanford Profiles ❯

**CONTACT US**

Exhibit KK



CBR (HTTP://

# CBR

Computer Business Review (/)

Let AI do it for you.

Learn more about Antigena Email

## Favourites

Favorite list is empty.
Clear favorites (?wp/?action=clear)

## Latest News on CBR

- "We Drink the Stuff" — Northumbrian Water CIO Nigel Watson on Utility Innovation (https://www.cbronline.c depth/cio-town-hall-live-september)
  1 day ago

- UK, European Banks, Fintechs Being Targeted with Malicious KYC Docs (https://www.cbronline.c kyc-docs-phishing)
  2 days ago

- Five Ways Cloud-Managed DDI Can Enhance Borderless Networks (https://www.cbronline.c managed-ddi)
  2 days ago

- Octopus Energy CTO James Eddison on APIs, the Cloud and the Future of Energy (https://www.cbronline.c energy-cto)
  2 days ago

- CISA to .GOV Agencies: Get Vulnerability Disclosure Plans Sorted in 30 Days (https://www.cbronline.c vulnerability-disclosure)
  2 days ago

- TLS Certificates Cut to One Year From This Month: What You Need to Know (https://www.cbronline.c year-tls-certificates)
  2 days ago

- Arm Reveals First 64-Bit Real Time Processor, Targets Computational Storage (https://www.cbronline.c

TECHNOLOGY (HTTPS://WWW.CBRONLINE.COM/NEWS/)   🏠 Back to Home (/)

## Liberate Technologies Strikes Interactive Deal With Star TV

CBR STAFF WRITER (HTTPS://WWW.CBRONLINE.COM/AUTHOR/CBR-STAFF-WRITER/)
18TH NOVEMBER 1999

➕ INCREASE /   DECREASE TEXT SIZE ➖

**Liberate Technologies Inc has licensed its TV Navigator set-top box software to Hong-Kong based Star TV, a subsidiary of News Corp Ltd, for use in technical trials of an interactive television service. Hong Kong's Telecommunications Regulatory Authorities have approved the trials, which are slated to run from November 1999 to February 2000. Star TV has […]**

Liberate Technologies Inc has licensed its TV Navigator set-top box software to Hong-Kong based Star TV, a subsidiary of News Corp Ltd, for use in technical trials of an interactive television service. Hong Kong's Telecommunications Regulatory Authorities have approved the trials, which are slated to run from November 1999 to February 2000. Star TV has applied for a pay TV license for its planned new portal, designed to offer multi-channel TV, digital radio, email, web browsing and e- commerce, all accessible via a remote control and a keyboard. If all goes well, the DTV portal will be launched in early 2000. Liberate has come a long way since it was Oracle spin-off Network Computer Inc, struggling with an unpopular name and image. The company now has a new CEO, Mitch Kurtzmann, formerly of Sybase, and a $100m IPO under its belt. Better still, it saw a similar deal with Cable & Wireless go live only last week.

**CBR is using cookies**

We use them to give you the best experience. If you continue using our website, we'll assume that you are happy to receive all cookies on this website.

Continue   Learn more (/privacy-policy/)

X

Privacy - Terms

# Exhibit LL

**SF**GATE

https://www.sfgate.com/business/article/Former-software-officer-indicted-Liberate-2721326.php

# Former software officer indicted / Liberate ex-COO accused of inflating company's revenue

By **Henry K. Lee**  Published 4:00 am PDT, Thursday, September 30, 2004

The former chief operating officer of a San Carlos software company has been indicted on charges of securities fraud for an alleged scheme to inflate the company's revenue, authorities said Wednesday.

**Donald Fitzpatrick**, 48, the one-time head of worldwide sales for **Liberate Technologies** Inc., was indicted late Tuesday by a federal grand jury in San Francisco.

Federal prosecutors charge that Fitzpatrick falsely inflated the company's revenue in fiscal years 2002 and 2003 by as much as 17 percent, causing investors to lose more than $40 million. Authorities believe he is living in Sydney, having been fired by Liberate.

His attorney did not return calls

**MBA BY THE BAY:** See how an
directory of Bay Area programs.



San Francisco Evening Forecast - 09/07/2020

9/7/2020
Case 3:20-cv-01596-VC Document 103 Filed 09/23/20 Page 234 of 264
Former software officer indicted - Liberate's COO accused of inflating company's revenue - SFGate

Fitzpatrick was charged with securities fraud and conspiracy to commit securities fraud, making false statements to auditors and falsifying the books of Liberate, which sells software and services for interactive television.



Can a Press Release Help SEO?

eReleases Press Release

SEO is a long-term commitment so you should consistently update and improve your strategy.

OPEN

Fitzpatrick also faces a separate civil complaint by the Securities and Exchange Commission. **Thomas Stitt**, 50, of Redwood City, former Liberate sales vice president,

has agreed to pay $78,000 to settle a complaint filed by the SEC for his role in the same alleged scheme.

According to the indictment, Fitzpatrick entered into an illegal side agreement in which Liberate supplied a customer with the money to make a purchase.

In this deal, Liberate used its own funds to create the false appearance of legitimate revenue, authorities said. Fitzpatrick told employees to "get the deal done" and to worry about the legal or financial "niceties" later, the indictment said.

In a second transaction, Fitzpatrick hid from Liberate's finance department a side agreement that he negotiated with a customer granting the customer future financial concessions, the SEC complaint said.

"The concessions Fitzpatrick secretly granted, if accounted for properly, would have wiped out the revenue Liberate reported to the public for the sale, " the SEC said.

Fitzpatrick also allegedly signed false letters to Liberate's outside auditor, PricewaterhouseCoopers, stating that he had told them about all aspects of the transactions.

Prosecutors also charged that he lied to investors on a conference call, lied to lawyers conducting an internal investigation of the company's finances and lied to the chief financial officer in a series of e-mail messages.

© 2020 Hearst Communications, Inc.



# Exhibit MM



Exhibit NN

**Beat**

# The Lobby — are you on the list?

Matt Marshall

May 2, 2007 12:00 PM





David Hornik, a partner at August Capital, a venture capital firm that prides itself at being at the center of Silicon Valley action, likes to wax on about the value of conferences.

He devotes a [category on his blog to conferences](#), which has about 70 posts on the subject, even though he doesn't post very frequently. Now he's helped kicked off an elite unconference, arguing that you don't learn anything from keynotes or powerpoint presentations. In a great conference, [his invitation says](#), "the conversation in the lobby is the content."

Ad (19)





Called "The Lobby," the conference will take place at the The Fairmont Orchid, The Big Island, Hawaii. It's two and a half days, and his group has invited an A-List of individuals — including a few well-heeled sponsors, of course — to gather with no distraction to network and converse. Here's the list, locked to outsiders, which someone slipped to VentureBeat:

ADVERTISEMENT



Sponsors are August Capital, Fenwick & West, H Int., Intel Capital, Kodak Gallery, Mozilla, Orrick Emerging and Yahoo! We've yet to reach Hornik directly, but an assistant at August confirmed he is in charge.

J Allard, VP, Microsoft
Dave Alles, Media Center Extender team, Microsoft
Dr. Phillip Alvelda, Chairman and CEO, MobiTV
Chris Anderson, Editor In Chief, Wired Magazine
Marc Andreessen, Founder, Ning
Adam Bain, EVP Technology, Fox Interactive Media
Mitchell Baker, CEO, Mozilla
Jim Bankoff, Former EVP Product, AOL
Raanan Bar-Cohen, Director of Product Strategy, Dow Jones
Jeff Barr, Web Services Evangelist, Amazon
Peter Barrett, CTO, MSTV, Microsoft
Joe Belfiore, Corporate VP, eHome Group, Microsoft
Chris Bell, Director of iTunes, Apple

    

The Lobby — Are you on the list? | VentureBeat

Brad Berens, Editor, iMedia
Jeff Berman, SVP, MySpace (Fox)
Jeff Bezos, CEO, Amazon
Angela Biever, Vice President, Intel Capital
Jeff Blackburn, VP Worldwide Business Development, Amazon
Michael Bloom, VP, Digital Music, MTV Networks
Shelby Bonnie, Co-Founder, CNET
Steve Boom, SVP, Broadband & Mobile, Yahoo
Emmanuelle Borde, Vice President, Sony Pictures Digital
Paul Bricault, SVP, William Morris Consultants
Sergey Brin, Co-Founder & President, Technology, Google
Don Buckley, SVP of Interactive Marketing, Warner Brothers
Michael Buhr, Sr. Director of Corporate Strategy, eBay
Brett Bullington, Board Member, Flickr, JotSpot, Oodle, Wink
Katie Burke Mitic, VP, Mareting and Operations, Skyrider
Garrett Camp, Co-Founder, StumbleUpon
John Caplan, President, Ford Models
Sean Carey, EVP of Digital Distribution and Production Acquisition, Sony
Mike Cassidy, CEO, Xfire (Viacom)
Betty Cohen, President and CEO, Lifetime Entertainment Services
June Cohen, Director of Media, TED Conference
Kevin Cohen, SVP, Strategic Planning, Turner Broadcasting Systems
Matt Cohler, VP Strategy and Business Operations, Facebook
Beth Comstock, President, Digital Media and Market Developement NBC Universal
Tom Conrad, CTO, Pandora
Kevin Conroy, EVP of Product, Marketing and Distribution, AOL
Andrew Conru, Founder and CEO, Friend Finder Network
Toby Coppel, SVP Corporate Development, Yahoo
Jonathan Coulton, Founder, JonathanCoulton.com
Sky Dayton, CEO, Helio
Lisa Ellis, EVP, Sony BMG
Tony Fadell, SVP, iPod Division, Apple
Josh Felser, Co-Founder and CEO, Grouper (Sony)
Shana Fisher, SVP of Strategy and M&A, Interactive Corp.
Erik Flannigan, VP of Programming, AOL
Jason Flom, Chairman and CEO, Virgin Records
Bill Flora, Designer, Zune, Microsoft
Tod Francis, General Partner, Shasta Ventures
Dave Geary, SVP Business Development, BetZip
Bernard Gershon, SVP and General Manager, ABC News Digital Media
Tom Glocer, CEO, Reuters
Shawn Gold, SVP, Marketing and Content, MySpace (Fox)
Seth Goldstein, Founder, AttentionSoft
Paul Graham, Founder, Y Combinator
Martin Green, SVP, CNET
Jordan Greenhall, CEO, Divx
Joe Greenstein, CEO, Flixster

    

Andre Haddad, SVP Product, eBay
Brad Handler, Co-Founder, Exclusive Resorts
Heather Harde, CEO, TechCrunch
Scott Heiferman, CEO, Meetup
Jay Higginbotham, VP New Initiatives, Turner Broadcasting Systems
Brent Hoberman, Chairman and Chief Strategic Officer, Lastminute.com
Chad Hurley, Co-Founder and CEO, YouTube (Google)
Daniel James, CEO, Three Rings
Arriana Huffington, CEO, Huffington Post
Alex Kazim, SVP, Skype (eBay)
Patrick Keane, EVP and Chief Marketing Officer, CBS Interactive
Kourosh Kharimkany, GM, Wired.com
Ben Kilgore, Xbox Live, Microsoft
Zach Klein, VP Development, CollegeHumor (IAC)
George Kliavkoff, Chief Digital Officer, NBC Universal
Joe Kraus, Co-Founder and CEO, JotSpot (Google)
Justin LaFrance, Co-Founder, StumbleUpon
Roger Lang, CEO, TransAria
Jim Lanzone, CEO, Ask.com
Doug Leeds, VP Products, Ask.com
Jordan Levin, Partner, Generate
Ross Levinsohn, Former President, Fox Interactive Media
Peter Levinsohn, President, Fox Interactive Media
Ellen Levy, Director, MediaX (Stanford)
Jeremy Liew, General Partner, Lightspeed Venture Partners
John Lilly, COO, Mozilla
Jakob Lodwick, CTO, CollegeHumor (IAC)
Nancy Lublin, CEO, Do Something
Zander Lurie, SVP, Strategy and Development, CNET
Joel Makower, CEO, Green World Media
Mike Marquez, VP Corporate Development, CBS Interactive
Chris Maxcy, VP Business Development, YouTube (Google)
Marissa Mayer, VP Search Products and User Experience, Google
Ian McCarthy, VP Product Marketing, Orb Networks
Judy McGrath, Chairman and CEO, MTV Networks
Fred McIntyre, VP of Video Products, AOL
Mary Meeker, Managing Director, Morgan Stanley
Vivek Mehra, General Partner, August Capital
Rick Mueller, President, LiveNation
Chris Michel, CEO, Affinity Labs
Jon Miller, Former CEO, AOL
Perkins Miller, SVP, NBC Universal
Louis Monier, Distinguished Engineer, Google
Bob Morgan, VP and GM, Shozu
Sean Moriarty, President and CEO, Ticketmaster
Steve Mosko, President, Sony Pictures Television
Walt Mossberg, Founder, D: All Things Digital

   

Ashwin Navin, President and COO, BitTorrent

Steve Newhouse, Chairman, CondeNet

Kent Nichols, Creator, Ask A Ninja

Martin Nisenholtz, SVP Digital Media, New York Times

Elliot Noss, CEO, Tuckows

Mathieu Nouzareth, CEO, Boonty

Pierre Omidyar, Founder, eBay

Thomas Oscherwitz, Chief Privacy Officer, ID Analytics

Larry Page, Co-Founder & President, Products, Google

DJ Patil, Corporate Architect, eBay

Sunil Paul, Angel Investor

Gil Penchina, CEO, Wikia

Chris Petrovic, VP Busines Development, Playboy

Peter Pham, VP Business Development, Photobucket

Jeremy Philips, SVP, News Corp.

Anil Podduturi, Supervising Producer, MTV Digital Media

Ariel Poler, Founder and CEO, TextMarks

Will Poole, SVP, Microsoft

Geoff Prentice, VP Strategic Partners and Corporate Development, Skype

Arvind Rajan, President and CEO, Grassroots Enterprises

David Richter, VP and General Counsel, Divx Networks

Danny Rimer, General Partner, Index Ventures

Antonio Rodriguez, CEO, Tabblo

Scott Roesch, VP and General Manager, Atom Films

Philip Rosedale, Founder and CEO, Linden Labs (Second Life)

Steve Rosenbaum, CEO, Magnify Media

Richard Rosenblat, CEO, Demand Media

Bruce Rosenblum, President, Warner Brothers Television Group

Dan Rosensweig, Former COO, Yahoo

Sean Ryan, CEO, Meez

Kevin Ryan, Co-Founder and CEO, ShopWiki

Adam Rymer, SVP, Digital Platforms, Universal Pictures

Chris Sacca, Head, Special Initiatives, Google

Matt Sanchez, CEO, VideoEgg

Scott Sangster, Director, Strategy and Development, Disney Interactive Group

Chris Satchell, GM, Game Development, Xbox, Microsoft

Joshua Schachter, Founder, Delicious

Munjal Shah, Founder and CEO, Riya

Tina Sharkey, CEO, BabyCenter

Kevin Shields, GM, Media Center, Microsoft

Willy Shih, Associate Professor, Harvard Business School

Ram Shriram, Board Member, Google

H.B. Siegel, Technical Director, IMDb (Amazon)

Josh Silverman, CEO, Shopping.com

Quincy Smith, President, CBS Interactive

Geoff Smith, Co-Founder, StumbleUpon

Megan Smith, Director, New Business Development and Strategy, Google

    

8/26/2020    The Lobby: Are you on the list? | VentureBeat

Gregg Spiridellis, Co-Founder and CEO, JibJab
Danah Stalder, SVP, Marketing and Business Operations, PayPal
Mark Stevens, Partner, Fenwick & West
Seth Sternberg, Co-Founder and CEO, Meebo
Lisa Stone, Co-Founder, BlogHer
Jeremy Stoppleman, Founder and CEO, Yelp
Kara Swisher, Founder, D: All Things Digital
Dan Surratt, EVP Digital Media, Lifetime Networks
Craig Syverson, Founder and CEO, Grunt Media
David Sze, General Partner, Greylock Capital
Peter Thiel, President, Clarium Capital
Scott Teissler, CIO and CTO, Turner Broadcasting Systems
Selina Tobaccawala, SVP, Product and Technology, Ticketmaster Europe
Bill Trenchard, Chairman, LiveOps
Owen Van Natta, COO, Facebook
Yossi Vardi, Chairman, International Technologies
Michael Van Swaaij, Chief Strategy Officer, eBay
Martin Varsavsky, Founder and CEO, Fon
Steve Venuto, Partner, Orrick
Jimmy Wales, Founder, Wikipedia
Charlie Walk, President, Epic Records
Hunter Walk, Manager, Google Video, Google
Ted Wang, Partner, Fenwick & West
Paul Wehrley, VP of Strategic Operations, Ask.com
Mark Weinberg, Director of Engineering, Zune, Microsoft
Jeff Weiner, SVP of Search, Yahoo
Steve Weinstein, President and CEO, MovieLabs
Alex Welch, Founder and CEO, Photobucket
Kara Welker, Partner, Generate
Denmark West, EVP, Chief of Operations, MTV Networks
Tim Westergren, Founder and Chief Strategy Officer, Pandora
Eric Wheeler, CEO, Neo@Ogilvy
Luke Wood, Head of A & R, Universal Music
Andrea Wong, EVP, Alternative Programming, ABC
Will Wright, Creator, The Sims, Spore
Sam Yagan, Co-Founder and CEO, OKCupid
Jerry Yang, Co-Founder and Chief Yahoo!, Yahoo
Jim Young, Co-Founder, HotOrNot
Niklas Zennstrom, Founder, Skype (eBay), Joost
Mark Zuckerberg, CEO, Facebook
Mitch Zuklie, Partner, Orrick
Jay Adelson, CEO, Digg
Andrew Anker, SVP, Six Apart
Mike Arrington, Founder and Editor In Chief, TechCrunch
John Battelle, CEO, FM Publishing
Shana Berger, Founder, Readymade
Barak Berkowitz, CEO, Six Apart

    

Stewart Butterfield, Co-Founder, Flickr (Yahoo)
Jason Calacanis, Entrepreneur in Action, Sequoia Capital
David Carson, CEO, Heavy
Jeff Clavier, Founder, SoftTech VC
Tony Conrad, CEO, Sphere
Ron Conway, Founder, Angel Investors
Dick Costolo, Co-Founder and CEO, Feedburner
James Currier, CEO, Ooga Labs
Stan Chudnowski, CTO, Ooga Labs
Ethan Diamond, Co-Founder, Oddpost (Yahoo)
Craig Donato, Founder and CEO, Oodle
Rael Dornfest, Founder and CEO, Stikit
Caterina Fake, Co-Founder, Flickr (Yahoo)
Iggy Fanlo, CEO, AdBright
Lisa Gansky, Co-Founder, Ofoto, GNN
Brad Garlinghouse, SVP, Yahoo
John Girard, CEO, Clickability
Steve Glenn, Founder and CEO, LivingHomes
Matt Haughey, Founder, MetaFilter
Rob Hayes, General Partner, First Round Capital
Marc Hedlund, Co-Founder, Wesabe
Reid Hoffman, Founder, LinkedIn
Auren Hoffman, Founder and CEO, Rapleaf
James Hong, Founder, HotOrNot
Bradley Horowitz, VP Product Strategy, Yahoo
Joi Ito, Board Member, Mozilla, Creative Commons
Michael Jackson, President of Programming, Interactive Corp.
Mark Jacobsen, Managing General Partner, O'Reilly AlphaTech Ventures
James Joaquin, Venture Partner, Bridgescale
Rob Kalin, Founder and CEO, Etsy
Mitch Kapor, Chairman, Open Source Applications Foundation
Philip Kaplan, Founder, AdBright
Josh Kopelman, Managing Director, First Round Capital
Tariq Krim, Founder and CEO, Netvibes
Max Levchin, Founder and CEO, Slide
Rob Lord, Founder and CEO, Songbird
Eric Lunt, Co-Founder and CTO, FeedBurner
Om Malik, Founder and CEO, GigaOm
Matt Mullenweg, Founder, WordPress
Craig Newmark, Founder, Craig's List
Mark Pincus, Founder, Tribe
Tim O'Reilly, CEO, O'Reilly Publishing
Kevin Rose, Founder and Chief Architect, Digg
Ted Rheingold, Co-Founder and CEO, Dogster
Narendra Rocherolle, CEO, 30 Boxes
Toni Schneider, CEO, WordPress
Dave Sifry, Founder and CEO, Technorati

    

Ben Trott, Co–Founder and CTO, Six Apart

Jeff Veen, Founder, MeasureMap (Google)

Evan Williams, Founder, Obvious Corp. (Twitter)

Mena Trott, Co–Founder and President, Six Apart

**Score lifetime access to this stock image library for only $29**

**Boost your productivity with these 9 hot deals for...**

**You can score a lifetime of cloud backup for under $50...**

**This Microsoft Excel training bundle is just $34 right now**

store

## You May Like

**Sebastopol Drivers Who Use Their Car Less Than 49...**
Comparisons.org

Learn More

**Chiropractors Baffled: "30 Second" Stretch...**
WeeklyPenny.com

Learn More



**Celebrity Trainer: I Feel Better At 60 Than I Did At 40, Thanks To This One Morning Trick**
Power Life By Tony Horton




**What a Switch Pro, PlayStation 5, and Nintendo's R.O.B. have in common**



**Grand Theft Auto V gets updated for PlayStation 5**

VB Lab    Newsletters    Events    Deals    Jobs

About    Contact    Careers    Privacy Policy

Exhibit OO

The Lobby

# The Lobby



## The Venue

The Fairmont Orchid is a four star resort on the Kohala Coast of Hawaii's Big Island. Need we say more? If so, here's the Orchid's **official website**.

**Why The Lobby?**
**Who's Been Invited?**
**Register!**

## Why The Lobby?

Why do you attend conferences? Is it to learn about industry trends or hear keynote speakers or watch powerpoint presentations? Or do you attend conferences to spend time in the lobby? In a great conference, the conversation in the lobby is the content. **The Lobby** aims to turn the traditional conference on its head. There will be no panels, no keynotes, no distractions from the real task at hand – engaging in meaningful conversation and building deeper relationships with other thought-leaders in the new media universe. For two and a half days, the individuals driving innovation and strategic development throughout the online media world will gather for an extended conversation. **The Lobby** will facilitate that dialog and nurture those relationships through a set of social gatherings and activities designed to bring down barriers and maximize productive discourse. Participants in **The Lobby** will leave with new partnerships, new friendships and new ideas.

**<u>Who's Been Invited?</u>**
**<u>Where's The Lobby?</u>**
**<u>Register!</u>**

## The Lobby Conference

October 24th - 26th, 2007
The Fairmont Orchid
The Big Island, Hawaii

**<u>UPLOAD YOUR INTRO VIDEO NOW!</u>**

**<u>Why The Lobby?</u>**
**<u>Who's Been Invited?</u>**
**<u>Where's The Lobby?</u>**
**<u>Register!</u>**

Exhibit PP

Google

"data aggregation"

All | News | Images | Videos | Shopping | More | Settings | Tools | SafeSearch on

Jan 1, 1970 – Dec 31, 2006 ▾ | All results ▾ | Clear

Ad · www.funnel.io/ ▾

Data Aggregation Tool - Free Trial Available

Power your marketing efforts with data from all your channels. Book a demo and start today. Collect all your marketing data and send it to any destination you want. Get started today.

Funnel for E-commmerce
Out of the box ad reporting and analysis for ecommerce marketers.

Data Sources
Funnel connects to all ad platforms no matter what they are. Sign up!

tdwi.org › articles › 2005/04/26 › data-aggregationseve... ▾

LESSON - Data Aggregation—Seven Key Criteria to an ...

Apr 26, 2005 - LESSON - **Data Aggregation**—Seven Key Criteria to an Effective Aggregation Solution. April 26, 2005. By Rich Ghiossi, VP Product Management and Marketing, ...
You've visited this page 3 times. Last visit: 9/15/20

www.hcpro.com › HIM-50026-866 › What-are-data-ag... ▾

What are "data aggregation" activities that a business ... - HCPro

Aug 8, 2005 - **Data aggregation** is where a business associate, in its capacity as the business associate of one covered entity, combines the PHI of such covered entity with ...
You've visited this page 2 times. Last visit: 9/15/20

www.jstor.org › stable

Confidentiality and Confidence: Is Data Aggregation a ... - jstor

Jan 4, 2006 - We present evidence that **data aggregation**, a simplistic approach that has been assumed to protect both scientific advancement and individual privacy, in reality ...
by NH Fefferman - 2005 - Cited by 42 - Related articles
You've visited this page 2 times. Last visit: 9/15/20

People also ask

- What is data aggregation?
- Which is an example of aggregate data?
- Why is data aggregation important?
- How is aggregate data used?

*Feedback*

www.bricker.com › insights-resources › resource › hipa... ▾

HIPAA Privacy Regulations: Definitions - Data Aggregation ...

Feb 1, 2001 - **Data aggregation** means, with respect to protected health information created or received by a business associate in its capacity as the business associate of a ...
You've visited this page 2 times. Last visit: 9/15/20

www.cdc.gov › mmwr › preview › mmwrhtml ▾

Role of Data Aggregation in Biosurveillance Detection ... - CDC

Sep 24, 2004 - Role of **Data Aggregation** in Biosurveillance Detection Strategies with Applications from ESSENCE. Howard S. Burkom,[1] Y. Elbert,[2] A. Feldman,[1] J. Lin[1] [1]Johns ...
by HS Burkom - Cited by 72 - Related articles
You've visited this page 5 times. Last visit: 9/15/20

aspe.hhs.gov › report › data-aggregation ▾

Data aggregation. | ASPE

Dec 28, 2000 - The NPRM did not include a definition of **data aggregation**. In the final rule, **data aggregation** is defined, with respect to protected health information received by ...
You've visited this page 2 times. Last visit: 9/15/20

www.tutorialspoint.com › python_data_science › pytho... ▾

Python - Data Aggregation - Tutorialspoint



data+aggregation - Google Search

Jan 1, 2000 - **Python** - **Data Aggregation** - Python has several methods are available to perform
aggregations on data. It is done using the pandas and numpy libraries.
You've visited this page 2 times. Last visit: 9/15/20

ieeexplore.ieee.org › document

### A Data Aggregation Strategy Based on Wavelet for the Internet ... ✅

Aug 15, 2001 - In this manuscript, we exploit the mathematical wavelet structure to define a
sophisticated **data aggregation** technique for information collected from different nodes ...
by B Guidi - 2017 · Cited by 1 · Related articles
You've visited this page 2 times. Last visit: 9/15/20

www.w3.org › interest › soaptech ▾

### Techniques for SOAP data aggregation and testing ✅

Jun 18, 2001 - This is compared to existing unit test frameworks for SOAP toolkits, and the
application of this approach to **data aggregation** is demonstrated using an RDF-based ...
You've visited this page 2 times. Last visit: 9/15/20

www.researchgate.net › figure › Comparison-of-the-data-...

### Comparison of the data aggregation methods | Download ... ✅

Jan 1, 2005 - **Data aggregation** is one of the power saving strategies in sensor networks,
combining the data that comes from many sensor nodes into a set of the meaningful ...
You've visited this page 2 times. Last visit: 9/15/20

us-cert.cisa.gov › files › publications › Data-Agg-120605 ▾ PDF

### Protecting Aggregated Data - US-Cert ✅

Dec 5, 2005 - The term **data aggregation** refers to the trend toward amassing, preserving, and
using large volumes of electronic information. Organizations engaged in **data** ...
You've visited this page 2 times. Last visit: 9/15/20

docs.oracle.com › server.920 › aggreg ▾

### SQL for Aggregation in Data Warehouses - Oracle Help Center ✅

Sep 15, 2000 - Therefore, analytical tasks require convenient and efficient **data aggregation**.
Optimized Performance. Not only multidimensional issues, but all types of processing ...
You visited this page on 9/15/20.

www.sciencedirect.com › science › article › pii

### Effects of data aggregation on the power of tests for a unit root ... ✅

Dec 15, 1992 - This paper studies the effects of **data aggregation** on the powers of the Phillips-
Perron and augmented Dickey-Fuller tests for a unit root by simulation. It is shown ...
by I Choi - 1992 · Cited by 90 · Related articles
You've visited this page 2 times. Last visit: 9/15/20

www.yodlee.com ▾

### Envestnet | Yodlee | A Leader in Data Aggregation ✅

Mar 1, 2006 - Envestnet | Yodlee has proudly fueled innovation for financial institutions and
fintech companies since 1999 through data, APIs, and FinApps. Learn more about ...
You've visited this page 2 times. Last visit: 9/15/20

www.gtap.agecon.purdue.edu › resources › download ▾ PDF

### Chapter 4 FlexAgg: Data Aggregation Program - Global Trade ... ✅

Feb 1, 2001 - This chapter describes the command line **data aggregation** program, also known
as FlexAgg, which is included in the GTAP 7 Data Package. It is based on user ...
by R McDougall - 2008

link.springer.com › chapter

### A New Data Aggregation Algorithm for Clustering Distributed ... ✅

Oct 15, 2002 - **Data aggregation** is one of the power saving strategies in sensor networks,
combining the data that comes from many sensor nodes into a set of the meaningful ...
by SJ Lee - 2004 · Cited by 5 · Related articles

link.springer.com › chapter

### Hierarchical In-Network Data Aggregation with Quality ... ✅

Jun 15, 2003 - Earlier work has demonstrated the effectiveness of in-network **data aggregation**
in order to minimize the amount of messages exchanged during continuous ...
by A Deligiannakis - 2004 · Cited by 202 · Related articles
You've visited this page 2 times. Last visit: 9/15/20

data aggregation - Google Search

groups.csail.mit.edu › tds › papers › Kuhn › disc11 ▾   PDF

**The Complexity of Data Aggregation in Directed ... - Research** ✅

Oct 15, 2003 - In this setting the method of choice is to first construct a spanning tree of the network graph, and then perform distributed **data aggregation** "up the tree". In a ...

by F Kuhn - Cited by 26 · Related articles

You've visited this page 2 times. Last visit: 9/15/20

www.ercot.com › Market Information ▾

**Data Aggregation - ERCOT.com** ✅

Dec 2, 2005 - Locate **data aggregation** daily postings that include UFE reporting; consumption data loading; and TDSP distribution and transmission loss factors. Also find ...

You've visited this page 2 times. Last visit: 9/15/20

ceng.usc.edu › ~bkrishna › research › papers › DataAg... ▾   PDF

**Impact of Data Aggregation in Wireless Sensor Networks** ✅

Jul 15, 2001 - We examine the im- pact of source-destination placement and communication network density on the energy costs and delay associated with **data aggregation**.

by B Krishnamachari - Cited by 1938 · Related articles

You've visited this page 2 times. Last visit: 9/15/20

www.jgea.org › resources › download ▾   PDF

**Chapter 5 GTAPAgg: Data Aggregation Program** ⓘ

Jun 5, 2005 - Chapter 5. GTAPAgg: **Data Aggregation** Program. Mark Horridge. GTAPAgg is a Windows program used to prepare data bases for the GTAP economic model.

by M Horridge - Cited by 12 · Related articles

netsec.ethz.ch › publications › papers › chan_fntdb11 ▾   PDF

**Secure Distributed Data Aggregation - Network Security ...** ✅

Jan 15, 2005 - DOI: xxxxxx. Secure Distributed **Data Aggregation**. Haowen Chan1, Hsu-Chun Hsiao2, Adrian. Perrig3 and Dawn Song4. 1 Carnegie Mellon University, USA, ...

by H Chan - Cited by 13 · Related articles

You've visited this page 2 times. Last visit: 9/15/20

journals.openedition.org › cybergeo ▾

**Spatially aggregated data and variables in empirical analysis ...** ✅

May 7, 1999 - Spatial **data aggregation** creates the need to investigate the connection between the theory and data as well as the micro-macro dualism. Top of page ...

by T Dusek - 2004 · Cited by 15 · Related articles

You've visited this page 2 times. Last visit: 9/15/20

ithandbook.ffiec.gov › e-banking › account-aggregation ▾

**Account ... - FFIEC IT Examination Handbook InfoBase** ✅

Oct 22, 2003 - ... credit card, brokerage, and banking **data**). **Aggregation** services can improve customer convenience by avoiding multiple log-ins and providing access to tools ...

You visited this page on 9/15/20.

citeseerx.ist.psu.edu › viewdoc › download ▾   PDF

**PHDA: A priority based health data aggregation ... - CiteSeerX** ✅

Jan 31, 2006 - PHDA: A priority based health **data aggregation** with privacy preservation for cloud assisted WBANs. Kuan Zhang a,*. , Xiaohui Liang a, Mrinmoy Baura a, ...

by K Zhang - 2014 · Cited by 84 · Related articles

You've visited this page 2 times. Last visit: 9/15/20

dl.acm.org › citation

**The Impact of Data Aggregation in Wireless Sensor Networks ...** ✅

Jul 16, 2002 - We also examine the complexity of optimal **data aggregation**, showing that although it is an NP-hard problem in general, there exist useful polynomial-time special ...

by B Krishnamachari - 2002 · Cited by 1940 · Related articles

You visited this page on 9/15/20.

www.openfinance.com ▾

**OpenFinance Overview** ✅

Mar 18, 2006 - Provides **data aggregation** services that automate the gathering of data from numerous sources, in a wide variety of formats, and delivers that data in a single ...

onlinelibrary.wiley.com › doi › wcm.454 › pdf ▾

**The impact of data aggregation on the performance of ...** ✅

Sep 12, 2006 - With the increasing need for different energy saving mechanisms in Wireless Sensor Networks (WSNs), data aggregation techniques for reducing the number of ...

arxiv.org › cs ▾

**[cs/0408039] Medians and Beyond: New Aggregation ... - arXiv** ✅
Aug 17, 2004 - The existing **data aggregation** techniques, however, are limited to relatively simple
types of queries such as SUM, COUNT, AVG, and MIN/MAX. In this paper we ...
by N Shrivastava - 2004 - Cited by 610 - Related articles

pubmed.ncbi.nlm.nih.gov › ...

**Increasing correlations between personality traits and cortisol ...** ✅
Nov 15, 1997 - Increasing correlations between personality traits and cortisol stress responses
obtained by **data aggregation**. Psychoneuroendocrinology. 1997 Nov ...
by JC Pruessner - 1997 - Cited by 292 - Related articles

www.cs.cmu.edu › sage › Papers › solarPlot-InfoViz98 ▾    DOC

**Taming Large Data Sets with Dynamic Aggregation** ✅
Apr 1, 2002 - **Data aggregation** simplifies large data sets by summarizing groups of data
elements and representing such groups with a single graphical symbol or glyph.
by MC Chuah - Cited by 117 - Related articles

research.utwente.nl › files ▾    PDF

**A Dynamic Data Aggregation Scheme for Wireless Sensor ...** ✅
Apr 15, 2003 - Our **data aggregation** scheme allows nodes to process data collected from
sensors and subsequently aggregate the data even in completely unfamiliar.
by S Chatterjea - Cited by 92 - Related articles

journals.sagepub.com › doi › pdf

**Exploring the Relationship between Data Aggregation and ...** ✅
Oct 15, 2002 - fic dynamic representations and to investigate their effects on prediction accuracy
. The relationship between **data aggregation** and predictability is explored by ...
by C Oh - 2005 - Cited by 36 - Related articles

core.ac.uk › download › pdf

**The effect of data aggregation interval on voltage results - Core** ✅
Jun 26, 2003 - suggests 10 minute **data aggregation** intervals are appropriate for routine power
quality monitoring of most power quality disturbances including magnitude of ...
by S Elphick - Cited by 12 - Related articles

tcipg.org › sites › default › files › papers ▾    PDF

**Data Aggregation in SCADA Networks - TCIPG** ✅
Apr 12, 2006 - **Data Aggregation** in SCADA Networks. Hoang Nguyen (hnguyen5@uiuc.edu) and
Klara Nahrstedt (klara.cs.uiuc.edu). Department of Computer Science.

web.cse.ohio-state.edu › publications › conf › sensys06 ▾    PDF

**Scalable Data Aggregation for Dynamic Events in ... - OSU CSE** ✅
Nov 1, 2006 - Scalable **Data Aggregation** for Dynamic Events in Sensor. Networks ∗. Kai-Wei Fan.
Dept. of Computer Science and. Engineering. The Ohio State University.
by KW Fan - 2006 - Cited by 93 - Related articles

www.usenix.org › files › nsdi12 › nsdi12-final11_0 ▾    PDF

**Exploiting In-network Aggregation for Big Data ... - Usenix** ✅
Aug 15, 2004 - ate data size (e.g., in distributed log **data aggregation**) or where there is a
requirement to generate the result at a single server (e.g., in a top-k job). We present a ...
by P Costa - Cited by 184 - Related articles

www.nature.com › ... › research article

**On ecological fallacy, assessment errors stemming from ...** ✅
Oct 11, 2006 - While different levels of areal **data aggregation** changed the results only
marginally, the choice of indices measuring the children's PFT performance had a ...
by BA Portnov - 2007 - Cited by 59 - Related articles

www.asprs.org › uploads › pers › jan › 1999_jan_73-84 ▾    PDF

**Comparing Effects of Aggregation Methods on ... - asprs** ✅
Jan 15, 1999 - Abstract. Spatial **data aggregation** is widely practiced for "scaling-up"
environmental analyses and modeling from local to regional and global scales. Despite ...
by L Blan - 1999 - Cited by 172 - Related articles

www.cs.utah.edu › ~lifeifei › papers › dataC ▾    PDF

**Robust Aggregation in Sensor Networks - CS @ Utah** ✅

data aggregation - Google Search

Mar 18, 2005 - reason, and because individual readings may be noisy or unavailable, it is natural to use **data aggregation** to sum- marize information collected by sensors.

by G Kollios - 2005 · Cited by 35 · Related articles

ro.uow.edu.au › cgi › viewcontent ▾   PDF

**The effect of data aggregation interval on voltage results** ✅

Jun 26, 2003 - IEC61000-4-30 which is the international standard describing power quality monitoring methodology suggests 10 minute **data aggregation** intervals are ...

by S Elphick - 2007 · Cited by 12 · Related articles

files.stlouisfed.org › files › htdocs ▾   PDF

**.Aggregated vs. Disaggregated Data in Regression Analysis ...** ✅

Nov 15, 2002 - differ across degrees of **data aggregation**. Given the frequent use of aggregated data to explain individual behavior, **data aggregation** can result in misleading ...

by TA Garrett - 2002 · Cited by 106 · Related articles

www.nber.org › papers

**Aggregation and the Estimated Effects of School Resources** ✅

Nov 15, 1996 - While **data aggregation** for well-specified linear models yields unbiased parameter estimates, aggregation alters the magnitude of any omitted variables bias.

by EA Hanushek - 1996 · Cited by 693 · Related articles

www.law.cornell.edu › cfr › text ▾

**45 CFR § 164.501 - Definitions. | CFR | US Law | LII / Legal ...** ✅

Feb 1, 2001 - **Data aggregation** means, with respect to protected health information created or received by a business associate in its capacity as the business associate of a ...

mypages.iit.edu › ~jqian15 › papers › PPSA-jnl ▾   PDF

**Privacy-Preserving Selective Aggregation of Online User ...** ✅

Sep 15, 2001 - research works trying to perform **data aggregation** in a privacy-preserving way. Most existing methods guarantee strong privacy protection yet at the cost of ...

www.csee.umbc.edu › ~nam1 › papers ▾   PDF

**Efficient Algorithms for Maximum Lifetime Data ... - UMBC CSEE** ✅

Oct 1, 2002 - **Data aggregation** performs in-network fusion of data packets, coming from different sensors enroute to the base station, in an attempt to minimize the number and ...

by K Kalpakis · Cited by 476 · Related articles

atlas.cs.virginia.edu › ~stankovic › psfiles › cdc-final ▾   PDF

**Feedback Control of Data Aggregation in Sensor Networks** ✅

Dec 15, 2004 - the degree of **data aggregation** to maintain specified acceptable latency bounds on data delivery while attempting to minimize energy consumption. An analytic ...

by T Abdelzaher · Cited by 91 · Related articles

www.ideals.illinois.edu › handle › Gu_Yuhong ▾   PDF

**A COMPARISON OF AGGREGATION METHODS OF ...** ✅

Dec 15, 2006 - whose estimates are closer to reference **data**, aggregation does improve the quality of estimates. We also plotted box plots as functions of the group size the ...

by Y Gu - 2010 · Related articles

graphics.stanford.edu › courses › Papers › Suri_sensys04 ▾   PDF

**New Aggregation Techniques for Sensor Networks - Stanford ...** ✅

Jan 15, 2000 - The existing **data aggregation** techniques, however, are lim- ited to relatively simple types of queries such as SUM, COUNT,. AVG, and MIN/MAX. In this paper we ...

by N Shrivastava - 2004 · Cited by 610 · Related articles

www.dba-oracle.com › data_warehouse › aggregating_... ▾

**Aggregating Data for the Oracle Data Warehouse** ✅

Jan 1, 1997 - Aggregating Data for the Oracle Data Warehouse, **Data Aggregation** And Drill-Down, Aggregation, Roll-Ups, And STAR Schemas.

Ad · www.ge.com/ ▾

**Operations Hub from GE Digital - Rapidly Build Industrial Apps**

Powerful, Code-Free Development Tools and Rich Displays. Download the Datasheet! Lower Costs and Time to Market for Web-Based Industrial Operations Applications. Centralized Environment. Request Demo.

★★★★☆ Rating for ge.com: 4.5 · 418 reviews

Manufacturing Execution · Proficy HMI/SCADA · Predix Edge · Proficy Historian

Ad · www.yodlee.com/ ▾

### Go with Envestnet Yodlee - Bank Account Aggregation
Access the most comprehensive and accurate financial data in the market. Sign up today.
Access to over 22,000 global data sources in financial services. Start Now. Types: Assets,
Account Information, Holdings, Investments.

Ad · www.albridge.com/ ▾

### BNY Mellon | Albridge™ - Innovative Data Aggregation
We Can Help You Make Sense Of Your Data, Work More Efficiently & Uncover Ideas For Growth.
Our Foundation Is **Data Aggregation** & Consolidated Wealth Reporting. Contact Us Today.
Certified Software. Data Excellence. Elegant Technology. Consistent Data Quality.
Our Services · Our Data Sources · Contact Us · Our History · Our Thinking



1 2 3    Next

● **Wright Area Action Group, Santa Rosa, CA** - Based on your past activity - Use precise location - Learn more

Help    Send feedback    Privacy    Terms



"data aggregation" - Google Search

Google    "data aggregation"

All   News   Images   Videos   Shopping   More    Settings   Tools      SafeSearch on

Jan 1, 1970 – Dec 31, 2006 ▾    All results ▾    Clear

www.schwimmerlegal.com › category › rss-and-data-ag... ▾
**RSS and Data Aggregation « Trademark Blog** ✅
Feb 2, 2006 - Useful post with many links entitled 'Copyrights, Blogs, News, Content Aggregation and RSS Feeds' by LawPundit. Filed under: RSS and **Data Aggregation**.

www.fao.org › docrep ▾
**Measuring and appraising capacity in fisheries: framework ...** ✅
Aug 27, 2005 - Measuring and appraising capacity in fisheries: framework, analytical tools and **data aggregation**. by. S. Pascoe Centre for the Economics and Management of ...

medical-dictionary.thefreedictionary.com › aggregation ▾
**Aggregation | definition of aggregation by Medical dictionary** ✅
Oct 30, 2005 - Also found in: Dictionary, Thesaurus, Legal, Financial, Encyclopedia, Wikipedia. Related to aggregation: **data aggregation**. aggregation. [ag″rĕ-ga′shun].

www.ideals.illinois.edu › handle › Gu_Yuhong ▾   PDF
**A COMPARISON OF AGGREGATION METHODS OF ...** ✅
Dec 15, 2006 - whose estimates are closer to reference **data**, aggregation does improve the quality of estimates. We also plotted box plots as functions of the group size the ...
by Y Gu - 2010 · Related articles

www.dba-oracle.com › data_warehouse › aggregating_... ▾
**Aggregating Data for the Oracle Data Warehouse** ✅
Jan 1, 1997 - Aggregating Data for the Oracle Data Warehouse, **Data Aggregation** And Drill-Down, Aggregation, Roll-Ups, And STAR Schemas.

i11www.iti.kit.edu › literatur › directed-diffusion-greedy ▾   PDF
**Impact of Network Density on Data Aggregation in Wireless ...** ✅
Nov 4, 2001 - In-network **data aggregation** is essential for wireless sensor networks where resources (e.g., bandwidth, en- ergy) are limited. In a previously proposed data ...
by C Intanagonwiwat - 2001 · Cited by 962 · Related articles

www.cs.uic.edu › ~rsharda › integrated ▾   PPT
**1.The Impact Of Data Aggregation in Wireless ... - UIC CS** ✅
Apr 19, 2006 - Address-centric routing. Routing based on an end-to-end manner. The Impact Of **Data Aggregation** On Wireless Sensor Networks. Sensor Network Models:.

graphics.stanford.edu › courses › Papers › Suri_sensys04 ▾   PDF
**New Aggregation Techniques for Sensor Networks - Stanford ...** ✅
Jan 15, 2000 - The existing **data aggregation** techniques, however, are lim- ited to relatively simple types of queries such as SUM, COUNT,. AVG, and MIN/MAX. In this paper we ...
by N Shrivastava - 2004 · Cited by 610 · Related articles

amity.edu › icactm › Proceeding ▾   PDF
**Energy Efficient Data Aggregation in Clustered WSN - Amity ...** ✅
Oct 15, 2002 - an energy efficient **data aggregation** scheme for clustered wireless sensor network (EEDAC-WSN). It reduces intra- cluster communications by allowing cluster ...
by NR Roy · Cited by 1 · Related articles

www.inrialpes.fr › splash › PDF › mobiquitous05 ▾   PDF
**Efficient Aggregation of encrypted data in Wireless Sensor ...** ✅
May 13, 2005 - "CDA: Concealed **Data Aggregation** in Wireless Sensor Net- works," ACM WiSe, 2004. [12] Chris Karlof and Naveen Sastry and David Wagner, "Tiny-. Sec: a link ...
by C Castelluccia · Cited by 669 · Related articles

www.builtinchicago.org › company › valence-health ▾
**Valence Health Chicago | Built In Chicago** ✅
Jan 1, 1996 - Recognized as a market leader in the area of clinical integration, Valence Health offers unique solutions that combine **data aggregation** and sophisticated data ...

data aggregation - Google Search

www.mdpi.com › htm ▾

**A Privacy-Preserving Noise Addition Data Aggregation ...** ✅

Feb 13, 2006 - To solve these problems, a privacy-preserving **data aggregation** scheme for the smart grid is proposed, which enables smart meters to report their consumption ...

by Y Chen - 2018 · Cited by 2 · Related articles

www.google.com.pg › patents ▾

**US7953842B2 - Open network-based data acquisition ...** ✅

Sep 30, 2006 - Additionally, the **data aggregation** unit 206 may, for example, reduce a plurality of identical device alarms, each of which may have been received in connection ...

people.eecs.berkeley.edu › papers › sia-hierachical ▾   PDF

**Secure Hierarchical In-Network Aggregation in Sensor Networks** ✅

Sep 19, 2006 - in-network **data aggregation**. Our algorithm is guaranteed to detect any manipulation of the aggregate by the adversary beyond what is achievable through direct ...

by H Chan - 2006 · Cited by 445 · Related articles

tools.ietf.org › html › rfc4498 ▾

**RFC 4498 - The Managed Object Aggregation MIB - IETF Tools** ✅

May 24, 2006 - by changing the value of an instance of aggrMOInstance or tAggrCtlMOInstance, the **data aggregation** operation may be subverted. This may result in wrong ...

www.iconics-uk.com › productbrochure › DataWorX32 ▾   PDF

**OPC Data Aggregation, Bridging, Redundancy ... - Iconics UK** ✅

Oct 30, 2006 - OPC **Data Aggregation**, Bridging, Redundancy & Tunneling. "The most complete OPC product for. OPC Data Bridging, Aggregation,. Redundancy, and OPC ...

www.dyninst.org › mrnet ▾

**MRNet | Putting the Performance in High Performance ...** ✅

Nov 8, 2003 - Scalable, Flexible **Data Aggregation**: MRNet's built-in filters provide efficient computation of averages, sums, concatenation, and other common data reductions.

www.hipaasurvivalguide.com › hipaa-regulations ▾

**Definitions under the HIPAA Privacy Rule** ✅

Feb 1, 2001 - HIPAA Privacy Rule Definitions: **Data aggregation**,De signated record set, Health care operations, Health oversight agency, Marketing, Research and Treatment.

www.americanbanker.com › creditunions › news › acti... ▾

**Action Is Next Step In Data Aggregation - American Banker** ✅

Dec 1, 2000 - NEW ORLEANS (12/01/00) -- Now that credit unionsand banks are working to aggregate their customer information in asingle location the next step is to ...

publib.boulder.ibm.com › HTML › TMTPmst228 ▾

**Endpoint-to-database data uploads - IBM** ✅

Jan 8, 2006 - You can force the **data aggregation** and immediate upload to the gateway and then to the database at any time. To do so, you use the command wmarsendata.

stats.oecd.org › glossary › detail ▾

**Data set Definition - OECD Glossary of Statistical Terms** ✅

Sep 25, 2001 - ... any permanently stored collection of information usually containing either case level **data**, aggregation of case level data, or statistical manipulations of either ...

www.ics.uci.edu › ~gts › paps ▾   PDF

**Authentication of Outsourced Databases using Signature ...** ✅

Feb 12, 2006 - **data aggregation** (exemplified by aggregation, such as SUM or AVER-. AGE) which usually return a single value as the answer to the posed query.

by M Narasimha · Cited by 197 · Related articles

worldclim.org › data › formats ▾

**Data format — WorldClim 1 documentation** ✅

Oct 14, 2004 - Only if all original cells have 'no data' then the aggregate cell has 'no **data**'. Aggregation was done for monthly precipitation, minimum, mean and maximum ...

www.gesmer.com › news › scrapers-robots-and-spiders... ▾

**Scrapers, Robots and Spiders: The Battle Over Internet Data ...** ✅

Jun 1, 2003 - Examples of **data aggregation** range from sites that collect pieces on retail sites to companies that aggregate personal financial data on mutual fund and banking ...

www.acsu.buffalo.edu › ~batta › Papersprof › Analysis... ▾   PDF

**Analysis of centroid aggregation for the Euclidean distance p ...** ✅

Nov 1, 1997 - Demand **data aggregation** results in loss of information and thereby induces errors in the locational decision being made, both in the facility location ...

by P Zhao - 1999 · Cited by 28 · Related articles

---

go.gale.com › i.do

**Network structure based data aggregation techniques ... - Gale** ✅

Aug 27, 2006 - **Data aggregation** is very crucial and important technique in wireless sensor networks. With the help of **data aggregation** we reduce the energy consumption by ...

by PT Suriya - 2016 · Related articles

---

www.linkedin.com › pedrobcoelho

**Pedro B. Coelho - Software Engineer - Data Aggregation - API ...** ✅

Feb 1, 2001 - Software Developer - **Data Aggregation** - API Team at eMoney Advisor. eMoney AdvisorDrexel University. Philadelphia, Pennsylvania500+ connections.

Philadelphia, Pennsylvania · Software Engineer - Data Aggregation - API Team - eMoney Advisor

---

ranger.uta.edu › ~yonghe › pubs › Adaptive_Routing ▾   PDF

**Adaptive Data Fusion for Energy Efficient Routing in ... - UTA** ✅

Aug 15, 2005 - Indeed, the cost for **data aggregation** may not be negligible for certain applications. For example, sensor networks monitoring field temperature may use simple ...

by H Luo · Cited by 165 · Related articles

---

www.businesswire.com › news › home › Albridge-Ann... ▾

**Albridge Announces Agreement to Provide Pacific Select ...** ✅

Jul 11, 2006 - The Albridge **Data Aggregation** service combines CashEdge's AllData solution with the on- demand reporting capabilities of Albridge Wealth Reporting(TM).

---

library.ahima.org › doc ▾

**Coordination of SNOMED-CT and ICD-10: Getting the Most ...** ✅

May 25, 2005 - They are typically used for external reporting purposes or other uses where **data aggregation** is advantageous, such as measuring the quality of care, ...

by SE Bowman - 2005 · Cited by 76 · Related articles

---

www.nrcs.usda.gov › portal › nrcs › detail › soils › use ▾

**Global Soil Regions Map | NRCS Soils** ✅

Feb 1, 2001 - **Data Aggregation** and Reliability: Conversion of the FAO Soil Map of the World to Soil Taxonomy requiring assigning a Suborder to every combination of FAO ...

---

academic.oup.com › aje › article

**Bias due to Aggregation of Individual Covariates in the Cox ...** ✅

Oct 1, 2004 - In general, careful manipulation of available data and efficient use of additional information may often help reduce biases induced by **data aggregation**.

by M Abrahamowicz - 2004 · Cited by 31 · Related articles

---

ijamtes.org › gallery ▾   PDF

**Study Of Aggregation Techniques In WSN** ✅

Sep 12, 2006 - In **data aggregation** techniques, all nodes sense the environment and then send their sensed values(SV) to the most powerful node in their neighborhood called ...

---

www.win.tue.nl › spor

**Latency Constrained Aggregation in Sensor Networks \*** ✅

Sep 1, 2006 - **Data aggregation** is a possible way to save energy consumption: nodes may delay data in order to aggregate them into a single packet before forwarding them ...

by L Becchetti · Cited by 31 · Related articles

---

trid.trb.org › view ▾

**ITS DATA ARCHIVING: CASE STUDY ANALYSES OF SAN ...** ✅

Sep 15, 2000 - The case study analyses of TransGuide (registered trademark) data were focused on **data aggregation** and data quality (i.e., data errors, missing data, and data ...

by SM Turner - 1999 · Cited by 55 · Related articles

---

www.dhs.gov › privacy › privacy_pia_usvisit_ident_final ▾   PDF

**IDENT - Homeland Security** ✅

Jul 31, 2006 - With regard to the concern over **data aggregation** itself, DHS limits the use and access of all data in IDENT to the purposes for which it was collected. Section 2.0.

data aggregation - Google Search

www.google.bs › patents ▾

**US5809172A - Non-linear aggregation mapping compression ...** ✓

Apr 28, 2005 - Further objects and advantages of the present **data aggregation** decimation method and the non-linear series of aggregation segments will become apparent ...

doi.pangaea.de › PANGAEA.783598 ▾

**Bernard, J et al. (2012): Reference list of 120 datasets from ...** ✓

Sep 1, 1992 - We use visual **data aggregation** metaphors based on grouping of similar data elements to scale with multivariate time series. Aggregation procedures can either ...

www.msa.com › Our Businesses ▾

**Metals - Management Science Associates, Inc.** ✓

Apr 10, 2006 - Our Raw Material **Data Aggregation** Service™ (RMDAS™) gives you a real competitive advantage by providing a reliable source of accurate ferrous scrap ...

www2.ku.edu › ~kuwpaper ▾   PDF

**Divisia Monetary Index** ✓

Apr 18, 2006 - Without coherence between **data aggregation** formulas and the models within which aggregates are embedded, stable structure can appear to be unstable.

by WA Barnett - 2006 · Related articles

guide.munin-monitoring.org › latest › graph › aggregate ▾

**Graph aggregation by example — Munin 2.999.10-detached ...** ✓

Jun 9, 2006 - ... plugin to graph distribution by percentages · multiple master **data aggregation** · Examples for ssh transport · service examples · Examples from Munin Wiki.

www.epa.gov › conference › session3 › johnson_pres ▾   PDF

**Corporate GHG Emission Inventory Lessons Learned - EPA** ✓

May 6, 2005 - **data aggregation** (facility→BU→Corporate). • Automation of data flow. • Ensures accuracy. – Maintains reporting flexibility. – Allows higher level review and ...

spectraleads.com › data-cleansing-scrubbing ▾

**Data Cleansing and Scrubbing Service | Data Validation and ...** ✓

Dec 8, 2004 - **Data aggregation**, organization, and cleansing; Enrichment of data with product attributes, images, and manufacturer specifications; De-duplication: eliminate ...

www.economicgeography.org › ~rpontius › pontius_m... ▾   PDF

**LNCS 3234 - Effect of Category Aggregation on Map ...** ⦸

Dec 11, 2004 - **data aggregation** has examined primarily the effects of modifying the unit of observation (i.e., the modifiable areal unit problem and the ecological inference.

by RG Pontius Jr · Cited by 78 · Related articles

gawron.sdsu.edu › intro_lecture_files › fastpython ▾

**Python Performance Tips** ✓

Mar 26, 2004 - **Data Aggregation**. Function call overhead in Python is relatively high, especially compared with the execution speed of a builtin function. This strongly suggests ...

help.sap.com › doc › en-US ▾

**RIS Information Structures - SAP Documentation** ✓

Feb 1, 2001 - The lowest **data aggregation** level is the merchandise category. The information structures for the article provide more detailed data. S082 Purchasing.

www.ercot.org › mktinfo ▾

**Market Information - Electric Reliability Council of Texas** ✓

Dec 2, 2005 - Locate **data aggregation** daily postings that include UFE reporting; consumption data loading; and TDSP distribution and transmission loss factors. Also find ...

birtworld.blogspot.com › 2006/09 › optimistic-sums ▾

**Optimistic Sums - BIRT World** ✓

Sep 26, 2006 - **data.aggregation** extension point. This post will walk you through the process of using the aggregation extension point to create your own OptimisticSum function ...

ssl.lu.usi.ch › entityws › Allegati › pdf_pub5544 ▾   PDF

**Visualizing Learner Models through data aggregation: a ... - USI** ✓

Nov 19, 2004 - Visualizing Learner Models through **data aggregation**: a test case. Luca Mazzola, Riccardo Mazza. Abstract: The needs of tools able to effectively support the ...

by L Mazzola · Cited by 14 · Related articles

www.google.vu › patents ▾

### US20060136349A1 - System and method for statistical ... ✅

Jul 25, 2006 - ... their use/non-use of outlier data for aggregation, and can compromise the usefulness of **data aggregation**. SUMMARY; [0005]. In accordance with a first aspect ...

Ad · bootcamp.berkeley.edu/classes/data-analytics ▾

### Learn Data Analytics - UC Berkeley

Learn Excel, Python, JavaScript, SQL, Machine Learning and more. Speak with admissions today to become a Big Data analyst — all applicants welcome. Continuing education. No application fee. Hands-on training. Career services. Courses: Excel, SQL, JavaScript.

Ad · www.retailtaxonomy.com/ ▾

### Product Data Aggregation - Fix Incomplete Product Data

Our experts research product information at the manufacturer level for proper aggregation. Fill in all the gaps for your shoppers so they can properly compare and purchase products. See Our Client List. Get a Quick Quote Today.

Data Cleansing · Data Aggregation · Request A Quote · Product Data Migration

Ad · www.yodlee.com/ ▾

### Account Aggregation Platform - Built for FinTech Developers

Access to over 22,000 global data sources in financial services. Sign up for an account today. Start Now. Types: Assets, Account Information, Holdings, Investments.

‹  ›

Previous    1   2   3    Next

⦿ **Wright Area Action Group, Santa Rosa, CA** - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms



Google

"data aggregation"

All | News | Images | Videos | Shopping | More | Settings | Tools | SafeSearch on

Jan 1, 1970 – Dec 31, 2006 ▾ All results ▾ Clear

go.imohealth.com › CT-NA-200506-Open-source-term...
IMO releases open source terminology and value set data ...
Jul 1, 2005 - In addition, it enables **data aggregation** and normalization across your enterprise which can then be summarized and shared with other collaborators.
You've visited this page 2 times. Last visit: 9/15/20

www.paradyn.org › mrnet
MRNet - Multicast Reduction Network - Paradyn
Mar 15, 2006 - **Data aggregation** and message multicast takes place within the context of a data stream, and multiple operations (both upward and downward) can be active ...

www.jcreview.com › ...
EFFICIENT SWARM OPTIMIZED DATA AGGREGATION OF ...
Jul 14, 2004 - doi: 10.31838/jcr.07.14.04. EFFICIENT SWARM OPTIMIZED **DATA AGGREGATION** OF IOT DEVICES AND ITS APPLICATION IN AGRICULTURE C. Sathish, K.
by C Sathish - 2020

pubsonline.informs.org › doi › pdf › mksc.14.3.g141
Generalizing What Is Known About Temporal Aggregation and ...
Jan 6, 2006 - is of brief duration-typically between six and nine months. (Advertising; Advertising Duration/Carryover; Regression-**data Aggregation**). ONEPAL munum. A.
by RP Leone - 1995 - Cited by 273 - Related articles

www.cnri.reston.va.us › xiwt_archive › IPERF-paper2 PDF
Internet Service Performance: Data Analysis and Visualization
Jul 15, 2000 - It provides insight into **data aggregation** approaches and suggests techniques that may be adapted to the specific needs of network operators. Furthermore, for ...

www.caida.org › internetatlas › gallery › nsfnet › data
Internet Atlas Gallery - Caida
Feb 1, 2002 - **Data Aggregation**: (Aggregate1): Networks that exist in the same city and report to the same backbone node are aggregated into a single colored line. During ...

carlstrom.com › mirror › pub › summaries › database
Datacube - Brian D. Carlstrom
Feb 1, 2001 - How do you efficiently compute this power set (which is really the data cube)? (If **data aggregation** function has special properties, e.g. is Distributive, Algebraic, ...

www.aclu.org › other › faq-choicepoint
FAQ on ChoicePoint | American Civil Liberties Union
Feb 15, 2005 - That is precisely what **data aggregation** companies seek to do, and why they therefore represent one of the greatest existing threats to Americans' privacy.

www.federalreserve.gov › supmanual › cch › cra_sg PDF
Sampling and Resubmission of CRA Data - Federal Reserve
Aug 15, 2001 - of the CRA **data aggregation** for those banks that do not use the FFIEC data entry software for editing and reporting small business and small farm loan data.

www.nyu.edu › g22.3033-002_su02 › slides › session11 PDF
XML for Java Developers G22.3033-002 - NYU
Jul 31, 2001 - Legacy Technology. T+1 Issues. • High Latency Batch Processes. • Client Connectivity. STP and T+1 Issues. • Multiple Technologies. • Global **Data Aggregation**.

www.fhwa.dot.gov › ohim › tvtw › natmec PDF
Development of an ITS Data Management System - FHWA
May 15, 1998 - **Data Aggregation** and Summarization. As described earlier in discussions related to data storage, the loop detector data are stored in the ITS. DataLink system ...
by RE Brydia - 1998 - Cited by 8 - Related articles

www.google.com.na › patents

### EP1131744B1 - Method and apparatus for selecting ... ✅

Apr 7, 2005 - 5822751 which describes implementation of a multidimensional **data aggregation** operator; and US patent no. 5713020 which describes multiple-level ...

asc.di.fct.unl.pt › ~jleitao › pdf › MiRAge  ▾  PDF

### Practical Continuous Aggregation in Wireless Edge ... - ASC ✅

Dec 15, 2002 - Baquero, and P. S. Almeida, "A survey of distributed **data aggregation** algorithms," IEEE. Communications Surveys Tutorials, vol. 17, no. 1, pp. 381–404, 1 2015. [ ...

by PA Costa · Cited by 4 · Related articles

scholar.google.com › citations  ▾

### Yannis Kotidis - Google Scholar ✅

Dec 15, 2001 - Hierarchical in-network **data aggregation** with quality guarantees. A Deligiannakis, Y Kotidis, N Roussopoulos. International Conference on Extending Database ...

iowiki.com › python_data_science  ▾  Translate this page

### Python Data Aggregation_学习Python数据科学|WIKI教程 ✅

Jan 1, 2000 - Python Data Aggregation. Scan me! Python有几种方法用于对数据进行聚合。它是使用pandas和numpy库完成的。数据必须可用或转换为数据帧以应用聚合 ...

trl.co.uk › reports  ▾

### ASTRID: Automatic SCOOT Traffic Information Database | TRL ✅

Jan 1, 1990 - ... minimum size (eg removal of repeated data descriptors) and **data aggregation** to its user-defined aggregation level. Regional data is scanned for missing data ...

www.enea.com ›

### Enea - Cloud-Native Software for Telecoms ✅

Mar 15, 2006 - Enea Unified Data Manager · Enea Stratum Cloud Data Manager · Enea Digital Identity · Enea **Data Aggregation** · Enea Equipment Identity Register.

www.lodginglogistics.com ▾

### Lodging Logistics > Home ✅

Apr 8, 2006 - ... hotel travel footprint from multiple data streams; Intelligent data-matching algorithms generate highest possible accuracy; Proven **data aggregation** processes

www.stylusstudio.com › ... › XQuery White Papers ▾

### XQuery Tutorial - Stylus Studio ✅

Oct 16, 2003 - Figure 1: Using XML for **data aggregation** and reporting. There are two XML inputs in this example: the relational database (RDBMS) and the Web service.

www.python.org › about › success › forecastwatch ▾

### ForecastWatch.com - Python Success Stories | Python.org ✅

Aug 3, 2004 - ... process for acquiring forecasts, an input process for acquiring measured climatological data, the **data aggregation** engine, and the web application framework.

sites.google.com › Home › sv—divers › cours-dwh-oracle

### 4 Hardware and I/O Considerations in Data ... - Google Sites ✅

Feb 1, 2002 - A hierarchy can be used to define **data aggregation**. For example, in a time dimension, a hierarchy might aggregate data from the month level to the quarter level ...

www.fgdc.gov › standards › projects › csdgm_rs_ex ▾  PDF

### Extensions for Remote Sensing Metadata - Federal ... ✅

Jan 15, 2002 - **Data Aggregation** Terminology. The FGDC Metadata Content Standard provides "a hierarchy of data elements and compound elements that define the ...

by TV Authority · 2002 · Cited by 1

www.sas.com › documents › third-party-whitepapers ▾  PDF

### Data Analytics at the Edge - SAS ✅

Nov 4, 2005 - Data modeling. Data synchronization among datacenters and the network edge/perimeter. Data filtering. **Data aggregation** from multiple sources. Data analysis.

www.ece.ubc.ca › ~vincentw › LWcGC06 ▾  PDF

### Frame Aggregation and Optimal Frame Size ... - UBC ECE ✅

May 15, 2005 - and reverse **data aggregation** are set to 1, respectively. The number of stations is varied from 5 to 30. The simulation results validate the accuracy of the ...

by Y Lin · Cited by 270 · Related articles

codes.findlaw.com › title-16-health › in-code-sect-16-3... ▾

### Indiana Code Title 16. Health § 16-39-5-3 | FindLaw ✓

Feb 1, 2001 - (b) As used in this section, "**data aggregation**" means a combination of information obtained from the health records of a provider with information obtained from ...

personaltrainerimini.it › azap › crsp-data-in-r ▾

### Crsp Data In R ⦿

Jun 29, 2001 - ... handling missing data, working with dates, statistical analysis concepts, **data aggregation**, statistical functions, and R traditional graphics. CRSP has created a ...

tufo.powerizer.xyz › ais-data-providers ▾

### Ais data providers ⦿

May 30, 2002 - ... **data aggregation** companies factor in. The main goal of AISHub. AIS supports the tracking and monitoring of sustainable preservation and fishing activities.

www.cmap.illinois.gov › documents › CATMUG-Zhan... ▾   PDF

### Census Data Available at CMAP - Illinois.gov ✓

Jun 12, 2006 - Other value added services: Data transformation. (DBF files and GIS files). **Data aggregation** (Chicago Community Area (CCA) data). Internal customized report.

**Ad** · www.ge.com/ ▾

### Proficy Operations Hub from GE - Centralized Visualization

Visualization Across HMI/SCADA, Manufacturing & Data Historian. Get the Infographic. Aggregate & Visualize Contextual & Situational Information for Industrial Applications. Centralized Environment. Request Demo. Highlights: Experts Available, Demo Available.

★★★★⯪ Rating for ge.com: 4.5 - 418 reviews

Grid Analytics · Services Offered · Product Listing · Transmission Solutions

*In order to show you the most relevant results, we have omitted some entries very similar to the 128 already displayed.*
*If you like, you can repeat the search with the omitted results included.*

‹   

Previous    1   2   **3**

⦿ **Wright Area Action Group, Santa Rosa, CA** - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms